**`06  006`**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

FILED
BROOKLYN OFFICE

**BLOCK, J**

MARIA GRANCIO, individually, and )
in her capacity as Executrix and Personal )
Representative of the Estate of Nicholas P. )
Grancio, )
        )
        Plaintiff, )
        )
v. )
        )
R. LINDLEY DeVECCHIO; )
        )
CHRISTOPHER FAVO. )
        )
        Defendants. )
        )

CIVIL ACTION
NO.

**JURY TRIAL DEMANDED**

**POLLAK, M.J.**

## COMPLAINT

### Introduction

1. This action for money damages is brought pursuant to the Fourth, Fifth, and Eighth

Amendments to the United States Constitution and under the common law of the State of New

York.  Jurisdiction is based upon 28 U.S.C. §§ 1331, 1343, and on the supplemental jurisdiction

of the court under 28 U.S.C. § 1367(a) for claims arising under state law.  This is a case about the

corrupt and unlawful relationship between law enforcement and a ruthless killer and career

criminal that went unchecked for many years and that led to the cold blooded murder of a man.

It also is about a culture that met such corruption with coverup and virtual license for many

years, allowing this crime, these wrongdoers, and others to escape justice, while others have gone

to prison on false testimony and through the concealment of material exculpatory evidence.

2. Plaintiff alleges, *inter alia*, that the federal officials sued herein conspired with each other and

with other individuals to bring about the wrongful death of Nicholas P. Grancio on or about

January 7, 1992, in Brooklyn, New York.

**Parties**

3. Nicholas P. Grancio, now deceased, was at all times material to this complaint an adult resident citizen of Kings County, New York. His wife, the Executrix of his Estate and his personal representative, Maria P. Grancio, is an adult resident citizen of Kings County, New York.

4. Defendant R. Lindley Devecchio (hereinafter "DEVECCHIO") is, upon information and belief, an adult resident citizen of Sarasota County, Florida and Defendant Christopher Favo (hereinafter "FAVO") is, upon information and belief, an adult resident citizen of St. Joseph County, Indiana. Both Defendants were at all times material to this complaint special agents of the Federal Bureau of Investigation (hereinafter "FBI") and acted in the scope of their employment as agents or employees of the FBI and the United States Department of Justice. They are sued in their individual capacities. FAVO remains an FBI Special Agent.

**Facts**

5. In the early afternoon of January 7, 1992, Nicholas P. Grancio (hereinafter "Grancio") was sitting in a car near where Avenue U, McDonald Avenue, and Village road converge in Brooklyn, New York.

6. Grancio was talking with his nephew, Joey Tolino, who was on the passenger side.

7. While Tolino and his uncle talked, they were being watched.

8. New York Police Department Detective Sergeant Joseph Simone and his partner, members of a task force working jointly with agents of the FBI to monitor suspected organized crime members and their activities, were watching Grancio as part of their surveillance duties for the day, just as they had done in the past. Their task force suspected that Grancio was a member of a the "Colombo" family organized crime group and that was the group this task force was assigned to monitor.

9. What Detective Simone and his partner did not know was that they were not alone in watching Grancio that day; indeed they themselves were being watched as well,

10. At the very time Simone and his partner had Grancio under surveillance, a group of three

2

men, Gregory Scarpa, Sr. ("Scarpa"), Larry Mazza ("Mazza"), and Jimmy Delmasto ("Delmasto") were riding around the streets looking for Grancio, intent on killing him once they found him.

11. Scarpa, Mazza, and Delmasto saw Grancio in his car; but they also saw Detective Simone and his partner in their surveillance position and recognized that they were law enforcement officers maintaining surveillance on Grancio. They knew that they could not kill Grancio while he was under surveillance.

12. Scarpa, Mazza, and Delmasto were all members of the organized crime group known to law enforcement as the "Colombo family." Scarpa was a leader of that organized crime group and was known and feared widely, as a ruthless killer and career criminal.

