UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MARIA GRANCIO, individually, and in her capacity as Executrix and Personal Representative of the Estate of Nicholas P. Grancio, | ) ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.  06-CV-0069 (FB)(CPP) |
| | ) | |
| R. LINDLEY DeVECCHIO; | ) | |
| CHRISTOPHER FAVO; | ) | **JURY TRIAL DEMANDED** |
| UNITED STATES OF AMERICA. | ) | |
| | ) | ECF Case |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

### Introduction

1.  This action for money damages is brought pursuant to the Fourth, Fifth, and Eighth Amendments to the United States Constitution, under the Federal Tort Claims Act, and under the common law of the State of New York.  Jurisdiction is based upon 28 U.S.C. §§ 1331, 1343, 1346(b), 2671, *et seq*., on the authority of *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and on the supplemental jurisdiction of the court under 28 U.S.C. § 1367(a) for claims arising under state law.  This is a case about the corrupt and unlawful relationship between law enforcement and a ruthless killer and career criminal that went unchecked for many years, was actively concealed, condoned, protected, and facilitated by our government, and that led to the cold blooded murder of a man.  It also is about a culture and a justice system in the Eastern District of New York that met such corruption with coverup and virtual license for many years, allowing this crime, these wrongdoers, and others to escape justice, while others have gone to prison on false testimony and through the concealment of material exculpatory evidence.

2.  Plaintiff alleges, *inter alia*, that the federal officials sued herein conspired with each other and

with other individuals, and acted, and failed to act in such a way as to bring about the wrongful death of Nicholas P. Grancio on or about January 7, 1992, in Brooklyn, New York.

3.  Plaintiff duly presented timely Notices of Tort Claims, pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671, *et seq*.; 2401; 2675(a) and all applicable federal regulations, giving notice of the wrongful death caused by the acts or omissions of the defendants, while acting within the scope of their office or employment with the United States of America, under circumstances in which the United States, if a private person, would be liable to the plaintiff in accordance with the laws of the State of New York.  Although the claims referenced in the Notice have not been denied, the United States has failed to act on the claims within six months from the date the claims were presented.  Therefore, the Plaintiff elects to treat these claims as having been denied.

### Parties

4.  Nicholas P. Grancio, now deceased, was at all times material to this complaint an adult resident citizen of Kings County, New York.  His wife, the Executrix of his Estate and his personal representative, Maria P. Grancio, is an adult resident citizen of Kings County, New York.

5.  Defendant R. Lindley Devecchio (hereinafter "DEVECCHIO") is, upon information and belief, an adult resident citizen of Sarasota County, Florida and Defendant Christopher Favo (hereinafter "FAVO") is, upon information and belief, an adult resident citizen of St. Joseph County, Indiana.  Both Defendants were at all times material to this complaint special agents of the Federal Bureau of Investigation (hereinafter "FBI") and acted within the scope of their office or employment as agents or employees of the FBI and the United States Department of Justice. They are sued in their individual capacities with respect to the *Bivens* actions.  FAVO remains an FBI Special Agent.

6.  Defendant United States of America (hereinafter "UNITED STATES") is a defendant in this action pursuant to the Federal Tort Claims Act, arising from the acts and/or omissions of employees and agents of the FBI and the Department of Justice, agencies of the Defendant, and

for claims arising under the laws of the State of New York based on the negligent or otherwise wrongful acts or omissions of individual agents of the FBI while acting within the scope of their office or employment by the FBI and/or Department of Justice, federal agencies pursuant to 28 U.S.C. §§ 2671, *et seq*.  Defendant UNITED STATES was at all times material to this Complaint the employer of the individual defendants.

7.  If the Defendant UNITED STATES were a private person, it would be liable to the Plaintiff in accordance with the laws of the State of New York, the place where the actions and omissions at issue herein occurred or should have, but did not, occur.

### Facts

8.  In the early afternoon of January 7, 1992, Nicholas P. Grancio (hereinafter "Grancio") was sitting in a car near where Avenue U, McDonald Avenue, and Village road converge in Brooklyn, New York.

9.  Grancio was talking with his nephew, Joey Tolino, who was on the passenger side.

10.  While Tolino and his uncle talked, they were being watched.

11.  New York Police Department Detective Sergeant Joseph Simone and his partner, members of a task force working jointly with agents of the FBI to monitor suspected organized crime members and their activities, were watching Grancio as part of their surveillance duties for the day, just as they had done in the past.  Their task force suspected that Grancio was a member of a the "Colombo" family organized crime group and that was the group this task force was assigned to monitor.  Additionally, the detectives recently had received information that an attempt to kill Grancio had been planned and likely would be made right away and they watched him to prevent his murder and to protect him as well.  This information had been transmitted to the Defendants as well.

12.  What Detective Simone and his partner did not know was that they were not alone in watching Grancio that day; indeed they themselves were being watched as well,

13.  At the very time Simone and his partner had Grancio under surveillance, a group of three men, Gregory Scarpa, Sr. ("Scarpa"), Larry Mazza ("Mazza"), and Jimmy Delmasto

("Delmasto") were riding around the streets looking for Grancio, intent on killing him once they found him.

14.  Scarpa, Mazza, and Delmasto saw Grancio in his car; but they also saw Detective Simone and his partner in their surveillance position and recognized that they were law enforcement officers maintaining surveillance on Grancio.  They knew that they could not kill Grancio while he was under surveillance.

15.  Scarpa, Mazza, and Delmasto were all members of the organized crime group known to law enforcement as the "Colombo family."  Scarpa was a leader of that organized crime group and was known and feared widely, as a ruthless killer and career criminal.

