UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

MARIA GRANCIO, individually, and in her : 
capacity as Executrix and Personal Representative :
of the Estate of Nicholas P. Grancio, :
 :
            Plaintiff, :
V. : CIVIL ACTION NO.
 : 06 CV 0069 (FB)
R. LINDLEY DeVECCHIO; :
 :
CHRISTOPHER FAVO; :
 :
UNITED STATES OF AMERICA. :
 :
           Defendants.

## AFFIDAVIT OF CHRISTOPHER FAVO

STATE OF INDIANA       )
                                ) ss.:
COUNTY OF SAINT JOSEPH  )

I, CHRISTOPHER FAVO, hereby attest and declare as follows under penalty of perjury:

1.     I am currently employed as a Special Agent with the South Bend Resident Agency, Indianapolis Division, of the Federal Bureau of Investigation ("FBI"). I began my service with the FBI on September 18, 1983 and have served as a Special Agent continuously since that time.

2.      I make this affidavit for the limited purpose of offering certain facts in support of the accompanying motion to dismiss the Amended Complaint or, in the alternative, for summary judgment, on all claims asserted against me in the above-captioned action.[1]

Overview of Service with the FBI

3.      After a short period of initial training, I was assigned to the FBI office in Minneapolis in January 1984, and remained there for approximately two years. In December 1985, I was transferred to New York, where I joined a terrorism task force based in Manhattan, and remained there through December 1988.

4.      In or about December 1988, I was assigned to what was known as the C-5 squad. At that time, that squad was responsible for the FBI's investigations into the activities of the Colombo organized crime family, one of the five major organized crime families operating in New York.

Assignment to C-10 Squad in 1990

5.      In or about January 1990, I was assigned to what was known as the C-10 squad, which became responsible for, among other things, the FBI's investigations into the Colombo family. While working for the C-10 squad, my primary office location was 26 Federal Plaza in New York, New York. From 1990 through sometime in 1994, my supervisor was R. Lindley DeVecchio, who was Supervisory Special Agent of the C-10 squad. I never supervised or had any supervisory responsibility for DeVecchio.

6.      The FBI maintained an overall investigation of the Colombo family as a whole, which included the collection of all incoming information on the Colombo family. In or about

---

[1] Because my affidavit is offered for this limited purpose only, I do not address all of the allegations in the Amended Complaint or all of the facts and circumstances related thereto.

June 1991, I became the case agent for that investigation, which entailed coordinating the collection and dissemination of information about the criminal activities of Colombo family members and associates.

First Awareness of Scarpa's Role as Confidential Informant

7. By June 1991, I had learned that Gregory Scarpa, Sr., a member of the Colombo organized crime family, was a confidential informant for the FBI. I also learned that DeVecchio handled or managed Scarpa as an informant, on behalf of the FBI.

8. I was not responsible for handling or managing Scarpa as a confidential informant and, accordingly, I never handled or managed Scarpa as an informant. In particular, Scarpa did not report to me on his work as an informant, and I did not pay Scarpa for his work. I never supervised Scarpa as an informant.

9. Before Nicholas Grancio ("Grancio") was killed, I had never spoken to Scarpa about Grancio, a reputed member of the Colombo family.

Events of Late 1991 and Early January 1992

10. As a result of a series of shootings in November and December 1991 that were eventually determined to be in connection with an internecine Colombo family war between the Orena and the Persico factions of that family, an FBI investigation was opened to which I was assigned as the case agent. Because it was determined that the FBI and the New York Police Department ("NYPD") needed to work together more closely to coordinate the law enforcement response to these murders, I was also assigned to coordinate investigative activities with detectives from the NYPD Organized Crime Investigative Division.

11. Although no formal task force was established, this coordinated effort was informally called the Colombo War Task Force (the "task force"). The NYPD detectives were

chiefly supervised by NYPD Lieutenant William Shannon and NYPD Sergeant Andrew Brogan. The FBI was not inserted into the NYPD chain of command. Initially, I was the sole member of the C-10 squad working with the NYPD on the Colombo war case.

12.     By the end of 1991, the shootings or attempts that had occurred in the Colombo family war included: an attempt on Vic Orena of the Orena faction (6/20/91); an attempt on Scarpa, a member of the Persico faction (11/18/91); the murder of Hank Smurra, reputed member of the Persico faction (11/24/91); an attempt on Ron Calder and Larry Sessa, reputed members of the Persico faction, resulting in injuries to Calder and bystanders (11/29/91); the murder of Gaetano Amato, a bystander, and injury to Joseph Tolino, reputed member of the Orena faction (12/03/91); the murder of Rosario Nastasi, reputed member of the Persico faction (12/05/91); the murder of Vincent Fusaro, reputed member of the Orena faction (12/06/91); and the murder of Matteo Speranzo, a clerk in a bagel shop affiliated with the Persicos (12/08/91).

13.     In late 1991, the task force concentrated surveillance on Colombo captain William Cutolo and reputed members of his crew (affiliated with the Orena faction). By early 1992, the investigation of the Colombo war had resulted in the arrests of several reputed members of Cutolo's crew by the NYPD with the assistance of the C-10 squad. These arrests included the January 5, 1992 arrest of Gabriel Scianna, a reputed member of Cutolo's crew, on a weapons charge. Following these arrests, I proposed that the surveillance conducted by the task force be refocused.

