F.#2006v0596

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
MARIA GRANCIO, individually and in her
capacity as Executrix and Personal Representative
of the Estate of Nicholas P. Grancio,

                        Plaintiff,                       Civil Action
                                                         No. CV-06-0069
        -against-
                                                         (Block, J.)
                                                         (Pollak, M.J.)
R. LINDLEY DeVECCHIO,
CHRISTOPHER FAVO,
UNITED STATES OF AMERICA,

                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


            DEFENDANT UNITED STATES OF AMERICA'S
               MEMORANDUM OF LAW IN SUPPORT OF ITS
        <u>MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION</u>


                                ROSLYNN R. MAUSKOPF
                                United States Attorney
                                Eastern District of New York
                                Attorney for Defendant Tucker
                                One Pierrepont Plaza
                                Brooklyn, New York  11201


GAIL A. MATTHEWS
Assistant U.S. Attorney
(Of Counsel)

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

APPLICABLE STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT
PLAINTIFF'S CLAIMS AGAINST THE UNITED STATES MUST BE
DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION . . . . . . . . . . . . . . . . . . . . 3

POINT I
      THE FTCA PROVIDES THE EXCLUSIVE REMEDY
      FOR ALL OF THE NON-BIVENS CLAIMS ASSERTED
      IN THE FIRST AMENDED COMPLAINT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

POINT II
      PLAINTIFF FAILED TO FILE HER ADMINISTRATIVE
      CLAIM PRIOR TO FILING THIS ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

POINT III
      PLAINTIFF FAILED TO FILE AN ADMINISTRATIVE CLAIM
      WITHIN THE FTCA'S TWO YEAR LIMITATIONS PERIOD . . . . . . . . . . . . . 8

      A.    Accrual for Purposes of the FTCA's Two Year Limitations Period . . . . . 8

      B.    Plaintiff Should Have Known Enough Facts Regarding
            Her Allegation That The Government Was Causally Connected
            To Her Injury More Than Two Years Prior To The
            January 6, 2006 Filing Of This Action . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            1.    *Knowledge Attributable to Plaintiff by Late 1994* . . . . . . . . . . . 14

            2.    *Knowledge Attributable to Plaintiff by Mid-1995* . . . . . . . . . . . 16

            3.    *Knowledge Attributable to Plaintiff by May 1996* . . . . . . . . . . . 19

            4.    *Knowledge Attributable to Plaintiff between 1996 and 1998* . . . 20

      C.    Legal Proceedings In This Court And Legal Precedents
            Issued By This Court Establish That Plaintiff's
            Claims Accrued No Later Than March 13, 1997 . . . . . . . . . . . . . . . . . . 22

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

i

## PRELIMINARY STATEMENT

The United States, by its attorney, Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, Gail A. Matthews, Assistant U.S. Attorney, of counsel, respectfully submits this memorandum of law in support of its motion to dismiss the First Amended Complaint ("Amended Complaint") or, in the alternative, for summary judgment.

The Amended Complaint raises allegations against the United States in connection with the January 7, 1992 murder of Nicholas Grancio ("Grancio"), which murder occurred as part of the 1991-1992 war within the Colombo Organized Crime Family of La Cosa Nostra. At its core, plaintiff alleges that, as the result of a conspiracy or negligent or reckless conduct, the government is responsible for Grancio's wrongful death because FBI agents enabled, encouraged, and facilitated an FBI informant, Gregory Scarpa, Sr. ("Scarpa"), in murdering Grancio, and then undertook efforts to conceal the circumstances surrounding the Grancio murder.

As set forth in Point I, below, the FTCA provides the exclusive remedy for all of the claims in this action except for the Bivens-type claims alleged in Count I of the Amended Complaint.[1] As set forth in Point II, plaintiff failed to exhaust her administrative remedies under the FTCA prior to initiating this action. In fact, plaintiff filed this action on the same day that she first submitted an administrative claim to the government, so the FTCA claims fail for lack of subject matter jurisdiction. As set forth in Point III, plaintiff's claims were not administratively exhausted within the FTCA's two-year limitations period; accordingly, plaintiff's claims in Counts II through XI must be dismissed, with prejudice, for lack of subject matter jurisdiction.[2]

---

[1] The individual federal defendants are represented by separate counsel with respect to these Bivens claims. As a result, those claims are not addressed in this motion by the U.S.

[2] In the event that the claims against the United States are not dismissed pursuant to this motion, defendant United States reserves its right to move to dismiss on additional grounds including, but not limited to: 1) plaintiff's tort claims should be dismissed pursuant to Fed. R.

## STATEMENT OF FACTS

For a complete statement of the material undisputed facts and underlying evidentiary support, the Court is directed to the United States of America's Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1, dated January 29, 2007 (hereinafter "Govt's 56.1").  In the interests of brevity, the facts set forth in the Govt's 56.1 are incorporated by reference.

## APPLICABLE STANDARD OF REVIEW

In reviewing a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), the court must accept all material factual allegations in the complaint as true.  See Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd., 968 F.2d 196, 198 (2d Cir.1992).  "However, argumentative inferences favorable to the party asserting jurisdiction should not be drawn." Atlantic Mut. Ins., 968 F.2d at 198 (quoting Norton v. Larney, 266 U.S. 511, 515, 45 S. Ct. 145, 147 (1925)). Where the existence of subject matter jurisdiction turns on a factual issue, the court is permitted to look beyond the complaint itself and may "refer to evidence outside the pleadings." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000) (citing Kamen v. American Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986)).  The district court may consider affidavits and material outside the pleadings to satisfy itself that it has the power to hear the case. Robinson v. Gov't of Malaysia, 269 F.3d 133, 141 n. 6 (2d Cir. 2001).  A court must "look to the substance of the allegations to determine jurisdiction." Cargill Int'l S.A. v. M/T Pavel Dybenko, 991 F.2d 1012, 1019 (2d Cir.1993).

---

Civ. P. 12(b)(1) because they are barred by the discretionary function exception to the FTCA; 2) plaintiff's claims should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6), because plaintiff has not alleged any facts that would show that the United States breached a duty to her; and 3) liability cannot arise under the FTCA because plaintiff has not alleged a cause of action that is analogous to a cause of action against a private citizen that is recognized in New York State where the alleged torts occurred.

