**EXHIBIT A**

# I N D I C T M E N T

## S U P R E M E   C O U R T   O F   T H E   S T A T E   O F   N E W   Y O R K
## C O U N T Y   O F   K I N G S

---------------------------------------------

THE PEOPLE OF THE STATE OF NEW YORK

AGAINST

X.   ROY LINDLEY DEVECCHIO
          DEFENDANT
X.   JOHN SINAGRA
          DEFENDANT

*L 10*

INDICTMENT NO. 6825/2005
NON-ALIGNED
RACKETS DIVISION

COUNTS

MURDER IN THE SECOND DEGREE (4 COUNTS)

TRUE BILL

FOREPERSON

CHARLES J. HYNES
DISTRICT ATTORNEY

## FIRST COUNT

THE GRAND JURY OF THE COUNTY OF KINGS BY THIS INDICTMENT, ACCUSES THE DEFENDANT ROY LINDLEY DEVECCHIO OF THE CRIME OF MURDER IN THE SECOND DEGREE [125.25-1] COMMITTED AS FOLLOWS:

THE DEFENDANT, ON OR ABOUT AND BETWEEN SEPTEMBER 1, 1984 AND SEPTEMBER 25, 1984 IN THE COUNTY OF KINGS, ACTING IN CONCERT WITH OTHER PERSONS, NAMELY GREGORY SCARPA SR. AND OTHERS, DID SOLICIT, REQUEST, COMMAND, IMPORTUNE AND INTENTIONALLY AID IN THE DEATH OF MARY BARI AND WITH THE INTENT TO CAUSE THE DEATH OF ANOTHER PERSON, NAMELY MARY BARI, CAUSED THE DEATH OF SUCH PERSON BY SHOOTING HER WITH A DEADLY WEAPON, IN THAT GREG SCARPA SR. AND OTHERS, WHILE ACTING IN CONCERT WITH ROY LINDLEY DEVECCHIO, DID SHOOT MARY BARI WITH A DEADLY WEAPON, THEREBY INFLICTING NUMEROUS GUNSHOT INJURIES TO THE HEAD AND THEREAFTER, ON SEPTEMBER 25, 1984, MARY BARI DID DIE FROM THESE INJURIES.

## SECOND COUNT

THE GRAND JURY OF THE COUNTY OF KINGS BY THIS INDICTMENT, ACCUSES THE DEFENDANT ROY LINDLEY DEVECCHIO OF THE CRIME OF MURDER IN THE SECOND DEGREE [125.25-1] COMMITTED AS FOLLOWS:

THE DEFENDANT, ON OR ABOUT AND BETWEEN JANUARY 1, 1986 AND SEPTEMBER 17, 1987 IN THE COUNTY OF KINGS, ACTING IN CONCERT WITH OTHER PERSONS, NAMELY GREGORY SCARPA SR. AND OTHERS DID SOLICIT, REQUEST, COMMAND, IMPORTUNE AND INTENTIONALLY AID IN THE DEATH OF JOSEPH DEDOMENICO AND WITH THE INTENT TO CAUSE THE DEATH OF ANOTHER PERSON, NAMELY JOSEPH DEDOMENICO, CAUSED THE DEATH OF SUCH PERSON BY SHOOTING HIM WITH A DEADLY WEAPON, IN THAT GREG SCARPA SR. AND OTHERS, WHILE ACTING IN CONCERT WITH ROY LINDLEY DEVECCHIO, DID SHOOT JOSEPH DEDOMENICO WITH A DEADLY WEAPON, THEREBY INFLICTING NUMEROUS GUNSHOT WOUNDS TO THE HEAD AND BODY AND THEREAFTER, ON SEPTEMBER 17, 1987, JOSEPH DEDOMENICO DID DIE FROM THESE INJURIES.

### THIRD COUNT

THE GRAND JURY OF THE COUNTY OF KINGS BY THIS INDICTMENT, ACCUSES THE DEFENDANTS OF THE CRIME OF MURDER IN THE SECOND DEGREE [125.25-1] COMMITTED AS FOLLOWS:

THE DEFENDANTS, EACH AIDING THE OTHER, ON OR ABOUT AND BETWEEN MAY 1, 1990 AND MAY 27, 1990 IN THE COUNTY OF KINGS, ACTING IN CONCERT WITH OTHER PERSONS, NAMELY GREGORY SCARPA SR. AND OTHERS, DID SOLICIT, REQUEST, COMMAND, IMPORTUNE AND INTENTIONALLY AID IN THE DEATH OF PATRICK PORCO AND WITH THE INTENT TO CAUSE THE DEATH OF ANOTHER PERSON, NAMELY PATRICK PORCO, CAUSED THE DEATH OF SUCH PERSON BY SHOOTING HIM WITH A DEADLY WEAPON, IN THAT JOHN SINAGRA, WHILE ACING IN CONCERT WITH GREGORY SCARPA SR., ROY LINDLEY DEVECCHIO AND OTHERS, DID SHOOT PATRICK PORCO WITH A DEADLY WEAPON, THEREBY INFLICTING NUMEROUS INJURIES, INCLUDING GUNSHOT WOUNDS TO THE HEAD, AND THEREAFTER, ON MAY 27, 1990 PATRICK PORCO DID DIE FROM THESE INJURIES.

### FOURTH COUNT

THE GRAND JURY OF THE COUNTY OF KINGS BY THIS INDICTMENT, ACCUSES THE DEFENDANT ROY LINDLEY DEVECCHIO OF THE CRIME OF MURDER IN THE SECOND DEGREE [125.25-1] COMMITTED AS FOLLOWS:

THE DEFENDANT, ON OR ABOUT AND BETWEEN MAY 1, 1992 AND MAY 22, 1992 IN THE COUNTY OF KINGS, ACTING IN CONCERT WITH OTHER PERSONS, NAMELY GREGORY SCARPA SR. AND OTHERS, DID SOLICIT, REQUEST, COMMAND, IMPORTUNE AND INTENTIONALLY AID IN THE DEATH OF LORENZO LAMPASI AND WITH THE INTENT TO CAUSE THE DEATH OF ANOTHER PERSON, NAMELY LORENZO LAMPASI CAUSED THE DEATH OF SUCH PERSON BY SHOOTING HIM WITH A DEADLY WEAPON, IN THAT GREG SCARPA SR. AND OTHERS, WHILE ACTING IN CONCERT WITH ROY LINDLEY DEVECCHIO, DID SHOOT LORENZO LAMPASI WITH A DEADLY WEAPON, THEREBY INFLICTING NUMEROUS INJURIES, INCLUDING GUNSHOT WOUNDS TO THE HEAD AND BODY AND THEREAFTER, ON MAY 22, 1992 LORENZO LAMPASI DID DIE FROM THESE INJURIES.

CHARLES J. HYNES
DISTRICT ATTORNEY

## SERVICE OF PRE-TRIAL MOTIONS BY DEFENDANT

TO DEFENDANT:

PLEASE TAKE NOTICE that pursuant to C.P.L. Article 225, defendant (s) must ordinarily make all pre-trial motions within forty-five days after arraignment and before commencement of trial.   Upon expiration of the applicable period within which defendant must make pre-trial motions, the People will move the Court to preclude any pre-trial motions made thereafter.

Sincerely,

CHARLES J. HYNES
District Attorney
Kings County

GJ 16 – Rev. 7/02

**EXHIBIT B**



**U. S. Department of Justice**

_Washington, D.C. 20530_

SEP 0 4 1996

Douglas E. Grover, Esq.
Grover & Bloch
Three New York Plaza
New York, New York  10004

Dear Mr. Grover:

    Re:  R. Lindley DeVecchio

    As you know, the Federal Bureau of Investigation, Office of Professional Responsibility referred to the Public Integrity Section allegations that your client R. Lindley Devecchio, an FBI Supervisory Special Agent, had committed federal offenses relating to Gregory Scarpa, Sr., now deceased.  We have determined that prosecution of SSA Devecchio in this matter is not warranted.

                    Sincerely,

                    Lee J. Radek
                    Chief
                    Public Integrity Section
                    Criminal Division

**EXHIBIT C**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARIA GRANCIO, individually, and in her capacity as Executrix and Personal Representative of the Estate of Nicholas P. Grancio,<br><br>      Plaintiff,<br><br>v.<br><br>R. LINDLEY DeVECCHIO; CHRISTOPHER FAVO; UNITED STATES OF AMERICA.<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   CIVIL ACTION NO.  06-CV-0069 (FB)(CPP)<br><br>**JURY TRIAL DEMANDED**<br><br>ECF Case |

## FIRST AMENDED COMPLAINT

### Introduction

1.  This action for money damages is brought pursuant to the Fourth, Fifth, and Eighth Amendments to the United States Constitution, under the Federal Tort Claims Act, and under the common law of the State of New York.  Jurisdiction is based upon 28 U.S.C. §§ 1331, 1343, 1346(b), 2671, *et seq.*, on the authority of *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and on the supplemental jurisdiction of the court under 28 U.S.C. § 1367(a) for claims arising under state law.  This is a case about the corrupt and unlawful relationship between law enforcement and a ruthless killer and career criminal that went unchecked for many years, was actively concealed, condoned, protected, and facilitated by our government, and that led to the cold blooded murder of a man.  It also is about a culture and a justice system in the Eastern District of New York that met such corruption with coverup and virtual license for many years, allowing this crime, these wrongdoers, and others to escape justice, while others have gone to prison on false testimony and through the concealment of material exculpatory evidence.

2.  Plaintiff alleges, *inter alia*, that the federal officials sued herein conspired with each other and

with other individuals, and acted, and failed to act in such a way as to bring about the wrongful

death of Nicholas P. Grancio on or about January 7, 1992, in Brooklyn, New York.

3.  Plaintiff duly presented timely Notices of Tort Claims, pursuant to the Federal Tort Claims

Act, 28 U.S.C. §§ 2671, *et seq.*; 2401; 2675(a) and all applicable federal regulations, giving

notice of the wrongful death caused by the acts or omissions of the defendants, while acting

within the scope of their office or employment with the United States of America, under

circumstances in which the United States, if a private person, would be liable to the plaintiff in

accordance with the laws of the State of New York.  Although the claims referenced in the

Notice have not been denied, the United States has failed to act on the claims within six months

from the date the claims were presented.  Therefore, the Plaintiff elects to treat these claims as

having been denied.

**Parties**

4.  Nicholas P. Grancio, now deceased, was at all times material to this complaint an adult

resident citizen of Kings County, New York.  His wife, the Executrix of his Estate and his

personal representative, Maria P. Grancio, is an adult resident citizen of Kings County, New

York.

5.  Defendant R. Lindley Devecchio (hereinafter "DEVECCHIO") is, upon information and

belief, an adult resident citizen of Sarasota County, Florida and Defendant Christopher Favo

(hereinafter "FAVO") is, upon information and belief, an adult resident citizen of St. Joseph

County, Indiana.  Both Defendants were at all times material to this complaint special agents of

the Federal Bureau of Investigation (hereinafter "FBI") and acted within the scope of their office

or employment as agents or employees of the FBI and the United States Department of Justice.

They are sued in their individual capacities with respect to the *Bivens* actions.  FAVO remains an

FBI Special Agent.

6.  Defendant United States of America (hereinafter "UNITED STATES") is a defendant in this

action pursuant to the Federal Tort Claims Act, arising from the acts and/or omissions of

employees and agents of the FBI and the Department of Justice, agencies of the Defendant, and

2

for claims arising under the laws of the State of New York based on the negligent or otherwise wrongful acts or omissions of individual agents of the FBI while acting within the scope of their office or employment by the FBI and/or Department of Justice, federal agencies pursuant to 28 U.S.C. §§ 2671, *et seq.* Defendant UNITED STATES was at all times material to this Complaint the employer of the individual defendants.

7. If the Defendant UNITED STATES were a private person, it would be liable to the Plaintiff in accordance with the laws of the State of New York, the place where the actions and omissions at issue herein occurred or should have, but did not, occur.

<u>Facts</u>

8. In the early afternoon of January 7, 1992, Nicholas P. Grancio (hereinafter "Grancio") was sitting in a car near where Avenue U, McDonald Avenue, and Village road converge in Brooklyn, New York.

9. Grancio was talking with his nephew, Joey Tolino, who was on the passenger side.

10. While Tolino and his uncle talked, they were being watched.

11. New York Police Department Detective Sergeant Joseph Simone and his partner, members of a task force working jointly with agents of the FBI to monitor suspected organized crime members and their activities, were watching Grancio as part of their surveillance duties for the day, just as they had done in the past. Their task force suspected that Grancio was a member of a the "Colombo" family organized crime group and that was the group this task force was assigned to monitor. Additionally, the detectives recently had received information that an attempt to kill Grancio had been planned and likely would be made right away and they watched him to prevent his murder and to protect him as well. This information had been transmitted to the Defendants as well.

12. What Detective Simone and his partner did not know was that they were not alone in watching Grancio that day; indeed they themselves were being watched as well,

13. At the very time Simone and his partner had Grancio under surveillance, a group of three men, Gregory Scarpa, Sr. ("Scarpa"), Larry Mazza ("Mazza"), and Jimmy Delmasto

3

("Delmasto") were riding around the streets looking for Grancio, intent on killing him once they found him.

14. Scarpa, Mazza, and Delmasto saw Grancio in his car; but they also saw Detective Simone and his partner in their surveillance position and recognized that they were law enforcement officers maintaining surveillance on Grancio. They knew that they could not kill Grancio while he was under surveillance.

15. Scarpa, Mazza, and Delmasto were all members of the organized crime group known to law enforcement as the "Colombo family." Scarpa was a leader of that organized crime group and was known and feared widely, as a ruthless killer and career criminal.

