**EXHIBIT J**

COMPLAINT
MEDICAL EXAMINER CASE
FD 313-081-H (Rev. 12-90)-H1

| | Additional Copies For | 1 Jurisdiction | 3 Pct of Report | Aided/Acc. No. | 12 Complaint No. | File No. |
|---|---|---|---|---|---|---|
| PAGE   OF   PAGES | | 00 | 061 | 49 | 342 | |

| 17 Date of this Report | Day of Week of this Report | 31 Date Orig Report | Date Assigned | M.P. Case Number | Unit Reporting |
|---|---|---|---|---|---|
| 01/08/92 | | Mo.  Day  Yr. | | | MISSING PERSONS SQUAD. |

| DETECTIVE ASSIGNED | | P.O.S. CASE NO. | M.E. CASE NO. | BOROUGH NO. | ZONE | ZONE NO. |
|---|---|---|---|---|---|---|
| STAINES | | | 92-167 | | | |

| Previous Classification | | 45 | 48 | 49 | 50 | 51 | 52 | 61 Rep. Agency Code | Case Status |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | O-O- | ☐Open ☐Closed |

| Classification Change To | | | | Invoice No.: |
|---|---|---|---|---|
| HOMICIDE | | | | |

| NAME OF DECEASED (LAST NAME, FIRST, M.I.) | AGE | RACE | SEX |
|---|---|---|---|
| GRANCIO, NICHOLAS | 64 | W | M |

| ADDRESS | APT. NO. |
|---|---|
| | PRIV |

| DATE OF OCCURRENCE | TIME OF OCC | DAY OF WEEK | PLACE OF OCCURRENCE |
|---|---|---|---|
| 01/07/92 | 1515 | TUES | F/O 32 VILLAGE RD NORTH BKLYN |

| EXPIRED AT | DATE | TIME |
|---|---|---|
| SCENE | 01/07/92 | 1515 1520 |

| MOS IDENTIFYING | SHIELD | COMMAND |
|---|---|---|
| | | |

| FAMILY MEMBER IDENTIFYING | REALTIONSHIP |
|---|---|
| | |

ADDRESS/

| PHOTO/PRINTS | COMMAND |
|---|---|
| | |

| DOCTOR PERFORMING AUTOPSY | DATE | LOCATION |
|---|---|---|
| MACAJOUX | 1/8/92 | KCHMEO |

CAUSE OF DEATH

BULLETS RECOVERED DURING AUTOPSY

DESCRIPTION OF CRIME/WEAPON

MEANS EMPLOYED   ☐ PHYSICAL FORCE   ☐ SHOTGUN   ☐ MACHINE GUN   ☐ OTHER
☐ KNIFE   ☐ BLUNT INSTRUMENT   ☐ HANDGUN   ☐ RIFLE   ☐ STRANGULATION (DESCRIBE)

MOTIVE   ☐ ROBBERY   ☐ NARCOTICS   ☐ DISPUTE   ☒ LINK   ☐ OTHER
☐ EMERGENCY   ☐ SEX CRIME   ☐ HURG. CRIME   ☐ JUSTIFIABLE   ☐ (DESCRIBE)

| | | NAME (LAST, FIRST M.I.) | | | | | | |
|---|---|---|---|---|---|---|---|---|
| P | ☐ IDENTIFIED ☐ UNKNOWN | | | | | | | |
| E | ☐ ARRESTED ☐ UNKNOWN | NAME (LAST, FIRST, M.I.) | | | | | | |
| R | ☐ ARRESTED ☐ UNKNOWN | NAME (LAST, FIRST M.I.) | | | | | | |

RELATIONSHIP
☐ FRIEND   ☐ ACQUAINTANCE   ☐ HUSBAND/WIFE   ☐ COMMON LAW   ☐ STRANGER   ☐ BOY/GIRL FRIEND   ☐ INTRA-FAMILY   ☒ UNKNOWN

CRIMINAL RECORD
Perp(s)

DETAILS

| REPORTING OFFICERS RANK, SIGNATURE, COMMAND | NAME PRINTED | TAX REG. NO. | SUPERVISOR'S SIGNATURE | C.O.'s INITIALS |
|---|---|---|---|---|
| | | | | |

DIST: 1. ARREST & CRIME CODING UNIT, 2. UNIT REFERRED TO, 3. CRIME ANALYSIS UNIT, 4. CHIEF OF DETECTIVES (CIRD), 5. FILE

**EXHIBIT K**

1

1        UNITED STATES DISTRICT COURT
         EASTERN DISTRICT OF NEW YORK
2
       - - - - - - - - - - - - - - - X
3                                   :
   PASQUALE AMATO,                  :    CV-96-1461
4  VICTOR ORENA,                    :    CV-96-1474
                                    :
5              Petitioners          :
                                    :
6          -against-               :
                                    :    United States Courthouse
7                                   :    Brooklyn, New York:
   UNITED STATES OF AMERICA,        :
8                                   :
               Respondent.          :
9      - - - - - - - - - - - - - - - X    January 7, 2004
                                         10:00 a.m.
10

11              TRANSCRIPT OF HEARING
        BEFORE THE HONORABLE JACK B. WEINSTEIN
12            UNITED STATES DISTRICT JUDGE

13  APPEARANCES:

14  For the Petitioners:    FLORA EDWARDS, ESQ.

15  For the Respondent:     ROSLYNN R. MAUSKOPF, ESQ.
                            United States Attorney
16                          BY:  PATRICIA NOTOPOULOS, ESQ.
                                 MICHAEL WARREN, ESQ.
17                          Assistant United States Attorneys

18

19

20  Court Reporter:         FREDERICK R. GUERINO, C.S.R.
                            225 Cadman Plaza East
21                          Brooklyn, New York
                            718-254-7220
22

23

24

25  Proceedings recorded by mechanical stenography, transcript
    produced by CAT.

       FREDERICK R. GUERINO, C.S.R.      OFFICIAL COURT REPORTER

168

I N D E X

1

2

3  G R E G O R Y   S C A R P A, Jr. .........................  26

4

5  DIRECT EXAMINATION

6  BY MS. EDWARDS: .....................................  27

7

8  CROSS-EXAMINATION

9  BY MS. NOTOPOULOS: ..................................  62

10

11  REDIRECT EXAMINATION

12  BY MS. EDWARDS: .....................................  91

13

14  L A W R E N C E   M A Z Z A .........................  96

15

16  DIRECT EXAMINATION

17  BY MS. EDWARDS: .....................................  96

18

19  CROSS-EXAMINATION

20  BY MS. NOTOPOULOS: ..................................  105

21

22  REDIRECT EXAMINATION

23  BY MS. EDWARDS: .....................................  119

24

25

Diana Pereira, CRR

169

1  S T E P H E N    D R E S C H.....................124

2

3  DIRECT EXAMINATION

4  BY MS. EDWARDS: ...................................124

5

6  J O S E P H    S I M O N E......................131

7

8  DIRECT EXAMINATION

9  BY MS. EDWARDS: ...................................131

10

11  CROSS-EXAMINATION

12  BY MS. NOTOPOLOUS: ...............................141

13

14

15               E X H I B I T S

16

17  Petitioner's Exhibit 1 was received and marked in

18  evidence..........................................133

19

20  Court's Exhibit 18, videotape of testimony of Gregory

21  Scarpa, was received in evidence..................167

22

23  Court's Exhibit 19, videotape of testimony of Lawrence

24  Mazza, was received in evidence...................167

25

Diana Pereira, CRR

```
                                                    96
              Mazza - Direct/Edwards

 1              A F T E R N O O N    S E S S I O N

 2         (Judge Weinstein enters the courtroom at 2:00 p.m.)

 3         (Larry Mazza testifies via video conference at this

 4   time.)

 5         THE COURT:  Swear the witness, please.

 6   L A W R E N C E    M A Z Z A, called as a witness, having been

 7         first duly sworn, testifies as follows:

 8         THE WITNESS:  If that's for me, I just heard the very

 9   end of that.

10         (The oath is given to Mr. Mazza again.)

11         THE WITNESS:  I do.

12         THE COURT:  What is your name?

13         THE WITNESS:  Lawrence Mazza.

14         THE COURT:  Spell your last name, please.

15         THE WITNESS:  M-a-z-z-a

16   DIRECT EXAMINATION

17   BY MS. EDWARDS:

18   Q    Good morning, Mr. Mazza.

19   A    Good afternoon.  It is afternoon now.

20   Q    Yes, it is.

21         My name is Flora Edwards.  If you don't understand a

22   question that I or other counsel ask you, please say so.

23   A    Okay.

24   Q    Since you are testifying from a remote location, please

25   stop me or any other counsel immediately if you have trouble
```

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

97

Mazza - Direct/Edwards

1   hearing the question.

2   A    Okay.

3        MS. NOTOPOULOS:  Your Honor, could we advise

4   Mr. Mazza that Mr. Brief is here in the courtroom?

5        THE COURT:  Yes.

6        Your attorney is here in the courtroom.  If you wish

7   to consult, we'll try to arrange that.  And you are being

8   watched on television here in the courtroom, and the recording

9   is being made of that television.

10       THE WITNESS:  Thank you, Your Honor.

11  BY MS. EDWARDS:

12  Q    Mr. Mazza, did you know an individual by the name of

13  Gregory Scarpa, Sr.?

14  A    Yes.

15  Q    Did you know an individual by the name of Nicholas

16  Grancio?

17  A    Yes.

18  Q    Let me direct your attention to January 7, 1992.

19       Were you with Gregory Scarpa, Sr., that day?

20  A    Yes, I was.

21       THE COURT:  Give me the date again, please.

22       MS. EDWARDS:  Sorry.  January 7, 1992.

23  BY MS. EDWARDS:

24  Q    What, if anything, were you doing that day in relation to

25  Nicholas Grancio?

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

98

Mazza - Direct/Edwards

1    THE COURT:  How do you spell his name?

2    MS. EDWARDS:  G-r-a-n-c-i-o.

3    A    Well, the day started we were going to do surveillance of

4    one of their clubs.

5    Q    Who is "we," sir?

6    A    Greg Scarpa, myself, and Jimmy Del Masto, and it started

7    out with watching one of their social clubs for a fellow named

8    Funzi D'Ambrosio, and ultimately we spotted Nicky Black.

9    Q    What did you plan to do with Nicky Black?

10    A    Oh, actually the same as anybody else on the side we were

11    fighting, shoot him if we could.

12    Q    Okay.

13        And is Nicky Black the same person as Nicholas

14    Grancio?

15    A    Yes, he is.

16    Q    Thank you.

17        Did there come a time when you observed Scarpa Sr.

18    Take a cell phone in your presence?

19    A    Yes.

20    Q    Did he call someone?

21    A    He made several calls, yes.

22    Q    Did he call someone named Delvecchio or someone referred

23    to as Delvecchio?

24    A    I can't say Delvecchio, no.  Not somebody as Delvecchio.

25    Q    Who were the people he called in your presence?

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

99

Mazza - Direct/Edwards

1  A    Well, he made some calls that I didn't know exactly who

2  he was calling.  Sometimes he called Linda, his wife, or

3  whatever she wound up being; I don't even know anymore.  I'm

4  not sure who else, really, but he made several calls.  It

5  wasn't only that one time.  He did that often.

6  Q    Okay.

7       Did you have -- when you were doing surveillances,

8  you put it on Nicky Black?

9       MS. NOTOPOULOS:  Objection.  It is not the

10  testimony.

