**EXHIBIT V**

1

1    SUPREME COURT OF THE STATE OF NEW YORK

2    COUNTY OF KINGS:  CRIMINAL TERM : PART 27
     ------------------------------------------------X
3    THE PEOPLE OF THE STATE OF NEW YORK                 Indict. No.
                                                         6825/05
4                   - against -                          **ARRAIGNMENT**

5    ROY LINDLEY DeVECCHIO and JOHN SINAGRA,

6                                    Defendants.
     ------------------------------------------------X
7                                      320 Adams Street
8                                      Brooklyn, New York
                                       March 30, 2006
9
     B E F O R E :  HONORABLE GUSTIN REICHBACH,
10                                     Justice

11

12   A P P E A R A N C E S :

13
          CHARLES J. HYNES, ESQ.
14        DISTRICT ATTORNEY - KINGS COUNTY
          for the People
15        BY:  NOEL DOWNEY, ESQ.
          BY:  MICHAEL F. VECCHIONE, ESQ.
16             Assistant District Attorneys

17
          THOMPSON HINE, LLP
18        Attorney for the Defendant
            One Chase Manhattan Plaza
19          58th Floor
            New York, NY  10005
20        BY:  DOUGLAS E. GROVER, ESQ.
          BY:  MARK BEDEROW, ESQ.
21        BY:  GINNINE FRIED, ESQ.

22

23                                   Minerva Marin
                                     Official Court Reporter
24

25

2

PROCEEDINGS

1    COURT OFFICER:  All rise, hear ye, hear ye, hear ye.

2    All persons having business before this court, draw near,

3    give your attendance and you shall be heard.  Part 27 of

4    the Supreme Court, County of Kings, is now in session,

5    The Honorable Gustin L. Reichbach, Justice, presiding.

6        Be seated and come to order.

7        THE CLERK:  Calling calendar -- indictment number

8    6825 of 2005, Roy Lindley DeVecchio and John Sinagra.

9    You are present?

10       MR. GROVER:  Defendant and Defense Counsel is

11   present.

12       MR. GIARAMITA:  By Counsel, my client is present,

13   John Sinagra.

14       THE CLERK:  As to Mr. DeVecchio, do you know -- have

15   you received a copy of the indictment?

16       MR. GROVER:  I did.

17       THE CLERK:  Appearances, please.

18       MR. GROVER:  My name is Douglas Grover, I'm with the

19   firm of Thompson Hine, One Chase Plaza, New York City.

20       MR. BEDEROW:  Also present, Mark Bederow,

21   B-E-D-E-R-O-W.

22       Good afternoon, Your Honor.

23       MS. FRIED:  Also present, Ginnine Fried.

24       Good afternoon, Your Honor.

25       THE CLERK:  Mr. Hines, as to your client,

MM

3

PROCEEDINGS

1    Mr. DeVecchio, have you received a copy of the

2    indictment?

3         MR. GROVER:  My name is Grover.  We have received a

4    copy of the indictment.

5         THE CLERK:  Do you waive its public reading?

6         MR. GROVER:  I waive the public reading of the

7    indictment.

8         THE CLERK:  How does the defendant plead?

9         MR. GROVER:  Not guilty.

10        THE CLERK:  As to--

11        MR. GROVER:  All counts.

12        THE CLERK:  All counts.  Thank you.

13        As to--

14        THE COURT:  We still need their appearances.  Let's

15   have the appearances again.

16        MR. GIARAMITA:  My name is Joseph Giaramita, 8215

17   Fifth Avenue, Brooklyn, New York.

18        Good afternoon, Judge Reichbach.  I represent

19   Mr. Sinagra. I have received the indictment, I waive the

20   reading and enter a plea of not guilty to all counts.

21        MR. VECCHIONE:  For the Office of the District

22   Attorney, Michael F. Vecchione.

23        MR. DOWNEY:  Noel Downey.

24        Good afternoon, Judge.

25        MR. VECCHIONE:  Good afternoon, Judge.

MM

4

PROCEEDINGS

1    THE COURT:  Okay, now.  Be seated.

2    Before we proceed with the arraignment, I have

3  received two requests for audio/visual coverage, but

4  before I address those, I want to address the issue of

5  press leaks and the Court's concern for a fair trial.

6    My only prior involvement with this case was signing

7  a number of Grand Jury subpoenas and, obviously, Grand

8  Jury proceedings are secret and confidential, but when I

9  was presented with these subpoenas by the Assistant

10 District Attorney, he reiterated the sensitivity of the

11 investigation and the need for secrecy, so I was

12 considerably dismayed to see a number of press reports

13 this past week regarding the case.  So, I certainly have

14 a general inclination against the imposition of gag

15 orders, but I want to emphasize to all the parties, with

16 particular emphasis to the D.A.'s Office, that the case

17 has got to be tried in the courtroom and not the press.

18   With that, I will first address these two

19 applications, one is from Tower Productions; is there a

20 representative here from them?

21   Okay, do you want to state your name for the record?

22   MS. MILTON:  Rachel Milton, M-I-L-T-O-N.

23   THE COURT:  All right, Tower Productions has sought

24 audio/visual coverage because they are involved in, it

25 seems, the preparation of a commercial documentary

MM

PROCEEDINGS

1   regarding matters of this kind.  Notwithstanding that the

2   US Supreme Court has increasingly extended an expanded

3   commercial speech rights, let it be the equivalent of the

4   traditional First Amendment rights, I have a different

5   view under the New York Constitution.  So even in the

6   event that I have discretion to permit this type of

7   filming, I wouldn't grant it.  That application is

8   denied.

9        More squarely presented from the First Amendment

10  concerns is an application from WNBC.

11       Is there a representative here?

12       MR. DIENST:  Yes, Jonathan Dienst, D-I-E-N-S-T.

13       And WNBC is acting on behalf of all electronic media

14  broadcast and radio in that we have a pool situation

15  whereby, if one camera was allowed into the courtroom, we

16  would film it and distribute it equally to all

17  representatives of the press.  We believe this case has

18  extraordinary public interest matters.  There have been

19  numerous arraignments in cases, where there is no

20  testimony, where certain judges have allowed cameras in.

21  We believe it's your discretion.  We would hope you

22  understand the public interest and would allow the

23  cameras in so that we can present this.

24       THE COURT:  I certainly understand the public's

25  interest.  Perhaps, if I had discretion, I might

MM

6

PROCEEDINGS

1   seriously consider it.  However, I don't know if you have

2   consulted with your Legal Department regarding this

3   matter, but, just this past June, 2005, the New York

4   Court of Appeals and Court TV against the State of New

5   York has squarely addressed this issue and, in rather

6   emphatic terms, have made clear that there is no

7   authority on the part of the Court to grant audio/visual

8   coverage in this matter. That request is denied.

9        I have also received two applications for the use of

10  still photography, one from Alex Ginsberg of the New York

11  Post and Robert, the Times photographer, here who has put

12  in this request.  If he is not here, I guess I don't have

13  to deal with it.

14       THE WITNESS:  I represent the Times, the

15  photographer is not here, but I am a reporter.

16       THE COURT:  You are not in a position to take

17  pictures, in any event?

18       THE WITNESS:  I am not.

19       THE COURT:  Mr.  Ginsberg is here from the Post.

20       MR. GINSBERG:  Alex Ginsberg, G-I-N-S-B-E-R-G, New

21  York, 1211 Avenue of the Americas, 10th Floor, 10036.

22       THE COURT:  While the Court of Appeals has been

23  rather emphatic about audio/visual coverage, I think the

24  issue of still photography is not quite as clear;

25  however, this is an -- I appreciate the timing

MM

7

PROCEEDINGS

1    difficulties, but this is a last-minute request that I

2    think is appropriate to give both Defense and the

3    District Attorney's Office an opportunity to be heard on

4    this.  This is not going to be the last appearance in

5    this case, so I am going to reserve decision on that.  I

6    am not going to permit it now.  I will set a date in the

7    immediate future where both the District Attorney and

8    Defense Counsel can be present.  You can have your

9    attorney there, whoever is going to represent this

10   request, and I will deal with it at that time.

11         MR. GINSBERG:  Thank you, Judge.

12         THE COURT:  All right, I guess with those

13   preliminary matters out of the way, we are up to the

14   question of bail.

15         MR. VECCHIONE:  Your Honor, I will be speaking with

16   regards to Mr. DeVecchio.  Again, my appearance is

17   Michael F. Vecchione, for the Office of the District

18   Attorney.

19         Your Honor, quite simply, the District Attorney's

20   Office, on behalf of the People, is asking that the

21   Defendant be remanded.

22         This Defendant is charged with providing classified

23   secret law enforcement information regarding individuals

24   who had provided information to law enforcement or who

25   are about to provide information to law enforcement on

MM

8

PROCEEDINGS

1    Gregory Scarpa, Sr., and his organized crime crew, as a

2    member of the Colombo crime family.  Scarpa, at that

3    time, in the years that I'm talking about, 1980 through

4    1992, was a powerful soldier within the Colombo crime

5    family.

6         After receiving information from this defendant,

7    Scarpa, who is known in mob circles as the Grim Reaper,

8    and his crew executed Mary Bari in 1984, Joseph

9    DeDomenico in 1987, Patrick Porco in 1990, and Lorenzo

10   Lampasi in 1992.

11        If I may, Your Honor, bear with me, I would like to

12   give a brief synopsis of each of those homicides to the

13   Court:

14        Our Office, during the course of a long-standing

15   investigation into the link between Mr. Scarpa and the

16   defendant, DeVecchio, uncovered information regarding the

17   murder of Mary Bari who, at the time of her death, was

18   the girlfriend of Colombo Consigliere, Alphonse Persico,

19   who was the brother of Carmine Persico, but then boss of

20   the Colombo crime family.

