UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

MARIA GRANCIO, individually, and )
in her capacity as Executrix and Personal )
Representative of the Estate of Nicholas P. )
Grancio, )
                                  )
            Plaintiff,            )
                                  )
v.                                )      CIVIL ACTION NO.  06-CV-0069 (FB)(CPP)
                                  )
R. LINDLEY DeVECCHIO;             )
CHRISTOPHER FAVO;                 )
UNITED STATES OF AMERICA.         )
                                  )      ECF Case
            Defendants.           )

**PLAINTIFF'S CONSOLIDATED MEMORANDUM IN RESPONSE TO DEFENDANTS'
MOTIONS TO DISMISS, FOR SUMMARY JUDGMENT OR FOR A STAY**

May 16, 2007

David I. Schoen
Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, Alabama 36106
334-395-6611
Fax: 917-591-7586
Dschoen@abanet.org
Counsel for Plaintiff Maria Grancio

# TABLE OF CONTENTS

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

THE GOVERNMENT'S MOTION TO DISMISS IS DUE TO BE DENIED . . . . . . . . . . . . . . 1

    The Federal Tort Claims in this Action Were Not Filed Prematurely . . . . . . . . . . . . . . 2

    The FTCA Claims Were Filed Within the Statute of Limitations . . . . . . . . . . . . . . . . . 12

THE INDIVIDUAL DEFENDANTS' MOTION ARE DUE TO BE DENIED . . . . . . . . . . . . 28

    Applicable Standards for Consideration of the Motions . . . . . . . . . . . . . . . . . . . . . . . . 28

    Preliminary Observations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    The Defendants' Motions Are Premature and Must Be Denied . . . . . . . . . . . . . . . . . . . 31

    The Defendants' Claim That There Was No Clearly Established Constitutional Rights
    Violation Here is Completely Unsupportable, Even at This Premature Stage . . . . . . . . 35

    Defendants' Actions Violated Plaintiff's 5th Amendment
    Substantive Due Process Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

    Defendants' Remaining Claims Should be Denied . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARIA GRANCIO, individually, and in her capacity as Executrix and Personal Representative of the Estate of Nicholas P. Grancio, ) ) ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | CIVIL ACTION NO.  06-CV-0069 (FB)(CPP) |
| R. LINDLEY DeVECCHIO; CHRISTOPHER FAVO; UNITED STATES OF AMERICA. ) ) ) ) | |
| Defendants. ) ) | ECF Case |

## PLAINTIFF'S CONSOLIDATED MEMORANDUM IN RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS, FOR SUMMARY JUDGMENT OR FOR A STAY

### Introduction

Defendants United States, Devecchio, and Favo have filed motions to dismiss the First Amended Complaint, or in the alternative, for summary judgment.  Mrs. Grancio files this consolidated Memorandum in response to each such motion.

### THE GOVERNMENT'S MOTION TO DISMISS IS DUE TO BE DENIED

The Defendant, United States of America ("USA") argues that the tort claims in the First Amended Complaint must be dismissed for two reasons.  First, it argues that Mrs. Grancio filed her Amended Complaint prematurely insofar as it sets forth tort claims against the USA under the Federal Tort Claims Act ("FTCA").[1]  Secondly, the USA argues that Mrs. Grancio failed to

---

[1]  In the heading for this argument, found at page 5 of the USA's memorandum of law, the argument is framed as follows: "PLAINTIFF FAILED TO FILE HER ADMINISTRATIVE CLAIM PRIOR TO FILING THIS ACTION."  That is a cognizable argument under 28 U.S.C. §2675 and the statute certainly requires an administrative claim to be filed before a complaint asserting jurisdiction under the FTCA can be filed in federal court.  However, the heading does not reflect the government's argument.  The USA actually makes an "exhaustion" argument (pages 5-7 of its Memorandum of Law), asserting that Mrs. Grancio filed this action purportedly without waiting either 6 months from filing her administrative claim or for a denial of such administrative claim from the relevant agency.  That would indeed violate 28 U.S.C. §2675)(a) if it were accurate; but it is not as a review of the record immediately makes clear.

file her administrative claim under the FTCA within the FTCA's two year statute of limitations period and therefore the claims raised under the FTCA in her First Amended Complaint are due to be dismissed as time barred. Both arguments are well written; but both must be rejected out of hand. The first is based fatally on an entirely mistaken premise. The second, notwithstanding the undoubtedly time consuming effort at gathering the voluminous exhibits offered in support of it, fails demonstrably short of its thesis when one considers the actual relevant specifics that apply to the argument and the actual facts that attend this case - as, of course, this Court must do.

**1.  The Federal Tort Claims in this Action Were Not Filed Prematurely.**

The USA claims to rely on 28 U.S.C. §2675(a) in support of its argument that Mrs. Grancio filed this action prematurely. [USA Memo at 5]  Section 2675(a) provides as follows:

§ 2675. Disposition by federal agency as prerequisite; evidence

(a) An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail. The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section. The provisions of this subsection shall not apply to such claims as may be asserted under the Federal Rules of Civil Procedure by third party complaint, cross-claim, or counterclaim.

.....

For a variety of reasons, the USA's argument in this regard is a bit confusing beyond the disconnect between the heading for the argument and the argument itself; but at bottom the argument appears to be that Mrs. Grancio's original Complaint was filed before either 6 months had passed (without action by the agency) from the filing of her administrative claim or before the administrative claim was finally denied, with the earlier of those two time periods being the date which permits the filing of a civil action under the FTCA.[2]  In order to try to make its

---

[2]  The USA's argument under this Point is confusing for at least the following reasons: (1) The USA asserts that the original complaint was filed prematurely; but the only FTCA claims it cites and which it argues must be dismissed are alleged to be found in the First Amended Complaint [ See Memo at 3: "As set forth more fully below, except for the claims alleging that

2

argument fly, the USA omits from its discussion several rather key facts relevant to both the chronology of events in this matter and the substance of the pleadings at issue and it attempts to use general principles from cases decided under the FTCA which simply do not have any bearing on the specific facts and course of events in this case, as appealing as those general principles might be to the government.

Mrs. Grancio filed her Complaint in this Court on January 6, 2006 [Doc. 1].  The Complaint was brought against Defendants Devecchio and Favo in their individual capacities [Doc. 1 at Para. 4] and brought directly under the identified relevant provisions of the United States Constitution ("Bivens" claims), invoking this Court's subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343 (Federal Question) and under 1367(a) (Supplemental Jurisdiction) as to the common law New York State claims.[3]

---

the individual federal defendants violated plaintiff's rights under the Constitution of the United States, all of the claims raised in plaintiff's **Amended Complaint** are governed by the FTCA.;" and Memo at 4: "Plaintiff's complaint alleges tort claims specifically against the United States, and various additional negligent acts or omissions committed by the individual defendants while they were acting within their (sic) of their FBI employment.  **See Am. Comp. At Counts II-XI**."][Emphasis Added].

The Complaint filed by Mrs. Grancio did not state **any** claims at all, in tort or otherwise, "against the United States."  Indeed, the United States was not at all a defendant, nor was it intended to be, nor were any claims raised under the FTCA.  Rather, in addition to the constitutional claims, common law tort claims were brought against the individual defendants Devecchio and Favo in their individual capacities.  The USA appears to try to bootstrap its misguided argument by tying the Amended Complaint to the original Complaint through a sort of punitive attempted application of F.R.C.P.'s Rule 15© "relation back" rule and by attempting to contend that since the original Complaint mentions tort claims, they must have been FTCA claims; but neither argument is availing and the authority relied upon by the USA is entirely inapposite.

(2) It is bewildering that the USA would assert that Mrs. Grancio's purported "failure to exhaust completely her administrative remedies *before* bringing a claim under the FTCA" is "undisputed" [USA Memo at 6][Emphasis in original] This is absolutely not so of course.  We wholly dispute this specious claim.  Her FTCA claims, raised in the First Amended Complaint were not premature at all and were not in any way filed out of time.

[3] In trying to understand the USA's claims under this point, we are assuming, and we have to assume it because the argument never is made expressly, that the argument rests on the purported logic that since there is a general principle that the FTCA is the exclusive vehicle for raising tort claims against federal employees acting within the scope of their employment, the tort claims in the initial complaint by definition had to be FTCA tort claims and, as such were premature.  This is, however, faulty logic and a mistaken premise in this case.  First, the argument ignores the actual bases for jurisdiction expressly invoked by the Plaintiff.  Secondly, it

On the same date Mrs. Grancio filed her Bivens Complaint, she also filed her administrative claim under the FTCA.  Her plan at that time was to file a separate FTCA claim once the same was ripe under the FTCA, with either the passage of 6 months without action or on the denial of her administrative claim. [Schoen Aff. ¶13]  It is, one would hope, undisputed that both Bivens actions and FTCA actions can be brought under the circumstances underlying this case either by separate actions or by a Complaint which raises both.  Mrs. Grancio had chosen the former course for a variety of reasons.

However, on September 15, 2006, the Court might recall that a pre-motion conference was held, based on pre-motion letters from both defendants which clearly reflected their understanding that the Complaint simply raised Bivens claims and common law state tort claims. Indeed, during the conference, when the Court suggested that the Complaint be amended to make more specific the allegations as to defendant Favo, the Court expressly advised that if the common law tort claims were not removed from the Complaint, the Court would consider imposing Rule 11 sanctions.[4]  The Court gave a short and finite period of time in which an Amended Complaint would be filed and the Court expressly advised that it would only permit one Amended Complaint, would not permit the litigation to proceed in "piecemeal" fashion, and

---

ignores the fact that this general principle does not apply at all in the event there is a finding that the defendant was not acting within the scope of his employment - in which case the claims would proceed as state common law tort claims - and here there was no concession of the same by the defendants and certainly no certification of the same by the USA prior to the filing of the Amended Complaint which actually raised FTCA claims.  Of course, the USA had notice at all relevant times of the filing of this action, since it was served with a copy of the Complaint under F.R.C.P. 4(i)(2)(B) and did not choose to certify until well after the Amended complaint was filed.  Thirdly, the argument ignores the well settled principle, both by statute and case law, that it is the "scope of employment" certification by the United States which , in such a case as this, transmutes the action into one against the United States under the FTCA and in which the United States must be named as a party defendant. *See e.g., Dufort v. Burgos*, 2005 U.S. Dist. LEXIS 23902, *13 (EDNY October 18, 2005)(Block, J.).

[4]  The Court might also recall the exception that I took, respectfully, to that comment. The fact of the matter is that the state common law torts would lie if, for example, the government refused to enter a "scope of employment" certification or if the Court refused to impose one on the Defendants' request, or if the same were imposed and was successfully challenged by Mrs. Grancio; so there is no basis for imposing sanctions for alleging the same on the alternative theory that the Defendants were not acting within the scope of their employment and in an effort to preserve such common law claims from a state statute of limitations bar.

that therefore I should give it my "best shot" in the Amended Complaint.

By this time, of course, more than 6 months had passed and there had been no action at all taken on the FTCA administrative claim; therefore, under §2675(a) a FTCA action was ripe for filing.

Accordingly, on September 29, 2006, almost 9 months after Mrs. Grancio had timely filed her FTCA administrative claim, Mrs. Grancio timely filed her Amended Complaint in this action, amending the allegations in her original complaint to some degree and instituting a new action against a new party-defendant, the United States of America, adding FTCA claims to her Bivens and common law state tort claims, and expressly invoking the Court's jurisdiction for the first time in this case under the FTCA, 28 U.S.C §1346. The Bivens claims in the First Amended Complaint, of course related back to the first Complaint under F.R.C.P. Rule 15© and the FTCA claims simply related back to the administrative FTCA claim - the event required under the FTCA statute of limitations, 28 U.S.C. §2401(b) and under §2675(a).

