UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

MARIA GRANCIO, individually, and )
in her capacity as Executrix and Personal )
Representative of the Estate of Nicholas P. )
Grancio, )
                                            )
          Plaintiff,                        )
                                            )
v.                                          )  CIVIL ACTION NO. 06-CV-0069 (FB)(CPP)
                                            )
R. LINDLEY DeVECCHIO;                       )
CHRISTOPHER FAVO;                           )  **HEARING REQUESTED**
UNITED STATES OF AMERICA.                   )
                                            )       ECF Case
          Defendants.                       )

### AFFIRMATION OF DAVID I. SCHOEN

DAVID I. SCHOEN, hereby affirms under penalty of perjury that the following is true to the best of my knowledge and belief:

1. I am an attorney, duly admitted to practice before this Court and I represent the Plaintiff, Maria Grancio, in this action. I am providing this Affirmation in support of her response to the Defendants' motions to dismiss this action, or for summary judgment, and, in the case of Defendant Devecchio, the alternative request for a stay of the action. All of the information provided herein is on personal knowledge except where indicated otherwise and I make this Affirmation based on such knowledge as gathered from my personal observations, review of documents, and discussions with other attorneys, witnesses, and others who have investigated or reported on the underlying and related facts. I incorporate herein by reference the disputation of

1

the "facts" asserted by the Defendants and the presentation of additional material facts set forth in Mrs. Grancio's L.R. 56.1 Statement and all allegations in the First Amended Complaint.

2. I became involved with this case merely as an interested observer late in 2004 when I was asked by Dr. Stephen Dresch to attend a meeting in Brooklyn at the home of Mrs. Grancio. I believe I had met Dr. Dresch and his colleague, Angela Clemente, previously, and I believe it was when they contacted me because of my representation of Michael Sessa, a defendant in this district convicted, in part at least, on the trial testimony of Defendant Devecchio which was demonstrably false. Dresch and Clemente, as I recall, explained to me that they were investigating misconduct that allegedly attended a number of cases in this district and that they were reporting or intended to report to some members of Congress on their findings. They also asked whether I would be interested in meeting with some Congressional staffers to discuss the Sessa case and a couple of other cases I had in this district. They were interested in the Devecchio matter, but seemed a bit more interested in circumstances involving Salvatore Gravano, his misconduct, and some facts I had uncovered about him. I agreed to provide some information and to meet with Congressional staffers; but I made clear that I could only devote a limited amount of time to this endeavor, mainly for financial reasons.

3. I first became involved in and began learning more about issues involving the Defendants and their relationship with Gregory Scarpa, Sr. around 1995 when I was approached by Michael Sessa who asked me to look into his case and consider taking it on on a *pro bono* basis. A significant portion of my practice has been devoted to *pro bono* representation since I began practicing and in 1995 I received the American Bar Association's national *pro bono publico* award in recognition of my civil rights litigation. I believe that is what led Mr. Sessa to contact me and it certainly was discussed at some point; but I am not sure what initially led him to me.

In any event, I was intrigued by the issues, especially because my father had been a Special Agent with the FBI and, not realizing the kind of time commitment that would be required, I agreed to get involved and stayed involved representing Mr. Sessa in his efforts to get a new trial until just a few years ago. We still maintain some contact periodically.

4. From around 1995 until around 2003, I spent a great deal of time investigating many aspects of the corrupt relationship between Defendant Devecchio and Gregory Scarpa, Sr. and the role Defendant Favo and others (including some prosecutors and judges) played in fostering it and permitting it to continue, what they knew about it and when, and what they knew about the illegal conduct it licensed, as well as what, if any effort, they made at stopping or reporting it. My interest was to learn everything I possibly could learn about it so that I could raise all relevant facts for Mr. Sessa. My investigation included, but was not limited to, meeting with other so-called Colombo case defendants and their lawyers, exchanging documents and information with them, reading all relevant documents, including, eventually, a redacted version of the OPR file, and many, many other things which required many hundreds of hours of my time over those years. I certainly was aware of the Grancio murder and I had a hunch that there could be some connection with the Devecchio/Scarpa relationship (I knew, of course, that Scarpa was involved); but try as others and I did, we could not ascertain facts that demonstrated a causal connection between the Grancio murder and government action/inaction. If we had, we would have raised it and spelled it out in our motion papers; but all we could do in good faith was lay out the known facts, continue to investigate, and be left with our suspicions or hunches, without any evidence of a causal link. It was left as just one more of Scarpa's murders during that time period. In 2006, I learned that there were many other murders by Scarpa pre-dating Mr. Grancio's that also allegedly were connected to Devecchio. Four of them are now the subject of a murder indictment

