# EXHIBIT 2

P 2

FD–302 (Rev. 3–10–82)

- 1 -

FEDERAL BUREAU OF INVESTIGATION

Date of transcription    2/6/94

On January 17, 1994, ASAC Donald North ordered SA
Christopher M. Favo to document incidents concerning SSA R. Lindley De
Vecchio which SA Favo observed during the investigation of the Colombo
LCN Family war.

During the Colombo LCN Family war I typically discussed the
events and problems in the investigation with SAs Tomlinson, Andjich,
and later Leadbetter and others from approximately 6:00 AM to 8:00 AM
in the morning.  I then briefed SSA De Vecchio.  At 1:00 PM I met with
or spoke Lt. Shannon or Sergeant Brogan and Detectives Patrick
Maggiore and Joseph Simone from the NYPD Organized Crime Investigative
Division (OCID) to provide information concerning active hit teams or
obtain information about arrests they had made.  On occasion I was
also in contact with Detective Brendan Finn from a separate OCID unit.
I was in regular contact with ADAs Eric Seidel, Brian Mich and Leon
Rodriguez and Investigator George Terra and Sergeant Frank Martarella
from the King's County District Attorney's (KCDA) office.  I spoke to
or met with AUSAs George Stamboulidis, Leopold Laufer, Andrew
Weissmann, Valerie Caproni, Michael Considine and John Gleeson from
the Eastern District of New York (EDNY).  At the time of shootings and
murders I was also in contact with Capt. Plackenmeyer, Sgt Piraino and
Det. Dades of the 68th Precinct, Inspector John Lynch, Lt. Azzinari of
the NYPD Brooklyn South Homicide unit, as well as homicide Detectives
Sanseverino, Angotti, De Carlo, Sgt Sheehan and others.  In addition,
I dealt with representatives of every other state and federal agency
having any contact with the Colombo LCN Family war.  Initially all
information received from these agencies and investigators was relayed
to SSA De Vecchio.  However, over the length of the war I began to
withhold information concerning Gregory Scarpa or what could not be
leaked to the media because I believed SSA De Vecchio was leaking
information to both Scarpa and Jerry Capece.

In December, 1991 and January, 1992, a source operated by SA
Kenneth Brown provided information on the activities of the Orena
faction in the war.  On one occasion this source advised that
Salvatore Miciotta was responsible for obtaining weapons and
establishing an Orena faction hit team.  On another occasion the
source reported that Joel "Joe Waverly" Cacace had established a hit
team.  At that point in the investigation we were concerned about our
sources being murdered so we notified them that hit teams were in
existence and warn them to be careful.  I was always careful not to

Investigation on   6/91-2/6/94   at New York, NY                    File #  281A-NY-214955

by  SA Christopher M. Favo/cmf                          Date dictated  2/6/94

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;

FD-302a (Rev. 11-15-83)

281A-NY-214955

Continuation of FD-302 of  SA Christopher M. Favo                    . On   6/91-2/6/94  Page   2

tell any source which Orena faction members posed a threat to the
source because that would in effect identify targets for our sources
to shoot.  SSA De Vecchio was responsible for notifying Scarpa.

After the 12/16/91 arrest of an Orena faction hit team the
investigative agencies involved in the Colombo LCN Family war decided
to work together and held several meetings in the Eastern District of
New York (EDNY).  These meetings were attended by the AUSAs,
detectives from the precincts investigating the murders, detectives
from the NYPD OCID task force, SAs Andjich and Favo and occasionally
SSA De Vecchio, and Detectives and District Attorneys from the KCDA
office.  After one meeting I was approached by ADA Eric Seidel and he
bluntly told me that he would not work with the FBI if SA Gary Draus
was involved in the case.  I told him that SA Draus was on my squad
but did not work on Colombo LCN Family investigations.  ADA Seidel
told me SA Draus previously disclosed a KCDA wire to an FBI informant
that was the target of the wire.  ADA Seidel stated that he was
convinced that SA Draus did that with the approval of his superiors at
the FBI.  I had heard of the SA Draus situation previously but not as
explained by ADA Seidel.  SSA De Vecchio supervised Gary Draus at the
time of that disclosure.  I notified SSA De Vecchio of ADA Seidel's
statement.

At one meeting Sgt. Martarella and Investigator Terra from the
KCDA office requested that they take responsibility for investigating
Gregory Scarpa's crew which they believed to be the most violent and
active in the war.  The FBI had an ongoing investigation of Victor
Orena and agreed to focus on the Orena faction.  The NYPD OCID
detectives would continue targeting the hit teams from either faction
using FBI source information.  After these areas of responsibility
were delineated, SSA De Vecchio regularly asked me about the progress
of the KCDA investigation.  I told him that they were doing nothing or
were telling me very little of what they were doing.  On occasions
when in briefing SSA De Vecchio I referred to information received
from the KCDA, I told SSA De Vecchio that I knew the KCDA had wires in
place but they would not tell me where because of the Draus situation.
In reality Det. Terra kept me informed of their wires and I provided
them with assistance whenever needed.

