# EXHIBIT 3

P 3

April 4, 1994
Washington, D. C.

I, Christopher M. Favo, having been duly sworn by Supervisory Special Agent (SSA) Robert J. O'Brien, hereby make the following statement to SSAs O'Brien and Timothy T. Arney, whom I know to be Special Agents of the Federal Bureau of Investigation (FBI), assigned to the Office of Professional Responsibility (OPR), FBIHQ.

I understand that this is an administrative interview regarding a criminal allegation that SSA R. Lindley De Vecchio made unauthorized disclosures to a source and to Daily News reporter Jerry Capeci.

I have been further advised of my rights and responsibilities in connection with this inquiry as set forth on a "Warning and Assurance to Employee Required to Provide Information" form (FD-645), which I have read and signed.

I entered on duty with the FBI on 9/18/83 and have been assigned to the New York Division since 12/31/85. I have been assigned to C-10 (Colombo/Bonnano Crime Families Squad) since January of 1990. My supervisor is SSA R. Lindley De Vecchio. I have been the case agent with respect to the overall cases regarding the "Colombo LCN Family War" and I was responsible for the Racketeering Enterprise Investigation (REI) of the Colombo Family.

FAVO, C.
4/4/94

-2-

For a long time I have had a concern that SSA De Vecchio may have divulged information to his former source Gregory Scarpa, Sr., who is currently incarcerated in a Federal Prison and is dying of AIDS. My concerns were shared by some others on my squad including SAs Jeffrey Tomlinson, Howard Leadbetter, and Raymond Andjich.

One day prior to Martin Luther Kings Holiday in January of 1994, I contacted Assistant Special Agent in Charge (ASAC), Donald North, of the New York Division, and requested an opportunity to meet with him regarding our concerns. On January 17, 1994, I, along with SAs Tomlinson and Leadbetter met with ASAC North. We were about to begin one of several trials with respect to the "Colombo LCN Family War" and were concerned about information from the Confidential Witnesses (CWs) indicating that Scarpa, Sr., had a law enforcement source, specifically in the FBI New York Office.

ASAC North met with us in the New York field office. We were not interested in getting SSA De Vecchio in trouble, we only wanted to see if he could be transferred to another squad and replaced by another supervisor so we would be able to continue our investigations and prosecutions in the "Colombo LCN Family War" matters, without a concern that he might be disclose information regarding certain of our cases. ASAC North told us De Vecchio and C-6 Supervisor Ray Kerr would be switched the following day. In addition, for our protection, he stated that

FAVO, C.
4/4/94

- 3 -

he would indicate that any complaints about De Vecchio came from the EDNY.

The following day De Vecchio was not transferred. ASAC North told me that CSSA Taylor had recommended against it because it would disrupt both C-10 and C-6 and it made no sense to disrupt both squads. A few days later, ASAC North told me and agent Leadbetter that the FBI was going to conduct an OPR inquiry and it would be led by ASAC Wayne Comer of the Philadelphia Division. He also told me that SSA Chris Mattiace of New Rochelle Resident Agency was going to replace SSA De Vecchio who was going to go to New Rochelle. ASAC North ordered me to prepare an FD-302 which summarized some incidents concerning SSA De Vecchio. I did prepare an FD-302, dated June 1991 - February 6, 1994 and, in the interest of brevity, that information is not being repeated in this statement, but the FD-302 is being attached to this statement.

I recall on 1/26/94 that ▓▓▓▓▓▓▓▓ who is on C-10 but investigates the Bonnano Family, told me that SSA De Vecchio was going to be transferred. ▓▓▓▓▓▓ as well as many of the other "Bonnano Agents" wanted SSA De Vecchio to stay on the squad. I believe that ▓▓▓▓▓▓ might have learned about the transfer when ASAC North told De Vecchio.

That same morning ▓▓▓▓▓▓ told me that SSA De Vecchio had an OPR problem and would be transferred temporarily. ▓▓▓▓▓ did not tell me who gave him this information.

