# EXHIBIT A

```
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK
 2
 3   - - - - - - - - - - - - - X
                CV 96-1474
 4   VICTOR ORENA,          CV 96-1461
     PASQUALE AMATO,
 5                          :
           Plaintiffs,      :
 6
           v.               :  United States Courthouse
 7                             Brooklyn, New York
     UNITED STATES OF AMERICA,
 8
                            :  May 20, 1996
 9        Defendant.        :  10:00 o'clock a.m.
10   - - - - - - - - - - - - - X
11
            TRANSCRIPT OF HEARING
12       BEFORE THE HONORABLE JACK B. WEINSTEIN
          UNITED STATES DISTRICT JUDGE.
13
14   APPEARANCES:
15   For the Plaintiff Orena:   GERALD SHARGEL
                                ALAN FUTERFAS
16                              ELLEN RESNICK
     For the Plaintiff Amato:   BENJAMIN BRAFMAN
17                              BRETT GILBERT
                                JEFFREY LICHTMAN
18
19   For the Defendant:         GEORGE STAMBOULIDIS
                                ANDREW WEISSMANN
20
21
22   Court Reporter:       Anthony M. Mancuso
                           225 Cadman Plaza East
23                         Brooklyn, New York 11201
                           (718) 330-7687
24
25   Proceedings recorded by mechanical stenography, transcript
     produced by CAT.
```

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

PAGE 2

2

 1   (Case called; both sides ready.)
 2       THE COURT: All right. Put on your case.
 3       MR. SHARGEL: Your Honor, we first call agent
 4   Lindley DeVecchio.
 5       MR. WEISSMANN: Your Honor, I don't mean to delay
 6   the proceedings. As we mentioned last week, we believe there
 7   needed to be Curcio waivers, particularly because one of the
 8   new attorneys for Mr. Orena has represented numerous people in
 9   the Colombo Family on both sides of the floor.
10       THE COURT: Who is?
11       MR. WEISSMANN: Mr. Futerfas. He indicated that he
12   discussed this with Victor Orena. But I just want to make
13   sure that there is a waiver on the record before we proceed.
14       MR. FUTERFAS: We have no objection to that, your
15   Honor.
16       I have spoken with Mr. Orena about this issue.
17       THE COURT: Is that so, sir?
18       DEFENDANT ORENA: Yes.
19       THE COURT: What about the other defendant, any
20   objection?
21       DEFENDANT AMATO: No, sir. No, your Honor.
22       MR. GILBERT: No.
23       THE COURT: Anything further on that?
24       MR. WEISSMANN: Your Honor, I think it needs to be a
25   little bit more detailed. If Mr. Futerfas can indicate what

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

3

 1   he explained to his client about what the potential conflict
 2   could be.
 3       THE COURT: Go ahead and ask him. Put it on the
 4   record.
 5       MR. FUTERFAS: Your Honor, I spoke to Mr. Orena this
 6   morning where the other cases stand. They are all but
 7   completed. I represented a Mr. Cappa. That individual was
 8   sentenced. I represented another individual before Judge
 9   Raggi. That individual took a plea. He is awaiting
10   sentence. I represented Mr. Anthony Russo in post-trial
11   proceedings and, the last court appearances on that, that
12   record is fully submitted before Judge Sifton. The last court
13   appearance was in July of 1995 I believe and I have also
14   explained to Mr. Orena that Mr. Shargel is going to be
15   carrying by far the laboring oar this morning. I'm assisting
16   Mr. Shargel in preparing the cross-examinations, preparing
17   Mr. Shargel, and that's it.
18       THE COURT: Anything further?
19       MR. WEISSMANN: If the defendant could indicate that
20   he understands that those raise potential problems.
21       THE COURT: Do you understand there are potential
22   problems that may adversely affect you?
23       DEFENDANT ORENA: Yes.
24       THE COURT: Do you want these attorneys to represent
25   you?

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

PAGE 4

4
DeVecchio/direct/Shargel

 1       DEFENDANT ORENA: Yes, your Honor.
 2       THE COURT: Anything further?
 3       MR. WEISSMANN: No, your Honor. Thank you.
 4       THE COURT: All right. Swear the witness.
 5   LINDLEY DeVECCHIO,
 6       having been duly sworn was examined and
 7       testified as follows:
 8       THE CLERK: State your name and spell it for the
 9   record.
10       THE WITNESS: Lindley, L I N D L E Y, DeVecchio, D E
11   V E C C H I O.
12   DIRECT EXAMINATION
13   BY MR. SHARGEL:
14   Q. Mr. DeVecchio, you are an agent of the Federal Bureau of
15   Investigation?
16   A. Yes, I am.
17   Q. Are you presently on duty? Do you have an active role in
18   the Federal Bureau of Investigation?
19   A. On advice of counsel, Mr. Shargel, I cannot answer your
20   questions because of my Fifth Amendment privilege.
21   Q. Did there ever come a time when you met a man by the name
22   of Gregory Scarpa?
23   A. My answer is the same as the previous one.
24   Q. Did you ever give information to Gregory Scarpa about
25   activity and information that the FBI learned?

