# EXHIBIT B

684

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2
     - - - - - - - - - - - - - - - X
 3
     UNITED STATES OF AMERICA,      :
 4                                           94 CR 108

 5          -against-                        United States Courthouse
                                    :        Brooklyn, New York
 6   JOSEPH SIMONE,

 7              Defendant.
                                    :        October 18, 1994
 8                                           9:30 o'clock a.m.
     - - - - - - - - - - - - - - - X
 9
                          TRANSCRIPT OF TRIAL
10              BEFORE THE HONORABLE RAYMOND J. DEARIE
             UNITED STATES DISTRICT JUDGE, and a jury
11
     APPEARANCES:
12
     For the Plaintiff:          ZACHARY W. CARTER
13                               United States Attorney
                                 BY:  STANLEY OKULA, and
14                                    KAREN A. POPP
                                 Assistant United States Attorneys
15                               225 Cadman Plaza East
                                 Brooklyn, New York 11201
16
     For the Defendant:          JOHN PATTEN, ESQ.
17

18

19

20   Court Reporter:             Henry R. Shapiro
                                 225 Cadman Plaza East
21                               Brooklyn, New York
                                 718-330-7687
22

23   Proceedings recorded by mechanical stenography, transcript
     produced by CAT.
24

25
```

HENRY SHAPIRO          OFFICIAL COURT REPORTER

Favo-direct-Popp

1 crew, Anthony Mazza, Richard Vissardo and Paul Stado were
2 ambushed while driving to the wake. Anthony Mazza was
3 murdered, the other two injured. He was arrested by Joseph
4 Simone and the detectives in January of '92.
5 Q    And you and Mr. Simone discussed the fact that these men
6 had been murdered on their way to the wake of Gazardo?
7 A    Yes.
8 Q    Are you familiar with the name Carmine Imbriale?
9 A    Yes.
10 Q    Who he is?
11 A    Carmine Imbriale was an associate of the Persico faction
12 of the Colombo family and he was a cooperating witness for the
13 FBI who I worked with extensively.
14 Q    When did he get arrested?
15 A    February 22, 1992.
16 Q    When did he become a cooperating witness?
17 A    The date he was arrested.
18 Q    Did you have any conversation with Mr. Simone regarding
19 Carmine Imbriale?
20 A    Yes.
21 Q    And approximately when did these conversations begin?
22 A    I believe about a week after he was arrested, after he
23 began working with us.
24 Q    And could you tell us about the first conversation that
25 you recall having with Mr. Simone about Imbriale?

Favo-direct-Popp

1  A    Yes, I was working down the corridor in the office space
2  and as I passed Joe Simone, he made a statement to me along
3  the lines of, how's Carmine, or Carmine says hello.  Carmine
4  Imbriale says hello.
5            Initially I responded as if I didn't know what he was
6  talking about.  And he told me that he had been told by a
7  friend of his in the Brooklyn District Attorney's Office that
8  Carmine Imbriale had begun cooperating with us and was working
9  with me.
10           Brooklyn District Attorney's Office initially
11 represented Imbriale so they were aware of the cooperation
12 agreement, and then he told me he knew Carmine Imbriale from
13 the Staten Island Football League, that he had a son that was
14 a good football player, was attentive to his kids and was
15 surprised to find out that he was affiliated with the Colombo
16 family.
17 Q    Did Simone tell you who Imbriale's kid was?
18 A    Alfred.
19 Q    Did you ever confirm to Mr. Simone during that
20 conversation that Imbriale was in fact cooperating?
21 A    Yes, I did.
22 Q    Why did you initially act like you didn't know what he
23 was talking about?
24 A    Because I have obligation to keep the identity of a
25 cooperating witness confidential.

HENRY SHAPIRO          OFFICIAL COURT REPORTER

Favo-direct-Popp

Q    Why is that?

A    For the protection of the cooperating witness and to make the work -- to assist in the work that he's going to do. If he's cooperating and making tapes and people know that he's cooperating, it's very hazardous to him. And in addition we won't accomplish very much.

Q    Why did you eventually tell him, confirm that Imbriale was in fact cooperating?

A    Because Detective Simone was working with me on the case, in my opinion, and he had some information about Carmine Imbriale was interested in what he had to say about him and he knew he was cooperating with me.

Q    Where did Imbriale live?

A    In Staten Island, in the Huguenot area.

Q    Did you have any other conversation after that with Mr. Simone about Imbriale?

A    Yes.

Q    Tell us about the next conversation that you had that you recall.

A    It was a short time thereafter, a week or so later, he said that he run into Carmine Imbriale in the street and says, Chris says hello, referring to me. And said that he made a statement to him along the line that he done the right thing, he could trust us to work with me and the other agent, Jeffrey Donaldson, if he needed any help, or if he had any questions

