UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK


| | | |
|---|---|---|
| MARIA GRANCIO, individually, and in her capacity as Executrix and Personal Representative of the Estate of Nicholas P. Grancio, | ) ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.  06-CV-0069 (FB)(CPP) |
| | ) | |
| R. LINDLEY DeVECCHIO; | ) | |
| CHRISTOPHER FAVO; | ) | **HEARING REQUESTED** |
| UNITED STATES OF AMERICA. | ) | |
| | ) | ECF Case |
| Defendants. | ) | |


<u>**AFFIRMATION OF DAVID I. SCHOEN IN SUPPORT OF RULE 56(f) MOTION**</u>

DAVID I. SCHOEN, hereby affirms under penalty of perjury that the following is true to the best

of my knowledge and belief:

1.  I am an attorney, duly admitted to practice before this Court and I represent the Plaintiff,

Maria Grancio, in this action.  I am providing this Affirmation in support of her motion under

Rule 56(f) of the Federal Rules of Civil Procedure in which Mr. Grancio seeks a continuance

with respect to the Defendants' summary judgment motions such that any and all such motions

would be held in abeyance in order to permit discovery to be taken as more specifically described

below.  All of the information provided herein is on personal knowledge except where indicated

otherwise and I make this Affirmation based on such knowledge as gathered from my personal

observations, review of documents, and discussions with other attorneys, witnesses, and others

who have investigated or reported on the underlying and related facts.

2.  I incorporate herein by reference, and to some degree by setting forth below portions of the same, all papers previously filed in opposition to the Motions to Dismiss or for Summary Judgment and draw the Court's attention particularly to paragraphs 19-21 of the Schoen Affirmation in opposition to such motions, as well as Paragraphs 2-12, 14-17 of that Affirmation insofar as they describe efforts that I have made in investigating this case and to obtain as many facts as possible related to the claims in this case; paragraphs 13, 23,29, 35, 36, and 67 of Mrs. Grancio's Rule 56.1 Statement, and to pages 14-15 and 18-36 of her Memorandum of Law in opposition to the summary judgment motions.  Those portions of the pleadings already on file further elucidate the manner in which the materials identified herein as needed through discovery are relevant to raising genuine issues of material fact in this case which would make summary judgment inappropriate as a matter of law.

3.  Pursuant to Rule 56(f), the undersigned has provided an explanation in his Affirmation in opposition to the summary judgment motions at ¶¶20-21 of some of the reasons Mrs. Grancio cannot adequately respond to motions for summary judgment at this early stage of the case without any opportunity for discovery and some of the kinds of discovery that are required before this Court fairly can consider motions for summary judgment and the Affirmation explains some of the reasons that, notwithstanding our due diligence, such opposing affidavits, documents, and testimony are not available without formal discovery tools.  I incorporate by reference those paragraphs here as if fully set forth herein on the question of the nature of the discovery we seek on facts reasonably expected to create a genuine issue of material fact.

4.  I have worked long and hard with no financial resources and no fee to investigate the facts underlying this case and have come up with a lot of documents rather randomly.  I have had no

means to compel any discovery whatsoever in this case.  There has been no discovery in the case, nor even an initial conference or scheduling order; nor has any Answer been filed by any Defendant in the case.  Motions to Dismiss or for Summary Judgment were the first and only substantive filings in this case.

