UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
MARIA GRANCIO, individually and in her capacity
as Executrix and Personal Representative of the Estate
of Nicholas P. Grancio,

                Plaintiff,

    - against -

R. LINDLEY DEVECCHIO,
CHRISTOPHER FAVO,
UNITED STATES OF AMERICA,

               Defendants.
----------------------------------------------------------------X

Case No. 06 CV 00069 (FB)(CLP)

**DECLARATION OF
DOUGLAS E. GROVER**

I, DOUGLAS E. GROVER, pursuant to 28 U.S.C. §1746, declare as follows:

1. I am a member of the law firm of Thompson Hine LLP, which represents defendant R. Lindley DeVecchio ("Mr. DeVecchio").

2. The information set forth in this declaration is predicated upon personal knowledge and information and belief.

3. I represented Mr. DeVecchio in the dismissed criminal prosecution, *The People of the State of New York v. R. Lindley DeVecchio* (Kings County Indictment No. 6825/2005) (the "related criminal proceeding"). The trial in the related criminal proceeding began on October 15, 2007. On November 1, 2007, the Honorable Gustin L. Reichbach ordered the dismissal of all charges against Mr. DeVecchio.

4. On October 18, 2007, I cross-examined Lawrence Mazza in the related criminal proceeding. During this questioning, I observed that plaintiff's counsel, David I. Schoen, was present in the courtroom.

5. During the trial, copies of the transcript were made available to the public on a daily basis.

6. A true and correct copy of excerpts from my cross-examination of Lawrence Mazza in the related criminal proceeding is annexed hereto as Exhibit A.

7. A true and correct copy of an e-mail from David I. Schoen to counsel for defendants, dated November 16, 2007, in which Mr. Schoen refused to voluntarily dismiss this action, is annexed hereto as Exhibit B.

8. Dominick "Fat Dom" Borghese was at one time a client of mine. The last time I spoke to him, he was in the witness protection program. Upon information and belief, Mr. Borghese is still alive and remains in contact (verbally) with other retired FBI agents known to me.

I declare under penalty of perjury that the foregoing is true and correct.

New York, New York
March 14, 2008

_____
Douglas E. Grover

# Exhibit A

1  happened?

2  A    We, as usual, driving around different areas where we
3  thought we can find some Orena people, Orena Faction people.

4  Q    And when was this, by the way?

5  A    This was a little after the holidays, early January.

6  Q    Of '92?

7  A    Yes.

8  Q    What were you doing, driving around doing what?

9  A    Looking at clubs, known hang outs where the Orena
10 people would be hanging out.

11 Q    Who was with you?

12 A    Greg Scarpa, and Jimmy Delmasto.

13 Q    Tell us what happened?

14 A    Again, we went down that block.  And saw Funzi's car
15 in the driveway.

16 Q    Same block you talked about before?

17          THE COURT:  Whose car.

18 A    Funzi D'Ambrosio.

19      So, we went around the block, parked in a position
20 where we can watch the club, see when he would come out.

21      While we were sitting there, I spotted Nicky Black's
22 truck.

23 Q    Who is Nicky Black?

24 A    Nicolas Grancio.

25 Q    You spotted his truck?

1   A   Yes, it was a SUV Toyota.

2       And I said to Greg, that's Nicky Black. And he said

3 to me, let's get him.

4       Jimmy started driving. As we go toward the corner,

5 he pulled away. He made a left on Avenue U.

6   Q   Who is the "he" that pulled away?

7   A   Nicky, Nicky Black, Nicky Grancio.

8   Q   Go ahead.

9   A   Made a left. Jimmy, myself, and Greg followed. He

10 came around the triangle.

11   Q   What is the triangle?

12   A   It is a triangle, or square as it is called, Billy

13 Grove Square.

14   Q   What section of Brooklyn is this?

15   A   Avenue U, just off McDonald Avenue.

16   Q   Go ahead?

17   A   And as he pulled around, he pulled over and somebody

18 came running out of the house to see him. As he did that, we

19 pulled up alongside. And we shot him.

