UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
MARIA GRANCIO, individually, and in
her capacity as Executrix and Personal
Representative of the Estate of Nicholas P.
Grancio,

**MEMORANDUM AND ORDER**
Case No. 06-CV-0069(FB)

Plaintiff,

-against-

R. LINDLEY DE VECCHIO;
CHRISTOPHER FAVO;
UNITED STATES OF AMERICA

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ JUL 2 4 2008 ★
BROOKLYN OFFICE

Defendant.

-------------------------------------------------------x

*Appearances:*
*For the Plaintiff:*
DAVID I. SCHOEN, ESQ.
2800 Zelda Road
Suite 100-6
Montgomery, AL 36106

*For Defendant United States:*
BENTON J. CAMPBELL, ESQ.
United States Attorney
Eastern District of New York
*By:* GAIL A. MATTHEWS, ESQ.
Assistant United States Attorney
271 Cadman Plaza East
Brooklyn, NY 11201

*For Defendant R. Lindley DeVecchio:*
SUNNY H. KIM, ESQ.
Thompson Hine
335 Madison Avenue, 12th Floor
New York, NY 10017-4611

*For Defendant Christopher Favo:*
MICHAEL G. CONSIDINE, ESQ.
Day Pitney, LLP
One Canterbury Green
Stamford, CT 06901

**BLOCK, Senior District Judge:**

On January 7, 1992, Nicholas Grancio ("Grancio"), was murdered by Gregory

Scarpa, Sr. ("Scarpa"), a member of the Columbo organized-crime family and an informant to the Federal Bureau of Investigation ("FBI"). Plaintiff, Maria Grancio ("Mrs. Grancio"), Grancio's wife and the personal representative of his estate, alleges that R. Lindley DeVecchio ("DeVecchio") and Christopher Favo ("Favo"), both FBI special agents at the time of the murder, conspired with each other and with Scarpa to bring about Grancio's death.

## I

Although Mrs. Grancio asserts numerous theories of liability, her claims resolve into three categories: (1) federal constitutional claims against DeVecchio and Favo under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971); (2) tort claims against the United States under the Federal Tort Claims Act ("FTCA"); and (3) tort claims against DeVecchio and Favo under New York law. The claims in this last category must be dismissed because the United States has certified, and Mrs. Grancio does not dispute, that DeVecchio and Favo were acting within the scope of their employment as federal officers during the relevant time period. *See* 28 U.S.C. § 2679(b)(1) (making the FTCA the exclusive remedy "for injury or loss of property, or personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment").

On the remaining claims, the United States moves to dismiss the FTCA claims for lack of subject-matter jurisdiction because (1) the claims were not presented to the federal government within two years of accrual, as required by the FTCA's statute of limitations, 28 U.S.C. § 2401(b), and (2) that Mrs. Grancio filed suit prior to exhausting her

administrative remedies, in violation of 28 U.S.C. § 2675(a) With respect to the *Bivens* claims, DeVecchio and Favo move to dismiss for failure to state a claim on the grounds (1) that the claims are time-barred under the three-year statute of limitations applicable to *Bivens* actions, *see Kronisch v. United States*, 150 F.3d 112, 123 (2d Cir. 1998), (2) that Mrs. Grancio has failed to allege a constitutional violation, and (3) that they are entitled to qualified immunity. All defendants seek, in the alternative, summary judgment on the merits, arguing that Mrs. Grancio has failed to adduce sufficient evidence to support her claim that DeVecchio and Favo played a role in Grancio's murder. In addition to responding to the defendants' motions, Mrs. Grancio requests, pursuant to Federal Rule of Civil Procedure 56(f), that the Court deny the motions, insofar as they seek summary judgment, as premature on the ground that she has not had an opportunity to conduct discovery.

Compliance with the FTCA's statute of limitations and exhaustion requirement "is necessary for subject matter jurisdiction to exist," *Williams v. United States*, 947 F.2d 37, 39 (2d Cir. 1991) (addressing statute of limitations); *see also Celestine v. Mount Vernon Neighborhood Health Ctr.*, 403 F.3d 76, 82 (2d Cir. 2005) (addressing exhaustion requirement), and the Court must satisfy itself that it has subject-matter jurisdiction before proceeding to any other issue. *See Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922, 929 (2d Cir. 1998) ("We are duty-bound, as was the district court, to address the issue of subject-matter jurisdiction at the outset."). By contrast, DeVecchio and Favo's motion to dismiss does not raise any jurisdictional issues. *See Diaz v. Kelly*, 515 F.3d 149, 153 (2d Cir. 2008) ("Since a statute of limitations [outside of the FTCA context] is a defense . . . , it has not

been regarded as jurisdictional[.]"); *cf. Merritt v. Shuttle, Inc.*, 187 F.3d 263, 266 n.2 (2d Cir. 1999) ("Because we dispose of this appeal on threshold jurisdictional grounds, we do not reach the district court's analysis of the nature of [the] *Bivens* claims, nor whether the individual federal defendants are entitled to qualified immunity from those claims.").