13. Scarpa told Mazza that he would be able to get the surveillance removed by calling his contact in law enforcement. Scarpa referred to his contact in law enforcement by the pseudonyms or nicknames "Dello" or his "Girlfriend." Both were pseudonyms or nicknames for Defendant DEVECCHIO and both were how Scarpa regularly referred to DEVECCHIO.

14. Scarpa called DEVECCHIO and told DEVECCHIO that he had found Grancio, but that he also saw law enforcement in place maintaining surveillance of Grancio.

15. DEVECCHIO advised Scarpa that he would take care of removing the surveillance from Grancio.

16. DEVECCHIO knew or reasonably should have known or suspected at that time that Scarpa wanted the surveillance pulled off of Grancio so that he (Scarpa) and the others could murder Grancio.

17. At DEVECCHIO's direction, FAVO, who worked closely with DEVECCHIO on the joint federal and state task force, telephoned Detective Simone and directed him to end the surveillance that he and his partner were conducting of Grancio.

18. FAVO directed Simone and his partner to return to the FBI New York field office headquarters for a meeting.

19. Simone found this direction most unusual; but he was required to follow the directive and he

3

and his partner pulled off their surveillance of Grancio and began to return to the FBI New York field office.

20. Minutes later, after seeing the surveillance team leave, following his phone call to DEVECCHIO for the purpose of accomplishing the same, Scarpa, with Mazza and Delmasto, drove up to Grancio's car and shot and killed Nicholas Grancio, spraying Grancio's blood and brain matter across the car and onto Joey Tolino.

21. Since the murder of Nicholas Grancio, DEVECCHIO and FAVO and others have lied about the matter in various settings, have misled on this subject and other incidents of gross misconduct repeatedly, and have taken other steps to conceal the true facts of the Grancio murder. The lying and coverup continue today.

22. The true facts of Nicholas Grancio's murder and the involvement of these Defendants and others in it have been and continue to be actively and fraudulently concealed by these Defendants and others and the same could not have been discovered earlier through reasonable diligence.

23. The first time Maria Grancio or any member of her family had even any remote idea that these Defendants or any government agent could have been involved in the death of Nicholas Grancio was late in 2004 when an investigator whom she did not know introduced himself to her and asked to speak with her. At that meeting, Mrs. Grancio learned for the first time that there was a suspicion that these Defendants were directly involved in her husband's murder.

24. As was the case before the Grancio murder, afterwards, Scarpa continued to operate in his close relationship with the Defendants and they continued to give him license and to assist him in his commission of various other crimes.

25. Gregory Scarpa, Sr., widely reputed to hold a major leadership position in the Colombo organized crime family and known on the street as a ruthless and feared killer, was a paid informant for the government since the 1960's.

26. His relationship with the government was actively fraudulently concealed by the defendants and others in the government consistently and, at all times, notwithstanding legal obligations to end the relationship and to disclose it.

27. In 1980, DEVECCHIO became Scarpa's "handler" at the FBI and he managed his informant status, had him paid for his work, and took responsibility for him.

28. DEVECCHIO's relationship with Scarpa went far beyond the relationship between law enforcement handler and informant that lawfully is permitted.

29. From in or about 1980 through at least 1992, DEVECCHIO and others employed by the government knowingly allowed, protected, encouraged and facilitated Scarpa's commissions of a broad range of crimes, including, but not limited to fraud, robbery, loansharking, and murder on an ongoing and repeated basis.

30. Scarpa was paid for his work for the FBI and Scarpa, in turn, paid DEVECCHIO in a variety of forms, for their relationship and for all that DEVECCHIO allowed and helped him to do.

31. Ironically, Scarpa was paid for providing information to DEVECCHIO that someone else had killed Grancio, notwithstanding the fact that by the time he provided such information and was paid for it, DEVECCHIO, FAVO, and others already knew that Scarpa had killed Grancio.

32. FAVO was aware of the illicit, illegal, and corrupt relationship between Scarpa and DEVECCHIO and aided them in accomplishing their illegal purposes or deliberately turned a blind eye to the same.