16.  Scarpa also was a government informant who was "handled" primarily by and was close friends with DEVECCHIO.

17.  Scarpa told Mazza that he would be able to get the surveillance removed by calling his contact in law enforcement.  Scarpa referred to his contact in law enforcement by the pseudonyms or nicknames "Lyn," "Del," "Dello" or his "Girlfriend."  These and others were pseudonyms or nicknames for Defendant DEVECCHIO and were how Scarpa regularly referred to DEVECCHIO.

18.  Scarpa called DEVECCHIO and told DEVECCHIO that he had found Grancio, but that he also saw law enforcement in place maintaining surveillance of Grancio.

19.  DEVECCHIO advised Scarpa that he would take care of removing the surveillance from Grancio.

20.  DEVECCHIO knew or reasonably should have known or suspected at that time that Scarpa wanted the surveillance pulled off of Grancio so that he (Scarpa) and the others could murder Grancio.  Before DEVECCHIO and FAVO pulled the surveillance team off of the Grancio surveillance, they had been told by other law enforcement officers that Mr. Grancio was thought to be a primary target for murder by what they understood to be Scarpa's group and that he was in immediate danger.  This gave rise to a special relationship between these defendants and Mr. Grancio, carrying with it a duty to protect, to warn, and to take other necessary precautions.  Both

4

Defendants owed a duty of care to Mr. Grancio and to the public, including a duty to warn and protect him, and to take other necessary precautions. Both Defendants and others breached that duty and, as a proximate cause of that breach, Mr. Grancio was killed.

21. Both Defendants knew or believed that Scarpa's group within the "Colombo family" was at "war" with the purported faction of the family of which they believed Mr. Grancio to be a member and that such "war" meant that people in one faction killed or tried to kill members of the other faction and Scarpa was known to be a ruthless killer and the men with him were known to be members of his faction. DEVECCHIO knew that Scarpa had committed murders and intended to continue committing murders and he (DEVECCHIO) was determined to help him in this endeavor.

22. At DEVECCHIO's direction and knowing the importance of the surveillance for a variety of reasons, including the need to protect Grancio from the imminent and credible threat to kill him, and aware of the "war" and Grancio's alleged position, FAVO, who worked closely with DEVECCHIO on the joint federal and state task force, telephoned Detective Simone and directed him to end the surveillance that he and his partner were conducting of Grancio.

23. FAVO directed Simone and his partner to return to the FBI New York field office headquarters for a meeting.

24. Simone found this direction most unusual, argued with FAVO, tried to dissuade him from the direction, and emphasized the critical importance of keeping Grancio under surveillance; but FAVO would not be dissuaded and he required Simone and his partner to follow the directive. Under protest, Simone and his partner pulled off their surveillance of Grancio and began to return to the FBI New York field office.

25. Minutes later, after seeing the surveillance team leave, following his phone call to DEVECCHIO for the purpose of accomplishing the same, Scarpa, with Mazza and Delmasto, drove up to Grancio's car and shot and killed Nicholas Grancio, spraying Grancio's blood and brain matter across the car and onto Joey Tolino.

26. Since the murder of Nicholas Grancio, DEVECCHIO and FAVO and others engaged in a

widespread pattern of lying about this matter and others in various settings, have misled on this subject and other incidents of gross misconduct repeatedly, and have taken other steps to conceal the true facts of the Grancio murder.  The lying and coverup continue today.

27.  Among other acts and omissions constituting misconduct, following this incident and in order to attempt to undermine Detective Simone's credibility, FAVO and other government employees, acting within scope of their office or employment, including, but not limited to, current counsel for the FBI and then federal prosecutor Valerie Caproni, lied under oath to attempt to implicate Simone in crimes of which he was innocent, FAVO tried to blame Simone for the leak of an informant's identity and status, when he knew it was DEVECCHIO who had given such information to Scarpa, and FAVO has continued to conceal the true facts surrounding his role in the murder of Mr. Grancio by continuing to provide false statements about the same, including a false claim concerning the surveillance of Grancio, undercut by contemporaneous official records of the same.

28.  FAVO unlawfully failed to report his suspicions about DEVECCHIO and Scarpa and the illegal conduct in which they were engaged, despite a duty under the law to report the same.  Had he reported it as required, the murder of Mr. Grancio and countless other murders and other crimes would have been prevented.

29.  FAVO was grossly negligent and was deliberately indifferent to the safety of Nicholas Grancio and to his duty to protect citizens so situated in calling off the surveillance of Mr. Grancio.

30.  The true facts of Nicholas Grancio's murder and the involvement of these Defendants and others in it have been and continue to be actively and fraudulently concealed by these Defendants and others and the same could not have been discovered earlier through reasonable diligence.

31.  The first time Maria Grancio or any member of her family had even any remote idea that these Defendants or any government agent could have been involved in the death of Nicholas Grancio was late in 2004 when an investigator whom she did not know introduced himself to her and asked to speak with her.  At that meeting, Mrs. Grancio learned for the first time that there

was a suspicion that these Defendants were directly involved in her husband's murder.

32.  As was the case before the Grancio murder, afterwards, Scarpa continued to operate in his close relationship with the Defendants and they continued to give him license and to assist him in his commission of various other crimes.

33.  Gregory Scarpa, Sr., widely reputed to hold a major leadership position in the Colombo organized crime family and known on the street as a ruthless and feared killer, was a paid informant for the government since the 1960's.

34.   His relationship with the government was actively fraudulently concealed by the defendants and others in the government consistently and, at all times, notwithstanding legal obligations to end the relationship and to disclose it.