14.     Grancio was reputed to be a Colombo family captain (affiliated with the Orena faction) who we believed would emerge as an active participant in fomenting possible criminal activity following the Cutolo crew arrests. As a result, the task force prepared to focus some of its surveillance efforts on Grancio and reputed members of his crew. Toward that end, I began gathering information about, and photos of, Grancio and his crew.

15. The purpose of the proposed focusing of surveillance on Grancio was the detection and prevention of possible criminal activity by Grancio and his crew. At the same time, Grancio and his crew, like other associates and members of the Colombo family, were at risk of being physically harmed by the rival faction during the war.

16. By either the morning of January 6 or January 7, 1992, I had contacted Lieutenant Shannon and Sergeant Brogan to request a meeting of the task force to discuss the refocusing of surveillance. This led to a meeting being scheduled for the afternoon of January 7, 1992 at 26 Federal Plaza. The task force included NYPD detectives Joseph Simone and Patrick Maggiore.

17. I was not directed by DeVecchio to call the task force members, including NYPD detectives Simone and Maggiore, in for the meeting on January 7, 1992. DeVecchio did not ask me at any time to undertake any effort to terminate any surveillance on January 7, 1992. DeVecchio did not tell me at any time that Scarpa had requested that any surveillance on Grancio be removed.

18. In the early afternoon of January 7, the task force members arrived at 26 Federal Plaza for the meeting. While most of the group had assembled, Simone and Maggiore had not yet arrived. Because Simone and Maggiore had previously conducted an investigation involving Grancio and thus had first-hand information about him and his crew, I believed that their attendance at the meeting would be useful. As a result, I called Simone and Maggiore to request their attendance at the meeting. At the time I made that call, I did not know whether they were watching Grancio.

19. When the whole group had assembled, including Simone and Maggiore, the meeting began. The refocusing of surveillance was discussed and I distributed information on, and photos of, the Grancio crew. Simone and Maggiore shared information they had gleaned

from their earlier investigation about members of the Grancio crew. Overall, the meeting, which also covered other topics, took approximately one-and-a-half to two hours.

20. Near the end of the January 7 meeting, the beepers of several members of the task force began buzzing, and we learned that Grancio had been shot.

21. Prior to Grancio's murder on January 7, 1992, DeVecchio and I never talked about Scarpa having a plan to commit a crime of violence against Grancio.

22. When I made the call to Simone and Maggiore on January 7, 1992, and throughout that call, I had no knowledge of Scarpa requesting of anyone that any surveillance on Grancio be removed.

23. When I made the call to Simone and Maggiore on January 7, 1992, and throughout that call, I had no knowledge of Scarpa having formulated a plan to commit a crime of violence against Grancio.

24. When I made the call to Simone and Maggiore on January 7, 1992, and throughout that call, I had no knowledge that detectives Simone and Maggiore had ever watched Grancio in order to prevent his murder or to protect him.

25. When I made the call to Simone and Maggiore on January 7, 1992, and throughout that call, I had no knowledge that Grancio was under surveillance to protect him or to prevent his murder.

26. During the call with Simone and Maggiore on January 7, 1992, neither told me that it was important to maintain surveillance on Grancio that afternoon or that they had Grancio under surveillance to protect him or to prevent his murder.

27. I never had any agreement with DeVecchio or any other person to enable Scarpa or Scarpa's associates to commit a crime of violence against Grancio.

28. At the time of Grancio's murder on January 7, 1992, I was not aware of the improprieties alleged in the Amended Complaint concerning the DeVecchio-Scarpa relationship.

29. As a result, I believed that my conduct was entirely lawful in light of the information I possessed at the time regarding DeVecchio, Scarpa and Grancio. I also believed that I was acting fully consistently with my legal obligations under the U.S. Constitution and all other applicable laws. I did not believe that my actions violated any rights applicable to Grancio under the U.S. Constitution or any other applicable source of law.

30. Further, in light of my experience with and knowledge obtained in my work for the FBI, I believe that any reasonable Special Agent in my position would have believed that his or her conduct was entirely lawful in light of the information possessed at the time and the legal obligations imposed by the U.S. Constitution, including the Fourth, Fifth and Eighth Amendments, and any other applicable source of law. Similarly, any reasonable Special Agent in my position would have believed that his or her actions did not violate any rights applicable to Grancio under the U.S. Constitution, including the Fourth, Fifth and Eighth Amendments, or any other applicable source of law.

Assignment to Indianapolis Division

31. At the end of 1993 and beginning of 1994, the FBI obtained significant amounts of new information regarding the activities of the Colombo organized crime family, including those of Scarpa, from a series of Colombo family members who cooperated with the government following their arrests. As a result of this additional information, I and other agents reported to the FBI concerns regarding the relationship that had existed between DeVecchio and Scarpa. As a result, the FBI opened an investigation of DeVecchio. I subsequently testified in several proceedings regarding that relationship and other aspects of my work on the C-10 squad.

32. In June 1996, I began work in the FBI's office in South Bend, Indiana, where (with the exception of temporary assignments elsewhere) I have remained since that time.

Christopher Favo

Subscribed and sworn to before me,
this 17 day of January 2007.

A Notary Public of St. Joseph County
My commission expires: Nov 30, 2009

Shelley M. Marker, Notary Public
A resident of St. Joseph County, IN
My commission expires November 30, 2009.