## ARGUMENT

### PLAINTIFF'S CLAIMS AGAINST THE UNITED STATES MUST BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION

The Federal Tort Claims Act ("FTCA") provides a limited waiver of the sovereign immunity of the United States for the negligent or wrongful acts or omissions of federal employees while acting within the scope of their employment. See 28 U.S.C. §§ 1346(b), 2671-2680. The Supreme Court has long held that "limitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied." Soriano v. United States, 352 U.S. 270, 276, 77 S. Ct. 269 (1957). A waiver of sovereign immunity must be "strictly construed in favor of the government." Akutowicz v. United States, 859 F.2d 1122, 1125 (2d Cir. 1988). Thus, any suit under the FTCA must strictly comply with the terms and conditions of such waiver. See Adams v. H.U.D., 807 F.2d 318, 321 (2d Cir. 1986) (requirements of 28 U.S.C § 2675(a) must be strictly construed and are jurisdictional in nature and cannot be waived).

Further, in an FTCA action, "plaintiff has the burden of showing by a preponderance of the evidence that subject matter jurisdiction exists." Lunney v. United States, 319 F.3d 550, 554 (2d Cir. 2003) (citing Makarova, 201 F.3d at 113). Where the United States has not waived sovereign immunity, the district court has no subject matter jurisdiction over the claim. United States v. Sherwood, 312 U.S. 584, 586- 87, 61 S. Ct. 767 (1941); Lunney, 319 F.3d at 554.

As set forth more fully below, except for the claims alleging that the individual federal defendants violated plaintiff's rights under the Constitution of the United States, all of the claims raised in plaintiff's Amended Complaint are governed by the FTCA. The Court lacks subject matter jurisdiction over plaintiff's FTCA claims on two independent grounds. First, plaintiff filed this action prior to receiving a denial of her administrative claim and prior to the expiration of the

six month period of time following the January 6, 2006 submission of her administrative claim to

the FBI.  Second, plaintiff failed to file an administrative claim within the two year statutory period

prescribed by the FTCA.  As a result, plaintiff has not met the prerequisites of the FTCA's waiver

of sovereign immunity.  Accordingly, all of plaintiff's claims in Counts II through XI should be

dismissed for lack of subject matter jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(1), or in the

alternative, the court should grant the United States summary judgment and dismiss the FTCA

claims as time-barred pursuant to Fed. R. Civ. P. 56.

## POINT I

### THE FTCA PROVIDES THE EXCLUSIVE REMEDY FOR ALL OF THE NON-BIVENS CLAIMS ASSERTED IN THE FIRST AMENDED COMPLAINT

The FTCA is the exclusive remedy available to the plaintiff for wrongful acts or

omissions committed by a federal employee within the scope of employment.  See United States v.

Smith, 499 U.S. 160, 165-66 (1991) ("'the remedy' against the Government under the FTCA 'is

exclusive of any other civil action or proceeding for money damages . . . against the employee' . .

.[and] 'any other civil action or proceeding for money damages . . . against the employee . . . is

precluded.' 28 U.S.C. § 2679(b)(1)"); Castro v. United States, 34 F.3d 106, 110 (2d Cir. 1994)

("government employees [are] immune from common-law tort claims for acts committed within the

scope of their employment").

Plaintiff's complaint alleges tort claims specifically against the United States, and

alleges various additional negligent and wrongful acts or omissions committed by the individual

defendants while they were acting within their scope of their FBI employment.  See Am. Comp. at

Counts II-XI.  With the exception of Count I, which charges the individual defendants with alleged

constitutional violations of the type that are excepted from coverage under the FTCA, see 28 U.S.C.

4

§ 2679((b)(2)(A), all of the allegations fall within the exclusive remedy of the FTCA.  The United States has certified that the individual defendants were acting within the scope of their respective employment at the time of the incidents out of which the claims alleged in the Amended Complaint arose, and the United States has been expressly substituted as the sole defendant with respect to all claims alleged in Counts II through XI of the Amended Complaint.  See Grancio v. DeVecchio, et al., CV-06-0069, Docket Entry Nos. 45-46.

**POINT II**

**PLAINTIFF FAILED TO FILE HER ADMINISTRATIVE
CLAIM PRIOR TO FILING THIS ACTION**

Plaintiff initiated this civil action by filing a complaint in the Eastern District of New York on January 6, 2006.  See CV-06-0069 Docket Entry No. 1; Govt's 56.1 at ¶ 124.  On that same date, plaintiff presented an administrative claim to the FBI.  Govt's 56.1 at ¶ 121.  Plaintiff's administrative claim was not finally denied until October 4, 2006.  Id. at ¶ 123.  As set forth below, plaintiff's action, filed prior to exhausting her administrative remedies, was premature and must be dismissed for lack of subject matter jurisdiction.

The FTCA commands that:

> An action **shall** **not** be instituted upon a claim against the United States for money damages for . . . personal injury . . . **unless** the claimant shall have first presented the claim to the appropriate Federal agency **and** his claim shall have been finally denied by the agency in writing and sent by certified or registered mail.  The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section.

28 U.S.C. § 2675(a)(emphasis added).

The Supreme Court has unequivocally held that the statutory "command that an 'action shall not be instituted . . . unless the claimant shall have first presented the claim to the

5

appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail' is unambiguous." McNeil v. United States, 508 U.S. 106, 110, 113 S. Ct. 1980 (1993) (quoting 28 U.S.C. § 2675).  The plain meaning of 28 U.S.C. § 2675 demonstrates Congressional intent to require the complete exhaustion of administrative remedies "before invocation of the judicial process."  508 U.S. at 112.

> Every premature filing of an action under the FTCA imposes some burden on the judicial system and on the Department of Justice which must assume the defense of such actions.  Although the burden may be slight in an individual case, the statute governs the processing of a vast multitude of claims.  The interest in orderly administration of this body of litigation is best served by adherence to the straight-forward statutory command.

508 U.S. at 112.

"The FTCA requires that a claimant exhaust all administrative remedies before filing a complaint in federal district court.  This requirement is jurisdictional and cannot be waived." Celestine v. Mount Vernon Neighborhood Health Center, 403 F.3 76, 82 (2d Cir. 2005) (citing McNeil, 508 U.S. at 113 (1993)); Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 510 (2d Cir. 1994). Accordingly, a district court will lack jurisdiction to entertain a claim for damages brought under the FTCA where a plaintiff has failed, in advance of filing in district court, to present that claim to the appropriate agency and obtain a final denial of the claim or allow six months to elapse following the filing of the claim.  See McNeil, 508 U.S. at 112; Robinson, 21 F.3d at 510; Keene Corp. v. United States, 700 F.2d 836, 841 (2d Cir. 1983) (the FTCA's administrative exhaustion rule is a jurisdictional requirement which cannot be waived); Tenorio v. Murphy, 866 F. Supp. 92, 98 (E.D.N.Y. 1994).