16. Scarpa also was a government informant who was "handled" primarily by and was close friends with DEVECCHIO.

17. Scarpa told Mazza that he would be able to get the surveillance removed by calling his contact in law enforcement. Scarpa referred to his contact in law enforcement by the pseudonyms or nicknames "Lyn," "Del," "Dello" or his "Girlfriend." These and others were pseudonyms or nicknames for Defendant DEVECCHIO and were how Scarpa regularly referred to DEVECCHIO.

18. Scarpa called DEVECCHIO and told DEVECCHIO that he had found Grancio, but that he also saw law enforcement in place maintaining surveillance of Grancio.

19. DEVECCHIO advised Scarpa that he would take care of removing the surveillance from Grancio.

20. DEVECCHIO knew or reasonably should have known or suspected at that time that Scarpa wanted the surveillance pulled off of Grancio so that he (Scarpa) and the others could murder Grancio. Before DEVECCHIO and FAVO pulled the surveillance team off of the Grancio surveillance, they had been told by other law enforcement officers that Mr. Grancio was thought to be a primary target for murder by what they understood to be Scarpa's group and that he was in immediate danger. This gave rise to a special relationship between these defendants and Mr. Grancio, carrying with it a duty to protect, to warn, and to take other necessary precautions. Both

4

Defendants owed a duty of care to Mr. Grancio and to the public, including a duty to warn and protect him, and to take other necessary precautions. Both Defendants and others breached that duty and, as a proximate cause of that breach, Mr. Grancio was killed.

21. Both Defendants knew or believed that Scarpa's group within the "Colombo family" was at "war" with the purported faction of the family of which they believed Mr. Grancio to be a member and that such "war" meant that people in one faction killed or tried to kill members of the other faction and Scarpa was known to be a ruthless killer and the men with him were known to be members of his faction. DEVECCHIO knew that Scarpa had committed murders and intended to continue committing murders and he (DEVECCHIO) was determined to help him in this endeavor.

22. At DEVECCHIO's direction and knowing the importance of the surveillance for a variety of reasons, including the need to protect Grancio from the imminent and credible threat to kill him, and aware of the "war" and Grancio's alleged position, FAVO, who worked closely with DEVECCHIO on the joint federal and state task force, telephoned Detective Simone and directed him to end the surveillance that he and his partner were conducting of Grancio.

23. FAVO directed Simone and his partner to return to the FBI New York field office headquarters for a meeting.

24. Simone found this direction most unusual, argued with FAVO, tried to dissuade him from the direction, and emphasized the critical importance of keeping Grancio under surveillance; but FAVO would not be dissuaded and he required Simone and his partner to follow the directive. Under protest, Simone and his partner pulled off their surveillance of Grancio and began to return to the FBI New York field office.

25. Minutes later, after seeing the surveillance team leave, following his phone call to DEVECCHIO for the purpose of accomplishing the same, Scarpa, with Mazza and Delmasto, drove up to Grancio's car and shot and killed Nicholas Grancio, spraying Grancio's blood and brain matter across the car and onto Joey Tolino.

26. Since the murder of Nicholas Grancio, DEVECCHIO and FAVO and others engaged in a

widespread pattern of lying about this matter and others in various settings, have misled on this subject and other incidents of gross misconduct repeatedly, and have taken other steps to conceal the true facts of the Grancio murder.  The lying and coverup continue today.

27.  Among other acts and omissions constituting misconduct, following this incident and in order to attempt to undermine Detective Simone's credibility, FAVO and other government employees, acting within scope of their office or employment, including, but not limited to, current counsel for the FBI and then federal prosecutor Valerie Caproni, lied under oath to attempt to implicate Simone in crimes of which he was innocent, FAVO tried to blame Simone for the leak of an informant's identity and status, when he knew it was DEVECCHIO who had given such information to Scarpa, and FAVO has continued to conceal the true facts surrounding his role in the murder of Mr. Grancio by continuing to provide false statements about the same, including a false claim concerning the surveillance of Grancio, undercut by contemporaneous official records of the same.

28.  FAVO unlawfully failed to report his suspicions about DEVECCHIO and Scarpa and the illegal conduct in which they were engaged, despite a duty under the law to report the same.  Had he reported it as required, the murder of Mr. Grancio and countless other murders and other crimes would have been prevented.

29.  FAVO was grossly negligent and was deliberately indifferent to the safety of Nicholas Grancio and to his duty to protect citizens so situated in calling off the surveillance of Mr. Grancio.

30.  The true facts of Nicholas Grancio's murder and the involvement of these Defendants and others in it have been and continue to be actively and fraudulently concealed by these Defendants and others and the same could not have been discovered earlier through reasonable diligence.

31.  The first time Maria Grancio or any member of her family had even any remote idea that these Defendants or any government agent could have been involved in the death of Nicholas Grancio was late in 2004 when an investigator whom she did not know introduced himself to her and asked to speak with her.  At that meeting, Mrs. Grancio learned for the first time that there

was a suspicion that these Defendants were directly involved in her husband's murder.

32. As was the case before the Grancio murder, afterwards, Scarpa continued to operate in his close relationship with the Defendants and they continued to give him license and to assist him in his commission of various other crimes.

33. Gregory Scarpa, Sr., widely reputed to hold a major leadership position in the Colombo organized crime family and known on the street as a ruthless and feared killer, was a paid informant for the government since the 1960's.

34. His relationship with the government was actively fraudulently concealed by the defendants and others in the government consistently and, at all times, notwithstanding legal obligations to end the relationship and to disclose it.

35. In 1980, DEVECCHIO became Scarpa's "handler" at the FBI and he managed his informant status, had him paid for his work, and took responsibility for him.

36. Due to his criminal record and criminal activities, including multiple murders, his unreliability, his known agenda, his mendacity, lack of credibility, the danger he posed to the public safety in general, and to Mr. Grancio in particular, and his intention to break the law, all of which were known to the Defendants and others with whom they worked and who were supervisors and otherwise their superiors, Scarpa was not qualified, suitable, or appropriate to serve either as a cooperating witness or informant for the FBI.

37. The Defendants and others employed by the UNITED STATES failed to follow proper procedures and guidelines with respect to the selection, use, employment, closing, and re-opening of cooperating witnesses and informants, and with respect to preventing and reporting the criminal activities of cooperating witnesses in the ways in which they dealt with Scarpa and others.

38. Defendants and other FBI agents and Justice Department officials, including Defendants' superiors and supervisors, all employees of the UNITED STATES, failed to follow proper procedures and guidelines with respect to monitoring and approving the activities of Scarpa, with the result that as an informant and/or cooperating witness, Scarpa was allowed and/or encouraged

to engage in actions that were illegal, including murder, conspiracy to murder, perjury, and other crimes. Such acts were neither suitable nor appropriate, nor legal, for FBI informants and/or cooperating witnesses. Defendants well knew such conduct to be unsuitable, inappropriate, and illegal; yet this was part of a pattern of conduct in which these Defendants engaged with respect to informants and/or cooperating witnesses in so-called organized crime cases and such misconduct often was condoned, fostered by, or turned a blind eye to by prosecutors and other court officials during the time frame preceding Mr. Grancio's murder and at all times relevant to this case.

39. The Defendants and their superiors also violated the guidelines, regulations, and policies with respect to the independent duty each agent and each supervisory agent has to properly supervise fellow agents and to report suspicions about misconduct and violations by such fellow agents and they further failed to investigate and, indeed, obstructed the investigation of the murder of Nicholas Grancio.

40. DEVECCHIO's relationship with Scarpa went far beyond the relationship between law enforcement handler and informant that lawfully is permitted.

41. From in or about 1980 through at least 1992, DEVECCHIO and others employed by the government knowingly allowed, protected, encouraged and facilitated Scarpa's commissions of a broad range of crimes, including, but not limited to fraud, robbery, loansharking, and murder on an ongoing and repeated basis.

42. Scarpa was paid for his work for the FBI and Scarpa, in turn, paid DEVECCHIO in a variety of forms, for their relationship and for all that DEVECCHIO allowed and helped him to do.

43. Ironically, Scarpa was paid for providing information to DEVECCHIO that someone else had killed Grancio, notwithstanding the fact that by the time he provided such information and was paid for it, DEVECCHIO, FAVO, and others already knew that Scarpa had killed Grancio. Moreover, knowing that Scarpa had killed Grancio, FAVO and others did nothing to arrest Scarpa or to report what they knew to local law enforcement authorities, or to prevent him from killing again. At all relevant times, FAVO and others actively concealed Scarpa's role in the

Grancio murder and by doing so (and otherwise) obstructed the investigation into that murder.

44. FAVO was aware of or should have been aware of the illicit, illegal, and corrupt relationship between Scarpa and DEVECCHIO and aided them in accomplishing their illegal purposes or deliberately turned a blind eye to the same. FAVO's actions in this regard, included falsifying material documents, suggesting to others that documents be falsified, lying on material issues and other acts and omissions, designed to conceal the true facts and to protect himself and others from having their misconduct uncovered. Favo was aware and concerned about the fact that he would be linked with DEVECCHIO and that he would be held responsible for not having disclosed his dealings with and what he knew about DEVECCHIO's unlawful conduct.

45. To the extent FAVO was not aware of all details of the relationship between Scarpa and DEVECCHIO, he reasonably should have been, and he had a lawful duty to act to stop that relationship and the crimes it facilitated; yet he did nothing to act on his knowledge and suspicions until it was too late and many crimes had been committed through the relationship, including several murders.

46. While FAVO did eventually come forward and report some of what he knew and suspected, he has continued to engage in a campaign of falsehood and misleading intended to coverup all of the true facts regarding his conduct, DEVECCHIO's conduct, and the conduct of other FBI agents and other law enforcement officers with whom FAVO has worked.

47. FAVO also improperly has contacted at least one witness who knows of his misconduct and who he believes to be cooperating with law enforcement and providing information about him and has tried to get that witness to alter facts about which he is concerned the witness might be reporting to law enforcement.

48. As a proximate result of the pattern of coverup by DEVECCHIO, FAVO and others, many of the true facts surrounding their unlawful conduct and the unlawful conduct of others still are not known.

49. Nicholas Grancio's death was a direct and proximate result of the acts and omissions of the Defendants as alleged in this Complaint and such actions as caused his death, as more

9

specifically described herein, were taken in violation of his clearly established constitutional rights.

50. These Defendants conspired with each other and with others and aided and abetted others to cause the death of Nicholas Grancio.

51. Defendants acted at all times with respect to the allegations in this Complaint in a manner that was wilful, reckless, wanton, grossly negligent, negligent, and in a way which was deliberately indifferent to and in knowing and intentional violation of the clearly established constitutional rights of Nicholas Grancio.

52. Due to his criminal record and criminal activities, including multiple murders, his unreliability, his mendacity, his lack of credibility, the danger he posed to public safety, and his intentions to continue to break the law, all of which were known to DEVECCHIO and FAVO and other law enforcement officers and government officials, Scarpa was not qualified, suitable or appropriate to serve either as a cooperating witness or as an informant for the FBI.

53. DEVECCHIO, FAVO, and the other FBI agents, and their superiors, including, but not limited to their immediate supervisors in the field office and superiors at FBI headquarters, and other federal government officials, failed to follow proper procedures and guidelines regarding the selection, use, payment, and supervision of, reporting on, monitoring, restricting criminal activity of, and other interaction and involvement with cooperating witnesses and informants, with respect to the selection and employment of Scarpa and others.

54. Prior to the murder of Nicholas Grancio, the defendants and others of their colleagues in law enforcement knew or reasonably should have known that Scarpa and the others intended to kill Grancio and that Scarpa sought to find him and have the surveillance removed from him for that purpose. This reflected a pattern of conduct by Scarpa and DEVECCHIO and others helped facilitate such conduct and assisted him in finding his murder targets, knowing his agenda.

55. Defendants failed to warn Grancio, failed to protect him, and failed to properly control the activities of Scarpa and failed to take any steps to prevent Mr. Grancio's murder.

56. As part of the coverup of their illegal conduct, Defendants indicated in official records that

on or about January 14, 1992, Scarpa had reported that a person named "Fusco" had killed Grancio and Defendants arranged to have the government pay Scarpa for that information, knowing that is was false and intending to document the false information to coverup the true facts and their involvement in the matter.

57. Throughout the period of time the FBI used Scarpa as an informant and afterwards, Defendants and others falsified reports and other documents, testified falsely, omitted facts from testimony they had a lawful duty to disclose, and otherwise acted improperly and unlawfully for the purposes of covering up the corrupt and unlawful relationship with and use of Scarpa and to conceal the same and their own misconduct and the misconduct of others and to secure convictions against defendants in criminal cases in the Eastern District of New York, knowing that their testimony and documents they produced in those cases were false, misleading, or omitted material facts.

58. In the 1980s and early 1990s, there were several killings among people whom the government contended were members of the Colombo organized crime family, leading the government to a theory it put forward in its prosecutions, that there was an internal "war" between what the government termed the "Orena" and "Persico" factions.

59. Scarpa, purportedly was a leader of the "Persico" faction and his intended victims, on most occasions, were purportedly members of the "Orena" faction.

60. DEVECCHIO became, in effect, a member of the "Persico" faction and assisted Scarpa in fomenting the "war" and in seeking to advance Scarpa's agenda through murder and other illegal conduct.