11       MS. EDWARDS:  I believe that's what he said, but we

12  can have it read back.

13       THE COURT:  You may inquire.

14  BY MS. EDWARDS:

15  Q    Did you say that you were doing some surveillance on

16  Nicky Black that you were watching him?

17  A    The social clubs that he and his friends went to, there

18  were a few social clubs in that area.  So we were doing -- we

19  were watching the place to see if any of the opposing people

20  pulled up.

21  Q    Was there anybody else watching the place?

22  A    On our side you mean?

23  Q    Was there any police surveillance?

24  A    At the moment in time we didn't know.

25  Q    Did there come a point when you observed any police

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

100

Mazza - Direct/Edwards

1   surveillance?

2   A    No, I didn't.

3   Q    Did there come a time when you became aware that Scarpa

4   Sr. observed police surveillance?

5   A    I don't really remember if he noted at that time or its

6   very, very foggy to me exactly what happened.  It is a long

7   time ago and it's difficult for me right now.  I don't really

8   remember at that moment him spotting any police presence of

9   any kind.

10  Q    Do you know someone named Steven Dresch?

11  A    Yes.

12  Q    Who is Steven Dresch, to your knowledge?

13  A    I'm not really sure exactly who he was.  He was some kind

14  of a writer.  I thought he was a lawyer.  He came down to

15  where I am to see me.  A lot of it was questions about Greg's

16  son.

17  Q    Did you tell Mr. Dresch that Scarpa Sr. had taken his

18  crew to kill Nicky Black?

19  A    Greg took the crew, yes, definitely.  That would be

20  something that I would say that's truthful.

21  Q    Did you tell Dr. Dresch that Nicky Black at that time was

22  under surveillance by the Organized Crime Task Force?

23  A    I found that out later, yes.

24  Q    Did you tell Dr. Dresch that Scarpa had called

25  Delvecchio?

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

Mazza - Direct/Edwards

1   A    I told him that he made phone calls.  I wouldn't know if

2   it was Delvecchio.  I was never told that directly.

3   Q    Okay.

4        Did you tell Dr. Dresch that Delvecchio had the task

5   force team pulled off surveillance?

6   A    I told him that I heard that later on, yes.

7   Q    Did you tell Dr. Dresch that once the surveillance was

8   gone, you and the others killed Nicky Black?

9   A    That's how it turned out, yes.

10  Q    Did you tell Dr. Dresch that -- well, let me backup a

11  little bit.

12       Sir, you've testified in another trial; is that

13  correct, at least one?

14  A    I did, yeah.  More than one, yes.

15  Q    Okay.

16       Did you testify pursuant to a cooperation agreement?

17  A    I did.

18  Q    Okay.

19       And you pled guilty to a number of crimes?

20  A    I did.

21  Q    And you received 5K1 letter for your testimony?

22  A    Yes.  Yes, I did.

23  Q    And you received a sentence?

24  A    Yes.

25  Q    And I take it you completed that sentence; is that

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

102

Mazza - Direct/Edwards

1   accurate?

2   A    Yes, except probation, three-year probation.

3   Q    So you are still on supervised release?

4   A    Yes, I am.

5   Q    Okay.

6        And did you tell Dr. Dresch that you were very

7   concerned that your testimony would subject you to some form

8   of retaliation by the government?

9   A    I don't know what my exact words were, but when I spoke

10  to him, I made it clear to him that this was a little rattling

11  to say the least to be back into this again after all of these

12  years, and it was -- it's a concern but not a fear.  I was

13  just -- it's a worry, an apprehension, I don't really know.

14  Again, this is a circumstance I never thought I would be in

15  again, and my wife certainly is concerned, but I'm going to be

16  truthful like I was from day one and hopefully that's all I

17  can be asked to do.

18  Q    Did you tell Dr. Dresch, now that you have been reunited

19  with your family, you are determined to do nothing that would

20  place you at risk of reimprisonment?

21  A    Absolutely.

22  Q    Did you ever tell Dr. Dresch that you were afraid that if

23  you testified regarding your knowledge regarding the Grancio

24  incident you would be prosecuted on some trumped-up charges?

25  A    I don't know if I said that.  But, again, I was concerned

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

Mazza - Direct/Edwards

1   just being pulled back into this.  I certainly would rather

2   not be here.  I'm a civilian -- I'm supposed to be at work

3   today.  My probation officer asks me every month if I missed a

4   day of work and I was telling him no all along until today.

5   Q    You say that you did not observe -- your testimony here

6   today is that you did not observe Scarpa calling somebody by

7   the name of Delvecchio?

8   A    Not Delvecchio.  I don't remember Delvecchio, no.

9   Q    What do you remember, sir?

10  A    Like I says, he made a lot of calls.  Sometimes he called

11  Linda.  Sometimes he called others.  Sometimes he went to

12  phone booths.  He wouldn't even call on the cell phone.  And

13  eventually, I mean, you know, I got to know him as "the

14  girlfriend," whoever he was calling.

15  Q    Did he call somebody that he referred to as "the

16  girlfriend" in your presence later?

17  A    Again it was several times.  I don't remember exactly if

18  it was that day.  It could have been.  It happened several

19  times.

20  Q    Do you recall Scarpa saying something about police

21  surveillance to you in relation to Nicky Black?

22  A    Not then, not there.

23  Q    When do you recall him saying that to you, if he did?

24  A    I don't recall him saying it.  I learned that later on.

25  Q    When did you learn that, sir?

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

104

Mazza - Direct/Edwards

1   A    I learned that when I was being debriefed, and I was

2   asked some questions about that day, and one of the agents

3   told me that there were surveillance 24/7 around Nicky Black,

4   and he was -- they were just called away when it had

5   happened.  He called told me that their investigation was if

6   we would have shot at the F.B.I. agents, that's what they were

7   pursuing to see if we would have shot at the F.B.I. agents, if

8   they had been there.

9   Q    You heard that from -- which agent did you hear that

10  from, sir?

11  A    I really don't remember the name, to be honest with you.

12  It was -- there were two different occasions that came up,

13  once at MCC an agent came by himself.  Another time it was in

14  Sandstone, Minnesota.  I believe those were maybe Inspector

15  General or Internal Affair type of agents, something like

16  that.

17  Q    And it is your testimony - I just want to make sure that

18  I understand it - it is your testimony that Scarpa did not

19  call Delvecchio in your presence, that is what you are saying

20  today?

21  A    That -- at that moment I don't know who he was calling

22  from the car.  He did make several calls, and again that was

23  normal day-to-day procedures for us.

24  Q    Did he make any calls which lead you to believe that he

25  was concerned about surveillance?

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

Mazza - Cross/Edwards

1   A    I can't remember that happening.  Sitting here now, I

2   don't remember that.  He wasn't overly concerned usually about

3   that.  He wasn't overly concerned that there was police

4   surveillance and I was trying to kill someone, sir.  Normally

5   on normal routine during the war he wasn't too concerned with

6   that.

7   Q    Is it your testimony, Mr. Mazza, that Scarpa was willing

8   to kill someone in front of the F.B.I.?

9   A    No.  No.  I'm not saying that at all.

10  Q    All right.

11       Did you tell Dr. Dresch that Scarpa was outraged by

12  the fact that there was so much surveillance around Nicky

13  Black?

14  A    No.

15       MS. EDWARDS:  Okay.  I have no more questions.  Thank

16  you.

17       THE COURT:  Thank you.

18  CROSS-EXAMINATION

19  BY MS. NOTOPOULOS:

20  Q    Good afternoon, Mr. Mazza.

21       My name is Patricia Notopoulos.  I'm an Assistant

22  United States Attorney here in Brooklyn.

23  A    Hello.

24  Q    Mr. Mazza, you testified in several trials as a

25  cooperating witness for the government, correct?

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

Mazza - Cross/Edwards

1   A    Yes.

2   Q    And am I correct that the last trial you testified in was

3   William Cutolo's trial?

4   A    I believe that was the last one, yes.

5   Q    And would you agree with me to the best of your

6   recollection that that trial was at the end of 1994?  I mean,

7   would you have any reason to doubt that it was?

8   A    Yeah, I have no reason to doubt that.  That seems about

9   the right time frame.

10  Q    That would be about nine years ago, correct?

11  A    Yes.

12  Q    And would it be fair to say that when you prepared for

13  Cutolo's trial, prepared your testimony with the prosecutors

14  and testified at that trial, that that was really the last

15  time that you really concentrated on all of the events

16  surrounding your involvement with Gregory Scarpa and the

17  Colombo family war?

18  A    That's true.

19  Q    Now, would it be fair to say that since the Cutolo trial,

20  your memory of events from the past has faded?

21  A    Yes.

22  Q    Now, did you have an opportunity to review your trial

23  testimony prior to your appearance here today, review your

24  trial testimony?

25  A    I haven't seen any of that.

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

Mazza - Cross/Edwards

1  Q     Did you review any F.B.I. reports of any debriefings of

2  you?

3  A     I don't believe I ever saw that either.

4  Q     Now, on January 7, 1992, that was the day that Nicky

5  Black was killed, correct?

6  A     Yes, it is.

7  Q     Now, that morning you and Scarpa and Jimmy Del Masto went

8  out to, you testified basically in sum and substance, look for

9  people on the other side, that other side, correct?

10 A     Yes.

11 Q     And was this other side the Persico -- I'm sorry, the

12 Orena side?

13 A     Yes.

14 Q     And this event occurred during what is known as the

15 Colombo Family war, correct?

16 A     Yes, ma'am.

17 Q     And the war consisted of a division within the Colombo

18 Family between people loyal to Vic Orena and people loyal to

19 Carmine Persico, correct?

20 A     Yes.

21 Q     And you and Mr. Scarpa remained loyal to Carmine Persico;

22 is that correct?

23 A     Yes, it is.

24 Q     Would it be a fair characterization of your quote/unquote

25 side being the Persico faction or the Persico side?

108

Mazza - Cross/Edwards

1    A    Yes, I was with the Persico faction.

2    Q    And you indicated in your testimony that when you went

3    out that day looking for members of the Orena faction, that's

4    what people from your side did; is that correct?

5    A    That was normal daily routine, yes.

6    Q    And that was norm daily routine not just for Mr. Scarpa

7    and members of his crew, but other crews headed by other

8    bosses on the Persico side, correct?

9         MS. EDWARDS:  Objection, Your Honor.

10        THE COURT:  I will allow it, if he knows.

11   A    Yes.

12   Q    For example, you testified in the trial of Anthony and

13   Joseph Russo, correct?

14   A    I did.

15   Q    And based upon your personal knowledge, that Anthony --

16   the Russos and people in their crews were part of other groups

17   that went out looking for Orena faction members to kill; is

18   that correct?

19   A    Yes.

20   Q    Now, this morning that you went out looking for Orena

21   faction members, the day that Grancio was killed, isn't it a

22   fact that that morning when you left -- where did you leave

23   from that morning?

24   A    Greg's house.

25   Q    When you left Greg's house, were you going out to find

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

109

Mazza - Cross/Edwards

1  Nicky Black or were you going out to find anybody on the Orena

2  side that you could find?

3  A    Anybody.

4  Q    And, in fact, it was Funzi D'Ambrosio's club that you

5  latched upon that morning that first aroused interest between

6  -- Mr. Scarpa's interest; isn't that true?

7  A    Right.  We were watching his club.

8  Q    And you were watching his club because when you went by

9  the club, you saw Mr. D'Ambrosio's car parked in front of the

10 club; is that correct?