21        Several days before the murder of Ms. Bari, Agent

22   DeVecchio, then the head of the Colombo squad of the FBI,

23   warned Scarpa that Bari was talking to law enforcement

24   and he was worried that Bari might tell the FBI about the

25   location of Alphonse Persico who, at the time, was a

MM

9

PROCEEDINGS

1   fugitive from federal authorities.  DeVecchio instructed

2   Scarpa he must immediately eliminate Bari. Mary Bari was

3   murdered on September 25, 1984, by Scarpa and others

4   associated with Scarpa and the Colombo crime family.

5       With regards to the murder of Joseph DeDomenico,

6   again, our Office uncovered, during the course of this

7   investigation, a direct link between DeVecchio and the

8   murder of Joseph DeDomenico, who was a made member of the

9   Colombo crime family and an associate of Scarpa, Sr.

10      I say Scarpa, Sr. because there is a Scarpa, Jr.,

11  who is the son of Gregory Scarpa, Sr.

12      In the Spring of 1986, the then Agent DeVecchio

13  warned Scarpa, Sr. that Joseph DeDomenico could no longer

14  be trusted since DeDomenico was participating in numerous

15  burglaries involving-- without involving Scarpa, who were

16  splitting the profits from those burglaries with Scarpa.

17      Moreover, DeVecchio, he expressed his concern to

18  Scarpa that DeDomenico was overindulging in narcotics and

19  he was dating a woman, at the time, who was a practicing

20  born-again Christian.  DeVecchio expressed his fear to

21  Scarpa that DeDomenico may be close to speaking with law

22  enforcement, since he was involved himself now with

23  religion.  DeVecchio, he instructed Scarpa, to eliminate

24  DeDomenico.

25      On September 17, 1987, Joseph DeDomenico was

MM

PROCEEDINGS

1    murdered by Gregory Scarpa, Jr. and others associated

2    with Scarpa, Sr. and his crew in the Colombo crime

3    family.

4         The third murder is the murder of Patrick Porco.

5         Our office uncovered, again, a direct link between

6    DeVecchio and the murder of Patrick Porco, who was a

7    close friend of Scarpa, Sr.'s other son, Joseph.

8         On Halloween night, as a background to this, on

9    Halloween night, October 31, 1987, an individual named

10   Dominick Masseria, who Mr. Downey will speak about with

11   regard to an individual in the future who is presently

12   under arrest, we will deal with that in a few moments.

13   Dominick Masseria was murdered in a drive-by shooting on

14   the steps of Our Lady of Guadalupe church on 15th Avenue

15   and 72nd Street in Brooklyn, as a result of having been

16   involved in a senseless egg-tossing incident earlier in

17   that evening.

18        Present in the vehicle from which the fatal shots

19   were discharged were Joseph Scarpa, Gregory Scarpa's son,

20   Patrick Porco, Raymond Aviles or Reyes Aviles, and an

21   individual named Craig Sobel, who is presently under

22   arrest and awaiting extradition in the State of Florida.

23        In May of 1990, Patrick Porco was interviewed by

24   detectives at the 62nd Precinct stationhouse about the

25   murder of Dominick Masseria.  On October 31, 1989,

11

PROCEEDINGS

1   several days later, Agent DeVecchio telephoned Scarpa and

2   informed Scarpa that Porco was, in fact, about to inform

3   on Joey, his son.  He instructed Scarpa, once again, that

4   something needed to be done with regard to Porco. Scarpa,

5   Sr. immediately instructed his son, Joseph, that Patrick

6   Porco must be killed.

7        On May 22 -- May 27, 1990, Patrick Porco was

8   murdered by the other defendant in this case, John

9   Sinagra, and Mr. Downey will fill in the details with

10  regards to that.

11       The last murder with regard to this, to

12  Mr. DeVecchio--

13       THE COURT:  Do the People contend that the other

14  defendant was the actual shooter in that murder?

15       MR. VECCHIONE:  In the Patrick Porco murder, yes,

16  sir.

17       With regard to the fourth victim, the murder of

18  Lorenzo Lampasi.

19       Once again, our Office uncovered a direct link

20  between DeVecchio and the murder of Lorenzo Lampasi who,

21  at the time, in 1992, was a soldier on the side of the

22  Vicarena faction of the Columbo crime family.  This was a

23  war going on within the Colombo crime family over control

24  of the family.  The Vicarena faction against the Persico

25  faction.  Lorenzo Lampasi was a member of the Vicarena

MM

12

PROCEEDINGS

1    faction.

2       One week prior to May 22, 1992, Scarpa informed

3    Agent DeVecchio that he wanted to murder Lorenzo Lampasi.

4       At the time, Scarpa was, as I said before, a soldier

5    in the Persico faction and they were at war with the

6    Vicarena faction.  DeVecchio returns several days later,

7    provided the following information:  The location of

8    Lampasi's residence, the fact that Lampasi left for work

9    at four a.m., most importantly, in order for Lampasi to

10   leave his driveway, he must open and close a locked gate,

11   thereby, giving opportunity for the murder.

12       Our Office learned that the information was provided

13   by DeVecchio regarding Lampasi's residence, the time he

14   leaves for work and the presence of the locked gate, and

15   it was obtained through surveillance by other FBI agents

16   who were working on the Colombo war.

17       On May 22, 1992, Lorenzo Lampasi was murdered in the

18   driveway of his home at four a.m. after he exited his car

19   and attempted to lock the gate. Lampasi was killed by

20   Scarpa, Sr. and others associated with the crime family.

21       This defendant's motives, Your Honor, were money,

22   quite frankly, in that he received a stipend from Scarpa

23   on a weekly basis and also his desire to feather his own

24   nest within the FBI to rise to greater prominence within

25   the Bureau.

MM

13

PROCEEDINGS

1    This case, as the District Attorney said this

2 morning, is one of the worst cases of law enforcement

3 corruption in the history of this country.

4    The defendant was the head of a squad of FBI agents

5 charged with investigating the Colombo crime family and,

6 as such, was privy to information on the movements of

7 members of the family, their enemies and those who were

8 providing information to law enforcement.  This is a

9 strong case with witnesses that range from civilians to

10 FBI agents, to government informants who were members of

11 Scarpa's crew.  Thus, the likelihood of conviction, Your

12 Honor, is very high.

13    In addition, this defendant is a threat to the

14 safety of witnesses in this case who are known to the

15 defendant and to the defense team.  As evidenced by these

16 charges and the information we uncovered in this

17 investigation, this defendant, clearly, has no hesitancy

18 in fingering for death individuals who provide

19 information to law enforcement.

20    During the pendency of this investigation, he had

21 investigators on his behalf, who ID'd themselves as

22 former FBI agents, visit witnesses in an attempt to get

23 information and to intimidate those witnesses.  It

24 happened on more than one occasion.

25    The likelihood--

MM

14

PROCEEDINGS

1    THE COURT:  Counsel, share with the Court how this

2    intimidation allegedly occurred.

3    MR. VECCHIONE:  The witnesses were visited by the

4    FBI agents, or former FBI agents, claiming to be working

5    on behalf of this defendant, made themselves known, said

6    that they wanted to talk to our witnesses and that the

7    witnesses knew that Lindley was a good guy and that they

8    needed to get on the record the statements of these

9    particular witnesses.  The fact that the witnesses were

10   found at the place where they live, Your Honor, to me, is

11   a form of intimidation and--

12   THE COURT:  That would suggest any attempts to

13   investigate or use, as is often the case in this court,

14   former police detectives to do investigations.  The mere

15   act of investigating, you're contending, is intimidation.

16   MR. VECCHIONE:  This is during the course of the

17   investigation, when the identity of witnesses were

18   secret.

19   THE COURT:  To me, intimidation means threats or

20   promises of harm to come, not the mere active

21   investigation which seems to me to be not inappropriate.

22   MR. VECCHIONE:  Your Honor, it seems to me if

23   someone were to go to a witness who is secret and

24   essentially say to them that we know where you are, we

25   know that you're a witness in the case, we know who you

MM

PROCEEDINGS

1    are about to testify against or have testified against

2    and we want to speak to you, Your Honor, that, in the

3    understanding of the particular witnesses involved, was a

4    threat.  If Your Honor chooses not to see it as a threat,

5    I would lay it out to the Court that, given the situation

6    that we have here, given the fact that four such

7    informants were killed by Mr. DeVecchio providing

8    information to Scarpa we, in the District Attorney's

9    Office, took it seriously and took it as a threat.

10        The likelihood that this defendant will flee, Your

11   Honor, is also great.  He faces four separate 25 years to

12   life sentences.  He has no roots in this community and

13   that he lives in Florida and has never been a native New

14   Yorker.

15        He has the assets to flee the country and he has

16   friends and associates throughout law enforcement who

17   over the years, Your Honor, I suggest, built up contacts,

18   not only here in the United States, but also

19   internationally who could easily assist him in fleeing.

20        THE COURT:  I'm certainly not discounting the

21   possibility of a flight, but by your own presentation,

22   you've indicated that the defendant has presumably known

23   about this investigation for a period of months that's

24   linking him to these witnesses.  Surely, he had an

25   opportunity to flee before an indictment was even issued,

16

PROCEEDINGS

1  if that was a real possibility, wouldn't you think?

2      MR. VECCHIONE:  The difference is that there is now

3  an indictment and he now faces those charges.  Before, it

4  was the possibility of an indictment, now, the reality of

5  an indictment, the reality of four separate 25 years to

6  life sentences now faces him directly, so there is a

7  change of -- a much different change, and there is a

8  significant change in circumstance.

9      Your Honor, at this point in time, based on my

10  presentation, I would ask that Mr. DeVecchio be remanded

11  for the murders of Bari, DeDomenico, Porco and Lorenzo

12  Lampasi.

13      THE COURT:  Thank you, Counsel.

14      Counsel.

15      MR. GROVER:  Your Honor, thank you.

16      Your Honor, I would like to start out by just

17  apologizing to the Court for Mr. DeVecchio's appearance.