The USA argues implicitly that because the FTCA purportedly is the exclusive means by which a federal employee can be sued in tort for conduct engaged in within the scope of the federal employment, the original Complaint, to the extent it alleged tort claims against the individual federal employee defendants, necessarily was a FTCA action and, as such, was filed prematurely. Tied to this argument is its claim that, while admittedly an Amended Complaint was filed expressly naming the USA as a party and invoking the Court's jurisdiction under the FTCA for the first time (and such Amended Complaint indisputably was filed more than 6 months after the administrative claim was filed), that Amended Complaint should have no significance because it cannot relate back to the original Complaint, since, this Court purportedly had no subject jurisdiction to entertain the original Complaint. The argument is filled with erroneous premises and has no validity for many reasons.

First, notwithstanding the general principle that the FTCA is the exclusive vehicle for suing federal employees for torts committed while acting within the scope of their federal employment, that in and of itself does not automatically make the state common law tort claims

5

against the individual defendants, alleged through this Court's supplementary jurisdiction, FTCA claims without more.

Rather it is the certification by the USA, 28 U.S.C. §2679(d)(1) or by the Court. 28 U.S.C. §2679(d)(3) (in the event the USA refuses to certify and the defendant challenges it) that the defendant was, indeed, acting within the scope of his federal employment, that transforms tort claims alleged against such individual federal employees into FTCA claims, for which the USA must be named as a party defendant and which effectuates the substitution of the USA for those individual party defendants as to such tort claims. *See* 28 U.S.C. §2679(d)("Upon certification ....").

This, of course, makes perfect sense. The courts perfectly well recognize that a Complaint may well state claims against federal officers under Bivens and through the court's supplemental jurisdiction as common law tort claims and that is what they remain unless or until there is a §2679 certification which is deemed to conclusively determine the question of whether they were acting within the scope of their federal employment. *See e.g. Holz v. Terre Haute Regional Hospital*, 123 Fed. Appx. 712, 713 (7th Cir. 2004)(recognizing validity of bringing joint Bivens claim through 28 U.S.C. §1331 (federal question jurisdiction) with a state tort claim under 28 U.S.C. §1367(a) (supplemental jurisdiction) if truly brought against federal officers in their individual capacities); *Hamm v. United States*, 2007 U.S. App. LEXIS 8365 (2d Cir., April 11, 2007)(dismissing FTCA claims against United States for injury allegedly caused by federal official because he was found not to have been acting with this scope of his employment at the time).

Moreover, the certification that a federal employee was acting within the scope of his employment is subject to review. *Gutierrez v. Lamagno*, 515 U.S. 417 (1995), with a district court's de novo review of the question triggered by the government's motion for substitution and opposition papers. *McHugh v. University of Vermont*, 966 F.2d 67, 74 (2d Cir. 1992). Naturally, if the result of the review is to find that a certification/substitution was not appropriate, the claim would proceed as a state tort claim; so we must be clear that the exclusive remedy language of

the Westfall Act does not mean every tort claim against a federal employee is subsumed under the FTCA. Rather it is only after there is a proper certification concerning scope of employment that the Act is triggered. *See e.g., Dufort v. Burgos*, 2005 U.S. Dist. LEXIS 23902, *13 (EDNY October 18, 2005)(Block, J.). This is important here because it was only well after Mrs. Grancio filed her FTCA claims in her First Amended Complaint, some 9 months after filing her administrative claim, that the USA filed its certification and substitution under the FTCA.

Secondly, unlike cases relied upon by the USA in its memorandum, Mrs. Grancio's case is not one in which there is nothing for an Amended Complaint to relate back to because the district court did not have jurisdiction. Here, the Court unquestionably had jurisdiction over the Bivens claims (and supplementary jurisdiction over the common law state tort claims) when the First Amended complaint was filed and it merely added a new defendant, new federal claims, and an additional basis for federal jurisdiction under the FTCA.

More importantly, insofar as it raised FTCA claims, it did not need to relate back to the filing of the original Complaint. Rather it related back to the filing of the administrative claim, which was timely filed, and that is what is relevant here. *See e.g., Morano v. U.S. Naval Hospital*, 437 F.2d 1009, 1011 (3d Cir. 1971); *Jama v. United States INS*, 22 F. Supp. 2d 353, 366 (D. NJ 1998).

The cases relied upon by the USA do not advance its argument under the operative facts in the instant case.

The USA makes short shrift of the single most important procedural fact in this case - the filing of the First Amended Complaint raising the FTCA claims and naming the USA as a party-defendant for the first time - and writes that the fact the she has "now" filed an administrative claim and obtained a denial of it is of no significance, because a "newly exhausted claim cannot relate back to the filing of an original complaint when subject matter jurisdiction did not exist for that claim at the time of the original filing." [USA Memo at 7]

Mrs. Grancio did not "now" file her administrative claim. She filed it in January of 2006, 9 months before she filed the First Amended Complaint in which she brought her FTCA claims.

7

Next, the "denial" of the claim is irrelevant for this analysis and actually post-dated the First Amended Complaint. Mrs. Grancio did not in any way rely on that denial for her FTCA claim to be ripe. Rather she filed it based on the passage of over 6 months from the filing of her claim with no action by the agency - the so-called "deeming" period. Third, as noted above, she is not making any claim that her FTCA claims in the First Amended Complaint relate back to a Complaint for which no subject matter existed. Her FTCA claims need only relate back to the timely administrative claim; for it is the administrative claim that is the relevant filing for statute of limitations purposes and, of course, the FTCA claims in the First Amended Complaint do relate back to that administrative claim and are timely brought in relation to that administrative claim.

The USA relies on the Supreme Court's decision in *McNeil v. United States*, 508 U.S. 106 (1993) in support of its argument. [USA Memo at 6-7]  In truth, *McNeil* undercuts this argument, at least by implication. *McNeil* involved a *pro se* inmate who filed his federal lawsuit with claims under the FTCA before either the passage of 6 months or a denial of his administrative claim. The prisoner filed his Complaint in federal court and then filed an administrative claim. The claim was soon thereafter denied and the prisoner made a filing in his court case attaching the agency's denial and reiterating his request for the appointment of counsel.

The Court held that the filing of the Complaint before the administrative claim was filed required a dismissal of the federal case; however, it expressly left open the question of what the result would be if the filing following the denial of the claim were to be construed as the initiation of a new action - whether the same would cure the earlier timing defect and allow the case to go forward. *McNeil*, 508 U.S. at 109, n.5; 111; 112, n.9. While we do not even need to confront the issue in our case, given the difference in the timing of the events, suffice it to say that *McNeil* certainly opens the door to the idea that a filing in such a case which can be deemed to be the institution of a new action following a claim denial or the passage of 6 months could cure a premature filing defect.

8

Next, the government relies on the decision in *Duplan v. Harper*, 188 F.3d 1195 (10th Cir. 1999) for the proposition that a "newly exhausted claim cannot relate back to the filing of an original complaint when subject matter jurisdiction did not exist for that claim at the time of the original filing. [USA Memo at 7] Again, the entire argument is misplaced here because that is not the procedural posture of the events in this case; but in any case, *Duplan* does not advance the government's argument.

In *Duplan*, the plaintiff filed an action in state court alleging medical negligence claims against the federal employee defendants. The government immediately filed a scope of employment certification and removed the case to federal court. *Id*. at 1198. The plaintiff then filed an administrative claim under the FTCA. Soon thereafter, the government moved to dismiss the federal action for the failure to first exhaust the administrative claim. The court put the case on an administrative hold while the administrative claim process was pending. After receiving notice that the administrative claim was denied, the case was reopened and the plaintiff filed an amended complaint adding the United States as a defendant. *Id*. The court found the certification appropriate (and it certified as to one doctor the government had declined to certify) and the United States was left as the sole defendant under the FTCA. The plaintiff filed a second amended complaint and the government moved to dismiss it on the argument that an amended complaint after the exhaustion of administrative remedies cannot cure the original jurisdictional defect from the original filing prior to such exhaustion. *Id*. The court denied the government's motion. *Id*. The plaintiff then filed a new action which was similar to the second amended complaint and the district court consolidated the two actions. *Id*. A multi-million dollar judgment was entered in favor of the plaintiff after a bench trial and the government appealed.

On appeal the government argued a lack of subject matter jurisdiction, based on the filing prior to the exhaustion of administrative remedies. The court considered the question of whether "an amended complaint filed after exhaustion can cure a prematurely filed original complaint, found little authority, and concluded that generally it should not be allowed to; however, in this case, since both parties had agreed to treat the amended complaint as the institution of a new

9

action and since the administrative remedies were exhausted before the amended complaint/new action was filed, the court had subject matter jurisdiction. *Duplan*, 18 F.3d at 1199-1200.

The decision in *Duplan* does not advance the government's argument at all. The cases are altogether different. First, in the instant case, Mrs. Grancio filed in federal court as an initial matter, not in state court and this Court had subject matter jurisdiction over the claims she filed, under 28 U.S.C. §§1331 and 1343, based on the Bivens claims and it had supplemental jurisdiction over the state tort claims under §1367(a). So there is no question here as to whether this Court had subject matter jurisdiction over the original Complaint.

Secondly, before the plaintiff in *Duplan* filed her amended complaint, the government had filed a scope of employment certification which, for removal purposes was unreviewable,[5] triggering §2679(d) and transforming the case into a FTCA case. In Mrs. Grancio's case, there was no such certification prior to the filing of her First Amended Complaint. Rather the First Amended Complaint, filed as a matter of right under F.R.C.P. 15(a), before any responsive pleading was filed, was filed at a time when the FTCA claims were ripe to be filed as such.

Interestingly, while the decision in *Duplan* certainly was influenced by the agreement among the parties to treat the amended complaint as a new action, the Court expressly noted that other courts (including a court in this district) have found that the filing of an amended complaint can be deemed to be the institution of a new action as well. *Id.* at 1200, *citing, McNeil, supra.; Hyatt v. United States*, 968 F. Supp. 96 (EDNY 1997); *Ellis v. Hanson Resources Co.*, 857 F. Supp.766 (D. Or. 1994).[6]

_____

[5] *See Osborn v. Haley*, – U.S. –, 127 S. Ct. 881, 166 L. Ed. 2d 819 (January, 22, 2007)(Government certification is conclusive for removal purposes and if federal court subsequently finds not within scope of employment, it retains jurisdiction and adjudicates the state tort law claims).

[6] By way of background and without going into an academic discourse more broad than necessary for the instant purposes, suffice it to say that there has been a trend (since the 1988 amendments to the Westfall Act) with respect to cases mistakenly filed in state court as a matter of first course (for which no administrative claim was filed) and later removed to federal court under the FTCA, to dismiss the case, while allowing a refiling pursuant to 28 U.S.C. §2679(d)(5), assuming the criteria there set forth is met. *See e.g., Celestine v. Mount Vernon Neighborhood Health Center*, 403 F.3d 76, 83-84 (2d Cir. 2005); *State Farm Ins. Co. V. United States*, 2004 U.S. Dist. LEXIS 14427 (EDNY, July 23, 2004)(Gleeson, J.); *Nin v. Liao*, 2003

This issue is quite simple.  Mrs. Grancio filed a Bivens claim with state court claims against individual defendants brought through the Court's supplemental jurisdiction. Contemporaneously with that Complaint, she filed her administrative claim under the FTCA. After the 6 month "deeming" period provided for in 28 U.S.C. §2675(a) had passed without any agency action on the administrative claim (actually 9 months after the claim was filed), she filed her First Amended Complaint as a matter of right under F.R.C.P. Rule 15(a), with more specific factual allegations as the Court had directed and adding the United States as a party defendant, while invoking the Court's jurisdiction under the FTCA for the first time, having exhausted all administrative requirements.  Following that filing, the agency finally issued a formal denial of the administrative claim and months later certified that with respect to the acts alleged in the First Amended complaint, the federal employee individual defendants were acting within the scope of their employment with the federal government and substituted the USA as the party defendant for all tort claims alleged in the First Amended Complaint.