returned against Devecchio in Brooklyn. Others are still under investigation and are believed to be connected to Devecchio as well.

5. Notwithstanding all of the efforts I had been making for years to ascertain all of the facts related to this matter (the Grancio murder and all aspects of criminality related to the Devecchio/Scarpa relationship), the first time I ever heard or otherwise learned the facts/theory underlying this lawsuit was in early 2004 (around the second week to the best of my recollection), when someone drew my attention to what I recall to be a newspaper report of an allegation raised in a hearing for Victor Orena and Pasquale Amato to the effect that Scarpa had called Devecchio before he killed Grancio, arranged for Devecchio to remove surveillance from Scarpa and then killed Grancio with the surveillance removed. I was shocked to learn this, notwithstanding all that I already knew or thought that I knew about the Scarpa/Devecchio relationship.

6. Shortly thereafter, I believe that I contacted the lawyer in the case, Flora Edwards, and inquired further. At some later date I read the transcript. I knew Ms. Edwards and I knew her to be devoted to her clients; but I have never known her to concoct any sort of story. In fact, in my experience with her she always has been forthright and careful with details. She told a compelling and detailed story about how she contacted Lawrence Mazza after his release from prison and the Witness Protection program and the facts he told her about how the Grancio murder had unfolded and of his reticence to come forward publicly with these facts. She has provided that information orally and in court filings in the Orena case. I have included her Declaration among the Exhibits offered in support of Mrs. Grancio's Response. [Exhibit 27]

7. While I was aware that equally serious allegations had been made against Defendant Devecchio, these were new facts and new allegations of a particularly serious nature and I did not

4

believe they could or should be made lightly; so I tried to investigate more.

8. Later in 2004, I was contacted again by Dr. Dresch. He asked me if I would meet with Mrs. Grancio and a former detective (Joe Simone) and hear the whole story as he (Dresch) understood it, having put it together with some records of Simone's that he had come across. I agreed to go to the meeting; but I said that I would likely be unable to do anything further with it, other than perhaps give my reactions and thoughts.

9. I went to Mrs. Grancio's home later in the year and met Mrs. Grancio, her two daughters, a son-in-law, Detective Simone, another former NYPD police officer, and perhaps one or two other people and I listened. Simone told us about his surveillance activities that week, about the call he received from Defendant Favo pulling him off of the surveillance of Nicky Grancio, about how he found this so very unusual and protested with Defendant Favo, to no avail. He then told us about learning that Grancio had been shot and about his interview with Joey Tolino who asked him what had happened to the law enforcement surveillance he and Grancio knew had been on him and why they had driven away, and who told him how after they had, Grancio was shot, with brain matter spraying onto Tolino. I have since tried to interview Tolino on several occasions; but I have been told categorically that he will not meet with me to speak about it. Simone has provided a Declaration and it is attached hereto at Exhibit 25 and, of course, he testified under oath in the *Orena* hearing.

10. Dr. Dresch, of course, also told the group what he had learned. He detailed how he had found Mazza in Florida and how he waited to speak with him. Then, when he did, as Dr. Dresch recounted it, Mazza told him the exact same story he had told Flora Edwards. During his investigation into corruption, Dresch had interviewed Simone, frankly because Simone was someone who had been accused of corruption and Dresch wanted to see what he could learn.