In December, 1991, a vehicle rented by Lawrence Mazza, a Scarpa
associate, was chased by, and escaped from, detectives under Sgt.
Andrew Brogan.  Sgt. Brogan then began directing his detectives to
pursue Gregory Scarpa, sometimes even when I provided him with other
targets.  On 2/11/92 they stopped Scarpa, Mazza and James Delmasto but
they were not in possession of weapons.  SSA De Vecchio later told me

FD-302a (Rev. 11-15-83)

281A-NY-214955

Continuation of FD-302 of  SA Christopher M. Favo _____ . On   6/91-2/6/94 Page   3

that Scarpa had been in possession of weapons but had been listening
to the police radio scanner and heard the detectives describe his
departure from his home.  Scarpa then circled the block, left the guns
and radios in his home and then departed again knowing they would be
stopped.  I told Lt. Shannon and Detectives Maggiore and Simone that
their radio communications were being intercepted by hit teams on the
Persico faction.

In January, 1992, Investigator George Terra told me they were
working a cooperating witness that had information on one of Michael
Sessa's loansharks, Carmine Imbriale.  I told him I did not know
Imbriale.  On February 27, 1992, Terra called me and told me they had
arrested Imbriale that morning, that he agreed to cooperate and that
he was a member of a hit team with Joseph Ambrosino, Carmine Sessa and
others.  Furthermore, Imbriale claimed that when arrested, he was
waiting to be picked up by Ambrosino to go to Long Island to murder
Patty Amato.  Imbriale also said he had dinner with Greg Scarpa the
night before and that Scarpa had claimed credit for shooting Joel "Joe
Waverly" Cacace.  Terra asked me to come to the KCDA office to discuss
Imbriale with ADAs Seidel and Hawkins.

After speaking to Terra, I briefed De Vecchio.  During the
briefing, De Vecchio received a telephone call.  De Vecchio listened
to the caller and then said "I don't know what he's saying about you.
We haven't even talked to him yet.  The Brookyn DA has him."  From the
context of the conversation I suspected he was talking to Scarpa.
When De Vecchio hung up the phone I asked him who he spoke to and he
stated it was "34".  "34" a name based on Scarpa's symbol number which
De Vecchio used when referring to Scarpa.  I made no comment about
what De Vecchio had stated to Scarpa and went to the KCDA office to
learn about Imbriale.  Some of Imbriale's information required
immediate action so I went to the EDNY to get an arrest warrant for
Pasquale Amato.  I telephonically notified De Vecchio that something
would have to be done about Amato but provided no information to him
concerning Scarpa.

The following day, I briefed De Vecchio on Imbriale's
information and told him we had agreed with the KCDA to take Imbriale
as a cooperating witness.  I then told De Vecchio that I believed he
disclosed Imbriale's cooperation with law enforcement to Scarpa the
day before.  I suggested that De Vecchio call Scarpa and warn him that
he had been overheard on a wire advocating Imbriale's murder and
therefore if anything happened to Imbriale, Scarpa would immediately
be arrested.  Approximately 1/2 hour later I observed De Vecchio
talking on the confidential telephone.  After completing the

FD-302a (Rev. 11-15-83)

281A-NY-214955

Continuation of FD-302 of  SA Christopher M. Favo _____ , On __6/91-2/6/94__Page__ 4

     conversation De Vecchio told me he had spoken to Scarpa and that Scarpa understood that he had a problem if anything happened to Imbriale.

     During the war SSA De Vecchio could not speak to Scarpa freely enough on the telephone and therefore had to see him at his home to obtain information and make payments.  SAs Tomlinson and Andjich accompanied him on these trips.  Afterwards SA Andjich told me he was angry because instead of speaking to Scarpa, he had to sit in Scarpa's living room with the TV on while De Vecchio met with Scarpa for over one hour.  De Vecchio then produced a short insert describing his meeting.