FAVO, C.
4/4/94

-4-

On 1/26/94, SSA De Vecchio called me into his office and asked me who had been saying things about him. I told SSA De Vecchio that I could not discuss the matter with him. SSA De Vecchio told me to get out of his office.

15 minutes or so later, SSA De Vecchio called me back into his office and told me that SSA Thomas Fuentes of the Organized Crime Section, Criminal Investigative Division, FBIHQ, was going to come up to New York and clear him. I believe SSA De Vecchio had spoken to ASAC North and learned that SSA Fuentes was going to be in charge of the OPR inquiry. SSA De Vecchio asked me who was in charge of handling a CW by the name of Billy Melli. Melli is a very important CW in our prosecutions and had identified Scarpa's source as an FBI agent. I told De Vecchio that Melli is being handled by SSA Leadbetter. I told SSA De Vecchio that I was not going to answer his questions about what Melli had said or about this matter. SSA De Vecchio reiterated that he would be cleared and then would return to the squad. SSA De Vecchio was angry about being accused of releasing information. De Vecchio told me that despite what had happened, he would deal with me professionally.

Just after that meeting, I went up to Joe Valiquette's office (the media representative), and used his telephone to beep ASAC North. I told ASAC North about my meetings with De Vecchio. ASAC North stated that he had just spoken to De Vecchio. I learned from ASAC North that the OPR investigation was going to

FAVO, C.

-5-

be handled by SSA Fuentes and SSA Jack Barrett, who was previously assigned to CID at FBIHQ and is a close friend of ASAC North's. ASAC North told me that SSA De Vecchio had told him that he was very upset about being accused, denied the accusation and stated that the CWs are "liars." ASAC North stated that he believed De Vecchio. I was concerned about SSAs Fuentes and Barrett being involved in the OPR investigation, because they were now or had been in De Vecchio's chain of command, were close friends of North's, could not be viewed as independent and SSA De Vecchio's comments indicated that Fuentes would not investigate in an unbiased manner.

Sometime before Fuentes and Barrett came to New York in late January 1994, I spoke with Valerie Caproni, the Assistant United States Attorney (AUSA) who is in charge of the prosecutions in the "Colombo LCN Family War." She told me she had met with SSAs Fuentes and Barrett and was impressed with their enthusiasm about pursuing the matter. She did state that they had a difference of opinion about the use of polygraphs. SSAs Fuentes and Barrett wanted to use polygraphs to test the veracity of the CWs and AUSA Caproni did not want to use polygraphs. AUSA Caproni was not aware of the relationship between SSAs Fuentes and Barrett and the New York Division and I explained to her that SSA Fuentes monitors New York's OC program and that De Vecchio indicated Fuentes would clear him. AUSA

FAVO, C.

-6-

Caproni thereafter requested the AUSAs accompany Barrett and Fuentes in the interviews.

ASAC North told us that we should not discuss the OPR matter with anybody, but it did not take long before other agents in the office indicated to me and others and that they knew we had reported our supervisor. We felt our request for confidentiality had not been taken seriously. On one occasion when ASAC North came out to Howard Leadbetter and me in the squad room and in front of other agents asked whether we had the 302s ready. When we asked what 302s he meant, ASAC North indicated they were the 302s from the CWs concerning Scarpa. I believe it is possible that █████████ and █████████ may have heard ASAC North make the comment to us. It was unprofessional for ASAC North to ask that question in the squad room. About a week later I contacted ASAC North to make an appointment to give the 302s to him. He told me just to give them to Brian Taylor and he would pick them up. The 302s summarized what the CWs had told us.

I started to hear from other agents in the office that, if SSA De'Vecchio is transferred, it would only be a temporary transfer. One of the concerns I had heard was that SSA Chris Mattiace did not want to transfer to New York City from New Rochelle. Later I heard that De Vecchio had been cleared of wrongdoing and would not be transferred.