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

Favo/direct/Shargel

1  A. That's correct.
2  Q. And when did you learn that Gregory Scarpa was committing
3  acts of violence?
4  A. Do you have any specific acts that you are speaking of?
5  Q. Let's focus on the year 1991. Let me be more specific.
6  Did there come a time when you started participating in
7  meetings with a joint task force, with the FBI, the Kings
8  County District Attorney's Office and other members of the New
9  York City Police Department?
10 A. Yes. Initially it was the FBI and just people from the
11 organized crime division of the police department, the
12 Brooklyn DA's Office came on later.
13 Q. Isn't it a fact that joint meetings with these other
14 agencies began in or about December of 1991?
15 A. We met with the New York Police Department in December
16 1991.
17 Q. Isn't it a fact that you learned from the New York City
18 Police Department, detectives from the New York City Police
19 Department, that Gregory Scarpa was described as one of the
20 most violent and active people in this alleged war?
21 A. He was among the violent people in the war. Do you want
22 to put a time period to this? I'm not sure what you are
23 asking.
24 Q. Let me see if I can be more specific.
25     December 1991 there had already been shooting in what

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 14

14
Favo/direct/Shargel

1  was supposed to be the war?
2  A. That's correct.
3  Q. In December of 1991 you already knew that on November 18
4  of 1991, according to Gregory Scarpa, someone shot at him,
5  right?
6  A. According to a number of people on November 18 of 1991
7  Gregory Scarpa was shot at.
8  Q. One of those people that was a source for that was
9  Gregory Scarpa himself, right?
10 A. He was one of several.
11 Q. You knew as of December of 1991, December of 1991, that
12 an attempt had been made to murder Vic Orena? You knew that,
13 didn't you?
14 A. Not as of December of 1991.
15 Q. You didn't know that?
16 A. Which attempt are you speaking of?
17 Q. The June 20 attempt of 1991.
18 A. We knew that in June.
19 Q. You knew that in June?
20 A. Yes.
21 Q. You knew that there was a potential for violence hat
22 least in June, correct?
23 A. That's correct.
24 Q. And in December of 1991, had people been murdered?
25 A. Yes.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

Favo/direct/Shargel

1  Q. And how many murders had taken place in December of 1991?
2  A. In December I believe there were first, third, fifth and
3  the eighth, four.
4  Q. Sorry.
5  A. I believe there were four in December of 1991.
6  Q. In December of 1991 you were told by representatives of
7  Kings County District Attorney's Office that Gregory Scarpa's
8  crew, Gregory Scarpa and his crew, were, as I said before,
9  among the most violent and active in the war, correct?
10     MR. WEISSMANN: Objection to the form.
11     THE COURT: Overruled.
12 A. They told me that was their belief. I don't recall
13 whether it was December 1991 or January '92.
14 Q. Well, do you remember the 302 that you filled out in
15 connection with this matter?
16 A. Yes.
17 Q. And do you have a copy of the 302? May we have an extra
18 copy for the agent? Or I can show you my copy.
19     Let me show you what we will for purposes of this
20 hearing -- actually, I'll keep the same exhibit number that
21 the government put on it in an earlier proceeding. 3500-8.
22     Let me show you a copy of what's been marked as
23 3500-8.
24     MR. SHARGEL: May I approach the witness, your
25 Honor.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 16

16
Favo/direct/Shargel

1      THE COURT: You need not ask.
2  Q. 3500-8. I'm referring you to page 2.
3      Does that refresh your recollection? Take a moment
4  to read it to yourself.
5      (Pause.)
6  A. Yes.
7  Q. Does that refresh your recollection that in December,
8  specifically on December 16, 1991, you were told of Gregory
9  Scarpa and his crew by the Kings County District Attorney's
10 Office?
11 A. No, I was not and it doesn't say that here.
12 Q. Is there anything in that 302 -- take your time and look
13 at it -- with respect to what you were told at that meeting?
14 A. What are you asking?
15 Q. My question to you is: Did you starting getting
16 information in December of 1991 that Gregory Scarpa was an
17 individual who was engaged in violent activity?
18 A. Probably. Not from this.
19 Q. Put that aside. Stay with the question.
20     Did you get information in December of 1991 that
21 Gregory Scarpa was engaged in acts of violence, threatening to
22 kill people, conspiring to kill people and actually killing
23 people?
24 A. He was among -- the whole family was at war. He was a
25 member of the family. We were hearing about a lot of people.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

## Page 29

Favo/direct/Shargel

1 according to what I heard from Kings County, who was doing
2 this shooting?
3 A. The way you have worded that question, the answer would
4 be no. I don't recall a specific question along those lines.
5   But I would like to explain that we discussed this
6 information as it came in and we dealt with it as it came in.
7   And when a 209 such as that one came in, it described
8 several different shootings, in which case we really have no
9 idea who has done any. We just have some source information
10 -- I guess I should say some idea of who has done what
11 shooting. Sometimes we were not sure what faction the person
12 who was shot was on.
13   We were dealing with a great deal of information. I
14 didn't deal with Gregory Scarpa, Lin DeVecchio did. If
15 Gregory Scarpa knew that information, I assume Lin DeVecchio
16 would have asked him and put it on the document. We discussed
17 things as they came in. Those are the answers that I could
18 deal with or I dealt with and I dealt with it.
19 Q. You assume, as you sit here now, that Lin DeVecchio would
20 put down exactly what he discussed with Gregory Scarpa? Is
21 that your view as you sit here now?
22   THE COURT: No. Don't answer that.
23   MR. SHARGEL: There are two prongs to this, your
24 Honor.
25   One prong is what should have been turned over prior

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

## Page 30

Favo/direct/Shargel

1 to the trial in November and December of 1992.
2   And the second prong is a newly discovered evidence
3 standard.
4   There are two separate issues. It's true that I
5 jumped. In this portion of my questioning I am focusing on
6 events that happened prior to Mr. Orena and Mr. Amato's
7 trial. Certainly at a later time, pressing the new trial
8 motion based on newly discovered evidence, I'll be addressing
9 that as well.
10   MR. WEISSMANN: Your Honor, the question --
11   THE COURT: We'll wait until you get to it rather
12 than jump around so we have a consistent and chronological
13 record.
14   MR. SHARGEL: I'll go in sequence.
15 BY MR. SHARGEL:
16 Q. Another individual has been murdered in December of 1991
17 by the name of Vincent Fusaro, correct?
18 A. That's correct.
19 Q. Here again, not to labor it, this insert to the 209
20 simply said that it was done by the Persico faction, right?
21 A. That's correct.
22 Q. And you recall no conversation with Agent DeVecchio where
23 you either asked for more detail or were supplied more detail?
24 A. We discussed these murders and this information as it
25 came in and we dealt with the information as it came in. As I