HENRY SHAPIRO          OFFICIAL COURT REPORTER

Favo-direct-Popp

1  to feel free to contact Joe.
2  Q    Did Simone during that conversation say anything about
3  the Witness Protection Program?
4  A    Yes. If he had any questions about the Witness
5  Protection Program that Joe would be happy to help him with
6  it.
7  Q    Mr. Simone is relating to you that he told Imbriale if
8  Imbriale had any questions about the Witness Protection
9  Program, that Simone could answer those questions?
10 A    Yes.
11 Q    Did you have a conversation with Mr. Imbriale after that?
12 A    Yes.
13 Q    And did you discuss the conversation that Imbriale and
14 Simone had?
15 A    Yes.
16 Q    What did Imbriale tell you?
17         MR. PATTEN: Objection, your Honor.
18         MS. POPP: Your Honor, I'll rephrase the question.
19 Q    As a result of what Imbriale told you, did you make a
20 decision about whether Mr. Simone and Mr. Imbriale should
21 meet?
22 A    Yes.
23 Q    Tell us about the decision.
24 A    It seemed to be mutually agreeable to them to meet to
25 discuss whatever Joe could tell him about the witness security

HENRY SHAPIRO           OFFICIAL COURT REPORTER

1  program. Both of them told me they were interested in doing
2  it.
3          I talked to Joe about the witness security program,
4  explaining a few of the details that I was aware of. I don't
5  know how the entire program worked. I knew a couple of things,
6  passed it on to Joe, movements and medical plans, questions
7  along those lines. And he and Carmine Imbriale and Carmine's
8  wife agreed to meet to discuss that.
9  Q    Was that normal practice?
10 A    No.
11 Q    Why is it not normal?
12 A    Dealing with a cooperating witness is a confidential
13 situation. You don't -- the normal practice is not to tell
14 anybody about it. The normal practice is to have the handling
15 agent fulfill the responsibility to make the cooperating
16 witness deal exclusively with the handling agent. It's for
17 the protection of the witness and the protection of the
18 investigation.
19 Q    Who was the handling agent?
20 A    I was.
21 Q    Why did you agree to allow the witness to meet with
22 Detective Simone?
23 A    Because they both requested it and they -- I trusted
24 Detective Simone.
25 Q    Now, did you have any other conversations after that with

Favo-direct-Popp

1  Detective Simone about Imbriale?

2  A    Yes.

3  Q    Tell us about those conversations starting with the next
4  one that you remember.

5  A    The next one was after the meeting, he told me it all
6  went fine, he explained the program to them, Imbriale and his
7  wife, they went over some of the details, and for whatever
8  Detective Simone could provide, and they seemed to be more
9  enthusiastic about getting into the program than they were
10 before.

11        Basically they made up their minds that they would do
12 it, and he remarked that he told them somehow he could not
13 help but believed the program worked like the movie My Blue
14 Heaven with Steve Martin, where all the people in the program
15 ended up in the same place.

16        Joe Simone accepted it, probably works out like that,
17 and it's not true.  And I was concerned about that.

18 Q    When did the conversation take place?

19 A    In March of '92.

20 Q    Did Mr. Imbriale agree to go into the Witness Protection
21 Program?

22        MR. PATTEN:  Objection as to hearsay.

23        THE COURT:  As to this question?

24        MR. PATTEN:  Yes.

25        THE COURT:  Overruled.

HENRY SHAPIRO         OFFICIAL COURT REPORTER

Favo-direct-Popp

1  Q   Did Mr. Imbriale agree to go into the Witness Protection
2  Program?
3  A   Yes.
4  Q   When did he make that decision?
5  A   By late March.
6  Q   Did he go directly into the program?
7  A   No.
8  Q   Did he remain on the street for some period of time?
9  A   Yes, he did.
10 Q   Sorry?
11 A   He remained on the street making recordings for us to
12 pursue the investigation.
13 Q   Did there come a time when he was taken off the street?
14 A   Yes.
15 Q   That was on July 10, 1992?
16 A   Yes.
17 Q   Prior to him being removed from the street, was this
18 something that was planned?
19 A   Yes.
20 Q   And did you tell Imbriale that he would be taken off the
21 street on July 10th?
22 A   Yes, we did. We planned it for several weeks in advance
23 so that he could get his personal plans in order.
24 Q   Did you say anything to him about the fact he was going
25 to be leaving?

1  A   He was to tell everyone that he's going on vacation in
2  the Catskill mountains.
3  Q   When he was taken off the street on July 10, '92, was he
4  immediately put into the Witness Protection Program?
5  A   No.
6  Q   Where was he taken to?
7  A   To a secure location in the Pocono mountains.
8  Q   What state are the Poconos in?
9  A   In Pennsylvania.
10 Q   Now, after Mr. Imbriale was relocated to Pennsylvania,
11 did you have a discussion with Mr. Simone about Imbriale?
12 A   Yes.
13 Q   Could you tell us about that discussion?
14 A   Joe Simone mentioned to me he was talking to his friend
15 Phil who -- affiliated with the Staten Island Football League
16 and Phil was breaking about --
17         MR. PATTEN: Objection to hearsay, anything about