5.  In addition to the foregoing the things set forth in earlier pleadings, I respectfully submit that the following is a listing of additional specific discovery (both document production and deposition testimony) that Mrs. Grancio needs in order fairly and fully to be able to respond to the motions for summary judgment in this case and to demonstrate genuine issues of material fact.  This is intended to be an illustrative listing and explanation and not an exhaustive or all inclusive one:

Trial Transcript from the recently concluded Devecchio criminal trial in Brooklyn:

Obviously, the trial transcript could not have been obtained in order to respond to the summary judgment motions since the trial began and ended after briefing on the motions.  To date, we have still have not been able to obtain it.  For some reason the New York Supreme Court Justice who heard the case has ordered the trial transcript sealed.  I have been advised by a participant in that trial and by people who observed the trial and/or who have seen portions of the transcript that the transcript has some critically valuable information otherwise unavailable to us and related directly to representations made in this case, credibility of the defendants, and which create genuine issues of material facts with respect to the claims and defenses in this case.  A colleague of mine has tried to get a copy of the sealed transcript from the trial court and his efforts were rejected.  We would seek an Order from this Court directing that a copy be provided to us.

Attorney Flora Edwards has advised me that she obtained a copy when Judge Weinstein

directed the government to provide her with a copy; but she is not permitted to share it. Another attorney has advised that he intends to make application to another judge in this district for access to the transcript. Clearly the Defendants in this case have access to it since, for example, counsel for Defendant Favo submitted excerpts from it in connection with a letter he wrote to this Court on December 7, 2007, seeking to stop Mrs. Grancio from getting an opportunity for discovery [Doc. 97].

Based upon my own observations during part of the criminal trial, the observations of others spectators who were present at the trial, and reports I have received from people familiar with the trial transcript, but who will not provide a copy to me, there was a great deal of testimony relevant to the relationship between Devecchio and Scarpa and Favo and Scarpa pre-dating the Grancio murder and this must be obtained and carefully reviewed. It is directly relevant to inferences that can be drawn about the conduct of these two defendants with respect to the Grancio murder vis a vis the theories for relief asserted in this case.

The trial, of course, centered on Devecchio and has a great deal about him and his corrupt relationship with Scarpa, knowledge of Scarpa's criminal activities, including murders, and his efforts at concealing the same. The following are some examples of information that, upon information and belief, surfaced at trial and that are relevant to issues of fact in this case with respect to Defendant Favo:

A. I learned for the first time from the trial that Defendant Favo was much more directly involved with Scarpa and his work as an informant than previously revealed or known. For example, it was developed at trial that Favo actually was the "alternate case agent" for Scarpa and Favo apparently executed a document so indicating. This meant, among other things, that if Scarpa called in and Devecchio was not there, Favo would take the call from Scarpa. This is

directly relevant to Favo's direct relationship with Scarpa and is very different from the understanding we had about this.  We have never before seen any document or other information so indicating.

B.  Favo also participated with Devecchio in preparation of a teletype used to re-open Scarpa as an informant, knowing that Scarpa had been committing murders, but concealing that fact from headquarters and misrepresenting the facts related to Scarpa's conduct in order to re-open him, believing apparently that ends justified the means.

C.  Favo had a close relationship with informant Carmine Imbriale.  Imbriale reports that he was "wired up" by Favo and recorded Scarpa and others on tape admitting to and describing, among other things, the 1991 murder of Vincent Fusaro and the attempted murder of Joe Cacace. Imbriale reports handing the tape to Favo and seeing Favo seal it up in front of him.  Oddly, Favo reportedly testified falsely at Devecchio's trial that none of the recordings made by Imbriale during the time period in question involved conversations with Scarpa.  We want the transcript on this, a copy of the tape, and, of course, this is just one of many subjects on which we need Favo's deposition testimony and Imbriale's deposition testimony.  We also want to know who in the U.S. Attorney's office was aware of this tape.  Favo reportedly testified that he became the case coordinator for the Colombo family in June of 1991 and that is significant because of the murders with which Scarpa was involved that occurred between then and the murder of Mr. Grancio.  What did Favo know and when?[1]  This is something we must be permitted to develop through his deposition and from document production which will be useful at his deposition. Additional reasons we need document production and testimony from Defendant Favo:

---

[1]  We know from Favo's testimony in *U.S. v. Cutolo* at Tr. 4952-53, 4961 that Favo knew at least by November 18, 1991 that Scarpa was an informant and for that reason intentionally did not prepare a report of a meeting with Scarpa.  *See also U.S. v. VM Orena*, Tr. 5252-5254.