20   Q   Who shot who?

21   A   I shot Nicky black.

22   Q   And was he in the car, outside of the car?

23   A   He was still sitting in the car.

24   Q   And what part of the car was he sitting in?

25   A   Behind the -- he was driving.

Direct - L. Mazza                                    712

1  Q   Now, you told us about someone who had come out of a
2  house; is that right?
3  A   Yes.
4  Q   And did you recognize that person?
5  A   I did.
6  Q   And who was that?
7  A   I just knew him as Anthony.
8  Q   Did he go into the car, go into the street?
9  A   He stood by the passenger side window where Joe
10 Tolino was sitting.
11 Q   Joe Tolino was in the car?
12 A   He was.
13 Q   Did either Joe Tolino, or this fellow Anthony get hit
14 with any gunfire?
15 A   Joe Tolino got hit with some fragments.
16 Q   Did you plead guilty in this case as well; is that
17 correct?
18 A   I did.
19 Q   Who did you plead guilty to murdering?
20 A   Nicholas Grancio.
21 Q   Did you plead guilty to Tolino's injuries?
22 A   Yes.
23 Q   What about this guy Anthony?
24 A   I am not sure he got hit.
25 Q   After you did what you just described, with regard to

PP

```
                        Mazza - Cross/Grover              864
```

1  Q    Would you say she was impressed?
2       MR. VECCHIONE: Objection.
3       THE COURT: Sustained.
4  Q    Well, Grancio was a very big target in the other
5  faction, wasn't he?
6  A    He was.
7  Q    And you had come upon him quite accidently that day,
8  didn't you?
9  A    Somewhat, yeah.
10 Q    What do you mean somewhat?
11 A    Well, we were watching the, a known Colombo club, and
12 that was his area.
13 Q    But you didn't expect to see Grancio specifically?
14 A    No, we did not.
15 Q    And, in fact, when he showed up, everything happened
16 quite quickly, didn't it?
17 A    Yes.
18 Q    There wasn't much time to think; it was an immediate
19 plan?
20 A    There wasn't much time to think.
21 Q    And who made -- who actually dictated the plan amongst
22 you and Mr. Scarpa and Mr. Delmasto?
23 A    There was no plan.
24 Q    You just acted?
25 A    Yes.

1  Q   And you were ready to act because you were carrying
2  loaded weapons?
3  A   Yes.
4  Q   Now, if we could get back to your meeting with the
5  agents. During the course of that meeting do you recall the
6  agents ever asking you if you had ever heard the law enforcement
7  source use --
8        THE COURT: Just, since he's testified to many
9  meetings with agents.
10       MR. GROVER: I'm sorry.
11       THE COURT: Are we talking about a specific
12  meeting?
13       MR. GROVER: Okay.
14 Q   Let's keep our attention on that meeting that occurred
15 in Sandstone in April of 1994. Unless I say otherwise.
16       Did the agents ask you if you had ever heard any names
17 used to refer to the girlfriend besides the words the
18 girlfriend? Did they ask you?
19 A   I don't know if they asked me that.
20 Q   But you didn't know any names, did you?
21 A   I did not.
22 Q   And, by the way, have you ever heard the name Lenny
23 Dello?
24 A   Yes.
25 Q   Who is Lenny Dello?

1   A   Lenny Dello was a goodfellow, a made guy in the
2   Colombo family.
3   Q   What faction was he in?
4   A   He was one that went from one side to the other side.
5   Q   He went from the Persicos to the Orenas?
6   A   He was a Persico and he wound up siding with Orena.
7   Q   When did he leave the Persico side and go to the other
8   side?
9   A   I don't know exactly.
10  Q   Was it before the shooting that took place on November
11  18th, 1991, in Scarpa's driveway?
12  A   I don't know exactly.
13  Q   Now, this fellow Lenny Dello, did you know him well?
14  A   Not really.
15  Q   Is he one of the individuals that you looked for when
16  you were driving around the streets of Brooklyn looking for
17  people to kill?
18  A   He was a good fellow on the other side, and yes.
19  Q   Wasn't there a time that you actually had looked for
20  him and done a surveillance of him in order to kill him?
21  A   It was -- I don't remember it specifically.  But it
22  was probably one of many.
23  Q   Now, if I can just go back to something you said on
24  direct examination.  The Grancio murder aside, which happened
25  pretty much accidentally, if I can use that phrase, right?  You

```
                    Mazza - Cross/Grover                    867
```

1  just came upon him; there had been no plan beforehand?

2        THE COURT: I take some exception to using the

3  word "accidently."

4        MR. GROVER: It's my mistake, Judge.

5        THE COURT: Perhaps "unexpectedly" would be a

6  better term.

7        MR. GROVER: That is a good word.

8  Q    The Grancio murder happened unexpectedly; isn't that

9  right?