For the reasons set forth below, the Court concludes that it has subject-matter jurisdiction over the FTCA claims. The Court further concludes, however, that Mrs. Grancio has failed to offer sufficient evidence to support her claim that DeVecchio and Favo were involved in the murder of her husband; because this conclusion is dispositive of all claims, the Court need not address whether Mrs. Grancio has sufficiently alleged a constitutional violation, nor whether her *Bivens* claims are barred by the statute of limitations or the doctrine of qualified immunity.

## II

All parties have submitted matters outside the pleadings. Insofar as the United States seeks dismissal for lack of subject-matter jurisdiction, consideration of such matters is appropriate. *See Luckett v. Bure*, 290 F.3d 493, 496-97 (2d Cir. 2002) ("In resolving the question of jurisdiction, the district court can refer to evidence outside the pleadings and the plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."). Since defendants' argument that Mrs. Grancio has failed to offer sufficient evidence to support her claims also depends on matters outside the pleadings, the Court must treat their motions on this issue as motions for summary judgment. *See Morelli v. Cedel*, 141 F.3d 39, 45 (2d Cir. 1998) ("Consideration of matters outside the pleadings converts the defendant's motion to dismiss into a

4

summary judgment motion.")[1]

A district court's role in considering a motion to dismiss for lack of subject-matter jurisdiction is different than its role in considering a motion for summary judgment. On the latter, the court's role is limited to determining whether there is a "genuine issue of material fact to be tried," *Savino v. City of New York*, 331 F.3d 63, 71 (2d Cir. 2003) (citing Fed. R. Civ. P. 56(c) and *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)), and the court must "resolve all ambiguities and draw all factual inferences in favor of the nonmoving party." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

In the face of a challenge to subject-matter jurisdiction, by contrast, there "must be a decision by the district court on jurisdiction – not a decision that there is or is not enough evidence to have a trial on the question." *Crawford v. United States*, 796 F.2d 924, 929 (7th Cir. 1986). As Judge Posner explained in *Crawford*:

> The purpose of summary judgment is to determine whether a trial can be averted. If the party moving for summary judgment fails to demonstrate that there is no triable issue, the case proceeds to trial . . . . But no case can properly go to trial

---

[1] In so treating defendants' motions, the Court is mindful that the opposing party must not be "taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings." *Groden v. Random House, Inc.*, 61 F.3d 1045, 1053 (2d Cir. 1995) (citation and internal quotation marks omitted); *cf. Ruotolo v. IRS*, 28 F.3d 6, 8 (2d Cir. 1994) ("The failure of a district court to apprise *pro se* litigants of the consequences of failing to respond to a motion for summary judgment is ordinarily grounds for reversal."). Since defendants' motions were framed in the alternative, Mrs. Grancio's counsel had sufficient notice that they might be deemed summary judgment motions. *See National Ass'n of Pharmaceutical Mfrs., Inc. v. Ayerst Labs.*, 850 F.2d 904, 911 (2d Cir. 1988) ("Among the factors suggesting that appellants were on notice [is that] Ayerst styled its motion as a 'motion to dismiss *or, in the alternative, for summary judgment*[.]'" (emphasis in original)). She likewise had a reasonable opportunity to present matters outside the pleadings in response to the motion and, indeed, did so.

> if the court is not satisfied that it has jurisdiction. The fact that the summary judgment proceeding may not resolve a jurisdictional issue definitively is no ground for assuming jurisdiction and proceeding to trial. The jurisdictional issue must be resolved first.

*Id.* at 928. Thus, "it is a court's duty to resolve disputed jurisdictional facts." *Gaston v. New York City Dep't of Health*, 432 F. Supp. 2d 321, 326 (S.D.N.Y. 2006) (citing *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1019 (2d Cir. 1993)). In resolving such disputes, a district court may "if necessary, hold an evidentiary hearing." *Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2003).

### III

The facts are taken from the parties' submissions, and are undisputed unless otherwise indicated.

### A. The Relationship between Scarpa and the FBI

Scarpa began providing inside information about organized crime to the FBI in the 1960s. Between 1980 and 1992 – when Grancio's murder brought an abrupt end to his role as a confidential informant – Scarpa was "handled" by DeVecchio. In the course of their 12-year relationship, DeVecchio and Scarpa had innumerable private meetings and conversations.

Mrs. Grancio alleges that, at some point, DeVecchio's relationship with Scarpa went beyond the lawful relationship between handler and informant. Among other things, she claims that DeVecchio fomented a gangland war between the rival Persico and Orena factions of the Colombo family by passing confidential information – such as wiretap details, surveillance details, and addresses – to Scarpa, a member of the Persico

faction, who then used the information to carry out hits on members of the Orena faction. Mrs. Grancio further claims that DeVecchio knew of Scarpa's criminal activity and protected him from law enforcement intervention.

Favo worked under DeVecchio's supervision during the relevant time period. Mrs. Grancio alleges that Favo was aware of the improper relationship between DeVecchio and Scarpa, and eventually reported the improprieties to others at the FBI; she claims that he should have come forward sooner, and that he continues to cover up some of the details regarding Scarpa's relationship with DeVecchio and the FBI.