33. To the extent FAVO was not aware of all details of the relationship between Scarpa and DEVECCHIO, he reasonably should have been, and he had a lawful duty to act to stop that relationship and the crimes it facilitated; yet he did nothing to act on his knowledge and suspicions until it was too late and many crimes had been committed through the relationship, including several murders.

34. While FAVO did eventually come forward and report some of what he knew and suspected, he has continued to engage in a campaign of falsehood and misleading intended to coverup all of the true facts regarding his conduct, DEVECCHIO's conduct, and the conduct of other FBI agents with whom FAVO has worked.

35. As a proximate result of such coverup by FAVO and others, many of the true facts surrounding their unlawful conduct and the unlawful conduct of others still are not known.

5

36. Nicholas Grancio's death was a direct and proximate result of the acts and omissions of the Defendants as alleged in this Complaint and such actions as caused his death, as more specifically described herein, were taken in violation of his clearly established constitutional rights.

37. These Defendants conspired with each other and with others and aided and abetted others to cause the death of Nicholas Grancio.

38. Defendants acted at all times with respect to the allegations in this Complaint in a manner that was wilful, reckless, wanton, grossly negligent, negligent, and in a way which was deliberately indifferent to the constitutional rights of Nicholas Grancio.

39. Due to his criminal record and criminal activities, including multiple murders, his unreliability, his mendacity, his lack of credibility, the danger he posed to public safety, and his intentions to continue to break the law, all of which were known to DEVECCHIO and FAVO and other law enforcement officers and government officials, Scarpa was not qualified, suitable or appropriate to serve either as a cooperating witness or as an informant for the FBI.

40. DEVECCHIO, FAVO, and the other FBI agents, and their superiors, including, but not limited to their immediate supervisors in the field office and superiors at FBI headquarters, and other federal government officials, failed to follow proper procedures and guidelines regarding the selection, use, payment, and supervision of, reporting on, monitoring, restricting criminal activity of, and other interaction and involvement with cooperating witnesses and informants, with respect to the selection and employment of Scarpa and others.

41. Prior to the murder of Nicholas Grancio, the defendants and others of their colleagues in law enforcement knew or reasonably should have known that Scarpa and the others intended to kill Grancio and that Scarpa sought to find him and have the surveillance removed from him for that purpose. This reflected a pattern of conduct by Scarpa and DEVECCHIO and others helped facilitate such conduct and assisted him in finding his murder targets, knowing his agenda.

42. As part of the coverup of their illegal conduct, Defendants indicated in official records that on or about January 14, 1992, Scarpa had reported that a person named "Fusco" had killed

6

Grancio and Defendants arranged to have the government pay Scarpa for that information, knowing that is was false and intending to document the false information to coverup the true facts and their involvement in the matter.

43. Throughout the period of time the FBI used Scarpa as an informant and afterwards, Defendants and others falsified reports and other documents, testified falsely, omitted facts from testimony they had a lawful duty to disclose, and otherwise acted improperly and unlawfully for the purposes of covering up the corrupt and unlawful relationship with and use of Scarpa and to conceal the same and their own misconduct and the misconduct of others and to secure convictions against defendants in criminal cases in the Eastern District of New York, knowing that their testimony and documents they produced in those cases were false, misleading, or omitted material facts.

44. In the 1980s and early 1990s, there were several killings among people whom the government contended were members of the Colombo organized crime family, leading the government to a theory it put forward in its prosecutions, that there was an internal "war" between what the government termed the "Orena" and "Persico" factions.

45. Scarpa, purportedly was a leader of the "Persico" faction and his intended victims, on most occasions, were purportedly members of the "Orena" faction.

46. DEVECCHIO became, in effect, a member of the "Persico" faction and assisted Scarpa in fomenting the "war" and in seeking to advance Scarpa's agenda through murder and other illegal conduct.