35.  In 1980, DEVECCHIO became Scarpa's "handler" at the FBI and he managed his informant status, had him paid for his work, and took responsibility for him.

36.  Due to his criminal record and criminal activities, including multiple murders, his unreliability, his known agenda, his mendacity, lack of credibility, the danger he posed to the public safety in general, and to Mr. Grancio in particular, and his intention to break the law, all of which were known to the Defendants and others with whom they worked and who were supervisors and otherwise their superiors, Scarpa was not qualified, suitable, or appropriate to serve either as a cooperating witness or informant for the FBI.

37.  The Defendants and others employed by the UNITED STATES failed to follow proper procedures and guidelines with respect to the selection, use, employment, closing, and re-opening of cooperating witnesses and informants, and with respect to preventing and reporting the criminal activities of cooperating witnesses in the ways in which they dealt with Scarpa and others.

38.  Defendants and other FBI agents and Justice Department officials, including Defendants' superiors and supervisors, all employees of the UNITED STATES, failed to follow proper procedures and guidelines with respect to monitoring and approving the activities of Scarpa, with the result that as an informant and/or cooperating witness, Scarpa was allowed and/or encouraged

to engage in actions that were illegal, including murder, conspiracy to murder, perjury, and other crimes.  Such acts were neither suitable nor appropriate, nor legal, for FBI informants and/or cooperating witnesses.  Defendants well knew such conduct to be unsuitable, inappropriate, and illegal; yet this was part of a pattern of conduct in which these Defendants engaged with respect to informants and/or cooperating witnesses in so-called organized crime cases and such misconduct often was condoned, fostered by, or turned a blind eye to by prosecutors and other court officials during the time frame preceding Mr. Grancio's murder and at all times relevant to this case.

39.  The Defendants and their superiors also violated the guidelines, regulations, and policies with respect to the independent duty each agent and each supervisory agent has to properly supervise fellow agents and to report suspicions about misconduct and violations by such fellow agents and they further failed to investigate and, indeed, obstructed the investigation of the murder of Nicholas Grancio.

40.  DEVECCHIO's relationship with Scarpa went far beyond the relationship between law enforcement handler and informant that lawfully is permitted.

41.  From in or about 1980 through at least 1992, DEVECCHIO and others employed by the government knowingly allowed, protected, encouraged and facilitated Scarpa's commissions of a broad range of crimes, including, but not limited to fraud, robbery, loansharking, and murder on an ongoing and repeated basis.

42.  Scarpa was paid for his work for the FBI and Scarpa, in turn, paid DEVECCHIO in a variety of forms, for their relationship and for all that DEVECCHIO allowed and helped him to do.

43.  Ironically, Scarpa was paid for providing information to DEVECCHIO that someone else had killed Grancio, notwithstanding the fact that by the time he provided such information and was paid for it, DEVECCHIO, FAVO, and others already knew that Scarpa had killed Grancio.  Moreover, knowing that Scarpa had killed Grancio, FAVO and others did nothing to arrest Scarpa or to report what they knew to local law enforcement authorities, or to prevent him from killing again.  At all relevant times, FAVO and others actively concealed Scarpa's role in the

Grancio murder and by doing so (and otherwise) obstructed the investigation into that murder.

44.  FAVO was aware of or should have been aware of the illicit, illegal, and corrupt relationship between Scarpa and DEVECCHIO and aided them in accomplishing their illegal purposes or deliberately turned a  blind eye to the same.  FAVO's actions in this regard, included falsifying material documents, suggesting to others that documents be falsified, lying on material issues and other acts and omissions, designed to conceal the true facts and to protect himself and others from having their misconduct uncovered.  Favo was aware and concerned about the fact that he would be linked with DEVECCHIO and that he would be held responsible for not having disclosed his dealings with and what he knew about DEVECCHIO's unlawful conduct.

45.  To the extent FAVO was not aware of all details of the relationship between Scarpa and DEVECCHIO, he reasonably should have been, and he had a lawful duty to act to stop that relationship and the crimes it facilitated; yet he did nothing to act on his knowledge and suspicions until it was too late and many crimes had been committed through the relationship, including several murders.

46.  While FAVO did eventually come forward and report some of what he knew and suspected, he has continued to engage in a campaign of falsehood and misleading intended to coverup all of the true facts regarding his conduct, DEVECCHIO's conduct, and the conduct of other FBI agents and other law enforcement officers with whom FAVO has worked.

47.  FAVO also improperly has contacted at least one witness who knows of his misconduct and who he believes to be cooperating with law enforcement and providing information about him and has tried to get that witness to alter facts about which he is concerned the witness might be reporting to law enforcement.

48.  As a proximate result of the pattern of coverup by DEVECCHIO, FAVO and others, many of the true facts surrounding their unlawful conduct and the unlawful conduct of others still are not known.

49.  Nicholas Grancio's death was a direct and proximate result of the acts and omissions of the Defendants as alleged in this Complaint and such actions as caused his death, as more

specifically described herein, were taken in violation of his clearly established constitutional rights.

50.  These Defendants conspired with each other and with others and aided and abetted others to cause the death of Nicholas Grancio.

51.  Defendants acted at all times with respect to the allegations in this Complaint in a manner that was wilful, reckless, wanton, grossly negligent, negligent, and in a way which was deliberately indifferent to and in knowing and intentional violation of the clearly established constitutional rights of Nicholas Grancio.