Plaintiff's undisputed failure to exhaust completely her administrative remedies *before* bringing a claim under the FTCA deprives this court of subject matter jurisdiction over the

claim.  See McNeil, 508 U.S. at 113; Robinson, 21 F.3d at 510; Shannon v. United States Parole

Comm'n, No. 97 Civ. 6420, 1998 WL 557584, at *2 (S.D.N.Y. Sept. 2, 1998).

It is worth noting that, even though plaintiff has now filed an administrative claim

and obtained a denial of that claim, plaintiff's amended complaint cannot cure the jurisdictional

defect in this action.  A newly exhausted claim cannot relate back to the filing of an original

complaint when subject matter jurisdiction did not exist for that claim at the time of the original

filing.  See Duplan v. Harper, 188 F.3d 1195, 1199 (10th Cir. 1999)(allowing a premature complaint

to be cured by amendment would render the exhaustion requirement meaningless and impose

unnecessary burden on the judicial system); Reynolds v. United States, 748 F.2d 291, 292 (5th

Cir.1984) (dismissing FTCA action that was filed prematurely and holding that complaint could not

be amended following exhaustion of administrative remedies:  "Filed on a date on which the court

lacked jurisdiction, [an amended complaint] related back to a date on which the court also lacked

jurisdiction."); Nin v. Liao, 2003 WL 21018816 (S.D.N.Y. May 5, 2003) (dismissing action where

plaintiff filed administrative claim with agency following filing of action in federal court and

observing that plaintiff could initiate new action upon exhaustion of administrative remedies).

In sum, subject matter jurisdiction under the FTCA did not exist at the time this

lawsuit was filed and it does not exist today.  Because plaintiff had not exhausted her administrative

remedies under the FTCA before filing this action, this court does not have subject matter

jurisdiction over plaintiff's FTCA claims, and this lack of subject matter jurisdiction cannot be cured

in this lawsuit.  As a result, plaintiff's FTCA claims (Counts II through XI) must be dismissed.

**POINT III**

**PLAINTIFF FAILED TO FILE AN ADMINISTRATIVE CLAIM
WITHIN THE FTCA'S TWO YEAR LIMITATIONS PERIOD**

A plaintiff seeking federal subject matter jurisdiction under the FTCA must first exhaust her administrative remedies by filing a claim with the appropriate agency within two years of the alleged injury.  28 U.S.C. §§ 2401(a), 2675(a).  Specifically, 28 U.S.C. § 2401(b) states:

> A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate agency within two years after such claim accrues ...

Thus, a litigant has two years to file a claim with the relevant administrative agency or his claim is forever barred.  See Solomon v. United States, 566 F. Supp. 1033, 1035 (E.D.N.Y. 1982) ("Compliance with the statute of limitations under the FTCA is a jurisdictional prerequisite and noncompliance results in the claim being forever barred.").

**A.**     **Accrual for Purposes of the FTCA's Two Year Limitations Period**

The standard for determining when a claim accrues for purposes of the FTCA's two-year statute of limitations is governed by federal rather than state law.  Kossick v. United States, 330 F.2d 933, 935 (2d Cir.1964), cert. denied, 379 U.S. 837, 85 S. Ct. 73.  Generally, an FTCA claim accrues at the time the injury or harm is inflicted.  Barrett v. United States of America, 689 F.2d 324 (2d Cir.1982) (citing United States v. Kubrick, 444 U.S. 111, 120 n. 7, 100 S. Ct. 352, 358 n. 7 (1979)).  The two year statute of limitations begins to run "when the plaintiff knows both the existence and cause of his injury."  Kubrick, 444 U.S. 111, 120, 100 S. Ct. 352 (1979); Kronisch v. United States, 150 F.3d 112, 121 (2d Cir.1998).

In exceptional situations, "courts have made a 'diligence-discovery' exception to this rule, which delays accrual for any plaintiff who is 'blamelessly ignorant of the existence or cause of

his injury.'" <u>Mingo v. U.S.</u>, 274 F. Supp. 2d 336 (E.D.N.Y. 2003) (quoting <u>Gittens v. The City of</u>

<u>New York</u>, No. 97 Civ. 5794, 1999 WL 688455, at *2 (S.D.N.Y. Aug. 30, 1999) (quoting <u>Barrett</u>

<u>v. United States</u>, 689 F.2d 324, 327 (2d Cir.1982)).  "The law is clear that accrual of a FTCA claim

does not await plaintiff's awareness that his injury was negligently inflicted and that damages may

be procured." <u>Mendez v. U.S.</u>, 732 F. Supp. 414, 427 (S.D.N.Y. 1990).

  The diligence-discovery rule is applied in circumstances where the government is

alleged to have concealed information concerning its acts giving rise to the plaintiff's injury.

<u>Kronisch</u>, 150 F.2d at121.  In those circumstances, accrual may be postponed until the plaintiff has,

> knowledge of, or knowledge that could lead to, the basic facts of the injury, *i.e.*,
> knowledge of the injury's existence and knowledge of its cause or of the person or
> entity that inflicted it ... [A] plaintiff need not know each and every relevant fact of
> his injury or even that the injury implicates a cognizable legal claim.  Rather a claim
> will accrue when the plaintiff knows, or should know, enough of the critical facts of
> injury and causation to protect himself by seeking legal advice.

<u>Id.</u> (quoting <u>Guccione v. United States</u>, 670 F. Supp. 527, 536 (S.D.N.Y. 1987)).  <u>See also</u> <u>Johnson</u>

<u>v. Smithsonian Inst.</u>, 189 F.3d 180, 189 (2d Cir. 1999).  While a mere "hunch, hint, suspicion, or

rumor of a claim," will not effect accrual, "such suspicions do give rise to a duty to inquire into the

possible existence of a claim in the exercise of due diligence." <u>Kronish</u>, 150 F.2d at 121.

  The Second Circuit has not adopted a test for determining when a plaintiff "should

have known," based on public information, enough of the critical facts to trigger accrual of a claim.