61. Nicholas Grancio's murder was but one illegal act in Scarpa's criminal campaign, in which DEVECCHIO was a partner, supporter, booster, advocate, sponsor, supervisor, promoter, facilitator, and aid. Actions in this connection by DEVECCHIO included, but were not limited to, the following:

     A. Passing to Scarpa confidential information that was the product of law enforcement intelligence, including wiretap surveillance details, addresses of Scarpa's enemies, and other

confidential information, to allow Scarpa and his family and friends to avoid detection or arrest

for their criminal activity or to allow Scarpa to engage in criminal activity, including murders;

B.  On at least one occasion, DEVECCHIO and Scarpa met in chambers with a federal

judge in the Eastern District of New York and during that meeting, with a criminal case against

Scarpa pending before that judge, in an effort to get leniency for Scarpa, DEVECCHIO advised

that judge of Scarpa's informant status and his medical condition.  Even after that meeting,

Scarpa's informant status was concealed from other criminal defendants for whom its disclosure

would have been relevant in their defense.  Even after this meeting in the judge's chambers,

DEVECCHIO was permitted to testify falsely in a criminal trial in the Eastern District, denying

under oath that he had intervened with any court to seek leniency for anyone.  DEVECCHIO

perjured himself in that trial, the government knew it, and then in its closing argument expressly

asking the jury to rely on DEVECCHIO's credibility.  Information about Scarpa expressly was

requested in that case and was withheld.  The Defendant in that case requested the police

investigative file in discovery and the government represented to the Court that there was nothing

exculpatory in it.  The Court blindly accepted that representation without further examination.  In

truth, the file showed several suspects in the murder investigation, none of whom was the

defendant on trial and one of whom was Greg Scarpa.

C.  DEVECCHIO and others gave material support and assistance to Scarpa with respect

to the commission of his crimes in return for information and personal gifts;

D.  Scarpa ran a campaign of murders and planned or attempted murders in the early

1990s, in addition to the murder of Nicholas Grancio and DEVECCHIO played various roles in

facilitating, fostering, and in at least one case, openly cheering on the murders, delighted to see

Scarpa's so-called faction "winning."

E.  As a result of his relationship with DEVECCHIO and FAVO, suffice it to say that

Scarpa, for all practical purposes was given immunity from arrest or prosecution despite

committing the most heinous of crimes, license to continue engaging in crimes, help in

accomplishing his criminal goals, and protection from intervention by law enforcement in his

criminal enterprises - often for Scarpa's family and friends as well.

      F. FAVO AND DEVECCHIO and others deliberately misled defendants in pending criminal cases and their lawyers, by withholding material documents and information they were duty bound to produce, often aided and abetted in this by prosecutors in the United States Attorney's office for the Eastern District of New York, all of whom were employed by the Defendant UNITED STATES and, FAVO was personally involved in developing a strategy of cover-up to foster this unlawful scheme of withholding such information and documents.

62. FAVO and other FBI agents knew about much or all of the problems and improprieties with informants both before and after the death of Mr. Grancio; yet they did nothing about reporting or putting an end to the corrupt relationship and its consequences for years, notwithstanding a clearly established legal duty to report it and to take appropriate steps to stop it and to prevent and respond appropriately to the crimes engaged in or fostered through it.

63. These Defendants and others wholly failed to supervise Scarpa as an informant, failed wholly to supervise each other and failed wholly to protect Nicholas Grancio and others from Scarpa and others, knowing the dangers that existed, all in violation of their lawfully required obligations to supervise, report, take corrective action, and protect members of the public, and to intervene when they know or suspect a serious crime is about to be committed. The danger to Nicholas Grancio was known and foreseeable to these Defendants and others, the Defendants' conduct was shocking to the conscience, Grancio was a foreseeable victim, and these Defendants created an opportunity for Grancio's death that otherwise would not have existed, but for their actions and/or omissions.

64. Had FAVO and others responded appropriately to the corrupt relationship between DEVECCHIO and Scarpa, the murder or Nicholas Grancio and other murders and crimes could and would have been prevented.

65. Instead, FAVO and others actually condoned, fostered, encouraged, and facilitated the corrupt relationship between DEVECCHIO and Scarpa and the crimes committed in connection with that relationship in a variety of way including, but not limited to, preventing the arrest of

Scarpa by local law enforcement officers when Scarpa was caught with a gun and later lying about the incident.

66. Even today, FAVO and other government law enforcement officials refuse to tell the truth or to reveal the complete and accurate details about DEVECCHIO's corrupt relationship with Scarpa and their own corrupt and improper actions with respect to cases they were investigating and informants, and what they knew or should have known when, and what they did or did not do in response.

67. The UNITED STATES, by and though its employees, failed properly to supervise these Defendants and others, failed properly to put a stop to their unlawful conduct and then wholly failed and refused to conduct a thorough investigation and failed to impose appropriate penalties once the outrageous misconduct described herein and much more of the same and worse became evident.

68. The UNITED STATES knew or should have known of the conduct of these Defendants as described herein and the propensities of these Defendants to engage in such misconduct and negligently retained them in their positions as Special Agents and negligently failed to supervise them in such positions.

69. Similarly, the UNITED STATES knew or should have known of the conduct of Scarpa as described herein and Scarpa's propensities for the same and negligently hired, retained, and supervised him.

70. The corrupt relationship described herein, albeit without sufficient detail and in far too mild a manner, is presented a case of how far wrong things can go in a relationship between handler and informant in the current guidelines with respect to how FBI agents should interact with informants; but the fact of the matter is, the UNITED STATES has allowed these Defendants and others to engage with impunity in the conduct described herein and in other instances and a pattern or practice of outrageous misconduct of a similar nature.

71. When others, including Scarpa's own son, finally have been willing to come forward with the true details about Scarpa's corrupt relationship with DEVECCHIO, prosecutors in this

14

district employed by the United States have responded invariably with a campaign designed to attack, discredit, punish, and isolate such a person.  In the case of Scarpa, Jr., notwithstanding the approach taken toward him in this District, information he has provided related to national security has been used elsewhere and his credibility has been substantiated.

72.  A primary witness to the Grancio murder has been convinced to change his story about the facts surrounding the murder because of his fear of retribution by employees of the Defendant United States, acting within the scope of their employment.

73.  DEVECCHIO received monetary and other gifts from Scarpa pursuant to and in furtherance of their corrupt relationship.

74.  Consistent with their campaign of corruption, these Defendants and others have falsely implicated others in crimes and misconduct at times to divert attention from their own wrongdoing or the wrongdoing of their friends and at other times for other illicit agendas.

75.  These Defendants and others often have been driven in their misconduct and their campaign of misleading, lying, withholding from disclosure that which they were obligated to disclose, and other corrupt conduct by a philosophy of the "ends justifying the means," seeing themselves as the appropriate decision makers and with their decisions divorced from what the Constitution requires.  The goal has been to ensure at all costs that no conviction is overturned, with the unspoken rationalization that even if the defendant at issue did not commit the crime charged, he likely did something else illegal.  Through this reasoning, details about the Scarpa/DEVECCHIO relationship have remained concealed.

76.  In this, these Defendants have not been alone; indeed, such a mentality appears to have been pervasive among law enforcement and even some court officials for many years, with prosecutors in this District long improperly deciding themselves to withhold from criminal defendants information about Scarpa's informant status and his corrupt relationship with DEVECCHIO and associated facts.

77.  When one federal judge in the district finally had the courage to upbraid the prosecutors for their misconduct in this regard and singled out one in particular for special opprobrium, his Order

was met with a letter from the United States Attorney asking him to withdraw his Order and remove reference to that prosecutor's conduct.  Shockingly, the judge acceded to that unprecedented request, withdrew the Order, removed the reference, and reissued the Order without it.

78.  Tellingly, two of the prosecutors whose judgments in withholding from the court and from criminal defendants relevant information about Scarpa, DEVECCHIO, and their corrupt relationship were pointedly questioned by the Court, including the one whom the Court singled for serious and demonstrable ethical lapses appear only to have been rewarded for their work, with one now, of all ironies, serving as General Counsel to the FBI and the other a lead prosecutor in the Arthur Andersen and Enron prosecutions - both guardians of the public integrity.  Both were elevated to these positions by the Defendant UNITED STATES, notwithstanding their improper, corrupt and unlawful conduct.

79.  In such a place, where discovery requests by criminal defendants invariably are met simply with the mantra "government counsel is aware of the government's obligations" rather than an attention to details and consequences, where demonstrable instances of prosecutorial misconduct are met on appeal by a court that is "troubled" or "concerned" about the misconduct, but unwilling generally to impose consequences, when a court hears incredible renditions of facts from law enforcement officers or learns about misconduct and takes no punitive action, and when a criminal process is driven almost wholly by the goal of securing and upholding a criminal conviction by any means, regardless of the constitutional rights run asunder in the rush to that end, an environment which in the extreme is characterized by the corrupt relationship between informant and government handler such as that described herein and worse, is given the opportunity, if not the license, to develop.

80.  As a direct and proximate cause of the wilful, wanton, knowing, intentional, reckless and/or negligent actions and omissions of the Defendants and their deliberate indifference to the life of Nicholas Grancio, the Plaintiff's decedent, Nicholas Grancio, was deprived of his liberty and his life without procedural and substantive due process of law, subjected to cruel and unusual

punishment, and was forced to endure emotional and physical pain and suffering.

81. As a direct and proximate result of the wanton, wilful, intentional, reckless and/or negligent actions and omissions of the Defendants as set forth above, Plaintiff Maria Grancio has been deprived of the loss of the income, services, protection, care assistance, society, companionship, comfort, guidance, counsel and advice of the her husband.

## COUNT I

### *Bivens* Cause of Action Against Federal Agents

82. All other paragraphs of this First Amended Complaint are incorporated herein by reference as though fully set forth.

83. The actions, conduct, and omissions of Defendants DEVECCHIO and FAVO violated the rights of the Plaintiff Maria Grancio and the Plaintiff's decedent, Nicholas Grancio under the Fourth, Fifth and Eighth Amendments to the United States Constitution.

84. Defendants wilfully, knowingly, intentionally, maliciously, recklessly, wantonly, and with deliberate indifference caused or allowed to be caused the death of Nicholas Grancio and by so doing, among other things, violated their lawfully required duties to warn him, to protect him, to report unlawful conduct by informants and by each other and others and to supervise the same and violated Mr. Grancio's rights to be free from unlawful seizures and cruel and unusual punishment, and to enjoy substantive due process under the law.

## COUNT II

### Conspiracy Cause of Action Under *Bivens*

85. All other paragraphs of this First Amended Complaint are incorporated herein by reference as though fully set forth.

86. The Defendants DEVECCHIO and FAVO conspired with each other and with others, to cause and allow to be caused the wrongful and unlawful death of Nicholas Grancio and to cover up the same and the corrupt use of and relationship with government informant Greg Scarpa, and to protect Scarpa's position as an informant and his continuing unlawful activities, as well as their own, and with respect to the other actions and omissions complained about above.

87. The acts and omissions described in previous paragraphs of this First Amended Complaint were taken and made in furtherance of and during the course of this conspiracy.

## COUNT III

### Cause of Action Against the United States Under the FTCA

88. All other paragraphs of this First Amended Complaint are incorporated herein by reference as though fully set forth.

89. At all times material to this case, Defendants DEVECCHIO, FAVO, and other agents and employees of the FBI and United States Department of Justice whose actions are referred to herein, were acting within the scope of their employment.

90. The UNITED STATES, if a private person, would be liable to the Plaintiff for the acts and omissions of its employees and agents described herein under the law of the place where said acts and omissions occurred (or did not occur), to wit, including, but not limited to, under common law tort claims arising under New York law for negligence, gross negligence, failure to warn, failure to protect, intentional infliction of emotional distress, wrongful death, conspiracy, conscious pain and suffering, negligent hiring, retention, supervision of its agents and employees, including informants, and negligence *per se*, all of which was the proximate cause of the death of Nicholas Grancio.

91. The Plaintiff timely and duly submitted an administrative claim under the FTCA to the appropriate authorities and those agencies have failed to make a final disposition of the claims within six months after they were filed and the claimant has elected to deem them denied.

## COUNT IV

### Common Law Conspiracy under New York Law

92. All other paragraphs of this First Amended Complaint are incorporated herein by reference as though fully set forth.

93. The Defendants DEVECCHIO and FAVO are liable to the Plaintiff and the Plaintiff's decedent for injuries and damages resulting from the fact that they combined and conspired together, and with others, to employ illegal means for an illegal purpose, namely to cause, permit,

18

aid, and abet, the wrongful and unlawful death of Nicholas Grancio and to cover up and keep secret their wrongful acts and the wrongful acts of others.

## COUNT V

### Negligence, Negligence *per se* and/or Gross Negligence under New York Law

94.  All other paragraphs of this First Amended Complaint are incorporated by reference as if fully set forth herein.

95.  The Defendants acted negligently, negligently *per se*, grossly negligent, carelessly, and recklessly with respect to their actions and/or omissions in at least, but not limited to, the following ways:

   a.  In the use and continuing use of Scarpa as an informant and in failing to control and report his criminal activities;

   b.  In violating the established guidelines, policy, rules, and regulations regarding the use and relationship with informants;

   c.  In failing to take appropriate steps to protect and warn Nicholas Grancio of the plans to kill him, failing to take proper precautions in that regard with respect to Scarpa, and in calling off the surveillance, despite knowing of the outstanding and imminent threat to Grancio;

   d.  In failing to properly supervise these Defendants and in retaining them as agents and as handlers of confidential informants, including, but not limited to Scarpa;

   e.  In such other ways as are set forth above;

96.  Defendants owed a duty of reasonableness and care to the public and to Nicholas Grancio and to those in his immediate family within the "zone of danger" in connection with his murder and the known plan to kill him.

97.  Defendants breached their duty in at least, but not limited to, the ways previously set, and that breach proximately caused the injuries and death of Nicholas Grancio and the damages flowing therefrom, all of which was foreseeable to them.

98.  As a proximate result of the Defendants' breach of their duties to the public and to Nicholas Grancio, Mr. Grancio suffered conscious pain and suffering, severe emotional distress, and

ultimately his death as more specifically described herein and as will be proven, and thereby sustained damages in a sum exceeding the jurisdictional limitations of all lower courts which otherwise would have jurisdiction over these claims.

## COUNT VI

### Common Law Intentional Infliction of Emotional Distress under New York Law

99.  All other paragraphs of this First Amended Complaint are incorporated herein by reference as though fully set forth.