11 A    Not directly in front of the club, but it was right

12 around the side street.  I believe there was a driveway that

13 he parked it in, I'm pretty sure.

14 Q    Okay.

15 A    But we did see his car.  I'm sorry.

16 Q    And you felt that if his car was parked in the location

17 it was, he might be in the club that you knew he frequented;

18 is that correct?

19 A    Yes.

20 Q    And was there a plan among the group that if you sat on

21 Funzi D'Ambrosio's car, he might come back to the car and

22 there might be an opportunity to kill him; is that correct?

23 A    Yes, it is.

24 Q    Now, do you recall at this point where Funzi D'Ambrosio's

25 club was located?

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

Mazza - Cross/Edwards

1  A    Right on the corner I think it is Van Siclen.  It's right

2  on the corner of McDonald Avenue, right off Avenue U.

3  Q    Okay.

4        And what you and Mr. Scarpa and Mr. Del Masto did was

5  park somewhere nearby to that club and where Mr. D'Ambrosio's

6  car was and you waited to see if Mr. D'Ambrosio showed up,

7  correct?

8  A    Yes.  We were parked about a block away.

9  Q    Okay.

10       Do you remember what street you would have been

11 parked on?

12 A    We were on again I believe it is Van Siclen facing

13 McDonald Avenue.

14 Q    Okay.

15       Now, then at that time while you were watching

16 D'Ambrosio's car and hoping to find him, Mr. Grancio's car --

17 Mr. Grancio showed up in his car; is that correct?

18 A    Yes.

19 Q    And isn't it a fact that that was fortuitous, you weren't

20 expecting him to show up; is that correct?

21 A    No, we weren't.

22 Q    But, nonetheless, Mr. Grancio was a target, a person in

23 the Orena faction, just like Mr. D'Ambrosio, that would be a

24 target of Mr. Scarpa and his crew and any other person in the

25 Persico faction; is that correct?

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

111

Mazza - Cross/Edwards

1  A    Yes, it is.

2  Q    And, in fact, Mr. Grancio was a pretty -- had pretty

3  strong crew.  He was a pretty -- someone that you would think

4  would be particularly violent; isn't that correct?

5  A    Yes.

6  Q    Now, isn't it a fact that when Mr. Grancio showed up

7  unexpectedly, a plan was immediately put in place to try to

8  kill him while he was -- while you had him in your sight; is

9  that correct?

10 A    Yes.

11 Q    And isn't it a fact that as you testified to before, that

12 Mr. Del Masto I believe -- who was driving the vehicle that

13 day, by the way, do you recall?

14 A    Driving whose vehicle?

15 Q    The vehicle that Scarpa and you and Mr. Del Masto were

16 in?

17 A    Jimmy was driving, James Del Masto was driving.

18 Q    Was it just the three of you that day?

19 A    Yes.

20 Q    Very shortly after Mr. Grancio was spotted, isn't it a

21 fact that Mr. Scarpa told Mr. Del Masto to try to pull up next

22 to Grancio's car?

23 A    Right.

24 Q    Now, did Mr. Grancio ever get out of his car and go

25 anywhere or did he stay in his car?

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

Mazza - Cross/Edwards

1   A    He was in the car.  He pulled away, circled the block.

2   We followed him.  When he pulled over, somebody came out of

3   the house to meet him and was on the opposite window, the

4   passenger side, and we just pulled up alongside of him.

5   Q    Okay.

6        So, now, where did Mr. -- Where did you first spot

7   Mr. Grancio in relation to D'Ambrosio's club?

8   A    It was right across the street.  There was a car service

9   there that they had something to do with.

10  Q    Okay.

11       So as soon as he was spotted by that car service,

12  Jimmy Del Masto started driving towards Mr. Grancio's car,

13  right?

14  A    Yes.

15  Q    But then Mr. Grancio started to drive away, you pursued,

16  correct?

17  A    That's correct.

18  Q    And is it fair to say Mr. Grancio made a couple of turns,

19  but then was stopped, his car was stopped because somebody

20  came to talk to him and I believe Mr. Tolino was in his car;

21  is that correct?

22  A    Yes, he was.  He was on the passenger's side, and I

23  forget the fellow's name, it might have been Anthony

24  something, running from the house to where we saw the cars,

25  and went over to the passenger window, and again we pulled up

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

113

Mazza - Cross/Edwards

1    alongside, and the rest you know.

2    Q    Okay.

3         So, you know, when this individual slowed down,

4    Mr. Grancio, that gave Mr. Scarpa and you and Mr. Del Masto

5    the opportunity to pull up alongside his car and shots were

6    fired and Mr. Grancio was killed, correct?

7    A    Right, yes.

8    Q    So, Mr. Mazza, when Mr. Scarpa made the telephone calls

9    that morning that you are referring to, would it be fair to

10   say that they were made during the time that you were waiting

11   to see if you could find Funzi D'Ambrosio to kill him; is that

12   correct?

13   A    It was at that time while we were watching that club.

14   Q    Right.

15        And from the moment you first saw Mr. Grancio till

16   the moment he was killed, there was no time to make any phone

17   calls, correct?

18   A    No, there wasn't.  No, right.

19   Q    And this version of events that I have gone over with you

20   is consistent with what you have testified to several times in

21   prior trials regarding the murder of Nicky Black Grancio,

22   correct?

23   A    To the best of my recollection, it is, yes.

24   Q    Now, Mr. Mazza, you certainly were aware that law

25   enforcement was surveilling a lot of individuals that were

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

114

Mazza - Cross/Edwards

1   involved in the Colombo war, correct?

2   A    Yes.

3   Q    And there were times when Mr. Scarpa was under

4   surveillance, correct?

5   A    Yes.

6   Q    And there were times when other members of the Persico

7   faction were under surveillance, correct?

8   A    That's correct.

9   Q    And is it your understanding that part of the reason of

10  all of the surveillance was to attempt to interdict or try to

11  stop the warring and the violence between the factions?

12  A    I would guess that's the reason why.

13  Q    Now, you testified you, yourself, did not notice any

14  surveillance on Nicky Grancio that day, correct?

15  A    I did not.

16  Q    And you did not notice any surveillance on Mr. Scarpa

17  that day, correct?

18  A    I don't believe we did.

19  Q    Some days you did notice surveillance, correct?

20  A    Yes, we did, and we actually listened to it sometimes on

21  the scanner, so...

22  Q    Do you recall that day if you were listening to --

23  A    I don't really recall.  Again that was pretty normal.  We

24  did it almost every day.  We might have.

25  Q    And probably the reason why you were listening on a

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

115

Mazza - Cross/Edwards

1   scanner was because as you are going out and trying to hunt

2   people from the Orena faction, generally during those times

3   you and Mr. Scarpa and Mr. Del Masto would be armed, correct?

4   A    Yes.

5   Q    And you were aware that there was a possibility that if

6   law enforcement surveillance caught up to you while you were

7   armed, that you might be arrested in possession of the

8   weapons?

9   A    Yes.

10  Q    Okay.

11        And, in fact, a lot of members from the Orena and

12  Persico factions were being arrested in possession of weapons

13  during that period of time, correct?

14  A    Yes, it is.

15  Q    And, in fact, in March of 1992, Mr. Scarpa wounds up

16  getting arrested because he was seen throwing a gun out of a

17  car; is that correct?

18  A    Yes.

19        MS. NOTOPOULOS:  Your Honor, I have no further

20  questions.

21        MS. EDWARDS:  Just a couple of very brief --

22        MS. NOTOPOULOS:  I'm sorry, could I go over one other

23  thing?

24        THE COURT:  Of course.

25  BY MS. NOTOPOULOS:

**<u>EXHIBIT L</u>**

Case 1:06-cv-00069-FB-CLP   Document 74-3   Filed 07/30/07   Page 28 of 65 PageID #: 458

1 of 1 DOCUMENT

Copyright 1994 The New York Times Company
The New York Times

November 20, 1994, Sunday, Late Edition - Final

**NAME:** Gregory Scarpa Sr.

**SECTION:** Section 1;  Page 49;  Column 3;  Metropolitan Desk;  Second Front

**LENGTH:** 2107 words

**HEADLINE:** The Mobster Was a Mole for the F.B.I.;
Tangled Life of a Mafia Figure Who Died of AIDS Is Exposed

**BYLINE:** By SELWYN RAAB

**BODY:**

Inside the Mafia, Gregory Scarpa Sr. could have served as a role model for ambitious gangsters. His underworld persona was that of a steadfastly loyal capo, or captain, in the Colombo crime family who for three decades ran rackets in New York City that enriched himself and his mob partners.

A flashy dresser who often carried $5,000 in cash, he at one point had homes on Sutton Place, in Las Vegas, and in Brooklyn and on Staten Island. Guile and ruthlessness earned him the underworld nicknames of "Hannibal" for his tactics and the "grim reaper" for his violence.

His mobster reputation also rested on his remarkable ability over four decades to evade prison despite numerous indictments on Federal and state charges.

Last year, Mr. Scarpa's luck with the law ended and he pleaded guilty to three murders and racketeering charges. Before his conviction, he had contracted the AIDS virus from a blood transfusion, and in June of this year, at age 66, he died in a prison hospital.

Now, through disclosures arising from recent court proceedings, another portrait has emerged of Mr. Scarpa: Almost to the end of his life, he was a mole for the Federal Bureau of Investigation, betraying Mafia secrets and his own boss for at least 20 years.

"The man was the master of the unpredictable and knew absolutely no bounds of fear," said Joseph R. Benfanti, a lawyer for Mr. Scarpa. "He abided by no moral codes; he made his own rules."

The exposure of Mr. Scarpa's double life has cast a rare spotlight on the F.B.I.'s shadowy dealings with a major mob informer who committed murders and other violent crimes while presumably providing the bureau with invaluable intelligence about organized-crime activities.

The disclosures have also raised questions about whether the F.B.I. funneled confidential information to Mr. Scarpa and immunized him from a prison sentence for decades.

And his unmasking has provided defense lawyers with an arsenal of legal ammunition in efforts to obtain new trials or acquittals for about 20 men who are accused of being Colombo family leaders and soldiers. The lawyers argue that

The Mobster Was a Mole for the F.B.I.;Tangled Life of a Mafia Figure Who

Mr. Scarpa, acting essentially on behalf of the F.B.I., duped their clients into committing crimes.

Another mystery that has surfaced since Mr. Scarpa's death is his purported role in helping the F.B.I. solve the 1964 murders of three civil-rights workers in Mississippi. In the last years of his life, Mr. Scarpa claimed that at the behest of the F.B.I., he terrorized a Ku Klux Klan member to disclose where the bodies had been buried, according to lawyers and law-enforcement officials who spoke on the condition of anonymity.

'Insurance Policy' Against a Long Term

F.B.I. spokesmen in New York and in Washington declined to comment on any aspect of Mr. Scarpa's affiliation with the agency. But other Federal law-enforcement officials, who spoke on the condition that they not be identified, said that he had been supplying information to the F.B.I. at least since the early 1970's.

Asked about Mr. Scarpa's motive for becoming an informer, one official said, "It was his insurance policy," an allusion to Mr. Scarpa's hope that he could obtain leniency if he were confronted with a long prison sentence.