18  He was asked to surrender last night at ten o'clock for a

19  two o'clock court appearance today, an act which I

20  thought was totally unnecessary, but since we were given

21  the courtesy of surrendering and had a week in which to

22  flee in that period of time, I took that courtesy and we

23  showed up at 10 o'clock full knowing, A, he was indicted

24  for four counts of murder.

25      I don't normally read the New York Post, I read it

MM

17

PROCEEDINGS

1   this time.  I knew exactly what he was indicted for, I
2   knew exactly who the victims were, I knew exactly who the
3   witnesses were and, in fact, over the last three months,
4   Mr. DeVecchio has known exactly what this is about.  He
5   has been up in my office, we have been pulling
6   transcripts from public proceedings relating to each and
7   every one of these homicides because we believe that when
8   these transcripts become public, they will show everyone,
9   a court and the rest of the world, that this is nonsense.
10      The District Attorney says that they have developed
11  evidence, new evidence that connects Mr. DeVecchio to the
12  homicides.  That new evidence is old evidence and it's
13  false evidence.  The evidence that they have is the
14  common-law of Gregory Scarpa.  A woman by the name of
15  Linda Schiro.  Linda Schiro was an FBI informant way back
16  when and she never told the FBI a damn thing.  She talked
17  to law enforcement year, after year, after year and never
18  said anything about this and, indeed, when specifically
19  confronted about what do you know about DeVecchio's
20  relationship with Scarpa, her answer was, 'Nothing, I
21  stay out of the kitchen,' and I aniticipate, because I
22  read my Daily News and my New York Post now, I anticipate
23  we are going to hear this woman come into this courtroom
24  and tell us she sat in the kitchen while he talked about
25  homicides.  Nonsense.  She told agents during

MM

18

PROCEEDINGS

1   investigations where she was specifically directed to

2   these questions over, and over again, that's the witness.

3       Now, I would like to address specifically

4   Mr. DeVecchio because I think the purpose of being here

5   is to determine whether or not he is a risk of flight.

6   We knew about this since I got that first phone call from

7   a reporter from a news station back on January 4th or

8   5th, saying to me, she had been told by someone in the

9   District Attorney's Office that Mr. DeVecchio is being

10  investigated for a homicide.  He didn't run.  Why didn't

11  he run?  Because he owns a home that he built in Florida,

12  that's his retirement home, because he has a significant

13  other in Florida, a woman that he has been with for a

14  number of years now who he is not going to run away from,

15  because he has a federal pension, that's what he lives

16  on.

17      He was an FBI agent for many years and he is retired

18  with a healthy pension that allows him to live in one

19  place and live well in Florida and if he were to run, he

20  would be poor and broke.  He would have nothing, because

21  that pension wouldn't continue.

22      He, indeed, has been doing work.  He doesn't just

23  sit around.  Some of that work is government work at this

24  present time.  Why?  Because he is still trusted and the

25  fact that he is trusted is demonstrated by the fact that

MM

19

PROCEEDINGS

1   in this courtroom today, you can see there are a number

2   of former FBI agents have come to his defense, have come

3   here to show Your Honor their support for DeVecchio.

4       One of the things that is important to understand,

5   we are here about bail, we are not here to throw out

6   allegations.  Lindley DeVecchio was and always will be a

7   man of the law.  He showed up last time full knowing the

8   gauntlet he would receive in the street.  He is here full

9   knowing the position that the District Attorney was going

10  to take and he is here because he has respect for the

11  law.

12      Is he angry?  Yes, he is angry.  Is he upset about

13  what is going on here and how he is being treated in the

14  press?  Yeah.  And that may be for another time and

15  another place, but he is certainly not going to walk away

16  from this.

17      This man, Your Honor, had been a decorated agent

18  during his 33 years in the FBI.  He is not just another

19  FBI agent who did his time and graduated the FBI.  This

20  was one of the people that really stood out.  What do I

21  mean by stand out?  In his early years in the 1970s going

22  into the 80s, there was an undercover investigation of an

23  arms' dealer by the name of Edwin Wilson.  He received a

24  lot of publicity.  At one point, there were threats on

25  the life of a prosecutor, a Southern District prosecutor.

MM

PROCEEDINGS

1   Mr. DeVecchio went undercover.  They pulled him into that

2   because he could play the role.  Mr. DeVecchio saved the

3   life of a prosecutor in the Southern District of New York

4   and I for one, as a former prosecutor, respect that.

5        Mr. DeVecchio was a force on the organized crime

6   squad, Your Honor.  The District Attorney of Kings County

7   has no idea what they are getting into when they get into

8   the world of organized crime.  They don't make these

9   kinds of cases and they don't know how people act in

10  these kinds of cases and they don't know how to deal with

11  witnesses in these cases.

12       I would like to tell you, Your Honor, it was in

13  1980, and the men are here who orchestrated it.  The FBI

14  embarked on a mission to take down the five families of

15  New York, the largest organized crime families in the

16  country, and the person who was at the center of that, he

17  is not the only one because many of these people are

18  sitting here in this courtroom.  Lin DeVecchio was one of

19  the supervisors that became involved in this effort.

20       How did he do that?  Because he was the supervisor

21  of an organized crime squad, because with Southern

22  District of New York and Eastern District of New York,

23  the families were divided amongst prosecutors to go after

24  these people.  Mr. DeVecchio was the case agent for the

25  Commission case.  That was the case that took down the

MM

21

PROCEEDINGS

1    five heads and the five families tried by Michael

2    Chertoff, President of Homeland Security.

3         Mr. DeVecchio, in that capacity, was in the center

4    of everything.   In that capacity, he also had another

5    very special role.   He was responsible for a number of

6    top echelon informants in the FBI.   It was his job to

7    contact and deal with these informants while they were

8    providing information for wire taps, while they were

9    providing information about organized crime hijackings,

10   while they were providing information about homicides.

11   When they needed to get information, one of

12   Mr. DeVecchio's roles was to go out there and get it and

13   Mr. Scarpa was one of those sources.   Not the only one.

14        So, during this time, this man played a critical

15   role in that whole process that the FBI, the US

16   Attorney's Office, can take pride in of taking down all

17   those families, and the DA says that in the last few

18   months, while they are conducting Grand Jury

19   investigation and sharing it with all the newspapers,

20   that they have learned that somehow, magically, the guy

21   who is responsible for literally hundreds of convictions,

22   including what we don't hear told, all these people in

23   the Colombo family are convicted and doing time.

24        So these squads convicted these people with the help

25   of the US Attorney's Office and he played a critical

MM

22

PROCEEDINGS

1    role.  All of his colleagues, his friends, his superiors,

2    they are here because they know what he was truly about.

3       THE COURT:  Counsel, one obvious concern is that the

4    defendant is not a resident of New York.

5       MR. GROVER:  That is correct.  Certainly, I have

6    submitted papers to Your Honor.  I told you where he

7    lives.  He has a home in Sarasota.  It's his primary

8    asset in his life.  He sold a home in Dumont, New Jersey

9    and moved to Florida some years ago and is fortunate to

10    own that home free and clear.  As I explained in my

11    papers, nevertheless, he has a very stable life.  He has

12    people around him who support him emotionally and, as I

13    said, he can't go anywhere, this is his life and his life

14    is about his work and the fact that he has been tarnished

15    with this is something that he can't run away from.

16       THE COURT:  I appreciate what you're saying.  On the

17    other hand, the charges here are as serious as can be.

18    So the fact that he might face penury on the run may be

19    preferable to a jail sentence in this case.  So the fact

20    that that's not necessarily dispositive, as I say, during

21    the pendency of this case, should he not be incarcerated,

22    where is he going to live?

23       MR. GROVER:  I will give you a number of

24    alternatives, Your Honor.  I would propose that he be

25    able to live at his home in Florida.  If Your Honor wants

MM

23

PROCEEDINGS

1    him, or Your Honor wants to arrange for some form of

2    reporting or wearing a bracelet or something blocking

3    that, I think we could live with that but, Your Honor, I

4    don't think that's appropriate, given the plausity of

5    evidence in this case and that was the part that I wanted

6    to get to.

7        He is not running because every one of these counts

8    that are alleged and they are serious and, frankly,

9    reading some of them, they are awful, but he had nothing

10   to do with them.  And the way the District Attorney is

11   trying to drag Mr. DeVecchio in is by having a witness

12   come in and say that they overheard some conversation or

13   that Gregory Scarpa, who is an admitted hire, who has

14   told people multiple stories about his sources of

15   information, including the Police Department, including

16   the District Attorney's Office in Brooklyn, this fellow,

17   Scarpa, would say anything to anybody and, Your Honor, as

18   you become more familiar, you will see, whenever he

19   wanted to kill somebody, the best excuse was, he is an

20   informant.

21       You are going to learn -- we are all going to learn,

22   that Mary Bari was not an informant.  So, if the cookie

23   jar is empty, you can't spill it.  There is no way that

24   anything was leaked or done, and if you listen to the

25   testimony, if you read the testimony--

MM

PROCEEDINGS

1    THE COURT:  Counsel, I let the District Attorney

2  perhaps go on a little long, too.  I am not here trying

3  the case.

4    MR. GROVER:  I appreciate that.  Let me tell you

5  what I propose.  This is what I sincerely believe.  Your

6  Honor, in the courtroom today are a group of former FBI

7  agents.  I asked if there would be a group of them that

8  would be willing to sign a recognizance bond on his

9  behalf.  I didn't know what kind of response I would get

10  in that request.

11    As I am sitting here right now, I have 45 names, I

12  believe, 45 names of former special agents of the FBI,

13  none of these gentlemen I would call wealthy men, they

14  are respected men, men in their community who come

15  forward and would be willing to sign a bond because they

16  feel so strongly on two issues.  One, that Lin DeVecchio

17  will return to this courtroom when he is required and,

18  two, that Lin DeVecchio would never do anything to harm a

19  witness, which was ludicrous the way that was presented

20  by the Assistant District Attorney.