It would be even further absurd to take the USA's certification expressly as to claims raised in the First Amended Complaint (the first time the FTCA was raised in this case substantively or in allegations invoking the Court's jurisdiction) and apply the certification and substitution retroactively to the original Complaint, especially when the USA had full notice by

_____

U.S. Dist. LEXIS 7521 (SDNY, May 5, 2003)(Francis, M.J.); *Filaski v. United States*, 776 F. Supp. 115 (EDNY 1991)(Wexler, J.).

The §2679(d)(5) procedure makes no sense in the instant case for a number of reasons. First and most significantly, there was no premature FTCA filing here. No FTCA action was filed until after exhaustion and before any certification. The original Complaint did not intend to and did not raise any FTCA claims. Secondly, this Court had and has subject jurisdiction over this case on more than one ground and has from its initiation.  That distinguishes it from these other cases which were in federal court only on removal and only because of the substitution and removal provision in §2679(d)(2) and because of the administrative default at the time of removal, there was no other basis for federal jurisdiction.  Third, Mrs. Grancio already long ago exhausted her administrative claim both by operation of law once the 6 months passed and based on the later denial; re-filing a claim would make no sense and would be an undue waste. Mrs. Grancio filed her First Amended complaint with all claims in it, rather than filing a separate FTCA action as planned because this Court ordered us to file one document with all claims, rather than proceeding piecemeal.  We had totally unrelated reasons for wanting to proceed with the Bivens and FTCA claims in two separate actions, with the former proceeding first; but yielded to the Court's direction and should not be penalized for that.

11

service of process (and the administrative claim) well before the First Amended Complaint was filed and made no certification or substitution until Mrs. Grancio characterized her claims as being pursuant to the FTCA. The USA's argument would turn the certification process into a weapon and would have it operate in a way never intended.

There is no legitimate exhaustion or premature filing issue in this case at all. To find that there is would require the Court to ignore the principles clearly established by statute (28 U.S.C. §2679(d)(1) "Upon certification ...") and by case law and find that the mention of state common law claims against federal employee defendants automatically states a claim under the FTCA, notwithstanding the alleged jurisdictional basis for those claims, the lack of any certification or admission that they were acting within the scope of their employment at the time in question, the possibilities that certification of the same would be denied or would not be proper upon challenge. This simply would not be permissible.

If, however, the Court did all of that nevertheless and then went a step further and found that it had to relate back the First Amended Complaint to the original Complaint and then found a dismissal proper for the reasons the government claims, the remedy would be to direct Mrs. Grancio simply to file another administrative claim and then re-file her suit after a denial or the deeming period, with it all relating back to the date of her originally filed administrative claim. None of this would make any sense and clearly is not called for under either the statute or the caselaw. Mrs. Grancio's FTCA claims were timely filed after the administrative claims process had been exhausted.

**2. The FTCA Claims Were Filed Within the Statute of Limitations.**

The USA argues next that even if the FTCA claims were not filed prematurely before the exhaustion of administrative remedies, the administrative claim was filed after the two year limitations period had passed. [USA Memo at 8-25] The USA appears to concede that Mrs. Grancio did not have actual knowledge sufficient to bring the claim any earlier than she did or at

least it does not offer any proof of any such actual knowledge.[7] Rather, it bases its claim on a constructive knowledge theory, arguing that because of the volume of media coverage and public exposure of related matters though other court cases, Mrs. Grancio should have been sufficiently aware of the injury and causal relationship, tying it to these defendants to have investigated more and earlier to a degree that would have enabled her to file such an administrative claim many years earlier.[8]

Just such an approach with a similar volume of material in support of just such an effort was rejected in a series of similar cases conspicuously missing from the USA's papers, precisely because when strained down to its essence it did not in any way, and certainly not sufficiently, place the victim's representative in any meaningful position to know the circumstances of the victim's death and the role law enforcement played in the same, let alone bring a law suit in good faith making such serious allegations. *See McIntyre v. United States*, 367 F.3d 38, 52-57 (1st Cir. 2004)(reversing the dismissal of McIntrye's claims on timeliness grounds and noting the error of relying on media reports which provide general facts about a corrupt relationship, even where plaintiff's decedent was quoted in articles); *Davis v. United States*, 340 F. Supp. 2d 79 (D. Mass. 2004); *Limone v. United States*, 336 F. Supp. 2d 18 (D. Mass. 2004); *Bennett v. F.B.I.*, 278 F. Supp. 2d 104 (D. Mass. 2003); *Donahue v. FBI*, 204 F. Supp. 2d 169, 177-78 (D. Mass. 2002). Mrs. Grancio would commend those cases to the Court's attention on this point.

Indeed, if the media coverage, *arguendo* provided some basis for Mrs. Grancio to begin a duly diligent search for a connection between law enforcement and her husband's death, she would have found nothing in the public domain or in any forum to which she reasonably could

---

[7] The USA complains at Page 13 of its Memorandum that Mrs. Grancio's assertion of a lack of actual knowledge until 2004 that government agents were involved in her husband's death, found in the First Amended Complaint at ¶31, was "unsworn." But of course there is no requirement that a Complaint in such an action as this be "sworn." Nevertheless, it must be accepted by this Court as true at this stage and for these purposes. Additionally, Mrs. Grancio has now filed her Declaration attesting to this fact. [Exhibit 24]

[8] The government offers several options for dates by which Mrs. Grancio should have had the requisite level of knowledge - a level it says has not been determined yet in the Second Circuit.

have had access. Indeed, all of her inquiries would have met with the same adamant denials from these defendants - the people certainly situated to know the true facts - that we see today. But more significantly, she might have found the filings to which the parties refer in their motion papers which reflect suspicions about Devecchio leaking information to Scarpa which mentions specific cases, but nowhere mentions Nicholas Grancio.

She would have found the results of an official inquiry conducted by our Justice Department which found no basis for further action and which, by its results, allowed Devecchio to retire with a pension into a life of leisure, hoping to leave all of his victims and their families far in the past with no way to reach him or take him to task for his murderous conduct.

This, of course, is the same Justice Department investigation which Devecchio and his lawyers and supporters, themselves FBI agents, publically have said totally "cleared" Devecchio of any wrongdoing in any regard, let alone in the killing of Nicholas Grancio and others. Mrs. Grancio and any other reasonable person was entitled to rely on those findings and claims as much or more as on newspaper articles she never even saw and which never even raised the possibility of the theory of her the cause of her husband's death and the surrounding circumstances alleged in this lawsuit. Could she have sued Mazza, Delmasto, or Scarpa, Sr. earlier? For sure; but based on their guilty pleas and the stories they apparently told at the time, she could not have sued these defendants and had no basis for alleging a government causal connection. Moreover, Mazza and Delmasto remained at all times exclusively in the custody and control of law enforcement as cooperating witnesses. The true facts were and still would have remained secret, but for Mazza's private revelation to a lawyer and an investigator and his insistence that they keep them secret and not attribute them to him. [Schoen Aff.; Dresch testimony at Exhibit 29; Exhibit 27]

Notwithstanding all of the media coverage cited by the USA and all other sources to which it points in support of its motion, the government's claim falls far short. The sources on which it relies establish nothing more than that there was a lot of coverage eventually of the corrupt relationship between Devecchio and Scarpa and the alleged coverup of the same by

14

Devecchio, Favo, and others and that crimes have been publicly attributed to that corrupt relationship.

It is worth noting that the exposure of the corrupt relationship in the media and other court cases noted by the USA did not exist until a significant time after Mr. Grancio's murder. In the immediate aftermath of the murder, when one reasonably might be expected to make the most intense investigative efforts to determine all of the circumstances, and for a long time afterwards, Defendants Favo were doing their all out best to conceal Scarpa's role as an informant and specifically his role as Nicky Grancio's killer (despite admitting that they knew it within days), going so far as to pay Scarpa for telling them someone else killed Grancio and later falsifying documents and lying to conceal Scarpa's informant status, even to the point of implying that Mazza or Delmasto was an informant, putting them at great risk during the "war." [L.R. 56.1 statement at pp. 4, 17, 19, etc.]

Nothing in its voluminous submission comes anywhere close to satisfying any relevant test for demonstrating sufficient knowledge to establish constructive knowledge that would have started the statute of limitations clock running on any of the dates suggested by the government. Indeed, without the facts uncovered by chance in an independent investigation into corruption in the Eastern District, among these agents, certain prosecutors, and others, first found (and kept secret) late in 2003 and first brought to Mrs. Grancio's attention late in 2004, Mrs. Grancio still would be without knowledge sufficient to have filed her administrative claim. Even today, there remain many facts exclusively within the defendants' knowledge and control which bear on the facts underlying this case and which require discovery.

The most any cognizable constructive knowledge test could even remotely be stretched in this case to arrive at the earliest possible date on which would be an argument for accrual of the claims could be made is that on January 8, 2004, when news of a hearing in the post-conviction case brought by Victor Orena was reported concerning an allegation that Mr. Grancio's killing was facilitated by an arrangement between Scarpa and Devecchio in which the latter would provide the former with the location of his desired targets/enemies, and specifically did so with

15

respect to Mr. Grancio and then called off surveillance to open Grancio up as a target. Mrs. Grancio did not actually learn about such a claim then; but if one buys into such a constructive knowledge theory, that would be the earliest date and this administrative claim was filed within two years of that date. It could not have been filed any earlier and the law would not and did not require any such filing earlier.

The USA's claim in this regard is ironic at best and far more troubling at worst in light of the clear and indisputable evidence of the Defendants' virtually unprecedented efforts at fraudulently concealing the information any reasonable person would have needed to bring such a case as this. Mrs. Grancio respectfully submits that based on arguments under the principle of equitable tolling, the discovery rule, and fraudulent concealment, there is no argument with even a scintilla of merit that could lead to a conclusion that her claim was filed out of time. [See L.R. 56.1 statement and exhibits referred to therein]

In any event, quite unlike one of the primary cases on which the government relies for its argument that Mrs. Grancio should be deemed to have known about her husband's death and its cause sufficiently to file her FTCA claim earlier, there is no evidence whatsoever that Mrs. Grancio had any actual knowledge of the cause of her husband's death and of the involvement of these defendants in that death until late in 2004.[9]

The USA tacitly acknowledges that there is no evidence that Mrs. Grancio had any actual knowledge of the theory of prosecution which supports her lawsuit, that is, that these law enforcement agents had any role in her husband's death; accordingly, the government argues in this section of its Memorandum at 8-25 that Mrs. Grancio's claim should be deemed to have accrued under the "diligence-discovery" rule in 1997, at the latest, based on statements made by parties and courts in other litigation [USA memo at 25] or, alternatively, by 1998, at the latest, based on widespread media coverage [USA memo at 21], all of which, the USA claims sufficiently gave rise to Mrs. Grancio's inquiry duty, such that her administrative claim, filed as

---

[9] Compare *Patterson v. United States,* 372 F.Supp. 2d 195, 201 (D. Mass. 2005).

it was on January 6, 2006, should be held to be time-barred.