5

Simone told him (as he told us that night) that all of his 302s and other papers concerning his work on the so-called Colombo war investigation had been taken from his desk during a period of time when he was on sick leave; yet he had some surveillance sheets and he showed those to Dresch. Flora Edwards used them at the Orena hearing and she and Dresch found them particularly significant, they said, because prior to that hearing Defendant Favo, in support of the government's position denying the allegations concerning the government's involvement in the Grancio murder, provided an affidavit purporting to confirm the truth of the government's position that, in essence, it could not have occurred as Orena was claiming because the date when Grancio was killed was "prior to" the time period when surveillance was regularly conducted. Simone's DAR sheets [Exhibit 15], showing his surveillance of Grancio on January 6, 1992 and January 7, 1992 exposed this rather unequivocally as wrong or untrue.

11. Before I agreed to get involved in the case actively and after my meeting at Mrs. Grancio's home, I asked Dr. Dresch to put all of his findings in this matter in writing for me. He did and he wrote the matter up for a Congressional Committee as well. Dr. Dresch is now deceased; but we rely on his sworn testimony in the *Orena* 60(b) hearing on January 7, 2004, subject to cross-examination by the government, in further support of this motion.

12. I found Mrs. Grancio to be a very quiet, reserved, and unsophisticated older woman who clearly had led a sheltered life while her husband was alive and who still had not recovered, even all these years later, from his death. One daughter lived with her and assisted her and by all reports, she generally just stayed at home and to herself. She did not read the newspaper or otherwise engage much in the outside world. When we spoke about her husband and his death, she became emotional. She told us how much she had wanted to know how and why it happened and she never was really satisfied by the story that it was just a matter of a rival's actions in the

"war." However, she never could learn anything more and she told us she was afraid to ask too many questions of too many people, for fear that there was something even more sinister involved or that the people who had done it would be angry, even though she understood they were either dead (Scarpa) or in prison (Mazza and Delmasto). She reported that some time in the past, a lawyer who had been a friend of her husband's suggested bringing a lawsuit; but she was afraid and did not know what good it would do to sue Mazza and Delmasto. Neither she nor the lawyer who had looked into the case knew any details about a government connection to the murder. I reached out for the lawyer myself to confirm this. When he understood the allegations we would be making, the lawyer expressed a fear for her physically if she filed such a lawsuit and counseled against it for that reason (and because he had never heard of me and did not know whether to trust me). Mrs. Grancio asked for some time to think about things and talk to her family about the matter. Ultimately they advised me that they wanted to pursue the matter in order to find out all of the facts and get some sense of justice by exposing them once and for all. Still the family expressed its fear of retaliation to me. I am not aware to date of any threats or other efforts at intimidation having been brought against Mrs. Grancio.

13. I was especially concerned about getting involved in the case because of my already existing pro bono caseload and I asked that they find another lawyer to take the case, while I agreed to help with advice. In late 2004 or early 2005, I was told that another lawyer was found and I was advised that he would file it. It turned out that as enthusiastic as the lawyer was, he had no experience with civil rights or FTCA litigation and was afraid to make this his first case. I felt that there might be an argument that the statute of limitations was triggered by the Orena hearing and attendant coverage, even though Mrs. Grancio was not aware of it at the time. I felt that the administrative claim for the FTCA should be filed by within 2 years of January 7, 2004 to be on

the safe side. I weighed a number of strategies and decided to file the *Bivens* action with supplemental jurisdiction state common law tort claims contemporaneously with it. I planned then to either file an amended complaint joining FTCA claims at the appropriate time (after 6 months or denial of the claim) or file a separate action under the FTCA, parallel to the *Bivens* action, with there being, of course, precedent for both courses of action. I favored the latter course. Following the pre-motion conference in this case in which the Court told me that it would consider Rule 11 sanctions if I did not dismiss the common law state tort claims and that I should give the amendment my "best shot" since the Court would only allow one amendment, I decided to bring the FTCA claims then, since the 6 month "deeming" period had long since passed without any action. I could have brought a separate FTCA action and just amended the original Complaint to make it a straight *Bivens* complaint and both courses (joint or separate actions) carry their own risks by having a judgment returned in one, potentially precluding the other; however, given the Court's admonition, I thought that the Court might object to the separate actions and decided a joint action would be the best way to proceed. I kept in the state common law claims as well because I did not yet know the government's position on certification and did not want to waive the state court claims or have a statute of limitations problem if certification were not forthcoming or proper.