     In February, March or April, 1992, I observed SSA De Vecchio on the confidential telephone speaking with someone I believed to be Scarpa.  Shortly thereafter SSA De Vecchio approached me with one telephone number and asked me to run the "Fast track" on it.  I could not read De Vecchio's handwriting and he could not remember if the telephone numbers was (516) 744-9256 or (516) 744-9266.  I asked SSA De Vecchio what the number was for and SSA De Vecchio stated it was for Joseph and Anthony "Chucky" Russo's safehouse.  I ran both numbers through fast track and they were subscribed to as follows: (516) 744-9256 was located at Waldbaums, Route 25 A, Rocky Point, NY; (516) 744-9266 was located at Washing Well Laundromat, 249 Echo Ave. 1st Floor, Sound Beach, NY.  The following weekend I went out to Long Island to examine the addresses.  The Waldbaums number was a payphone and I don't recall finding the laundromat.  The following Monday I told SSA De Vecchio what I had found and asked several questions about where their safehouse could be.  SSA De Vecchio then told me that the Russos did not have a safehouse there and the numbers were for one of Scarpa's loanshark victims.

FD-302a (Rev. 11-15-83)

281A-NY-214955

Continuation of FD-302 of  SA Christopher M. Favo     , On   6/91-2/6/94   Page   5

     On March 31, 1992, Sgt. Brogan and Det. Jon Willoughby surveilled Scarpa and observed him drop a gun out of his car.  Because there were no backup NYPD units, Brogan and Willoughby retrieved the gun and did not arrest Scarpa.  Brogan called me and asked a series of confusing questions which indicated that he did not see who threw the gun or know Scarpa by description.  I notified De Vecchio and since our concern was that the NYPD would force us to arrest Scarpa for the gun, we called Stamboulidis and informed him that Scarpa was a source. I made the initial notification and then De Vecchio criticized me for doing what he wanted to do.  Stamboulidis said that he could avoid arresting Scarpa federally because the Brogan's statements as a witness were sufficiently convoluted to prevent a prosecution.  Brogan went to KCDA for an arrest warrant and got permission to bring Scarpa in for questioning.  Brogan, Matt Higgins, Jon Willoughby and Christine McNulty among other detectives then camped out in front of Scarpa's house planning to detain him when they saw him.

     SSA De Vecchio and I were both concerned about having a source arrested for weapons possession when he could conceivably provide much more crucial information.  At SSA De Vecchio's request and my agreement I told Lt. Shannon that we had a source placed in the Scarpa crew and their continued attention to Scarpa was preventing the source from gathering information.  I stated this in a manner to indicate our source was probably Mazza or Delmasto.  Lt Shannon agreed to stop pursuing Scarpa.  However, Sgt. Brogan and the ADAs both indicated to me that they were still considering indicting Scarpa for weapons possession and a grand jury would hear evidence of this.

     On May 22, 1992, in two separate shooting incidents, the Persico faction murdered and injured two members of the Orena faction. Both incidents occurred early in the day and I briefed De Vecchio at approximately 11:00 AM.  Upon being briefed De Vecchio excitedly declared "We are going to win this thing!"  My impression was that when SSA De Vecchio said "we" he meant the Persico faction.  I told De Vecchio that as law enforcement we did not support either side in the war.  De Vecchio then stated that was what he meant.

     Joseph Ambrosino began to cooperate on June 11, 1992.  Within one week the prosecutors and I were aware that we had sufficient probable cause to arrest Greg Scarpa for conspiracy to murder or murder.  However, the KCDA had wires in place and were making progress on Scarpa's crew.  In addition, we had done so many arrests and searches and were seeking so many fugitives that SSA De Vecchio told me that we were forbidden to arrest or indict anyone else without his prior approval.  I did not tell SSA De Vecchio what information KCDA

D-302a (Rev. 11-15-83)

?81A-NY-214955

Continuation of FD-302 of  SA Christopher M. Favo                    , On   6/91-2/6/94 Page   6

was getting on the wires.  I told De Vecchio that Scarpa told
Ambrosino that he had murdered Grancio and was involved in other
murders and shootings but since Ambrosino was the only witness the
EDNY would not indict him at the time.  It was true the EDNY did not
plan to indict him at that time, but the reason was that we had more
cases than we could handle and it was to our benefit for the KCDA to
continue their investigation.

For the remainder of 1992, Scarpa's closest associates, Mazza
and Delmasto were fugitives.  I asked De Vecchio to contact Scarpa to
determine where they were.  De Vecchio told me that Scarpa would not
give them up because they were collecting his money for him and De
Vecchio would not insist that Scarpa give them up.  De Vecchio
regularly asked whether the EDNY would indict Scarpa and I told him it
could happen at some point but was not planned immediately.  I told De
Vecchio this because I believed that if I told him when we were going
to indict Scarpa, he would tell Scarpa.