FAVO C

-7-

I contacted ASAC North. ASAC North told me that SSAs Fuentes and Barrett had conducted an inquiry and found that SSA De Vecchio could not have given the "DEA list" information to Scarpa, Sr. ASAC North told me that the inquiry had been terminated, but it could be reopened at a later date. ASAC North said it made no sense to inconvenience both supervisors by transferring them when no information surfaced which would confirm the allegations against SSA De Vecchio. ASAC North stated that De Vecchio was under orders not to take any calls from Scarpa.

Three days later De Vecchio called a squad meeting attended by everyone except Andjich who was at a neutral site meeting. De Vecchio said he had been cleared but the case could be reopened later. De Vecchio declared his innocence and was critical of anyone who believed a CW over him. De Vecchio added that the whole situation was handled incorrectly by the agents who went to the EDNY and in the future anyone with a problem should bring it to him.

It was speculated that SSA De Vecchio may decide to retire and that would solve our problem with SSA De Vecchio's presence as supervisor of C-10. There came a time when SSA De Vecchio needed to move from his office space to another office space. He packed up all of the boxes, including all his plaques. They were not immediately unpacked at the new location, which gave us the impression that maybe he would be moving or retiring;

FAVO, C.

-8-

but after five or six weeks, he unpacked the plaques and put them on the wall and the impression was rather clear that he was not moving or retiring.

Some of us on C-10 were still in a rather untenable position. Since we felt uncomfortable about not being able to discuss certain elements of our investigation of Scarpa's crew with SSA De Vecchio, AUSA Caproni suggested we provide that information to the Drug Enforcement Agency (DEA), in an effort for the DEA to pursue the investigation of the Scarpa crew. We had worked very hard to put these cases together and preferred that the FBI handle its problems properly rather than rely on the DEA to solve our problem.

My wife and I are expecting a child and I decided to take some annual leave in order to be with my family. I put in an application to take six weeks' annual leave. I put the leave slip in on 3/14/94 with my leave to commence on 3/16/94. My intention was that my taking annual leave would force management to address the task of preparing for ten trials with only a few experienced agents and enable me to get some rest. In addition, I felt our original problem with investigating the Scarpa crew still remained. I was certain I would confront the De Vecchio/Scarpa issue when on the witness stand in the upcoming trials and in the end would be held responsible for not reporting my dealing with SSA De Vecchio.

FAVO, C.

-9-

When ████████ heard I took six weeks leave and realized I was having difficulty handling the situation with SSA De Vecchio, he suggested I speak to ████████ whom I trusted. I knew ████ and ████ arranged for us to meet.

I met with ████ on 3/16/94, and we spent approximately three hours discussing my concerns about SSA De Vecchio and Scarpa, Sr. It has been brought to my attention that ████ prepared a memorandum to Deputy Assistant Director in Charge William A. Gavin, dated 3/18/94, regarding our discussion. I have reviewed my FD-302 concerning this matter, which is attached to this statement, and the FD-302 is correct in its content.

I believe the interviews of the following FBI New York personnel would be helpful in this investigation:

1) SA Jeffrey W. Tomlinson, C-10
2) SA Robert J. Neuendorf, C-10
3) SA Howard Leadbetter, C-10
4) SA Raymond Z. Andjich, C-10
5) SA Terrence J. Harkins, C-10
6) SA Mary Ann Walker, C-10
7) SA Gary Draus, Chicago Division
8) SA William S. Vanderland, PLAs Office
9) ASAC Donald V. North
10) SA Jeffrey Carrie, SO-13
11) SA Kevin O'Rourke, SO-13

FAVO, C.

12) Lt. William Shannon, NYPD

Interviews of the following EDNY personnel would be of value in this investigation:

1) AUSA Valerie Caproni, worked with CWs Parlegreco, Melli and Delmasto. AUSA Caproni was the prosecutor of Gregory Scarpa, Jr.'s crew.

2) AUSA George Stamboulides, worked with CW Sessa.

3) AUSA Andrew Weissman, worked with CW Ambrosino.

4) AUSA Ellen Corcella, worked with CW Mazza.