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

## Page 31

Favo/direct/Shargel

1 sit here I can't recall saying to him specifically we should
2 know this because the way organized crime works a lot of times
3 they don't talk about who specifically has done the murders.
4 And to simply have the shooters names being on the Persico
5 side was more than we had at that time.
6 Q. Agent Favo, at any time during December 11, 1991 or the
7 days thereafter, did you have any idea -- did you have any day
8 that Gregory Scarpa was the person responsible for killing
9 these people?
10 A. December of 1991?
11 Q. Not in December of 1991.
12   Do you recall that on January 7, 1992 an individual
13 by the name of Nicky Grancio was murdered?
14 A. Yes.
15 Q. And do you recall reading an insert that was prepared,
16 January 8, 1992 --
17   MR. SHARGEL: Which by the way, judge, in the
18 exhibits says 1991. It's been testified toe in other trials
19 it's a typo.
20 Q. Were you aware that there was an insert provided on
21 January 8, 1992, dealing with --
22 A. I am aware there was one provided.
23 Q. And the insert on January 8, 1992 said that the murder of
24 Nicky Grancio was done by the Persico faction, once again the
25 Persico faction, of the Colombo Family?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

## Page 32

Favo/direct/Shargel

1 A. Yes.
2 Q. Did there come a time shortly after that where you
3 started to get information as to who it was in the Persico
4 faction?
5 A. That killed Grancio?
6 Q. That killed Nicky Grancio, yes.
7 A. We got a good deal of information in about the Grancio
8 homicide at that time and it had a good number of different
9 people responsible for that murder.
10 Q. One of the people responsible for that murder, albeit
11 among others, was Gregory Scarpa?
12 A. Yes, among others.
13 Q. You were told or related to the fact within days of Nicky
14 Grancio being murdered on January 7, 1992, that Gregory Scarpa
15 was responsible, right?
16 A. That's correct.
17 Q. In fact, you're aware that a detective, a detective by
18 the name of Maggiore testified that you told him within days
19 of the Grancio murder that it was Gregory Scarpa that killed
20 Nick Grancio, correct?
21 A. That's correct, because they were chasing someone else.
22 Q. My question is, Agent Favo, putting aside because they
23 were chasing someone else, the fact is you told Detective
24 Maggiore of the Kings County District Attorney's Office and
25 you believed in January of 1992 that there was strong reason

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 32

32
Favo/direct/Shargel

1 to believe that Gregory Scarpa, the confidential informant,
2 had murdered Nicky Grancio, right?
3 A. We had had information that that was the case, yes.
4 Q. Did you have any discussions with Lindley DeVecchio in
5 January of 1992 about the fact that it was -- that you were
6 getting information that Gregory Scarpa, his informant, was
7 the person that was actually going out and shooting, murdering
8 people?
9 A. I discussed all the information that we received on any
10 of these cases with Lin DeVecchio. So I naturally would have
11 told him. I was one of the people.
12 Q. Was there any conversation between you and Lindley
13 DeVecchio at that time about the possibility that the
14 informant was killing people?
15 A. I told him he was one of the people that had been named
16 by the informants. That was the conversation we had.
17 Q. Did he say anything in response?
18 A. I don't recall anything. I don't recall the conversation
19 specifically, but I can tell you that we discussed this every
20 day.
21 Q. Did he say anything, like, nah, that couldn't have
22 happened, Gregory Scarpa wouldn't have done something like
23 that?
24   Did he ever say anything like that?
25 A. I don't recall.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 34

34
Favo/direct/Shargel

1 Q. Do you recall whether he expressed surprise or dismay
2 when you told him this news about Gregory Scarpa? Do you
3 recall any of that?
4 A. As I say, I don't recall. There was a conversation every
5 single day about this war while we were investigating it.
6   MR. SHARGEL: May I have a moment, your Honor?
7   (Pause.)
8 Q. Let me ask you another question: Gregory Scarpa wasn't
9 the only informant that C-10 had, was he?
10 A. There were a number of informants both on C-10 and on
11 other squads that other agents handled that reported on the
12 war.
13 Q. Let's stick with C-10 for a moment.
14   Were there -- I don't want to know their names and I
15 bet the court wouldn't let me know anyway. Were there other
16 informants that were giving information about what was going
17 on during this period of time?
18 A. Yes.
19 Q. And did other informants provide information that was
20 placed in inserts to form 209's?
21 A. Yes.
22 Q. And did other informants give information about these
23 very same topics, the shootings of Amato and -- Gaetano Amato
24 and Tolino and Fusaro and Grancio? Did you get that
25 information from other informants?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 35