18 Phil.
19         THE COURT: Could I go back to the question, please?
20         MS. POPP: Did you have any discussion with Mr.
21 Simone about Mr. Imbriale. The answer was yes. Would you
22 tell us what was said during that discussion.
23         THE COURT: These are discussion with Mr. Simone?
24         MS. POPP: Agent Favo is testifying as to what Mr.
25 Simone said.

Favo-direct-Popp

1  THE COURT: Overruled.

2  MR. PATTEN: May we go to sidebar for a moment,
3  please?

4  THE COURT: All right.

5  (Sidebar.)

6  MR. PATTEN: I'm aware of the fact if it was
7  discussion with my client between this officer, it wouldn't be
8  hearsay. But in his answer he starts to weave in what
9  Imbriale said and gives these long answers. The question
10 itself might be a discussion between my client and Mr. Simone,
11 but then in the answer he starts to weave in what Imbriale
12 said, and that's what I'm objecting to, not the question.

13 THE COURT: Most of it is not coming out for the
14 truth, in any event.

15 MS. POPP: The agent was not relating what Imbriale
16 said but what Simone said.

17 THE COURT: Certainly the question --

18 MS. POPP: What Simone said is Simone tells the agent
19 about a conversation that Simone supposedly had with
20 Cialdella.

21 MR. PATTEN: Then Cialdella said, you see what I
22 mean.

23 THE COURT: What Cialdella said is not coming out for
24 the truth. He's relating a conversation. Statements
25 attributed to a third non-testifying person are not to be

HENRY SHAPIRO           OFFICIAL COURT REPORTER

Favo-direct-Popp

1   considered by them for the truth asserted.
2           MR. PATTEN: I would like that instruction.
3           THE COURT: Fair enough.
4           (Open court.)
5           THE COURT: Ladies and gentlemen, to the extent that
6   the witness may refer to conversations between Mr. Simone and
7   a third-party, and statements made by a third-party to Mr.
8   Simone, the statements made by a third-party who is not here
9   testifying and subject to cross-examination are what we'd call
10  normally hearsay.
11          You may not consider the statements of those
12  third-parties for the truth of the facts asserted in the
13  statements. All right. I'll try to give you a simple
14  example.
15          If Mr. Simone were speaking to Mr. X, and Mr. X told
16  Mr. Simone that, I use the same example, the world is flat,
17  the statement of Mr. X could not be considered by you as proof
18  that the world or the earth was flat, all right. It's only
19  proof that he made that particular statement, not to be
20  considered for the truth of the matters asserted by that third
21  person.
22          Go ahead.
23          MS. POPP: Thank you.
24  Q   Agent, let me back up and ask another question.
25          At the time that Mr. Imbriale was relocated to

HENRY SHAPIRO        OFFICIAL COURT REPORTER

Favo-direct-Popp

1  Pennsylvania, did you have a discussion with Mr. Simone about
2  Mr. Imbriale's house?
3  A   Yes.
4  Q   Tell us about the conversation.
5  A   Since Carmine Imbriale was leaving his house, I asked him
6  if he was in the neighborhood to go by and see that everything
7  was all right.
8  Q   You notified Mr. Simone that Mr. Imbriale was taken off
9  the street?
10 A   Yes.
11 Q   Did there come a time after that conversation that you
12 had a conversation with Mr. Simone about his friend in the
13 football league?
14 A   Yes.
15 Q   Would you tell us about that conversation?
16 A   Joe Simone told me he had a conversation with his friend
17 who was a coach of one of the teams and the friend was
18 bragging that he had -- was going to have a really good team,
19 the next season that they would do well, and the starting
20 halfback or fullback would be Alfred Imbriale.  And Joe told
21 me he didn't have the heart to tell this guy that Alfred was
22 not coming back.
23 Q   Did Mr. Simone identify a name associated with this
24 football coach?
25 A   Yes.

Favo-direct-Popp

1  Q    Who was that name?

2  A    Phil.

3  Q    Did Mr. Simone also tell you during the same period of
4  time that he had spoken with Mr. Imbriale after he had been
5  relocated?

6  A    Yes.

7  Q    Tell us about that conversation.

8  A    As I recall, it was just -- I think it had something to
9  do with the football league. Carmine Imbriale contacted about
10 with some question about the football league.

11 Q    Did there come a time that you learned that Mr. Simone's
12 mother had received flowers in the hospital from Billy Cutolo?

13 A    Yes.

14 Q    How did you learn that?

15 A    From Detective Simone.

16 Q    Tell us about that conversation.

17 A    Detective Simone and Detective Maggiore had been
18 scheduled to testify at a suppression hearing in Brooklyn
19 District Court. The suppression hearing was for a gun that
20 was seized during the December '91 arrest of Michael Spataro.
21 When they were set to appear, Detective Simone could not
22 appear because his mother had taken ill and he went to the
23 hospital to see her.

24      And I spoke to Detective Simone about two days
25 later. He was telling me that he received a phone call from

HENRY SHAPIRO        OFFICIAL COURT REPORTER