Notwithstanding counsel for Defendant Favo's suggestion in his December 7, 2007 letter to the Court, in reliance as well on the rather naive and misguided words from the Devecchio trial court judge, that Mr. Favo is something of a marginally involved hero who turned in the crooked Devecchio when he understood what was going on, the picture of Mr. Favo that emerges from the documents and information so far available gives a very different picture and it is a matter that must be pursued.  It is directly related to inferences that can and perhaps should be drawn regarding his role with respect to the murder of Nicholas Grancio, whether he spoke directly to Scarpa that day, why he called off Detective Simone from surveillance and so on.  The following demands that discovery from and related to Defendant Favo be permitted before summary judgment is considered:

To the extent the December 7, 2007, letter from counsel for Defendant Favo is at all relevant to the matter of discovery the "developments" to which Mr. Favo refers only highlight the need for additional discovery, rather than "confirm(ing)" that a request for discovery should be "rejected." [12/7/07 Letter at 1, ¶2]

Counsel for Mr. Favo refers principally to two new "developments."  First, he argues that Mazza's recent testimony, which he selectively highlights in his letter, elicited at a trial at which both sides had an interest in limiting any suggestion of wrongdoing by Favo, clinches any question in Favo's favor with respect to any and all theories of this case as to Favo, let alone on the question of discovery.  Secondly, as he has in argument earlier in this case, he presents Mr. Favo in virtually heroic stature, this time with the purported imprimatur of Justice Reichbach, for standing up to the "enormous institutional pressure" he must have faced, when he turned in Devecchio for having "grown to close to his informant,"... "risking the opprobrium of (his) colleagues." [Considine Letter of December 7, 2007 at 3, n.2, quoting from Justice Reichbach's

decision in *People v. Devecchio*].

This, once again, is part of the well used theme of presenting Mr. Favo as someone who, when he finally heard Devecchio exclaim his seeming support for success with one of Scarpa's murders, then concluded that something must be wrong with Devecchio's relationship with Scarpa and he (Favo) needed to report his concerns to higher-ups.

This theme is pure unadulterated nonsense as demonstrated now by the undisputed and indisputable evidence already a part of the record, but that will be developed much more fully through directed discovery. Unfortunately, Justice Reichbach never heard any of the real evidence on this point, because it was not placed at issue in the Devecchio criminal case for independent reasons held by each of the two sides to that litigation. Justice Reichbach assuredly would have taken a very different look at Mr. Favo's heroism if he had known any of the following, all of which is supported by record evidence already submitted in connection with the pending motions:

A. Within days of Nicholas Grancio's murder in January of 1992, Favo knew that Scarpa, Sr., a Confidential Informant, had killed Grancio; yet he did not "step forward" to take any of the corrective action he was obligated to take. Indeed, Scarpa was paid just days after that for falsely telling the Group that Richie Fusco had killed Grancio and Favo subsequently took extraordinary affirmative action to ensure that Scarpa, Sr. would stay on the street with license to kill; [Grancio Rule 56.1 Statement at ¶4 and materials cited there];

B. More than 2 months after Grancio was killed, on March 31, 1992, knowing that Scarpa, Sr. was a killer who recently had killed with a gun, Favo and others intervened with NYPD officers to stop them from arresting Scarpa, Sr., after they had seen him with discarding a gun (at a time when he had been closed as an informant because of his commission of violent

crimes while operating as an informant).  Mr. Favo went above and beyond the rest in his

"heroism" and he actually fabricated a story to the NYPD in which he implied that Mazza or his

colleague Delmasto were informants (knowingly putting them in danger with his fabrication), all

to avoid Scarpa's arrest (by arguing that arresting him would hamper the work of his colleague

informant), and to keep this man he knew to be a killer on the street; [*Id*. at ¶6];