10  A    Yes. And most of them did.

11  Q    As opposed to the ones that happened unexpectedly,

12  isn't it true that over time you conducted surveillances of

13  homes and places you thought the Orenas were hanging out?

14  A    Yes.

15  Q    And in many instances you would go a day or two before

16  without even carrying weapons, so that you could safely drive

17  around and pick a spot?

18  A    Very rare that we didn't have weapons.

19  Q    You usually carried the weapons?

20  A    Yes.

21  Q    But you would drive to these places and scope out the

22  place before you actually committed the crime; isn't that right?

23  A    No, it's not.

24  Q    You usually did it one shot first time?

25  A    Yes.

1  Q   Mr. Mazza, did a time come when you become aware of a
2  civil lawsuit with respect to the murder of Nicholas "Nicky
3  Black" Grancio?
4  A   Yes.
5  Q   And, at sometime, did Flora Edward contact you about
6  testifying in that lawsuit?
7  A   I don't remember her doing it. I remember someone
8  else doing it.
9  Q   Who contacted you to testify in that lawsuit?
10 A   Asking me was Angela Clemente.
11 Q   And where, and when did you speak with Angela
12 Clemente?
13 A   That was over the telephone.
14 Q   And did you agree to testify in that lawsuit?
15 A   No.
16 Q   I'm sorry?
17 A   No.
18 Q   Did you get subpoenaed to testify in that lawsuit?
19 A   I did not.
20 Q   Do you recall testifying on a video link?
21 A   I do.
22 Q   In that lawsuit before Judge Weinstein -- excuse
23 me -- withdrawn.
24     I made a mistake.
25     Did you provide a document to the lawyers in that

1  lawsuit, any type of document?

2  A    I did not.

3  Q    Now, just to wrap it up for today, Judge.

4       Prior to your testimony in the grand jury, here in

5  Brooklyn, over a year ago, did you ever tell anybody in law

6  enforcement that you knew the name of the law enforcement

7  source?

8  A    I did not.

9  Q    Did you ever tell anybody that you knew the name --

10 who the girlfriend was?

11 A    No.

12 Q    And finally, did you ever tell anybody, before you

13 testified in the grand jury in 2006, the name of -- the name

14 Lin?

15 A    No.

16 Q    First time, 2006?

17 A    As I recall, yes.

18 Q    And isn't it a fact, that thinking back to that

19 interview with the agents in 1994 at Sandstone, Minnesota, you

20 never said Lin to them during that meeting?

21 A    I don't think I did.

22 Q    But it was something that bothered you; wasn't it?

23 Let me withdraw that.

24      Isn't it a fact, that you were searching your own

25 mind and memory for the name of the individual that Greg had

# Exhibit B

## Grover, Douglas

**From:** dschoen593@aol.com
**Sent:** Friday, November 16, 2007 4:52 PM
**To:** mgconsidine@daypitney.com
**Cc:** Gail.Matthews@usdoj.gov; Grover, Douglas
**Subject:** Re: SCHOEN LETTER

I have carefully considered your letter to me of November 13, 2007 and the attachments you provided with that letter and I have done some additional work in considering what you provided and your request that, based on what you have written and provided, I voluntarily dismiss Mrs. Grancio's case. You asked me to give an answer as to whether I would agree to do so by today. I am writing now, in compliance with your request, to respectfully advise that I do not think it is appropriate to voluntarily dismiss Mrs. Grancio's case. Thank you for writing and presenting me with your position. I must tell you that I felt that I wanted, as a matter of courtesy after you took the time to write, to write a more detailed response; but I have been surprised to see email correspondence among the lawyers used as exhibits in this case and I had not had that experience before. So I think I will leave it by just responding directly to your question.

I am shutting down now for the Sabbath; so please if you need to write back for any reason, I will not be able to respond this evening. I did not want you to think I was ignoring anything.

I am responding by "Reply All" as you requested.

Thank you,

David Schoen


-----Original Message-----
From: Considine, Michael G. <mgconsidine@daypitney.com>
To: dschoen593@aol.com
Cc: Gail.Matthews@usdoj.gov; douglas.grover@thompsonhine.com
Sent: Tue, 13 Nov 2007 11:18 am
Subject: FW: SCHOEN LETTER

```
David

Attached is a letter for your consideration.  A hard copy is being sent
by regular mail.

Thanks
Mike
```

Email and AIM finally together. You've gotta check out free AOL Mail!