### B. Scarpa's Murder of Grancio

Grancio was a reputed *capo* of the Orena faction. On January 7, 1992, he was under surveillance by New York Police Department detectives Joseph Simone ("Simone") and Patrick Maggiore ("Maggiore"). Simone and Maggiore were members of a task force that worked jointly with the FBI to monitor organized crime: the task force typically monitored members of the Colombo family and was specifically monitoring Grancio on January 7th in response to a tip that his rivals planned to kill him.

At approximately 1:30 p.m., Simone and Maggiore left their post. Approximately one hour and 45 minutes later, Grancio, who was sitting in his car with his nephew, was murdered by Scarpa and his associates, Larry Mazza ("Mazza") and James DelMasto ("DelMasto").

Mrs. Grancio alleges that Scarpa, Mazza, and DelMasto realized that Grancio was under surveillance when they first arrived at the scene. She alleges that Scarpa then called DeVecchio to have the surveillance removed, which DeVecchio instructed Favo to

do.

DeVecchio and Favo concede that Simone and Maggiore left their post at Favo's request. They deny, however, that the request was part of a murder conspiracy with Scarpa. By affidavit, DeVecchio states that he never "receive[d] a telephone call, or any other form of communication, from Gregory Scarpa, Sr. in which [he was asked] to remove or terminate any surveillance of Nicholas Grancio." DeVecchio Aff. ¶ 3. He further attests that he did not "request, recommend, order or otherwise suggest to . . . Christopher Favo, either directly or indirectly, that he contact agents or investigators regarding any surveillance of Nicholas Grancio, or that he instructed such agents or investigators to terminate any surveillance of Nicholas Grancio." *Id.* ¶ 4. Favo has submitted a similar affidavit, in which he states that "DeVecchio did not ask[him] at any time to undertake any effort to terminate any surveillance on January 7, 1992," and that "DeVecchio did not tell [him] at any time that Scarpa had requested that any surveillance on Grancio be removed." Favo Aff. ¶ 17. Favo insists that he called Simone and Maggiore away because he "believed that their attendance at the [task force] meeting would be useful," *id.* ¶ 18, and that neither detective told him "that it was important to maintain surveillance on Grancio that afternoon or that they had Grancio under surveillance to protect him or to prevent his murder." *Id.* ¶ 26.

## C. Allegations of an Improper Relationship Raised Elsewhere

In 1993, Scarpa pleaded guilty to murdering Grancio. A year later, Mazza and Delmasto pleaded guilty to conspiring with and assisting Scarpa in carrying out the murder.

Grancio's murder also triggered an internal FBI investigation into the relationship between Scarpa and DeVecchio; because the investigation was inconclusive, the federal authorities declined to prosecute DeVecchio. In 2006, however, a Brooklyn grand jury indicted him on four counts of aiding and abetting Scarpa in connection with four murders other than Grancio's. DeVecchio removed the prosecution to this Court, which remanded for lack of subject-matter jurisdiction. *See New York v. DeVecchio*, 468 F. Supp. 2d 448 (E.D.N.Y. 2007). The state dropped the charges when, at trial, its chief witness unexpectedly changed her story. *See* Michael Brick & Anahad O'Connor, *Ex-F.B.I. Agent's Murder Trial Fizzles, as Does Chief Witness*, N.Y. Times, Nov. 1, 2007, at A1.

Allegations of an improper relationship between Scarpa and DeVecchio also surfaced in federal criminal proceedings against Victor Orena ("Orena"), the head of the eponymous faction of the Colombo family. In 1993, Orena was found guilty of a host of crimes, including the murder of loan shark Thomas Ocera ("Ocera"). *See United States v. Orena*, 32 F.3d 704, 707 (2d Cir. 1994). In 1997, he collaterally attacked his murder conviction on the ground that it was not he, but rather DeVecchio and Scarpa, who conspired to kill Ocera; he argued, in particular, that the prosecution's failure to disclose the relationship between DeVecchio and Scarpa violated *Brady v. Maryland*, 373 U.S. 83 (1963). Judge Weinstein held that the prosecution should have disclosed the connection, but that its failure to do so "had no discernable effect on the criminal activities of [Orena and his co-defendant] or on their trials." *Orena v. United States*, 956 F. Supp. 1071, 1112 (E.D.N.Y. 1997).

Orena resurrected his collateral challenge in 2004 by means of a motion for

relief from judgment under Federal Rule of Civil Procedure 60(b); he alleged that newly discovered evidence supported his claim that Scarpa and DeVecchio were responsible for Ocera's murder. At an evidentiary hearing before Judge Weinstein, his counsel, Flora Edwards ("Edwards"), called Mazza as a witness.