47. Nicholas Grancio's murder was but one illegal act in Scarpa's criminal campaign, in which DEVECCHIO was a partner, supporter, booster, advocate, sponsor, supervisor, promoter, facilitator, and aid. Actions in this connection by DEVECCHIO included, but were not limited to, the following:

A. Passing to Scarpa confidential information that was the product of law enforcement intelligence, including wiretap surveillance details, addresses of Scarpa's enemies, and other confidential information, to allow Scarpa and his family and friends to avoid detection or arrest

for their criminal activity or to allow Scarpa to engage in criminal activity, including murders;

B. On at least one occasion, Devecchio and Scarpa met in chambers with a federal judge in the Eastern District of New York and during that meeting, with a criminal case against Scarpa pending before that judge, in an effort to get leniency for Scarpa, Devecchio advised that judge of Scarpa's informant status and his medical condition. Even after that meeting, Scarpa's informant status was concealed from other criminal defendants for whom its disclosure would have been relevant in their defense. Even after this meeting in the judge's chambers, Devecchio was permitted to testify falsely in a criminal trial in the Eastern District, denying under oath that he had intervened with any court to seek leniency for anyone. Devecchio perjured himself in that trial, the government knew it, and then in its closing argument expressly asking the jury to rely on DEVECCHIO's credibility. Information about Scarpa expressly was requested in that case and was withheld. The Defendant in that case requested the police investigative file in discovery and the government represented to the Court that there was nothing exculpatory in it. The Court blindly accepted that representation without further examination. In truth, the file showed several suspects in the murder investigation, none of whom was the defendant on trial and one of whom was Greg Scarpa.

C. DEVECCHIO and others gave material support and assistance to Scarpa with respect to the commission of his crimes in return for information and personal gifts;

D. Scarpa ran a campaign of murders and planned or attempted murders in the early 1990s, in addition to the murder of Nicholas Grancio and DEVECCHIO played various roles in facilitating, fostering, and in at least one case, openly cheering on the murders, delighted to see Scarpa's so-called faction "winning."

E. As a result of his relationship with DEVECCHIO, suffice it to say that Scarpa, for all practical purposes was given immunity from arrest or prosecution despite committing the most heinous of crimes, license to continue engaging in crimes, help in accomplishing his criminal goals, and protection from intervention by law enforcement in his criminal enterprises - often for Scarpa's family and friends as well.

8

48. FAVO and other FBI agents knew about much or all of these problems; yet they did nothing about reporting or putting an end to the corrupt relationship and its consequences for years, notwithstanding a clearly established legal duty to report it and to take appropriate steps to stop it and to prevent and respond appropriately to the crimes engaged in or fostered through it.

49. These Defendants and others wholly failed to supervise Scarpa as an informant and failed wholly to supervise each other and failed wholly to protect Nicholas Grancio and others from Scarpa and others, knowing the dangers that existed, all in violation of their lawfully required obligations to supervise, report, take corrective action, and protect members of the public, and to intervene when they know or suspect a serious crime is about to be committed. The danger to Nicholas Grancio was known and foreseeable to these Defendants and others, the Defendants' conduct was shocking to the conscience, Grancio was a foreseeable victim, and these Defendants created an opportunity for Grancio's death that otherwise would not have existed.

50. Had FAVO and others responded appropriately to the corrupt relationship between DEVECCHIO and Scarpa, the murder or Nicholas Grancio and other murders and crimes could and would have been prevented.

51. Even today, FAVO and other government law enforcement officials refuse to tell the truth or to reveal the complete and accurate details about DEVECCHIO's corrupt relationship with Scarpa, and what they knew or should have known when, and what they did or did not do in response. When others, including Scarpa's own son, finally have been willing to come forward with the true details about Scarpa's corrupt relationship with DEVECCHIO, the government in this District has responded invariably with a campaign designed to attack, discredit, punish, and isolate such a person. In the case of Scarpa, Jr., notwithstanding the approach taken toward him in this District, information he has provided related to national security has been used elsewhere and his credibility has been substantiated.

52. Consistent with their campaign of corruption, these Defendants and others have falsely implicated others in crimes and misconduct at times to divert attention from their own wrongdoing or the wrongdoing of their friends and at other times for other illicit agendas.