52.  Due to his criminal record and criminal activities, including multiple murders, his unreliability, his mendacity, his lack of credibility, the danger he posed to public safety, and his intentions to continue to break the law, all of which were known to DEVECCHIO and FAVO and other law enforcement officers and government officials, Scarpa was not qualified, suitable or appropriate to serve either as a cooperating witness or as an informant for the FBI.

53.  DEVECCHIO, FAVO, and the other FBI agents, and their superiors, including, but not limited to their immediate supervisors in the field office and superiors at FBI headquarters, and other federal government officials, failed to follow proper procedures and guidelines regarding the selection, use, payment, and supervision of, reporting on, monitoring, restricting criminal activity of, and other interaction and involvement with cooperating witnesses and informants, with respect to the selection and employment of Scarpa and others.

54.  Prior to the murder of Nicholas Grancio, the defendants and others of their colleagues in law enforcement knew or reasonably should have known that Scarpa and the others intended to kill Grancio and that Scarpa sought to find him and have the surveillance removed from him for that purpose.  This reflected a pattern of conduct by Scarpa and DEVECCHIO and others helped facilitate such conduct and assisted him in finding his murder targets, knowing his agenda.

55.  Defendants failed to warn Grancio, failed to protect him, and failed to properly control the activities of Scarpa and failed to take any steps to prevent Mr. Grancio's murder.

56.  As part of the coverup of their illegal conduct, Defendants indicated in official records that

on or about January 14, 1992, Scarpa had reported that a person named "Fusco" had killed Grancio and Defendants arranged to have the government pay Scarpa for that information, knowing that is was false and intending to document the false information to coverup the true facts and their involvement in the matter.

57. Throughout the period of time the FBI used Scarpa as an informant and afterwards, Defendants and others falsified reports and other documents, testified falsely, omitted facts from testimony they had a lawful duty to disclose, and otherwise acted improperly and unlawfully for the purposes of covering up the corrupt and unlawful relationship with and use of Scarpa and to conceal the same and their own misconduct and the misconduct of others and to secure convictions against defendants in criminal cases in the Eastern District of New York, knowing that their testimony and documents they produced in those cases were false, misleading, or omitted material facts.

58. In the 1980s and early 1990s, there were several killings among people whom the government contended were members of the Colombo organized crime family, leading the government to a theory it put forward in its prosecutions, that there was an internal "war" between what the government termed the "Orena" and "Persico" factions.

59. Scarpa, purportedly was a leader of the "Persico" faction and his intended victims, on most occasions, were purportedly members of the "Orena" faction.

60. DEVECCHIO became, in effect, a member of the "Persico" faction and assisted Scarpa in fomenting the "war" and in seeking to advance Scarpa's agenda through murder and other illegal conduct.

61. Nicholas Grancio's murder was but one illegal act in Scarpa's criminal campaign, in which DEVECCHIO was a partner, supporter, booster, advocate, sponsor, supervisor, promoter, facilitator, and aid. Actions in this connection by DEVECCHIO included, but were not limited to, the following:

    A. Passing to Scarpa confidential information that was the product of law enforcement intelligence, including wiretap surveillance details, addresses of Scarpa's enemies, and other

confidential information, to allow Scarpa and his family and friends to avoid detection or arrest for their criminal activity or to allow Scarpa to engage in criminal activity, including murders;

B.  On at least one occasion, DEVECCHIO and Scarpa met in chambers with a federal judge in the Eastern District of New York and during that meeting, with a criminal case against Scarpa pending before that judge, in an effort to get leniency for Scarpa, DEVECCHIO advised that judge of Scarpa's informant status and his medical condition.  Even after that meeting, Scarpa's informant status was concealed from other criminal defendants for whom its disclosure would have been relevant in their defense.  Even after this meeting in the judge's chambers, DEVECCHIO was permitted to testify falsely in a criminal trial in the Eastern District, denying under oath that he had intervened with any court to seek leniency for anyone.  DEVECCHIO perjured himself in that trial, the government knew it, and then in its closing argument expressly asking the jury to rely on DEVECCHIO's credibility.  Information about Scarpa expressly was requested in that case and was withheld.  The Defendant in that case requested the police investigative file in discovery and the government represented to the Court that there was nothing exculpatory in it.  The Court blindly accepted that representation without further examination.  In truth, the file showed several suspects in the murder investigation, none of whom was the defendant on trial and one of whom was Greg Scarpa.

C.  DEVECCHIO and others gave material support and assistance to Scarpa with respect to the commission of his crimes in return for information and personal gifts;

D.  Scarpa ran a campaign of murders and planned or attempted murders in the early 1990s, in addition to the murder of Nicholas Grancio and DEVECCHIO played various roles in facilitating, fostering, and in at least one case, openly cheering on the murders, delighted to see Scarpa's so-called faction "winning."

E.  As a result of his relationship with DEVECCHIO and FAVO, suffice it to say that Scarpa, for all practical purposes was given immunity from arrest or prosecution despite committing the most heinous of crimes, license to continue engaging in crimes, help in accomplishing his criminal goals, and protection from intervention by law enforcement in his

criminal enterprises - often for Scarpa's family and friends as well.

F.  FAVO AND DEVECCHIO and others deliberately misled defendants in pending criminal cases and their lawyers, by withholding material documents and information they were duty bound to produce, often aided and abetted in this by prosecutors in the United States Attorney's office for the Eastern District of New York, all of whom were employed by the Defendant UNITED STATES and, FAVO was personally involved in developing a strategy of cover-up to foster this unlawful scheme of withholding such information and documents.