The First Circuit, recently, "in a series of tragic cases arising out of the FBI's mishandling of

informants drawn from organized crime," <u>Barrett ex rel. Estate of Barrett v. U.S.</u>, 462 F.3d 28, 30

(1st Cir. 2006), has developed an instructive body of case law regarding when a plaintiff should be

charged with knowledge of the critical facts sufficient to trigger accrual of a claim against the

government for wrongful death resulting from the relationship between an FBI agent and an

9

informant.

Where a dispositive motion, as here, is based on objective evidence of whether a reasonable person knew of sufficient facts to believe that there is a causal connection between the government and the injury, the First Circuit begins the inquiry by asking: "with what generally available information the plaintiff should be charged." Rakes v. United States, 442 F.3d 7, 20 (1st Cir. 2006). The First Circuit has found that:

> At some point, facts achieve a local notoriety great enough that the only practicable course is to attribute knowledge of them to people in a position to become familiar with them. The limitations provision in the FTCA is, like most statutes of limitations, in part a rule of repose: it permits the United States to rest easy after a period of time, knowing suits for long-past wrongs are barred. See Kubrick, 444 U.S. at 117, 100 S. Ct. 352. In furtherance of this policy of repose, we charge plaintiffs with the knowledge an objective observer reasonably ought to have expected them to have. If such an observer, aware of the depth of the information available and of the breadth of that information's circulation, would reasonably have expected someone in a potential plaintiff's position to begin his inquiry, then the duty to inquire is triggered.

Rakes, 442 F.3d at 20 (where plaintiffs claim they have not read widely circulated articles, "[t]he question . . . is whether the government was entitled to expect [plaintiffs] either to have read them or to otherwise have become aware of their general purport"). See also Patterson v. U.S., 451 F.3d 268, 273 (1st Cir. 2006) (plaintiff, brother of murder victim, "was residing in that very Boston media market" when "most of the breaking publicity concerning the FBI's complicity in the Deegan slaying occurred in December 2000 and early January 2001, and became a prominent topic of public interest especially within the Boston media market").

If the objective evidence establishes that the depth and breadth of the circulated information was sufficient to expect a reasonable person in plaintiff's position to begin her inquiry, the duty to inquire is triggered and an administrative claim filed two years after the duty is triggered

is forever barred.  See Patterson v. U.S., 451 F.3d 268, 273 (1st Cir. 2006) ("administrative claim was

submitted more than two years after [plaintiff] reasonably should have acquired knowledge of the

FBI's involvement in his own brother's murder"); Rakes, 442 F.3d at 23, 27 (information in the press

"was enough to trigger a duty to inquire" and "[plaintiffs] filed their claims too late, and the district

court consequently had no jurisdiction over them.").

**B.      Plaintiff Should Have Known Enough Facts Regarding Her Allegation That
         The Government Was Causally Connected To Her Injury
         More Than Two Years Prior To The January 6, 2006 Filing Of This Action**

       Here, plaintiff has asserted that the government caused her injury by bringing about

the wrongful death of Nicholas Grancio on January 7, 1992.  In Counts II through XI, plaintiff, in

actuality, offers three theories of how the government caused this injury.  First, plaintiff claims that

government employees, either through a conspiracy or as the result of negligent or reckless conduct,

caused Grancio's wrongful death by enabling, encouraging, and facilitating Scarpa's murder of

Grancio.  Second, plaintiff claims that, either through a conspiracy or as the result of negligent or

reckless conduct, the government covered up DeVecchio's alleged conduct in enabling, encouraging

and facilitating Scarpa's murderous activities, including the circumstances surrounding Grancio's

murder.  Third, plaintiff claims that FBI agents and Scarpa were negligently supervised.

       Specifically, plaintiff claims that:

- Scarpa was a paid FBI informer since the 1960's; in 1980, DeVecchio became
  Scarpa's handler, managed his informant status, and paid Scarpa for his work.  Am.
  Comp. at ¶¶ 16, 33, 35, 42.  In turn, Scarpa "paid DeVecchio in a variety of forms,"
  "for all that DeVecchio allowed and helped him to do."  Id. at ¶ 42.

- "DeVecchio's relationship with Scarpa went far beyond the relationship between law
  enforcement handler and informant that lawfully is permitted."  Am. Comp. at ¶ 40.

- From 1980 to 1992, DeVecchio and other others "knowingly allowed, protected,
  encouraged and facilitated Scarpa's commissions of a broad range of crimes,

including . . . murder."   Am. Comp. at ¶ 41.  See also id. at ¶¶ 38, 60.

- Defendants knew, in the 1980s and early 1990s, the Orena and Persico factions of the Colombo crime family were at "war"; Scarpa was the leader of the Persico faction and his intended victims were members of the Orena faction.  Am. Comp. at ¶¶ 15, 21, 58-59.

- "DeVecchio became, in effect, a member of the "Persico" faction and assisted Scarpa in fomenting the 'war' and in seeking to advance Scarpa's agenda through murder and other illegal conduct."  Am. Comp. at ¶ 60.  "Grancio's murder was but one illegal act in Scarpa's criminal campaign," which included "passing to Scarpa confidential information that was the product of law enforcement intelligence, including wiretap surveillance details, addresses of Scarpa's enemies and other confidential information, to allow Scarpa and his family and friends to avoid detection or arrest for their criminal activity or to allow Scarpa to engage in criminal, including murders."  Id. at ¶ 60(A).

- Scarpa and DeVecchio and others helped facilitate, and aided and abetted Scarpa in murdering Grancio "and assisted him [Scarpa] in finding his murder targets, knowing his agenda."  Id. at ¶ 54; see also ¶ 50.

- Scarpa, Mazza and Delmasto were intent on killing Grancio. Id. at ¶¶ 11 & 13.

- On January 7, 1992,  "Scarpa, Mazza and Delmasto saw Grancio in his car" and also saw law enforcement maintaining surveillance on Grancio Id. at ¶¶ 8, 14.  Scarpa told Mazza he could get the surveillance removed by calling his contact in law enforcement who he referred to as, among other things, his "Girlfriend," which was a pseudonym for DeVecchio  Id. at ¶ 17.

- Scarpa called DeVecchio and advised him that he found Grancio, but that he also saw law enforcement maintaining surveillance on Grancio.  Id. at ¶ 18.  DeVecchio advised Scarpa he would remove the surveillance, and he then directed Favo to pull the surveillance team off Grancio.  Id. at ¶¶ 19-20.