100.  The Defendants DEVECCHIO and FAVO are liable to the Plaintiff and the Plaintiff's decedent for injuries and damages resulting from the fact that by their acts and omissions alleged herein they intentionally inflicted emotional distress upon the Plaintiff.

## COUNT VII

### Wrongful Death under New York Law

101.  All other paragraphs of this First Amended Complaint are incorporated herein by reference as though fully set forth.

102.  As a direct and proximate result of the aforementioned acts, omissions, and negligence of the Defendants, Plaintiff's decedent, Nicholas Grancio, was caused to die on or about January 7, 1992.

103.  Maria Grancio, by decree of the Surrogate's Court of Sullivan County, New York  was duly certified and found qualified to serve as Executrix and the Personal Representative of the Estate of Nicholas Grancio and as such serves properly in such capacity and as the personal representative in this action.

104.  As a direct and proximate result of the death of Nicholas Grancio, his distributes have been pecuniarily damaged and have suffered and will suffer pecuniary loss.

105.  The Defendants, jointly and/or severally, are liable to the Plaintiff and the Plaintiff's decedent for the occurrence and damages aforesaid.

106.  This cause of action arises from decedent, Nicholas Grancio's wrongful death and is exempt from any statutory modification of joint and several liability.

107.  Decedent, Nicholas Grancio, left surviving as those entitled to share in his Estate, his wife and children who had and will continue to be deprived of his company, friendship, guidance, maintenance, society, loss of enjoyment of life, support and services; who suffered great pecuniary damage and who expended money for funeral and administrative expenses as a direct result of his death, all to their personal damage and to the damage of Maria Grancio, individually and as representative of any dependents and next of kin of the Estate of Nicholas Grancio, which are compensable under the New York State E.P.T.L., including Sections 5-4.1 and 5-4.3 thereof.

108.  As a consequence of the Defendants' actions and omissions as described herein, Nicholas Grancio and the others identified above suffered severe and permanent injuries, including conscious pain and suffering, severe emotional distress, and wrongful death, as more specifically described above and as will be proven, and thereby sustained damages for which they seek compensation here.

109.  Such actions and omissions by Defendants also require damages sufficient to punish the Defendants for their actions and omissions and to deter them from engaging in or failing to engage in the future in such conduct as gave rise to such injuries and wrongful death and as gives rise to these claims.

## COUNT VIII

### Negligent Hiring, Supervision, and Retention Under New York Law

110.  All other paragraphs of this First Amended Complaint are incorporated herein as though fully set forth.

111.  Defendants regularly dealt with the public and the UNITED STATES and its employees knew that its employees, agents, and persons situated as these individual Defendants were would deal and did regularly deal with the public, with people situated like Mr. Grancio was, with informants and others with propensities for criminal conduct, including murder.

112.  Defendant UNITED STATES had a duty to use reasonable care in selecting, hiring, training, supervising, and retaining people in its employ, including informants, cooperating witnesses, Special Agents, supervisory personnel and other employees of the FBI

and Department of Justice and owed a duty to the public and to Mr. Grancio to use such reasonable care with respect to the hiring, supervision, and retention of Scarpa and Defendants DEVECCHIO and FAVO, mindful of the serious, sensitive, and dangerous nature of the work in which its employees would engage and situations they would encounter and for which they would be responsible.

113.  Defendant United States and its employees, including, but not limited to the named Defendants herein, breached the duty of reasonable care in the manner in which it hired Scarpa or permitted him to be hired as an informant and cooperating witness and in the manner in which it failed adequately to supervise and then retained Scarpa, DEVECCHIO, FAVO, and others after it knew or should have known about the problems attending the matters described herein.

114.  Defendant UNITED STATES was further negligent with respect to the other improper and unlawful acts and omissions of its employees as specifically described above, including the protection of Scarpa from arrest and prosecution, the concealment of the corrupt relationship between Scarpa and the FBI, and the withholding of evidence and obstruction of justice described above.

115.  Defendants were negligent *per se* by permitting the pattern and practice of the wholesale violation of the Attorney General's rules, regulations, and policies with respect to the matters herein described and by concealing Scarpa's status at times when a duty to disclose it existed under the law.

116.  As a proximate result of the foregoing breaches of duties, Nicholas Grancio and his wife and family suffered great injuries, including his death and conscious pain and suffering and emotional distress and other losses.

### COUNT IX

### Conscious Pain and Suffering Under New York Law

117.  All other paragraphs of this First Amended Complaint are incorporated herein as though fully set forth.

118.  As a direct and proximate result of the aforementioned acts, omissions, and negligence of the Defendants, Plaintiff's decedent. Nicholas Grancio, was caused to suffer excruciating conscious pain and suffering before her death on or about January 7, 1992.

119.  The Defendants, jointly and/or severally, are liable to the Plaintiff and the Plaintiff's decedent for the occurrence and damages aforesaid.

120.  This cause of action arises from decedent, Nicholas Grancio's wrongful death and is otherwise exempt from any statutory modification of joint and several liability.

121.  As a consequence of the Defendants' actions and omissions as described herein, Nicholas Grancio suffered severe and permanent injuries, including conscious pain and suffering, severe emotional distress, and wrongful death, as more specifically described above and as will be proven, and thereby sustained damages in a sum exceeding the jurisdictional limitations of all lower courts which otherwise would have jurisdiction over these claims.

122.  Such actions and omissions by Defendants also require damages sufficient to punish the Defendants for their actions and omissions and to deter them from engaging in or failing to engage in the future in such conduct as gave rise to such injuries and wrongful death and as gives rise to these claims.

## COUNT X

### Negligent Infliction of Emotional Distress Under New York Law

123.  All other paragraphs of this First Amended Complaint are incorporated by reference as if fully set forth herein.

124.  At all times relevant hereto, Plaintiff, Maria Grancio was the wife of the deceased, Nicholas Grancio and, as such was an immediate family member of the deceased and, at all relevant times was within the "zone of danger" within the meaning of that term under New York law.

125.  Shortly after the murder of her husband, Maria Grancio learned about the brutal killing and the details of the shooting and the effect it had on her husband and his body.

126. Maria Grancio was aware that her husband had been brutally shot and killed, with his head mutilated, causing excruciating pain.

23

127.  As a result of all of the foregoing and having a tremendously close relationship to the victim, Nicholas Grancio, her husband, Plaintiff Maria Grancio suffered the negligent inflection of emotional distress and mental trauma.

128.  As a result of the aforesaid negligent infliction of emotional distress, Plaintiff Maria Grancio suffered the following injuries, including, but not necessarily limited to:

      a.     Severe shock to her nervous system;

      b.     Severe mental anguish and trauma;

      c.     Physical manifestation of the severe shock and mental anguish.

129.  As a result of the aforesaid contemporaneous sensory observance of the incident described herein, Plaintiff, Maria Grancio has suffered from and continues on a daily and recurring basis to suffer from some or all of the following: pain, mental anguish, psychic injury, terrible sadness, anxiety, discomfort, inconvenience, shock, fright, nightmares, nervousness and apprehension.

130.  As a result of the aforesaid experience Plaintiff Maria Grancio has been and continues to be deprived of the ordinary and usual enjoyments of life, health, family and recreation and all of the same likely will continue in the future and has suffered injuries and damages as described above in a sum sufficient to compensate her for the injuries suffered as described above and in an amount in excess of the jurisdictional limitations of all lower courts which otherwise would have jurisdiction over these claims.

## COUNT XI

### On Behalf of Decedent's Wife Under New York Law

131.  Plaintiff Maria Grancio, individually and as the wife and immediate family member of the deceased, Nicholas Grancio, reiterates and realleges each and every allegation contained in all of the foregoing paragraphs, inclusive, with the same force and effect as if set forth fully herein.

132.  At all times relevant to this action, Plaintiff, Maria Grancio was the wife of the deceased, Nicholas Grancio.

133.  By reason of the foregoing, as more specifically set forth hereinabove, and as a direct and proximate result of the same, this Plaintiff wife of Nicholas Grancio has suffered injuries

described above and has been deprived of the companionship, society, affection, enjoyment, and loving family relationship they enjoyed with her beloved husband Nicholas Grancio and has suffered damages in an amount in excess of the jurisdictional limitations of all lower courts which otherwise would have jurisdiction over these claims.

   **WHEREFORE**, plaintiff requests this Court:

1. Award compensatory damages to Plaintiff against the Defendants, jointly and severally;

2. Award punitive damages to Plaintiff against Defendants DEVECCHIO AND FAVO, jointly and severally, in an amount sufficient to punish Defendants for their actions and omissions and to deter them from engaging in or failing to engage in the future in such conduct as gave rise to such injuries and wrongful death and as gives rise to these claims;

3. Award costs and attorney's fees to Plaintiff;

4. Award such other and further relief as this court may deem appropriate.


**THE PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL COUNTS SO TRIABLE.**

Respectfully Submitted,

_____

s/David I. Schoen DS0860

David I. Schoen, Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, Alabama 36106
Phone: 334-395-6611; Fax: 917-591-7586
E-Mail: DSchoen@abanet.org or DSchoen593@aol.com

COUNSEL FOR PLAINTIFF


October 1, 2006

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

MARIA GRANCIO, individually, and            )
in her capacity as Executrix and Personal   )
Representative of the Estate of Nicholas P.  )
Grancio,                                     )
                                             )
      Plaintiff,                            )
                                             )
v.                                           )    CIVIL ACTION NO.  06-CV-0069 (FB)(CPP)
                                             )
R. LINDLEY DeVECCHIO;                        )    **JURY TRIAL DEMANDED**
CHRISTOPHER FAVO;                            )
UNITED STATES OF AMERICA.                    )    ECF Case
                                             )
      Defendants.                          )

## CERTIFICATE OF SERVICE

    I hereby certify that on October 1, 2006, I served a copy of the foregoing First Amended Complaint on counsel for Defendants Devecchio and Favo by emailing the same to them at "Douglas.Grover@ThompsonHine.com" and MGConsidine@dbh.com and understand that they will be served through the ECF system as well.  I will serve the Defendant United States of America with a copy of the foregoing First Amended Complaint and a copy of the original Complaint with a Summons as provided for under the Federal Rules of Civil Procedure and I will file the executed return of service once service on the United States has been effected.

---

s/David I. Schoen DS0860

David I. Schoen, Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, Alabama 36106
Phone: 334-395-6611; Fax: 917-591-7586
E-Mail: DSchoen@abanet.org or DSchoen593@aol.com

COUNSEL FOR PLAINTIFF

**<u>EXHIBIT D</u>**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
MARIA GRANCIO, individually and in her
capacity as Executrix and Personal Representative
of the Estate of Nicholas P. Grancio,

     Plaintiff,       Civil Action
               No. CV-06-0069

  -against-

               (Block, J.)
R. LINDLEY DeVECCHIO,        (Pollak, M.J.)
CHRISTOPHER FAVO,
UNITED STATES OF AMERICA,

      Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## CERTIFICATION OF SCOPE OF EMPLOYMENT

    Pursuant to the provisions of 28 U.S.C. § 2679(d)(1), and by virtue of the authority

vested in United States Attorneys by 28 C.F.R. § 15.4, it is hereby certified that, on the basis of the

information now available with respect to the allegations contained within the above-captioned

complaint, the individual defendants, R. Lindley DeVecchio and Christopher Favo, were acting

within the scope of their respective employment as employees of the United States of America at the

time of the incidents out of which the allegations in the First Amended Complaint arose.

Dated: Brooklyn, New York
    January 10, 2007

          ROSLYNN R. MAUSKOPF
          UNITED STATES ATTORNEY
          Eastern District of New York
          One Pierrepont Plaza, 14th Floor
          Brooklyn, New York  11201

    BY:   _s/ Gail A. Matthews_
        Gail A. Matthews (EDNY 5854)
        Assistant United States Attorney
        (718) 254-6025

cc:     David I. Schoen, Esq.
          Attorney for plaintiff
        Douglas E. Grover, Esq.
          Attorney for defendant DeVecchio
        Michael G. Considine, Esq.
          Attorney for defendant Favo

**EXHIBIT E**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
MARIA GRANCIO, individually and in her
capacity as Executrix and Personal Representative
of the Estate of Nicholas P. Grancio,

                        Plaintiff,                        Civil Action
                                                        No. CV-06-0069

      -against-

                                                      (Block, J.)
R. LINDLEY DeVECCHIO,                       (Pollak, M.J.)
CHRISTOPHER FAVO,
UNITED STATES OF AMERICA,

                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## NOTICE OF SUBSTITUTION OF UNITED STATES OF AMERICA
## AS SOLE DEFENDANT WITH RESPECT TO ALL TORT CLAIMS

        PLEASE TAKE NOTICE that, pursuant to the Federal Tort Claims Act, 28 U.S.C.

§ 2671 et seq. ("FTCA") and the January 10, 2007 Certification of Scope of Employment by the

United States Attorney for the Eastern District of New York that the individual defendants, R.

Lindley DeVecchio and Christopher Favo, were acting within the scope of their respective

employment at the time of the incidents out of which the claims alleged in the First Amended

Complaint arose, the United States of America is hereby substituted for the individual defendants

with respect to the Plaintiff's claims of personal injury and death arising or resulting from the

negligent or wrongful acts and omissions of the individual defendants including, but not limited to,

the claims set forth in the First Amended Complaint in Counts II through XI.