In the aftermath of Mr. Scarpa's death, his tangled relationship as a mob kingpin and as an informer has led to these developments:

*An internal investigation by the F.B.I. of R. Lindley DeVecchio, the agent who handled Mr. Scarpa for over 15 years, to determine if he leaked information to Mr. Scarpa about mob rivals and pending arrests. Douglas E. Grover, Mr. DeVecchio's lawyer, described the allegations as "ridiculous and pure nonsense."

*Assertions by defense lawyers that the F.B.I. used Mr. Scarpa as an agent provocateur to provoke a war among factions in the Colombo family and thereby provide evidence for indictments. In the war, from 1991 through 1993, 10 people were killed and 17 wounded.

*Defense appeals to overturn the convictions in April of seven men identified as Colombo family leaders, capos and soldiers on grounds that testimony concerning their relationships with Mr. Scarpa should have been excluded because he was a secret Government agent. Defense lawyers say that Federal prosecutors in Brooklyn withheld information about Mr. Scarpa until they were ordered to turn over confidential F.B.I. reports to defense lawyers in three separate cases in the last two months.

Law-enforcement officials said that the legal brouhaha over Mr. Scarpa's involvement with the F.B.I. could jeopardize a long campaign by the bureau and Federal prosecutors to destroy the Colombo family, one of the five Mafia groups based in the city.

Federal prosecutors, in opposing motions for new trials and the unveiling of more evidence about Mr. Scarpa's undercover work, said that he had never been authorized to commit crimes and that the prosecution had no legal requirement to disclose his full record as a confidential informer.

After 10 Arrests, Only 30 Days in Jail

Mr. Scarpa's life of crime began in Bensonhurst, Brooklyn, a blue-collar neighborhood that has long been a recruiting field for Mafia groups. By the early 1970's, according to New York City Police Department records, Mr. Scarpa was a top capo, heading a mob crew from his Bensonhurst headquarters in a storefront club at 75th Street and 13th Avenue.

From 1950 to 1985 he was arrested 10 times on charges like carrying an unlicensed gun, assault, fencing hijacked liquor, heading bookmaking and loan-sharking rings and trying to bribe police officers. His scrapes with the law included charges in 1974 that he was a major conspirator in the theft of $4 million in stocks and bonds and in 1985 that he was behind a plot to counterfeit credit cards.

The Mobster Was a Mole for the F.B.I.;Tangled Life of a Mafia Figure Who

Most charges against him were either dismissed or resulted in probation. His only jail time was 30 days in 1976 for trying to bribe two police officers.

Defense lawyers suggest that F.B.I. agents intervened secretly with state and Federal judges and prosecutors to obtain leniency for Mr. Scarpa. "No one with a record like that could be so lucky," said a lawyer who represented Mr. Scarpa in one of his cases and who insisted on anonymity.

In 1986, at the age of 58, Mr. Scarpa was the father of five children by his wife and a mistress. He was then a robust 5-feet-10, with the compact body of a 200-pound wrestler. That year he underwent emergency surgery for a bleeding ulcer and received a pint of blood from a member of his crew who later died of AIDS.

Four years after the operation, Mr. Scarpa's AIDS was diagnosed. He lost 50 pounds and became gaunt. Still, despite failing health, he supervised his crew with an iron hand.

By the late 1980's, the Colombo family, however, was roiled in internal disputes stemming from a life sentence given the gang's boss, Carmine Persico. Mr. Persico wanted his son, Alphonse, to succeed him, but the move was opposed by a faction loyal to Victor Orena, the acting boss.

At several recent trials, Colombo defectors testified that a war over the succession erupted in 1991 and that Mr. Scarpa sided with the smaller Persico faction.

Reports of Murders, Disputes and Deals

So far, in response to orders by Federal judges in Brooklyn, prosecutors have given defense lawyers 72 separate reports by Mr. DeVecchio of his meetings and telephone conversations with Mr. Scarpa from Dec. 2, 1980, to Aug. 27, 1993. Those recently unclassified F.B.I. reports present a tale illuminating murders and other crimes by Colombo mobsters, changes in the family hierarchy, news of inductees and internal disputes. They also gave details of the Colombo partnerships and deals with other Mafia families.

During the Colombo war, Mr. Scarpa was a battle commander for Mr. Persico. But the F.B.I. reports reveal that he nevertheless betrayed Mr. Persico by tipping off the F.B.I. about murders sanctioned by Mr. Persico and about his loan-sharking activities.

Omitted in the reports are Mr. Scarpa's own criminal deeds, although he would later plead guilty to three murders and attempts to murder nine other supporters of Mr. Orena's faction.

The reports show that Mr. Scarpa also lied. He identified members of another crew in the murder of an Orena faction capo, Nicholas Grancio, in January 1992. Mr. Scarpa later confessed that he led the hit team that shot Mr. Grancio.

In March 1992, Mr. Scarpa went into hiding after the Brooklyn District Attorney's office obtained a warrant for his arrest on a gun-possession charge. From April through August of 1992, Mr. Scarpa met or spoke on the telephone seven times with Mr. DeVecchio, but the F.B.I. did not inform the District Attorney's office about his whereabouts or arrest him.

Mr. Scarpa surfaced in August 1992 to testify in a malpractice suit involving his contracting of AIDS. He obtained a $300,000 settlement. But his boldness in testifying alerted investigators in the Brooklyn District Attorney's office and he was arrested on a state gun charge and also by Federal authorities on racketeering and murder charges.

Even after the indictment, Mr. Scarpa continued to provide information secretly to Mr. DeVecchio, apparently in the flickering hope of obtaining leniency yet one more time.

The Mobster Was a Mole for the F.B.I.;Tangled Life of a Mafia Figure Who

And, while free on $1.2 million bail and ailing, Mr. Scarpa's trigger finger remained active. On Dec. 29, 1992, near his home in Dyker Heights, Brooklyn, he was shot in the left eye in a gun battle over a narcotics deal and his bail was revoked.

In May 1993, he pleaded guilty to the Federal racketeering charges, and on Dec. 15, he was sentenced to 10 years in prison and fined $200,000. On June 8, he died of complications from AIDS at the Federal Medical Center in Rochester, Minn.

A Crew Member Becomes a Witness

The F.B.I.'s internal investigation of Mr. DeVecchio began in January when Lawrence Mazza, a former member of Mr. Scarpa's crew, became a prosecution witness in Colombo family cases. Mr. Mazza, according to an F.B.I. report turned over to defense lawyers, said that Mr. Scarpa had boasted to him that during the Colombo war, a law-enforcement agent gave him the hideouts of members of Mr. Orena's faction.

Furthermore, Mr. Mazza informed the F.B.I. that Mr. Scarpa had told him he had been alerted to the pending arrest in 1987 of his son, Gregory Scarpa Jr., on Federal narcotics and murder charges by the Drug Enforcement Administration and to his own arrest in 1986 by the Secret Service for counterfeiting credit cards.

Mr. Mazza, according to the F.B.I. report, said that Mr. Scarpa frequently referred to the law-enforcement confidant who slipped him information as "the girlfriend."

Joseph A. Valiquette, a spokesman for the F.B.I.'s New York office, refused to discuss the inquiry into possible leaks. Mr. DeVecchio, 54, has been an agent for 29 years and until this year had been the supervisor of a squad that investigated the Colombo family.

Mr. DeVecchio declined to be interviewed. His lawyer, Mr. Grover, said that Mr. DeVecchio had been reassigned from the Colombo unit to another supervisory job unrelated to organized-crime work.

"He is angry and annoyed," Mr. Grover said of Mr. DeVecchio, "because he knows he is going to be completely cleared and yet there will remain an undeserved lingering doubt about his reputation because of these absurd allegations."

Defense Lawyer Requests Hearing

A defense lawyer in some Colombo family cases, Alan S. Futerfas, asked Federal Judge Charles P. Sifton in Federal District Court in Brooklyn on Nov. 10 for a hearing to determine if additional reports on Mr. Scarpa's informer activities should be released.

Mr. Futerfas asserted in his appeal that previously released F.B.I. reports show that the government "turned a blind eye to Scarpa's activities" in a plan "to create and further a divisive conflict which would enable the F.B.I., to make, it hoped, dozens of arrests and convictions."

Two Federal prosecutors, Valerie Caproni and Ellen M. Corcella, denied in a brief that the F.B.I. incited the Colombo War. The prosecutors said the defense request for additional F.B.I. reports was so broad that it could be construed as a move to compel the F.B.I. to "abandon the informant program entirely, which defendants no doubt would relish."

In another Federal case in Brooklyn, Judge Eugene H. Nickerson is inspecting Mr. Scarpa's F.B.I. files before ruling if more reports are relevant evidence in a trial of seven men accused of being Colombo family racketeers.

"It is best the truth comes out," Judge Nickerson said last month in ordering the review.

The Mobster Was a Mole for the F.B.I.;Tangled Life of a Mafia Figure Who

**GRAPHIC:** Photos: Gregory Scarpa Sr., shown at a party in the 1970's, was considered a loyal capo in the Colombo crime family; By 1993, Mr. Scarpa had become ill with AIDS and had been shot in the eye. (pg. 49); Gregory Scarpa Sr., center, avoided prison for decades, perhaps, as it turns out, because he betrayed Mafia secrets to the F.B.I. for at least 20 years. He is shown in a surveillance photograph from the 1970's. (pg. 56)

**LOAD-DATE:** November 20, 1994

**<u>EXHIBIT M</u>**

1 of 1 DOCUMENT

Copyright 1995 The New York Times Company
The New York Times

May 9, 1995, Tuesday, Late Edition - Final

**SECTION:** Section B; Page 3; Column 2; Metropolitan Desk

**LENGTH:** 669 words

**HEADLINE:** Prosecutors Say F.B.I. Agent Passed Information to a Colombo Mob Figure

**BYLINE:** By SELWYN RAAB

**BODY:**

In an unusual twist that could damage the Government's campaign against the Colombo crime family, Federal prosecutors in Brooklyn said yesterday that an F.B.I. agent had for years disclosed confidential information to a high-ranking member of that Mafia group.

The prosecutors said the agent, R. Lindley DeVecchio, funneled to Gregory Scarpa Sr., a captain in the Colombo family, information about his enemies' possible hideaways during an internal Colombo war from 1991 to 1993 in which 10 men were killed.

According to the prosecutors, Mr. DeVecchio also tipped off Mr. Scarpa about pending arrests, about crime family members who had become informers and about the activities of his rivals. They also said the agent gave Mr. Scarpa the addresses of two men that Mr. Scarpa was hunting to collect loan shark debts.

In effect, the prosecutors indicated that while Mr. Scarpa was a mole for the Federal Bureau of Investigation inside the Mafia, he was also getting potentially valuable information from Mr. DeVecchio.

Lawyers for about 20 men who in the last two years have been convicted of being Colombo family racketeers or who are about to be tried on such charges said the revelations could be helpful in winning new trials or in gaining acquittals. The defense lawyers contend that the F.B.I. used Mr. Scarpa as an agent provocateur to foment violence in the Colombo family.

Mr. Scarpa, 66, died last June while serving a prison sentence for racketeering.

A brief description of the information provided to Mr. Scarpa by Mr. DeVecchio was provided yesterday by the United States Attorney's office in Brooklyn in a letter to lawyers for six defendants who are accused of being Colombo family members and of conspiring to murder opponents in the family war. Opening statements in the trial are to be made today in Federal District Court in Brooklyn.

At trials and hearings last year involving other suspected Colombo family members, prosecutors disclosed that Mr. Scarpa had been an F.B.I. informer for more than 15 years. In recent years, he was supervised by Mr. DeVecchio, who until 1994 was the head of the Colombo family squad in the F.B.I.'s New York office.