21    These people are willing to go to bat for him and

22  these people would not be in this courtroom if that were

23  not the case.  They are not here simply out of

24  friendship, they are here because they respect him, they

25  know what he did, they know what kind of person he is,

MM

25

PROCEEDINGS

1   and they know that when he gives his word, he keeps it.

2       That's what the critical issue is and if Your Honor

3   is concerned about what he is going to say, if I had to

4   tell this Court he would stay in my house three blocks

5   from this court house, I would do that, if that's what

6   the Court wishes, but I don't see the difference if he is

7   in his house in Florida and if he has to call in and

8   report.

9       THE COURT:  It might make a difference, if he's got

10  a bracelet on where he is.

11      MR. GROVER:  May I have a moment?

12                  (Brief pause.)

13      MR. GROVER:  Your Honor, if it can be accomplished,

14  I think it's unnecessary here, but if that's what it

15  would take, then that's what I would propose, or at least

16  go along with, Your Honor.  I don't think it's necessary.

17  Again, I point to the people that are willing to sign on

18  as his co-guarantors in some way.  Reading the bail act,

19  of course, the risk of flight is the critical question

20  and there are many different ways in which bail can be

21  achieved.

22      THE COURT:  I'm aware of the permutations and I'm

23  certainly happy to consider them.

24      I also have to, and I agree, the critical ingredient

25  is the risk of flight, but factored into the risk of

MM

26

PROCEEDINGS

1    flight is the seriousness of the charges and here we can

2    be talking about more serious charges.

3        MR. VECCHIONE:  I would like to add one more thing,

4    Your Honor.  Mr. Grover seems to think the District

5    Attorney's Office doesn't know what they're doing and I

6    take umbrage with that.

7        The second thing I would like to say is Mr. Grover

8    talks about this investigation in which he believes or

9    says that witnesses said certain things and took

10   positions, I believe he quoted from one of them.

11       I would like to tell Your Honor that, during the

12   course of this investigation, we uncovered evidence that

13   Mr. DeVecchio tampered with the witnesses in that

14   investigation.  We have witnesses who are the go-between

15   between Mr. DeVecchio and the witnesses who were

16   investigated by the OPR, which is the Office of

17   Professional Responsibility and, in fact, shaped that

18   testimony during the course of several meetings with this

19   go-between.

20       In addition, Your Honor, the OPR investigation,

21   which was conducted openly, questioned by a federal

22   prosecutor who is now the general counsel of the FBI, to

23   such an extent and she said that the OPR investigation

24   was itself corrupt, to such an extent that the original

25   OPR investigation was going to be investigated itself

MM

27

PROCEEDINGS

1   because of what was--

2         THE COURT:  Was going to be?

3         MR. VECCHIONE:  Yes, it was not because

4   Mr. DeVecchio was allowed to retire and leave the employ

5   of the FBI.

6         So to hold up -- in addition, one other factor is

7   that we have been contacted by Senator Grassley, who has

8   indicated he sits on a committee, a senate committee,

9   that oversees federal funding to the FBI and is

10  interested in getting information regarding this OPR

11  investigation.

12        In addition, Your Honor, the person who referred

13  this to us, Congressman Delahunt, from Massachusetts,

14  sits on the Judiciary Committee of the House of

15  Representatives and is also going to look into the

16  matters that are part and parcel of this indictment.

17        This is not something that anybody takes lightly.

18  We do not bring law enforcement people into court because

19  that, at just at the whim of the District Attorney or the

20  whim of witnesses, we have tested this case, we have gone

21  ahead and done every single thing that's necessary to

22  bring it to a Grand Jury and a Grand Jury heard 30

23  witnesses over the course of several months and returned

24  these indictments.  So for Mr. Grover to make light of

25  this, to call me ludicrous in my statements, I believe is

MM

28

PROCEEDINGS

1 an injustice.

2  THE COURT:  I actually did not hear Defense Counsel

3 making light of it.  I think he adequately addressed the

4 seriousness of it.  Obviously, there is a big factual

5 dispute, which I am not going to resolve at this moment.

6  MR VECCHIONE:  Can I say one other thing?

7  Mr. Grover also indicated that in the last week or

8 so, Mr. DeVecchio knowing about this, could have left,

9 well, he had press and photographers, essentially, camped

10 outside of his door.  People were there every single day.

11 There was nowhere for DeVecchio to go.

12  THE COURT:  Counsel, with all respect, that might

13 have been true last week, it wasn't true back in January

14 when apparently the Defense was first informed of this.

15  MR. VECCHIONE:  There were photographers who took

16 pictures of Mr. DeVecchio outside of his home early on in

17 this investigation.  There were people who were seeking

18 to get statements from him, knocking on his door all

19 during the course of this investigation.

20  THE COURT:  You're not stating the last three months

21 he was under 24 hour surveillance?

22  MR. VECCHIONE:  Of course not.  Where was he going

23 to go?  The Defense knows that that was in fact the case

24 because they commented on it.

25  THE COURT:  Counsel, if you are saying he had

29

PROCEEDINGS

1   nowhere to go in January, where is he going to go now?

2   MR. VECCHIONE:  That presumes that the press and the

3   photographers will still be camped at his door.  Your

4   Honor, we certainly can't depend on the press and

5   photographers to do the job of making sure that this

6   defendant returns to court each and every time.

7   THE COURT:  I agree.

8   MR. VECCHIONE:  I tell you, Your Honor, that the

9   assembled FBI agents who are here provide a network to

10  allow this individual to leave this country, that is what

11  they are here for.

12  MR. GROVER:  Your Honor, we must have thousands of

13  years of service to the government of the United States

14  sitting in this courtroom.  For the District Attorney of

15  Kings County to suggest that they would participate in

16  any way on behalf of any defendant in any case in a way

17  that would be suggested to be inappropriate is truly

18  disgraceful.  Your Honor, these people have dedicated

19  their lives to their country working in the FBI, many are

20  former military men.  These are guys who used to work 24

21  hours a day in pursuit of what they were doing.  These

22  are people that took down the mob.  They don't take this

23  lightly, and for them to agree, 45 of them to agree that

24  they would sign on behalf of Mr. DeVecchio, they don't

25  take lightly because they know the consequences.  They

MM

30

PROCEEDINGS

1   know what it means to forfeit a bond.  That's been their

2   business for many years to chase after people.

3       So, Your Honor, my request is that Mr. DeVecchio

4   came here, six days after learning that this indictment

5   had been filed and after we have been hearing about this

6   in the press, he traveled to New York.  He certainly

7   could have traveled somewhere else, but he came to my

8   offices some time ago.  Mr. DeVecchio will come back

9   whenever he is needed and I think that, under these

10  circumstances, this is a case that cries out for unusual

11  bail.  These crimes are years and years ago.  They are

12  from the testimony of witnesses that have changed.  There

13  is clear and unequivocal testimony from convicted

14  murderers who confessed to the very crimes that are the

15  basis of this, such as Lampasi.

16      THE COURT:  I'm not sure that makes him any more

17  credible than the incredibility you are attributing to

18  the People's witnesses.

19      MR. GROVER:  The only thing I can say about Carmine

20  Sessa is that Carmine Sessa testified in half a dozen

21  federal trials, testified against many number of people,

22  all of whom are convicted, and these people are doing

23  life sentences because of the testimony of this guy who

24  made an agreement with the government to testify.  He

25  cooperated.  In fact, if you don't have the time, and I'm

MM

PROCEEDINGS

1    not suggesting Sessa told the story of the Bari murder,

2    that was gratuitously given up when he was being

3    debriefed.  He was not arrested on that.  The testimony

4    that these people gave was used to put people in jail in

5    the Eastern District of New York.  I might add, Your

6    Honor, that this indictment is an attack on all of that

7    testimony and those convictions.

8        This is what is going on here with an agent who had

9    a relationship with an informant who was providing

10   information to the FBI.  There are people, sinister

11   people, who are using that in order to get people out of

12   prison and this is step one.  They tried it in front of

13   Judge Weinstein in numerous motions, they were all

14   denied.  Judge Weinstein said all hearsay that came out

15   of Scarpa, nonsense.  It can't be believed.

16       Judge Weinstein met many of these witnesses,

17   including the witness that we heard today, something

18   about getting paid monthly.  We think we know where that

19   comes from, that comes from Gregory Scarpa, Jr.  His

20   testimony was dismissed completely.  Why?  Because being

21   convicted of murder in front of Judge Raggi in Eastern

22   District of New York, he came in and testified on behalf

23   of Vicarena, Jr.   The boss of the family, he told the

24   Judge he had never committed any homicide.  He told the

25   Judge that—-

                           MM

32

' PROCEEDINGS

1    THE COURT:  Counsel, we don't have to review--

2    MR. GROVER:  I beg your forgiveness.  I'm proposing

3  we have people that are willing to bat for this

4  gentleman.  Your Honor, this means a lot to him.  It

5  means a lot to them, and I would ask that if we could

6  create a recognizance bond with all of these gentlemen

7  signing on his behalf, that would be a fair way to insure

8  that he would return to this court when necessary.

9    MR. VECCHIONE:   can I say one last thing?

10   Mr. Grover raised another issue with regard to Judge

11  Weinstein and uses that somehow as something in favor of

12  Mr. DeVecchio.  I would like to just quote from Judge

13  Weinstein two sentences in his decision involving

14  Vicarena versus the United States in Pasquale Amado

15  against the United States, and he says as follows:

16    "DeVecchio proved the far less credible witness

17  whose memory lapses were not believable.  That he had

18  largely inadvertently fallen under Scarpa's spell and

19  furnished him with some warnings to protect Scarpa

20  personally and, as a source, is likely."

21    I don't know how that supports the position that

22  Mr. DeVecchio's -- the charges against him have inverted

23  in other parts and that he has been cleared.