The USA's claims in this regard may appear superficially to be less than frivolous simply by virtue of the amount of time that has, indeed, passed between the murder of Nicky Grancio and the filing of an administrative claim by his estate. However, in the specific context of this case, which is all that is relevant to the Court's inquiry, with all due respect, after any kind of meaningful case specific analysis, the USA's claim is demonstrably meritless.

The USA's argument acknowledges the appropriateness of applying the "diligence-discovery" to the usual two-year statute of limitations under the FTCA and clearly assumes the application of the same to the FTCA context; therefore, Mrs. Grancio will not burden the Court with any further discussion of those basic premises.[10]  Similarly, the USA's argument acknowledges the continuing viability of the relevant inquiry under the "diligence-discovery" rule as formulated in *Kronisch v. United States* 150 F.3d 112, 121 (2d Cir. 1998) in this context and therefore, Mrs. Grancio will respond based on that common premise.[11]

While it is undeniably true that there was widespread media coverage of the undeniably corrupt relationship between Gregory Scarpa, Sr. and defendant DeVecchio and even some media coverage, albeit to a far lesser extent, of the corrupt means employed by defendant Favo (and others) to cover up and conceal this corrupt relationship and its murderous results, there was absolutely nothing in a single media source cited by the USA which would have given Mrs. Grancio any cognizable basis for knowing or having reason to make inquiry concerning the

---

[10]  In other cases, the government has questioned the applicability of the "diligence-discovery" (or "due diligence-discovery" or "discovery rule") rule under the FTCA and Mrs. Grancio certainly was and remains prepared to discuss the same; however, this is a response to the USA's argument and we do not believe it serves any purpose, other than an academic one, to take up the Court's time with an argument not being made here.

[11]  Under *Kronisch*, 150 F.3d at 121, accrual is postponed until the plaintiff has "knowledge of, or knowledge that could lead to, the basic facts of the injury" which the Court in *Kronisch* explained meant "knowledge of the injury's existence and knowledge of its cause or of the person or entity that inflicted it…"  Under *Kronisch*, therefore, it is both the injury and causation that are the relevant factors.  Again, parties elsewhere have questioned the continuing viability of *Kronisch*; but the USA's argument here concedes its continuing viability so this response works from the premise.

role of these defendants directly and as alleged in her First Amended Complaint in her husband's murder. Indeed, the express accusations in the media of very specific conduct by these defendants with respect to other victims and the omission of any mention, by suggestion, or otherwise, that these defendants engaged in the conduct alleged in this case with respect to Mr. Grancio's murder provides further support for Mrs. Grancio's position that she did not know, could not have known, and cannot reasonably be deemed to have known or have had reason for inquiry as that standard has been developed under the law, sufficient to have brought her administrative claim any earlier than two years before she filed her administrative Notice of Claim in this case.

The USA argues in its memorandum that this Court should look to the body of law developed in the First Circuit surrounding the application of the "discovery rule" and related principles to the claims in this case to determine when Ms. Grancio's claims accrued. An analysis of all relevant principles under the First Circuit's standards leads conclusively to a finding that her claims were timely filed within two years of their accrual and the USA's motion to dismiss must be denied.

The decision in *Limone v. United States*, 336 F. Supp. 2d 18 (D. Mass. 2004) is instructive. There the plaintiff alleged that the defendants had wrongly secured a conviction many years earlier by lying and withholding exculpatory evidence. In *Limone*, the Court found that Greco, the plaintiff, had strong suspicions as early as 1968; but he had "no proof of what the FBI had actually done" and "he could not get the proof until 2000 because of the FBI's continuing malfeasance." Therefore, after a careful analysis, the Court found Greco's claims filed in 2002, to be timely. *Limone*, 336 F. Supp. 2d at 46. In *Limone*, the USA argued that Greco knew or should have known of the FBI's alleged subornation of perjury through a witness at the time of trial and conviction (his father's wrongful conviction) based on certain specific facts discussed in the decision. Greco argued, however, and the Court found, that such a position was "profoundly disingenuous", considering the government's active efforts in covering up and deceiving everyone with respect to its misconduct for so many years. *Id*.

18

The Court in *Limone* articulated the discovery rule in this context as follows: "A claim accrues once a 'plaintiff knows, or in the exercise of reasonable diligence should have known, the factual basis of the cause of action, including the fact of the injury and the injury's causal connection to the government.'" *Id.* at 47. "Whether a plaintiff, in the exercise of reasonable diligence, should have discovered the necessary facts is an objective inquiry." *Id.* "A claim does not accrue when a person has a mere hunch, hint, suspicion, or rumor of a claim, but such suspicions do give rise to a duty to inquire into the possible existence of a claim in the exercise of due diligence." *Id.*, *quoting Kronisch v. United States*, 150 F. 3d 112, 121 (2d Cir. 1998).

Significantly, the Court in *Limone*, referred to the decision in *Matter of Estate of Bennett v. F.B.I.*, 278 F. Supp. 2d 104 (D. Mass. 2003) in support of its conclusion that Greco's case did not accrue when the government alleged that it had.

In *Matter of Estate of Bennett*, the plaintiff had many more specific facts far earlier than Ms. Grancio had in the instant case, nevertheless, the *Bennett* Court found the claims to have been timely filed.  In *Bennett*, the plaintiff claimed damages for the decedent who was killed by an informant who had a corrupt relationship with his FBI handler.  The plaintiff's decedent was killed in 1967 by the informant.  The Court found that the plaintiff believed in the late 1960s that the informant had killed his father; indeed, the informant at issue had been indicted for that murder, but the charges were dropped.  *Limone*, 336 F. Supp. 2d at 47.  The *Bennett* Court specifically wrote, however, that "knowledge of the identity of the immediate tortfeasors did not then put the plaintiff . . . on notice that the FBI might have some responsibility for [the] death. After all, the FBI is generally thought to be concerned with **law enforcement** and not an outlaw itself."  See *Limone*, 336 F. Supp. 2d at 47, *quoting from*, *Bennett*, 278 F. Supp. 2d at 104.

The First Circuit specifically held in *McIntyre v. United States*, 367 F. 3d 18, 54-57 (1st Cir. 2004), also a case with far more specific facts than are present here (including "numerous news reports and a court hearing" describing the informant's involvement in the plaintiff's decedent's murder") that the statute of limitations was tolled as to McIntyre's estate "because even a reasonable inquiry based (the known facts) would have been thwarted by the FBI's

19

unwillingness to release information." See *Limone*, 336 F. Supp. 2d at 47, *citing McIntyre*, 367 F.3d at 54-57.

The Court further specifically noted that while Greco may have believed in his father's innocence at the time of the trial in the 1960s and further may have believed that the government's witness Barbosa committed perjury in securing Greco's father's conviction and, may even have suspected, based on the express defense articulated in the case, that the FBI had its hand in the perjury; however, this was not enough, because, as the Court found in *Limone*, Greco could not have known that the FBI was enabling, encouraging, and covering up the perjury. Indeed, as here, the FBI's involvement in the matter was "inherently unknowable even incapable of detection by the wronged party through the exercise of reasonable diligence." *Limone*, 336 F. Supp. 2d at 48.[12]

The Court in *Limone* further explained and found applicable two related principles which Ms. Grancio asserts and relies upon here. The Court explained that the doctrine of equitable tolling "suspends the running of the statute of limitations if a plaintiff, in the exercise of reasonable diligence, could not have discovered information essential to the suit." *Limone*, 336 F. Supp. 2d at 48.

The Court then explained the similar doctrine of "fraudulent concealment," also asserted by Ms. Grancio here, which "tolls the statute of limitations 'where a plaintiff has been injured by fraud and remains in ignorance of it without any fault or want of diligence or care on (her) part.'" Such a defense applies where two conditions, clearly present in the instant case, exist. These two conditions require that the defendant who raises the limitations defense must have engaged in fraud or deliberate concealment of material facts related to the wrongdoing and the plaintiff must have failed to discover these facts within the normal limitations period despite his or her exercise

---

[12] Interestingly, the *Limone* Court's decision was bolstered by the holding in *Attallah v. United States*, 955 F. 2d 776, 780 (1st Cir. 1992) in which the Court applied the discovery rule where the government agents whose conduct was at issue were not indicted for the underlying crime for several years after the underlying conduct because even the police did not have sufficient information to bring charges earlier. In the instant case of course, the Kings County District Attorneys Office was only able to bring criminal charges against DeVecchio within the last year for similar reasons.

of due diligence. *Id.* As it was with Greco in *Limone*, so it is with Ms. Grancio here, and both principles, equitable tolling and fraudulent concealment, fully support and, indeed require, a finding that she timely filed her lawsuit in this case.[13]

The decision in *Bennett* is perhaps even more compelling, based on the similarity of underlying facts. In *Bennett*, the plaintiff knew without question that the decedent had been killed by the government informant; however, as the Court found, the FBI's continuing efforts to conceal the informant's status as an informant and the fact that it allowed the informant to continue committing crimes while acting as an informant made a "strong case that the FBI's involvement was 'inherently unknowable' and 'incapable of detection by the wronged party through the exercise of reasonable diligence.'" *Bennett*, 278 F. Supp. 2d 104, 111 (D. Mass. 2003). The government argued in *Bennett* that there were sufficient facts since the late 1960s for representative of the estate to have discovered all necessary facts to lead them to suspect that the officially sanctioned relationship between the FBI and the murderer caused the decedent's death.

There, as here, the government claimed that extensive media reports (with more specific facts linking this specific murder to the corrupt relationship) should have led, through the exercise of "reasonable diligence" to the bringing of the claims earlier than they were brought. The *Bennett* Court thoroughly considered the government's argument in this regard and rejected them for factors which apply here as well. *See Bennett*, 278 F. Supp. 2d at 114-117. *See also, Donahue v. FBI*, 204 F. Supp. 2d 169, 177-178 (D. Mass. 2002). (Holding that media reports in the case were not sufficient to have triggered the statute of limitations and denying the motion to dismiss).

---

[13] Mrs. Grancio has set out in her L.R. 56.1 statement some of the actions and omissions that require the application of equitable tolling and fraudulent concealment principles in this case. [See e.g. pp. 17, 19, 20, 21, 22, 23, 24, 25, 26]. The record of concealment and falsification as told in Favo's own admissions [Exhibits 1-3] and in the various other 302s attached to these pleadings as exhibits shows unequivocally a gross pattern of fraudulent concealment designed to keep the true facts from being exposed. Even today, as reflected in the Schoen Affirmation, Larry Mazza has reported to Congress efforts at intimidating him engaged in by people who he has named and who presented themselves to him as representatives of Mr. Devecchio's defense team, on one occasion tellingly opening a jacket to show a gun, coming on his workplace, etc., all perceived to be designed to secure certain testimony favorable to Devecchio and divorced from the truth.

Finally, as to *Bennett*, the Court there noted, as is the case in the instant case, that at the very time the case was being considered, Congress continued its investigation into the underlying misconduct by the FBI and other government officials. *Bennett*, 278 F. Supp. 2d at 112.

The media reports in the instant case, no matter how extensive and widespread, cannot support the government's accrual argument because they simply do not include any facts from which a reasonable plaintiff could conclude, or even have sufficient basis for inquiry about the underlying facts of this case which link the government to Mr. Grancio's murder and which only reasonably should have been discovered or could have been discovered in 2004 and which only were discovered by Ms. Grancio in late 2004.

These facts, as alleged in her First Amended Complaint, are specifically that Scarpa saw law enforcement surveillance on his target, Nicky Grancio, then he called DeVecchio, his FBI handler, demanded that the surveillance be lifted, achieved that result through DeVecchio's actions and from Favo's radio call, and then (and only then, was able to move in and kill Grancio with impunity. These are the operative and necessary facts to link the government to the murder and they simply were not reflected in any media report to which the USA refers.