14. Naturally, I also wanted to interview Lawrence Mazza, especially in light of what had happened at the *Orena* hearing. However, Mazza was angry after the January 2004 *Orena* hearing. He expressly had said that he did not want to be subpoenaed, but he was and it made him angry, as he has reported. Mazza's position also has been that he doesn't want to be involved in this matter any further because of personal fear and, in any event, he advises that he sees no reason why he should come forward and expose the facts at the request of someone on

behalf of Nicky Grancio's estate because he believes Grancio wanted to kill him. He has confirmed this latter position within the past several months. Also within the past several months, I have received reports from Mazza through an intermediary of all of the following: He has felt intimidated and threatened by people who have visited him and come to his job site since the Devecchio indictment was returned, both by their words and actions. He reported the visits in the Summer of 2006. He has provided the names of the people who have visited him (provided by them to him) and he has said that they identified themselves as former agents working to clear Defendant Devecchio. He has described gestures they have made to him which he took as a threat (opening a jacket and showing a gun) and he has reported these matters to the authorities through an intermediary and possibly directly on his own. After one such person visited him on his job, he lost his job. All of this has made him more hesitant to come forward with the facts as he told them to both Dr. Dresch and Ms. Edwards. Mazza has requested that he receive protection and be given a new identity for his protection. Mazza is not the only person perceived to have provided information against Defendant Devecchio who has reported efforts at intimidating and threatening them by men who claim to be former federal agents and friends/supporters of Defendant Devecchio and some of this has been reported in the press. The manner in which these former agents, some of whom were involved in the OPR "investigation", have gone about showing their support, in person and on the website created to support Devecchio reportedly has been the subject of some concern in Congress. Indeed, a staff member of one member of Congress advised me that a Senator took up the matter with the current FBI Director and one particularly offensive matter on the website was removed immediately thereafter.

15. I have reviewed both the Declaration of Defendant Devecchio's attorney, submitted in

support of his motion to dismiss this case and the transcript of the *Orena* hearing at which Mazza testified and to which the Declaration refers at P. 6, ¶20 and find it, frankly, to present a misleading representation of Mazza's testimony - given over Mazza's protest at being called as a witness. For example, Mr. Grover represents in his Declaration that Mazza testified that "no telephone calls were made by Scarpa before the shooting." While at one point under examination by government counsel Mazza agreed with counsel that there was no time to use the phone immediately before they shot Grancio [Exhibit 29, Tr. 113]. Throughout his testimony, Mazza clearly testified that, like on all other occasions, Scarpa was on the phone all the time, calling his "girlfriend" perhaps and several other people from the car before they killed Grancio and it could have been with Devecchio, he just was not sure. [Exhibit 29, Tr. 98; 99; 101; 103; 104; 119-20]

16. Mazza has indicated that he will not formally get involved until he has a new identity and an assurance of protection; however, I make the following representation as an officer of the Court, based expressly on a Declaration Mazza has signed and provided, but on the condition that it not be filed (unless under seal) because of his continuing fear:

A. On January 7, 1992, prior to killing Grancio, Scarpa made several telephone calls;

B. When he met with Dr. Dresch on May 30, 2003, he told Dresch he was not willing to testify to the facts they discussed unless, as Dresch testified, it was at a Congressional hearing under a grant of immunity and with his protection guaranteed because of his fear of retribution;

C. Scarpa regularly made calls in front of him to someone he referred to as "Lin" and that Scarpa did so on the day of the Grancio murder before they shot Grancio and he believes the "Lin" to whom Scarpa was speaking likely could have been Devecchio.