In July, 1992, Lt. Shannon asked me several questions about
Greg Scarpa.  He told me that the KCDA planned to indict him for the
weapons possession violation.  The following day I approached Shannon
in his office and asked him not to tell me anything else about their
plans for Scarpa until the night before they were going to arrest him.
I was then comfortable telling De Vecchio that the NYPD was not
telling me about their weapons possession case.  I told Stamboulidis
that I did not want to push the EDNY to indict Scarpa at this time but
in the future I would ask him for a complaint against Scarpa for
conspiracy to murder and asked that he provide it no matter how short
the notice.

On August 30, 1992, Lt. Shannon contacted me at home (possibly
through my beeper) and told me they had arranged for Scarpa to
surrender himself the following day.  I called Stamboulidis the
following morning and asked for the arrest warrant and he agreed.
After the time at which the police were scheduled to place Scarpa in
custody, I went to De Vecchio and told him that Scarpa was
surrendering to the KCDA on the weapons charges.  De Vecchio told me
he was aware of that and that Scarpa's attorney had negotiated the
surrender because Scarpa had been assured that he would be arraigned
and home in one day.  I told De Vecchio that the EDNY felt that since
we had a case against Scarpa, it was impossible to justify his
surrender and release in Kings County and the federal government not
arresting him.  Not arresting Scarpa would mean that we believed he
was no danger to the community when the federal government was trying
to detain all Colombo war participants on grounds of dangerousness to

{- D-302a (Rev. 11-15-83)}

B1A-NY-214955

ntinuation of FD-302 of SA Christopher M. Favo _____ On 6/91-2/6/94 Page 7

the community.  De Vecchio immediately called Stamboulidis who
corroborated my statements.  De Vecchio was visibly upset.  Several
minutes after I left De Vecchio's office, I observed De Vecchio
speaking on the confidential phone.  Several minutes later De Vecchio
told me that he attempted to contact Scarpa but he had already
surrendered.  Stamboulidis wrote a complaint and Scarpa was arrested
by SAs Andjich and Seymour after his Kings County Court appearance.

Throughout the course of the war important investigative
information was disclosed in Jerry Capece's weekly column appearing
Tuesdays in the Daily News.  On several occasions SSA De Vecchio
approached me or another agent with a specific question about the
investigation of the war or the Colombo family and our answer to the
question appeared in the Capece's column the following day with an
attribution to a law enforcement source or federal law enforcement
source.  On several occasions I mentioned this to SSA De Vecchio and
he blamed the leaks on the prosecutors in the EDNY.  I began
withholding information from SSA De Vecchio on Monday mornings to
prevent its appearance in Tuesday's column.  Capece frequently called
SSA De Vecchio and the secretary, Bernadette MacMillan, as well as
nearly every agent on the squad has taken messages from Capece for SSA
De Vecchio.

On April 4, 1993, Palm Sunday, Carmine Sessa was arrested at
St. Patrick's Cathedral by FBI agents.  Immediately after the Sessa
was handcuffed, and in the presence of Special Agents from the SO-13
squad SSA De Vecchio stated that he had to give Capece a call so he
could send a photographer over.  After Sessa and the others were
removed from the scene, I called SA Valiquette at his home to inform
him of the arrest.  Valiquette stated that Capece would be out of town
that week and was unlikely to contact him about the arrest.

Sessa did not begin to cooperate the day of his arrest because
his son was on a cruise and would not return to the United States for
one week.  Sessa remained in MCC considering cooperation and speaking
to members and associates of the Persico faction. ████████████████

—302a (Rev. 11-15-83)

31A-NY-214955

ntinuation of FD-302 of  SA Christopher M. Favo _____, on _6/91-2/6/94_ Page ___8__

       After June, 1992, I spoke to De Vecchio about not talking to Capece several times.  On several occasions he denied talking to him but claimed he could not stop him from calling.  In late 1993, De Vecchio stated that Doran told him to talk to Capece.  In most cases when the conversation concerned nonpublic information about the case appearing in the Daily News, De Vecchio blamed the leaks on the AUSAs from the Eastern District.

       In the summer of 1993, a film crew from the BBC came to C-10 to photograph an FBI squad in action.  When the BBC asked to see photographs of mobsters and crime scenes I argued with SSA De Vecchio that the Attorney General's guidelines prohibited disclosing the photographs.  De Vecchio told me he would not disclose the photographs.  I told them I would put them in my file cabinet for which De Vecchio maintains one key.  Instead I put them in a separate file cabinet for which nobody else has a key and I did not come to work the next day.  SSA De Vecchio called me at home and stated he had gone through my locked file cabinet and could not find the crime scene photographs.  I then told him they were in another cabinet and I had the key at home.  When I returned to work SSA De Vecchio ordered me to turn the photographs over to him.  I did that and the photos were placed in the C-10 safe.  After the BBC crew left I removed the photos and placed them in a safe in the EDNY.  De Vecchio has not asked about the photos since the BBC crew's departure.