The following CWs need to be interviewed with respect to this allegation:

1) Carmine Sessa - Sessa has known Scarpa for 10 to 15 years. Sessa is in a position to provide information concerning Scarpa, Sr., receiving information regarding phone numbers and license plates from his law enforcement source. Sessa may have seen the "DEA list" which identified approximately nine individuals (not 30 individuals, as was reported in ▓▓▓ memorandum) which were to be indicted in a DEA case in 1988. This information is crucial to the potential notice to Scarpa, Sr., that Scarpa, Jr., was one of those to be indicted. Sessa and his wife, Anne Sessa, were very close to Scarpa, Sr., at one time. Anne Sessa used to receive phone calls for Scarpa, Sr., from "Dello" which is believed to be the name SSA De Vecchio utilized when he contacted Scarpa, Sr.

FAVO, C.
4/4/94

-11-

2) Larry Mazza - Mazza may know about the "DEA arrest list." Mazza may know about a 1985 U.S. Secret Service arrest and search of the Wimpy Boy's Club. Mazza may know about the bug in the Wimpy Boys' Social Club. Mazza may know what information Scarpa received from his source during the war.

In June, 1992, arrest warrants were obtained for seven people including Mazza and James Delmasto. Mazza may have been told to keep a low profile and he would not be arrested. The fugitive cases of Mazza and Delmasto were assigned to one agent and were not sufficiently pursued. It took approximately six months for Mazza to be located. Also, Mazza had a close relationship with Linda Scarpa, wife of Scarpa, Sr.

3) Joseph M. Ambrosino - Ambrosino states that several days after Carmine Imbriale was arrested, Scarpa, Sr., told Sessa that Imbriale was bad and they had to take some action.

4) James Delmasto - He should be able to provide the same information as Mazza.

5) Billy Melli - Melli was close to Gregory Scarpa, Jr., and possibly knows about the DEA arrest list. Melli got the contract to kill Cosmo Catanzano. Scarpa, Jr., told Melli that he learned from Scarpa, Sr., that Catanzano was likely to cooperate after arrest and that they had to get Catanzano.

6) Mario Parlagreco - Parlagreco was the Wimpy Boy's Club manager. He should know about Scarpa, Sr., obtaining phone numbers and license plate numbers from his law enforcement

FAVO, C.

source. Also, Parlagreco participated in the attempt to kill Catanzano. Parlagreco has heard Scarpa say that he had a source.

I believe it would also be beneficial to interview U.S. Federal Judge Jack Weinstein regarding the sentencing and bail of Scarpa, Sr. I also believe it would be beneficial to interview U.S. Federal Judge I. Leo Glasser concerning the sentencing of Scarpa, Sr. and Scarpa, Jr. Magistrate Caden may also have participated on the Scarpa, Sr. bail decision. The sentencing of these subjects were lighter than expected, and it is possible that SSA De Vecchio might have contacted the Judges prior to sentencing.

The following information pertains to the "Hello" telephone line in SSA De Vecchio's office. The telephone number is ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ called SSA De Vecchio at approximately 9:45 a.m. and approximately 10:00 a.m. on ▓▓▓ I understand ▓▓▓ was concerned about information that appeared in the newspaper regarding ▓▓▓ On 3/11/94, SA Mary Ann Goldman (nee Walker) heard SSA De Vecchio receive a call on this line, but neither was certain who he spoke to. On 2/28/94 (exact time not known), I understand that ▓▓▓▓▓▓▓▓▓ called SSA De Vecchio on this line. On 2/10/94, at 10:30 a.m., SSA De Vecchio received a call on the "Hello" line.

FAVO, C.
4/4/94

Case 1:06-cv-00069-FB-CLP  Document 82-4  Filed 07/30/07  Page 14 of 14 PageID #: 1360

-13-

I have read this statement consisting of this and twelve (12) other pages and it is true and correct.

_____
Christopher M. Favo

Sworn to and subscribed before me this 6th day of April, 1994, at New York, New York.

_____
Robert J. O'Brien
SSA, FBIHQ

Witness:

_____
Timothy T. Arney
SSA, FBIHQ

FAVO, C.