35
Favo/direct/Shargel

1 A. Yes, I did.
2 Q. And did any of the other informants say to you that it
3 was Gregory Scarpa's crew or Gregory Scarpa himself that was
4 responsible for the actual murder or shootings of these
5 people?
6 A. Some did and some named other people.
7 Q. As a matter of fact, there were other inserts to 209's in
8 January of 1992 where Gregory Scarpa started to name other
9 people for the murder of Grancio, right?
10 A. I know -- I can recall that he blamed another crew for
11 one of the murders. I don't know if it was Grancio or one of
12 the other ones.
13 Q. Let me show you the insert for January 14, 1992, and I
14 ask you to look at that paragraph.
15 A. That's correct. Yes.
16 Q. Did you recall -- do you recall now any discussions that
17 you had with Agent DeVecchio about this information?
18 A. As I mentioned, we discussed -- I went into him every
19 morning. I gave the report. I told him what information we
20 had and if this was information that came in, it was
21 discussed.
22 Q. So there never came a time, as you recall, in December of
23 1991 or January of 1992, where you had discussions with Agent
24 DeVecchio about the possibility that Gregory Scarpa, the
25 informant, was actually out murdering people? No discussions

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 36

36
Favo/direct/Shargel

1 like that?
2   MR. WEISSMANN: Objection. Misstates his
3 testimony.
4   THE COURT: I'll allow it. If you can answer it,
5 answer it.
6 A. As I said, I spoke to him every day about the information
7 that we had. This was information that we had. I told it to
8 him.
9 Q. Did there come a time when you knew of the arrest of
10 Carmine Imbriale?
11 A. Yes.
12 Q. When was that?
13 A. It was the end of February 1992.
14 Q. Were you involved in the debriefing of Imbriale?
15 A. Eventually, yes.
16 Q. And before you were actually -- before that eventuality
17 came, before you were actually involved in the debriefing of
18 the Carmine Imbriale, you learned the information that he was
19 giving to other agents, right?
20 A. Not exactly that way. If you would like, I can explain.
21 Q. Let me ask the question their way.
22   Were you still Colombo coordinator the end of
23 February 1992?
24 A. Yes.
25 Q. Were you the Colombo coordinator at the beginning of

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

61

Favor-direct-Shargel

1  Q. I'm asking you for the name of a single agent who you
2  spoke to, a supervisory agent, disclosed this information
3  about Scarpa?
4  A. Whoever. It would have been I imagine North, Brian
5  Taylor, anybody that was asking questions about the FBI that
6  would have come on these topics, it would have been given to
7  them. It was not withheld.
8  Q. Don North knew this information that you had learned from
9  Imbriale, right?
10 A. (No response.)
11 Q. Yes or no?
12 A. He would have -- I can't recall specific conversation
13 but all this information was passed along. When we had bigger
14 meetings about it, it was discussed.
15 Q. In March of 1992, March 31st, 1992, after Gregory Scarpa,
16 according to what you were told by the Kings County District
17 Attorney's Office was seen throwing a gun out the window, you
18 took steps as directed by Lindley DeVecchio so that
19 Gregory Scarpa would not be arrested, right?
20 A. No.
21 Q. No?
22 A. No.
23 Q. Well, did you have a conversation with the an Assistant
24 United States Attorney on this question?
25 A. Not on that question.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

62

Favor-direct-Shargel

1  Q. Did you say to an Assistant United States Attorney that
2  our concern was that the New York City Police Department would
3  force us to arrest Scarpa?
4  A. Yes.
5  Q. When did you --
6  A. That's not the exact wording. Basically --
7  Q. Not the exact wording?
8  A. I can't recall. I would quote it but that's basically
9  what we were discussing.
10 Q. Did you say --
11 A. In a 302?
12 Q. Did you say that you're concerned --
13 A. Were you asking me if that's what I said to the
14 prosecutor?
15 Q. Let me finish the question.
16 A. Okay.
17 Q. After notifying DeVecchio, I'll read it, if I may. I
18 notified DeVecchio and since our concern was that the NYPD
19 would force us to arrest Scarpa for the gun, we called
20 Stamboulidis and informed him that Scarpa was a source; is
21 that right?
22 A. Yes.
23 Q. Then you had a conversation with Mr. Stamboulidis, right?
24 A. And others, yes.
25 Q. Well, the individual in your 302 that you recall having a

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

63

Favor-direct-Shargel

1  conversation with is Mr. Stamboulidis, correct?
2  A. I spoke to him on the phone. Is that the part you're
3  talking about -- then we went and had a subsequent meeting.
4  I'm not sure what you're getting at.
5  Q. Did Mr. Stamboulidis say he could avoid arresting Scarpa
6  federally because of detectives' statements being convoluted
7  or something like that?
8  A. That -- we had a discussion about whether this required
9  an arrest, whether there was probable cause for arrest,
10 whether we had to go out and do the arrest. We didn't want to
11 arrest him because he was an informant, providing information,
12 but if there was probable cause for an arrest we would do it.
13 That was what the discussion was about. There was a problem
14 of the way the information had been relayed to me. There was
15 also a problem because two people were in the car and no one
16 saw exactly who threw the gun out.
17 Q. You knew it was a federal crime for a felon to be in
18 possession of a gun, you knew that?
19 A. I knew that. He wasn't the only one in the car. That
20 was part of the problem.
21 Q. You knew at that time that a detective said he saw
22 Gregory Scarpa, you know that, throw the gun out, out the
23 window, right?
24 A. That's what he said. He didn't describe him.
25 Q. So there was some equivocation?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

64

Favor-direct-Shargel

1  A. There was.
2  Q. So you thought and felt comfortable knowing what the
3  substance of the guidelines are, you felt comfortable in March
4  of 1991, the end of March of 1991 keeping Scarpa or seeing
5  that Scarpa was not arrested, right?
6  A. We went and talked to the prosecutor --
7  Q. Can you answer that yes or no?
8  A. You use the term "felt comfortable." We went to find out
9  whether there was probable cause for an arrest, whether one
10 could be done, whether we would do it. They said there was
11 not; that the other alternative was a Brooklyn District
12 Attorney could arrest him if they felt it was and they didn't
13 either.
14 Q. They could arrest him?
15 A. If they felt it was probable cause they could arrest him.
16 Q. Agent Favo, did you know the Brooklyn District Attorney's
17 Office had what they called a "wanted" on him?
18 A. I later found out they issued a wanted, not a warrant.
19 Q. Did you know they were out looking for him?
20 A. Yes.
21 Q. Did you know they wanted -- that they had camped at his
22 door, to use your words, did you know that?
23 A. Yes.
24 Q. You knew they were actively looking for him until at
25 least April 15th, 1992, correct?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