C. Favo was expressly advised by other informants that Scarpa, Sr. was committing

murders at the very time Favo knew him to be an informant; indeed one of Favo's informants,

Carmine Imbriale, provided Favo with tape recordings from Scarpa establishing the same; yet

Favo took no corrective action.[2] [*Id*. at ¶15];

D.  In order to further cover up for Devecchio, the "hero" Mr. Favo went so far as to

falsely accuse NYPD Detective Joe Simone of being the source of leaks of confidential

information which could have endangered lives, when he (Favo) well knew that Devecchio was

the source who "leaked" such information to Scarpa, Sr.  Simone, the police detective who Favo

had called off the Grancio surveillance, faced a criminal trial because of these false allegations.

Fortunately, he was acquitted; but his career was ruined. [*Id*. at ¶13];

E.  One must wonder how Justice Reichbach would reconcile his view of Mr. Favo's

forthrightness if he had been made aware that when Favo was first confronted with the assertion

that he had pulled surveillance off of Grancio, he provided a sworn statement supporting the

government's claim that during the time period Mr. Grancio was killed surveillance was not

regularly being conducted (in support obviously of the position that there was no surveillance for

---

[2]  During the trial in *People v. Devecchio*, the informant telephoned to find out why the DA had not elicited testimony from Favo about these tape recordings.  This is another witness with intimate knowledge about these matters from whom discovery would be sought.  He has expressed his fear of retribution if he came forward voluntarily and reports that he will not do so under the advice of counsel.  His testimony will have to be compelled.

him to call off).  It was only after he was confronted with Simone's daily log sheets reflecting his surveillance and when he was pulled off that Favo's story became that there was surveillance, but that he had called Simone off of the surveillance for a previously scheduled meeting; [*Id.* at ¶11];

G.  Favo provided Devecchio with information to help Scarpa, Sr.'s criminal activities at a time when he (Favo) admittedly knew it was improper to do so. [*Id.* at ¶25];

The examples go on and on and the foregoing is not intended to be an exhaustive list.

All of this also goes directly to the need for discovery.  We know again from Favo himself and from other record sources cited in Mrs. Grancio's motion response papers that Favo knew Scarpa, Sr. was Devecchio's informant (and knew that Scarpa led a violent criminal gang) well before the Grancio murder.[3]  Dispute our due diligence in investigating this case and notwithstanding Defendants' various representations about the abundance of material we have uncovered, what we have so far are only portions of what we need and what would be available through compelled discovery and we are entitled to the rest to be able to paint a full picture. Favo has argued that most of what we have cited about Favo relates to events after Grancio's murder and that that cannot be used to support the claims about him with respect to the Grancio murder; but to the extent that is true, it is because we have had no chance at all for compelled discovery.

It is no "fishing expedition" when we know without question about the kinds of things Favo did to facilitate Devecchio's corrupt relationship with Scarpa after the Grancio murder and we know that Favo was part of Devecchio's Group before the Grancio murder and was aware of Scarpa's informant status and his violent conduct.  Indeed, we now know Favo was the Colombo

---

[3]  See e.g., Favo's testimony in *U.S. v. Cutolo* at Tr. 4952-53, 4961 (no report prepared of November 18, 1991 meeting with Scarpa because he knew Scarpa was an informant); *U.S. v. VM Orena*, Tr. 5252-5254.

Group leader and soon became Scarpa's alternate case agent. We must be permitted to learn the details of Favo's relationship and dealings in this regard to allow us to obtain and present evidence that allows the jury to draw inferences about his conduct in calling off the Grancio surveillance. The nature and amount of knowledge he had, an inference concerning his intent and agenda that can be drawn from the same and other information specifically material to this is all directly relevant to the viability of the claims against him and requires an opportunity for discovery. One must also consider the evidence from Detective Simone and other NYPD officers regarding what Favo knew about Grancio being Scarpa's target and Simone's efforts to convince Favo not to pull him off of surveillance. Defendants would have us be limited to affidavits from Devecchio and Favo on these central questions and then try to ensure that that is the case by arguing against discovery. That must not be permitted.