Mazza testified that on January 7, 1992, he, Scarpa and Del Masto were surveilling one of the Orena faction's social clubs and "ultimately . . . spotted Nicky Black [i.e., Grancio]." Tr. at 98.[2] During the surveillance, he observed Scarpa "[t]ake a cell phone" and make "several calls," *id.*; however, Mazza did not know who Scarpa was calling. *See id.* at 99 ("Well, he made some calls that [sic] I didn't know who exactly he was calling."). Mazza further testified that they later learned that Grancio had been under police surveillance, but that "[a]t that moment in time we didn't know." *Id.*

On cross-examination, Mazza testified that they were not expecting to come across Grancio, but that once he arrived at the club, "a plan was immediately put in place to try to kill him." *Id.* at 111. He also clarified that the phone calls he referred to on direct examination took place before Grancio arrived:

> Q.   And from the moment you first saw Mr. Grancio till the moment he was killed, there was no time to make any phone calls, correct?
>
> A.   No there wasn't. No, right.

*Id.* at 113.

Edwards then attempted to impeach her own witness by eliciting testimony

---

[2]"Tr." refers to the transcript of the evidentiary hearing, which is attached as Exhibits 29 and 30 to Mrs. Grancio's response to defendants' motions.

from Stephen Dresch ("Dresch"), a self-described "independent consultant and independent scholar" with a Ph.D. in economics. Tr. at 124. Dresch had interviewed Mazza in 2003 in connection with an investigation into "official misconduct" by the FBI, *id.* at 126; he summarized the interview as follows:

> [Mazza told me that] members of the Scarpa crew, including Greg Scarpa and Mr. Mazza himself, had gone to eliminate, terminate, murder Mr. Grancio. When they arrived where they expected to find Grancio . . . , they apparently determined that he was in fact, you know, at that location, but they also observed that he was under surveillance, and that Greg, meaning Mr. Scarpa Sr., had become very upset at discovering the surveillance. . . .

> Mr. Scarpa became upset and immediately called, and I don't recall exactly how Mr. Mazza characterized this, either his law enforcement source or his girlfriend, I think the term "girlfriend" was used. But it was very clear it was someone in law enforcement. . . . [Scarpa] essentially ordered, demanded that the surveillance team be withdrawn from the location, the surveillance of Grancio. . . .

> [R]elatively shortly after this conversation, telephone conversation, between Scarpa and this law enforcement source they returned to the scene, discovered that the surveillance had been terminated, and that they proceeded to terminate Mr. Grancio.

*Id.* at 127-28.[3]

---

[3]The impetus for Dresch's investigation into Grancio's murder is not entirely clear from the record; he testified that he "became very interested in particularly the fate of an Oklahoma businessman who had become a cooperating witness to the F.B.I. and had also been consulted and was about to be appearing as a witness for the House Committee on Government Reform and the investigation of the business affairs of the late Congress [sic] Secretary Ron Brown." Tr. at 126. He apparently believed that the committee "would eventually extend its inquiry into . . . questions related to the F.B.I.'s handling of informants." *Id.* at 129.

At the conclusion of the hearing, Judge Weinstein stated that in light of Mazzo's testimony, Dresch's testimony had "[z]ero probative force": "What [Mazza] says to Dresch according to Dresch does not seem to be of any weight. . . . His testimony was nugatory on the issues before me. I have the direct witness. I don't want hearsay." *Id.* at 163. One week later, Judge Weinstein issued a written decision once again rejecting Orena's claim. *See Orena v. United States*, 299 F. Supp. 2d 82 (E.D.N.Y. 2004).

## IV

In respect to the United States' argument that the Court lacks subject-matter jurisdiction over Mrs. Grancio's FTCA claims, "a tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented." 28 U.S.C. § 2401(b). In addition, the FTCA imposes an administrative exhaustion requirement on tort claims against the United States:

> An action shall not be instituted upon a claim against the United States for money damages for injury . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail.

*Id.* § 2679(b)(1).

## A. Statute of Limitations

It is undisputed that Mrs. Grancio filed an administrative claim with the FBI

on January 6, 2006. Thus, her FTCA claims are time-barred unless they accrued on or after January 6, 2004.

As the Second Circuit has recently reiterated, "a claim under the Federal Tort Claims Act accrues on the date that a plaintiff discovers that he has been injured." *Valdez ex rel. Donely v. United States*, 518 F.3d 173, 177 (2d Cir. 2008). "'However, . . . where plaintiff would reasonably have had difficulty discerning the fact or cause of injury at the time it was inflicted, the so-called "diligence-discovery rule of accrual" applies. Under this rule, accrual may be postponed until the plaintiff has or with reasonable discovery should have discovered the critical facts of both his injury and its cause.'" *Id.* (quoting *Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir. 1998)) (alteration in *Donely*). "'[A] plaintiff need not know each and every relevant fact of his injury or even that the injury implicates a cognizable legal claim. Rather, a claim will accrue when the plaintiff knows, or should know, enough of the critical facts of injury and causation to protect himself by seeking legal advice.'" *Kronisch*, 150 F3d at 121 (quoting *Guccione v. United States*, 670 F. Supp. 527, 536 (S.D.N.Y. 1987)) (alteration in *Kronisch*).