9

53. These Defendants and others often have been driven in their misconduct and their campaign of misleading, lying, withholding from disclosure that which they were obligated to disclose, and other corrupt conduct by a philosophy of the "ends justifying the means," seeing themselves as the appropriate decision makers and with their decisions divorced from what the Constitution requires. The goal has been to ensure at all costs that no conviction is overturned, with the unspoken rationalization that even if the defendant at issue did not commit the crime charged, he likely did something else illegal. Through this reasoning, details about the Scarpa/DEVECCHIO relationship have remained concealed.

54. In this, these Defendants were not alone; indeed, such a mentality appears to have been pervasive among law enforcement and even some court officials for many years, with prosecutors in this District long improperly deciding themselves to withhold from criminal defendants information about Scarpa's informant status and his corrupt relationship with DEVECCHIO and associated facts.

55. When one federal judge in the district finally had the courage to upbraid the prosecutors for their misconduct in this regard and singled out one in particular for special opprobrium, his Order was met with a letter from the United States Attorney asking him to withdraw his Order and remove reference to that prosecutor's conduct. Shockingly, the judge acceded to that unprecedented request, withdrew the Order, removed the reference, and reissued the Order without it. Tellingly, two of the prosecutors whose judgments in withholding from the court and from criminal defendants relevant information about Scarpa, DEVECCHIO, and their corrupt relationship were pointedly questioned by the Court, including the one whom the Court singled for serious and demonstrable ethical lapses appear only to have been rewarded for their work, with one now, of all ironies, serving as General Counsel to the FBI and the other a lead prosecutor in the Arthur Andersen and Enron prosecutions - both guardians of the public integrity.

56. In such a place, where discovery requests by criminal defendants invariably are met simply with the mantra "government counsel is aware of the government's obligations" rather than an

10

attention to details and consequences, where demonstrable instances of prosecutorial misconduct are met on appeal by a court that is "troubled" or "concerned" about the misconduct, but unwilling generally to impose consequences, when a court hears incredible renditions of facts from law enforcement officers or learns about misconduct and takes no punitive action, and when a criminal process is driven almost wholly by the goal of securing and upholding a criminal conviction by any means, regardless of the constitutional rights run asunder in the rush to that end, an environment which in the extreme is characterized by the corrupt relationship between informant and government handler such as that described herein and worse, is given the opportunity, if not the license, to develop.

57. As a direct and proximate cause of the wilful, wanton, intentional, reckless and/or negligent actions and omissions of the Defendants and their deliberate indifference to the life of Nicholas Grancio, the Plaintiff's decedent, Nicholas Grancio, was deprived of his liberty and his life without procedural and substantive due process of law, subjected to cruel and unusual punishment, and was forced to endure emotional and physical pain and suffering.

58. As a direct and proximate result of the wanton, wilful, intentional, reckless and/or negligent actions and omissions of the Defendants as set forth above, Plaintiff Maria Grancio has been deprived of the loss of the income, services, protection, care assistance, society, companionship, comfort, guidance, counsel and advice of the her husband.

**COUNT I**

***Bivens* Cause of Action Against Federal Agents**

59. Paragraphs 1 through 58 are incorporated herein by reference as though fully set forth.

60. The actions, conduct, and omissions of Defendants DEVECCHIO and FAVO violated the rights of the Plaintiff Maria Grancio and the Plaintiff's decedent, Nicholas Grancio under the Fourth, Fifth and Eighth Amendments to the United States Constitution.

**COUNT II**

**Conspiracy Cause of Action Under *Bivens***

61. Paragraphs 1 through 60 are incorporated herein by reference as though fully set forth.

62. The Defendants DEVECCHIO and FAVO conspired with each other and with others, to cause and allow to be caused the wrongful and unlawful death of Nicholas Grancio and to coverup the same and the corrupt use of and relationship with government informant Greg Scarpa, and with respect to the other actions and omissions complained about above.

63. The acts and omissions described in paragraphs 5 through 59 of this Complaint were taken and made in furtherance of and during the course of this conspiracy.