62.  FAVO and other FBI agents knew about much or all of the problems and improprieties with informants both before and after the death of Mr. Grancio; yet they did nothing about reporting or putting an end to the corrupt relationship and its consequences for years, notwithstanding a clearly established legal duty to report it and to take appropriate steps to stop it and to prevent and respond appropriately to the crimes engaged in or fostered through it.

63.  These Defendants and others wholly failed to supervise Scarpa as an informant, failed wholly to supervise each other and failed wholly to protect Nicholas Grancio and others from Scarpa and others, knowing the dangers that existed, all in violation of their lawfully required obligations to supervise, report, take corrective action, and protect members of the public, and to intervene when they know or suspect a serious crime is about to be committed.  The danger to Nicholas Grancio was known and foreseeable to these Defendants and others, the Defendants' conduct was shocking to the conscience, Grancio was a foreseeable victim, and these Defendants created an opportunity for Grancio's death that otherwise would not have existed, but for their actions and/or omissions.

64.  Had FAVO and others responded appropriately to the corrupt relationship between DEVECCHIO and Scarpa, the murder or Nicholas Grancio and other murders and crimes could and would have been prevented.

65.  Instead, FAVO and others actually condoned, fostered, encouraged, and facilitated the corrupt relationship between DEVECCHIO and Scarpa and the crimes committed in connection with that relationship in a variety of way including, but not limited to, preventing the arrest of

Scarpa by local law enforcement officers when Scarpa was caught with a gun and later lying about the incident.

66.  Even today, FAVO and other government law enforcement officials refuse to tell the truth or to reveal the complete and accurate details about DEVECCHIO's corrupt relationship with Scarpa and their own corrupt and improper actions with respect to cases they were investigating and informants, and what they knew or should have known when, and what they did or did not do in response.

67.  The UNITED STATES, by and though its employees, failed properly to supervise these Defendants and others, failed properly to put a stop to their unlawful conduct and then wholly failed and refused to conduct a thorough investigation and failed to impose appropriate penalties once the outrageous misconduct described herein and much more of the same and worse became evident.

68.  The UNITED STATES knew or should have known of the conduct of these Defendants as described herein and the propensities of these Defendants to engage in such misconduct and negligently retained them in their positions as Special Agents and negligently failed to supervise them in such positions.

69.  Similarly, the UNITED STATES knew or should have known of the conduct of Scarpa as described herein and Scarpa's propensities for the same and negligently hired, retained, and supervised him.

70.  The corrupt relationship described herein, albeit without sufficient detail and in far too mild a manner, is presented a case of how far wrong things can go in a relationship between handler and informant in the current guidelines with respect to how FBI agents should interact with informants; but the fact of the matter is, the UNITED STATES has allowed these Defendants and others to engage with impunity in the conduct described herein and in other instances and a pattern or practice of outrageous misconduct of a similar nature.

71.  When others, including Scarpa's own son, finally have been willing to come forward with the true details about Scarpa's corrupt relationship with DEVECCHIO, prosecutors in this

14

district employed by the United States have responded invariably with a campaign designed to attack, discredit, punish, and isolate such a person.  In the case of Scarpa, Jr., notwithstanding the approach taken toward him in this District, information he has provided related to national security has been used elsewhere and his credibility has been substantiated.

72.  A primary witness to the Grancio murder has been convinced to change his story about the facts surrounding the murder because of his fear of retribution by employees of the Defendant United States, acting within the scope of their employment.

73.  DEVECCHIO received monetary and other gifts from Scarpa pursuant to and in furtherance of their corrupt relationship.

74.  Consistent with their campaign of corruption, these Defendants and others have falsely implicated others in crimes and misconduct at times to divert attention from their own wrongdoing or the wrongdoing of their friends and at other times for other illicit agendas.

75.  These Defendants and others often have been driven in their misconduct and their campaign of misleading, lying, withholding from disclosure that which they were obligated to disclose, and other corrupt conduct by a philosophy of the "ends justifying the means," seeing themselves as the appropriate decision makers and with their decisions divorced from what the Constitution requires.  The goal has been to ensure at all costs that no conviction is overturned, with the unspoken rationalization that even if the defendant at issue did not commit the crime charged, he likely did something else illegal.  Through this reasoning, details about the Scarpa/DEVECCHIO relationship have remained concealed.

76.  In this, these Defendants have not been alone; indeed, such a mentality appears to have been pervasive among law enforcement and even some court officials for many years, with prosecutors in this District long improperly deciding themselves to withhold from criminal defendants information about Scarpa's informant status and his corrupt relationship with DEVECCHIO and associated facts.

77.  When one federal judge in the district finally had the courage to upbraid the prosecutors for their misconduct in this regard and singled out one in particular for special opprobrium, his Order

was met with a letter from the United States Attorney asking him to withdraw his Order and remove reference to that prosecutor's conduct. Shockingly, the judge acceded to that unprecedented request, withdrew the Order, removed the reference, and reissued the Order without it.

78. Tellingly, two of the prosecutors whose judgments in withholding from the court and from criminal defendants relevant information about Scarpa, DEVECCHIO, and their corrupt relationship were pointedly questioned by the Court, including the one whom the Court singled for serious and demonstrable ethical lapses appear only to have been rewarded for their work, with one now, of all ironies, serving as General Counsel to the FBI and the other a lead prosecutor in the Arthur Andersen and Enron prosecutions - both guardians of the public integrity. Both were elevated to these positions by the Defendant UNITED STATES, notwithstanding their improper, corrupt and unlawful conduct.