- After the surveillance team pulled off Grancio, Scarpa, Mazza and Delmasto, "drove up to Grancio's car and shot and killed Nicholas Grancio, spraying Grancio's blood and brain matter across the car and onto Joey Tolino," his nephew.  Id. at ¶¶ 9, 25.

- Defendants knew Scarpa had killed Grancio, but they did nothing to arrest Scarpa. Id. at ¶ 43.

- Defendants and others in the government actively and consistently concealed Scarpa's relationship with the government and falsified documents and testified falsely to secure convictions.  Id. at ¶¶ 26, 30, 34, 43, 44, 48, 56, 57, 74-79.  Favo

failed "to act on his knowledge and suspicions until it was too late and many crimes had been committed . . . including several murders."  <u>Id.</u> at ¶¶ 28, 45.

•     Scarpa was paid by the FBI for providing information that someone other than Scarpa killed Grancio, and defendants knew that this information was false.  <u>Id.</u> at ¶ 43.

•     Defendants should have known that Scarpa was not qualified or suitable to serve as an informant; defendants failed to follow proper procedures and guidelines for handling informants, which allowed and encouraged Scarpa's illegal and murderous activities.  <u>Id.</u> at ¶¶ 36-38.

Plaintiff alleges that neither she nor "any member of her family had even any remote idea that these Defendants or any government agent could have been involved in the death of Nicholas Grancio" until late 2004 "when an investigator whom she did not know introduced himself to her and asked to speak with her."  Am. Comp. at ¶ 31.  Even accepting this incredible (and unsworn) claim as true on this motion, plaintiff's action must be deemed time-barred.

Plaintiff's claim that she had no knowledge of the possibility of government involvement in Grancio's death until late 2004 cannot salvage her untimely FTCA claim.  When the court begins its inquiry, "by asking what generally available information an objective observer reasonably ought to have expected the plaintiff[] here to have had" (<u>see</u> <u>Rakes</u>, 442 F.3d at 22), the trail of news and published legal decisions that began at the time of Grancio's 1992 death and continued through 1998, demonstrates that plaintiff should have known, no later than 1998, of sufficient facts to believe that there was a causal connection between the government and her injury.  As set forth below, the facts surrounding Grancio's death, and the allegations of government conduct that have been raised in plaintiff's complaint, achieved a local notoriety in Brooklyn, and across the nation, "great enough that the only practicable course is to attribute knowledge of them" to plaintiff.  <u>See</u> <u>Rakes</u>, 442 F.3d at 20.

1.      *Knowledge Attributable to Plaintiff by Late 1994*

By late 1991, Scarpa, Sr. was a known Colombo capo loyal to Persico and Grancio was known as a Colombo capo loyal to Victor Orena  Govt's 56.1 at ¶¶ 1-6.  The two factions were at war and were shooting at each other.  Id. at ¶  4.  Widespread news in 1992 established that Grancio was murdered on January 7, 1992 in connection with the Colombo internal war.  Id. at ¶¶ 7-13.  News reports addressed the gory details of the Grancio drive-by killing and that Grancio's nephew, Joey Tolino, was in the car at the time of the shooting and was spattered with his uncle's "blood and brains."  Id. at ¶ 8.  Plaintiff acknowledges in her complaint that her husband was a foreseeable victim and that an attempt had been made on his life prior to his murder on January 7, 1992 (see Am. Comp. at ¶¶ 11, 63), and she acknowledges that "[s]hortly after the murder of her husband, [she] learned about the brutal killing and the details of the shooting" (id. at ¶ 125).  Thus, plaintiff must be charged with knowing, on or about the time of Grancio's murder, that Grancio was murdered by the Persico faction as part of the Colombo war.

Law enforcement in Brooklyn responded to Grancio's murder by, among other things, organizing 150 city, state and federal investigators into flying squads that raided mafia hangouts and arrested more than 50 mobsters.  See Govt's 56.1 at 10.  This large show of force took place in the very community where Grancio was murdered and plaintiff continues to live.  See Am. Comp. at ¶¶ 4, 8, 124.

Then, on August 31, 1992, Scarpa was arrested by the federal government and was publicly identified as Grancio's murderer.  Govt's 56.1 at ¶¶ 14-17.  In 1993, Scarpa, Mazza and Delmasto were indicted for conspiring to murder Grancio.  Id. at ¶¶ 18-25. By March 1994, Scarpa, Mazza and Delmasto had all pled guilty to killing Grancio.  Id. at ¶¶ 20, 26-27.  Plaintiff's claim that

14

defendants "did nothing to arrest Scarpa . . . or to prevent him from killing again," and all of the claims that the government enabled and facilitated Scarpa in killing others clearly refers to a time period prior to August 31, 1992.  In any event, Scarpa died in June 1994 (id. at ¶ 23), permanently preventing him from killing again or participating in any further criminal conspiracies.

Throughout 1994, Mazza testified, in open court and at various trials, regarding how he, Scarpa and Delmasto drove up alongside Grancio's car and shot him.  Id. at ¶¶ 25-29.  Various legal decisions, including a decision by the Second Circuit in 1994, published the fact that Scarpa and his "crew, aligned with the Persico faction, murdered Grancio, Lampase, and Fusaro, all Orena faction members."  U.S. v. Brady, 26 F.3d 282, 288 (2d Cir. 1994).  See Govt's 56.1 at ¶ 24.  Scarpa, Mazza, Delmasto, and Grancio's nephew, Joey Tolino are four of the seven witnesses identified on plaintiff's January 6, 2006 administrative claim (see Pl's SF-95 Form, Govt's 56.1 at ¶ 122).  Plaintiff should be charged with knowing, by 1994, the identity of Grancio's shooters and that these four individuals, one of whom was her nephew, had knowledge relevant to her wrongful death claim.

On June 21, 1994, Scarpa's role as a FBI informant was publicly disclosed and, within days, became international news.  Id. at ¶ 30; see id. at ¶ 108.  By late 1994, allegations became widespread that Scarpa and FBI Special Agent DeVecchio had conspired to foment the Colombo war.  Id. at ¶¶ 31-42.  October 1994 news reports specifically identified DeVecchio as a law enforcement source of Scarpa's, that DeVecchio went by the pseudonym "the Girlfriend," and that DeVecchio may have given Scarpa the addresses and hiding places of rivals he wanted killed.  Id. at ¶¶ 31-32.  The news reports identified Mazza as a government informant and delineated the confidential information that Mazza claimed "the girlfriend" had disclosed to Scarpa.  Id. at ¶¶ 34, 40.