Dated: Brooklyn, New York
       January 10, 2007

                                     ROSLYNN R. MAUSKOPF
                                     UNITED STATES ATTORNEY
                                     Eastern District of New York
                                     One Pierrepont Plaza, 14th Floor
                                     Brooklyn, New York  11201

              BY:             s/ *Gail A. Matthews*
                                     Gail A. Matthews (EDNY 5854)
                                     Assistant United States Attorney
                                     (718) 254-6025

cc:    David I. Schoen, Esq.
      Attorney for plaintiff
    Douglas E. Grover, Esq.
      Attorney for defendant DeVecchio
    Michael G. Considine, Esq.
      Attorney for defendant Favo

**EXHIBIT F**

Case 1:06-cv-00069-FB-CLP   Document 74-2   Filed 07/30/07   Page 42 of 88 PageID #: 537

Service:  **Get by LEXSEE®**
Citation:  **299 fsupp 2d 82**

*299 F. Supp. 2d 82, *; 2004 U.S. Dist. LEXIS 380, ***

VICTOR J. ORENA and PASQUALE AMATO, Movants, -against- UNITED STATES OF AMERICA, Respondent.

96 CV1461, 96 CV 1474, 92 CR 351

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

299 F. Supp. 2d 82; 2004 U.S. Dist. LEXIS 380

January 15, 2004, Decided

**PRIOR HISTORY:** United States v. Orena, 145 F.3d 551, 1998 U.S. App. LEXIS 11501 (2d Cir. N.Y., 1998)

**DISPOSITION:** [**1] Petitioners' motions for dismissal of their indictments or for new trials denied.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Movants, two mobsters, who were convicted in the early 1990s of various crimes, including murder, and sentenced to life imprisonment and the loss of all their assets, launched renewed collateral attacks on their convictions. They claimed new evidence demonstrated that it was an associate, who died in prison, and a former FBI agent, and not movants, who killed a fellow gang member and organized a mob war.

**OVERVIEW:** The only relevant support for movants' contentions of any significance were the alleged confessions of the associate to his son, a convicted murderer and a member of a Mafia family, that his father (the associate) and the agent had committed the crimes of which movants had been convicted. Other witnesses called by movants during the evidentiary hearing on their motions presented no testimony of any significance. The court found the son to be not credible. His source was also not credible. The only substantial information the son had was furnished to him orally by his father. The son observed nothing that took on significance without the father's extra-judicial statements. Since both the father and the son were sentenced to federal prison, where the father died, and the son was serving an almost endless sentence, they had good reason to want to further damage the reputation of the FBI and to help movants, their erstwhile friends and sometimes adversaries. Thus, none of the newly presented evidence was persuasive. The court's decision of March 10, 1997, denying a similar collateral attack remained unshaken in its premises and findings.

**OUTCOME:** The motions were denied.

**CORE TERMS:** convicted, reasonable doubt, defense counsel, senior, credited, credible, murderer, serving, prison, mafia, died

**COUNSEL:** For Pasquale Amato, PETITIONER (1:96cv1461): Flora Edwards, New York, NY USA.

For Victor J Orena, PETITIONER (1:96cv1474): Flora Edwards, New York, NY USA.

For United States of America, RESPONDENT (1:96cv1461, 1:96cv1474): Andrew Weissman, George

Stamboulidis, United States Attorney's Office, Brooklyn, NY USA.

For Victor J. Orena aka: Victor J. Orena, "Little Vic", Defendant (1:92cr351): Gustave H. Newman, Newman & Schwartz, New York, NY USA.

U. S. Attorneys (1:92cr351): Andrew Weissman, Ellen Corcella, George Stamboulidis, John Gleeson, Stephen Kelly, United States Attorney's Office, Daniel Seth Dorsky, Office of the United States Attorney, Brooklyn, NY.

**JUDGES:** Jack B. Weinstein, Senior United States District Judge.

**OPINION BY:** Jack B. Weinstein

**OPINION: [\*82]** MEMORANDUM and ORDER

*Jack B. Weinstein, Senior United States District Judge*

In the closing decades of the last century heavily armed mobs of Mafiosi, protected by bullet proof vests and scanners monitoring police radio channels, roamed the **[\*83]** streets of New York in their automobiles **[\*\*2]** (bugged by the Federal Bureau of Investigations) shooting down their rivals in crime. One of the more fascinating episodes was the civil war in the Columbo organized crime family.

In the sequelae of that struggle, the two movants, Victor J. Orena and Pasquale Amato, were convicted in the early 1990's of various crimes, including murder. They were sentenced to life imprisonment and loss of all their assets. Their convictions were affirmed. Collateral attacks on the judgments of conviction were rejected by the trial court after an extensive evidentiary hearing. The by now archaic history is fully described in *United States v. Sessa, 821 F. Supp. 870 (E.D.N.Y. 1993), aff'd sub nom, United States v. Amato, 15 F.3d 230 (2d Cir. 1994)* and *United States v. Orena, 32 F.3d 704 (2d Cir. 1994); Orena v. United States, 956 F. Supp. 1071 (E.D.N.Y. 1997), aff'd by summary orders, Orena v. United State* (2d Cir. April 28, 1998) and *Amato v. United States,* (2d Cir. April 20, 1998).

As of 1997 the matter was accurately summed up as follows:

Attempting to transform a troubling cloud of questionable ethics and judgment **[\*\*3]** enveloping an F.B.I. Special Agent into a raging storm of reasonable doubt, petitioner-defendants move for dismissal of their indictments or for new trials ... The claim is that the government violated its disclosure obligations under *Brady v. Maryland,* after engaging in and covering up outrageous government misconduct.

Orena and Amato contend that it was not they -- the convicted criminals -- but ex-F.B.I. Special Agent, R. Lindley DeVecchio, who conspired with one of the defendants' associates -- the murderer Gregory Scarpa -- to cause the killing of their partner, the loanshark, Thomas Ocera, and to instigate an internecine mafia war. The evidence to prove this bizarre, but not entirely implausible, contention, defendants argue, should have been supplied to defense counsel so that they could rely on the jurors' rationality or befuddlement (they claim either provides a justifiable basis for reasonable doubt) to achieve a verdict of not guilty, or at least disagreement sufficient for a mistrial.

Scarpa has died in prison and can provide no help on the facts. DeVecchio, having been allowed to resign from the F.B.I ... [,] was granted immunity, all documents relevant to his **[\*\*4]** background were revealed, and he was subjected to fierce examination by defense counsel.

Despite the seamy aspects of law enforcement revealed by the record, ... defendants' factual assumptions and legal theories are unpersuasive.

956 F. Supp at 1076-77 (citations omitted).

As an epilogue, Orena and Amato now present further "evidence" in a renewal of their attack on their convictions. An additional full evidentiary hearing was held on their new motions. The only relevant support for their contentions of any significance are the alleged confessions of Scarpa to his son, Gregory Scarpa, Jr., a convicted murderer and a made member of a mafia family, that it was the father and Del Vecchio, not defendants, who killed a fellow gang member and organized the mob war. Gregory Scarpa, Jr. testified by video from prison where he is serving what amounts to more than a life sentence.

Other witnesses called by petitioners at the hearing presented no testimony of any significance. None revealed any direct knowledge of Del Vecchio's alleged demonic connection to the senior Scarpa that can be credited.

[*84]  Gregory Scarpa, Jr. testified that Del Vecchio was paid some $ 100,000, furnished [**5] with such "entertainment" as call girls, champagne, and a hotel suite at the Holiday Inn in Staten Island, and provided an all-expense paid trip to Aspen, Colorado for services he rendered to the senior Scarpa and the mob, and that for these and other benefits Del Vecchio started the Columba war, helped Gregory Scarpa and his associates hunt down and kill members of a competing faction of the mob, and protected the Scarpas, father and son, from the police. The court finds this witness to be not credible. His source is also not credible on these matters.

The only substantial information Scarpa, Jr. had was furnished to him orally by his parent. The son, if he is credited at all, was told by his sire what Del Vecchio was doing for the mob and what the elder Scarpa was doing for Del Vecchio. The son observed nothing that took on significance without the father's extra-judicial statements. Since both Scarpas were sentenced to federal prison, where the father died, and the son is serving an almost endless sentence, they had good reason to want to further damage the reputation of the F.B.I. and to help their erstwhile friends, and sometimes adversaries, Amato and Orena.

None of the newly [**6]  presented evidence is persuasive. The court's decision of March 10, 1997 denying a similar collateral attack remains unshaken in its premises and findings. The motions are denied.

So Ordered.

Jack B. Weinstein

Senior United States Judge

Dated: January 15, 2004

Service:  **Get by LEXSEE®**
Citation:  **299 fsupp 2d 82**
View:  Full
Date/Time: Friday, November 10, 2006 - 2:24 PM EST

* Signal Legend:
- Warning: Negative treatment is indicated
[Q] - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
[A] - Citing Refs. With Analysis Available
[i] - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

**EXHIBIT G**

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

1

2

- - - - - - - - - - - - X

3                                    :
PASQUALE AMATO,             :    CV-96-1461
4   VICTOR ORENA,              :    CV-96-1474

5              Petitioners  :

6       -against-            :
                            :    United States Courthouse
7   UNITED STATES OF AMERICA,:    Brooklyn, New York:

8                            :
             Respondent.  :
9   - - - - - - - - - - - - X    January 7, 2004
                                 10:00 a.m.
10

11              TRANSCRIPT OF HEARING
       BEFORE THE HONORABLE JACK B. WEINSTEIN
12          UNITED STATES DISTRICT JUDGE

13  APPEARANCES:

14  For the Petitioners:    FLORA EDWARDS, ESQ.

15
For the Respondent:     ROSLYNN R. MAUSKOPF, ESQ.
16                          United States Attorney
                            BY:  PATRICIA NOTOPOULOS, ESQ.
17                               MICHAEL WARREN, ESQ.
                            Assistant United States Attorneys
18

19

20  Court Reporter:         FREDERICK R. GUERINO, C.S.R.
                            225 Cadman Plaza East
21                          Brooklyn, New York
                            718-254-7220
22

23

24

25  Proceedings recorded by mechanical stenography, transcript
    produced by CAT.

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

168

1                    I N D E X

2

3  G R E G O R Y   S C A R P A, Jr.....................26

4

5  DIRECT EXAMINATION

6  BY MS. EDWARDS: ...................................27

7

8  CROSS-EXAMINATION

9  BY MS. NOTOPOULOS: ................................62

10

11  REDIRECT EXAMINATION

12  BY MS. EDWARDS: ...................................91

13

14  L A W R E N C E   M A Z Z A......................96

15

16  DIRECT EXAMINATION

17  BY MS. EDWARDS: ...................................96

18

19  CROSS-EXAMINATION

20  BY MS. NOTOPOULOS: ...............................105

21

22  REDIRECT EXAMINATION

23  BY MS. EDWARDS: ..................................119

24

25

Diana Pereira, CRR

169

1   S T E P H E N      D R E S C H.................................124

2

3   DIRECT EXAMINATION

4   BY MS. EDWARDS: ..............................................124

5

6   J O S E P H     S I M O N E.................................131

7

8   DIRECT EXAMINATION

9   BY MS. EDWARDS: ..............................................131

10

11  CROSS-EXAMINATION

12  BY MS. NOTOPOLOUS: ...........................................141

13

14

15                       E X H I B I T S

16

17  Petitioner's Exhibit 1 was received and marked in

18  evidence.....................................................133

19

20  Court's Exhibit 18, videotape of testimony of Gregory

21  Scarpa, was received in evidence.............................167

22

23  Court's Exhibit 19, videotape of testimony of Lawrence

24  Mazza, was received in evidence..............................167

25

                    Diana Pereira, CRR

134

Simone - Direct/Edwards

1   BY MS. EDWARDS:

2   Q    I would like to direct your attention to this document.

3   What kind of document is this?

4   A    This is what is called a DAR, Daily Activity Report.   It

5   is prepared either at the end of the tour or the following

6   day;  the activities that you did during that tour of duty.

7   Q    Okay.

8         What day is this prepared for?

9   A    January 7th of '92.

10  Q    All right.

11        Who prepared this, sir?

12  A    I did.

13  Q    Is this your handwriting?

14  A    Yes, it is.

15  Q    Did you prepare this contemporaneously with --

16  A    Yes.

17  Q    And is this your copy of the document?

18  A    This is a copy of my copy, yes.

19  Q    It is a copy of your copy.  Okay.

20        Are there any other copies that you submitted

21  anywhere else?

22  A    Yes.

23  Q    Where did you submit them?

24  A    There is a three-fold form.  One form goes to

25  headquarters.  The other form is kept at the command, and the

Diana Pereira, CRR

135

Simone - Direct/Edwards

1  third copy is the office.

2  Q    I would like to draw your attention to the first entry

3  where it says time from 1245 to 1330.

4       Can you tell me what 26 was, Colombo Task Force?

5  A    26 was Village Road and Avenue U.  It as was an apartment

6  on the second floor, above a real estate office or insurance

7  company.  It had a good view of most of Avenue U, Van Sicklen,

8  Lake Street. It was used as an observation post.

9  Q    Were you engaged in routine surveillance?

10 A    Yes.

11 Q    Who were the subjects of your surveillance?

12 A    At that time, it was Nicky Grancio.

13 Q    And who was Nicky Grancio, if you know?

14 A    He was a capo in the Colombo Crime Family.

15 Q    I would like to draw your attention to the next entry

16 that says 1330.

17      Can you explain your entry?

18 A    It says --

19 Q    Looks like "exit."

20 A    "ERT," en route to " 26 Federal Plaza with Maggiure.

21 That's a license plate number of the car that we were using.

22 Q    And what does that mean?  What happened, to the best of

23 your recollection, that put you en route?

24 A    We were called in by Agent Favo for a conference.

25 Q    How do you know it was Agent Favo?

Diana Pereira, CRR

Simone - Direct/Edwards

1   A    Over the radio.

2   Q    Let me see if I understand.

3        You suspended the surveillance.  You were told to

4   suspend the surveillance?

5   A    Yes.

6   Q    To return to Federal Plaza.

7        Did you think that was unusual?

8   A    At that time, yes.

9   Q    I'm sorry, I didn't hear that.

10  A    Yes.

11  Q    What was the purpose or were you told the purpose of the

12  order to return to Federal Plaza?

13  A    I don't remember but it was for a team meeting.  I don't

14  remember what it was.