After learning last year about Mr. Scarpa's links to the F.B.I., defense lawyers asked in court papers for more information about his relationship with Mr. DeVecchio. The information was turned over to the defense on the order of Judge Edward R. Korman of Federal District Court in Brooklyn.

Prosecutors Say F.B.I. Agent Passed Information to a Colombo Mob Figure

In the letter to the defense, Ellen M. Corcella, an assistant United States Attorney, said that in January 1992 Mr. DeVecchio told Mr. Scarpa that Victor Orena, the head of one of the factions of the Colombo family, was staying at his girlfriend's house. Mr. Scarpa was one of the battle commanders for a group loyal to Carmine Persico, the imprisoned boss of the family, and Mr. Scarpa was known to be hunting for Mr. Orena.

The F.B.I. agent, according to the letter, also provided information about an Orena "hit team that was looking for members of the Persico faction."

Ms. Corcella said Mr. DeVecchio warned Mr. Scarpa in 1987 about the impending arrest of his son, Gregory Jr., by the Drug Enforcement Administration. The son was a fugitive for nine months before being arrested and convicted on drug-trafficking charges.

In the late 1980's, Ms. Corcella said, Mr. DeVecchio warned Mr. Scarpa that his clubhouse in Brooklyn was being bugged and that he was under investigation for credit card frauds.

According to Ms. Corcella, Mr. DeVecchio alerted Mr. Scarpa in June 1992 that two of his closest associates, Lawrence Mazza and James DelMasto, were about to be arrested, "but that if they stayed away from their normal 'hangouts' they could avoid being arrested."

Last year, the F.B.I. said it had begun an internal inquiry into Mr. DeVecchio's action but refused to disclose any details. Douglas E. Grover, Mr. DeVecchio's lawyer, declined to comment on the implications of the letter yesterday, saying he had not seen it.

**LOAD-DATE:** May 9, 1995

**<u>EXHIBIT N</u>**

Westlaw.

5/10/95 NYDLYNWS 7

5/10/95 N.Y. Daily News 7
1995 WLNR 5377188

New York Daily News
Copyright 1995 Daily News, L.P.

May 10, 1995

Section: NEWS

THE LAWMAN & MAFIOSO FBI BIG AIDED MOB, FED SEZ

GREG B. SMITH and JERRY CAPECI

A top FBI crime buster fell into cahoots with a key mobster and fed him confidential federal information at the height of the bloody Colombo crime family wars, a U.S. prosecutor admitted yesterday as seven gangsters went to trial on murder conspiracy charges.

The stunning concession from Assistant U.S. Attorney Ellen Corcella was plainly intended to pre-empt an expected defense argument that Agent R. Lindley DeVecchio's cozy friendship with the late crime boss Gregory Scarpa compromises the case against the seven Colombos.

Even Brooklyn Federal Judge Edward Korman has shaken his head at reports of the agent's involvement with the mob, declaring at a recent hearing that DeVecchio "certainly crossed the line by a fairly wide mark."

The feds believe that DeVecchio, ex-head of the FBI's Colombo unit, leaked critical information to the homicidal Scarpa on at least eight occasions. DeVecchio is still a supervisor in the New York office, and the FBI's New York spokesman, Joseph Valiquette, has declined to comment on the allegations.

The allegations are "absolutely untrue," DeVecchio's lawyer, Douglas Grover, told the Daily News last night. "It's a disgrace that the government has allowed these allegations to fester for so long without resolving them."

The revelations surfaced as Victor and John Orena, the sons of the late Victor (Little Vic) Orena, and five associates come to trial in Brooklyn Federal Court, charged with participating in the Colombo war. Defense attorneys say Scarpa waged the war himself with the FBI's permission, and that their clients were merely defending themselves.

But a review of court papers and interviews with sources show just how far DeVecchio may have crossed over.

On a frigid December night in 1991, Mafia informant Scarpa met with DeVecchio  and gave him advice about the war raging in the Colombo crime family, pitting imprisoned boss Carmine (Junior) Persico against rival Orena.

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Scarpa, a Persico ally, suggested that if Orena was killed or indicted, the war would stop.

DeVecchio, the trusted lawman, apparently took to heart the advice of Scarpa, the career sociopath.

Within a month, the feds say, DeVecchio gave Scarpa the Queens address of Orena's girlfriend, where Orena allegedly was hiding out. Scarpa's associates then used the information to try  unsuccessfully  to assassinate Orena.

On Feb 27, 1992, reputed Colombo gangster Carmine Imbriale was arrested on fraud and drug charges, agreeing immediately to cooperate with the feds. That same day, DeVecchio let Scarpa know Imbriale was cooperating, the feds believe.

The Imbriale incident is disturbing for two reasons. First, DeVecchio effectively sentenced Imbriale to death by letting the mob know he was an informant.

Second, the feds left Scarpa out on the street despite information from Imbriale that Scarpa had bragged about participating in the attempted murder of reputed gangster Joel (Waverly) Cacace.

To date, prosecutors have not said aloud why DeVecchio  a veteran investigator with a promising career in the bureau  may have crossed the line. So far, only Korman has offered a theory.

"He was acting, however misguided he may have been, in what he thought was for a law enforcement purpose, like a police officer who goes out and maybe executes a search warrant," Korman said.

---- INDEX REFERENCES ----

COMPANY: DAILY NEWS

NEWS SUBJECT:  (Legal (1LE33))

REGION:  (USA (1US73); Americas (1AM92); North America (1NO39); New York (1NE72))

Language:  EN

OTHER INDEXING:  (DAILY NEWS; FBI; LAWMAN; MAFIA; PERSICO)  (Agent R. Lindley; Carmine Imbriale; DeVecchio; Douglas Grover; Edward Korman; Ellen Corcella; Gregory Scarpa; Imbriale; John Orena; Joseph Valiquette; Korman; Orena; Scarpa)

KEYWORDS: FBI; Organized Crime; Gregory Scarpa; Illustration

EDITION: SPORTS FINAL

Word Count: 658
5/10/95 NYDLYNWS 7

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

5/10/95 NYDLYNWS 7                                                    Page 3

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT O**

Westlaw.

NewsRoom

5/11/95 NYDLYNWS 30

Page 1

5/11/95 N.Y. Daily News 30
1995 WLNR 5388448

New York Daily News
Copyright 1995 Daily News, L.P.

May 11, 1995

Section: NEWS

MOBSTER HAD DEAL WITH FBI

GREG B. SMITH

Over and over, career gangster Gregory Scarpa got busted on charges like bookmaking, assault and larceny.

Over and over, he dodged jail time.

Now, evidence has emerged to explain why.

In a racketeering trial unfolding in Brooklyn federal court this week, documents and testimony indicate the FBI may routinely have bailed Scarpa out because he was one of its prize informants.

The feds charge that seven Colombo defendants participated in a bloody civil war in 1991-92.

Their attorneys say they were simply defending themselves from the sociopathic Scarpa, and in opening arguments the defense argued the FBI gave Scarpa a pass to commit crime.

"He's committed oodles of crimes and miraculously, he's never been arrested," said Alan Futerfas, representing defendant John Orena. "Was he told: 'We don't want you. We don't want to mess with the likes of you.'? No. The silence, ladies and gentlemen, was deafening."

Prosecutors acknowledge Scarpa's FBI handler, Agent R. Lindley DeVecchio, may have leaked information to his key source and warned him of impending indictments.

Scarpa's good luck with the law began around the time he signed up as an informant, sources say. Eight times between 1959 and 1974 he was busted on everything from making book to stealing mail. Eight times the charges were dismissed.

On March 10, 1976, Scarpa went too far, bribing a cop, according to documents. He pleaded guilty but got just 30 days  an unusually light sentence considering his criminal past.

During this time, police knew he was running a "major,sophisticated auto theft ring," according to papers filed by Edward McDonald, director of the now-defunct Organized Crime Strike Force.

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

5/11/95 NYDLYNWS 30                                           Page 2


Yesterday, McDonald, now a prominent Manhattan attorney, declined to comment on why so many of Scarpa's charges were dismissed.

One of the cases McDonald wouldn't discuss was a 1985 arrest by the Secret Service, in which Scarpa was charged as "one of the biggest distributors of counterfeit credit cards in the New York metropolitan area."

Scarpa pleaded guilty and agreed to accept seven years of jail time. But when sentencing day came around, the jail time was dropped, replaced by five years probation.

The same year, the prosecutors believe, DeVecchio may have warned Scarpa that his Brooklyn hangout, the Wimpy's Boys Social Club, was being bugged by the Secret Service and that he'd soon be arrested on the credit card charges.

But the FBI knew even more. On Jan. 12, 1992, for instance, agents admit they knew Scarpa had shotgunned rival gangster Nicky Grancio in the head.

On Feb. 27, 1992, agents say, the FBI learned Scarpa bragged about shooting Joe (Waverly) Cacace.

The FBI also knew Scarpa was a fugitive from the NYPD after a detective saw Scarpa toss a weapon from his car on March 31, 1992. Scarpa escaped until Aug. 31, 1992. During his months on the lam, he met secretly with DeVecchio six times. DeVecchio never turned him in.

---- INDEX REFERENCES ----

NEWS SUBJECT:  (Crime (1CR87); Legal (1LE33); Social Issues (1SO05); Criminal Law (1CR79); Automobile Crime (1AU99))

REGION:  (USA (1US73); Americas (1AM92); North America (1NO39); New York (1NE72))

Language:  EN

OTHER INDEXING:  (BOYS SOCIAL CLUB; FBI; MOBSTER; NYPD; ORGANIZED CRIME STRIKE FORCE; SECRET SERVICE; WIMPY)  (Agent R. Lindley DeVecchio; Alan Futerfas; DeVecchio; Edward McDonald; Gregory Scarpa; John Orena; Nicky Grancio; Prosecutors; Scarpa)

KEYWORDS: Organized Crime; FBI; Gregory Scarpa

EDITION: SPORTS FINAL

Word Count: 582
5/11/95 NYDLYNWS 30


©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

5/11/95 NYDLYNWS 30

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT P**

1 of 1 DOCUMENT

Copyright 1995 Newsday, Inc.
Newsday (New York)

May 29, 1995, Monday, CITY EDITION

SECTION: NEWS; Pg. A15

LENGTH: 813 words

HEADLINE: Mob Trial Points To Ties Between FBI, Gangsters

BYLINE: By Patricia Hurtado. STAFF WRITER

BODY:

Colombo crime family consigliere Carmine Sessa was one of Gregory Scarpa Sr.'s closest friends, but he always wondered if the ruthless killer and capo also was an FBI informant.

"I've been around the guy many years and I saw a lotta things, a lotta guys getting arrested and killed and him escaping all the time. Nothing happened to him. It just seemed confusing to me," said Sessa, 44, who also served at one point as acting Colombo boss.

Sessa said he also received a warning from Lucchese family underboss Anthony Casso, who'd been alerted by his own valued law-enforcement source that Scarpa was an informant.

"I thought there might be something funny there and that there may be some truth to this," Sessa testified last week in Brooklyn Federal court.

Testimony from Sessa - and even from FBI agents - has drawn a picture of a strangely symbiotic relationship between some investigators and mobsters, especially Scarpa, who died of AIDS last June while serving a prison term for racketeering.