24    As to the other defendant, Mr. Downey?

25    MR. DOWNEY:  Good afternoon, Judge.

MM

33

PROCEEDINGS

1    Judge, Mr. Vecchione alluded to two incidents, I
2    would like to repeat them quickly.
3    Back in Halloween of 1989, this was a drive-by
4    shooting on 15th Avenue in front of Our Lady of Guadalupe
5    church.  On that evening Dominick Masseria was tragically
6    struck down.  The drive-by shooting was done by a white
7    limousine.  Inside of that white limousine was Ray
8    Aviles, the driver, Joseph Scarpa, the son of Greg
9    Scarpa, Sr., as well as Patrick Porco and Craig Sobel.
10    During the course of the investigation that I
11    undertook, we were able to apprehend Craig Sobel.  During
12    the course of our investigation, we were able to uncover
13    evidence against Craig Sobel, who now stands in custody
14    in Florida, and Dominick Masseria's family is present
15    here in court today, Judge.
16    During the course of that investigation into the
17    death of Dominick Masseria, Reyes Aviles surrendered in
18    days, pled guilty to Manslaughter in the First Degree and
19    was sentenced to three-and-a-half to ten-and-a-half
20    years.
21    Judge, in an effort to apprehend Craig Sobel back in
22    1989, the detectives of the 62nd Precinct attempted to
23    obtain additional information and they brought Patrick
24    Porco down to their precinct and, as you have heard from
25    the earlier arguments this afternoon, Patrick Porco was

MM

34

PROCEEDINGS

1   interviewed by those detectives.  Agent DeVecchio lead

2   that information to Scarpa and Patrick Porco was killed

3   during Memorial Day weekend, May 27, 1990.

4        That's why John Sinagra stands before you today,

5   because when it comes to John Sinagra and John Sinagra

6   and the Mafia, John Sinagra is the ultimate want-to-be

7   who could never be, because he was not 100 percent

8   Italian.  He tried desperately to become a part of Greg

9   Scarpa's crew by marrying his niece, by essentially

10  developing a lucrative narcotics business out of his

11  bagel store on Nostrand Avenue and Avenue P.  The one

12  thing that would hurt him over the top is killing for

13  Greg Scarpa, Sr, and that's what he did during Memorial

14  Day of 1990.

15       Judge, during the course of this investigation, we

16  come to learn that John Sinagra was the trigger man in

17  killing Patrick Porco upon the orders of Greg Scarpa, Sr.

18  which, of course, as you have come to learn in an

19  argument today, was leaked by Agent DeVecchio.

20       Judge, in that evening, Patrick Porco sat in the

21  rear seat of John Sinagra's vehicle and when the time was

22  right, John Sinagra turned around with a handgun and

23  pumped some five rounds in the head of Patrick Porco,

24  later to dump him, his body, like a piece of trash on the

25  corner of West First Street and Village Road South here

35

PROCEEDINGS

1   in Brooklyn.

2       Judge, I'm asking you to remand this defendant

3   during the course of these proceedings.  The reasons are

4   as follows:

5       First:  The violence of this crime.  I've just

6   explained that to you.

7       Secondly:  John Sinagra has absolutely no contacts

8   with New York.  He currently resides in Las Vegas.  He

9   was apprehended by the Criminal Apprehension Team of the

10  Las Vegas Metro Police in conjunction with the Brooklyn

11  District Attorney's Office detectives.

12      Additionally, he is a cab driver out in Las Vegas

13  and, my understanding, has no family ties.

14      Judge, I ask you, again, to remand him.

15      MR. GIARAMITA:  Your Honor, good afternoon.  I

16  represent John Sinagra.

17      My question, respectfully, is why did they wait so

18  long to arrest him if they had that information?  He has

19  never been charged with narcotics out of a bagel store.

20  I remember when he had that bagel store, it was a small

21  store and he was never charged with any dealing of

22  narcotics.  I am not aware of any reason why they would

23  wait so long if they had evidence that he had committed a

24  murder and to let him go.  Do you understand?  They are

25  saying that this happened in 1990, he left New York in

36

PROCEEDINGS

1  1992.

2      When he left in 1992, he was -- he never moved from

3  anywhere after arriving in Las Vegas.  He worked as a

4  limousine driver, now he's been there after as a

5  dispatcher.  He lives with his two-year-old son and his

6  fiance.  He has never moved.  Yes, he is married to

7  somebody, it doesn't make him a criminal.  I've been

8  speaking to his family throughout.

9      THE COURT:  Obviously, one concern of the Court, in

10  addition to the seriousness of the charges, is his lack

11  of contacts with the jurisdiction.

12      MR. GIARAMITA:  I understand, Your Honor.  He lived

13  in New York most, from what I recall, for many years

14  prior to going to Las Vegas, but he didn't go to Las

15  Vegas right after this happened.  We are talking at least

16  over two, three years after the crimes of which he is

17  being charged.  Those crimes, in addition, are 16 years

18  ago.

19      If the Court would allow me to try to put something

20  together to allow him to remain free, we would like that

21  opportunity.  Why?  Because, as you can see, this case is

22  going to be very highly contested and controverted.  This

23  case, he will be in jail for a long, long time if they

24  had the evidence that he was doing drug dealing.

25      THE COURT:  While that's not the Federal Court, the

37

PROCEEDINGS

1   case will not languish for a long time, that you can be

2   sure.

3       MR. GIARAMITA:  I'm not aware, you know, my point

4   is, I believe there will be a trial.  I don't believe

5   this will be a plea.  I do believe it will go for a

6   protracted period of time.  He does need medical

7   attention.  He has very high cholesterol.  They took his

8   medication away from him.  He also needs Zoloft.

9       I knew Sinagra since he had the cash register

10  business and when he had the bagel store.  If you know

11  people that are bad people, that doesn't make you a bad

12  person unless you do something wrong.  If he did

13  something wrong, I haven't heard why they had to wait for

14  16 years to go and arrest him.  I understand that there

15  was a protractive investigation involving the defendant.

16  He doesn't know him, he doesn't have anything to do with

17  him.  They are seeking -- he is going to fight this case.

18  He is not pleading guilty.

19      THE COURT:  How much time do you feel you need to

20  put together a proposal for bail?

21      MR. GIARAMITA:  Well, Your Honor, I would like to

22  speak -- if I can get some type of agreement with the

23  District Attorney, I would work as soon as possible.

24      THE COURT:  I would disabuse you of the hopes that

25  you are going to get a deal on bail with the District

MM

38

PROCEEDINGS

Attorney.  I thought you indicated you wanted some time

to attempt to put together some sort of bail package?

MR. GIARAMITA:  I think I can.  I have spoken to his

fiance's mother, who lives in California.  They are

interested in helping.  I have to go back to the family.

I have only gotten this call two days ago and I was able

to get into the case, but I have no -- I had no

information on this case until I read the newspapers.

I'm trying to get information as we're going along.  I

haven't even had a chance to interview him until he was

sitting at this table today.  I would like to have the

opportunity to try to put something together, Your Honor,

until you reserve decision on that basis.

THE COURT:  I'm not going to reserve decision

because he is before the Court and the Court has to deal

with his custody.  I am going to remand him and if you

want to notify the Court and the District Attorney at a

mutual convenient date to make a further bail

application, you can do that.

MR. GIARAMITA:  I would like for you to revisit it

before Your Honor as opposed to another judge because I

believe that--

THE COURT:  Counsel, don't worry, it's my case.

MR. GIARAMITA:  I'm sorry, Your Honor, I didn't

know.

MM

39

PROCEEDINGS

1    THE COURT:  That's all right.

2    MR. GIARAMITA:  I had very little time to get in

3    touch with the people involved in this case and I haven't

4    had the opportunity to be able to flush that out, but I

5    thank you.

6    THE COURT:  Okay.  You can let the District Attorney

7    and Chambers know, meanwhile, the Defendant, Sinagra,

8    will be remanded.

9    Obviously, the Court has a great deal of concerns.

10   The allegations in this indictment are shocking and I

11   certainly agree with the District Attorney's statement

12   that he made reference to, with one caveat, I believe you

13   said this is the most shocking case of law enforcement

14   abuse.  The caveat I would add is that I agree, if

15   proven, that's yet to be done and the defendant certainly

16   is entitled to the presumption of innocence, as are all

17   defendants before the Court.

18   On the other hand, Counsel, you can't get more

19   serious than the allegations here and the Defendant does

20   not have deep ties, at least anymore, to the New York

21   area.

22   On the other hand, I don't accept the People's

23   position that the facts that the Defense seeks to

24   interview witnesses is tantamount to witness intimidation

25   and, obviously, if there are any allegations presented to

MM

40

PROCEEDINGS

1   the District Attorney, they will, I'm sure, bring those

2   allegations to the Court's attention and it will

3   certainly cause the Court to revisit the issue of bail.

4        What I'm going to do in terms of the Defendant,

5   DeVecchio, is set a partially secured bail bond.  The

6   bond will be in the sum of one million dollars to be

7   secured by the sum of $100,000 to be, as I said,

8   partially secured by $100,000 and to have five sureties

9   in addition to the defendant, sign the appropriate

10  affidavits, making them each jointly and severally liable

11  for the balance of the million dollars bond.

12       MR. GROVER:  Your Honor, I confess some ignorance on

13  this subject.  What precisely is it that we need to do

14  today to have Mr. DeVecchio released in terms of the

15  Court?

16       THE COURT:  You have to come up with $100,000.

17       MR. GROVER:  I have that in escrow.

18       THE COURT:  You have to have five reputable people--

19       MR. GROVER:  I think I can do that five times over.

20       THE COURT:  Sign the affidavit where each of them

21  become jointly and severally liable for the $900,000

22  differential between the million dollars and the $100,000

23  bail.

24       MR. GROVER:  I will submit that.

25       THE COURT:  Also, most importantly, I am going to

MM

41

PROCEEDINGS

1   require an electronic monitoring.  The Court's concerned

2   where that monitoring is going to be.  Obviously, I would

3   be much more comfortable if the defendant was able to be

4   in the New York area so the Court can follow that

5   monitoring as closely as it would like.