Courts routinely have rejected such a claim as the government makes here on much more specific media reports which far more specifically draw the causal link. *See McIntyre v. United States*, 367 F. 3d 38, 52-57 (1ˢᵗ Cir. 2004) (reversing the dismissal of *McIntyre's* claims on timeliness grounds and noting the error of relying on media reports which provide general facts about corrupt relationship, even where plaintiff's decedent was quoted in articles). *See also, Davis v. United States*, 340 F. Supp. 2d 79 (D. Mass. 2004) (denying government's motion to dismiss).

The cases relied upon by the USA for its claim that Mrs. Grancio's administrative claim is time-barred are readily distinguishable and do not advance the USA's argument on the facts of the instant case.

The USA relies on the First Circuit's decision in *Patterson v. United States*, 451 F.3d 268 (1ˢᵗ Cir. 2006), for example. In *Patterson*, two FBI informants killed Deegan in 1965 and the

22

local FBI office knew about the murder plan in advance and did nothing to try to prevent the murder or to prevent the wrongful conviction of two others for the murder.

In 2000, there was widespread publicity, not just about the corrupt relationship between that FBI office and its informants and the resulting crimes, but specifically revealing that the FBI knew about Deegan's murder plan ahead of time and the wrongful prosecution/conviction of the two others and did nothing to prevent either. This media coverage served as a catalyst for Congressional and judicial action which, in early 2001, led a judge to vacate the wrongfully procured convictions. In sharp contrast to the instant case, the exact facts specific to the issue that later served as the basis for the administrative claim and the FBI's role in that specific incident - in detail - were exposed in both the media coverage and the related court case which vacated the wrongful conviction. By January 18, 2001, at the latest, there was widespread media coverage and judicial findings establishing the wrongful/actionable conduct, beyond any dispute.

In the instant case, again, while there was widespread media coverage about the corrupt relationship between Devecchio and Scarpa, the cover-up efforts of Devecchio, Favo, and others, none of that reasonably could be deemed to give rise to any inquiry duty, let alone obligation to bring suit for Mrs. Grancio against these Defendants for her husband's death. By any objective measure, a person so situated could not file suit based on some general suspicion that because of what was reported in general, her husband also must somehow have been killed through this corrupt relationship. Any such case would have been dismissed out of hand, with sanctions likely.[14]

Nothing in the media coverage or court actions relied upon by the Defendants here has **ever** even raised the suggestion of the facts on which this lawsuit and theory of prosecution are based. The facts alleged here, taken as true for these purposes, are that Devecchio actively

---

[14] As it is, counsel for Defendant Devecchio already promised to seek sanctions against me in this case for bringing an action on a theory which he said (erroneously) Judge Weinstein had already "ruled on" (referring to the *Orena* Rule 60(b) proceeding and with the knowledge (again erroneously) that Mazza would say the facts attributed to him never happened. He repeats this threat in his motion papers, saving it for another day.

called off surveillance, at Scarpa's insistence (through Favo), knowing Grancio to be a primary target and that Scarpa was a killer who intended on killing Grancio (and others) and so forth. Until this claim was raised in a hearing on January 7, 2004, with some media coverage afterwards, this claim had never been raised anywhere, for the facts simply were not publicly known and Mrs, Grancio had no way to know them.[15]

In the absence of specific media reports even suggesting the facts on which these claims are based, there is no constructive knowledge establishing an accrual of the claim and there is no evidence that any inquiry could have been directed or could have uncovered the relevant facts. The government cannot rely, as it must, on the notion that one must, as a matter of law, assume that every murder with which Scarpa was involved was on done with the assistance of law enforcement and there is no such duty to assume. Even that would not be enough here; for a Plaintiff has to have a specific theory for any claim and without the same any claim would be subject to immediate dismissal.

Generalities about the corrupt relationship between Devecchio and Scarpa and even allusions to specific examples of how that corrupt relationship manifested itself, making no mention of Grancio and how it was causally connected to his murder, did not give Mrs. Grancio the standing to sue.

Mrs. Grancio filed her administrative claim, of course, within 2 years of January 7, 2004.

*Patterson* is even further distinguishable. The initial FTCA claim filed in the case, by a relative not qualified to file, was filed more than 2 years after the convictions were vacated - a date by which there no longer could have been any real question about the underlying actionable facts. Then, almost a year later, a new claim was filed by a qualified representative. *Patterson*, 451 F.3d at 269. However, it was undisputed that both the unqualified relative (quoted in some

---

[15] Even if somehow some so far unstated fact could be found to have given rise to some inquiry duty earlier, Mazza, the only one apparently willing (then unwilling, then willing again, etc.) to reveal the true facts was incarcerated until around 2002 (upon information and belief) and was in the WitSec program. Moreover, he has said that he would not have helped the Grancio family in any event because he believed Nicky Grancio wanted to kill him at some point. There would have been no reasonable way for Mrs. Grancio to satisfy any relevant inquiry even if she had such a duty. [Schoen Aff.]

of the earlier news coverage, *Id.* at 273) and the qualified representative (*Id.* at 272) both had actual knowledge of the relevant actionable facts in the case more than two years before their respective filings.  In short, the case is fully distinguishable from Mrs. Grancio's case on virtually every factor that is relevant under "discovery rule" jurisprudence.

The other case on which the government primarily relies in connection with this argument is *Rakes v. United States*, 442 F.3d 7 (1st Cir. 2006). [USA Memo at 10-13] *Rakes* does, indeed, have some general language that would appear to be helpful to the USA here; however, when the facts are closely examined and when the instant case is compared and then analyzed on the kind of "case-specific" facts that must be examined for, as the *Rakes* Court noted, it all will depend on the very much on the circumstances of each case.  *Rakes*, 442 F.3d at 21.

The immediately apparent material difference between *Rakes* and the instant case is *Rakes* was brought by two living plaintiffs who themselves had been the victims of the underlying conduct in 1984, some 17 years before they filed their FTCA Notice of Claim.  The case again arises from the corrupt relationship between the FBI and its informants in Boston; but in *Rakes* it was an informant's extortion of the plaintiffs in 1984 with the assistance or through the emboldening actions of an FBI agent, with his involvement coming after they already had begun the extortion that was at issue.

When first approached with the extortion scheme by the informants who were local thugs seeking to take over the plaintiffs' business by force, the plaintiffs sought help from a law enforcement friend.  That friend turned to a friend of his on the local FBI team and this agent turned out to be rotten and tied in with the same thugs who were extorting the plaintiffs.  He, of course, told the informants that the plaintiffs had complained.  A key distinguishing factor arose immediately.  For, as the Court easily found, the would be plaintiffs had notice that the thugs had law enforcement behind them from the very start - when the thugs returned and told them to have their policeman friend "back off."  *Rakes*, 442 F.3d at 21-22.

In distinguishing *Rakes* from its earlier decision in *McIntyre*, the Court in *Rakes* noted that in *Rakes* it would have been immediately apparent to a reasonable inquiring plaintiff that the

bad FBI agent was one of only two or three people who could have tipped off the informants that they had sought help. *Rakes*, 442 F.3d at 22, n.11. The case is fully distinguishable on its facts from the instant case.

There is an aspect of *Rakes* that perhaps should be examined more closely. The question the Court asked in *Rakes* was what the would-be plaintiff should have known and when. *See e.g. Rakes*, 442 F.3d at 20. In *Rakes*, in addition to media coverage of the relevant events, there were judicial proceedings that, far more than in the instant case, exposed the specific facts on which the plaintiffs' theories were based.[16]

For example, in *Bennett*, one of the crooked FBI agents, Connolly, was himself indicted along with the informants and the same was reported widely in the media in 2000. *Bennett*, 429 F. Supp. 2d at 275, 279. The claim was presented in 2003.[17]

In contrast, in the instant case, notwithstanding the widespread media coverage of allegations concerning Devecchio and, to a lesser extent, Favo, which describe clear instances of illegal conduct by any possible objective measure, until just last year, there was no action at all taken against either which would in any way indicate to the public that there was any solid evidence to support the very serious allegations that had been the subject of the newspaper articles. Indeed, notwithstanding the public accusations of complicity or worse with multiple murders and other crimes, his lawyers and supporters, themselves former respected FBI officials, have trumpeted his complete innocence and the inconceivability that there is any truth to any of the allegations and he was permitted, after a full formal investigation (which his lawyer publicly has announced "cleared" him entirely) to retire with a pension a and without sanction. Any

---

[16] *See also Bennett v. United States*, 429 F. Supp. 2d 270 (D. Mass. 2006), a case not cited by the USA. The Court in *Bennett* asked the same question and focused on the fact that one of the crooked FBI agents whose conduct was most directly at issue, had been indicted, along with the informants, for the very sort of thing at issue in the civil case and this was widely reported in the media in 2003, while the claim was not filed until 2003. This case should not be confused with *Matter of Estate of Bennett v. FBI*, 278 F. Supp. 2d 104 (D. Mass. 2003) discussed above.

[17] In *Rakes*, the claimant had had an earlier perjury trial to which the whole underlying extortion theme was central. *Rakes*, 442 F.3d at 15-16.

reasonable observer who believes in the system and in law enforcement's intended role would never believe that she should inquire as to whether such a person, who had been thoroughly investigated by the professionals charged with making such investigations, actually was directly involved in the murder of her husband. Such a suggestion is, with all due respect, absurd.

The decision in *Bennett* is further distinguishable. The decedent in that case was killed in 1967 and the claim was filed in 2003. One of the decedent's beneficiaries was consulted for and quoted in a newspaper article published about the incident in 2000. *Bennett*, 429 F. Supp. 2d at 275. This was found to be a critically important fact. *Id*. at 278-279. Ultimately, the Court found the direct knowledge of Susan Bennett, a beneficiary, as reflected in media reports, should reasonably have led her to the appropriate inquiry such as to give rise to the accrual of the claim more than two years before the claim was filed.

There is one additional aspect of both decisions that is worth noting here. The Court in *Bennett*, 429 F. Supp. 2d at 276, n.6 refers to the *Rakes* decision and remarks that the First Circuit in *Rakes* directed that in considering the "discovery rule" for accrual purposes, a court will "charge the plaintiffs with the knowledge **the government** reasonably ought to have expected them to have." [Emphasis by the *Bennett* Court].

The district judge writes in *Bennett* that he did not understand this to be a new formulation of the rule; but it is significant for Mrs. Grancio's case. As noted above and in the supporting papers, the government, with respect to her husband, has "cleared" Devecchio, at least until his indictment last year and even until now as to the incident underlying this lawsuit. Similarly, it has fought this claim as untrue in Victor Orena's Rule 60(b) proceeding. The government surely should not be heard, on this record, to say now that Mrs. Grancio or anyone else reasonably should be charged with knowing what it denies to be the truth; nor, given its purportedly full inquiry and thorough investigation, should it be heard to complain that she did not make her due diligence inquiry early enough.

The facts are clear that if she had made as full and inquiry the government claims she should have made, she still would not and could not reasonably have learned the facts on which

her lawsuit is based any time earlier than when these allegations first surfaced on January 7 or 8 of 2004 and actually came to her attention late in 2004 when Dr. Dresch told her what he had learned from Mazza.

On other reason that the USA's motion should be denied is that ultimately it raises a fact question and the same should not be decided on a motion to dismiss without any opportunity for discovery or to develop the record both as to what was known and as to what was fraudulently concealed, and how, as well as all other facts to factor into the equitable tolling analysis. As the Court wrote in *Guccione v. United States*, 670 F. Supp. 527, 536 (SDNY 1987), "[w]hether the exceptional diligence-discovery rule of accrual for an FTCA claim is a factual question." Additionally, "[t]he question whether ... [plaintiff] ... exercised due diligence to discover [critical facts] are ordinarily matters for the finder of fact to determine at trial." *Id.* at 537. *See also Orlikow v. United States*, 682 F. Supp. 77, 86 (D. D.C. 1998). The motions should be denied for this reason as well.