I believe that if called to testify in this case, Mazza will testify truthfully to the facts he told Flora

Edwards and Dr. Dresch as they have described those facts.

17. I have spoken personally with staffers for members of Congress (House and Senate) and they have advised me that they are actively investigating this and related matters and have asked me for documents and information.

18. Mrs. Grancio opposes any stay of the proceedings in this case. Defendant Devecchio seeks a stay based on the pendency of the criminal proceedings against him; however, in this case and in proceedings related to the criminal case he has filed documents under oath unequivocally declaring his innocence. He should not be permitted to avoid or postpone other proceedings which will call such declarations into question. This is certainly not a case in which a stay might be in order so that a defendant does not face the Hobson's choice of defending or invoking his Fifth Amendment right. Devecchio must not be permitted to use such a right as both a shield and sword, testifying as to his purported innocence in support of a motion to dismiss, then seeking a stay to avoid testifying when that motion is denied.

19. Pursuant to Rule 56(f) of the Federal Rules of Civil Procedure, I am providing the following assertions in this Declaration to explain why Mrs. Grancio cannot, without the formal discovery tools provided under the Federal Rules of Civil Procedure, she cannot and should not be expected or required to present fully and fairly all of the facts necessary to establish her opposition to the pending motions and why, therefore, the Court must deny summary judgment and permit full discovery before a consideration of any motions for summary judgment.[1]

20. The following are some of the reasons why Mrs. Grancio cannot obtain the necessary

---

[1] It is not necessary under Rule 56(f) to set forth any substantive evidentiary facts that are lacking or to present any proof "creating even a minimal doubt on the issue of fact which entitles (the non-moving party) to a full trial. Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d §2740. However, because I can identify here a good deal of what we need but cannot obtain without full discovery, I will make a more substantive showing than is required.

11

materials, despite her due diligence and investigation into these facts:

    A. Most of the essential documents with respect to the allegations in this case are official government documents exclusively within the government's control. Indeed, upon information and belief, even the Brooklyn District Attorney's office, presently prosecuting a criminal murder case against Devecchio and the relevant Committee staff in Congress have been unable to get an unredacted copy of the OPR report or Scarpa's informant file - two of the most essential sources of relevant information in this case. Interestingly, upon information and belief, counsel for the government in this case is believed to be the repository and the decisor with respect to whether such documents are to be turned over to either or both of those offices. Moreover, upon information and belief, counsel for Devecchio has boasted that he has copies of both. This material and most of what we have not yet been able to obtain, is relevant to the substantive claims, factually and legally and to the claim of fraudulent concealment.

    B. Relevant witnesses include former FBI agents who have aligned themselves with Devecchio and who sponsor a website designed to reflect support for and raise money for Devecchio and certainly cannot be expected to truthfully provide essential information to the undersigned relative to this case.

    C. Other relevant witnesses are believed to be prospective witnesses in the upcoming criminal trial for Devecchio and the undersigned cannot interfere with that process and does not have access to many of them.

    D. Certain key witnesses have voiced their fear of getting involved in the case and at least one has reported being intimidated to the extent that he has refused to authorize the submission to the Court of his affidavit on the relevant facts.

    E. This case is at its earliest stages, with no Answer having been filed and no discovery

having been permitted.

F. Other key witnesses continue to be cooperating witnesses for the government and/or are the Witness Protection program and cannot be located and/or have institutional reasons for not wanting to help Mrs. Grancio's position or take action perceived to be contrary to the government's position - and the government clearly and consistently has taken the position that it does not want a full exposure of the Devecchio/Scarpa matter and government officials, including prosecutors in this district, have taken affirmative steps in the past to ensure that the relevant information is withheld - especially insofar as it can be used to support collateral attacks on convictions in the district.