## Page 77

Favo-direct-Shargel

1 THE COURT: That's right, I'm going to take a
2 break.
3 MR. SHARGEL: Let us take a short break.
4 THE COURT: Otherwise we'll fish around, back around
5 more than we need to. Go ahead. Take a ten minute break, get
6 the information. Counsel for the government, can you instruct
7 the witness on what he can or cannot say what I instructed?
8 MR. SHARGEL: May I say one thing before you go?
9 Mr. Orena is not in the penitentiary, there's no sep problem
10 with them.
11 THE COURT: Pardon?
12 MR. SHARGEL: They're not in separation.
13 THE COURT: I want them separated while they're in
14 the courthouse.
15 (Recess).
16 (Continued on next page.)

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

## Page 78

Favo-direct-Shargel

1 MR. SHARGEL: May I proceed?
2 THE COURT: Yes.
3 MR. WEISSMANN: Your Honor, the FBI has told us that
4 Greg Scarpa was closed on March 3 of 1992 and reopened April 8
5 of 1992.
6 THE COURT: Thank you.
7 MR. SHARGEL: May I?
8 THE COURT: Yes.
9 BY MR. SHARGEL:
10 Q. Agent Favo, now that we have the date of March 3, 1992,
11 that's the date I'd like to focus you on. March 3, 1992 was
12 within a day, give or take, of when you yourself had spoken or
13 the FBI had spoken to Carmine Imbriale, correct?
14 A. Prior to it, yes.
15 Q. Whether it rose to the level of probable cause or not,
16 you received information prior to March 3 that Gregory Scarpa
17 had shot or claimed credit for or toasted the shooting of Joel
18 Cacace?
19 A. That's correct.
20 Q. And you had information from informants, as you told us
21 earlier before the first break, you had information from
22 informants that are unnamed that Gregory Scarpa was actively
23 involved in violence, correct?
24 A. Yes.
25 Q. You had information about the murders of Gaetano Amato,

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

## Page 79

Favo/direct/Shargel

1 about Fusaro, about Grancio, and with respect to each one of
2 those, you had information that Gregory Scarpa was involved,
3 correct?
4 A. I don't know about all of them. But we had information
5 that he was part of the war; he was one of the people that was
6 involved with it.
7 I don't recall whether we had specific information on
8 each one, naming him as being involved in each one.
9 Q. Specifically, let's take one example, and we had this, I
10 don't want to go over it, but with respect to Grancio --
11 A. I'll grant you Grancio.
12 Q. -- you had specific information that he was the killer,
13 correct?
14 A. No. No. We had information that he was involved in the
15 murder. We had information that he was, that his son was and
16 other people were named as being involved in the murder.
17 Q. And this came from multiple sources, right?
18 A. Yes. Multiple sources provided the overall information.
19 Not all of them named his involvement in it.
20 Q. Was it before Imbriale or after Imbriale that you got
21 this information -- withdrawn. By March 3, according to the
22 stipulation from the government, Scarpa is already closed,
23 he's closed at that point, correct?
24 A. Yes.
25 Q. And in order to close an informant, certain steps may be

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

## Page 80

Favo/direct/Shargel

1 taken -- must be taken in accordance with guidelines, correct?
2 A. Yes. They send a communication to close.
3 Q. And, in fact, the communication doesn't simply go to a
4 supervisor at 26 Federal Plaza, correct?
5 A. It goes to headquarters.
6 Q. In Washington, D.C.
7 A. Washington, D.C., yes.
8 Q. And the memorandum --
9 MR. SHARGEL: I'm going to ask for production of the
10 memorandum closing him as an informant.
11 MR. WEISSMANN: We object.
12 THE COURT: Denied.
13 MR. SHARGEL: I'd like to tell you this, Judge: at
14 the trial before Judge Korman, the government put into
15 evidence, as Exhibit 5000-B, a teletype that was a closing
16 document at that time in September, not this closing, but in
17 September of 1990 -- or at least marked, I don't know if it
18 got into evidence, but at least marked it as an exhibit.
19 So I have made my request. I understand you denied
20 it, but I have made my request for that closing document.
21 Q. In that closing document, without giving us any specifics
22 or revealing any secrets, in that closing document -- by the
23 way, were you familiar with the closing document?
24 A. No.
25 Q. Did you ever see the closing document?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

## PAGE 93 SHEET 24

Favo/direct/Shargel

1 Scarpa was closed?
2 A. Yes. I believe so.
3 Q. Agent DeVecchio asked you to get certain information for
4 him?
5 A. He had a phone number that he asked me to run.
6 Q. Did you know before he asked you to run that phone number
7 that he had spoken to Scarpa on the telephone?
8 A. I didn't know for sure, but I assumed it.
9 Q. Well, what happened that made you assume that?
10 A. Because my impression was, from speaking to him, that
11 this phone number had something to do with a safe house being
12 used by the Russo crew, Chuckie Russo, JoJo Russo.
13 Q. During this period of time -- by the way, is this after
14 you see Agent DeVecchio speaking with Gregory Scarpa on the
15 phone and telling him about Imbriale, or before?
16 A. I believe it's before. As I say, I can't put a specific
17 date to it.
18 Q. What did Agent DeVecchio ask you to do?
19 A. He asked me to run a phone number. He had written it on
20 a sheet of paper. When I looked at it, I couldn't read one of
21 the digits so I ran it two ways.
22      I took it up to the -- sent it up to the operations
23 center that does, they call it a fast track, they take the
24 number and give the address.
25 Q. Didn't you ask Agent DeVecchio what that number was for?