We are only limited in our ability to respond to their blanket denials **because** there has been no discovery. There are multiple theories of recovery as to both Favo and Devecchio and discovery is required to develop them. We have argued in Mrs. Grancio's Memorandum of Law, based especially on the similar Boston cases, why all theories here are viable; but, as the court there found, we must be permitted to engage in discovery to develop them.

There also was testimony reportedly at the Devecchio trial about filing and reporting concerning Scarpa and informants generally. It has been reported to me that Devecchio's attorney has represented that he has Scarpa's official informant file. We have absolutely no way, without the ability to compel discovery, to obtain that and it is critically important and directly relevant to the issues in this case. It may well reveal Scarpa's criminal activities, known to Devecchio (and Favo) prior to the Grancio murder in explicit detail - information we have no other way of knowing. It certainly should show when and why Scarpa was closed as an

10

informant and how Devecchio (and Favo) got him re-opened based on false information, putting

him on the street to continue murdering, based on belief that the ends justified the means - they

needed a good informant on the street, regardless of the consequences was the gist of reported

trial testimony.

Larry Mazza reportedly testified at the trial about the presence of Anthony Bianco

(known to him as "Anthony") and Joseph Tolino at the Grancio murder. We have not been able

to get either to talk to us (in the case of Bianco we have not been able to find him) and we must

be permitted the tools to compel testimony and take their depositions (if Bianco is still alive and

can be found). Their testimony would be directly relevant on the timing of the removal of the

surveillance and Tolino already has been reported to have commented or been questioned by law

enforcement about that subject. We need to be able to obtain his testimony.

There reportedly was testimony from various witnesses at trial about pre-Grancio murders

involving Scarpa and Devecchio and we must be able to depose those witnesses. Mazza

reportedly testified at some length, as did Carmine Sessa about murders by Scarpa and we must

be able to pursue those further with these witnesses to be able to draw inferences about

Devecchio's involvement and the likelihood, therefore of his involvement with the Grancio

murder.

Linda Schiro and Greg Scarpa, Jr. are additional witnesses whose deposition we must be

permitted to take as they have direct knowledge about the corrupt Scarpa/Devecchio relationship

and specifically their roles with respect to murders committed by Scarpa or at his direction with

Devecchio's knowledge or assistance. In the case of Greg Scarpa, Jr., while he gave a

Declaration on one limited subject, he felt that he could not get more involved at that time as the

Brooklyn D.A.'s office was planning to call him as a witness in the criminal case and did not

want him assisting me.  I was advised directly by the D.A.'s office that they did not want me getting statements from him and even the declaration was a bit upsetting to them; so I had no means to obtain his testimony in the depth and detail needed.  He knows and could testify about their involvement together in several murders from first hand knowledge and he knows from his father about Devecchio's role in the Grancio murder and at least one murder not yet publicly attributed to Devecchio which pre-dated the Grancio murder.

There was a great effort engaged in in the Eastern District designed to conceal the corrupt relationship between Scarpa and Devecchio.  Much of this has been described in the motion opposition papers already filed, based on what could be culled from the random portions of the OPR report and random 302s we were able to obtain from all of the various sources we exhausted in our investigation.  These efforts were actively engaged in by at least former AUSAs Stamboulidis, Weissman, and Caproni.  We wish to depose all three to find out what they knew about this relationship and its link to murders and when.  Further the concealment efforts, which we know continued by Caproni for a long time, based on documents already submitted reflecting her instructions to continue concealing it, are relevant to the government's claim here about what was known publicly and about what Mrs. Grancio should have had constructive knowledge.  It is also relevant to our claim of fraudulent concealment.  We wish to depose each of them.