When a claim accrues under the diligence-discovery rule is often described as a question of fact; outside the FTCA context, any genuine dispute of material facts regarding claim accrual must be resolved at trial. *See, e.g., In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 204 (S.D.N.Y. 2003) ("[I]t is a question of fact for ultimate resolution at trial (or on summary judgment if the factual record permits only one conclusion) whether plaintiffs in the exercise of reasonable diligence would have discovered the facts underlying the present claim more than one year before those claims

were asserted[.]"). As noted, however, the FTCA transforms the question of claim accrual into a jurisdictional inquiry, and any disputed jurisdictional facts must be resolved by the district court.

In some circumstances – for example, where credibility is at issue – an evidentiary hearing on disputed jurisdictional facts may be unavoidable. Here, however, the historical facts underlying the issue of claim accrual are undisputed: Mrs. Grancio does not deny that she learned of her husband's murder shortly after it happened, nor that she eventually learned that Scarpa had pleaded guilty to the murder. She attests, however, that she did not learn of DeVecchio and Favo's alleged involvement in the murder until late 2004, when Dresch "asked if he could come to [her] home to tell [her] some of the things he had learned about [her] husband's death." Aff. of Maria Grancio ¶ 6. For its part, the United States does not dispute that Mrs. Grancio did not have actual knowledge of the "critical fact" of DeVecchio and Favo's alleged involvement until 2004; instead, it cites to media coverage and court cases addressing the relationship between Scarpa and DeVecchio.

Thus, the sole dispute concerning the accrual of Mrs. Grancio's FTCA claim is the ultimate question of whether publicity cited by the United States would have put a reasonable person on inquiry notice prior to January 6, 2004, that DeVecchio and Favo played a role in Grancio's murder. Because the facts relevant to this issue are undisputed and already in the record, there is no need to conduct an evidentiary hearing. *Cf. Chang v. United States*, 250 F.3d 79, 86 (2d Cir. 2001) (holding that district court acted within its discretion in deciding non-frivolous § 2255 motion without an evidentiary hearing).

14

Although the Second Circuit has not spoken on the issue, several district judges in the circuit have held that widespread publicity can trigger inquiry notice for statute of limitations purposes. *See, e.g., Guccione,* 670 F. Supp. at 536 (notice triggered by "[e]xtensive press coverage of the ABSCAM trials and the ABSCAM controversy in general"); *Blue Cross v. SmithKline Beecham Clinical Labs.,* 108 F. Supp. 2d 116, 124 (D. Conn 2004) (notice triggered by "highly publicized, industry-wide information" concerning fraudulent billing practices). In addition, the United States argues that the First Circuit's decision in *Rakes v. United States,* 442 F.3d 7 (1st Cir. 2006), supports its position that Mrs. Grancio's FTCA claims are time-barred.

The plaintiffs in *Rakes* operated a liquor store in Boston. In 1983, two mobsters demanded that they sell the store; the plaintiffs reported the extortion to an FBI agent, who, unbeknownst to them, was working with these mobsters. The agent reported the complaint back to the mobsters, who told the plaintiffs to have law enforcement "back off." *Id.* at 13. Fearing for their safety, the plaintiffs sold the store at a loss. Sixteen years later, they filed a claim with the FBI, alleging that the agent's complicity in the extortion had resulted in the loss of their store. When the FBI failed to respond, the plaintiffs filed an FTCA action. The district court dismissed the action as time-barred.

The First Circuit affirmed, holding that the plaintiffs should have known of the FBI's involvement in the extortion more than two years before they filed their administrative claim. In support of that conclusion, it cited a "trail of newspaper articles" reporting on a trial at which one of the mobsters testified that he and his cohort "were all but given carte blanche to break the law, " and that he had been "rewarded for his work

15

for the [FBI] with a free pass on murder." *Id.* at 22. The circuit court noted that, "[m]ost vitally," the press coverage had culminated in a front-page exposé in the Boston Globe that "accused the FBI, and [the agent] in particular, of looking the other way while [the mobsters] committed crimes," and "specifically discussed the extortion of the [plaintiffs'] liquor store as one of the crimes the FBI had known of but declined to do anything about." *Id.* at 22-23.

The circuit court also noted that it was irrelevant whether the plaintiffs had actually read any of the articles because "at some point, facts achieve a local notoriety great enough that the only practicable course is to attribute knowledge of them to people in a position to become familiar with them." *Id.* at 20. It concluded that

> the government was entitled to expect that, through the channels of communication that run among people connected through ties of neighborhood, community, friendship, and family, the general purport of these important and widely circulated articles would become known to people in [the [plaintiffs'] positions.

*Id.* at 23.

As in *Rakes*, the government has submitted a number of media reports. In the main, however, they deal with the allegedly improper relationship between Scarpa and DeVecchio in general terms. *See, e.g., New York Daily News*, Oct. 13, 1994 ("A law enforcement source known as 'the Girlfriend' [whom the article identified as DeVecchio] may have given Scarpa the addresses of rivals he wanted killed in exchange for his cooperation."); *New York Times*, Nov. 20, 1994 (reporting on the FBI's internal investigation to "determine if [DeVecchio] leaked information to Mr. Scarpa about mob rivals and

pending arrests"); *The New Yorker*, Dec. 16, 1994 (reporting theory that "the F.B.I. had deliberately fed Scarpa information, to help foment the war, and to make certain that [Scarpa] would emerge victorious").