## COUNT III

### Common Law Conspiracy under New York Law

64. Paragraphs 1 through 63 are incorporated herein by reference as though fully set forth.

65. The Defendants DEVECCHIO and FAVO are liable to the Plaintiff and the Plaintiff's decedent for injuries and damages resulting from the fact that they combined and conspired together, and with others, to employ illegal means for an illegal purpose, namely to cause, permit, aid, and abet, the wrongful and unlawful death of Nicholas Grancio and to cover up and keep secret their wrongful acts and the wrongful acts of others.

## COUNT IV

### Common Law Intentional Infliction of Emotional Distress under New York Law

66. Paragraphs 1 through 65 are incorporated herein by reference as though fully set forth.

67. The Defendants DEVECCHIO and FAVO are liable to the Plaintiff and the Plaintiff's decedent for injuries and damages resulting from the fact that by their acts and omissions alleged herein they intentionally inflicted emotional distress upon the Plaintiff.

## COUNT V

### Wrongful Death under New York State Law

68. Paragraphs 1 through 67 are incorporated herein by reference as though fully set forth.

69. As a direct and proximate result of the aforementioned acts, omissions, and negligence of the Defendants, Plaintiff's decedent, Nicholas Grancio, was caused to die on or about January 7, 1992.

70. MARIA GRANCIO, by decree of the Surrogate's Court of Sullivan County, New York  was

duly certified and found qualified to serve as Executrix and the Personal Representative of the Estate of Nicholas Grancio and as such serves properly in such capacity and as the personal representative in this action.

71. As a direct and proximate result of the death of Nicholas Grancio, his distributes have been pecuniarily damaged and have suffered and will suffer pecuniary loss.

72. The Defendants, jointly and/or severally, are liable to the Plaintiff and the Plaintiff's decedent for the occurrence and damages aforesaid.

73. This cause of action arises from decedent, Nicholas Grancio's wrongful death and is exempt from any statutory modification of joint and several liability.

74. Decedent, Nicholas Grancio, left surviving as those entitled to share in his Estate, his wife and children who had and will continue to be deprived of his company, friendship, guidance, maintenance, society, loss of enjoyment of life, support and services; who suffered great pecuniary damage and who expended money for funeral and administrative expenses as a direct result of his death, all to their personal damage and to the damage of MARIA GRANCIO, individually and as representative of any dependents and next of kin of the Estate of Nicholas Grancio, which are compensable under the New York State E.P.T.L., including Sections 5-4.1 and 5-4.3 thereof.

75. As a consequence of the Defendants' actions and omissions as described herein, Nicholas Grancio and the others identified above suffered severe and permanent injuries, including conscious pain and suffering, severe emotional distress, and wrongful death, as more specifically described above and as will be proven, and thereby sustained damages for which they seek compensation here.

76. Such actions and omissions by Defendants also require damages sufficient to punish the Defendants for their actions and omissions and to deter them from engaging in or failing to engage in the future in such conduct as gave rise to such injuries and wrongful death and as gives rise to these claims.

**WHEREFORE,** plaintiff requests this Court:

1. Award compensatory damages to Plaintiff against the Defendants, jointly and severally;

2. Award punitive damages to Plaintiff against Defendants, jointly and severally, in an amount sufficient to punish Defendants for their actions and omissions and to deter them from engaging in or failing to engage in the future in such conduct as gave rise to such injuries and wrongful death and as gives rise to these claims;

3. Award costs and attorney's fees to Plaintiff;

4. Award such other and further relief as this court may deem appropriate.


**THE PLAINTIFF HEREBY DEMANDS A JURY TRIAL ALL COUNTS SO TRIABLE.**


Respectfully Submitted,

s/David I. Schoen DS0860

David I. Schoen, Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, Alabama 36106
Phone: 334-395-6611; Fax: 334-272-0529
E-Mail: DSchoen@abanet.org or DSchoen593@aol.com

COUNSEL FOR PLAINTIFF


January 6, 2006

14