79. In such a place, where discovery requests by criminal defendants invariably are met simply with the mantra "government counsel is aware of the government's obligations" rather than an attention to details and consequences, where demonstrable instances of prosecutorial misconduct are met on appeal by a court that is "troubled" or "concerned" about the misconduct, but unwilling generally to impose consequences, when a court hears incredible renditions of facts from law enforcement officers or learns about misconduct and takes no punitive action, and when a criminal process is driven almost wholly by the goal of securing and upholding a criminal conviction by any means, regardless of the constitutional rights run asunder in the rush to that end, an environment which in the extreme is characterized by the corrupt relationship between informant and government handler such as that described herein and worse, is given the opportunity, if not the license, to develop.

80. As a direct and proximate cause of the wilful, wanton, knowing, intentional, reckless and/or negligent actions and omissions of the Defendants and their deliberate indifference to the life of Nicholas Grancio, the Plaintiff's decedent, Nicholas Grancio, was deprived of his liberty and his life without procedural and substantive due process of law, subjected to cruel and unusual

punishment, and was forced to endure emotional and physical pain and suffering.

81.   As a direct and proximate result of the wanton, wilful, intentional, reckless and/or negligent actions and omissions of the Defendants as set forth above, Plaintiff Maria Grancio has been deprived of the loss of the income, services, protection, care assistance, society, companionship, comfort, guidance, counsel and advice of the her husband.

## COUNT I

### *Bivens* Cause of Action Against Federal Agents

82.   All other paragraphs of this First Amended Complaint are incorporated herein by reference as though fully set forth.

83.   The actions, conduct, and omissions of Defendants DEVECCHIO and FAVO violated the rights of the Plaintiff Maria Grancio and the Plaintiff's decedent, Nicholas Grancio under the Fourth, Fifth and Eighth Amendments to the United States Constitution.

84.   Defendants wilfully, knowingly, intentionally, maliciously, recklessly, wantonly, and with deliberate indifference caused or allowed to be caused the death of Nicholas Grancio and by so doing, among other things, violated their lawfully required duties to warn him, to protect him, to report unlawful conduct by informants and by each other and others and to supervise the same and violated Mr. Grancio's rights to be free from unlawful seizures and cruel and unusual punishment, and to enjoy substantive due process under the law.

## COUNT II

### Conspiracy Cause of Action Under *Bivens*

85.   All other paragraphs of this First Amended Complaint are incorporated herein by reference as though fully set forth.

86.   The Defendants DEVECCHIO and FAVO conspired with each other and with others, to cause and allow to be caused the wrongful and unlawful death of Nicholas Grancio and to cover up the same and the corrupt use of and relationship with government informant Greg Scarpa, and to protect Scarpa's position as an informant and his continuing unlawful activities, as well as their own, and with respect to the other actions and omissions complained about above.

87.  The acts and omissions described in previous paragraphs of this First Amended Complaint were taken and made in furtherance of and during the course of this conspiracy.

## COUNT III

### Cause of Action Against the United States Under the FTCA

88.  All other paragraphs of this First Amended Complaint are incorporated herein by reference as though fully set forth.

89.  At all times material to this case, Defendants DEVECCHIO, FAVO, and other agents and employees of the FBI and United States Department of Justice whose actions are referred to herein, were acting within the scope of their employment.

90.  The UNITED STATES, if a private person, would be liable to the Plaintiff for the acts and omissions of its employees and agents described herein under the law of the place where said acts and omissions occurred (or did not occur), to wit, including, but not limited to, under common law tort claims arising under New York law for negligence, gross negligence, failure to warn, failure to protect, intentional infliction of emotional distress, wrongful death, conspiracy, conscious pain and suffering, negligent hiring, retention, supervision of its agents and employees, including informants, and negligence *per se*, all of which was the proximate cause of the death of Nicholas Grancio.

91.  The Plaintiff timely and duly submitted an administrative claim under the FTCA to the appropriate authorities and those agencies have failed to make a final disposition of the claims within six months after they were filed and the claimant has elected to deem them denied.

## COUNT IV

### Common Law Conspiracy under New York Law

92.  All other paragraphs of this First Amended Complaint are incorporated herein by reference as though fully set forth.

93.  The Defendants DEVECCHIO and FAVO are liable to the Plaintiff and the Plaintiff's decedent for injuries and damages resulting from the fact that they combined and conspired together, and with others, to employ illegal means for an illegal purpose, namely to cause, permit,

18

aid, and abet, the wrongful and unlawful death of Nicholas Grancio and to cover up and keep secret their wrongful acts and the wrongful acts of others.

## COUNT V

### Negligence, Negligence *per se* and/or Gross Negligence under New York Law

94.  All other paragraphs of this First Amended Complaint are incorporated by reference as if fully set forth herein.

95.  The Defendants acted negligently, negligently *per se*, grossly negligent, carelessly, and recklessly with respect to their actions and/or omissions in at least, but not limited to, the following ways:

a.  In the use and continuing use of Scarpa as an informant and in failing to control and report his criminal activities;

b.  In violating the established guidelines, policy, rules, and regulations regarding the use and relationship with informants;

c.  In failing to take appropriate steps to protect and warn Nicholas Grancio of the plans to kill him, failing to take proper precautions in that regard with respect to Scarpa, and in calling off the surveillance, despite knowing of the outstanding and imminent threat to Grancio;

d.  In failing to properly supervise these Defendants and in retaining them as agents and as handlers of confidential informants, including, but not limited to Scarpa;

e.  In such other ways as are set forth above;

96.  Defendants owed a duty of reasonableness and care to the public and to Nicholas Grancio and to those in his immediate family within the "zone of danger" in connection with his murder and the known plan to kill him.