In alleging that the FBI had used Scarpa as an agent provocateur to provoke and foment the Colombo war, which by that point had brought about the deaths of 10 men and wounded 17 others, news reports expressly identified Grancio as an Orena capo who was killed by Scarpa. Id. at ¶ 38.  Most telling, news reports quickly picked up on the allegation that Scarpa and DeVecchio spoke on the day Grancio was murdered (id. at ¶ 30), implying that Grancio's murder was the result of a conspiracy between Scarpa and DeVecchio.  Id. at ¶ 33.  News reports even identified aspects of the "cover up," as characterized by plaintiff's complaint in this action (see Am. Comp. at ¶ 56), of Grancio's real murderer; indeed, it was widely reported  that Scarpa, in his role as an informant, had officially and vaguely reported to DeVecchio that "Grancio was killed by a Persico loyalist," when all the while, Scarpa was the murderer.  Govt's 56.1 at ¶ 35.

Thus, allegations in plaintiff's 2006 complaint that DeVecchio was "the girlfriend" and that he had assisted Scarpa in murdering his Orena rivals, including Grancio, are the very allegations that received widespread news coverage in 1994.  These facts, which are the critical facts underlying plaintiff's current claims, should have been known to plaintiff by late 1994.

2.  *Knowledge Attributable to Plaintiff by Mid-1995*

Even if the court could somehow find that plaintiff's duty to inquire had not been triggered by late 1994, well-publicized events throughout the following year unequivocally demonstrate the accrual of plaintiff's claims by mid-1995.

In May 1995, federal prosecutors had reportedly confirmed, in highly publicized court proceedings, that DeVecchio had disclosed confidential information to Scarpa, and that DeVecchio, the head of the FBI's elite Colombo squad, was the subject of a federal criminal investigation.  Id at ¶¶ 43-53.  In widespread news reports, prosecutors detailed examples of DeVecchio's improper

communications with Scarpa, including that "Mr. DeVecchio tipped off Mr. Scarpa about pending arrests [of Mazza, Delmasto and Scarpa, Jr.], about crime family members who had become informers and about the activities of his rivals.  They also said the agent gave Scarpa the addresses of two men that Mr. Scarpa was hunting to collect loan shark debts."  Id at ¶ 43.  Prosecutors reportedly confirmed that DeVecchio had leaked critical information to "the homicidal Scarpa on at least eight occasions."  Id. at ¶ 49.

Importantly, in May 1995, news reports expressly charged DeVecchio with helping Scarpa assassinate his Orena faction rivals.  Id at ¶¶ 54-59.  New York newspapers repeatedly charged DeVecchio with having "helped a Mafia assassin commit murder" and having "urged the informant, Gregory Scarpa, to commit murder" and having leaked confidential information that Scarpa then used "to track down and kill rivals for power."  Id. at ¶ 54.

Further, mid-1995 news reports began charging the federal government with covering up the Scarpa-DeVecchio relationship.  Id. at ¶¶ 57-68.  Prosecutors confirmed that DeVecchio's "fellow agents 'blew the whistle' on DeVecchio after becoming concerned about his relationship with Mr. Scarpa," thus disclosing that DeVecchio's fellow agents at some point possessed the type of information that plaintiff now claims, in the instant action, had been concealed.  News reports charged that by the summer of 1992, DeVecchio's FBI colleagues had suspicions that DeVecchio was helping Scarpa "finger" Orena loyalists, but sat on their suspicions for 18 months, waiting until January 1994, to report those suspicions to an FBI supervisor.  Id. at ¶¶ 62-68.  Further, news reports expressly charged the FBI with knowing by January 12, 1992, five days after Grancio's January 7, 1992 murder, that "Scarpa had shotgunned rival gangster Nicky Grancio in the head," id. at ¶ 58, yet Scarpa remained on the street.  News reports charged that the FBI knew Scarpa was a fugitive

between March and August 1992 and, while Scarpa was on the lam, Scarpa "met secretly with DeVecchio six times."  Id. at ¶ 57.

By June 1995, Special Agent Chris Favo was publicly identified in widespread news coverage as a member of DeVecchio's Colombo squad and Favo was publicly criticized for allegedly covering up the DeVecchio-Scarpa relationship.  Id. at ¶¶ 60-68.  These are the very allegations of cover-up and fraudulent concealment that have been raised in the instant action.  Compare id. at ¶¶ 60-68 with Am. Comp. at ¶¶ 26, 28, 30, 34, 43, 44, 48, 56, 57.

By July 1995, allegations of an FBI cover up gained significant momentum in the local and national press as a result of the acquittals of seven men who had been charged with taking part in the bloody Colombo war.  Id. at ¶¶ 69-77.  The FBI was being expressly accused by jurors with fomenting and covering up Scarpa's murderous conduct.  Id. at ¶¶ 69-77

Thus, by mid-1995, prosecutors had publicly confirmed plaintiff's claim, as asserted in this 2006 action, that DeVecchio had disclosed confidential information to Scarpa, and widespread news coverage expressly charged DeVecchio with assisting Scarpa in killing his Orena rivals.  The 1995 news even used the catch phrase plaintiff uses here in claiming that the FBI gave Scarpa "a license to kill."  See Govt's 56.1 at ¶ 71; Am. Comp. at ¶ 32.

While news reports did not expressly charge DeVecchio with lifting surveillance to assist Scarpa in murdering Grancio, widespread reports were specific enough to put plaintiff on notice that DeVecchio may have used his confidential knowledge and position, as the head of the Colombo squad, to assist Scarpa in murdering Grancio.  See Kronish, 150 F.2d at 121 (a plaintiff need not be aware of every relevant fact in order to trigger FTCA accrual).  Further, the widespread reports were specific enough to put plaintiff on notice that the FBI may have covered up its

knowledge of facts surrounding Grancio's killing and the DeVecchio-Scarpa relationship.  Thus, by July 1995, plaintiff should have known these reports, which were sufficient to put her on notice of a possible causal connection between the government and plaintiff's injury, i.e., Grancio's death.

3.   _Knowledge Attributable to Plaintiff by May 1996_

Even if this court could somehow find that plaintiff's claims had not accrued by July 1995, widely publicized legal proceedings in May 1996 expressly identified the viability of civil claims against DeVecchio for any role he may have played in leaking confidential information that Scarpa used to hunt down and kill his Orena rivals and further publicized the factual allegations plaintiff asserts in this action.