15  Q    What was the meeting about?

16  A    That's what I don't remember.  Because during the

17  commotion, as you could see, down further, at about --

18  Q    Let's move down.

19  A    --  1600, we got word that Nicky Grancio was shot, fatally

20  shot.

21  Q    What did you do after you got word?

22  A    Went to the vicinity of 26 Federal.

23  Q    The entry from 1630 to 1730, what does that mean "AA

24  with"?

25  A    And above with Maggiure re the Grancio homicide.  That's

Diana Pereira, CRR

137

Simone - Direct/Edwards

1   the vicinity of where he was shot, on Village Road by Avenue U

2   there.

3   Q    Does that mean that you returned to the scene --

4   A    Yes.

5   Q    -- Where he was shot?

6        Okay.

7        Where did you go at 740?

8   A    740, went to Coney Island Hospital.

9        THE COURT:  1740.

10       MS. EDWARDS:  1740, I'm sorry.

11  Q    You went to Coney Island Hospital.  Why did you go there?

12  A    To interview Anthony Bianco.

13  Q    Who is he, to your knowledge?

14  A    I don't recall right now.

15  Q    At 1825, can you describe what happened there?

16  A    Yes.  1825 we were at the 61 Precinct.  We interviewed an

17  individual named Joey Tolino.

18  Q    What was the sum and substance of that interview?

19  A    He was present when Nicky Grancio got shot.

20  Q    What did you learn from Joey Tolino?

21  A    That he had told me that --  first he had said: Where

22  did you guy's go?  You have been following, and all of a

23  sudden you disappear and Nicky got shot, he got killed,

24  something to that effect.  He also explained to me shortly

25  after we left, a dark van pulled up to next him with a sliding

Diana Pereira, CRR

138

Simone - Direct/Edwards

1  door, opened.  He saw a barrel come out of the sliding door

2  area and he yelled, screamed, he ducked, and they shot Nicky.

3  Q    How many of these surveillances have you done?

4  A    Many.

5  Q    Ten?  Twenty?  A hundred?

6  A    Hundreds.

7  Q    Hundreds.

8       How often have you been ordered to suspend

9  surveillance to have a team meeting?

10  A    Not often.

11  Q    Okay.

12       What did you do with the information you received

13  from Jerry Tolino, did you share it with anyone?

14  A    Yes.

15  Q    Who did you share that with?

16  A    Agent Favo.

17  Q    Did there come a time when you were no longer in Squad

18  C5?

19  A    Yes.

20  Q    What happened?

21  A    I was transferred to Health Services.

22  Q    Did there come a time when you were brought up on

23  charges?

24  A    Yes.  I was arrested.

25  Q    When was that, sir?

Diana Pereira, CRR

139

Simone - Direct/Edwards

1   A   December 8th of '93.

2   Q   What were those charges?

3   A   Attempted alleged bribery, attempted alleged conspiracy.

4   Q   Did you continue to work after your arrest?

5   A   Until May of '96.

6   Q   What was your assignment there?

7   A   Health Services.

8   Q   And did you go to trial?

9   A   Yes.

10  Q   What was the result of that trial?

11  A   I was acquitted.

12  Q   After your acquittal, did you return to active duty in

13  the police department?

14  A   No, not active duty.  The day I was arrested was the day

15  I was retiring.

16  Q   I see.

17      THE COURT:  You were retired or did you retire?

18      THE WITNESS:  I was supposed to retire that day.

19  Q   And what was the result of your department trial?

20  A   Termination.

21  Q   Did you recover your pension?

22  A   Nothing.

23  Q   Are you testifying here today because you are angry with

24  the police department?

25  A   No.  I just want to see justice done.

Diana Pereira, CRR.

Simone - Direct/Edwards

1   Q    Have you been promised anything in exchange for this

2   testimony?

3   A    No.

4           MS. EDWARDS:  Thank you, sir.

5           No more questions.

6           THE COURT:  Would you like to take a short break

7   while you confer?

8           MS. NOTOPOLOUS:  That would be great, your Honor.  I

9   would proceed today.

10          THE COURT:  I would rather not bring the witness

11  back.

12          MS. NOTOPOLOUS:  Right.  I think I would be able to

13  do that, having gotten this document.

14          THE COURT:  All right.

15          Take a 10-minute recess, please.

16          (Recess)

17

18

19

20

21

22

23

24

25

141

1          (Judge Weinstein enters the courtroom.)

2          THE COURT:  Are you prepared to proceed?

3          MS. NOTOPOLOUS:  Yes, your Honor, I am.  There are

4     some facts I may need to check out.  It may not lead to

5     additional cross.  I would like to proceed.

6          MR. ORENA:  Your Honor, Ms. Edwards is in the

7     ladies' room.

8          THE COURT:  Call the witness.

9          (Whereupon, the witness, Christopher Simone, resumes

10    the stand.)

11         THE COURT:  Proceed, please.

12    CROSS-EXAMINATION

13    BY MS. NOTOPOLOUS:

14    Q    Good afternoon, Mr. Simone.  My name is Patricia

15    Notopoulos .   I am an Assistant United States Attorney for

16    the government.

17         Mr. Simone, this document that was shown to you this

18    afternoon, it is a Daily Activity Report;  is that correct?

19    A    Yes.

20    Q    And you would fill them out every day that you were

21    working, usually that day or shortly after that day.  Is that

22    correct?

23    A    Yes.

24    Q    Now, on this particular day -- it was January 7th,

25    1992, correct?

Diana Pereira, CRR

142

1    A    Yes.

2    Q    On January 7,1992, you were assigned to Squad C5.  Is

3    that correct?

4    A    Yes.

5    Q    Now, you testified that Lynn DelVecchio was your boss,

6    correct?

7    A    In charge of C5, yes.

8    Q    In charge of C5.

9         Now, when you say he was in charge of C5, Lynn

10   DelVecchio was an FBI agent, correct?

11   A    Right.

12   Q    He supervised the FBI agents on C5.  Correct?

13   A    Yes.

14   Q    And C5 was the task force.

15        So it had FBI agents working with NYPD officers,

16   together?

17   A    Right.

18   Q    Correct.

19        And now the police officers, you had your own boss,

20   isn't that correct?

21   A    Yes.

22   Q    And who was your boss on C5?

23   A    Lieutenant Shannon.

24   Q    Now, Lieutenant Shannon would obviously work closely with

25   the boss of C5, the FBI boss, correct?

Diana Pereira, CRR

143

1    A    Yes.

2    Q    But nonetheless, you, as a detective, were answerable

3    ultimately to Lieutenant Shannon, isn't that correct?

4    A    No.

5    Q    It is your testimony you would ultimately be answerable

6    to the FBI boss of the squad?

7    A    Well, depending on the circumstances.  If we were doing

8    surveillance, the case agent would be given the surveillance

9    reports and all.  They would go over it with Lieutenant

10   Shannon or Sergeant Brogan.  A lot of times Sergeant Brogan

11   would be in the street when the surveillances were done.

12   Q    Okay.

13        But now you are talking about individual  assignments

14   and who you might provide your information to or who may have

15   directed you to do something, correct?

16   A    Yes.

17   Q    But in the broad general chain of an organized FBI task

18   force squad, there is an FBI boss in charge of the agents and

19   an NYPD lieutenant in charge of the detectives on a task force

20   squad?

21   A    Yes.

22   Q    Okay.

23        Now, in January of 1992, wasn't Squad C5 the Genovese

24   squad?

25   A    At one time, it was.  I think it still is.  I don't even

144

1   know.  When the Colombo war broke out, we were called in to

2   join a new squad.  I am taking it to be C5;  I could be

3   wrong.  But it was a joint task force during the Colombo war.

4   Q    Isn't it a fact or does it refresh your recollection that

5   in January of 1992 the boss of C5 was a Steve Stone?

6   A    Genovese?

7   Q    As the Genovese squad?

8   A    Right.  Not during the Colombo war.

9   Q    Well, during the Colombo war, there was a Genovese squad,

10  correct?

11  A    Yes.

12  Q    And that squad's designation in the FBI is C5, correct?

13  A    I might have got numbers wrong, but what I was --  I was

14  part of a joint task force during the Colombo war under

15  supervision of Lieutenant Shannon and Lynn DelVecchio.

16  Q    Well, isn't it a fact that although you were assigned to

17  C5 under Lieutenant Shannon, which is on a squad headed by

18  Dave Stone, you provided -- a tremendous amount of your work

19  during that time was assisting in the investigation of the

20  Colombo Family war, is that fair to say?

21  A    Say that again.

22  Q    I'm sorry, I will rephrase the question.

23       Isn't it a fact that, technically, in January of

24  1992, you were assigned to Squad C5 and the boss of C5 was

25  Steve Stone?

145

1  A   Okay.

2  Q   Isn't that correct?

3  A   Yes.

4  Q   However, during this time the Colombo family war was

5  raging --

6  A   Correct.

7  Q   -- And the detectives on C5, the Genovese squad, provided

8  manpower to investigate the Colombo Family war;  is that

9  correct?

10  A   Yes, but not --  I am not sure --  I don't think it was

11  just C5.  Other squads also.

12  Q   Okay.

13       Many other squads?

14  A   To make one squad.

15  Q   To make --

16       In other words, the police department drew from

17  precincts, correct, for manpower --

18  A   No.

19  Q   -- To investigate the war?

20  A   Precincts were doing their own investigations.

21       What we were doing, they got detectives from OCID,

22  within OCID itself.  There were different squads for different

23  crime families and people were drawn in from --  it was up to

24  the police department who they decided.

25  Q   Okay?

146

1  A    OCID, but it was OCID detectives, not precinct

2  detectives.

3  Q    Okay.  No question about it though, you did a lot of work

4  investigating the Colombo Family war, correct?

5  A    Yes.

6  Q    And there is actually no question about it that you

7  worked closely with Agent Favo, correct?

8  A    Yes.

9  Q    Lieutenant Shannon, your immediate NYPD boss, was

10  intimately involved in that investigation, correct?

11  A    Yes.

12  Q    Lieutenant Shannon worked closely with Agent Favo,

13  correct?

14  A    I believe so, yes.

15  Q    And as a detective under Lieutenant Shannon, you were

16  routinely given assignments by Lieutenant Shannon as to what

17  activities you would be doing to investigate the Colombo War

18  during that period of time, correct?

19  A    Not all the time directly from Lieutenant Shannon, also

20  from Agent Favo.

21  Q    Okay.

22  A    Yeah within the squad, yes.

23  Q    Okay.

24       So within the squad, either Agent Favo or Lieutenant

25  Shannon were actively involved in organizing the investigation

Diana Pereira, CRR

147

1  of the Colombo Family war.  Would that be fair to say?

2  A    Yes.

3  Q    And those were the people that you most often dealt with

4  in terms of the work that you were doing.  Is that correct?

5  A    Yes.

6  Q    And in fact, you were in contact with Agent Favo quite

7  frequently during that period of time.  Correct?

8  A    Yes.

9  Q    You would report to him things you learned.  Correct?

10       Agent Favo would tell you things he learned; is that

11  correct?

12  A    Yes.

13  Q    The two of you worked together to accomplish the

14  assignments and the goals of whatever the investigation ,

15  wherever the investigation was headed at the time.  Is that

16  fair to say?

17  A    Yes.  Yes.

18  Q    Now, in terms of surveillances, a lot of the work you did

19  was surveillance work; is that correct?

20  A    Yes.

21  Q    And in fact, wasn't it a strategy of the New York City

22  Police Department, a primary strategy in combatting the war is

23  to have aggressive surveillance to try to find people that you

24  believed were active in the war, capture them engaged in some

25  kind of criminal activity --  criminal actively, primarily

148

1   carrying guns -- and be able to arrest them and prosecute

2   them, and that would help stem the violence.  Is that correct?

3   A    At that time, yes.

4   Q    At that time.

5   A    Yes.

6   Q    And around January of 1992, in fact, you were doing a lot

7   of surveillance work.  Isn't that correct?

8   A    Yes.

9   Q    Now, on this document AR dated January 7,1992, you

10  indicate that at 12:45, it says U/D plant 26.

11  A    That's OD, O/D.

12  Q    On duty plant.

13        Now, where was this plant located?

14  A    Second floor, between Village Road and U, on the second

15  floor over an insurance company or a mortgage company.

16  Q    Now, when you say it is a plant, why does the police --

17  is this a police department facility?

18  A    No.  Its an FBI lookout.

19  Q    Okay.  So this is an FBI location?

20  A    Right.

21  Q    And it is maybe an apartment or some kind of an office

22  that they would rent --

23  A    Right.

24  Q    -- Or something like that.

25        So that they could is surreptitiously make

149

1    observations of a scene; is that correct?

2    A    That's true.

3    Q    Now, plant 26, is it your testimony is an FBI

4    designation?

5    A    PD was in there;  yes.

6    Q    Right.  But the number --

7    A    It was a joint task force plant.  I don't know who

8    designated --  I don't know who signed the check to pay the

9    rent, but it was a designated plant for the unit that was

10   running the Colombo War.

11   Q    Okay.

12         Now, isn't it a fact that there was an investigation

13   of Nicky Black in the late '80s?

14   A    There could have been.

15   Q    And at that time there was a plant relate --  that was

16   established to surveil Nicky Black and conduct the

17   investigation of Nicky Black at that time?

18   A    I don't recall.

19   Q    Are you aware of any plant in the area of Bay Ridge that

20   you were using during this period of time?

21   A    Give me an address or something.  Refresh my memory.  I

22   don't know.  I don't remember.