At this latest trial of six reputed gangsters charged with participating in the Colombo family war between 1991 and 1993, federal prosecutors acknowledged that FBI Special Agent R. Lindley DeVecchio, assigned to the elite squad investigating the Colombo family, "may have" supplied information to Scarpa about his rivals.

DeVecchio, who handled Scarpa since the mid-1980s, is now a supervisory special agent in another division. And agents testified last week that an internal FBI investigation of DeVecchio is continuing. His lawyer Douglas Grover has denied any wrongdoing by the agent.

The defendants include two sons of convicted Colombo boss Victor Orena Sr. - Victor M. Orena and John T. Orena. All are charged with conspiracy to murder rivals in the feud that erupted between the faction loyal to their father, the acting boss, and allies of imprisoned Colombo chief Carmine Persico.

In their cross-examination of FBI agents, defense lawyers have gone on the offensive, essentially putting the agency itself on trial. The strategy to attack Scarpa worked well in the 1994 trial of reputed Colombo capo William Cutolo, who was acquitted of racketeering murder.

DeVecchio is not expected to testify for the prosecution and defense lawyers declined to say if they will call him.

Mob Trial Points To Ties Between FBI, Gangsters Newsday (New York) May

Defense lawyer Gerald Shargel, who is representing Victor M. Orena, has called DeVecchio a "rogue agent" who helped provoke the war by providing valuable information to Scarpa about his rivals' whereabouts.

And James La Rossa, attorney for defendant Thomas Petrizzo, charged the defendants were merely protecting themselves from Scarpa, who, the lawyer said, was a "crazed killer."

In a ruthless cross-examination of FBI Special Agent Howard Leadbetter, Shargel brought out that Scarpa actually spoke to DeVecchio the day the mobster murdered Nicholas Grancio, a Teamsters boss and Colombo family capo, and then called the DeVecchio the day after the murder to report that "peace was now impossible" because "someone" had killed Grancio.

But while acknowledging the relationship DeVecchio had with Scarpa, prosecutors have argued to the jury that DeVecchio is not on trial.

"You are not here to determine if Agent DeVecchio was incompetent or guilty of a venality or if Scarpa compromised DeVecchio," Assistant U.S. Attorney Ellen Corcella told the jury.

To defuse the allegations, Corcella brought the DeVecchio-Scarpa relationship out first through questioning of FBI agents.

Leadbetter testified agents reported their concerns about DeVecchio to superiors after several high-ranking Colombos agreed to cooperate with authorities and told them that crucial pieces of law enforcement intelligence had reached mobsters.

Such information included Scarpa's knowing about the impending arrest of his son and others or that the FBI was about to raid a New Jersey safehouse where several mobsters were hiding. Scarpa evaded arrest by leaving just before the raid. He was not arrested until later in 1992.

"We didn't know it was Lin DeVecchio," Leadbetter testified. "But when we examined all the information together and added the pieces of information that we knew from our own investigation . . . it became apparent that this was a situation that warranted further investigation."

The mob was certainly worried about Scarpa's loyalties. Sessa said Joe Tomasello, the acting boss for the Persico faction of the Colombo family, suggested Scarpa "go out and kill somebody on the Orena faction to settle everybody's mind."

"They felt if he killed somebody, he wasn't cooperating," Sessa said. He testified Scarpa replied, "What does he think this is, the movies?" Sessa explained: "It was already 11 o'clock at night and it wasn't like he could just go out and find somebody to kill at that hour."

The trial resumes tomorrow before U.S. District Court Judge Edward Korman.

**LOAD-DATE:** May 30, 1995

**EXHIBIT Q**

2 of 2 DOCUMENTS

Copyright 1995 Newsday, Inc.
Newsday (New York)

June 4, 1995, Sunday, CITY EDITION

**SECTION:** CURRENTS; Pg. 33
Other Edition: Nassau and Suffolk

**LENGTH:** 676 words

**HEADLINE:** The FBI Gave Him an Edge

**BYLINE:** By Murray Kempton

**BODY:**

Early in 1991 Victor M. Orena Sr., the Colombo crime family's Prince John, commenced moving through blood to seize its scepter from Carmine Persico, its King Richard dungeoned among infidels far away; and Lindley DeVecchio and Gregory Scarpa Sr. scented a wind insufficiently ill not to blow both of them good.

DeVecchio was supervisor of the Federal Bureau of Investigation's Colombo crime strike force and Scarpa was a Colombo captain and as much Persico's liege as he could ever be anybody's. He had also indulged the FBI's weakness for gossip as a Confidential Informant (CI) for at least two decades.

He and DeVecchio had established a regular trade in intelligence, with the advantage generally on Scarpa's side and about to be crushingly so in the months ahead.

When he contemplated the Colombo Wars of Succession, DeVecchio had some excuse for assuming that, as overseer of a CI with the four-star rating of Top Echelon, he would be privy to every secret and have an avenging eye upon every assassin.

Meanwhile Scarpa had better reason for assurance that, by gulling DeVecchio, he could earn himself a judgement-proof license to kill. In the first phase of fratricide, the pavements were mainly stained with Persico blood; and, since Scarpa was himself so eligible a target, DeVecchio was unsurprised by the meager service he brought to fingering the perpetrators.

But then reprisals began and savagely enough to send Victor Orena scuttling into hiding. Even when events were passing his faction's way, however, Scarpa remained an unhelpful servitor; with each fresh murder, DeVecchio would inquire and Top Echelon CI's replies would float into the intangibility of "The Persicos did it."

Still, Scarpa could scarcely be asked to answer that he was the "Persico" who did it, which was most probably what he indeed was. DeVecchio now knows to his sorrow that Scarpa began the counterattack by killing Gitano Amato and wounding Joseph Tolino on Dec. 10, 1991, then killing Vincent Fusaro beside his Christmas tree and killing Nicky Grancio for the New Year. Thirteen of the 15 shootings on the Persico scoreboard are credited to this besotted homicidist in the year before the hand of nature pushed him to the grave.

And all the while, DeVecchio blindly went on trading gold for Scarpa's straws. He warned Scarpa that Colombo soldier Carmine Imbriale had turned informer. He told him that an FBI alert was pending for two active outriders on

Scarpa's forays but that they'd be safe if they avoided their "usual haunts." He informed him of the whereabouts of Sal Miciotta, an Orenista for whom Scarpa had intentions anything but charitable.

And finally, in the summer of 1992, when the police were pursuing Scarpa on a gun charge, DeVecchio met with him at regular intervals for four months and Scarpa used these last graces of sanctuary to murder Lary Lampesi.

By then refugees from the Colombo wars were straggling into the federal witness protection program and telling DeVecchio's FBI colleagues about his uneven - and in its effects infamous - bargain with Scarpa. That news shocked the agents in 1992, and they fraternally forebore to tell their superiors until 1994.

Victor Orena Jr. and six other relicts of his father's faction are on trial in Brooklyn for stocking guns and planning murders. Their lawyers claim that terror of Scarpa had compelled them to arm in mere self-defense, an argument scarcely implausible to anyone who would be as minded as I to check out the gun shows on the mere rumor that Scarpa was out to get me.

On Thursday, FBI Special Agent Jeffrey Tomlinson writhed in the torments of explaining to Gerald Shargel and James LaRossa of defense counsel why he had covered up for Lin DeVecchio through 18 months after learning the whole of this unsavory story. The FBI has lately taken to picking its directors off the bench and ornamenting them with successive references to each as "Judge", which, we are to presume, gives some color of law to all-but-officially-sanctioned frolics with lawlessness.

**LOAD-DATE:** June 05, 1995

**<u>EXHIBIT R</u>**

1 of 1 DOCUMENT

Copyright 1995 The New York Times Company
The New York Times

July 1, 1995, Saturday, Late Edition - Final

SECTION: Section 1; Page 25; Column 5; Metropolitan Desk

LENGTH: 811 words

HEADLINE: 7 Found Not Guilty in Plot Tied to a Mob Family Feud

BYLINE: By DENNIS HEVESI

BODY:

In a case that hinged on the connection between an F.B.I. agent and a mob captain acting as an informer, all seven suspected members of a faction of the Colombo crime family were found not guilty yesterday of conspiring to murder members of another faction.

There was virtually rapt silence in Judge Edward R. Korman's courtroom in the Federal courthouse in downtown Brooklyn as the first six names were read and followed by, "Not guilty," and then an eruption of glee as up to 100 friends and relatives, the defendants and their lawyers punched the air, shouted, hugged, wept and slapped one another's backs at the final finding. The jury deliberated 12 hours in the seven-week trial.

One juror, who identified himself only as Juror 0186, said, "There wasn't sufficient evidence" for a conviction, and added that the pivotal moment "was when they showed the sheet of the conversations with DeVecchio and Scarpa."

"It showed that Scarpa was basically running free," the juror added.

The juror was referring to R. Lindley DeVecchio, the agent who until last year headed the C10 Squad of the Federal Bureau of Investigation, assigned to investigate the Colombo gang, and Gregory Scarpa, a reported Colombo captain who was also Mr. DeVecchio's informer. Defense lawyers said their clients were forced to protect themselves from Mr. Scarpa while Mr. DeVecchio shielded the informer.

The prosecution had portrayed the defendants as conspirators who arranged a series of murders to install their patron, Victor Orena Sr., as head of the family. The war, prosecutors said, erupted in 1991 between the faction loyal to Mr. Orena, the acting boss, and Carmine Persico, the imprisoned boss, who wanted his son Alphonse to succeed him.

The defendants included Mr. Orena's sons Victor Jr. and John and Thomas Petrizzo, a contractor who helped build many skyscrapers in the city. The prosecution described Mr. Petrizzo as a mob captain, leading a double life.

Mr. Scarpa was a commander for the Persico faction. He pleaded guilty to murder and died in prison last year, after contracting AIDS from a blood transfusion.

The defense contended that its clients were just trying to protect themselves from the Persico faction and Mr. Scarpa in particular. Tacitly conceding that the defendants were gang members, one lawyer, James LaRossa, said:

"Some of them had weapons. But there is no testimony in this record that they ordered anyone killed, no evidence that they stalked anyone or that they went out to shoot anyone."

7 Found Not Guilty in Plot Tied to a Mob Family Feud The New York Times

Mr. Scarpa, Mr. LaRossa added, killed six in the Orena faction.

The defense argued that the murders were helped by Mr. Scarpa's relationship with Mr. DeVecchio. Testimony about that was given by two F.B.I. agents, Jeffrey W. Tomlinson and George Leadbetter 2d, who worked under Mr. DeVecchio. They said they came to suspect that Mr. DeVecchio had disclosed confidential information that had helped Mr. Scarpa evade arrest.

On June 19, the last day of testimony, a third F.B.I. agent, Christopher Favo, recounted a day in May 1992 when, he said, Mr. DeVecchio slapped his desk at the news that two Orena men had been killed.

"And you wrote down that he got excited about it," Mr. LaRossa asked. "Didn't he?"

"Yes," Mr. Favo responded.

"You said that he said to you, 'We're going to win this thing,' right? Meaning the war, right?"

"Yes."

"Meaning the Persico side, right?"

"Yes."

Mr. DeVecchio, who has declined to comment, was transferred last year to other duties.

Members of the prosecution team did not respond to messages at their office yesterday. But in his summation, the prosecutor, George Stamboulidis, conceded that the evidence was circumstantial. "How do you know that there was an agreement to murder?" he asked. "In short, because there were murders."