6        Obviously, since there are going to be issues of

7   consultation with Counsel, so he is not going to be --

8   I'm not requiring him to be 24 hours a day in the house

9   for the monitoring purposes.  What I would require is for

10  you to submit a schedule to the Court on a weekly basis

11  indicating where he will be in terms of counsel meetings,

12  and the like, medical appointments, whatever else, so

13  that the monitoring company can be notified as to when he

14  will be on the monitor and off the monitor.

15       MR. VECCHIONE:  May I add something?  I would also

16  ask the Court, as a condition, two conditions of the bail

17  and that is, one, a bail source hearing if in fact the

18  bail or the bond is presented to Your Honor and the

19  second is that Mr. DeVecchio surrender whatever valid

20  passport he has.

21       THE COURT:  I was getting to the passport.

22       MR. GROVER:  We brought the passport, that's not an

23  issue.

24       I'm still not sure if I understand the logistics.

25  Is this a document that is being created by a court clerk

MM

42

PROCEEDINGS

1    that people will sign?

2         THE COURT:  Yes.

3         MR. GROVER:  As to the $100,000, since I have

4    $240,000 in escrow, can I have 24 hours?

5         The money belongs to Jay DeVecchio, that's his

6    brother.  I would have to make arrangements to release

7    that escrow from my firm.  Since the bank will be closed

8    shortly, chances are I can't handle the transaction till

9    tomorrow.  I can assure the Court that that money is in

10   escrow and that it's from Mr. Jay DeVecchio and I have

11   the paperwork to back that up.

12        MR. VECCHIONE:  I just want to say I will be

13   available tomorrow morning if Mr. Grover wants to come to

14   our office with all of the necessary paperwork and allow

15   us to look at it.

16        Perhaps we can come to some agreement that the

17   security is in fact sufficient and that it doesn't come

18   from funds that were gotten from Mr. Scarpa or any other

19   illegal activities, and if that's the case, then we will

20   perhaps avoid a hearing on this issue and may very well

21   come to an agreement.

22        MR. GROVER:  Judge, what I want to try to determine

23   is whether or not we can manage to have Mr. DeVecchio go

24   home today.  I am representing to the Court, as an

25   officer to the court, that Jay DeVecchio is a partner.

MM

43

PROCEEDINGS

1    THE COURT:  This is what I'm going to do:  We will

2    have the papers prepared, you can have the five

3    additional sureties sign today so they are on the hook as

4    well as the defendant.  I will give you till --

5        Step up for just a moment.

6            (A discussion was held off the record.)

7    THE COURT:  All right, what I'm going to do is set a

8    bail source hearing for 9:30 tomorrow morning.  It's my

9    understanding that Defense Counsel and the Court will go

10   to the District Attorney's Office this afternoon with

11   whatever documentation it has to satisfy, hopefully, the

12   dis -- after the District Attorney sources the money and,

13   assuming it's okay, you can call my chambers and let me

14   know it's approved so we won't have to proceed, and if

15   there is a problem, we will have a bail source hearing at

16   9:30 tomorrow morning.

17       MR. VECCHIONE:  That's fine, Your Honor.

18       THE COURT:  I need the defendant's passport.  I am

19   now -- Mr. DeVecchio, in addition to these bail

20   requirements, not all of which we have finalized, I am

21   also advising you that you have a right to be present at

22   the trial, however, should you fail to appear in court on

23   the date that is set for trial, the trial will proceed in

24   your absence, and if the trial proceeds in your absence,

25   you will be giving up your right to consult with your

MM

44

PROCEEDINGS

1  attorney during the course of the trial.  You will be
2  giving up your right to observe the witnesses against
3  you, you will be giving up your right to testify on your
4  own behalf, should you choose to do so.  You will further
5  be giving up the right to address the Court at the time
6  of sentencing, should you be convicted; do you understand
7  all of that?

8      THE DEFENDANT:  I understand that, Your Honor.

9      THE COURT:  Given the lateness of the hour, what I
10  am -- I am going to release the defendant until 10
11  o'clock tomorrow morning to give; that is, assuming all
12  the other paperwork is completed to give the defendant an
13  opportunity to post $100,000.

14      MR. GROVER:  Your Honor that check is made payable
15  to the clerk of the court?

16      THE COURT:  I don't know, I don't get the check, so
17  you better talk to the clerk.

18      MR. GIARAMITA:  One thing briefly.  My client's
19  fiance, I have been in contact with, they have two homes
20  in Las Vegas.

21      THE COURT:  You are telling me they have the homes?

22      MR. GIARAMITA:  I want to put that together, I want
23  to know if I can present that information to you by
24  tomorrow at the time of that court appearance.

25      THE COURT:  You can do it on Monday if you wish.

MM

45

PROCEEDINGS

1    Realistically, Counsel, you really think you are

2  going to have that all put together in that short period

3  of time?

4        MR. GIARAMITA:  I will do my best.

5        THE COURT:  Okay, do your best.

6        MR. GIARAMITA:  You want to put it on for Monday?

7        THE COURT:  Yes.

8        MR. GIARAMITA:  Thank you very much.

9        THE CLERK:  Your Honor, defendant and attorney have

10  executed Parker warnings.

11       THE COURT:  Is there anything else?

12       MR. VECCHIONE:  No, sir.

13       THE COURT:  Okay.

14       Wait, of course, there is something else.  We now

15  have to talk about our next court appearance and the

16  substance of the case.

17       I suspect I know the answer to this question, but

18  being obliged to ask, is the District Attorney going to

19  proceed by open file discovery in this matter?

20       MR. VECCHIONE:  No, Your Honor, motions.

21       THE COURT:  How much time do you need for your

22  motions?

23       MR. GROVER:  30 days.

24       THE COURT:  Given that this is an X indictment, I

25  assume, well, let me not assume anything.

MM

PROCEEDINGS

1   Any property seized during the course of these

2   arrests?

3   MR. VECCHIONE:  No, sir, you mean from the

4   defendant?

5   THE COURT:  Yes.

6   MR. VECCHIONE:  No, sir.

7   THE COURT:  Any statements made?

8   MR. VECCHIONE:  No, sir.

9   THE COURT:  Okay.  So far, I suspect there won't be

10  anything by way of Wade hearings or Mapp hearings or

11  Huntley hearings or anything like that?

12  MR. VECCHIONE:  That's correct.

13  THE COURT:  So we will probably--

14  MR. GROVER:  I'm anticipating a lot of problems

15  here, Judge.  I'm not anticipating an easy road.  I

16  believe there is going to be a Kastigar Hearing.  I think

17  there may be a due process hearing relating to the way

18  the Grand Jury was conducted, the fact that we were aware

19  of all of this.

20  If there was Brady material and whether or not this

21  was entirely presented to the Grand Jury fully

22  understanding the limitations of the argument and I think

23  that in this case, it may have risen well beyond that.

24  I'm not going to argue the point, I'm just alerting

25  Your Honor to the issues.  I suggest on motions that we

MM

PROCEEDINGS

1     have 60 days to file motions.  I do not anticipate,

2     simply, discovery motions, there certainly will be more

3     motions.  I anticipate a lengthy submission of motions in

4     this case.

5         MR. VECCHIONE:  We attempt to file a voluntarily

6     disclosure form in 15 days, perhaps from there,

7     Mr. Grover will want to, so he knows, that he can at

8     least wait for that and perhaps file motions dependent

9     upon what information is in the voluntary disclosure

10     form.

11         THE COURT:  Somehow, I don't think that will circuit

12     much motion practice.

13         MR. VECCHIONE:  I don't think so either, but it

14     might focus the motion practice.

15         THE COURT:  I will give you till May 1st, Counsel.

16         So defense motion is by May 1st, People's response

17     by May 15th.

18         MR. VECCHIONE:  Your Honor, can we have a little

19     more than two weeks, perhaps a month?

20         MR. GROVER:  While we're haggling dates, I would ask

21     ask for a little more time than four weeks given what we

22     have to deal with.  I don't object to Mr. Vecchione

23     having the appropriate response time as well.

24         THE COURT:  You would have taken a different

25     position had I set a different bail?

MM

48

PROCEEDINGS

1      MR. GROVER:  I would, Your Honor, but I do

2  appreciate the Court's position on this.

3      THE COURT:  Step up for a moment.

4              (A discussion was held off the record.)

5      THE COURT:  Okay.  The defense motion is by May

6  15th, People's response by June 12th and we will have

7  arguments on the motion June 26th.

8      MR. GROVER:  What date did you say oral argument?

9      THE COURT:  June 26th.

10      MR. GROVER:  I don't -- can I beg the Court's

11  indulgence?  If we can do that before the 20th, I would

12  appreciate it.  I will be leaving the country.

13      THE COURT:  Well, it only takes me a week to absorb

14  what I suspect will be voluminous papers.

15      MR. GROVER:  Then some time in July, after July

16  10th?

17      THE COURT:  As I said, I would rather do it sooner

18  than later.

19      June 19th.

20      Okay, we're adjourned.

21      THE COURT:  On the record, a further bail

22  application, April 6th.

23      MR. GIARAMITA:  How is the 5th?

24      THE COURT:  April 5th.

25      MR. GIARAMITA:  Thank you, Your Honor.

MM

PROCEEDINGS

\*       \*       \*       \*       \*

THE CLERK:  Will all six please, raise your right

hands:  Do you solemnly swear to the truthfulness of the

affidavits that you have just executed?

(Collective response.)

THE WITNESSES:  I do.

THE CLERK:  Sir, state your name for the record?

MR. TAYLOR:  Brian Taylor.

MR. DOYLE:  Jeffrey Doyle.

MR. STEVENS:  Lewis Stevens.

MR. KOSSIER:  James Kossier.

MR. MATTESE:  Christopher Mattese.

MR. DeVECCHIO:  Roy Lindley DeVecchio.