It would be difficult to imagine a case more appropriate than this for the application of the doctrines of equitable tolling and fraudulent concealment, given the years of actions, not just by these defendants, but by virtually every government official who touched this case for years, including other agents, prosecutors, judges, and those charged with investigating the matter for the government.

## THE INDIVIDUAL DEFENDANTS' MOTIONS ARE DUE TO BE DENIED

Defendants Devecchio and Favo have filed motions to dismiss under F.R.C.P. Rule 12(b)(6) or for summary judgment under Rule 56 with respect to Mrs. Grancio's *Bivens* claims set forth in the First Amended Complaint ("FAC").

### Applicable Standards for Consideration of the Motions

In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted, this Court must accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party. *In re Tamoxifen Citrate Antitrust Litig.*, 429 F.3d 370, 384 (2d Cir. 2005), *amended by* 466 F.3d

28

187, 200 (2d Cir. 2006).  The Court's inquiry and analysis is limited to the facts as asserted

within the four corners of the complaint (here the First Amended Complaint) and any documents

incorporated in the complaint by reference. *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 776 (2d

Cir. 2002).

The Federal Rules of Civil Procedure require that a pleading contain "a short and plain

statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

Under this simplified standard for pleading, this Court may dismiss a complaint only if it is clear

that no relief could be granted under any set of facts that could be proved consistent with the

allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Tamoxifen*, 429 F.3d at 384

(quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)

(quotation marks, citation, and alteration omitted)). The Court must construe the complaint

liberally to determine whether the plaintiff could prove no set of facts that would entitle her to

relief on her claims.  *See generally Jaghory v. N.Y. State Dep't of Educ.*, 131 F.3d 326, 329 (2d

Cir. 1997).

Similarly, when considering a question of qualified immunity in the context of a motion

for summary judgment, the Court must, of course, "view the facts and draw reasonable

inferences 'in the light most favorable to the party opposing the [summary judgment] motion"

and where, as here, qualified immunity has been claimed, "this usually means adopting ... the

plaintiff's version of the facts." *Scott v. Harris*, – U.S. –, 127 S. Ct. 1769; 2007 U.S. LEXIS

4748, *9-*11 (April 30, 2007).

**Preliminary Observations**

At the outset, a few preliminary observations about the individual Defendants' arguments

must be made:

1.  Both Defendants seek to isolate Mrs. Grancio's allegations, as if in a vacuum, and in doing so,

both miscast and minimize them to set up straw man arguments, asking the Court to follow them

in missing the "forest for the trees." *Limone*, 271 F.Supp. 2d at 365-66; *Davis*, 34o F. Supp. 2d

at 86-87. *See also*, *Liuzzo v. United States*, 508 F. Supp. 923 (E.D. Mich. 1981)(refusing to

adopt the government's formulation of the relevant facts and legal theories that "piecemeal(ed)" a factually complicated theory of multiple instances of misconduct by the FBI).

2.  In their attempts to draw the Court's attention away from the outrageous, indeed, tragically historic and monumental governmental misconduct that occurred in this case and in so many other instances involving these agents and others, documented in the exhibits attached to these papers and, as the government has pointed out, documented widely in the media, the Defendants ignore (and therefore implicitly ask the Court to ignore) reported cases from strikingly similar parallel conduct in Boston that provide detailed and thoughtful discussions of many of the exact same issues raised in this case and it is not for a lack of citation to authority from other jurisdictions or a lack of familiarity with the cases.[18]  *See e.g., Davis v. United States*, 340 F. Supp. 2d 79 (D. Mass. 2004); *Limone v. United States*, 271 F. Supp. 2d 345 (D. Mass. 2003), *aff'd by Limone v. Condon*, 372 F. 3d 39 (1st Cir. 2004); *McIntyre v. United States*, 336 F. Supp. 2d 87 (D. Mass. 2004).  Those cases truly are instructive on the issues presented in this case and it is inexcusable that a brief purporting to address these issues would omit even a reference to them.

3.  Devecchio's brief, however, is singularly extraordinary for a variety of reasons; but the leading reason is what one might call its "Chutzpah" factor.  Here is a defendant who is presented as Peck's Bad Boy in the most current version of the FBI's Guidelines on dealing with confidential informants - a case study in just how drastically wrong one's conduct can go, [Exhibit 14], whose outrageous misconduct, directly responsible for the death of many people through a corrupt relationship with a ruthless killer, now the subject of a criminal indictment returned by a grand jury in Brooklyn charging him with 4 murders, and an ongoing investigation by the United States Congress, who asks for a stay in this case because of his purported concern still today about being indicted for the crime of murder of Nicholas Grancio that is the subject of

---

[18]  Indeed, in the government's brief on the statute of limitations issue, it suggests that the Court should use a standard for constructive knowledge adopted in some of the Boston cases dealing with the outrageous misconduct that has been the subject there of so much litigation. [USA memo at 10-13]  It is not possible that the individual defendants simply missed the Boston cases when it came to analyzing the substantive issues.

this lawsuit, and on and on, and on, purportedly with a straight face asking this Court to find him entitled to the defense of qualified immunity with respect to the actions alleged regarding his direct role in Mr. Grancio's murder and in so many others.

But, like the Ginzu knife, "that's not all."  Knowing that an officer of this Court is prepared to testify under oath that Larry Mazza told her the exact rendition of the facts that serve as the basis for this Complaint, that Dr. Stephen Dresch, now deceased, but then working to investigate and report back to a Congressional Committee on these facts testified to the same, and finally knowing that the eyewitness, Larry Mazza, who told them both these facts and then balked when subpoenaed to testify, as he warned he would, out of fear, has recently complained to Congress about being intimidated by "investigators" purportedly working for Devecchio with visits to his job, etc. to attempt to influence his testimony and who, as a result has asked for a new identity and relocation - knowing all of this - Devecchio threatens Rule 11 sanctions, as he has orally, for filing this Complaint. [Devecchio Memorandum of Law at 2-3, n.3].

**The Defendants' Motions Are Premature and Must Be Denied**

The Defendants' motions are premature on this record with no opportunity for any discovery yet.  Because of the nature of the claims and the fact that the relevant operative facts and underlying documents critical to so many issues in this case are exclusively within control of the Defendants and/or are within the control of others and because we need the ability to compel the production of such documents and to compel relevant testimony from the Defendants and others in order to fully develop all relevant facts, the Defendants' motions should be denied, with, perhaps, leave to renew them after a full opportunity to develop the record. *Limone v. United States*, 271 F. Supp. 2d 345, 348-349 (D. Mass. 2003)("At this early point in the litigation, prior to discovery and presentation of proof, the plaintiffs' allegations are presumed to be true.  The case can be dismissed only if the claims are in some way legally deficient."); *affirmed*, 372 F.3d 39 (1st Cir. 2004); *Davis v. United States*, 340 F. Supp. 2d 79, 93 (D. Mass. 2004)(too early in the litigation to parse claims and determine Defendants' conduct vis a vis duty to control informants); *McIntyre v. United States*, 336 F. Supp. 2d 87, 100, n.8 (D. Mass.

2004)(Factual controversies often make deciding issues of qualified immunity impossible at the early stage of a case); *See also Talbert v. Smith*, 2006 U.S. Dist. LEXIS 44366 (W.D. VA June 29, 2006); *Demarco v. Sadiker*, 199 U.S. App. LEXIS 29677 (2d Cir. November 8, 1999); *Castro v. United States*, 34 F.3d 106 (2d Cir. 1994); *DeMartino v. Zenk*, 2006 U.S. Dist. LEXIS 33454 (EDNY May 25, 2006); ; *Kirk v. Metropolitan Transit Auth.*, 2001 U.S. Dist. LEXIS 2786, *49-*54 (SDNY March 19, 2001)(granting leave to amend complaint based on facts learned in discovery related to original claims);F.R.C.P. 56(f).

Examples that illustrate why it is inappropriate to consider summary judgment or a qualified immunity defense without discovery in this case abound. The matter is highlighted perhaps most clearly with respect to the allegations against Defendant Favo. The First Amended Complaint charges that Favo had a direct role in Mr. Grancio's murder on a couple of theories and, of course, for purposes of these motions, all facts alleged in the Complaint must be taken in the light most favorable to Mrs. Grancio and she is entitled as a matter of law to have all reasonable inferences drawn in her favor.

First, when Scarpa called Devecchio and told him that he needed the surveillance pulled off of Grancio so that he could kill him without having law enforcement officers present, it is alleged that Devecchio directed Favo to call the surveillance team and remove them. [FAC ¶22] On these allegations, Favo is a direct participant in Scarpa/Devecchio's plan and furthers the murderous scheme. Favo has filed an affidavit denying that Devecchio told him to remove the surveillance (he says he called in the surveillance team for a meeting on his own) and that he did not know Grancio was a target, etc. Now, on the one hand, at this stage, the Court must take as true the allegation that Scarpa called Devecchio for this purpose, that Devecchio knew this and that Devecchio directed Favo as alleged and that Favo knew what that Grancio was a target. However, Favo's affidavit deals with these issues and he presents his version as an undisputed material fact. Mrs. Grancio must be permitted discovery on such threshold issues about what Favo knew or suspected about Scarpa and his involvement with murders at the time and before, about Scarpa's relationship with Devecchio before and at the time (we know from Favo's own

reports that at times he provided Devecchio with information on Scarpa's loan shark victims, Scarpa's enemies, etc.) [Exhibits 1, 2, 3], and about Grancio.[19]  We can only learn these things through basic discovery of documents exclusively within Defendants' control and testimony.

Similarly, on a second theory, it is alleged that Favo is responsible for Grancio's death because he knew Scarpa's propensities as a killer, he knew about and fostered actively and passively (and despite knowing he had a legal obligation to do otherwise) Scarpa's license to commit violent crimes with impunity from his relationship with the FBI, and because he knew Grancio was an imminent target of Scarpa and his "faction." [e.g., FAC ¶¶21,22]  Again, for this allegation we must have an opportunity for discovery.  Mrs. Grancio should not have to meet Mr. Favo's bare assertion of facts in his allegation with no opportunity for discovery.  At a minimum, she is entitled to discovery to give rise to an inference, say, arising from Favo's pattern of conduct vis a vis Devecchio and Scarpa earlier.  Through discovery, she may well show how Favo's constitutional duties in this situation, based on his knowledge of and relationship with (as Case Agent) with Scarpa and Grancio, were clearly established under *DeShaney* well before *Dwares* (i.e. more direct and active action/inaction with different level of knowledge).

While it is true that Defendant Favo was one of the agents who eventually turned in Devecchio, so to speak, **eventually** is the operative word (and his motivation - perhaps only done because he knew Carmine Sessa would expose it - is in question).  The things he did and did not do, despite knowing he had a duty to do or not do them, for a very long time after he indisputably knew Scarpa was a CI in his Group's control who was actually murdering people with help from information he was getting from the FBI and was carrying on his criminal enterprise (of which Devecchio perhaps already had become a *de facto* member) - make it absolutely astonishing that

_____

[19]  On this last point we do have in the record an affidavit from one of the surveillance officers, Detective Simone who Favo called, and Simone told him that he must not be taken off of surveillance and that Grancio was a target. [Exhibit 25]  We also have the testimony from Detective Higgins, a member of Favo's team, who clearly knew Grancio was an imminent target and had tried to warn Grancio of the same the previous day [Exhibit 20] (and we know from Favo that, as Case Agent, he (Favo) got all reports from all members of the Group every day, Exhibits 1, 2, 3).

he has been allowed to remain an FBI agent - and these are just the undisputed facts. We have a lot more to find out about this, especially in light of the revelation just last year about 4 more murders attributed to Devecchio. It is undisputed that Favo did some outrageous things with respect to the same for a significant period of time after Mr. Grancio's murder, including the things already mentioned, lying about whether probable cause for Scarpa's arrest existed (and thereby allowing him to remain free long after he indisputably knew Scarpa was killing a lot of people), falsifying documents and lying to draw attention away from Scarpa and in doing so knowingly endangering others by implying they were informants instead.