G. The investigators and the prosecutors in the Brooklyn DA's office just within the past year announced that their investigation had just uncovered sufficient evidence to indict Devecchio in 4 murders all predating Mr. Grancio's murder. They have exclusive access to the fruits of that investigation and will not share their evidence with me. However, through the upcoming Devecchio criminal trial, a great deal of information, much of which may well have been concealed all of these years, will surface. In the *McIntyre* case, the criminal case against FBI agent Connolly and in related cases, the criminal case against Salemme were seminal events which provided essential and otherwise unavailable evidence to be used in the civil cases.

H. Clearly, a great deal of evidence held exclusively by the government is still being concealed. For example, in the 2006 Guidelines on informants [Exhibit 14], while Devecchio is presented as an example of a corrupt relationship with an informant, his misconduct clearly is minimized and the report is limited to his leaks to Scarpa and his assistance in some criminal activity; but nothing like actively participating in murders or allowing Scarpa free license to murder as we now know occurred and as the Brooklyn DA has charged. I also am aware of

13

several other as yet uncharged murder cases concerning Devecchio and Scarpa being investigated in more than one jurisdiction.

21. The following are some examples (not intended to be all-inclusive) of the kinds of essential information we seek in order to prepare this case for trial and to respond to properly brought and timely summary judgment motions:

    A. All information concerning all murders committed by Scarpa or in which Scarpa was a suspect pre-dating the Grancio murder, including but not limited to the 4 murders for which Devecchio has been indicted and what information did these defendants have about Scarpa's role in the murders at the time. I am aware of at least 2 other murders in which Scarpa and Devecchio are suspected.

    B. Mazza acknowledges being contacted twice by investigators while in prison and being asked, in effect what he thought when he saw surveillance lifted right before the murder, [e.g. Exhibit 29] implying that he knew or should have known Scarpa had arranged for the same. What information prompted these questions? It was Favo who called off the surveillance; so if investigators suspected wrongdoing in calling it off, thereby prompting the questions, this implicates Favo, at least potentially.

    C. What led Detective Higgins to try to warn Grancio that he was an immediate murder target the day before his murder? What information and from what source was given to the Group?

    D. Favo has admitted knowing within days of the Grancio murder that Scarpa killed Grancio. How did he know it?

    E. All 302s, 209s and other official reports concerning the murders with which Scarpa was involved or for which he was suspected.

F. All documents and facts surrounding the re-opening of Scarpa as an informant and how many times was he closed (and why) and re-opened (and why).

G. Recently I was approached by a source who claimed that Nicholas Grancio was a confidential informant. I need to know whether this is accurate.

H. All documents related to the 1987 allegations of a corrupt relationship between Scarpa and Devecchio.

I. All documents related to the Fusaro and Amato murders with which Scarpa was involved and which immediately pre-dated the Grancio murder.

J. All witnesses and sources of information identified by Favo in Exhibit 3, p. 9 as likely having information bearing on the Scarpa/Devecchio relationship.

K. All phone records related to Scarpa's calls to Devecchio. It is believed that, while these phone records are not still maintained or accessible from the phone companies, the government has most or all such records from all of Scarpa's phones and from the phones of his associates and their families, from where he was known to call Devecchio. [See reference in Exhibit 9 by Caproni to records of Scarpa's calls to 26 Federal Plaza, FBI HQ]

L. In ¶47 of the First Amended Complaint, an assertion is made about information provided by a person who claimed to be an informant handled by Favo. That person provided a good deal of information to a person investigating this case for me and, upon information and belief, to the Brooklyn DA's office (according to him). There is now reason to believe that rather than providing accurate information, this person was intentionally sent to provide misinformation in this and in the criminal case. We need to see all records concerning this person's use as an informant and cooperating witness to determine the accuracy of his information.

22. In opposing the individual defendants' arguments on the statute of limitations, Mrs. Grancio

relies on her argument in response to the government's motion on the statute of limitations, noting that the Biven claims carry a 3 year limitations period.

23. Mrs. Grancio respectfully requests a hearing with respect to the Defendants' motions.

I affirm under penalty of perjury that all of the foregoing is true and accurate to the best of my recollection and belief.

May 16, 2007
Washington, DC

_____
David I. Schoen