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

## PAGE 94

Favo/direct/Shargel

1 A. I assumed -- I believed it was for the Russo safe house.
2 Q. My question is, didn't you ask --
3 A. Well, I don't know that I asked him, but I had that
4 impression. So either I asked him or he gave it to me, but
5 that was the impression that I had.
6 Q. As you sit here now, can you think of anything that
7 caused that impression?
8 A. I'm sure we discussed it. I don't know whether I asked
9 him or not, but that was the impression I had, it had
10 something to do with the Russo safe house.
11      Whether he told me that as he gave me the phone
12 number or I asked him what this was for and he told me that, I
13 can't recall.
14 Q. Does it refresh your recollection that on page 4 of your
15 302 -- since there is no jury here, I will save a step -- you
16 said in your 302, that I asked Special Agent DeVecchio what
17 the number was for and DeVecchio skated that it was for Joseph
18 and Anthony Chuckie Russo's safe house; do you remember
19 that?
20 A. Yes, I remember writing that.
21 Q. Does that refresh your recollection as to what happened?
22 A. Then it was that way. I'm telling you, I'm not trying to
23 not tell you what it is. If that's what it says, that's what
24 it is.
25 Q. Then you went out and you did -- as you said a moment

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

## PAGE 95

Favo/direct/Shargel

1 ago, you checked those numbers, right?
2 A. Yes.
3 Q. You knew they didn't come back to any locations that
4 could be fairly described as safe houses, right?
5 A. I didn't know that.
6 Q. You didn't know that?
7 A. No.
8 Q. What did they come back for?
9 A. One came back for a phone booth, which turned out to be a
10 phone booth, the other one was for a laundromat. I went out
11 to Long Island and found both addresses -- well, I found one
12 of the addresses. I couldn't find the second one.
13 Q. Were you puzzled by what those numbers came back to?
14 A. When I went out there?
15 Q. Yes.
16 A. Yes.
17 Q. Because it didn't resemble anything that could be a safe
18 house, correct?
19 A. That's correct.
20 Q. And you came back to 26 Federal Plaza and you had another
21 conversation with Agent DeVecchio, didn't you?
22 A. That was, I think, like a Sunday that I went looking for
23 them, so sometime early the next week I asked him what the
24 numbers were.
25 Q. What did he tell you?

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

## PAGE 96

Favo/direct/Shargel

1 A. I told him I went out there and these didn't look like a
2 safe house.
3 Q. What did he tell you?
4 A. He said they had something to do with Scarpa's business,
5 which I believed I took to be loan-shark business.
6 Q. You knew it was a number for a loan-shark victim, right?
7 A. I believed that. I assumed that, but I don't know that.
8 Q. Didn't you say -- if I may, 5173, Mr. Weissmann -- do you
9 remember being asked these questions and giving these answers
10 at a trial last year:
11      "QUESTION: He..." meaning Agent DeVecchio "...told
12 you that it was one of Scarpa's loan-shark victims, isn't that
13 right, sir?
14      "ANSWER: The words were business number. What it
15 meant to me was loan-shark victim.
16      "QUESTION: Well, sir, you wrote down in your 302
17 one of Scarpa's loan-shark victims, didn't you?
18      "ANSWER: Yes. The terminology he used was
19 customer.
20      "QUESTION: Is that right?
21      "ANSWER: Which I knew to mean loan-shark victim."
22      Then you go on to say in another answer later on down
23 the page that I assume that Scarpa was in the loan-shark
24 business.
25      Do you remember giving those answers to those

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

Favo/direct/Shargel

1 questions?
2 A. Yes.
3 Q. Well, did you think something was odd or peculiar that
4 your supervisor, Agent DeVecchio, was checking numbers to find
5 Scarpa's loan-shark victims?
6 A. I thought it was improper.
7 Q. As a matter of fact, you knew it was improper, didn't
8 you?
9 A. Yes. It was not something I would have done.
10 Q. Well, you know as you sit here now, and you knew back
11 then in February or March, whenever this took place, in 1992,
12 that an FBI agent is not supposed to aid someone in committing
13 a crime, right?
14 A. That's correct.
15 Q. And you know it now and you knew then that loan-sharking
16 was a crime, right?
17 A. That's correct.
18 Q. And you know now and you knew then that helping a
19 loan-shark get a number or locate or find a customer or a
20 victim is illegal, you knew that, right?
21 A. Yes.
22 Q. In fact, you said that it raised a problem with you then,
23 and you were very concerned about it, right?
24 A. That's correct.
25 Q. My question to you, Agent Favo, is there anyone that you

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 99

99
Favo/direct/Shargel

1 Q. And you knew full well under the Attorney General
2 guidelines and everything you knew about the FBI that you had
3 reason to believe that Lindley DeVecchio was doing things that
4 were improper, unethical or criminal, right?
5 A. I had a suspicion.
6 Q. And in April --
7 A. The problem was that --
8    THE COURT: Let him finish.
9 A. That incident, the Imbriale incident, which I believed to
10 be inadvertent, could be explained as being inadvertent. This
11 incident, I wasn't a part of the phone call, I only knew what
12 he had told me. I didn't know the entire circumstances of
13 anything that he had done.
14    So on its own it didn't rise to a tremendous level of
15 probable cause for anything.
16 Q. Agent Favo, was your determination that it didn't rise to
17 the level of probable cause about anything colored by, what
18 you said before, the blind faith in Agent DeVecchio? Can you
19 answer that yes or no?
20 A. I don't recall saying blind faith. But I'll deal with it
21 this way. I would not have suspected him of doing anything
22 improper at this time, and I did not.
23 Q. Agent DeVecchio --
24 A. And I perceived that as being something, some aberration,
25 or I didn't know the entire story.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 98