We also wish to obtain a variety of documents, including the phone records from the telephone of Larry Mazza's sister which we now have learned Mazza says Scarpa often used to call Devecchio and which we have reason to believe the government knew at or around the time of Grancio's murder.  These records could be relevant to what calls Scarpa made to Devecchio on the day of the Grancio murder.  We want to obtain all phone records from phones accessible to Scarpa that day and we have reason to believe, from a report authored by Caproni that it was

from a review of such phone records that Scarpa's corrupt relationship with Devecchio was uncovered.

We also want to obtain in discovery case files from murders related to Scarpa or committed by Scarpa that Favo reportedly was involved in investigating including, but not limited to: Hank Smurra (reportedly testified about in Devecchio trial); Eli Ackley; Vincent Fusaro (12/91); Gaetano Amato (12/91 - misidentified by Mazza at Devecchio trial as "Pasquale Amato"); Sal Scarpa (1986 murder handled by NYPD investigators Richter and Gardell; but we have reason to believe Greg Scarpa was involved and it related to his informant status, allegedly covered up by at least one Defendant here); "Fat Dom" Borghesi - his murder at Scarpa's behest allegedly was linked at the Devecchio trial to a tip to Scarpa that he was an informant); Matteo Sparanza (12/91 murder, case reportedly opened by Favo); Rosario Nastasi; Vincent Pizzaro; FNU Tuklove (spelling)(murder attributed at the trial to Scarpa or his crew; an unidentified male reportedly in the trunk of a car to which Favo was directed according to a person claiming to have been an informant for Favo - Al Anglisano.[4]

We would like to obtain all records of Scarpa's work as an informant for an agent named James Ingram. We have reason to believe that he worked with Ingram on matters not reflected in Scarpa's main informant file.

We would like to depose Diane Scarpa who reportedly has told the Brooklyn D.A.'s office about seeing Scarpa pay Devecchio a large sum of money.

We would like to depose Tommy Dades who was a primary investigator in the Brooklyn

---

[4] We also wish to depose Anglisano. He has played a rather bizarre role in this matter over the past couple of years, approaching the Brooklyn D.A. about being a witness and implicating Favo in wrongdoing, only to level accusations against the Brooklyn D.A.'s office, leading some there to believe he was planted by Devecchio (and possibly others) in this investigation.

D.A.'s office not at liberty to speak about the case, but no longer employed there.  He reportedly interviewed Greg Scarpa, Jr., Linda Schiro, and Defendant Favo at length and conducted an independent investigation of many facts learned from them about the Scarpa/Devecchio relationship and he could testify about the cooperation or lack thereof of Defendant Favo in the criminal investigation.

We need to depose Mazza for a variety of reasons, most of all because of the various stories he has told about the Grancio murder as already discussed at length in earlier filed papers. We also need to obtain a copy of a diary Mazza reportedly kept and handed over to the government (reportedly to Defendant Favo) which, according to his reported Devecchio trial testimony, chronicled his criminal activities during the relevant time period.

There are, of course, many other people who we need to depose to properly investigate and prepare this case and to whom we have no access other than through compelled discovery. These include agent Tomlinson and others employed by the government who have a great deal of intimate knowledge concerning the corrupt Devecchio/Scarpa relationship and Mr. Favo's involvement with the same. Mrs. Grancio needs and deserves the opportunity to take their testimony under oath.  This goes as well for current or former informants with intimate knowledge of the same, like Carmine Sessa.

6.  There is a great deal more discovery in which one must engage to properly pursue this case, all of which would be relevant to genuine issues of material facts and which has not and cannot be obtained without the tools that permit one to compel discovery.  The foregoing are just some specific illustrative examples which, under Rule 56(f) make it clear that Mrs. Grancio must be permitted to take discovery before summary judgment could even be considered.

I affirm under penalty of perjury that all of the foregoing is true and accurate to the best of

my recollection and belief.

February 13, 2008
New York, New York

_____
David I. Schoen