The only article to arguably make a connection between the improper relationship and Grancio's murder appeared in the *Daily News* on October 30, 1994. The article did not suggest, however, that DeVecchio had assisted Scarpa in the murder; at best, it suggested that Scarpa had told DeVecchio that it was about to happen:

> Scarpa, a Persico loyalist, flourished by killing and telling, FBI documents show. He kept DeVecchio informed throughout the unfolding [Persico-Orena] war, sometimes a step ahead, sometimes too late, the documents show:
>
> . . .
>
> • On January 7, 1992, Scarpa met again with DeVecchio. Later that day, he executed Nicholas (Nicky Black) Grancio in Gravesend. "This one's for Carmine!" Scarpa shouted as he shot off his rival's face."

Greg B. Smith and Jerry Capeci, *Mob, Mole & Murder*, N.Y. Daily News, Oct. 30, 1994.

Because the media coverage proffered by the government lacks a "smoking gun" connection between DeVecchio and Grancio's murder, this case is distinguishable from *Rakes*. The Court concludes that the media coverage of the allegedly improper relationship between DeVecchio and Scarpa was too generalized to put a reasonable person on notice of a possible link between DeVecchio and Grancio's murder.

As Mrs. Grancio points out, specific allegations of a possible connection between DeVecchio and Grancio's murder were not publicized until the hearing before Judge Weinstein on Orena's Rule 60(b) motion, which took place on January 7, 2004. Mrs.

Grancio's FTCA claims accrued, at the earliest, on that date; therefore, they are timely.[4]

## B. Exhaustion

"The FTCA requires that a claimant exhaust all administrative remedies before filing a complaint in federal district court." *Celestine*, 403 F.3d at 82. Because this requirement is jurisdictional, the subsequent denial of an administrative claim cannot cure a prematurely filed action. *See McNeil v. United States*, 508 U.S. 106, 113 (1993) (rejecting argument that an FTCA action "is not 'instituted' until the occurrence of the events that are necessary predicates to the invocation of the court's jurisdiction").

Mrs. Grancio filed her administrative claim with the FBI on the same date she filed her initial complaint – January 6, 2006.[5] While the initial complaint did not name the United States as a defendant or expressly assert claims under the FTCA, it did assert common-law tort claims against DeVecchio and Favo. When her administrative claim was denied on October 4, 2006, Mrs. Grancio immediately amended her complaint to add the United States as a defendant and assert claims under the FTCA.

---

[4]Although the Court need not and does not reach the issue of when Mrs. Grancio's claims against DeVecchio and Favo accrued for purposes of the three-year statute of limitations for *Bivens* actions, it notes that the same accrual analysis would apply, *see Barbaro v. United States*, 521 F. Supp. 2d 276, 280 (S.D.N.Y. 2007) ("The discovery rule, which supplies the statute of limitations rule for FTCA actions, also governs *Bivens* actions."); however, where – as in a *Bivens* action – the statute of limitations does not present a jurisdictional issue, factual disputes concerning claim accrual cannot be summarily resolved by the court. *See Bertha Building Corp. v. National Theatres Corp.*, 248 F.2d 833, 835-36 (2d Cir. 1957) ("And if [defendant's] affirmative defense based on the statute of limitations tendered genuine issues of fact, they were also as of right triable by jury.")

[5]The United States does not dispute that Mrs. Grancio's administrative claim was sufficient "to permit the agency to conduct an investigation and to estimate the claim's worth." *Romulus v. United States*, 160 F.3d 131, 131 (2d Cir. 1998).

The question, then, is whether Mrs. Grancio's tort claims against DeVecchio and Favo in her initial complaint constituted "a claim against the United States" within the meaning of the FTCA's exhaustion requirement. If they did not, then her initial complaint did not contain any claims subject to the requirement and its filing is of no consequence to the exhaustion issue. If, on the other hand, the claims in the initial complaint were subject to the exhaustion requirement, then the Court lacks jurisdiction over them because they were filed prematurely (that is, prior to the denial of Mrs. Grancio's administrative claim); under *McNeil*, the subsequent denial of the administrative claim did not cure this jurisdictional defect.

The United States cites several cases for the proposition that, under *McNeil*, jurisdiction over an FTCA claim is assessed at the outset of the litigation, regardless of subsequent amendments to the complaint. *See Webster v. United States*, 2005 WL 3031154, at *2 (E.D. Cal. Nov. 8, 2005) ("[A] plaintiff cannot bring a[n] FTCA action prematurely and then subsequently amend his complaint after denial of the administrative claim because the district court lacks jurisdiction over an FTCA action filed before the exhaustion requirement of Section 2675(a) is satisfied.") ; *Brown v. Hendershot*, 2006 WL 2707432, at *4 (M.D. Pa. 2006) ("The filing of an amended complaint does not cure the defect."); *Hines v. City of New York*, 1996 WL 706877, at *1 (S.D.N.Y. Dec. 9, 1996) ("[P]laintiff cannot rely on an amended complaint when the original complaint . . . was premature."). These cases, however, are inapposite because they take as given that the original complaint asserted a claim against the United States.