97.  Defendants breached their duty in at least, but not limited to, the ways previously set, and that breach proximately caused the injuries and death of Nicholas Grancio and the damages flowing therefrom, all of which was foreseeable to them.

98. As a proximate result of the Defendants' breach of their duties to the public and to Nicholas Grancio, Mr. Grancio suffered conscious pain and suffering, severe emotional distress, and

ultimately his death as more specifically described herein and as will be proven, and thereby

sustained damages in a sum exceeding the jurisdictional limitations of all lower courts which

otherwise would have jurisdiction over these claims.

## COUNT VI

### Common Law Intentional Infliction of Emotional
### Distress under New York Law

99.  All other paragraphs of this First Amended Complaint are incorporated herein by reference

as though fully set forth.

100.  The Defendants DEVECCHIO and FAVO are liable to the Plaintiff and the Plaintiff's

decedent for injuries and damages resulting from the fact that by their acts and omissions alleged

herein they intentionally inflicted emotional distress upon the Plaintiff.

## COUNT VII

### Wrongful Death under New York Law

101.  All other paragraphs of this First Amended Complaint are incorporated herein by reference

as though fully set forth.

102.  As a direct and proximate result of the aforementioned acts, omissions, and negligence of

the Defendants, Plaintiff's decedent, Nicholas Grancio, was caused to die on or about January 7,

1992.

103.  Maria Grancio, by decree of the Surrogate's Court of Sullivan County, New York  was duly

certified and found qualified to serve as Executrix and the Personal Representative of the Estate

of Nicholas Grancio and as such serves properly in such capacity and as the personal

representative in this action.

104.  As a direct and proximate result of the death of Nicholas Grancio, his distributes have been

pecuniarily damaged and have suffered and will suffer pecuniary loss.

105.  The Defendants, jointly and/or severally, are liable to the Plaintiff and the Plaintiff's

decedent for the occurrence and damages aforesaid.

106.  This cause of action arises from decedent, Nicholas Grancio's wrongful death and is

exempt from any statutory modification of joint and several liability.

107.  Decedent, Nicholas Grancio, left surviving as those entitled to share in his Estate, his wife and children who had and will continue to be deprived of his company, friendship, guidance, maintenance, society, loss of enjoyment of life, support and services; who suffered great pecuniary damage and who expended money for funeral and administrative expenses as a direct result of his death, all to their personal damage and to the damage of Maria Grancio, individually and as representative of any dependents and next of kin of the Estate of Nicholas Grancio, which are compensable under the New York State E.P.T.L., including Sections 5-4.1 and 5-4.3 thereof.

108.  As a consequence of the Defendants' actions and omissions as described herein, Nicholas Grancio and the others identified above suffered severe and permanent injuries, including conscious pain and suffering, severe emotional distress, and wrongful death, as more specifically described above and as will be proven, and thereby sustained damages for which they seek compensation here.

109.  Such actions and omissions by Defendants also require damages sufficient to punish the Defendants for their actions and omissions and to deter them from engaging in or failing to engage in the future in such conduct as gave rise to such injuries and wrongful death and as gives rise to these claims.

### COUNT VIII

### Negligent Hiring, Supervision, and Retention Under New York Law

110.  All other paragraphs of this First Amended Complaint are incorporated herein as though fully set forth.

111.  Defendants regularly dealt with the public and the UNITED STATES and its employees knew that its employees, agents, and persons situated as these individual Defendants were would deal and did regularly deal with the public, with people situated like Mr. Grancio was, with informants and others with propensities for criminal conduct, including murder.

112.  Defendant UNITED STATES had a duty to use reasonable care in selecting, hiring, training, supervising, and retaining people in its employ, including informants, cooperating witnesses, Special Agents, supervisory personnel and other employees of the FBI

and Department of Justice and owed a duty to the public and to Mr. Grancio to use such reasonable care with respect to the hiring, supervision, and retention of Scarpa and Defendants DEVECCHIO and FAVO, mindful of the serious, sensitive, and dangerous nature of the work in which its employees would engage and situations they would encounter and for which they would be responsible.

113.   Defendant United States and its employees, including, but not limited to the named Defendants herein, breached the duty of reasonable care in the manner in which it hired Scarpa or permitted him to be hired as an informant and cooperating witness and in the manner in which it failed adequately to supervise and then retained Scarpa, DEVECCHIO, FAVO, and others after it knew or should have known about the problems attending the matters described herein.

114.   Defendant UNITED STATES was further negligent with respect to the other improper and unlawful acts and omissions of its employees as specifically described above, including the protection of Scarpa from arrest and prosecution, the concealment of the corrupt relationship between Scarpa and the FBI, and the withholding of evidence and obstruction of justice described above.

115.   Defendants were negligent *per se* by permitting the pattern and practice of the wholesale violation of the Attorney General's rules, regulations, and policies with respect to the matters herein described and by concealing Scarpa's status at times when a duty to disclose it existed under the law.

116.   As a proximate result of the foregoing breaches of duties, Nicholas Grancio and his wife and family suffered great injuries, including his death and conscious pain and suffering and emotional distress and other losses.

## COUNT IX

### Conscious Pain and Suffering Under New York Law

117.   All other paragraphs of this First Amended Complaint are incorporated herein as though fully set forth.

118.  As a direct and proximate result of the aforementioned acts, omissions, and negligence of the Defendants, Plaintiff's decedent. Nicholas Grancio, was caused to suffer excruciating conscious pain and suffering before her death on or about January 7, 1992.

119.  The Defendants, jointly and/or severally, are liable to the Plaintiff and the Plaintiff's decedent for the occurrence and damages aforesaid.