By May 1996, there were widely circulated reports that the infamous mobster, Victor Orena, who had been convicted in 1992 in connection with the Colombo war, was demanding a new trial on the grounds that his conduct was justified because the FBI and DeVecchio-Scarpa were trying to kill Orena.  Id. at ¶¶ 78-87.  The United States District Court in Brooklyn agreed to hold a hearing on Orena's new trial motion.  The hearing focused almost exclusively on allegations that DeVecchio gave Scarpa information, including confidential FBI information regarding the address of Orena's hideout, so that Scarpa could kill Orena.  Id.  The  hearing resulted in extensive news reports that summarized the allegations regarding DeVecchio's role in using "Scarpa to foment a war from 1991 to 1993" and, specifically, to help "Scarpa escape arrest and to track down underworld opponents."  Id. at ¶ 82.

In connection with the Orena hearings, Favo took the witness stand and testified about actions he took in withholding information from DeVecchio, who was Favo's supervisor, for fear that DeVecchio would pass the information onto Scarpa.  Id. at ¶ 84.  Favo also testified that he and

other agents did not report DeVecchio's suspected leaks to their supervisors until 18 months after their suspicions arose.  Id.  DeVecchio was called to the witness stand but declined to provide any substantive information regarding his relationship with Scarpa.  Instead, he invoked his fifth amendment privilege against self-incrimination.  The May 1996 hearing also resulted in the public disclosure of testimony and evidence that DeVecchio had accepted gifts from Scarpa, and that Scarpa had been paid upwards of $158,000.00 by the FBI.  Id. at ¶¶ 85-86.  The hearings even led to the disclosure of allegations that the FBI had modified its informant guidelines with respect to Scarpa, implying that appropriate procedures were not followed.  Id. at ¶ 86.  The press had a field day reporting all of these events.  Id. at ¶¶ 79-80, 82-87.

Notably, during the May 1996 hearing, Judge Weinstein observed in open court, and was quoted in the press as stating, that DeVecchio "faces serious, possibly criminal and certainly civil charges."  Id. at ¶ 81.  See also id. at ¶ 115.  Thus, Judge Weinstein observed in May 1996 that DeVecchio could be the target of civil claims arising out of his relationship with Scarpa. Accordingly, plaintiff should be charged with knowing in May 1996 the facts that were disclosed at the hearing, including the alleged FBI "cover up" of the Scarpa-DeVecchio relationship and the fact that DeVecchio had accepted gifts from Scarpa and Scarpa, in turn, was well-paid by the FBI. Further, even if plaintiff's instant claims are not deemed to have accrued prior to May 1996, Judge Weinstein's observation of viable civil claims against DeVecchio should mark the accrual date of plaintiff's claims.

4.     _Knowledge Attributable to Plaintiff between 1996 and 1998_

Even if this court could somehow find that plaintiff's claims had not accrued by May 1996, a new round of media coverage in 1997 became extremely specific in detailing allegations that

DeVecchio and the FBI had taken the side of the Persico's and conspired to murder Orena faction members like Grancio.  By September 1996, and continuing through 1998, national news reports expressly stated that Grancio's murder was part of a conspiracy between Scarpa and the FBI.  Id. at ¶¶ 88-100.  Even Penthouse magazine ran a comprehensive expose on the DeVecchio-Scarpa relationship.  The article specifically alleged, as plaintiff alleges in this action (Am. Comp. at ¶ 60), that the FBI was part of the Persico faction and the Grancio murder was a victory for both the FBI and Scarpa:

> It was during 1992 in the struggle for the Colombo family that the sub-rosa relationship between Scarpa and DeVecchio blossomed.  In January of that year Scarpa had stunned Orena's crew with the brash killing of Nicky "Black" Grancio, a feared Orena *capo*.  The Grancio hit was a turning point in the war and a major victory for the Persico faction–i.e., Scarpa and the F.B.I.

Govt's 56.1 at ¶ 91.  In addition, the national news reports again linked Scarpa's killing of Grancio with the claim that DeVecchio and Scarpa called or met one another almost every day.  Id. at ¶ 99.

The articles charged that "the FBI's relationship with Scarpa amounted to a crime in itself."  Id. at ¶ 96.  The articles also addressed in detail Favo's whistleblower role and how Favo's suspicions of DeVecchio and Scarpa evolved, the government's alleged efforts to cover up the DeVecchio-Scarpa scandal, and that "the alleged cover-up may continue, with many details about the FBI's conduct remaining secret forever."  Id. at ¶ 96.  See also ¶ 94.

The national news reports declared that "Scarpa's relationship with DeVecchio had become one of the hottest stories in New York."  Id. at ¶ 94.

Plaintiff, the wife of Grancio and a resident of Brooklyn, and the person with the most incentive to know about the circumstances surrounding her husband's murder, must be assumed to have been exposed to this widespread publicity concerning her husband's murder, his murderer, and

his murderer's relationship with the FBI.  See Patterson v. U.S., 451 F.3d 268, 273 (1ˢᵗ Cir. 2006)

("As we have noted, however, the test for FTCA accrual is not subjective, but objective, and in these

particular circumstances, [plaintiff] must be assumed to have been exposed to the widespread in-state

publicity concerning his own brother's murder.").  Indeed:

> [T]he government was entitled to expect that, through the channels of
> communication that run among people connected through ties of neighborhood,
> community, friendship, and family, the general purport of these important and widely
> circulated articles would become known to people in [plaintiffs]' positions.  This
> means that [plaintiffs] should have had at least some notion that strong accusations
> of wrongdoing by [the FBI agent] had been made . . . .

Rakes, 442 F.3d at 23 (finding immaterial whether plaintiff actually read or became aware of general

purport of widely circulated articles).

In sum, if ever there were a set of facts and alleged wrongdoing that had attained the

notoriety necessary to trigger the accrual of a claim, this case presents that set of facts.  Plaintiff,

whose husband was murdered 14 years prior to her filing an administrative claim, had not exercised

reasonable diligence in discovering the critical facts of her injury and its cause.  Indeed, "even if

plaintiff's awareness of h[er] injury and its cause prior to [January 6, 2004] could only be

characterized as a mere 'hunch' or 'suspicion,' plaintiff would still have been under a duty to

diligently investigate h[er] claim."  Kronisch, 150 F.3d at 122.  Plaintiff's claim should be deemed

to have accrued long prior to January 6, 2004.  Her January 6, 2006 administrative claim should be

deemed time-barred, and this action should be dismissed for lack of subject matter jurisdiction.