23   Q    Maybe around Third Avenue.

24         Detective Simone, do you remember a plant around

25   Third Avenue in Bay Ridge?

Diana Pereira, CRR

150

1  A    No.

2  Q    Now, at 1:30, this indicates that you went en route to

3  Federal Plaza with Maggiure?

4  A    Maggiure, correct?

5  Q    Maggiure was a fellow detective assigned to C5 --

6  A    To this joint task force.

7  Q    To this joint task force.

8       You indicate in your testimony that you were called

9  off --

10      By the way, when you say that you were at plant 26

11 doing surveillance of Nicky Black, were you looking for Nicky

12 Black or did you actually see Nicky Black?

13 A    We were following Nicky Black.

14 Q    Well, if you were following Nicky Black, why does it

15 indicate that you were stationary at te plant?

16 A    We were called on duty from stationary plant.  Got out of

17 the stationary plant, went to our vehicle. Surveilled the

18 area.  When we came across Nicky Black, we followed him.

19 Q    Where was it that you first found Nicky Black?

20 A    I don't recall.  It would be on the surveillance report.

21 Q    On the surveillance report?

22 A    Yes.

23 Q    Do you recall preparing a surveillance report of this?

24 A    I normally would have, but I don't have any surveillance

25 reports.

Diana Pereira, CRR

151

1   Q    And is this a surveillance report that was in the form of

2   a DD5?

3   A    It was a surveillance report -- I don't know.  I forget

4   the numbers, it's been so long.

5   Q    Is the surveillance report --

6   A    It is not a PD surveillance report.  It is a federal.

7   Q    It was a federal document? .

8   A    Right.

9   Q    Now, isn't it a fact that Lieutenant Shannon also, at the

10  end of each day, would summarize all the surveillance and all

11  the work that had been done that day by the police department

12  in what's called a 49?

13  A    I wouldn't know.  If that's what he does, then that's

14  what he did.

15  Q    Now, the police department was very concerned about the

16  violence that was being shed over the Colombo family war,

17  correct?

18  A    Yes.

19  Q    And innocent people were at risk because the Colombo

20  family was warring.   Correct?

21          THE COURT:  Why don't you let him answer.   Answer

22  orally.  Just don't shake your head.

23          THE WITNESS: Okay.

24  A    Yes.  Yes.  Yes.

25  Q    Isn't it a fact that the NYPD brass wanted to be kept

1   abreast on a daily basis of all of the efforts of all the

2   surveillance teams to be able to monitor the progress and

3   aggressiveness of the investigation?

4          MS. EDWARDS:  Objection.  If he knows.

5   A    That would be up to the lieutenant.  See, I don't know

6   what the lieutenant's job was.  I am not a lieutenant.  He

7   would have to report to the lieutenant, to the section

8   sergeant.  He would review and give it to the lieutenant.

9   What the lieutenant did with that information is brass

10  information.  I don't know.

11  Q    Okay.

12  A    You know what I mean.

13  Q    Okay?

14         But you would report your daily activity to your

15  sergeant.  Your sergeant --

16  A    Brogan.

17  Q    Sergeant Brogan would report that to Lieutenant Shannon

18  and then Lieutenant Shannon may or may not have prepared a

19  report for the brass; is that correct?

20  A    I would assume so, yes.

21  Q    One would think, certainly, if you had done a

22  surveillance of Nicky Black the day he was killed, that would

23  have become a very significant surveillance.  Wouldn't that be

24  true?

25  A    Yes.  Yes.

Diana Pereira, CRR

153

1   Q    And if Lieutenant Shannon had prepared a report for the

2   brass that day, that surveillance would be on that report?

3   A    Yes.

4   Q    Now, you indicated you were called back to Federal Plaza

5   and that caused you to break off surveillance on Nicky Black;

6   is that correct?

7   A    Yes.

8   Q    And that was at approximately 1:30 p.m.?

9   A    Yes.

10  Q    And you were called back to Federal Plaza by Chris Favo,

11  correct?

12  A    Yes.

13  Q    Now, it was not unusual for Chris Favo to call you in for

14  a meeting.  Was it?

15  A    Was it unusual?  Normally it would be done over the phone

16  or before we went out on the street or at the end of the

17  tour.  For a surveillance, for everybody to come in from a

18  surveillance, it was unusual.

19  Q    Okay.

20       So you are saying there were times when you got

21  called in by Chris Favo or Lieutenant Shannon, I suppose, to

22  come off a surveillance and, you know, deal with something

23  that had to be dealt with at headquarters; is that correct.

24       MS. EDWARDS:  Objection.  That's not what he said.

25       THE COURT: Sustained.

Diana Pereira, CRR

154

1       MS. NOTOPOLOUS:  I'm sorry.

2   Q   Your desk, your office, was at 26 Federal Plaza,

3   correct?

4   A   Yes.

5   Q   It was not unusual to be called back from the field to

6   your office at 26 Federal Plaza to attend meetings.  Was it?

7       MS. EDWARDS:  Objection.  Asked and answered, and

8   that's not what he said.

9       THE COURT:  I will allow it.

10  A   I didn't hear.

11  Q   It was not unusual to be called back to Federal Plaza

12  from a surveillance to attend a meeting?

13  A   No.  But not everybody.

14  Q   Okay.

15      So it is your testimony that on this date, everybody

16  got called back?

17  A   Yes.

18  Q   And there was a meeting.  Everybody got called back for a

19  meeting, but you don't remember what the meeting was about, do

20  you?

21  A   No, I don't.

22  Q   But did everybody within the --

23  A   Within our area, I believe there was either one or two

24  detectives up in the apartment, myself and Maggiure on the

25  street, and there could have been two others in another

Diana Pereira, CRR

155

1   vehicle.  I am not sure.  I don't recall.

2          But we were called back.

3   Q   So when you say everybody was called back, you are

4   talking about this group?

5   A   Right.  There's -- I forget how many, maybe 18,20

6   detectives.  Some might be in the vicinity of McDonald, some

7   might be in the vicinity of 65th Street, you know, 82nd

8   Street.  We all had a different area of assignment.

9   Q   Okay.

10         So --

11  A   You didn't flood an area with 20 cops.  Let's put it this

12  way.

13  Q   Right, right?

14         So it wasn't that surveillance was called back just

15  for Nicky Black.  It was for other individuals and other

16  detectives --

17  A   No.  I am talking about just us from plant 26.

18  Q   Okay.

19         How many people were at plant 26?

20  A   As I said, it is hard to recall.  I believe there were

21  one or two upstairs and possibly another car.  Possibly six

22  people.  But I am not sure .   I really don't remember.  Could

23  have been eight people.  I don't know.

24  Q   Now, isn't it a fact that it was during this meeting that

25  members of the police department and the FBI learned that

156

1   Nicky Black had been killed.  Is that correct?

2   A    Yes.

3   Q    And in fact, do you recall being the one that notified

4   Agent Favo that this had occurred?

5   A    Not at all.

6   Q    After the homicide, you went out and interviewed various

7   individuals relating to the homicide, correct?

8   A    Right.

9   Q    Do you recall that this Anthony Bianco -- you indicated

10  you didn't recall who he was.  Does it refresh your

11  recollection that that was the person that had been talking to

12  Grancio at his car when he was killed?  Does that refresh your

13  recollection?

14  A    I don't remember.

15  Q    Joey Tolino was he not in the car with Nicky Black?

16  A    He could have been or he could have been outside.  I

17  really don't remember.  It would be on the reports.  Joey

18  Tolino was close to Nicky because he had remains of Nicky on

19  him.

20  Q    Right.  Isn't it fact Joey Tolino was Nicky Black's

21  nephew, I believe?  Does that refresh your recollection?

22  A    I've heard that but I don't know if that's true.

23  Q    Now there is no question about it that it was not Lynn

24  DelVecchio that called you off the surveillance that day, it

25  was Chris Favo, correct?

157

1   A    Yes.

2   Q    And there is no question about it that on a routine basis

3   it was Chris Favo that directed activities and not Lynn

4   DelVecchio; is that correct?

5   A    Yes.  Yes.

6   Q    You indicated that you think there was a surveillance log

7   prepared of the Nicky Black surveillance.  Correct?

8   A    I believe so, yes.

9   Q    Is this a document that's prepared, like the DAR, in

10  multiple copy?

11  A    Yes.

12  Q    And it is an FBI document, correct?

13  A    Yes.

14  Q    Where do you put those documents after you do them?

15  A    Case agent.

16  Q    To the case agent?

17  A    Yes.

18  Q    Was that Chris Favo that you are referring to?

19  A    Yes.

20  Q    So it is your testimony you gave Chris Favo a

21  surveillance report of your surveillance of Nicky Black on

22  January 7th, 1992?

23  A    It could have been the 302 that we all made out.  I don't

24  remember.

25  Q    So it would have been a 302 --

Diana Pereira, CRR

158

1   A    Or a surveillance.  Usually a surveillance and a 302, if

2   it is something important, are both made.

3   Q    Okay.

4        Now, going back to the team that was surveilling

5   Nicky Black on the 7th, it was yourself --  correct --  and

6   definitely Detective Maggiure.

7   A    Yes.

8   Q    Do you remember the names of any of the other

9   individuals?

10  A    The only one that would come to mind is Carl Barber.  He

11  would be upstairs but I am not even sure if it was him that

12  was up there.

13  Q    And what location did this plant overlook?

14  A    What location?  The vicinity of Avenue U from McDonald

15  Avenue to as far as you could see west, which is probably

16  like, I don't know, Van Siclen.  I don't even know the names

17  of the streets after that.

18  Q    This area was Nicky Black Country, right?

19        Avenue U was Nicky Black's location, correct?

20  A    Yes.  Yes.

21  Q    Wasn't it also a location sort of known to be controlled

22  by Funzi D'Ambrosio?

23  A    Oh, there were several families that walked the Avenue.

24  Q    Several crews, would it be fair to say off the avenue?

25  A    Yes.

159

1   Q   Nicky Black was strong there, correct?

2   A   And Funzi D'Ambrosio, correct.

3   Q   Joe Waverly, isn't that correct?

4   A   He was more on --  he was on Avenue U but down by east

5   15th?

6   Q   Further down, correct?

7   A   Yes.

8   Q   Isn't it a fact that very near this plant, very near this

9   plant was a club operated by Funzi D'Ambrosio on McDonald

10  Avenue, isn't that correct?

11  A   I believe so but I am not sure.

12  Q   And that's a place that you could see from this plant?

13  A   On McDonald Avenue.

14  Q   Yes.  From the plant, could you see that club?

15  A   No.  I don't think so, because, you saw very little of

16  McDonald Avenue.

17  Q   Okay.

18      Now you start work on the 7th at 12:45 p.m.

19  Correct?

20  A   Yes.  Yes.

21  Q   And you were called back approximately 45 minutes later?

22  A   Yes.

23  Q   In those 45 minutes, what do you recall seeing Nicky

24  Black do?

25  A   I don't recall, on surveillance.

Diana Pereira, CRR

160

1    Q    Was Nicky Black in a vehicle?

2    A    Yes.

3    Q    Was he walking on the street?

4    A    Yes.  He was in his car.  He was in a Land Cruiser which

5    was fairly new.  He used to use a Jeep Cherokee but he bought

6    himself a new Land Cruiser, and he was driving, and the way he

7    usually would, along Avenue U.

8    Q    And isn't it fair to say that when the war first broke

9    out, there was a lot of concentration put on surveilling Billy

10   Cutolo's crew?

11   A    Yes.

12   Q    Would it be fair to say that that was the --  not the

13   sole, but the primary focus of surveillance at the beginning

14   of the war, from the Orena side?

15   A    Yes.  I would say so, yes.

16   Q    Was that because Billy Cutolo was known to probably be

17   the person who would be the most violent and the most active

18   at that time in the war?

19   A    Well, I don't know.  We were told where to go and who to

20   look for --

21   Q    Okay?

22   A    --  By the FBI.

23   Q    Okay.

24        Now, isn't it fair to say that around this time in

25   January --  by early January of '92, a lot of the crew

Diana Pereira, CRR

161

1   members in Cutolo's crew had been locked up?

2   A    Yes.

3   Q    Isn't it a fair to say that it was believed that Nicky

4   Black and people around him were going to become more active

5   and become stronger and surveillance was being strengthened

6   against that crew?  Isn't that correct?

7   A    Not -- anybody that was in the area was -- I mean,

8   you had a lot of people, Joey Kopo (ph).  You had a lot of

9   people involved in that area that was going to get stronger if

10  Billy was out of the way.

11  Q    People would get stronger if Billy was out of the way?

12  A    Yeah.  If anybody was out of the way, somebody was going

13  to get stronger.

14  Q    Do you recall, Detective Simone, what time Nicky Grancio

15  was killed?

16  A    I don't recall.

17  Q    Would it refresh your recollection if I told you it was

18  about 3:15, sometime like that?

19  A    No, I wouldn't recall.

20  Q    On the 7th?

21  A    I never saw an official report on the actual time of, you

22  know, death, or --

23  Q    Uh-huh.

24  A    Because the precinct cops or the 61 Precinct cops were

25  the ones who-- and they were the first on the scene.

Diana Pereira, CRR

162

1    Q    Okay.

2         MS. NOTOPOLOUS:  Your Honor, I have no further

3    questions at this time.  I wouldn't anticipate calling the

4    witness back --

5         THE COURT: Would not?

6         MS. NOTOPOLOUS:  Would not.  However, there is one

7    particular thing that I need to research and it may create an

8    issue or it may not.  I am just warning the court it is

9    possible.

10        THE COURT:  All right.  I don't see any need myself.

11   If you have to call him, we'll have him back but I prefer not

12   to have him back.

13        MS. NOTOPOLOUS:  I appreciate, your Honor, the offer,

14   and I will try not to.

15        THE COURT:  Okay.

16        Thank you very much, sir.

17        MS. EDWARDS:  Thank you.

18        THE COURT:  Do you have redirect?

19        MS. EDWARDS:  No.  No, your Honor.

20        I have a brief application to make on behalf of

21   Dr. Dresch, if everybody is agreeable.

22        Dr. Dresch has come in from Michigan.  That means he

23   is going to have to come back.