The prosecution case relied on taped conversations of defendants, telephone records and the testimony of accomplice witnesses. The evidence included bulletproof vests, pistols, reverse telephone directories and street maps supposedly used to find victims.

Mr. Stamboulidis reminded the jurors of one gang member's testimony about a conversation in which Mr. Petrizzo reportedly said of the Persico faction, "These people are no good, and they all have to die."

Yesterday a juror, Philip Severino, listed important items of evidence that were never produced: "Missing photos of a supposed shooting attempt on Scarpa taken by the police or the F.B.I. A missing revolver that was thrown out a window by Mr. Scarpa. It was recovered but missing when it came time to produce it. Shell casings in an assassination attempt on Scarpa. A garbage bag found when the F.B.I. did an early morning raid on Victor Orena Sr.'s house on Long Island. It supposedly contained guns."

"I had a problem," Mr. Severino said, "with four items missing."

**LOAD-DATE:** July 3, 1995

1 of 1 DOCUMENT

Copyright 1995 The New York Times Company
The New York Times

July 2, 1995, Sunday, Late Edition - Final

SECTION: Section 1; Page 25; Column 5; Metropolitan Desk; Second Front

LENGTH: 1611 words

HEADLINE: The Thin Line Between Mole And Manager

BYLINE: By SELWYN RAAB

BODY:

Thirteen years ago, the careers of R. Lindley DeVecchio, an F.B.I. agent, and Gregory Scarpa, a Mafia gangster, became secretly entwined.

Mr. Scarpa was a prized mole for the Federal Bureau of Investigation inside the Colombo crime family; Mr. DeVecchio was his contact agent, or handler. But that relationship has now backfired for the Government, wrecking a major case because of charges by other agents that Mr. DeVecchio, too, was a mole, providing confidential information to Mr. Scarpa that helped him to evade arrests and to track down rivals in a mob war.

On Friday, after a six-week trial, a Federal jury in Brooklyn acquitted two reputed Colombo family capos and five soldiers on charges of conspiracy to murder and possession of firearms. Jurors said they had been influenced by the defense's central arguments: that Mr. DeVecchio, seeking to generate evidence for arrests, had used Mr. Scarpa to foment the Colombo war from 1991 to 1993 and that the actions of the seven defendants were taken in self-defense to escape being killed by Mr. Scarpa.

The war left at least 10 men dead and 14 wounded.

The F.B.I. began an internal investigation last year into Mr. DeVecchio's dealings with Mr. Scarpa, but the findings have not been disclosed. Officials say this is the first case of an F.B.I. agent being investigated on charges that he leaked confidential information to a Mafia figure.

The liaison between the gangster and the agent began in 1982, when Mr. Scarpa was a feared Colombo captain, a rising star in New York's underworld. Mr. DeVecchio was assigned as his primary contact agent, responsible for prying evidence and intelligence tips from him about Mafia operations.

The arrangement began promisingly for both men. While handling Mr. Scarpa, Mr. DeVecchio was promoted to supervise an organized-crime squad that investigated the Colombo and Bonanno families. An agent since 1966, Mr. DeVecchio -- Lynn to his friends -- drew high praise from top F.B.I. officials for his investigative work, particularly with Mr. Scarpa, who became one of the bureau's most valuable Mafia spies.

As Mr. DeVecchio advanced in the 1980's, Mr. Scarpa fashioned another success story. From his base in Bensonhurst, Brooklyn, he enriched himself through gambling, loan sharking, fraud rackets and narcotics trafficking. A chunky, muscular man and a flashy dresser whose mob nickname was the Grim Reaper, Mr. Scarpa was admired in the underworld for his remarkable ability to evade prison despite several indictments.

The Thin Line Between Mole And Manager The New York Times July 2, 1995,

But in 1993, after a lifetime of crime, Mr. Scarpa pleaded guilty to murder and racketeering charges. He died a year ago in a prison hospital at age 66 after contracting the AIDS virus from a blood transfusion.

Mr. DeVecchio, 54, who declined to be interviewed, was transferred last year from organized-crime assignments to supervision of a unit in New York City that investigates other kinds of crimes.

Many details of the relationship between the gangster and the agent were revealed at the recent trial in Federal District Court in Brooklyn. The case also produced testimony and affidavits illuminating the vital importance of informers to the F.B.I. in developing organized-crime cases, as well as how treacherous those alliances can be.

In addition, the trial shed light on some of the opaque methods used by the F.B.I. to oversee Mafia spies, including top-security "hello phones" (telephone lines that informers use to reach their contacts at bureau headquarters in lower Manhattan) and code numbers used in reports to hide informers' identities from other agents.

The testimony concerned the bureau's two categories of mob spies: confidential informers, known as C.I.'s, like Mr. Scarpa, who work on the condition that they will not be asked to testify, and confidential witnesses, or C.W.'s, who go undercover with the understanding that they may be called as prosecution witnesses and that their identities may be disclosed.

Mr. DeVecchio did not testify, but the most blistering testimony against him came from three fellow agents, Christopher M. Favo, Jeffrey W. Tomlinson and George Leadbetter 2d, who worked directly under him from 1991 to 1994. The agents said that as early as 1992 they had begun to suspect that Mr. DeVecchio had disclosed confidential information that helped Mr. Scarpa and his accomplices evade arrest, and that he may have warned the mobster about other Colombo family turncoats who were working for the F.B.I.

Mr. Favo testified that he withheld information from Mr. DeVecchio because he feared that Mr. DeVecchio would funnel it to Mr. Scarpa. He said that in May 1992 Mr. DeVecchio had seemed pleased and had pounded his desk in apparent delight when he learned that two rivals of Mr. Scarpa had been shot, as if Mr. DeVecchio was favoring one of the factions in the Colombo war.

"I thought there was something wrong," Mr. Favo testified about Mr. DeVecchio's conduct. "He was compromised. He had lost track of who he was."

Mr. Favo said he delayed reporting his suspicions about Mr. DeVecchio for 18 months, at first because he thought Mr. DeVecchio had revealed the information to Mr. Scarpa inadvertently and then because he doubted that anyone would believe him.

Mr. Favo, questioned by a defense lawyer, Gerald L. Shargel, about Mr. DeVecchio's purported disclosures to Mr. Scarpa, was asked, "Do you believe it was criminal as you sit here now?"

"Yes," Mr. Favo replied.

The three agents testified that they could not understand why Mr. DeVecchio continued to use Mr. Scarpa as an informer and failed to arrest him in June 1992 after two defectors separately implicated him in a murder. Mr. Scarpa was indicted on Federal racketeering charges in August 1992 only after he was arrested on a gun-possession charge by the Brooklyn District Attorney's office.

The agents said their concerns about Mr. DeVecchio jelled in late 1993, after three defectors in the Colombo family told them that Mr. Scarpa had boasted since the mid-1980's that a law-enforcement agent had tipped him off about Colombo defectors, the hide-outs of rivals, the pending arrests of mobsters and the placement of eavesdropping bugs.

In January 1994, shortly after the arrests of the seven defendants who were acquitted, the agents finally reported

The Thin Line Between Mole And Manager The New York Times July 2, 1995,

their doubts about Mr. DeVecchio to F.B.I. officials.

The Colombo war, prosecutors say, erupted in November 1991 between factions loyal to Victor J. Orena, the family's acting boss, and Carmine Persico, the imprisoned boss of the family, who wanted his son, Alphonse, to succeed him as leader. Mr. Scarpa was a battle commander for the Persico group.

The seven defendants were accused of being members of the Orena faction. They included two of Mr. Orena's sons and Thomas Petrizzo, a major construction contractor in New York City and New Jersey, who prosecutors asserted was a Colombo captain.

A prosecutor, Ellen M. Corcella, acknowledged in her opening and closing statements that Mr. Scarpa might have compromised Mr. DeVecchio. But she urged the jury not to be distracted by that relationship.

Instead, she asked jurors to concentrate on testimony by three Colombo family defectors and evidence obtained through electronic eavesdropping, which she said showed that the defendants had sought to gain control of the family by hunting down and killing their opponents.

James K. Kallstrom, the head of the F.B.I.'s office in New York City, said that "no conclusions should be drawn" concerning the allegations against Mr. DeVecchio until the internal inquiry was completed. He noted that Mr. DeVecchio had not been suspended or demoted and that his salary of $105,000 a year had not been cut.

Mr. DeVecchio's lawyer, Douglas E. Grover, said: "There is no evidence that Lynn DeVecchio leaked anything to anybody at any time. Everything he did in his dealings with Scarpa were made known to his superiors at all times."

Noting that Mr. Favo, Mr. Leadbetter and Mr. Tomlinson had begun working on organized-crime cases in 1991 and had limited knowledge about handling informers, Mr. Grover said, "They are inexperienced agents who would not know how to make a case without Lynn telling them what to do."

James Fox, who was in charge of New York's F.B.I. office from 1984 until his retirement last year, and Jules J. Bonavolonta, the retired head of the office's organized-crime division, described Mr. DeVecchio in interviews as an outstanding agent whose credibility had never before been questioned.

"Anytime you are handling a major informer, whether it is in organized crime, espionage or drugs, you treat them special, differently, no question about it," Mr. Fox said. "They are delivering goods that no money can buy."

F.B.I. policy, Mr. Fox said, prohibits agents from feeding information to informers. "But there are rules and real life," he said, "and sometimes you have to give something to get something."

Under the F.B.I.'s first director, J. Edgar Hoover, who died in 1972, each field agent had a quota to recruit at least four informers every year. There are no longer any quotas, but officials say that field agents are evaluated partly on their ability to produce and cultivate informers.

Mr. Bonavolonta said that Mr. Scarpa, like most informers, had probably become one to "hedge his bets" in the expectation that his cooperation would reduce his sentence if he was convicted of a major crime.

"Working with such a volatile, powerful and dangerous guy like Scarpa, who is at the top of the organized-crime structure, takes a lot of capability," Mr. Bonavolonta added. "The tension, stress and responsibility is awesome."

LOAD-DATE: July 2, 1995

**<u>EXHIBIT S</u>**

1 of 4 DOCUMENTS

Copyright 1996 Newsday, Inc.
Newsday (New York)

September 29, 1996, Sunday, NASSAU AND SUFFOLK EDITION

SECTION: CURRENTS; Page A41

LENGTH: 629 words

HEADLINE: FBI REWARDS THE GULLIBLE

BYLINE: Murray Kempton

BODY:

THE FBI and the CIA are unique among government agencies for flourishing the only two sets of initials whose invocation never runs the risk of being accompanied by an invective.

But then it has always been easy for them to fool the innocent, and apparently almost as easy for the guilty to fool them. That lesson clamors in the honorable retirement the Justice Department has just granted Supervisory Special FBI Agent Lindley DeVecchio. His pension rewards a career that earned him singular status for the supposed authority on the privities of organized crime he had gleaned through being protractedly gulled by Gregory Scarpa Sr., a Mafioso and licensed FBI informant whose homicidal bent continually terrified his criminal associates without ever worrying the FBI controller who mistook Scarpa for his creature when Scarpa had in fact made him his.

The unevenness of their partnership is lit up by the imbalance between what the presumed master got from the servant and what the servant got back from the master. Last year, embarrassment by revelations of this bizarre alliance compelled the Justice Department to yield up the FBI forms where DeVecchio had recorded the information provided by Scarpa from December, 1980, through November, 1992.