THE COURT:  Do each of you understand that should

the bail be forfeited here, each of you individually, as

well as collectively, will be on the hook for $900,000?

(Collective response.)

THE WITNESSES:  Yes, Your Honor.

THE COURT:  All right, bond is approved.

(Collective response.)

THE WITNESSES:  Thank you.

REPORTER'S CERTIFICATION
I hereby certify that the foregoing
is a true and accurate transcript of
the proceedings.

MINERVA MARIN,
Official Court Reporter
MM

**EXHIBIT W**

UNITED STATES DISTRICT COURT                           AB8885
EASTERN DISTRICT OF NEW YORK
------------------------------------X
                                    :
THE PEOPLE OF THE STATE OF NEW YORK  :
                                    :   AFFIDAVIT IN OPPOSITION
                                    :   TO PETITION FOR REMOVAL
      -against-                      :
                                    :   CR-06-235
R. LINDLEY DeVECCHIO,                :
                                    :   Kings County Indictment
                         Defendant. :   Number 6825/2005
                                    :
------------------------------------X

STATE OF NEW YORK)
                 ) ss:
COUNTY OF KINGS  )

     ANN BORDLEY, having been duly sworn, deposes and says:

     1.   I am an assistant district attorney in the County of
Kings.   I am admitted to practice in this Court and in the
courts of New York State.

     2.   This affidavit is submitted in opposition to the
petition for removal, dated April 7, 2006, of R. Lindley
DeVecchio (hereinafter "defendant").   The statements herein are
made on information and belief, based on the records and files
of the Kings County District Attorney's Office and the grand
jury minutes in this case.

     3.   On February 1, 2005, the Kings County District
Attorney's Office received a letter suggesting that defendant
was involved in the murder of Nicholas Grancio on January 7,
1992, in Brooklyn, New York.   At the time of the murder,

defendant was a special agent for the Federal Bureau of Investigation (hereinafter "F.B.I."). Defendant has since retired from the F.B.I.

4. The District Attorney's Office commenced an investigation. The District Attorney's Office was not able to substantiate the allegation that defendant was involved in the Grancio murder. However, during the course of the Office's investigation, the Office uncovered evidence of defendant's participation in the murders of four other individuals: Mary Bari, Joseph DeDomenico, Jr., Patrick Porco, and Lorenzo Lampasi.

The Grand Jury Presentation

5. From December of 2005 to March of 2006, the District Attorney's Office presented evidence to a grand jury sitting in Kings County. The grand jury evidence established the facts set forth below in paragraphs 6 to 46.[1]

---

[1] Under New York law, grand jury proceedings are secret. See N.Y. Crim. Proc. Law § 190.25(4); N.Y. Penal Law § 215.70. But the People have obtained a written order from Justice Gustin L. Reichbach, the state judge assigned to this case, granting the People permission to summarize the grand jury testimony in this answer and to provide the grand jury minutes to this Court for its in camera review.

<u>The relationship between defendant and Scarpa</u>

6.   Gregory Scarpa, Sr., was a "made" member of the Colombo crime family.  During the course of his criminal career, Scarpa engaged in a wide variety of crimes, including burglary, loan sharking, illegal gambling, drug dealing, and murder.  When asked by one of his criminal associates how many murders he had committed, Scarpa responded that he had stopped counting after he had reached fifty.

7.   Defendant was a special agent of the F.B.I.   From approximately 1978 to 1992, Scarpa paid defendant for information about the federal government's investigation of organized crime.

8.   At the beginning of the relationship between Scarpa and defendant, Scarpa and defendant would speak by telephone and would agree to meet at a specific location.  Defendant would drive to the location in one car and Scarpa's girlfriend, Linda Schiro, would drive Scarpa to the meeting in another car. Scarpa and defendant would then hold their meetings in either defendant's or Scarpa's car.  However, after Scarpa and Linda Schiro moved into a house at 218 Avenue J in Brooklyn in 1978, defendant started meeting with Scarpa once or twice a week in Scarpa's house at 218 Avenue J.  Once a week, Scarpa would give defendant a roll of bills that were bound together by a rubber

3

band.   When Scarpa and Schiro subsequently moved into a house at
1243 82nd Street in Brooklyn in 1986, defendant met with Scarpa
in his house at 1243 82nd Street.   Defendant and Scarpa met
regularly at the house at 1243 82nd Street until 1991, the year
when an internal war broke out in the Colombo crime family.

9.   Defendant did not reveal to the F.B.I. his financial
relationship with Scarpa.   Instead, on July 1, 1980, defendant
registered Scarpa as a confidential informant with the F.B.I.
From 1980 until 1992, defendant served as Scarpa's official
F.B.I. handler.   But although Scarpa was registered as a
confidential informant, Scarpa did not comply with the F.B.I.
rules regarding confidential informants.   A confidential
informant for the F.B.I. is not permitted to participate in any
criminal activities, in the absence of prior written
authorization from F.B.I. supervisors.   During the period from
1980 to 1992, Scarpa continued to commit crimes, including
burglary, loan sharking, illegal gambling, drug dealing, and
murder, even though Scarpa never received authorization to
commit any crimes.

10.   Defendant was aware of Scarpa's criminal activities,
but he did nothing to stop them.   On the contrary, defendant
helped Scarpa and his associates to commit crimes and to evade
detection by law enforcement agents.   In particular, defendant

4

aided Scarpa and others to kill Mary Bari, Joseph DeDomenico, Jr., Patrick Porco, and Lorenzo Lampasi.

### The murder of Mary Bari

11. Mary Bari was the girlfriend of Alphonse Persico, the brother of Carmine Persico, the boss of the Colombo crime family. In September of 1984, Alphonse Persico was a fugitive from justice.

12. A few days before September 25, 1984, defendant met with Scarpa at Scarpa's home at 218 Avenue J in Brooklyn. Defendant informed Scarpa that Bari was speaking to federal law enforcement agents. Defendant expressed concern that Bari would tell the agents where Alphonse Persico could be found. Defendant told Scarpa that he had to take care of this problem. Scarpa told defendant not to worry and said that he (Scarpa) would take care of the matter.

13. On September 24, 1984, at about 6 or 7 p.m., in the Occasions bar at 6908 13th Avenue in Brooklyn, Scarpa, acting in concert with others, shot and killed Bari. Scarpa and his accomplices put Bari's body into the trunk of a car, drove to McDonald Avenue, and dumped Bari's body.

14. On September 25, 1984, at about 7 a.m., Police Officer William Fedele found the body of thirty-one-year-old Mary Bari

on the curb opposite 1247 McDonald Avenue. The cause of Bari's death was three gunshot wounds to the head.

15. Several days after September 25, 1984, defendant met with Scarpa again in Scarpa's home at 218 Avenue J. Scarpa described to defendant how he and his accomplices had killed Bari.

## The murder of Joseph DeDomenico, Jr.

16. Joseph DeDomenico, Jr., was a member of Scarpa's "crew." As part of Scarpa's crew, DeDomenico committed a number of bank burglaries with Scarpa and others.

17. In 1985 or 1986, the relationship between Scarpa and DeDomenico began to deteriorate. Scarpa held DeDomenico responsible for a crime that had gone badly. Scarpa humiliated DeDomenico, by criticizing DeDomenico in front of others.

18. Sometime thereafter, DeDomenico formed his own crew. DeDomenico's crew committed a series of burglaries of jewelry stores and fur stores. Over the course of six months to a year, DeDomenico's crew made about a million dollars as a result of these burglaries. DeDomenico did not inform Scarpa of the existence of this crew or share the proceeds of the crimes with Scarpa.

19. In the early spring of 1986, defendant met with Scarpa at Scarpa's house on 218 Avenue J. Defendant told Scarpa about

the burglaries that DeDomenico had been committing behind Scarpa's back. Defendant also told Scarpa that DeDomenico had left his wife and was now with a woman who was a born-again Christian. Defendant said that he did not trust DeDomenico and that he was worried that DeDomenico might talk. Defendant told Scarpa that that they could not keep DeDomenico around and that Scarpa had to do something about him. Scarpa said that he would take care of it.

20. Scarpa told Lawrence Mazza, Scarpa's right-hand man and confidant, that they had to kill DeDomenico. Scarpa explained to Mazza that DeDomenico had become a born-again Christian and that being a born-again Christian was one step away from being a "rat."

21. Scarpa had a son named Gregory Scarpa, Jr. On or before September 17, 1987, Gregory Scarpa, Jr., acting in concert with others, shot and killed DeDomenico in a stolen car.

22. On September 17, 1987, at about 1:55 a.m., Police Officer Susan Scellato found the body of forty-four-year-old Joseph DeDomenico, Jr., in a car at 2065 72nd Street in Brooklyn. The cause of DeDomenico's death was multiple gunshot wounds to the head and body.

23.   Sometime after the death of DeDomenico, defendant met with Scarpa, Sr., in Scarpa's home at 1243 82nd Street in Brooklyn.  Scarpa told defendant about the murder of DeDomenico.

### The murder of Patrick Porco

24.   Scarpa had another son, named Joey Scarpa.   Joey Scarpa's best friend was Patrick Porco.

25.   On October 31, 1989, at about 11:40 p.m., in front of Our Lady of Guadalupe Church on 7223 15th Avenue in Brooklyn, Joey Scarpa, Patrick Porco, Reyes Aviles, and Craig Sobel, acting in concert, shot and killed seventeen-year-old Dominic Masseria.

26.   In May of 1990, Porco spoke with detectives of the New York City Police Department and the Kings County District Attorney's Office about the death of Masseria.

27.   In May of 1990, the telephone in Scarpa's home rang. Schiro picked up the telephone.   Defendant was on the line. Defendant asked to speak to Scarpa.   Schiro gave Scarpa the telephone.   Scarpa was on the telephone for only a couple of seconds.   Scarpa then hung up and told Schiro that they needed to go to a pay phone.   Schiro drove Scarpa to a pay phone near Fort Hamilton Parkway and Tenth Avenue in Brooklyn.