This certainly gives rise to the right to a need/duty to make full and thorough inquiry through discovery of what Favo knew, did, and did not do before Mr. Grancio's murder. Mrs. Grancio's ability to respond to a motion to dismiss or for summary judgment on complicated facts, reflected in often detailed and revealing documents within the Defendants' exclusive control, simply based on the few scraps of documents and bits of information her lawyer can obtain through an investigation without subpoena power or other means of compulsion.

The Defendants, however, would have this Court decide these fact intensive issues without access to the facts and this is not fair nor permitted under this Circuit's jurisprudence. *Limone, Supra.*; *Davis, Supra.*

Rule 56(f) of the Federal Rules of Civil Procedure provides protection for the non-moving party in just such a situation, expressly to avoid the unfair result of having summary judgment adjudicated at the outset of a case without the opportunity for discovery, especially in a fact intensive case like this. Pursuant to Rule 56(f), the undersigned has provided an explanation in his Affirmation at ¶¶20-21 of some of the reasons he cannot adequately respond to motions for summary judgment at this early stage of the case without any opportunity for discovery and some of the kinds of discovery that are required before this Court fairly can consider motions for summary judgment and the Affirmation explains some of the reasons that, notwithstanding or due diligence, such opposing affidavits, documents, and testimony is not available without formal discovery tools.

"The purpose of subdivision (f) is to provide an additional safeguard against an improvident or premature grant of summary judgment..." and it should be applied with a "spirit of liberality." Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d §2740. The instant case, at this juncture, and for the reasons set out in the Schoen Affirmation incorporated in this Memorandum, is the exact sort of case in which Rule 56(f) is intended to act as such a safeguard, notwithstanding the competing interests in adjudicating such issues as qualified immunity at an early stage. In a fact-intensive case like this, in which almost all of the relevant information is exclusively within the defendants control, and already has been concealed to a large degree, motions for summary judgment must be denied until a full opportunity for discovery has been provided.

**The Defendants' Claim That There Was No Clearly Established Constitutional Rights Violation Here is Completely Unsupportable, Even at This Premature Stage**

Defendants Devecchio and Favo argue that they are entitled to qualified immunity, which shields government officials "from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional [**56] rights of which a reasonable person would have known.'" Hope v. Pelzer, 536 U.S. 730, 739, 153 L. Ed. 2d 666, 122 S. Ct. 2508 (2002). Here, the defendants argue their actions should be immunized because the rights at issue here which Mrs. Grancio claims were violated have only at some time after this incident in 1992 recently been recognized and since they were not recognized in 1992, they were not "clearly established" in 1992 and are not actionable, leaving these defendants shielded from liability by , the qualified immunity. Here, as in 271 F. Supp. 2d 345, 366 (D. Mass. 2003), the defendants' argument draws the issue much too narrowly.

The allegations in this lawsuit are *inter alia*, that the Defendants gave license to an informant to kill, provided him the information he needed to get away with it, actively, directly, with reckless disregard for and deliberate indifference to the sanctity of life participated in the murder of Nicholas Grancio, and then covered it up, as well as their relationship with Scarpa for many years. As the Court wrote in *Limone*, 271 F. Supp. 2d 345, 366, it is, in a word,

35

"ridiculous" to even suggest that in1992, any law enforcement officer or any other reasonable person somehow would think it was permissible to assist in or facilitate a murder or give license to kill with impunity, or leak confidential information to a killer, or cover-up the same, all while knowing that the killer was so operating and that the victim was a known and immediate target. The clearly established right to be free from being so murdered through the help of law enforcement officers has been established since the time of the Ten Commandments and certainly was by 1992.

Judge Gertner's words in *Limone* in response to a claim that the officers at issue withheld evidence or framed someone for a crime, apply with even greater force on the outrageous facts presented here: "It is, in a word, ridiculous to suggest that, at any time in this nation's [*366] history, a reasonable law enforcement officer would have thought it permissible to" commit the acts alleged in this case - all of which must be taken as true.   As in *Limone*, the allegations here are much broader than Defendants would have it.

Moreover, this case is not just about events in 1992 but the conduct that preceded it, which cemented the Devecchio relationship and gave Scarpa license and let him know it and it is about the continuing efforts, in ensuing years, to cover up the wrongs and the governmental link to it.  There certainly is no way to grant a motion to dismiss or for summary judgment based on qualified immunity on this record without discovery. *See Limone*, 271 F. Supp. 2d at 366.

The Defendants' motions must be denied as premature.  However, it is undeniably clear that at a minimum, under the applicable standards at this stage, the motions must also be denied for the clear presence of at least one constitutionally viable theory for recovery - the 5th Amendment Substantive Due Process claim.[20]

---

[20]  We are familiar with the principle of constitutional rights analysis which provides that "where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process must be the guide for analyzing these claims," *Albright v. Oliver*, 510 U.S. 266, 273 (1994). Mrs. Grancio wants to be clear, therefore, that in demonstrating why the substantive due process claim clearly applies, she does not in any way waive her claims to violations of other specific constitutional provisions and she reserves her right to argue in favor of such violations as well.  Moreover, it is nothing short of absurd for any defendant to claim for even a moment that the concept of qualified immunity - an inquiry into

36

**Defendants' Actions Violated Plaintiff's 5th Amendment Substantive Due Process Rights**

The allegations in the First Amended Complaint, which must be taken as true (with all reasonable inferences flowing therefrom drawn in Mrs. Grancio's favor) clearly establish these Defendants' direct involvement in the murder of Nicholas Grancio in concert with Scarpa their informant and, demonstrate unequivocally a violation of the by then clearly established right to be free from cold-blooded murder at the hands of law enforcement and its informant.  In the words of the First Circuit in *Limone*, 372 F.3d at 44, "This is easy pickings."

Mrs. Grancio relies on and directs the Court's attention to the analysis of the substantive due process rights claim in *McIntyre*, 336 F. Supp. 2d at 107-127 as the plaintiff therein's claims related to FBI Agent Connolly and the 1984 murder at issue, both with respect the explication of the constitutional right and qualified immunity and to the Court's conclusions on the matter.[21] The language and conclusions of the *McIntyre* Court on this issue apply with even greater force here, given the more directly involved conduct of these Defendants as alleged and the even further establishment of the law by 1992.

Because Judge Lindsay in *McIntyre*, 336 F. Supp. 2d at 122-126 articulated the issue and its resolution far better than I ever could, I quote at length here from his opinion.  The findings he made there, even on this undeveloped record, apply with even greater force in Mrs. Grancio's case.

The following is the relevant excerpt from the *McIntyre* decision which Mrs. Grancio adopts as argument:

The *Fifth Amendment* explicitly states that the government may not deprive a citizen of life without due process of law. Indeed, "one of the less controversial **[\*123]** aspects of the *due process clause* is its implicit prohibition against a public officer's intentionally killing **[\*\*88]** a person, or seriously impairing the person's health, without any justification." *K.H. ex rel Murphy*

what a reasonable person should have understood about his constitutionally valid duties at any given point in time - should have any application to the scenario alleged in the First Amended complaint - direct involvement and participation in a citizen's murder.

<sup>21</sup>  Mrs. Grancio, after discovery, would distinguish the Fourth Amendment claim she raises from the Fourth Amendment claim in *McIntyre*, 336 F. Supp. 2d at 101-105 and she will argue at the appropriate time why her claim under the Fourth Amendment is constitutionally valid.

*v. Morgan, 914 F.2d 846, 848 (7th Cir. 1990); see also Souza, 53 F.3d at 426* ("There is a constitutional right not to be deprived of life without due process of law. Thus, a state actor cannot murder a citizen."). n34 The cases discussed in the preceding section of this memorandum and order establish that this right may be implicated even where the murder is physically carried out by a private actor.

n34 As I explained in Part III.D.2.b, *supra*, the government's interest in prosecuting the LCN did not justify taking the life of the decedents.

The defense of qualified immunity applies unless the law is clearly established either by materially similar precedent or by general legal principles that apply with obvious clarity to the facts of the case. *Hope v. Pelzer, 536 U.S. 730, 741, 153 L. Ed. 2d 666, 122 S. Ct. 2508 (2002)*. Under the facts as alleged by the plaintiffs, it cannot be doubted that [**89] Connolly violated the substantive due process rights of McIntyre. In fact, because Connolly allegedly participated in and/or aided and abetted the murder of McIntyre, the right in question might be characterized as the right not to be murdered by the government. As so characterized, the right is clearly established by the words of the *Fifth Amendment* itself. *See, e.g., Heinrich, 62 F. Supp. 2d at 319* (holding that the plaintiffs' decedents had a clearly established right in 1946 to be free from being injected with plutonium by the government without her consent "even absent the abundant case law that has developed on this point since the passage of the *Bill of Rights*"). But, even if the right is characterized as a right not to be murdered by a private actor where a government actor aided, abetted, collaborated or conspired with the private actor to accomplish the murder, the right was clearly established before McIntyre was murdered. The fact that there is no case proclaiming the existence of the right under factual circumstances like those presented by the case before me does not preclude a determination that the right was clearly established. The Supreme Court has [**90] rejected the notion that the determination of whether a constitutional right is clearly established requires that a court find that the facts before it are fundamentally similar to a previous case declaring the right. The Court instead has explained that

general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful.

*Hope, 536 U.S. at 741* (quoting *Lanier, 520 U.S. at 270-71*) (internal citation marks omitted). Thus, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* Indeed, "the easiest cases don't even arise." *Lanier, 520 U.S. at 271* (quoting *United States v. Lanier, 73 F.3d 1380, 1410 (7th Cir. 1996)* (Daughtrey, J., dissenting)). For example, "there has never been . . . a *section 1983* case accusing welfare officials of selling foster children into slavery; it does [**91] not follow that if such a case arose, the officials would be immune from damages [or criminal] liability." *Id.* (quoting *Lanier, 73 F.3d at 1410* (Daughtrey, J., dissenting)) n35; *see also Anderson, 483 U.S. at 640* [*124] (explaining that it is not required that the "very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent"). n36

n35 The quotations the Court cited from Judge Daughtrey's dissent in the Seventh Circuit's *Lanier* opinion originated in *K.H. ex. rel. Murphy v. Morgan, 914 F.2d 846, 850-52 (7th Cir. 1990)*, a case in which the Seventh Circuit, in affirming the district court's denial of motion to dismiss based on qualified immunity, held that a child's due process right "not to be placed with and shuffled among foster parents known to be incompetent and indeed dangerous" was

clearly established. The court relied on a Supreme Court decision that the Constitution requires the state to take steps to prevent children in state institutions from deteriorating physically or psychologically, and on a circuit decision that a state cannot avoid certain responsibilities merely by delegating custodial responsibility to an irresponsible private person, in finding that the due process right of the child was "clearly established."