98
Favo/direct/Shargel

1 reported that to?
2 A. In January '94, I reported it.
3 Q. January of 1994?
4 A. Yes.
5 Q. By the time that Scarpa was reopened on April the 8,
6 1992, you already had the Imbriale problem in your mind; you
7 knew that was a problem, right?
8 A. Yes.
9 Q. By the time Scarpa was reopened on April the 8, 1992, you
10 had this episode with getting numbers of a shylock or
11 loan-shark victim for Scarpa; you heard that, right?
12 A. Yes.
13 Q. Is there any procedure that you know of within the FBI
14 that if another agent is doing something improper, unethical
15 or criminal, anyone of those things, that there's a procedure
16 to pass that information along to a responsible person?
17 A. You report it to your supervisor.
18 Q. Well, if your supervisor is the person who is doing
19 something wrong, does that mean there's no one else you can
20 report it to?
21 A. Then you would report it to his supervisor.
22 Q. And his supervisor was Donald North?
23 A. That's correct.
24 Q. And you knew that full well in 1992?
25 A. Yes, I did.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 100

100
Favo/direct/Shargel

1 Q. Agent --
2 A. And I had a lot more to be concerned with at that point
3 then Lin DeVecchio and his informant. We were in the middle
4 of a war. There were a lot of shootings by a lot of people.
5 Q. Concerned with that or not, you knew that corrupt or
6 illegal activity of a brother FBI agent was something that you
7 should be concerned with, correct?
8 A. That's correct.
9 Q. And you knew also, did you not, that you had an abiding
10 faith in DeVecchio's integrity that prevented you, at least at
11 that time, from going to anyone else in the FBI, right?
12 A. When you say prevented, it would be along the lines that
13 I thought I must be mistaken or there is more to this.
14 Q. In other words --
15 A. And -- so, in other words, that I didn't think that this
16 was what it appears to be now as we look back at it.
17 Q. So in the period -- I'm still, say, with the period
18 February, March, April -- you were essentially giving Agent
19 DeVecchio the benefit of the doubt, right?
20 A. That's correct.
21 Q. You have said earlier that to report Agent DeVecchio to
22 other supervisors in the FBI, it wouldn't be believed, it
23 wouldn't be taken well, I think you said in the past, right?
24 A. It would not have been believed.
25 Q. It was as if someone said that your wife was cheating;

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

## Page 105

Favo/direct/Shargel

1  Q. In fact, even before May the 22, 1992, based on what
2  you -- what happened, what you saw and observed in the early
3  part of 1992, February, March and April, you stopped giving
4  Agent DeVecchio accurate information, correct?
5  A. No.
6  Q. The answer is no?
7  A. No. After that.
8  Q. After May 22?
9  A. Yes.
10 Q. Did you --
11 A. As it pertained to Greg Scarpa.
12 Q. As it pertained to Greg Scarpa?
13 A. Information that pertained to Greg Scarpa.
14 Q. How long after that, by the way? How long after May 22?
15 A. What how long after May 22?
16 Q. How long after May 22 did you start telling Agent
17 DeVecchio things that were not true or were not giving him
18 information?
19 A. Actually, I wasn't telling him the complete story as it
20 pertained to Greg Scarpa, and for the most part it happened
21 after Joseph Ambrosino became a cooperating witness.
22 Q. That was in June, correct?
23 A. That's right.
24 Q. Let me ask you, do you remember being asked these
25 questions and giving these answers at page 5160, starting on

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

## Page 106

Favo/direct/Shargel

1  5159, about when it was that you began withholding information
2  from Lindley DeVecchio.
3        You were asked about a meeting -- going back to 5158,
4  Mr. Weissmann -- about a meeting in January of 1992 with
5  a then Assistant District Attorney in Kings County named Eric
6  Seidel; do you remember that?
7  A. Yes.
8  Q. Do you remember Eric Seidel saying that he was concerned
9  about giving you information because he thought that there
10 were leaks in the FBI?
11 A. Yes.
12 Q. In other words --
13 A. A specific agent that he mentioned.
14 Q. A specific agent by the name of Drews, right?
15 A. Drous.
16 Q. And then you were asked questions about whether you
17 started withholding information from Lindley DeVecchio, do you
18 remember being asked those questions?
19 A. Yes.
20 Q. And do you remember being asked was it before that,
21 meaning the meeting with Eric Seidel in January of 1992, and
22 you said it was after that. Do you remember that?
23 A. It would have been after that.
24 Q. And then you were asked when after that, and do you
25 remember giving this answer: I became concerned around

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

## Page 107

Favo/direct/Shargel

1  February. It's hard to put a date to it because it happened
2  awhile ago, but after, at the end of February, the end of
3  March and April, I became concerned and began to be more
4  careful about what I said. As of May, 1992, I did not tell
5  him anything truthfully about what we were -- what
6  investigations were going on with Gregory Scarpa.
7       "QUESTION: So you began to lie to him?
8       "ANSWER: I did.
9       "QUESTION: Right?
10      "ANSWER: Yes.
11      "QUESTION: Openly?
12      "ANSWER: To him."
13      As of May of 1992, after everything that you learned
14 in February and March and April, you began lying to Lindley
15 DeVecchio, right?
16 A. After May 22, I was sure that I could not speak to him
17 straightforwardly as it concerned Greg Scarpa.
18      But I thought that your question was specifically
19 when we stopped doing this, and the information that I was
20 withholding was information coming from Joseph Ambrosino.
21 That's why I placed that in June.
22      During the period of May 22 to June 10, we were
23 involved in something elsewhere. Scarpa was not an issue, so
24 I don't know that I withheld anything from him during that
25 time.