More on point is 28 U.S.C. § 2679(d), which governs the mechanics of

converting claims against individual employees into claims against the United States. Section 2679(d)(1) provides that

> [u]pon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court *shall be deemed an action against the United States* under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

(emphasis added). Section 2679(d) then provides that "*[u]pon certification*, any action or proceeding . . . shall proceed in the same manner as any action against the United States and . . . shall be subject to the limitations and exceptions applicable to those actions" (emphasis added). Thus, under the plain language of the FTCA, a tort claim against an individual federal employee is not deemed a "claim against the United States" – and, as a result, subject to the exhaustion requirement – until the Attorney General has certified that the employee was acting within the scope of his or her employment. The certification here did not occur until *after* Mrs. Grancio had already amended her complaint to add FTCA claims and name the United States as a defendant; since, by that time, her administrative claim had been denied, her FTCA claims were not premature.

## V

As previously explained, central to the merits of all of Mrs. Grancio's claims is her contention that DeVecchio and Favo played a role in her husband's murder by terminating the surveillance on him in response to a request from Scarpa. The defendants argue that she has failed to adduce sufficient admissible evidence to support this allegation.

Mrs. Grancio quite reasonably argues that she should not be bound by DeVecchio and Favo's self-serving averments that they played no role in Grancio's murder; nevertheless, because she would bear the burden of proof at trial, she must offer sufficient evidence to contradict their claimed lack of involvement in the murder. *See Golden Pac. Bancorp. v. FDIC*, 375 F.3d 196, 200 (2d Cir. 2004) (if the party moving for summary judgment shows an absence of evidence supporting the non-moving party's claim, " the non-moving party must respond with 'specific facts showing that there is a genuine issue for trial'" (quoting Fed. R. Civ. P. 56(e)).

In that regard, Mrs. Grancio argues that she has proffered sufficient evidence to show that Mazza would corroborate her allegations. Standing in the way of this contention, however, is Mazza's 2004 testimony in *Orena* that he, Scarpa, and DelMasto came upon Grancio unexpectedly, that they did not observe any law-enforcement surveillance, and – most critically – that "[f]rom the moment [they] first saw Grancio till the moment he was killed, there was no time to make any phone calls." Tr. at 113. To overcome this hurdle, Mrs. Grancio offers Dresch's testimony in *Orena*. She also offers the declaration of Edwards, Orena's attorney. Edwards states that she interviewed Mazza prior to the hearing in *Orena* and "asked him specifically about the circumstances surrounding the killing of Nicholas Grancio." Edwards Decl. ¶ 5. Her description of what Mazzo told her is as follows:

> [Mazza] said that they spotted Grancio; but they saw that law enforcement had Grancio under surveillance as well. Mazza said that Scarpa asked to borrow a cell phone. He then said that Scarpa called someone that he called "Del" or "Lin" and that shortly thereafter the law enforcement surveillance was

removed and they moved in and killed Grancio.

*Id.* ¶ 7. Edwards further states that Mazza refused to sign an affidavit memorializing the interview because "he was very concerned that the government would retaliate against him by bringing new charges or somehow violating him if he in any way helped the defense." *Id.* ¶ 8.

The version of events set forth in both Dresch's testimony and Edwards' declaration is flatly inconsistent with Mazza's testimony in *Orena.* "Prior inconsistent statements are generally admissible for impeachment purposes only, *see* Fed. R. Evid. 613, and are inadmissible hearsay for substantive purposes unless they were made at 'a trial, hearing, or other proceeding, or in a deposition.' Fed. R. Evid. 801(d)(1)(A)." *Santos v. Murdock,* 243 F.3d 681, 684 (2d Cir. 2001). Mazza's statements to Dresch and Edwards were made in private interviews, not court proceedings.

That Mazza may have been unwilling to memorialize what he allegedly told Edwards in an affidavit does not alter the analysis; at best, it would render him unavailable as a witness. To be admissible, what he allegedly told Edwards would still have to fit within one of hearsay exceptions for unavailable witnesses set forth in Federal Rule of Evidence 804; it does not.

In short, Dresch's prior testimony and Edwards' declaration are textbook examples of inadmissible hearsay.[6] They are, therefore, insufficient to defeat summary

---

[6]In fact, Dresch's prior testimony is double hearsay, consisting of (1) what he previously stated in court about (2) what Mazza told him. Because Dresch is now deceased, his prior testimony would be admissible under Rule 804(b)(1); however, that does not cure the second hearsay problem.

judgment. *See Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) ("[A]n affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial.").

Finally, Mrs. Grancio offers an affidavit from Mazza, in which he reaffirms that on the day of Grancio's murder Scarpa "made multiple calls to a person whom he addressed as 'Lin.'" Mazza Aff. ¶ 8. He goes on to state, however, that he assumed at the time that "Lin" was "most likely Linda (Scarpa Sr.'s common law wife)," *id.*, but that he "now believe[s] that 'Lin' could have been Lindley DeVecchio." *Id.* ¶ 9. Mrs. Grancio argues that Mazza's affidavit supports an inference that the phone call to "Lin" was a call to DeVecchio, that the call involved a request to call off the surveillance on Grancio, that DeVecchio relayed the request to Favo, and that Favo complied.

Mazza's affidavit establishes, at best, that Scarpa called DeVecchio on the day of Grancio's murder. It does not, however, suggest that Mazza is prepared to recant his sworn testimony in *Orena* that there was no time to make any phone calls between Scarpa's crew's fortuitous discovery of Grancio and his murder. Thus, Mrs. Grancio's assertions about the nature of the calls from Scarpa and DeVecchio and Favo's subsequent actions are pure speculation unsupported by any evidence. Although Mrs. Grancio is, at this stage, entitled to have every reasonable inference drawn in her favor, she cannot defeat summary judgment by "rely[ing] on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998).

In sum, Mrs. Grancio's claims hinge on Mazza; indeed, her counsel at one point wrote to opposing counsel that he "firmly believe[s] the accounts Mazza gave to both

Ms. Edwards and Dr. Dretsch as they have reported them," and that if he did not, he "would not have agreed to bring this case." Letter from David I. Schoen to the Court (June 27, 2007), Ex. 2. Neither those accounts nor Mazza's affidavit, however, can overcome Mazza's sworn testimony in *Orena*.

## VI

As Mrs. Grancio correctly points out, no discovery has taken place, and Federal Rule of Civil Procedure 56(f) gives the Court discretion to either deny or reserve ruling on a summary judgment motion until discovery is complete. *See Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137 (2d Cir. 1994) ("A district court's denial of more time to conduct discovery pursuant to Rule 56(f) is subject to reversal only if it abused its discretion.").

A party opposing a summary judgment motion as premature must "show[] by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition," Fed. R. Civ. P. 56(f); the affidavit must include "[1] the nature of the uncompleted discovery; [2] how the facts sought are reasonably expected to create a genuine issue of material fact; [3] what efforts the affiant has made to obtain those facts; [4] and why those efforts were unsuccessful." *Paddington Partners*, 34 F.2d at 1138. "A court can reject a request for discovery, even if properly and timely made through a Rule 56(f) affidavit, if it deems the request to be based on speculation as to what potentially could be discovered." *Id.*

Mrs. Grancio's counsel has submitted an affidavit that includes an extensive, non-exhaustive list of the information he would seek in discovery:

- all information concerning all murders committed by Scarpa or in which Scarpa was a suspect pre-dating the Grancio murder;

- deposition testimony from Mazza;

- information as to why Mazza was asked by FBI investigators "what he thought when he saw surveillance lifted right before the murder";

- all official reports concerning the murders with which Scarpa was involved or for which he was suspected;

- all documents and facts surrounding the re-opening of Scarpa as an informant and how many times he was closed and re-opened;

- all phone records related to Scarpa's calls to DeVecchio; and

- the transcript of DeVecchio's criminal trial, which is apparently sealed.

The affidavit also describes counsel's efforts to obtain that information and states that those efforts were unsuccessful because much of the information he seeks is either in the hands of the government or possessed by individuals unwilling to speak to him voluntarily. Thus, Mrs. Grancio has satisfied the first, third and fourth elements set forth in *Paddington Partners*.

With respect to the second requirement, Mrs. Grancio's counsel has failed to articulate how the discovery sought could be expected to create a genuine issue of material fact, other than a conclusory assertion that it might yield circumstantial evidence to support an inference that DeVecchio and Favo acted improperly.

In other circumstances, records of Scarpa's phone calls to Grancio and Mazza's deposition might have sufficient potential relevance to warrant discovery. Here, however, Mrs. Grancio's contention that such discovery would be fruitful is purely speculative in light of Mazza's sworn testimony in *Orena* that Scarpa made no phone calls

between the time of Grancio's arrival and his murder. In the absence of any suggestion that Mazza is prepared to admit to having perjured himself in *Orena*, the Court must agree with defendants that Mrs. Grancio has realized that she can no longer rely upon Mazza to corroborate her theory, and that she wishes to embark on a "fishing expedition" in search of other evidence.

## CONCLUSION

The Court is always cautious when considering a motion for summary judgment and has been especially so here in light of the seriousness of Mrs. Grancio's allegations. The fact remains, however, that she has failed to adduce sufficient admissible evidence to support her claim that DeVecchio and Favo played a part in her husband's murder. Accordingly, the Court grants defendants' motions for summary judgment and denies Mrs. Grancio's Rule 56(f) motion; the complaint is dismissed in its entirety.

**SO ORDERED.**

s/FB
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
July 24, 2008