120.  This cause of action arises from decedent, Nicholas Grancio's wrongful death and is otherwise exempt from any statutory modification of joint and several liability.

121.  As a consequence of the Defendants' actions and omissions as described herein, Nicholas Grancio suffered severe and permanent injuries, including conscious pain and suffering, severe emotional distress, and wrongful death, as more specifically described above and as will be proven, and thereby sustained damages in a sum exceeding the jurisdictional limitations of all lower courts which otherwise would have jurisdiction over these claims.

122.  Such actions and omissions by Defendants also require damages sufficient to punish the Defendants for their actions and omissions and to deter them from engaging in or failing to engage in the future in such conduct as gave rise to such injuries and wrongful death and as gives rise to these claims.

## COUNT X

### Negligent Infliction of Emotional Distress Under New York Law

123.  All other paragraphs of this First Amended Complaint are incorporated by reference as if fully set forth herein.

124.  At all times relevant hereto, Plaintiff, Maria Grancio was the wife of the deceased, Nicholas Grancio and, as such was an immediate family member of the deceased and, at all relevant times was within the "zone of danger" within the meaning of that term under New York law.

125.  Shortly after the murder of her husband, Maria Grancio learned about the brutal killing and the details of the shooting and the effect it had on her husband and his body.

126.  Maria Grancio was aware that her husband had been brutally shot and killed, with his head mutilated, causing excruciating pain.

127.  As a result of all of the foregoing and having a tremendously close relationship to the victim, Nicholas Grancio, her husband, Plaintiff Maria Grancio suffered the negligent inflection of emotional distress and mental trauma.

128.  As a result of the aforesaid negligent infliction of emotional distress, Plaintiff Maria Grancio suffered the following injuries, including, but not necessarily limited to:

        a.      Severe shock to her nervous system;

        b.      Severe mental anguish and trauma;

        c.      Physical manifestation of the severe shock and mental anguish.

129.  As a result of the aforesaid contemporaneous sensory observance of the incident described herein, Plaintiff, Maria Grancio has suffered from and continues on a daily and recurring basis to suffer from some or all of the following:  pain, mental anguish, psychic injury, terrible sadness, anxiety, discomfort, inconvenience, shock, fright, nightmares, nervousness and apprehension.

130.  As a result of the aforesaid experience Plaintiff Maria Grancio has been and continues to be deprived of the ordinary and usual enjoyments of life, health, family and recreation and all of the same likely will continue in the future and has suffered injuries and damages as described above in a sum sufficient to compensate her for the injuries suffered as described above and in an amount in excess of the jurisdictional limitations of all lower courts which otherwise would have jurisdiction over these claims.

## <u>COUNT XI</u>

### On Behalf of Decedent's Wife Under New York Law

131.  Plaintiff Maria Grancio, individually and as the wife and immediate family member of the deceased, Nicholas Grancio, reiterates and realleges each and every allegation contained in all of the foregoing paragraphs, inclusive, with the same force and effect as if set forth fully herein.

132.  At all times relevant to this action, Plaintiff, Maria Grancio was the wife of the deceased, Nicholas Grancio.

133.  By reason of the foregoing, as more specifically set forth hereinabove, and as a direct and proximate result of the same, this Plaintiff wife of Nicholas Grancio has suffered injuries

described above and has been deprived of the companionship, society, affection, enjoyment, and loving family relationship they enjoyed with her beloved husband Nicholas Grancio and has suffered damages in an amount in excess of the jurisdictional limitations of all lower courts which otherwise would have jurisdiction over these claims.

**WHEREFORE**, plaintiff requests this Court:

1.  Award compensatory damages to Plaintiff against the Defendants, jointly and severally;

2.  Award punitive damages to Plaintiff against Defendants DEVECCHIO AND FAVO, jointly and severally, in an amount sufficient to punish Defendants for their actions and omissions and to deter them from engaging in or failing to engage in the future in such conduct as gave rise to such injuries and wrongful death and as gives rise to these claims;

3.  Award costs and attorney's fees to Plaintiff;

4.  Award such other and further relief as this court may deem appropriate.


**THE PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL COUNTS SO TRIABLE.**


Respectfully Submitted,


_____

s/David I. Schoen DS0860

David I. Schoen, Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, Alabama 36106
Phone: 334-395-6611; Fax: 917-591-7586
E-Mail: DSchoen@abanet.org or DSchoen593@aol.com

COUNSEL FOR PLAINTIFF


October 1, 2006

25

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MARIA GRANCIO, individually, and in her capacity as Executrix and Personal Representative of the Estate of Nicholas P. Grancio, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION NO.  06-CV-0069 (FB)(CPP) |
| R. LINDLEY DeVECCHIO; CHRISTOPHER FAVO; UNITED STATES OF AMERICA. | ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) | ECF Case |

**CERTIFICATE OF SERVICE**

I hereby certify that on October 1, 2006, I served a copy of the foregoing First Amended Complaint on counsel for Defendants Devecchio and Favo by emailing the same to them at "Douglas.Grover@ThompsonHine.com" and MGConsidine@dbh.com and understand that they will be served through the ECF system as well.  I will serve the Defendant United States of America with a copy of the foregoing First Amended Complaint and a copy of the original Complaint with a Summons as provided for under the Federal Rules of Civil Procedure and I will file the executed return of service once service on the United States has been effected.

_____

s/David I. Schoen DS0860

David I. Schoen, Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, Alabama 36106
Phone: 334-395-6611; Fax: 917-591-7586
E-Mail: DSchoen@abanet.org or DSchoen593@aol.com

COUNSEL FOR PLAINTIFF