**C.    Legal Proceedings In This Court And Legal Precedents Issued By This Court
Establish That Plaintiff's Claims Accrued No Later Than March 13, 1997**

In September 1996 prosecutors announced their decision declining to prosecute

DeVecchio for a crime but expressly stated that they had not "exonerated DeVecchio."  Id. at ¶¶ 101-

07.  Prosecutors explained that they did not have evidence "beyond a reasonable doubt," but that there was "some reason to believe" that DeVecchio leaked confidential information to Scarpa.  <u>Id.</u> at ¶¶ 101-04.  In fact, an Assistant U.S. Attorney testified that:  "There is a strong circumstantial case that DeVecchio leaked information to Scarpa.  We don't contest that."  <u>Id.</u> at ¶ 107.

Various legal decisions issued between 1994 and 1999 refer to Scarpa's role as an FBI informant, DeVecchio's misconduct in, among other things, leaking confidential information to Scarpa, and claims that SA DeVecchio's unlawful conduct fomented the Colombo war.  <u>See</u> <u>United States v. Cutolo</u>, 868 F. Supp. 39, 41 (E.D.N.Y. 1994) (Nickerson, J.) (addressing claims that "'Scarpa, a government agent, was sent out by the F.B.I. in order to spread fear among the defendants and to incite them to react.'"); <u>United States v. Persico, Jr., et al.</u>, 1997 WL 867788 *1–*17 (E.D.N.Y. 1997) (Sifton, J.) (describing in detail the relationship between Scarpa and the FBI, and DeVecchio in particular, and FBI SA Tomlinson's conclusion "that DeVecchio was Scarpa's source"); <u>Persico, Jr.</u>, 1997 WL 867788 *13 n.8 (E.D.N.Y. 1997) (noting DeVecchio "expressed joy at the deaths of Orena faction members"); <u>Orena v. United States</u>, 956 F. Supp. 1071, 1087 (E.D.N.Y. 1997) (finding that:  "Over the course of their relationship DeVecchio may well have made a number of unauthorized disclosures of information to Scarpa."), <u>aff'd</u> 145 F.3d 551 (2d Cir. 1998); <u>U.S. v. Brady</u>, 1999 WL 438468, *4 (E.D.N.Y. Apr. 30, 1999) (Glasser, J.)("Colombo war was the product of a Machiavellian plan devised and incited by Scarpa and DeVecchio for their own undefined purposes"); <u>U.S. v. Brady</u>, 1999 WL 438468, *3 (E.D.N.Y. Apr. 30, 1999) (Glasser, J.) (characterizing claims that "the Federal Bureau of Investigation (FBI) 'was essentially 'a partner in crime' with the most prolific killer during the course of the Colombo war, Greg Scarpa' and that 'the FBI condoned, tolerated and influenced Scarpa's campaign of murder as most readily reflected

in FBI Agent DeVecchio's exclamation that '[w]e're going to win this thing' upon learning of the murder of Larry Lampesi.'").

In addressing claims that DeVecchio "continued to pass information to his informant, Scarpa, throughout the Colombo War" (Orena, 956 F. Supp. at 1087), a March 10, 1997 decision of this court addressed claims that "DeVecchio . . . may even have aided and abetted Scarpa in criminal pursuits" (Orena, 956 F. Supp. at 1087).  The decision further stated: "The general premise is that Scarpa was a violent free agent who operated with impunity and with a license to kill granted by DeVecchio." Orena, 956 F. Supp. at 1096.  Judge Weinstein characterized this premise as an "all-embracing theory of all-encompassing guilt of all crimes by the unholy DeVecchio-Scarpa alliance." Orena, 956 F. Supp. at 1097.

The March 10, 1997 decision expressly addressed claims that Favo had "knowledge of DeVecchio's alleged Wartime leaks to Scarpa . . . and attempts to shield Scarpa from prosecution." Orena, 956 F. Supp. at 1098.  The decision also addressed a claim that Favo was involved in an FBI cover-up:  "Favo . . . wanted to perpetuate a cover-up of DeVecchio's misconduct in order to vindicate himself, preserve his professional reputation and minimize the potential negative consequences to the F.B.I. of DeVecchio's actions." Id.

Importantly, in a decision issued on March 13, 1997 this court expressly recognized the viability of civil actions against federal law enforcement by the families of Scarpa's shooting victims.  Judge Sifton declared that the Scarpa-DeVecchio activities and the "serious errors of judgment on the part of law enforcement"should be handled in civil wrongful death actions:  "Here, as in DeSapio, *administrative disciplinary proceedings and civil litigation in the form of lawsuits by the victims of Scarpa's shootings and their families are available remedies*." United States v.

Persico, Jr., et al., 1997 WL 867788 *21 (E.D.N.Y. 1997) (Sifton, J.) (emphasis in original), aff'd

in part and rev'd in part sub nom., U.S. v. Orena, 145 F.3d 551, 553 (2d Cir. 1998) (affirming the

denial of defendants' motions to dismiss the indictment and reversing the grant of defendants'

motions for a new trial), cert. denied, 525 U.S. 1072 (1999)(emphasis added).  Judge Sifton added

that:  "*Defendants were not the victims of DeVecchio's horrendous errors of judgment; the families

of those shot in the war were.*"  Id. (emphasis added).  See also United States v. Orena, et al., CR-92-

351-DGT-1 (May 20, 1996 Hearing Transcript at p.6 (Matthews Dec. Exh. P)("[DeVecchio] faces

certainly serious criminal charges and certainly civil and administrative charges.").

       Thus, on March 13, 1997, this court expressly recognized the viability of plaintiff's

civil claims against the government.  Plaintiff's failure to file an administrative claim within two

years of March 13, 1997 unquestionably bars the instant action.

## CONCLUSION

       For the foregoing reasons, defendant United States respectfully requests that the Court

grant this motion to dismiss for lack of subject matter jurisdiction or, alternatively, grant the United

States summary judgment and such other and further relief as it deems just and proper.

Dated: Brooklyn, New York
     January 29, 2007

                       ROSLYNN R. MAUSKOPF
                       United States Attorney
                       Eastern District of New York
                       One Pierrepont Plaza, 14th Fl.
                       Brooklyn, New York 11201

*s/ Gail A. Matthews*
GAIL A. MATTHEWS (5854)
Assistant U.S. Attorney
     (Of Counsel)