24        THE COURT:  I don't myself see any point in

25   cross-examining Dresch.  He didn't say anything that I found

Diana Pereira, CRR

163

1    of any use.  I had the direct testimony of the witness.  What

2    he says to Dresch according to Dresch does not seem to me of

3    any weight.  If he is without --

4          Excuse me?

5          If the witness, himself, is going to be impeached, I

6    don't see the point.

7          MS. NOTOPOLOUS:  I mean, certainly, if that's your

8    Honor's position, there would be less need to call him back.

9          What I will say is that it is also possible I could

10   simply provide facts to the court, credibility issues

11   involving Mr. Dresch.

12         THE COURT:  I don't see any point.  His testimony was

13   nugatory on the issues before me.  I have the direct witness.

14   I don't want hearsay.

15         MS. EDWARDS:  My only application was going to be if

16   indeed the determination is made he should be brought back for

17   cross --

18         THE COURT:  I don't want him.

19         MS. EDWARDS:  I withdraw my application.

20         THE COURT:  Is he still in the building?

21         MS. EDWARDS:  I don't know.  He probably is.

22         THE COURT:  I see no need for him.

23         MS. NOTOPOLOUS:  Your Honor, if I see the need, I

24   will write the court a letter and indicate why.

25         THE COURT: Yes.  Zero probative force.  What's the

Diana Pereira, CRR

164

1   point?

2           What other witness do you have?

3           MS. EDWARDS:  I have no more witnesses.  My only

4   application was if we could do it by video.  We can arrange

5   that.

6           THE COURT:  No, it is not necessary.  I don't want

7   him.

8           Do you have another witness?

9           MS. EDWARDS:  No.  I do not have another witness.

10          THE COURT:  Are you resting?

11          MS. EDWARDS: I am resting, your Honor.

12          THE COURT:  All right.

13          Does the government have a witness?

14          MS. NOTOPOLOUS:  No, your Honor the government does

15   not.

16          THE COURT:  Are you resting?

17          MS. NOTOPOLOUS:  I am resting with the exception of

18   the two areas of concern I have indicated to the court --

19          THE COURT:  Of whom?

20          MS. NOTOPOLOUS:  There is one thing I want to look up

21   with Mr. Simone, and issues of Mr. Dresch, but I don't

22   anticipate it requiring a witness --

23          THE COURT:  I don't know why we need Simone.  We have

24   the contemporaneous record.  What's the point of Simone?

25          MS. NOTOPOLOUS:  Can I have one moment, your Honor?

Diana Pereira, CRR

165

1          THE COURT: Yes.

2          (Pause.)

3          MS. NOTOPOLOUS:  Fine, your Honor.  I don't see a

4   need to call the witnesses back.  Like I said, I will make a

5   written application to the court with reasons why, if it is

6   necessary.

7          THE COURT:  As far as the court is concerned ,  the

8   hearings are closed.

9          If you want to make a motion to reopen them, you

10  may.  But as far as I am concerned, they are closed.  I have

11  all the evidence before me.

12         Is there anything else you want to submit?

13         MS. EDWARDS:  I would like to get the record and

14  provide the court with a supplemental memorandum based on the

15  record, if I may, your Honor.

16         THE COURT:  All right.  Order instantaneous copy.

17  Give me a memorandum by Friday.  This Friday give me a

18  memorandum.

19         It is very short.  You've briefed it thoroughly.

20  There is nothing new that the witness said that you don't

21  already have in your memoranda.

22         MS. EDWARDS:  By this Friday, your Honor?

23         THE COURT: Yes.  I don't see any point, really, for a

24  supplemental brief, because you have in your brief and

25  materials everything the witnesses have said.

Diana Pereira, CRR

166

1        MS. EDWARDS:  Your Honor, I would at least like an

2   opportunity to have a week to take a look at this.

3        THE COURT:  Of course.  If you need it, I understand.

4        MS. EDWARDS:  I really do need a week, your Honor.

5        THE COURT: I understand your professional

6   obligations.

7        Instantaneous copy ordered.

8        MS. EDWARDS:  That's fine.

9        THE COURT:  Ordered, paid for by the government.

10       Briefs are due 9:00 next Wednesday.

11       MS. EDWARDS:  We don't have to be in court on the

12   13th?

13       THE COURT:  Correct.

14       MS. EDWARDS:  Then we can do it by Wednesday.

15       THE COURT:  Correct.

16       Thank you very much.

17       MS. NOTOPOLOUS:  Thank you, your Honor.

18       Do you have a cassette here now?  Is that the same

19   cassette for both?

20       VIDEOTAPE TECHNICIAN:  No.  Actually I changed it

21   because I anticipated --

22       THE COURT:  You have two cassettes?

23       VIDEOTAPE TECHNICIAN:  I anticipated this being much

24   longer.

25       THE COURT:  May I have the cassettes, please.

Diana Pereira, CRR

167

1          (Pause.)

2              THE COURT:  Is this the first cassette?

3              VIDEOTAPE TECHNICIAN:  The second one.  The first one

4     I had brought downstairs with me after we had finished with

5     it.

6              THE COURT:  Get the first cassette and we will mark

7     it as a Court Exhibit, part of the testimony of Gregory Scarpa

8     Jr.  That is a court exhibit, part of the testimony of

9     Lawrence Mazza, or it is in full, I guess.

10             MS. NOTOPOLOUS:  Correct, your Honor.

11             THE COURT:  Court Exhibit 19.  Scarpa is 18.

12    Mazza is 19.

13             (Whereupon, Court's Exhibit 18, videotape of

14    testimony of Gregory Scarpa, was received in evidence, as of

15    this date.)

16             (Whereupon, Court's Exhibit 19, videotape of

17    testimony of Lawrence Mazza, was received in evidence, as of

18    this date.)

19             THE COURT:  Anything further?

20             MS. NOTOPOLOUS:  No, your Honor.

21             THE COURT:  Thank you very much.

22             (Whereupon, the hearing was concluded.)

23

24

25

Diana Pereira, CRR

**EXHIBIT H**



APPENDIX V • 315

(b) 7(C),

# FEDERAL BUREAU OF INVESTIGATION

Precedence:  IMMEDIATE                           Date:  04/10/1996

To:  DIRECTOR, FBI          Attn:  ASSISTANT DIRECTOR, INSPECTION
                                   DIVISION

From:  ADIC, NEW YORK
          Contact:  JAMES J. ROTH

Approved By:  ROTH JAMES J

Drafted By:  ROTH JAMES J:jjr

File Number(s):  263-  (Pending)

Title:  SUPERVISORY SPECIAL AGENT R. LINDLEY DEL VECCHIO
        OPR MATTER

            NY requests that whatever investigation is to be
conducted as a result of this letter be conducted expeditiously,
with the results provided to DOJ, and that DOJ be strenuously
pressed to provide a prosecutive opinion regarding this matter so
that it may be resolved.  NY believes, based on the investigative
results to date and assuming this latest information does not
change the result, that there is insufficient evidence to take
prosecutive action against SSA DelVecchio.  The failure of the DOJ
to provide a prosecutive opinion or for the FBI to
administratively resolve this matter continues to have a serious
negative impact on the government's prosecutions of various LCN
figures in the EDNY and casts a cloud over the NYO.

B. Memo from ADIC James Kallstrom and PLO James Roth to FBI Director Louis Freeh urging the resolution of the OPR against DeVecchio, which "casts a cloud over the NYO" (above). Below: The DAR that proves that Det. Joe Simone was called back to 26 Federal Plaza just before Gregory Scarpa Sr.'s murder of Nicholas Grancio.

INVESTIGATORS DAILY ACTIVITY REPORT FD439-156 (REV. 2-77)                    Print Legibly or Type

| OVERTIME | HOURS | MINUTES | SHIELD/NUMBER | TASK REG. NUMBER | NAME (last) DET. JOE SIMONE | |
|---|---|---|---|---|---|---|
| Straight Time | 5 | 43 | 1945 | 84261 | | CODE 1/ CODE 2/ CODE 3/84 |
| Last Report Submitted | Reasons Report Not Submitted (D.E.O., Vacation, etc.) | | | TUES DATE V945X8100 | Date of Activity 1/7/92 | |
| MON 1/6 | | Activity: include members assigned with, arrest numbers, property seized, etc. | | | Area or Major Case Number | Expense Items | Amount Expended |
| From | To | | | | | | |
| 1245 | 1330 | W/D PLANT # 26 — COLUMBO TASK FORCE | | | | | |
| 1330 | 1400 | EXT 26 FED PL. W MAGUIRE 1/116-GJM | | | | | |
| 1400 | 1600 | A/A W/A RE: CONFER W/ C. FAVO. | | | | | |
| 1600 | 1630 | EXT V/o VILLAGE CO N. + MED. ME BKLYN W/A I/A | | | | | |
| 1630 | 1730 | A/A W/A RE: GRANCIO HOMICIDE | | | | | |
| 1740 | 1800 | EXT 61 PCT O.I. HOSP. W/A I/A | | | | | |
| 1800 | 1820 | N/A W/A RE: INTERVIEW ANTHONY BIANCO | | | | | |
| 1820 | 1825 | EXT 61 PCT W/A I/A | | | | | |
| 1825 | 2000 | N/A W/A RE: INTERVIEW JOEY TOLINO | | | | | |

**<u>EXHIBIT I</u>**

**AIDED REPORT (Form 1)**

- Date of Occur.: 2-7-91
- Surname: GRANCIO   First Name and Initial: Nicholas
- Sex M  Color W  Age 62  Pct. 061
- Time of Occur.: 1565
- Address: 1756 E 23 ST, Bklyn   Aided No. 49
- Place of Occurrence: F/O 32. Village Rd North, Bklyn
- Check One: ☒ Dead
- Nature of Illness or Injury: DOA
- Removed To: KCH  ☒ Morgue
- Responding E.M.T.-Paramedic: 5648
- Log Entries: ☒ No  61 342
- Notifications: Nephew, Joseph Tolino, on scene  P.O. Box 434, Worthsboro, NY
- DUPLICATE REPORTS TO: PD 304-152 (Rev. 12-89)-2

**AIDED REPORT (Form 2)**

- Date of Occur.: 5/22/92
- Surname: LAMPASI   First Name and Initial: Lorenzo
- Sex M  Color W  Age 64  Pct. 66
- Time of Occur.: 0422
- Address: 210 Caton Ave   Apt./Flr. 5B  856
- Place of Occurrence: R/O 210 Caton Ave
- Nature of Illness or Injury: D.O.A.
- Removed To: KCH  ☒ Morgue
- Responding E.M.T.-Paramedic: 6733
- Log Entries: ☒ Yes  Pct. 66  5669
- Notifications: Missing Person J624
- DUPLICATE REPORTS TO: PD 304-152 (Rev. 12-89)-2

**AIDED REPORT (Form 3)**

- Date of Occur.: 2-26-92
- Surname: CACASE   First Name and Initial: Joe
- Sex M  Color W  Age 50  Pct. 6
- Time of Occur.: 0945
- Address: 324 Ave U Bklyn   Aided No. 407
- Place of Occurrence: F/O 2112  E 14  (U-V)
- Nature of Illness or Injury: Gunshot - Abdomen/Buttocks
- Removed To: KCH
- Notifications: Kim Cacase wife on scene
- DUPLICATE REPORTS TO: PD 304-152 (Rev. 12-89)-2

**DETAILS:** (Include descriptions of lost, abandoned, abused, neglected, destitute child, unidentified person. When CPR is administered, include length of time CPR performed and results obtained.)

AT T/P/O, DOA FOUND INSIDE CAR W/ AT LEAST SEVERAL GUNSHOT WOUNDS TO HEAD. - PRONOUNCED AT 1523 HRS BY EMS # 5648.

M.E. CASE # 167- DR EICKERT

**ADDITIONAL REPORTS PREPARED:** UF61 # 342

**NAME AND ADDRESS OF WITNESSES (If none, so state)**

| | Rank | Name (Print or Type) | Shield No. | Com'd. | Signature | | |
|---|---|---|---|---|---|---|---|
| REPORTED BY | PO | FLOOD | 14569 | 061 | P.O. Patt FH | | |
| REVIEWED BY | Sgt | J. Cents | | | | Pct. 61 | Aided No. 47 |

---

**DETAILS:** (Include descriptions of lost, abandoned, abused, neglected, destitute child, unidentified person. When CPR is administered, include length of time CPR performed and results obtained.)

AT T/P/O AIDED WAS FOUND DOA. W/ GUN SHOT WOUND

MISSING PERSON REPORT 5674

**ADDITIONAL REPORTS PREPARED:** UF61 # 5669    95 TAG # Q-13931

**NAME AND ADDRESS OF WITNESSES (If none, so state)**

| | Rank | Name (Print or Type) | Shield No. | Com'd. | Signature | | |
|---|---|---|---|---|---|---|---|
| REPORTED BY | PO | GAMBARDELLA | 12825 | 66 | | | |
| REVIEWED BY | Sgt | Napora | | | | Pct. 66 | Aided No. 856 |

---

[page bottom, rotated/upside-down]

**DETAILS:** (Include descriptions of lost, abandoned, abused, neglected, destitute child, unidentified person. When CPR is administered, include length of time CPR performed and results obtained.)

AT T/P/O A.DOA SUFFERED GUNSHOT WOUNDS TO ABDOMEN AND BUTTOCKS DURING DRIVE BY SHOOTING

**ADDITIONAL REPORTS PREPARED:** UF 61 # 2824

**NAME AND ADDRESS OF WITNESSES (If none, so state)**

| | Rank | Name (Print or Type) | Shield No. | Com'd. | Signature | | |
|---|---|---|---|---|---|---|---|
| REPORTED BY | PO | HERNANDEZ | 29411 | 75 | | | |
| REVIEWED BY | | | | | | Pct. | Aided No. 707 |