The secrets reported run largely to changes in the table of organization of Scarpa's Colombo crime family and constitute matters of small moment except for inflating DeVecchio's repute for access to its intimacies. Whenever Scarpa passed from the trivial to the substantial, he struck keys calculatedly false, as in assigning the murder of Gaetano Amato to "accident" and the 1991 Christmas-season murders of Vincent Fusaro and Nicky Grancio to "the Persico faction" in the putative war between the imprisoned Carmine Persico and the usurping Victor Orena.

If there had indeed been a Colombo war, Scarpa had held its liveliest gun and used it to kill Amato, Fusaro and Grancio. These combats were all but exclusively Scarpa's; and he enlisted DeVecchio as a Persico partisan so enthusiastic as to inspire him to clap his desk at the news that two more Orena troopers lay dead and shout, "We're going to win this thing." His zest may or not be excused by the dream that, when peace was restored, Scarpa would hold entire command over the Famiglia Colombo and the FBI would at last own a boss among bosses.

In return for reports of what didn't matter and lies about what did, DeVecchio paid Scarpa back with the solid gold of:

1) a tip that Gregory Jr. would do well to leave town and thereby escape an imminent arrest for dealing drugs from his father's Wimpy Boys social club

2) the whereabouts of two clients of Scarpa's loan-shark bank who had fled to avoid punishment for debt

FBI REWARDS THE GULLIBLE Newsday (New York) September 29, 1996, Sunday,

delinquency

3) the address of the house that hid Victor Orena, who, as Scarpa had put it to DeVecchio, had better be killed or arrested as soon as possible

4) a warning that New York City Police had issued warrants for two of Scarpa's associate hit men, who would be wise to steer clear of the Wimpy Boys club

5) alerts, possibly red ones, identifying three former Scarpa collaborators who might soon be testifying to his detriment.

This last favor came too late to be useful, because by then none of Scarpa's malice availed against the ravages of his flesh. By 1993, he was in prison, thanks not to the FBI but the New York cops, and had but a year to live. At his sentence for murder, the assistant U.S. attorney saluted him as "quite an asset to the FBI over the years." He would have the natural death he denied so many brethren and DeVecchio will have his full pension. Impunity had been FBI agent DeVecchio's gift to Scarpa and now immunity from all consequences of his folly is the FBI's gift to DeVecchio.

**LOAD-DATE:** September 29, 1996COLUMN. FEDERAL BUREAU OF INVESTIGATION. EMPLOYE. LINDLEY DEVECCHIO. RETIREMENT. ORGANIZED CRIME. INFORMER. GREGORY SCARPA SR.   ORGANIZED CRIME (91%); INVESTIGATIONS (71%); DRUG RELATED CRIME (50%); COLUMN. FEDERAL BUREAU OF INVESTIGATION. EMPLOYE. LINDLEY DEVECCHIO. RETIREMENT. ORGANIZED CRIME. INFORMER. GREGORY SCARPA SR.   ORGANIZED CRIME (91%); INVESTIGATIONS (71%); DRUG RELATED CRIME (50%);

**EXHIBIT T**

1 of 1 DOCUMENT

Copyright 1997 The New York Times Company
The New York Times

January 26, 1997, Sunday, Late Edition - Final

**SECTION:** Section 1; Page 23; Column 5; Metropolitan Desk

**LENGTH:** 606 words

**HEADLINE:** Ex-F.B.I. Official Is Pressured To Testify on Ties to Mobster

**BYLINE:** By SELWYN RAAB

**BODY:**

A former Federal Bureau of Investigation supervisor who has refused to testify about allegations that he leaked Government secrets to a mobster is likely to be faced next month with the prospect of testifying or going to jail.

The pressure on the former agent, R. Lynn DeVecchio, to testify stems from a recent legal victory won in Federal District Court in Brooklyn by a convicted Mafia leader, Victor J. Orena. Lawyers for Mr. Orena said on Friday that they expect Mr. DeVecchio to be ordered to testify under a grant of immunity from prosecutors, and that he could be jailed for contempt of court if he continues to balk.

The lawyers are trying to overturn Mr. Orena's life sentence in prison on racketeering and murder charges by asserting that Mr. DeVecchio fomented an internal war in the Colombo crime family in the early 1990's and that he framed Mr. Orena by funneling confidential F.B.I. information to a rival Colombo gangster, Gregory Scarpa.

At a hearing in May on the appeal for a new trial, Mr. DeVecchio cited his Fifth Amendment rights against self-incrimination rather than testify about his relationship with Mr. Scarpa, who was a top F.B.I. informer before he died of AIDS in 1994. But on Dec. 20, Judge Jack B. Weinstein of Federal District Court in Brooklyn granted a defense request that he draw an "adverse inference" from Mr. DeVecchio's refusal to testify, a decision that could undermine the Government's effort to block a new trial.

"The Government's case is damaged because every allegation we made concerning DeVecchio is now inferred to be true unless he testifies," said Gerald Shargel, Mr. Orena's chief lawyer, in an interview Friday.

Mr. Shargel said that Federal prosecutors in Brooklyn who are handling the case told him that because of Judge Weinstein's ruling, "they are considering giving DeVecchio immunity and making him available to us at a hearing," which is set for Feb. 28. In general, a witness who is granted immunity from prosecution may no longer invoke the Fifth Amendment and must testify or face jail for contempt of court.

Andrew Weissmann and George A. Stamboulidis, the assistant United States attorneys who are opposing the appeal, declined to comment.

Mr. DeVecchio, who retired from the F.B.I. in October after an internal inquiry found no grounds to prosecute him for his dealings with Mr. Scarpa, declined to comment. His lawyer, Douglas E. Grover, said, "If he gets immunity, he'll testify and tell the truth."

Ex-F.B.I. Official Is Pressured To Testify on Ties to Mobster The New Yo

Mr. Orena, 62, was convicted in 1992 on Federal charges that he led a faction in a Colombo war that left at least 10 men dead and 14 wounded. But last year, three F.B.I. agents who worked in a unit headed by Mr. DeVecchio testified that they suspected that Mr. DeVecchio had helped Mr. Scarpa escape arrest and track down supporters of Mr. Orena.

From the late 1980's until 1994, Mr. DeVecchio was in charge of the F.B.I. squad in the New York City area that investigated the Colombo family. Now a private investigator, he recently was hired by the Laborers International Union of North America to investigate Mafia influence among the union's locals in the New York area.

Under an agreement with the Justice Department, officials and members of the union who refuse to testify to investigators about mob ties can be expelled from the union. Douglas Gow, the union's inspector general, said that he learned of Mr. DeVecchio's refusal to testify at the Orena appeal after he had been hired.

Mr. Gow, once the F.B.I.'s No. 2 official, added that he did not consider Mr. DeVecchio's citing of the Fifth Amendment a reason for dismissing him.

**LOAD-DATE:** January 26, 1997

**<u>EXHIBIT U</u>**

Westlaw.

2/23/97 NYDLYNWS 19

**News**Room

Page 1

2/23/97 N.Y. Daily News 19
1997 WLNR 6774165

New York Daily News
Copyright 1997 Daily News, L.P.

February 23, 1997

Section: NEWS

## FED'S SET TO TATTLE

### HELEN PETERSON

The FBI's dirty secrets could be aired this week as retired FBI Supervisor Lindley DeVecchio  testifies under immunity on his questionable relationship with the late mobster Gregory Scarpa Sr.

The last time he was questioned, he invoked the Fifth Amendment. But this week his constitutional right against self-incrimination goes out the window  he's been granted full immunity to talk about his handling of Scarpa.

DeVecchio is accused of leaking government secrets to Scarpa over the course of a 12-year relationship  ranging from giving him advance warning that his son, Gregory Scarpa Jr., would be charged in a drug case to sensitive details that may have helped fuel the internal Colombo crime family war between 1991 and 1992.

The relationship has caused numerous headaches  not to mention bad blood  among prosecutors and FBI agents investigating organized crime.

Eleven people  including two innocent bystanders  were shot dead during the war and many others were injured.

Defense attorneys Gerald Shargel and Alan Futerfas said they are looking forward to DeVecchio's testimony before Brooklyn Federal Judge Jack Weinstein at a hearing on Friday to determine whether convicted Colombo acting boss Victor Orena deserves a new trial.

Both lawyers have spent the last few weeks preparing to cross-examine DeVecchio.

Just last week Futerfas won a new trial for another convicted Colombo mobster on grounds that Brooklyn federal prosecutors should have disclosed Scarpa's informant status and that DeVecchio was being investigated for leaking him information.

The Justice Department declined to prosecute DeVecchio on criminal charges last year, but Orena insists he, too, deserves a new trial on similar grounds.

About 16 reputed mobsters who were tried after the disclosures were acquitted.

Shargel charges that DeVecchio "desperately" tried to protect Scarpa and keep him

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

from being arrested, knew that Scarpa was committing violent crimes and lied in reporting Scarpa's activities to FBI headquarters in Washington.

DeVecchio also is accused of giving Scarpa the address where Orena was hiding during the war, and informants have testified that Scarpa vowed to kill Orena.

"I think that obviously this is a black eye for the FBI," Shargel said. "Unfortunately this is a law enforcement agency that has had quite a few sordid chapters in the last few years, but this has to rank high among them."

In his written decision granting new trials to Colombo acting underboss Joseph Russo, capo Anthony Russo and crewmember Joseph Monteleone, Brooklyn Federal Judge Charles Sifton suggested that relatives of Scarpa's shooting victims have every right to sue the FBI.

Sifton said the Scarpa-DeVecchio relationship revealed "a highly reprehensible trading of information between a law enforcement official and a criminal. . . ."

"Scarpa emerges as sinister and violent and at the same time manipulative and deceptive with everyone including DeVecchio.

"DeVecchio emerges as arrogant, stupid or easily manipulated but, at the same time, caught up in the complex and difficult task of trying to make the best use of Scarpa's information to bring the war to a close," Sifton wrote.

DeVecchio, who retired last year, insists he never leaked government secrets to Scarpa.

"I established an excellent rapport with Scarpa, but I always remembered that he was a 'wiseguy' and I was an FBI agent," he said in a 1995 affidavit.

During the course of a 30-year career as an FBI mole, Scarpa was paid $158,000 by the bureau and was used on missions to the Deep South during the civil rig hts era.

He is believed to have threatened a Ku Klux Klan member into giving up the location of the bodies of three civil rights workers slain in Mississippi in 1964, and court papers show he went on a similar mission to that state in 1966.

Scarpa died in prison in 1994 at the age of 66.

---- INDEX REFERENCES ----

COMPANY: JUSTICE DEPARTMENT

NEWS SUBJECT:  (Legal (1LE33); Judicial (1JU36))

REGION:  (USA (1US73); Americas (1AM92); North America (1NO39); New York (1NE72))

Language:  EN

OTHER INDEXING:  (FBI; FED; FEDERAL; JUSTICE DEPARTMENT; KU KLUX KLAN; ORENA) (Alan Futerfas; Anthony Russo; Charles Sifton; DeVecchio; DeVecchio.; Gerald Shargel; Gregory Scarpa Jr.; Gregory Scarpa Sr.; Jack Weinstein; Joseph Monteleone; Joseph Russo; Lindley DeVecchio; Scarpa; South; Victor Orena)

KEYWORDS: FBI; Lindley DeVecchio; Organized Crime; Testimony; GREGORY SCARPA SR

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2/23/97 NYDLYNWS 19

EDITION: RACING FINAL

Word Count: 767
2/23/97 NYDLYNWS 19

END OF DOCUMENT

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.