28.   Schiro stayed in the car while Scarpa called defendant.   Scarpa spoke with defendant for five or ten minutes.

8

When Scarpa returned to the car, Scarpa told Schiro, "I can't believe this fucking kid.  Patrick is going to rat on Joey.  We got to do something about this."  Scarpa and Schiro drove back to their house.

29.  When they returned, Scarpa called his son Joey into the dining room.  He told Joey that Porco was going to inform the authorities of Joey's role in the murder of Masseria.

30.  On May 26 or May 27, 1990, Joey Scarpa and John Sinagra picked up Porco in a 1978 or 1979 Pontiac LeMans and drove to McDonald Avenue.  On McDonald Avenue, Sinagra shot and killed Porco.  Sinagra and Joey Scarpa then drove to another location and dumped Porco's body on the street.

31.  On May 27, 1990, at about 5:39 a.m., Captain Lizette Scarfutto found the body of eighteen-year-old Patrick Porco at the corner of West First Street and Village Road South in Brooklyn.  The cause of death was a gunshot wound to Porco's head.

32.  Shortly after the death of Porco, defendant met with Scarpa at Scarpa's home at 1243 82nd Street.  Scarpa told defendant that they had killed Porco.  Scarpa said that his son Joey was upset about the killing of Porco and was very angry at Scarpa.  Defendant told Scarpa that Joey would get over it when

he realized that, as a result of the shooting, he had avoided jail.

### The murder of Lorenzo Lampasi

33.  In 1991, a deadly internal war commenced within the Colombo crime family between two opposing factions: one faction was loyal to imprisoned boss Carmine Persico and the other faction was loyal to acting boss Victor A. Orena.  Each faction organized "hit teams," which killed members of the opposing faction.  Scarpa, who was part of the Persico faction, formed a hit team which killed people associated with the Orena faction.

34.  On or about May 15, 1992, defendant met with Scarpa in Scarpa's home at 1243 82nd Street.  Scarpa told defendant that he wanted to kill Lorenzo Lampasi, who was part of the Orena faction.  Scarpa asked defendant for information on Lampasi, including the address where Lampasi was living and the time that Lampasi left his house for work in the morning.  Defendant told Scarpa that he would get Scarpa the information.

35.  Law enforcement agencies had conducted physical surveillance on Lampasi at his home at 210 Caton Avenue in Brooklyn.  This surveillance showed that Lampasi left his home for work at about 4 a.m.  There was a gate on Lampasi's driveway, which Lampasi had to open in order to drive his car

onto the street.   Every morning, after Lampasi drove past the
gate, Lampasi got out of his car to close and lock the gate.

36.  On or about May 19 or May 20, 1992, defendant met with
Scarpa in Scarpa's home at 1243 82nd Street.   Defendant said
that he had gotten the information Scarpa had wanted.   Defendant
gave Scarpa Lampasi's address and said that Lampasi left his
home for work at 4 a.m.   Defendant also told Scarpa about the
gate on Lampasi's driveway.   Defendant told Scarpa that Lampasi
had to get out of his car to open and close the gate.

37.  On or about  May 21, 1992,  Scarpa  met  with  three
members of his hit team, Lawrence Mazza, James Delmastro, and
Larry Fiorenza, to plan the murder of Lampasi.   Scarpa told the
others that Lampasi left his home at 4 a.m.

38.  On May 22, 1992, at about 2 a.m., Scarpa picked up
Mazza and Delmastro in New Jersey.   They drove to Lampasi's home
at 210 Caton Avenue in Brooklyn.   At about 4 a.m., Lampasi drove
down his driveway past the gate.   Lampasi got out of his car to
close and lock the gate.

39.  The car containing Scarpa, Mazza, and Delmastro pulled
up to Lampasi.   Scarpa shot Lampasi once with a rifle.   Lampasi
fell to the ground.   Scarpa, Mazza, and Delmastro got out of
their car and fired additional shots at Lampasi.   Scarpa, Mazza,
and Delmastro got back into their car and drove away.

40.  On May 22, 1992, at about 4:25 a.m., in response to a radio run, Sergeant Guy Petersen and his partner drove to 210 Caton Avenue.  Sergeant Peterson found the body of sixty-six-year-old Lorenzo Lampasi on the ground near Lampasi's car.  The cause of Lampasi's death was gunshot wounds to the head.

41.  At the time of the Colombo war, defendant was the supervisor of C-10, the F.B.I. squad assigned to investigate the Colombo and Bonnano crime families.  One of defendant's subordinates, Special Agent Christopher Favo, was the case agent in charge of the F.B.I.'s investigation into the Colombo war. When Agent Favo was informed that Lampasi had been killed, he reported that fact to defendant.  Defendant responded, "[W]e're gonna win this thing."  Agent Favo reminded defendant that they were the F.B.I. and that the F.B.I. was not on either side of the Colombo war.

42.  About a week or so after the death of Lampasi on May 22, 1992, defendant met with Scarpa in Scarpa's home on 82nd Street.  Scarpa told defendant about the shooting of Lampasi.

The arrest of Scarpa

43.  During the investigation of the Colombo war, Agent Favo obtained evidence connecting Scarpa to the murder of Nicholas Grancio and the shooting of Joel Cacace, two mobsters associated with the Orena faction.  Agent Favo learned that

12

Scarpa was supposed to surrender himself to state authorities on a gun charge on August 31, 1992 and that Scarpa was expected to be released a few hours later.

44.  Agent Favo obtained a warrant from the United States District Court for the Eastern District of New York to arrest Scarpa for conspiracy to commit murder.  Although defendant was Favo's supervisor and Scarpa's handler, Agent Favo did not inform defendant of the arrest warrant until state officials had taken defendant into custody.  Agent Favo and two other members of the C-10 squad who reported to defendant, Agent Jeffrey Thomlinson and Agent Ray Andjich, suspected that defendant had been providing confidential law enforcement information to Scarpa.  Agent Favo, Agent Thomlinson, and Agent Andjich feared that if they told defendant of the federal arrest warrant before Scarpa surrendered himself, defendant would warn Scarpa and Scarpa would flee.

45.  When Agent Favo told defendant of the federal arrest warrant for Scarpa, defendant got angry.  Defendant attempted to call Scarpa, but defendant was unable to reach him.

46.  Scarpa died in prison in 1994.

### The grand jury's decision

47.  At the conclusion of the grand jury presentation, the prosecutor instructed the grand jury on New York law regarding

accessorial liability and intentional murder. The prosecutor told the grand jury that "when one person engages in conduct which constitutes an offense, another person is criminally liable for such conduct when, acting with the mental culpability required for the commission thereof, he solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct." See N.Y. Penal Law § 20.00. The prosecutor also told the grand jury that a person is guilty of Murder in the Second Degree "when with intent [to] cause the death of another person, he causes the death of such person or a third person." See N.Y. Penal Law § 125.25(1). The prosecutor then submitted to the grand jury four counts of intentional murder: one count concerning the death of Mary Bari; one count concerning the death of Joseph DeDomenico, Jr.; one count concerning the death of Patrick Porco; and one count concerning the death of Lorenzo Lampasi.[2] The grand jury returned a true bill on all counts.

48. On March 23, 2006, the grand jury filed Kings County Indictment Number 6825/2005, which charged defendant with four counts of Murder in the Second Degree (N.Y. Penal Law § 125.25[1]).

---

[2] New York's statute of limitations barred the prosecution of defendant for other state crimes. See N.Y. Crim. Proc. Law § 30.10.

State Court Proceedings

49.  On March 30, 2006, defendant was arraigned on the indictment in the Supreme Court, Kings County, before Justice Gustin L. Reichbach.  Defendant pled not guilty.  The court set bail in the amount of $100,000 cash bond and a $900,000 surety. Because defendant does not live in New York State, the court ordered that, as a condition of his release on bail, defendant had to wear an electronic monitoring bracelet.

50.  Defendant was released on bail.

The Removal Petition

51.  By petition dated April 7, 2006, defense counsel now moves to remove this state criminal prosecution to federal court pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1).  In his petition, defendant contends that he is entitled to removal because he was acting under color of office at the time of the alleged crimes and because he has two colorable federal defenses:  a Supremacy Clause immunity defense and a "Kastigar defense."

52.  Defendant's petition for removal should be denied because he is not entitled to removal under 28 U.S.C. § 1442(a)(1).  Defendant was not acting under color of office when he aided Gregory Scarpa, Sr., to kill Mary Bari, Joseph DeDomenico, Patrick Porco, and Lorenzo Lampasi.  Furthermore,

15

defendant has no colorable federal defense.   Defendant has no
Supremacy Clause immunity defense, because the murders of Bari,
DeDomenico, Porco, and Lampasi were not necessary and proper to
the performance of defendant's federal duties.   Defendant has no
colorable "Kastigar defense," because the Supreme Court's
decision in Kastigar v. United States, 406 U.S. 441 (1972), did
not create a defense to the crime of murder and because, in any
event, defendant does have not a colorable Kastigar claim.

53.   I am serving and filing with this answer affidavits
from the five individuals who worked on this case:   Assistant
District Attorneys Noel Downey, Bryan Wallace, and Michael
Vecchione, Detective Investigator Patrick Lanigan, and analyst
Thomas Dades.   These affidavits demonstrate that there is no
basis for defendant's Kastigar claim because the People's
evidence was not directly or indirectly derived from compelled
statements made by defendant.   In addition, I am serving on this
Court, for its in camera review, the grand jury minutes.

For these reasons and for the reasons set forth in the accompanying memorandum of law, defendant's petition for removal should be denied.

Ann Bordley
Ann Bordley
Assistant District Attorney
(718) 250-2464

Sworn to and subscribed before me
this 24th day of May, 2006

Robert W. Ho

ROBERT W. HO
Notary Public, State of New York
No. 01HO6026162
Qualified in New York County
Commission Expires June 07, 2007

17