[**92]

  n36 *See also Drummond v. City of Anaheim, 343 F.3d 1052, 1061 (9th Cir. 2003)* "Notwithstanding the absence of direct precedent, the law may be, as it was here, clearly established. Otherwise, officers would escape responsibility for the most egregious forms of conduct simply because there was no case on all fours prohibiting that particular manifestation of unconstitutional conduct." (quoting *Deorle v. Rutherford, 272 F.3d 1272, 1285-86 (9th Cir. 2001)*)); *Clem v. Corbeau, 284 F.3d 543, 553 (4th Cir. 2002)* ("When the defendants' conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts that the action was unconstitutional, closely analogous pre-existing case law is not required to show that the law is clearly established.' To hold otherwise would allow an officer who understood the unlawfulness of his actions to escape liability simply because the instant case could be distinguished on some immaterial fact, or worse, because the illegality of the action was so clear that it had seldom been litigated." (quoting *Mendoza v. Block, 27 F.3d 1357, 1361 (9th Cir. 1994)*) (additional citation omitted)); *id. at 554* ("The lack of more cases with similar facts is due to the clarity, rather than the ambiguity, of the [case law precedent]."); *Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 253 (2d Cir. 2001)* ("To the extent that no case applying this right [to be free from excessive force] in the educational setting has previously arisen in our circuit . . . [is] a strong indication that the right to be free from excessive force is so well-recognized and widely observed by educators in public schools as to have eluded the necessity of judicial pronouncement."); *Eberhardt v. O'Malley, 17 F.3d 1023, 1028 (7th Cir. 1994)* ("This is such an elementary violation of the *First Amendment* that the absence of a reported case with similar facts demonstrates nothing more than widespread compliance with well-recognized constitutional principles."); *McDonald v. Haskins, 966 F.2d 292, 295 (7th Cir. 1992)* ("In sum, that no precisely analogous case exists does not defeat [plaintiff]'s claim. It would create perverse incentives indeed if a qualified immunity defense could succeed against those types of claims that have not previously arisen because the behavior alleged is so egregious that no like case is on the books. As we recognized in *K.H. ex rel. Murphy* . . . the easiest cases don't even arise." (internal quotation marks omitted)).

[**93]

  Cases in which "general statements of the law" gave "fair and clear ruling" applied "with obvious clarity" to the conduct in question include *Drummond v. City of Anaheim, 343 F.3d 1052, 1061-62 (9th Cir. 2003)* (holding that officer's alleged conduct in subduing mentally ill citizen violated "clearly established" law because the court "needed no federal case directly on point to establish that kneeling on the back and neck of a compliant detainee, and pressing the weight of two officers' bodies on him even after he complained that he was choking and in need of air violates clearly established law, and that reasonable officers would have been aware of the same"); and *Polk v. District of Columbia, 121 F. Supp. 2d 56, 70-71 (D.D.C. 2000)* (holding that, where police officer allegedly directed ride-along civilian to detain someone for whom there was no probable cause, the absence of any reported cases addressing that precise conduct did not foreclose a determination that the right to be free from such detentions was clearly established; there was no "open question" whether the Constitution outlawed the officer's conduct and "there can be little doubt that [**94] the Constitution forbids police officers [*125] to share their authority to conduct searches and seizures with unauthorized civilians"). n37

n37 *See also Clem, 284 F.3d at 553-54* (holding that, where Supreme Court had held that deadly force cannot be used by a police officer to seize an unarmed nondangerous suspect, officers who, in response to a call from a woman requesting assistance with her mentally ill husband who had not taken his medications, subjected the husband to pepper spray and shot him three times, violated the husband's clearly established *Fourth Amendment* rights); *Skrtich v. Thornton, 280 F.3d 1295, 1304 (11th Cir. 2002)* (holding that, where Supreme Court cases held that prisoners cannot be subjected to gratuitous disproportionate force that has no object but to inflict pain, guards who severely beat a prisoner during a cell extraction after they had rendered the prisoner completely inert by an electric shock, violated the clearly established *Eighth Amendment* rights of the prisoner; the absence of cases concerning gratuitous force *in the context of a cell extraction* did not preclude a determination that the right in question was clearly established); *Newburgh Enlarged Sch. Dist., 239 F.3d at 253;* (holding that absence of precedential case law expressly holding that students have a substantive due process right not to be struck by a teacher did not preclude a determination that gym teacher who grabbed student by the throat, lifted him off the ground by his neck, dragged him across the gym floor to the bleachers, choked him and slammed the back of his head against the bleachers four times, rammed his forehead into a metal fuse box and punched him in the face, violated the clearly established substantive due process rights of the student); *McBride v. Village of Michiana, 100 F.3d 457, 461 (6th Cir. 1996)* (holding that "although no Supreme Court or Sixth Circuit decisions had, at that time, applied time-honored *First Amendment* principles to a situation *specifically* involving governmental retaliation against a news reporter," town officials who had allegedly retaliated against reporter after she published reports criticizing the local government violated the clearly established *First Amendment* rights of the reporter); *McDonald, 966 F.2d at 295* (holding that police officer who held a gun to the head of a 9-year old boy and threatened to pull the trigger violated the rights of the boy even though no closely analogous case existed; explaining that "it should have been obvious . . . that his threat of deadly force . . . was objectively unreasonable given the alleged absence of any danger").

**[**95]**

Based on these principles, I hold that in 1984, the substantive due process right to not be murdered by a private actor where a government actor aided, abetted, collaborated or conspired with the private actor to accomplish the murder was clearly established. Although in 1984 the courts had not addressed factual circumstances "fundamentally similar" to those alleged by the plaintiffs in this case, "in the light of pre-existing law, the unlawfulness" of Connolly's conduct was "apparent." *Anderson, 483 U.S. at 640.* The text of the *Fifth Amendment* provided the general prohibition against the government's depriving citizens of life. It was also clearly established in 1984 that constitutional violations can be effectuated by private actors acting in concert with government actors. *See Sherman v. United States, 356 U.S. at 373 (1958)* ("[The] Government cannot disown [the informant] and insist it is not responsible for his actions."); *Burton, 365 U.S. at 725 (1961)* ("The State has so far insinuated itself into a position of interdependence with [the private business] that it must be recognized as a joint participant in the challenged **[**96]** activity, which, on that account, cannot be considered to have been so purely private' as to fall without the scope of the *Fourteenth Amendment.*"); *Hoffa v. United States, 385 U.S. at 311 (1966)* (an informant is not "to the slightest degree more free from all relevant constitutional restrictions than is any other government agent"); *Adickes, 398 U.S. at 151 (1970)* (private actor's "understanding" with police officer to refuse service to a customer was state action subject to constitutional scrutiny), discussed *supra.* I "need no federal **[**126]** case directly on point," *Drummond, 343 F.3d at 1061,* to conclude that it was clearly established in 1984 that an FBI agent violates the substantive due process right of an individual to be free from government-sponsored, incited, or provoked murder if the individual is murdered as a result of the disclosure by the agent to violent criminals that the individual is cooperating with the government in investigations of the unlawful activities of the criminals, and the agent knows or

should know that the criminals will kill the individual, reasonably believing that the agent will protect them from prosecution [**97] for that murder.

Although none of the parties have addressed the issue, I also hold that, based on the plaintiff's allegations, it was reasonable for Connolly to have been aware that his conduct violated McIntyre's clearly established right to be free from government-involved murder. There are no allegations supporting a conclusion that Connolly made a reasonable mistake as to what the law required, *see Saucier, 533 U.S. at 205*, that he was reasonably ignorant of crucial facts, *see Suboh v. District Attorney's Office of Suffolk Dist., 298 F.3d 81, 95 (1st Cir. 2002)*, or that any other circumstance existed that would have made it unreasonable for Connolly to appreciate that his conduct was unconstitutional. Moreover, while regulations do not establish constitutional rights, they may provide fair warning that conduct violates the Constitution. *Groh v. Ramirez, 540 U.S. 551, 157 L. Ed. 2d 1068, 124 S. Ct. 1284, 1293-94 & n.7 (2004)* (explaining that federal agency directive that its agents had to be sure a search warrant was sufficient on its face before executing it "underscored that [an agent] should have known that he should not execute a patently defective [**98] warrant"); *Hope, 536 U.S. at 744* (state department of corrections regulations concerning permitted of uses of hitching post provided fair warning that prison guards' conduct was unconstitutional, when the guards, in violation of the regulations, handcuffed an inmate to the hitching post for seven hours without water or bathroom breaks). Here, the Guidelines required FBI agents to "ensure that individual rights are not infringed and that the government itself does not become a violator of the law." Compl. P 110.

I therefore hold that Connolly is not entitled to qualified immunity on count X of the complaint on this present motion for judgment on the pleadings under *Rule 12©*, and I DENY his motion as to count X.

There can be no question that on the facts alleged and even on the slim record developed thus far from limited witness interviews and the slim pickings available from an investigation, the Defendants' motions to dismiss or for summary judgment must be denied out of hand as to Mrs. Grancio's 5th Amendment Substantive Due Process claim. There must be a full opportunity for discovery before her other claims like the failure to protect, failure to warn, supervisory liability claim, duty to control informants, conspiracy, and the other constitutional claims can even be considered by this Court on a motion to dismiss or for summary judgment.

"Qualified immunity is a judge-made doctrine. The elementary justification for the doctrine is that public officials performing discretionary functions should be free to act without fear of retributive suits for damages except when they should have understood that particular conduct was unlawful." Davis v. Scherer, 468 U.S. 183, 195, 82 L. Ed. 2d 139, 104 S. Ct. 3012 (1984). In this case, with respect to the Substantive Due Process claim on these facts, this is not a tough call on the conscience shocking horrendous facts of this case.

41

### Defendants' Remaining Claims Should be Denied

The Defendants' arguments that the *Bivens* claims in the First Amended Complaint should be dismissed on statute of limitations grounds should be rejected for the same reasons argued above with respect to the government's statute of limitations claims.  The Complaint in this case raising the *Bivens* claims was timely filed well within the 3 year statute of limitations, considering the "discovery rule," equitable tolling, and fraudulent concealment, all discussed at length above.

Defendant Devecchio's request for a stay should be denied as well.  To the extent he relies on Fifth Amendment grounds that often attend such matters, his arguments are not well taken, given his affidavit in support of these motions and in proceedings related to this and his desired removal of the criminal case.  He has unequivocally addressed and denied claims of guilt in this case, dealing directly with the merits.  He cannot be permitted to use his Fifth Amendment rights as both a shield and a sword, invoking it when it suits him (to seek a stay) and waiving it when it suits him - denying the claims in seeking dismissal.


Respectfully Submitted,


s/David I. Schoen DS0860

David I. Schoen, Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, Alabama 36106
Phone: 334-395-6611; Fax: 917-591-7586
E-Mail: DSchoen@abanet.org or DSchoen593@aol.com

COUNSEL FOR PLAINTIFF


May 16, 2007


42

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

MARIA GRANCIO, individually, and
in her capacity as Executrix and Personal
Representative of the Estate of Nicholas P.
Grancio,

    Plaintiff,

v.

                                    CIVIL ACTION NO.  06-CV-0069 (FB)(CPP)

R. LINDLEY DeVECCHIO;
CHRISTOPHER FAVO;
UNITED STATES OF AMERICA.

                                  ECF Case

    Defendants.

## CERTIFICATE OF SERVICE

    I hereby certify that on May 16, 2007, I served a copy of the foregoing Memorandum of Law and supporting documents on counsel for all Defendants by email, properly addressed to their respective email addresses as set forth on the docket sheet in this case.

s/David I. Schoen DS0860

David I. Schoen, Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, Alabama 36106
Phone: 334-395-6611; Fax: 917-591-7586
E-Mail: DSchoen@abanet.org or DSchoen593@aol.com

COUNSEL FOR PLAINTIFF

43