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

## Page 108

Favo/direct/Shargel

1  Q. Ambrosino is arrested on June 11, or agrees to cooperate
2  on June 11, 1992.
3  A. That's correct.
4  Q. June 11, 1992, do you debrief him? The answer is yes,
5  isn't it?
6  A. Yes, it is.
7  Q. You debriefed him with an agent by the name of Tomlinson,
8  correct?
9  A. Yes. And other agents. It was a long debriefing period,
10 several months. So Jeff Tomlinson was there most of the time,
11 and other agents as well.
12 Q. Ambrosino told you about Gregory Scarpa; that was one of
13 the topics of conversations, right?
14 A. Yes.
15 Q. And that was in June of 1992, correct?
16 A. Yes.
17 Q. And in June of 1992, he tells you that Gregory Scarpa
18 murdered Fusaro, right?
19 A. Yes.
20 Q. You knew it for sure at that point, right?
21 A. Yes.
22 Q. You knew in June of 1992, when Ambrosino cooperates, that
23 Gregory Scarpa had murdered Grancio, correct?
24 A. That's what he says, yes. And we have it on a tape
25 recording by that time.

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

## PAGE 117

Favo/direct/Shargel

AFTERNOON SESSION

CHRISTOPHER FAVO, resumed:

THE COURT: All right, proceed, please.

DIRECT EXAMINATION

BY MR. SHARGEL: (Continued).

Q. Agent Favo, before the lunch break I asked you a question about your learning about a meeting at Gregory Scarpa's house in December of 1991; you recall that question, right?

A. Yes.

Q. In fact, it's been referred to in other proceedings and you're familiar with the reference the kitchen meeting?

A. Yes.

Q. Have you heard that?

A. I heard about the kitchen table 302 regarding the document.

Q. When did you learn -- I would like to get from you -- when did you learn about that meeting? When did Agent Andjich or Agent Tomlinson, who were present there with Agent DeVecchio, when did they tell you about that?

A. Agent Andjich told me about a day or two afterwards.

Q. Did he tell you in such a way that it raised his suspicions or concerns about the way Agent DeVecchio was handling this matter of Gregory Scarpa?

A. His concern was that they had gone to the house and they had sat in the living room with the television on, rather than

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

## PAGE 118

Favo/direct/Shargel

going in and sitting in on the meeting.

Q. Do you recall any further conversation about any suspicion he raised to you? You were the coordinator at that time. Any other suspicion that he raised to you?

A. We spoke about it for a few minutes. He was upset the 302 that had come out had been a very short document describing another aspect of this.

What he spoke about mostly was going to the house or whatever, going to the house, not getting in to see Scarpa, having to sit in the living room for an hour, him thinking it's improper, and the 302 didn't reflect what was on the 302, and he had signed the 302 or hadn't signed the 302.

Q. The 302 that he signed, you've seen that before, have you not?

A. Yes.

MR. SHARGEL: Judge, may I have a moment?

(Pause.)

Q. The 302 that was actually prepared, let me show you a document that's dated 12-10-1991, and I'll show that to government counsel.

The 302 that was prepared on 12-10-1991. Is that a 209 insert or is that a 302?

A. It's a 302.

Q. It appears in form somewhat different than an ordinary 302, is that right?

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

## PAGE 119

Favo/direct/Shargel

A. Not that I know of.

Q. The information that's contained in that 302, which is Exhibit P in the appendix, the information that is contained in that 302, does that information, as far as you know, reflect what was actually said to Agent DeVecchio that day, if you know?

A. I know it does not reflect what was said to Agent DeVecchio that day.

Q. Do you know there is a 209 report that was prepared for the same meeting?

A. That was at my suggestion.

Q. And at your suggestion to whom?

A. Agent DeVecchio.

Q. Did you have a conversation with Agent DeVecchio as to why this 302, this form 302 was prepared in the manner that it was?

A. Yes.

Q. Is it -- tell us what that conversation was?

A. When Lin came back from meeting Scarpa, he was concerned that he had been seen in the neighborhood by people in the neighborhood going in and out of the house.

At that time we had just had Al D'Arco become a cooperating witness and when he came in he advised there was a leak of information from the FBI.

We were working another case or just completing

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

## PAGE 120

Favo/direct/Shargel

another case involving a witness whose identity ended up being disclosed to the Orenas through a means that we couldn't tell. Our concern was that there was somebody in the FBI that might have had access to our files.

Since that person could conceivably search our files to find what document reflected the meeting where DeVecchio could have been seen at the house, I suggested that he write a 302 that says, basically, that nothing happened, nothing was discussed, a negative meeting.

Then the 209 was created the following date with the symbol numbers so you couldn't tell you who gave the information; anybody reading it couldn't tell, and that's what reflected what DeVecchio and Scarpa had discussed.

Q. The 302 that you have in front of you is for December 10?

A. That's correct.

Q. And the 209 insert for that very same meeting -- it was a single meeting -- is dated December 11?

A. That's correct.

Q. Do you know as you sit here now which date the meeting took place?

A. The 10th.

THE COURT: What year are we talking about now?

MR. SHARGEL: The kitchen meeting, the actual meeting.

THE COURT: What year?

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER