1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

MARIA GRANCIO,                          :    06-CV-0069 (FB)

            Plaintiff,                  :
                                        :
                                        :
       -against-                        :    United States Courthouse
                                        :    Brooklyn, New York
                                        :
                                        :
R. LINDLEY DeVECCHIO,                   :    March 20, 2008
ET AL,                                  :    11:00 a.m.
                                        :
            Defendant.                  :
                                        :
- - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT
BEFORE THE HONORABLE FREDERIC BLOCK
UNITED STATES SENIOR DISTRICT JUDGE

A P P E A R A N C E S :

For the Plaintiff:    DAVID I. SCHOEN, ESQ.
                      2800 Zelda Road
                      Suite 100-6
                      Montgomery, Alabama 36106

For the Defendant:    THOMPSON HINE, LLP
                      For the Defendant - R. Lindley DeVecchio
                      335 Madison Avenue
                      12th Floor
                      New York, New York 10017-4611
                      BY:  DOUGLAS GROVER, ESQ.
                           SUNNY H. KIM, ESQ.

                      DAY PITNEY, LLP
                      For the Defendant - Christopher Favo
                      7 Times Square
                      New York, New York 10036-7311
                      BY:  MICHAEL G. CONSIDINE, ESQ.
                           ROSEMARY Q. BARRY, ESQ.

2

1    Appearances:  (Continued.)

2    For the Defendant:    BENTON J. CAMPBELL
                            United States Attorney -
3                           Eastern District of New York
                            271 Cadman Plaza East
4                           Brooklyn, New York 11201
                      BY:   GAIL A. MATTHEWS, ESQ.

5

6

7

8    Court Reporter:    Anthony D. Frisolone, CSR, RDR, FCRR, CRI
                         Official Court Reporter
9                        Telephone:  (718) 613-2487
                         Facsimile:  (718) 613-2694
10                       E-mail:   Anthony_Frisolone@nyed.uscourts.gov

11   Proceedings recorded by computerized stenography.  Transcript
     produced by Computer-aided Transcription.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Oral Argument                                    3

1           (In open court.)

2           (Judge FREDERIC BLOCK takes the bench.)

3           COURTROOM DEPUTY:  Civil cause for oral argument.

4  Grancio versus DeVecchio.

5                I ask the parties if you can all step forward

6  please and state your appearances for the record.

7                MR. SCHOEN:  Good morning, Your Honor, David Schoen

8  for the plaintiff, Mrs. Grancio.

9                MS. MATTHEWS:  Gail Matthews from the U.S.

10  Attorney's Office on behalf of the United States.

11                MR. GROVER:  Douglas Grover from Thompson Hine on

12  behalf of Mr. DeVecchio.

13                MR. CONSIDINE:  Michael Considine from Day Pitney on

14  behalf of Christopher Favo.

15                THE COURT:  As I understand your papers, there are

16  two issues before me:  One, whether the statute of limitations

17  bars this case going forward because of all of the alleged

18  media publicity or whatever else that happened back in 1994 or

19  thereabouts, and that's an issue that's common both to the

20  United States and to DeVecchio and Favo, correct?

21                And the second issue is what do we do about the

22  assertion that qualified immunity should be flushed out at

23  this stage of the litigation?

24                I think those are the two things that we have

25  to talk about, all right.

1        Let's deal with the newspaper publicity.  My sense

2   of this is that it was not until 2004 when this thing really

3   surfaced publicly with the prosecution or the indictment in

4   Brooklyn that the public really got to know that there was a

5   claim that DeVecchio was deeply involved with Scarpa and that

6   in 1994 you had some newspaper publicity, but nothing so

7   explicit about all of that.

8              Isn't that really a factual matter for the jury

9   to reflect upon all of that rather than for me, just as a

10  matter of law, to apply the statute of limitations based upon

11  these alleged newspaper articles?

12             MS. MATTHEWS:  Your Honor, if I may, on behalf of

13  the Government.

14             First of all, that issue is strictly a bench

15  issue with respect to the United States and the factual

16  assessment is --

17             THE COURT:  I guess you're right.  Because the

18  United States is not involved with the jury, so it's the

19  Federal Torts Claim Act here that triggers your liability.

20             MS. MATTHEWS:  Correct.

21             THE COURT:  And that's for me to decide.

22             MS. MATTHEWS:  Correct.

23             And, Your Honor, if I also may, the factual

24  record that has been meticulously compiled and put before the

25  Court shows that there was a plethora of news articles in the

1    mid-'90s and court decisions in the mid-'90s that referred to

2    as the "DeVecchio-Scarpa relationship."

3              THE COURT:   There is no question about that there

4    was a relationship, but there was nothing there that said that

5    DeVecchio crossed the line and was being charged with giving

6    information to Scarpa; that, you know, he used that to then

7    murder Grancio.

8              MS. MATTHEWS:   Your Honor, everything you said just

9    now is wrong, actually, except for -- what was in the paper

10   and what was made clear in decisions by Judge Sifton and Judge

11   Weinstein is that there were a wide array of allegations --

12             THE COURT:   Right.

13             MS. MATTHEWS:   -- that DeVecchio and Scarpa were

14   both orchestrating the entire war and that DeVecchio was

15   assisting Scarpa in these murders and there are expressed --

16             THE COURT:   Well, why don't you show me the article

17   that says that?  I've looked at the Daily News article of

18   October 13, 1994.  There are a couple of days.  I looked at

19   the New York Times article of November 20, 1994; I looked at

20   the New Yorker article.  I don't know whether or not

21   Mrs. Grancio reads the New Yorker; I don't know that she reads

22   the New York Times, but I've looked at those.

23             What else is there?  The Daily News article or

24   articles reported a possible link between Scarpa and DeVecchio

25   in the Grancio killing and a mob moll murder and it talks

1    about Scarpa meeting with DeVecchio and that later that day

2    "Nicky Black" or Grancio was, of course, executed.

3                   There's a statement there in the Daily News

4    article of October 30, 1993, that says, "This one's for

5    Carmine."

6                   MS. MATTHEWS:   Your Honor, as you get to the

7    articles in 1995 in the Government's Exhibit J, starting

8    there, J, K, L --

9                   THE COURT:   May, 1995 article?

10                  MS. MATTHEWS:   The 1995 articles like the News Day

11   article in Exhibit J on May 10, 1995 -- and this is a quote

12   right in the article:   "An FBI organized crime specialist

13   helped a Mafia assassin commit murder by passing along

14   information about the identities of the informants."

15                  THE COURT:   Right.  But how does Mrs. Grancio know

16   that at that time that it was DeVecchio that was involved in

17   that?

18                  MS. MATTHEWS:   Well, what Mrs. Grancio knows is that

19   her husband was murdered by Scarpa, and what Mrs. Grancio

20   should be charged with knowing is that all of Scarpa's conduct

21   in murdering his Colombo rivals was allegedly assisted by

22   DeVecchio.  And those allegations are just widely stated in

23   these court decisions and in these newspaper articles that

24   charge again and again and again DeVecchio with this complicit

25   conduct in bringing about these murders.  And, while the

1   articles don't all mention Grancio specifically, a few of them

2   do, and by 1996 the Penthouse article is pulling the entire

3   story together explicitly.

4            THE COURT:  You have to sort of put the dots

5   together here.  Look, I read Ray-kus (ph) or Rakes.  That's

6   the only case you have where media coverage, so to speak, was

7   sufficient to trigger a statute of limitations.  It's not

8   exactly the same type of knowledge that somebody has if they

9   find a sponge in their intestines or they know specifically

10  that factual information that there ought to be a duty to act

11  is.  So you have the one and only case and I read Rakes, and

12  this case is not at all like Rakes.

13           Let me tell you why.  The media coverage in Rakes

14  included very specific allegation that the extortion in Rakes

15  was, quote, "One, the crimes the FBI had known of but declined

16  to do anything about."  So you have a very specific set of

17  allegations there in Rakes, and here you have to sort of draw

18  things together.  It may well be that you could surmise.  It

19  may well be that if you study this thing, you might suspect

20  there is a connection, but it doesn't quite ring the bell as

21  the same type of specific information, let alone information

22  contained in the newspaper article.

23           MS. MATTHEWS:  But, Your Honor, Judge Sifton's

24  decision on March 13, 1997, expressly stated that civil

25  litigation in the form of lawsuits by the victims of Scarpa's

1   shootings and their families are available remedies.

2           THE COURT:  Well, let me ask you this.  Do you think

3   that somebody should be charged with knowledge of the court

4   decision?

5           MS. MATTHEWS:  No, but that is --

6           THE COURT:  You don't have any case that says that,

7   do you?

8           MS. MATTHEWS:  I don't think standing alone that

9   that would be sufficient.

10          THE COURT:  All right, I understand that.  But I

11  don't even know how you can consider that.  Look, we write

12  decisions all the time.  The reason why you have an argument

13  superficially about the public knowledge is because it comes

14  through a public media:  The newspaper.  The courts', you

15  know, decisions and proceedings are not really of the same

16  bent and of the same reach as the newspaper headlines.  Our

17  decisions are not published on the front page.

18          Maybe if Judge Sifton's decision was a banner

19  headline in the Daily News and received widespread publicity,

20  you might have more of an argument, but I don't think that

21  standing alone, or even in combination, a judicial decision

22  should be the basis for charging somebody with specific

23  knowledge to trigger the statute of limitations.  It doesn't

24  make sense to me.

25          MS. MATTHEWS:  Your Honor, the Sifton decision

Oral Argument                              9

1    received in Paragraph 107 of the Government's Undisputed

2    Facts, the Sifton decision received widespread coverage, Daily

3    News, March 4th; New York Times, March 4th.

4            THE COURT:  But even the Sifton decision doesn't

5    necessarily link DeVecchio to the Grancio murder.

6            MS. MATTHEWS:  Your Honor, the headlines were:

7    "Federal prosecutors teamed up with defense attorneys to

8    pummel a retired FBI supervisor in court admitting he leaked

9    government secrets to a top-echelon mob informant."

10           "Prosecutors conceded retired FBI Supervisor Lindley

11   DeVecchio gave information to mob moll Gregory Scarpa that

12   helped fuel a war in the Colombo Crime Family."

13           There's a strong circumstantial case that

14   DeVecchio leaked information to Scarpa.  All of this is

15   covered in the press.

16           THE COURT:  Well, I don't know whether that's true.

17   You know, the media coverage makes clear that Scarpa killed

18   Grancio, that's for sure; that, Scarpa had an improper

19   relationship with DeVecchio, but I'm not so sure that this

20   coverage draws a connection between Grancio's murder and the

21   corrupt relationship between Scarpa and DeVecchio.

22           And that's really what the basis of Grancio's key

23   theory is, that DeVecchio removed law enforcement surveillance

24   of her husband and that he effectuated that removal.  There's

25   nothing in any of these articles that talks about the

1    surveillance situation and that this is something that really

2    put him in danger.

3              I mean, look, we just are having a little discussion

4    here.

5              MS. MATTHEWS:  We are, Your Honor.

6              THE COURT:  You're talking about putting somebody

7    out of court, you're talking about a statute of limitations

8    would be triggered from general newspaper publicity.  It's

9    something which it's a kind of a different type of scenario

10   than what you normally would see, and you are relying upon the

11   Rakes case, which is clearly distinguishable.

12             MS. MATTHEWS:  But, Your Honor, I would -- and just

13   one last word on this particular issue.  It turns out that the

14   Rakes case was just one of a series of very thoughtful cases

15   that came out of the First Circuit over the time period

16   2006-2007 that talk about why it is that a person in a

17   position like Mrs. Grancio should have a heightened obligation

18   to inquire regarding these facts.  Because of who she is, as

19   the wife of someone who she knows was murdered by Scarpa, she

20   should be charged with some obligation, not to sit back

21   14 years, but to actually --

22             THE COURT:  How would she find out that there was a

23   surveillance team and that DeVecchio allegedly was responsible

24   for jettisoning the surveillance?  How would she know about

25   that in 1994?

1          MS. MATTHEWS:  Well, Your Honor, what she would do

2    is what she claims she has done now, 14 years later, based on

3    the very same factual situation.

4          THE COURT:  Well, you have something different now.

5    You have the Brooklyn D.A.'s office coming up with very

6    specific allegations.  I assume that it includes the

7    surveillance situation.  That information, I assume, arose in

8    1990 and 2004 and may not have been available.  I think when

9    you rely upon newspaper publicity, you know, it's not a simple

10   cup of tea.

11          Do you have any cases stronger than Rakes that you

12   want to call my attention to?  Because I think that case is

13   clearly distinguishable.  It's a much more focused, much more

14   harsher, much more clearer case.

15          MS. MATTHEWS:  One second, Your Honor.

16          MR. SCHOEN:  Also, Judge, it's a religious fast day.

17   I just may have to sit down in just a second.

18          THE COURT:  Do you have a problem?

19          MR. SCHOEN:  It's a religious fast day, so I get a

20   little bit lightheaded when I'm just standing here.

21          THE COURT:  Pull up a chair and sit down.

22          MR. SCHOEN:  Thank you very much.

23          (Pause.)

24          MR. CONSIDINE:  Your Honor, I just want to add --

25   one moment, if I may?

1         THE COURT:  Just let me sort this out procedurally.
2    If I find out that, you know, we need to -- you know, that
3    maybe there are factual issues involved here that I really
4    can't grant, I guess, summary judgment dismissing on the basis
5    of the statute of limitations at this posture, you may be
6    ultimately successful.  But you can question Mrs. Grancio as
7    to what she knew or what efforts she made to find that
8    information based upon these articles, that I suspect that
9    could be a proper subject of inquiry.
10        You're just distracting her.  She's not going to be
11   able to answer my question.
12            Did you hear what I just said?
13        MS. MATTHEWS:  Most of it.
14        THE COURT:  Have you deposed her at all?
15        MS. MATTHEWS:  No.
16        THE COURT:  Well, you can ask her all these
17   questions.  But I have to decide whether I have enough here as
18   a matter of law right now to grant your motion, and I just am
19   not comfortable in doing that.  There are too many nuances,
20   too many factual considerations here.  I think her testimony
21   would be useful, no question about it.  Maybe she was in China
22   then, I don't know.  Maybe she doesn't speak English, I don't
23   know.  Maybe she doesn't read the New Yorker, I don't know.
24   So I think that those do impress me as being factual matters
25   that you can properly inquire into.

Oral Argument                    13

1          But I think if I were to throw this case out,

2    regardless of how thin one may view the case, based upon

3    statute of limitations now, that, you know, I will be trying

4    this case again sometime in the future if the circuit

5    reverses.  So, it doesn't seem that that's the proper thing to

6    do.

7                If you go forward here and have your

8    depositions or whatever else you have to do, it may well be

9    that you can come back and convince me.  But I think right now

10   it's too fact laden with concerns right now.

11               MS. MATTHEWS:  Well, Your Honor, I'm going to

12   hopefully take you up on what I think might have been an offer

13   to submit an application this afternoon to you with any law

14   that, unlike Rakes, may be more on point.

15               THE COURT:  I will give you a chance.  But was

16   Rakes, by the way, a summary judgment motion or was it after

17   trial?  I don't remember.

18               MS. MATTHEWS:  I think it was on summary judgment,

19   Your Honor, but I don't want to commit.

20               THE COURT:  You may be right.

21               MS. MATTHEWS:  I'm pretty sure it was before trial.

22               THE COURT:  In any event, if you go through with

23   your deposition, I have a situation where the claims against

24   DeVecchio would be before the jury and there may be a factual

25   issue for the jury to sort out here and your determination

Oral Argument                       14

1    would be for the Court.

2                MS. MATTHEWS:  That is correct, Your Honor.

3                THE COURT:  I understand.  But I can listen, you

4    know, in one fell swoop to all of the evidence, let the jury

5    make its determination and I can make my separate

6    determination.

7                MS. MATTHEWS:  Those things do happen.  Your Honor,

8    I do want to let my colleague, he wants to make one argument

9    that's related to the same statute of limitations argument.

10   But for the Government, we should never get to the point of

11   any depositions in this case because there's a wholly

12   independent ground on which this Court does not have subject

13   matter jurisdiction.

14               THE COURT:  Is this in your papers?

15               MS. MATTHEWS:  Yes, it is, Your Honor.

16               THE COURT:  What is the ground?

17               MS. MATTHEWS:  And that's the primary argument that

18   we made, that plaintiff failed to exhaust his administrative

19   remedies prior to bringing this action.

20               THE COURT:  I will deal with that.

21               MS. MATTHEWS:  And so importantly to -- this case

22   has to be dismissed because any other conclusion would vitiate

23   the jurisdictional prerequisites of Section 2675 of the

24   Federal Tort Claims Act.

25               THE COURT:  Let's see.  You have two arguments that

1  you can see I'm prepared for in this case, right?  So, in

2  respect to your exhaustion argument, as I read your papers,

3  you argue that the original complaint, which named only

4  DeVecchio and Favo as defendants and did not include FTCA

5  claims, contained common law tort claims against DeVecchio and

6  Favo.  Those common law tort claims were, by their nature,

7  FTCA claims and therefore should have been exhausted before

8  the suit was filed.  I think that's what your argument is,

9  right?

10          MS. MATTHEWS:  Well, that's part of the argument,

11  Your Honor, although that's almost an alternative argument.

12  The crux of it is plaintiff instituted this action on

13  January 6th by filing a complaint.  Regardless of what claims

14  were in the case on that day, plaintiff had not exhausted his

15  administrative remedies and, therefore, there can never be

16  subject matter jurisdiction against the United States in the

17  case that was initiated on January 6, 2006.

18          THE COURT:  Well you have an action against

19  individual defendants for common law tort claims, but the

20  question is you need more than that here under the Federal

21  Tort Claims Act.  You have to be able to know that these

22  actions were taken within the scope of their employment.  That

23  may be a separate factual issue as well.

24          MS. MATTHEWS:  That's actually alleged in the

25  initial complaint, Your Honor, and that complaint was served

1   on the Government.

2          THE COURT:  Right.  But the issue of whether it's

3   within the scope of their employment is what previously led to

4   the FTCA claim, that they had no knowledge of that within the

5   scope of their employment, so it's tied together here.

6          MS. MATTHEWS:  Right.  But, Your Honor, they knew

7   enough that there was a likelihood, because plaintiff's

8   counsel filed an administrative claim on January 6th.  And

9   separate and apart from whatever claims were alleged in that

10  initial complaint, the administrative claim filed on

11  January 6,2006 was denied on October 4, 2006, and that

12  triggered the six-month jurisdictional window in which

13  plaintiff could initiate an action against the United States,

14  and plaintiff has not done that.

15         THE COURT:  I don't think that applies here.  Again,

16  you're on thin sledding here with respect to that, because,

17  you know, really not until the facts came out she amended the

18  complaint and alleged all these very specific facts dealing

19  with the relationship and the supervision of DeVecchio and

20  Grancio.  That wasn't the basis of the initial complaint, It

21  was based on common law tort.  It really wasn't an FTCA claim

22  at all.

23         MS. MATTHEWS:  Your Honor, all those same

24  allegations, all those same common law tort claims were in

25  that initial complaint.

1          THE COURT:  Yes, but common law tort is not what
2    we're talking about.  We're talking about the specific
3    allegations that brings us under the umbrella of the FTCA.  I
4    have your argument here.  Look, what this comes down to really
5    is that you have a sequence of events over the period of time,
6    and in fairness to Grancio, really, everything that I can't
7    say in court hit the fan when Hynes's office became
8    interactive.  That's really the overview here, what I share
9    with you.  Until then, yes, there was a lot of stuff out there
10   and this and that, but it didn't really crystallize until we
11   had the underlying indictment, and then all the very specific
12   press about DeVecchio's alleged involvement with all of this
13   sort of cup of tea.  I have your arguments.  This is what
14   you're here for, to argue, but I suspect that I'm not
15   comfortable in dismissing based upon the statute of
16   limitations at this time.
17          MS. MATTHEWS:  Your Honor, let me just say that with
18   respect to this initial argument, there will not be any
19   further factual revelation in this case that will bear on this
20   argument.
21          THE COURT:  You can take her testimony.
22          MS. MATTHEWS:  Which will not bear at all on the
23   issue of when she initiated this action and her failure to
24   finally --
25          THE COURT:  That's an administrative remedy.  I'm

1    not concerned at all about that.

2          MS. MATTHEWS:  But, Your Honor, let me just say that

3    you should be because it is blackletter law.

4          THE COURT:  We'll take another look at that, because

5    I don't think you will be able to win the day on that, but you

6    know, why don't you take her deposition and then you can come

7    back to me and say, here's what she said, she was living in

8    Brooklyn, she read these articles, she knew about all of this,

9    and, you know, there's a whole series of questions you can

10   pose to her.  Or maybe she'll say that I wasn't even in the

11   country.  What if it were that she was in China as a

12   missionary hypothetically?

13         MS. MATTHEWS:  Her affidavit says she has been in

14   Brooklyn consistently in the past -- since Grancio's death in

15   1992.

16         THE COURT:  What if she doesn't read the newspapers?

17   People don't always read the newspapers.  You'd be surprised

18   how many jurors never read newspapers.

19         MS. MATTHEWS:  Your Honor, if you're not going to

20   accept our argument that she should be charged with this

21   knowledge that was objectively out there, then, yes, you're

22   talking about taking discovery so --

23         THE COURT:  She's charged with every bit of

24   information that may be contained in the Daily News on a

25   particular day?

1          MS. MATTHEWS:   No, the sum of it, Your Honor.   The

2     duty to inquire is foisted upon her by all of that widespread

3     media that plaintiff acknowledges.

4          THE COURT:   It's fact specific, okay, and I'm not

5     comfortable in dismissing the case without giving the parties

6     an opportunity to develop facts.   That's all I'm saying.

7               Now, who wishes to speak?   Mr. Grover?

8          MR. GROVER:   Actually, Mr. Considine.

9          THE COURT:   Mr. Considine, do you want to add

10    anything to develop the argument by Ms. Matthews?

11         MR. CONSIDINE:   No.   I think Ms. Matthews addressed

12    the statute of limitations point very effectively, Your Honor.

13         THE COURT:   Mr. Schoen, do you want to say anything

14    else regarding the statute of limitations?

15         MR. SCHOEN:   No, Your Honor, nothing other than

16    what's in the papers.

17         THE COURT:   What do you say about the failure to

18    comply with the administrative exhaustion here?   I view this

19    thing as the initial complaint being a different animal than

20    the amended complaint.

21         MR. SCHOEN:   If I could just back up about what I

22    said earlier, that I have nothing to say.   Again, it's in the

23    papers.   But on the publicity issue, if Mrs. Grancio had read

24    the papers, what she would have read was that DeVecchio had

25    been cleared of any involvement.   What she also would have

Oral Argument                    20

1    read that -- never would have seen any allegation, anyplace,

2    in any media report tieing DeVecchio to the Grancio matter.

3            THE COURT:  Is that true, that the papers did report

4    that he had been cleared of any wrongdoing?

5            MS. MATTHEWS:  The papers reported that there was

6    more than -- there was reasonable doubt as to criminal

7    activity so that he would not be charged with a crime.  Was

8    there circumstantial evidence -- Valerie Caproni admitted in

9    the papers, it flooded the newspapers in '95 --

10           THE COURT:  I see, I disgorged them pretty well, but

11   I can look through them again.  But if, in fact, there was

12   some question that was trotted out as to whether or not

13   DeVecchio was really criminally involved with any wrongdoing,

14   doesn't that undercut your argument, as distinguished counsel,

15   Mr. Schoen, points out?

16           MS. MATTHEWS:  As opposed to undercutting it, it

17   adds to it.  To this day, there's been no evidence of him

18   undertaking any criminal activity.  And in fact, the recent

19   prosecution, the dismissal of that prosecution by the D.A.'s

20   office where the D.A. stood up and said, "We don't have

21   evidence," that underscores it further.

22           THE COURT:  But clearly, that's, you know, something

23   -- you may win on the merits here.

24           MS. MATTHEWS:  But, Your Honor, the fact of the

25   matter is when there are allegations in the paper that there's

Oral  Argument                    21

1    potential criminal activity, just because the Department of

2    Justice says, "We at this point don't believe it reaches --"

3            THE COURT:  What's she supposed to do?  How would

4    she know that there was a surveillance situation?  I don't

5    know when she found out that information or how she found it

6    out.  But was there surveillance, yes or no?

7            MS. MATTHEWS:  Not by the Department of Justice.

8            THE COURT:  Well, by somebody?

9            MS. MATTHEWS:  By somebody.

10           THE COURT:  There was surveillance?

11           MS. MATTHEWS:  How would she know that?  How did she

12   find that out to this day?

13           THE COURT:  It's in the papers.  You tell me.  I

14   don't know.  That's why you have to conduct further discovery.

15   I don't know.  I'm just giving you an example of facts that

16   are somewhat unclear, which I think a reasonable --

17           MS. MATTHEWS:  I understand, Your Honor.  My whole

18   argument wasn't based on the facts known to Mrs. Grancio, and

19   I don't purport to say she was in town reading them.

20           THE COURT:  You're just saying she needs to inquire?

21           MS. MATTHEWS:  Absolutely.

22           THE COURT:  She needs to inquiry of the surveillance

23   team.  And who is she going to inquire -- she's going to call

24   -- who's the head of the FBI back then?

25           MS. MATTHEWS:  Callstrom?

Oral Argument                    22

1        MR. GROVER:   The date -- in '89?

2        MS. MATTHEWS:   No; '92 -- '95 really is the date

3   that --

4        MR. GROVER:   Probably Louis Freeh.

5        THE COURT:   Is she going to call up Mr. Freeh and

6   say, geez, I want to talk to him, will you put me through to

7   him, and I'm concerned here, I see all these articles, is it

8   possible that, you know, there is something here that I should

9   know about, any link specifically to Mr. DeVecchio, and

10  Mr. Freeh would say, "Well, come down to my office in

11  Washington and have a little chat with me about that."

12       MS. MATTHEWS:   Your Honor, let me just say that

13  there were 18 criminal defendants who were acquitted in 1994

14  and 1995 based on these allegations.  People were out there

15  saying it and relying on it and it was widespread publicity.

16       THE COURT:   All right.  But I think Rakes is the

17  exception to normally what would be the rule, and that was a

18  very extreme case, but it was specifically more difficult than

19  this cup of tea.  We're talking about -- you know, as we speak

20  right now, I think it reinforces my sense of things, that to

21  dispose of this case at this posture of litigation on statute

22  of limitation grounds, even if it's a weak case, it would be

23  something that would be reversible rather --

24       MS. MATTHEWS:   And erring on the side of going over

25  it one more time, Your Honor, I would just say that the

1   exhaustion argument cannot be ignored.  It's the type of

2   argument that --

3           THE COURT:  We're not ignoring it, but I just think

4   that the underlying complaint was common law tort and the

5   amended complaint really focused on the FTCA claim.  In any

6   event --

7           MS. MATTHEWS:  But the law says that the amended

8   complaint is not a separate animal.  It can't be deemed a

9   separate animal.

10          THE COURT:  You're doing a very good job.

11          MS. MATTHEWS:  Thank you, Judge.

12          THE COURT:  You're an excellent forceful advocate,

13  but you've met your match here.

14          MS. MATTHEWS:  I see.

15          THE COURT:  This is why oral arguments are

16  important, to give counsel the opportunity to speak as

17  eloquently as you have spoken, but my style is to interact

18  with lawyers.

19          You know, when I used to practice law a hundred

20  years ago, I always felt, you know, unsatisfied whenever I

21  would come to court with an oral argument -- and I had some

22  interesting oral arguments, too -- and the judge would sit

23  there impassively and walk away from this after making big

24  speeches and then I had no comfort level that the judge

25  understood what I said, was listening, cared, read the papers.

1    And I said, "If lightning ever strikes someday, I'm not going

2    to do it that way."  I think that lawyers deserve the respect

3    in having a judge who's going to talk to them and hopefully

4    are secure enough not to worry about saying something stupid.

5              Okay.  Let's talk about qualified immunity.

6              MR. CONSIDINE:   Thank you, Judge.

7              MS. MATTHEWS:   That's them.

8              THE COURT:   Yeah, that doesn't concern you.

9              MS. MATTHEWS:   It does not, Your Honor.

10             THE COURT:   And what I'm puzzled about in terms of

11   the qualified immunity issue is that we have here all the

12   §12(b)(6) motion on summary judgment.  I guess, on the face of

13   the complaint, there - it's not sufficient for me to find

14   qualified immunity.  There's nothing intrinsically in the

15   complaint that grants your clients qualified immunity to the

16   contrary.  It's pretty incendiary stuff.

17             So you submitted in the context, I guess, of a

18   Rule Rule 56 motion an affidavit from DeVecchio, affidavit

19   from Favo that said he had nothing to do with it.  That's

20   factual stuff, no question about it.

21             So, now, Mr. Schoen, you're in the hot seat here.  I

22   have nothing from you.  Don't you have some obligation in the

23   face of the Rule 56 motion and in the face of affidavits by

24   people who have knowledge of the circumstances, saying that we

25   had nothing to do with this, to come forward with something to

1   defeat summary judgment?  Or you feel that you'll need some

2   time to have discovery to be able to mount an opposition to

3   it?

4           MR. SCHOEN:  Well, two -- three answers, I suppose,

5   to that, Your Honor.  Number one is how we define what the

6   wrong was and, therefore, the clearly established

7   constitutional right but one --

8           THE COURT:  Just talk to me about processing.

9           MR. SCHOEN:  Okay.

10          THE COURT:  Don't say -- I don't care how you define

11  "clearly established constitutional right" in the first

12  instance.  They're coming out and saying they have nothing to

13  do with this, and you have submitted nothing in opposition

14  except you say something about Mazza, if that's how you

15  pronounce his name, has given you some sort of a declaration

16  that you have, that he doesn't want it to see the light of day

17  and that's sufficient for the application.  I don't get it.

18          MR. SCHOEN:  All right.  Your Honor, so

19  procedurally, yes, the overriding answer to it is, as I said

20  in my Rule -- first in the papers in response to the summary

21  judgment motion and in my affirmation and in the Rule 56.1

22  statement and more recently in the Rule Rule 56(f) motion, we

23  do need discovery.

24          THE COURT:  Do you agree with me that if you -- you

25  know, this is all you have, this -- you know, your naked

1    allegations, as incendiary as they are, in the complaint, that

2    would not be sufficient to defeat the qualified immunity

3    application in the face of these affidavits that I have in

4    front of me; would you admit to that?

5              MR. SCHOEN:   The complaint alone without the

6    exhibits that I filed, Your Honor?

7              THE COURT:   Well, what exhibits did you file?

8              MR. SCHOEN:   I have about 30 exhibits that bear

9    on -- most of which bear on this question, but which also --

10             THE COURT:   What exhibits do you have in opposition

11   to the actual affidavits of denial?

12             MR. SCHOEN:   I don't have an exhibit, for example,

13   that says -- that can show that DeVecchio called up --

14             THE COURT:   What are you talking about?

15             MR. SCHOEN:   -- Favo.  I'm talking about several

16   things.  Let me, Your Honor --

17             THE COURT:  Talk to me.  You know the case.  Just

18   talk it out.

19             MR. SCHOEN:   I was just going to get my exhibits.

20   First of all, the Court referred to this alleged statement

21   that --

22             THE COURT:   Why are you relying upon the Mazza

23   affidavit?  It seems that's what your principle argument is

24   with respect to DeVecchio.

25             MR. SCHOEN:   Well, the way this started, Your Honor,

1   was with the Mazza affidavit.  It was with what Mazza told a

2   lawyer, a member of the bar of this court, Flora Edwards, and

3   what Mazza told an investigator, Stephen Dresch, which they've

4   testified about --

5           THE COURT:  I'm looking for affidavits.

6           MR. SCHOEN:  Those are affidavits.  I have

7   affidavits from Flora Edwards, for example, that Mazza told

8   her in detail exactly what he originally said to Dresch and

9   Flora Edwards; that is, that on the day of the shooting, he

10  was in the car with Scarpa and Del Masto, that Scarpa got a

11  call from DeVecchio.

12          THE COURT:  So we have affidavits here from these

13  people saying, this is what Mazza told me?

14          MR. SCHOEN:  Oh, yes.  That's in the file.  That's

15  in the record.  Judge --

16          THE COURT:  I don't have anything from Mazza

17  directly other than some reference that, you know, something

18  should be under seal.

19          MR. SCHOEN:  Judge, let me explain that, because I

20  don't like to be cryptic about it.  I felt I had an

21  obligation.  Mazza gave an affidavit to an investigator with

22  the proviso that it not be submitted in court unless it's

23  submitted under seal.  I said, "I can't guarantee that it

24  would be submitted under seal."  I felt an obligation to stay

25  true to my word.

1           But now, in all of these responsive papers, there's

2     a question raised whether I'm even telling the truth that I

3     have such a thing.  That's been raised repeatedly.  It's

4     referred to in the alleged statement, so I brought it with me

5     today.  And in my most recent filing I said, in reply then to

6     this argument, "I'm happy to submit it to the Court under

7     seal."  If the Court decides it ought to be unsealed, let the

8     Court unseal it and show it to them.  I also have, by the way,

9     Your Honor, an e-mail from Mazza.

10          THE COURT:  If we don't have it, if you are just

11    relying upon, you know, secondhand statements which would not

12    be of evidentiary value, would you agree that I just can't

13    rely upon those statements in opposition to the summary

14    judgment motion?  I need something specific in evidentiary

15    form like Mazza's affidavit.  That's the general law.

16          MR. SCHOEN:  Sure.  I understand, Your Honor.  We do

17    have -- Mazza's testimony, in my view, in the Aréna trial --

18    that's one of the exhibits in the case -- I think it's my

19    Exhibit 30, but it's an exhibit also that one of the

20    defendants has -- and my view respectfully has been misstated

21    by the defendant.  In that testimony -- what happened here is

22    Mazza gave --

23          THE COURT:  Talk to me about what you have that

24    counters the affidavits from Favo and DeVecchio that say,

25    "You're full of it," and that we were not involved in this at

Oral Argument                    29

1   all.  Tell me what you have.  If you have something, that

2   creates an issue of fact, I'm sure distinguished counsel

3   representing DeVecchio or Favo would agree that that's

4   something that would have to be flushed out and that would

5   defeat their application for qualified immunity at this stage

6   in the litigation.

7           MR. SCHOEN:  Several things, Your Honor, depending

8   on the theory that we're talking about -- of the complaint

9   that we're talking about.  For example, on the removal of the

10  surveillance, we have an affidavit from the police officer who

11  was conducting surveillance -- he's a member of the Joint Task

12  Force with Favo, DeVecchio, et cetera and that group, who was

13  called off surveillance by --

14          THE COURT:  So you have an affidavit saying, I was

15  called off, and he was called off by whom?

16          MR. SCHOEN:  By defendant Favo.

17          THE COURT:  Oh, there is an affidavit?

18          MR. SCHOEN:  Yes, Your Honor.  -- by Joe Simone.  He

19  also said that he argued with Favo and said, I shouldn't be

20  pulled off of surveillance now, he was told to come into the

21  building.  We have also reference to trial testimony --

22          THE COURT:  You have affidavits that say, "In truth

23  Favo told me to go off surveillance."

24          MR. SCHOEN:  Yes, Your Honor.

25          THE COURT:  So that's contrary to what your claim

1   is, isn't it?

2           MR. CONSIDINE:  No, Your Honor.  I'm trying to

3   figure out where we're going with this.  For this reason, in

4   order for Christopher Favo, an individual agent, now to have

5   his personal assets on the line, the plaintiff has to

6   establish the constitutional violation under the Fourth,

7   Fifth, or Sixth Amendment.

8           THE COURT:  The constitution doesn't allow people to

9   kill people.

10          MR. CONSIDINE:  Exactly.  And what's important,

11  though, Judge, is Nicholas Grancio --

12          THE COURT:  Aren't we talking about a constitutional

13  violation if these allegations are true and that these people

14  who were, you know, agents at the time and in the scope of

15  their work, you know, were involved in aiding and abetting

16  Scarpa to murder people?

17          MR. CONSIDINE:  There's no allegation, Your Honor.

18          THE COURT:  Isn't that a constitutional violation?

19          MR. CONSIDINE:  If that's indeed what was alleged.

20  With regard to Chris Favo, it's very simple.  All that is

21  alleged against Christopher Favo is that another agent called

22  him and asked him to be removed from surveillance.  So there's

23  nothing in that phone call which indicates -- there's no

24  allegation that the other agent told him that Greg Scarpa was

25  out on the scene.  There's no allegation that he was informed

1   that the purpose for removing the surveillance was to murder.

2   It's simply a request to remove surveillance.

3           THE COURT:   Do you have an affidavit that says

4   something to the contrary?

5           MR. SCHOEN:   We have trial testimony that Detective

6   Higgins, who was also part of this Task Force, had warned that

7   Nicky Grancio was a specific target.   Nicky Grancio was the

8   person under the surveillance then.   But, Judge, what we also

9   have to look at here -- we can't look at in a vacuum, and

10  that's the problem and that's what the court in McIntyre and

11  these other cases say.   We have to take a look at what it is

12  that Favo knew and should have known at the time.

13          And what we are now starting to learn from this

14  DeVecchio trial testimony -- which, as they say it in Boston,

15  criminal trial testimony is probably the most fertile ground

16  where you may learn some things you didn't know.   What we've

17  learned for the first time there, and why we need discovery,

18  was the -- a primary role that Favo took as a Colombo case

19  agent in 1991.   We also learned that in 1991, before this,

20  Favo learned that Scarpa was an informant and concealed that

21  fact.   We can't look at -- I'm sorry.

22          THE COURT:   How do you know that?

23          MR. CONSIDINE:   Judge, his point with regard to

24  vacuum is very important for this reason.   Nicholas Grancio --

25          MR. SCHOEN:   Can I answer the question the Judge

1    asked me?

2              THE COURT:  I will go back and forth.

3              MR. SCHOEN:  I'm sorry, Your Honor.  You just asked:

4    How do we know that?

5              THE COURT:  You finish that.

6              MR. SCHOEN:  That's in trial testimony from the

7    <u>Catolo</u> trial.  It's referenced in the papers that Favo

8    testified that he knew in 1991 that Scarpa was an informant

9    and that he concealed that in some documents that he prepared.

10             THE COURT:  I'm not so sure that rings the bell.

11   What documents were they concealed in?

12             MR. SCHOEN:  They are in a report that he did --

13   there are two reports that are relevant.

14             THE COURT:  So he doesn't want to expose them and he

15   knows somebody is an informant.  What's the big deal about

16   that?

17             MR. SCHOEN:  Well, Judge, again, this is why we need

18   discovery.  Let's look at it this way --

19             THE COURT:  You don't have to argue so hard, just

20   answer my question.  What do you expect to accomplish in

21   discovery?  Who do you want to depose?  What do you want to

22   do?

23             MR. SCHOEN:  What Favo knew when, what -- in

24   addition to deposition, we --

25             THE COURT:  You want to depose Favo?

1          MR. SCHOEN:  Yes, Your Honor.  But we need papers.

2   We need papers.  What we've learned is just days after Scarpa

3   killed Grancio, Favo knew that Scarpa killed Grancio -- that's

4   in testimony, trial testimony -- did nothing, kept him on the

5   street, knowing that he was a murderer committing murder.

6          But it's not just that.  He gave him license, we

7   say.  He gave him license because of knowing he committed that

8   murder and knowing -- what we know is shortly after this

9   thing, Favo had an informant named Carmine Imbriale, and

10  Carmine Imbriale made tape-recordings for Favo with Scarpa on

11  them in which Scarpa was admitting murders, in 1991 another

12  attempted murder against a guy named Joe Caccese after that --

13         THE COURT:  There's no question that it was known

14  that there were murders and attempted murders.  What does that

15  have to do with this case? So you want to question Favo.  Are

16  you telling me that you really are asking that we do not pass

17  upon the summary judgment qualified immunity application at

18  this time because you really have enough basis to warrant

19  having discovery, having an opportunity to question Favo and

20  DeVecchio; is that what you're saying?

21         MR. SCHOEN:  Absolutely, Your Honor.  And to get the

22  underlying documents the informant filed and those kinds of

23  things that tell the history of this case that we have no

24  access to and that the defendants have exclusive access to.

25         THE COURT:  Well, why shouldn't they have the

1  opportunity to flush that out?

2       MR. CONSIDINE:  Judge, because the allegations of

3  their complaint or that there was a phone call and Christopher

4  Favo removed surveillance.  The surveillance of Nicholas

5  Grancio was undertaken because he was a mobster and he was

6  involved in the middle of a war.

7       THE COURT:  That's it.  The obligation goes beyond

8  that.  It says that, you know, he had all this knowledge and

9  that this was, I guess, something that would create a danger

10 or risk, that he knew he was an informant, that he knew there

11 was a likelihood that there could be some foul play.  I don't

12 know.  I have to look at all these things.

13      You see, the problem I have with this is I have a

14 lot of loose allegations and claims and bits and pieces of

15 information, and you want me to make a summary determination

16 now on the issue of qualified immunity.

17      Let me just put that to the side.  What does the

18 Mazza declaration say?  Because if you have something

19 foursquare and Mazza puts DeVecchio and Favo in the soup and

20 then I think that you are going to be successful in defeating

21 summary judgment.

22      MR. SCHOEN:  Let me give you a little background,

23 Your Honor.

24      First of all, we have the statements from two

25 interviews that Mazza gave in which he detailed exactly what

1   happened.   He also said in those interviews how scared he was

2   and that --

3           THE COURT:   That's known.   So there is no reason why

4   this could be under seal.   You honored your request --

5           MR. SCHOEN:   Okay.

6           THE COURT:   -- the request to not go public with

7   this in the first instance unless the judge tells you.   I'm

8   telling you now to do it.   Read to me what Mazza said in this

9   declaration which will be part of this file in opposition to

10  the motion of summary judgment that you think creates an issue

11  of fact.

12          MR. SCHOEN:   And for Your Honor's -- for later

13  review, if you wish, I set out in my affirmation exactly what

14  he says also.

15          THE COURT:   But will you say that?

16          MR. SCHOEN:   Yes, okay.   I'll read from the --

17          THE COURT:   Here's what Mazza says, and what date is

18  that?

19          MR. SCHOEN:   It's dated -- he faxed it in

20  January 11th, '07.

21          THE COURT:   What form does it take?

22          MR. SCHOEN:   It's called -- shall I pass it to Your

23  Honor?

24          THE COURT:   Is it an affidavit?

25          MR. SCHOEN:   It's called an affidavit, but then it

Oral Argument                          36

1    says, pursuant to 28 U.S.C. Section 1746, which is the

2    declaration statute, he, Larry Mazza, says certain things and

3    then he signs it at the end on January 10, 2007.

4           THE COURT:  He makes a declaration.  Does he say

5    he's being sworn to an oath?

6           MR. SCHOEN:  He says, "Having been duly sworn hereby

7    depose and state under penalty of perjury that the following

8    factual representations are true and correct to the best of my

9    knowledge and recollection."

10          THE COURT:  Don't bother with the nuances of the

11   declaration or affidavit.

12          MR. SCHOEN:  He says -- shall I read it or

13   summarize?

14          THE COURT:  Well --

15          MR. SCHOEN:  I'll read it.

16          THE COURT:  How long is it?

17          MR. SCHOEN:  Page and a half, page and a third.

18          THE COURT:  Let's hear it now because this is the

19   first time that DeVecchio and Favo are hearing this.

20          MR. SCHOEN:  He also sent an e-mail, Your Honor,

21   following up, but, anyway.

22          THE COURT:  Just read it.

23          MR. SCHOEN:  "On January 7, 1992, I, Lawrence Mazza,

24   was a member of the Persico faction of the Colombo Crime

25   Family and one of the passengers in a van which also held

1   Gregory Scarpa, Senior and Jimmy Del Masto.  Gregory Scarpa,

2   Senior was also a member of the Colombo Organized Crime Family

3   and known on the streets as a feared killer.  On the afternoon

4   of January 7, 1992, we pulled up beside Nicholas Grancio, who

5   was subsequently killed from a gunshot wound to his head.

6   Prior to this event, Gregory Scarpa, Senior made several

7   telephone calls."

8            That's the key.  All right.

9            THE COURT:  Go ahead.

10           MR. SCHOEN:  "On May 30, 2003, I was interviewed by

11  Dr. Stephen P. Dresch, at which time I expressed that I was

12  not willing to testify on this matter unless it was in a

13  Congressional hearing and I would be protected through

14  immunity in fear of concern for possible retribution.

15           In late July 2006, I became aware of and

16  reviewed an FBI 302 authored by Agent Christopher Favo dated

17  6/91, dash, 2/6/94 giving merit to my concerns stated in

18  Paragraph 5 above."

19           Paragraph 5 was the paragraph in which he told

20  Dresch he was afraid.

21           "Which additionally informed me of my name

22  being irresponsibly and purposely placed as a possible

23  'source,'" in quotes, "thereby attempting to divert attention

24  away from Gregory Scarpa, Senior as being," the quote,

25  'source,' closed quotes, "and instead, allowing direct

1    attention to be placed on me and Jimmy Del Masto, which could

2    have placed our lives in significant and immediate danger.

3              THE COURT:  Well, let's get to the part where he

4    talks about DeVecchio and Favo.

5              MR. SCHOEN:  Well, right, one of the things that the

6    defendants have said repeatedly is that Mazza has said

7    unequivocally there were no phone calls with Scarpa before the

8    Grancio murder.  That's not what his testimony said, by the

9    way.

10             THE COURT:  So now he says it to the contrary.

11             MR. SCHOEN:  It also says that here but --

12             THE COURT:  Go ahead.

13             MR. SCHOEN:  Okay.  In the summer of -- there's only

14   three more paragraphs.

15             THE COURT:  Go ahead.

16             MR. SCHOEN:  "In the summer of 2006, additional

17   overt attempts were made by former agents of the FBI that were

18   using intimidation tactics to elicit information from me,

19   which I properly reported to the authorities directly

20   thereafter."

21             THE COURT:  Stop.  He doesn't name anybody?

22             MR. SCHOEN:  No.  But this explains why his story

23   has changed after he gave the interviews to Flora Edwards and

24   to Dresch.

25             THE COURT:  Okay.

1          MR. SCHOEN:  "During the duration of time that I

2    spent with Gregory Scarpa, Senior, he made multiple calls to a

3    person whom he addressed as," quote, "Lin," L-i-n, closed

4    quotes.   "At the time I assumed it was most likely Linda,

5    Scarpa, Senior's common-law wife.   Gregory Scarpa, Senior had

6    to eat small meals several times a day and Linda would remind

7    him of this.   On the day of the Grancio homicide, while we

8    were driving around, Gregory Scarpa, Senior was on the

9    telephone multiple times.   Scarpa had just left from being

10   with Linda.   However, shortly thereafter, he was back on the

11   phone with," quote, "Lin," closed quotes.

12          "In hindsight, I now believe that Lin, in quotes,

13   could have been Lindley DeVecchio, and my presumption of Linda

14   being, quote, Lin, closed quotes, may have been an incorrect

15   presumption in light of the events that took place shortly

16   thereafter, coupled with my former and current knowledge of

17   the events that took place throughout my association with

18   Gregory Scarpa, Senior.   I have not been threatened, coerced,

19   or promised anything for --"

20          THE COURT:   So let's assume that he says that "Lin"

21   was DeVecchio and he just says that he knows that he was on

22   the phone with him.   And he's having a conversation with him

23   and then the murder happens later that day?

24          MR. SCHOEN:   Yes, Your Honor.   Again, we can't look

25   at that in a vacuum because we know from later testimony --

1          THE COURT:  I want to know what you rely upon.

2          MR. SCHOEN:  Testimony from, for example -- which I

3  don't have, but which has been reported to me -- from the

4  criminal trial in Brooklyn, that it was a well-known method of

5  operation that Scarpa would speak with DeVecchio on the phone

6  for purposes of furthering his criminal activity.

7          THE COURT:  You say that.  I mean, there's no

8  question that the undercover agent has phone conversations

9  with Scarpa.  There's nothing eventful about that.  That's not

10  what you're relying upon.  You're saying that you have

11  evidence here that says that, in fact, I was there and I

12  overheard a conversation by DeVecchio that informed Scarpa

13  that I am going to remove surveillance or I'm going to do

14  something that constitutes aiding and abetting the murder of

15  Grancio.  There's nothing in there that says that.

16          MR. SCHOEN:  But according to the sworn testimony of

17  Stephen Dresch and the affidavit of Flora Edwards, that's

18  exactly what Mazza has said.

19          THE COURT:  I can't rely upon that.  He hasn't said

20  it in his affidavit.

21          MR. SCHOEN:  But he has explained why he changed his

22  story.

23          THE COURT:  Okay.  But I'm just trying to flush out

24  what we're talking about.  I have nothing here from Mazza that

25  rings the bell to me.  Now, I have to decide whether to allow

Oral Argument                    41

1   you to go forward and have discovery.  I don't know whether

2   I'm going to allow that or not.

3           MR. SCHOEN:  And this is the most difficult issue,

4   by the way, on discovery because -- let me explain, Judge --

5   because it's unlikely we're going to find all of the phone

6   records from back then between the two of them.  But what

7   Mazza says in his e-mail is, how come they're all treating it

8   like they only -- and he knows what's going on here.  He knows

9   this is about whether Scarpa was speaking to DeVecchio in

10  order to further this crime.  And what he says is, why didn't

11  they check my sister's phone because that's where Scarpa --

12          THE COURT:  Stop for a second.  You know, this case

13  fell apart on the criminal level.  We know all about that.

14  And, you know, the Government, you know, was making the same

15  claims that you're making here, and when push came to shove,

16  they folded their tent.

17          Now you come here on the civil level and you are

18  crying out basically the same arguments.  But I'm looking for

19  something here that links them, because if there is that

20  linkage, then I would imagine this criminal trial would have

21  gone forward.  So, it's difficult for you to find anything out

22  there that Hynes's office, you know, doesn't already have

23  which didn't ring the bell.  I don't know where you are going

24  here.

25          Are you going to question DeVecchio and Favo?

1              MR. SCHOEN:  Yes, Your Honor.

2              MR. CONSIDINE:  Your Honor, they both submitted

3     affidavits indicating that there was never a call between

4     DeVecchio and Favo to remove their surveillance.

5              THE COURT:  How -- what are you going to do with

6     that?  Do you expect them to change their testimony?

7              MR. SCHOEN:  No, Your Honor.  I expect to be able to

8     depose Larry Mazza.  But beyond that, Your Honor --

9              THE COURT:  You're going to depose Larry Mazza?

10             MR. SCHOEN:  Yes, Your Honor.

11             THE COURT:  And you're going to want to, in the

12    deposition, get him to be able to say that indeed he knows

13    that Scarpa and DeVecchio talked specifically about taking off

14    surveillance and aiding and abetting the murder of Grancio.

15    Do you think he's going to say that?

16             MR. SCHOEN:  I don't know, Your Honor, but that's

17    only one part of this case.

18             MR. GROVER:  Judge --

19             THE COURT:  It seems very thin.

20             MR. GROVER:  -- I would like to jump in on that

21    specific issue.

22             Just so you understand, Judge, the timing here

23    was that the district attorney began their investigation

24    because of the allegations about the Grancio homicide.  And

25    the district attorney during the course of the criminal

1   proceeding submitted papers in which they acknowledged that

2   they didn't have any evidence of the Grancio homicide, and

3   therefore, that was not indicted as one of the four cases.  In

4   addition, when Mazza --

5           THE COURT:  I have that all before me, I take it?

6           MR. GROVER:  You do.  In addition, when Mazza

7   testified in 2004, there shouldn't be any question about what

8   he said.  It's in the papers.  Mr. Considine put it in his

9   December 7th letter to the Court and to all parties and it was

10  included in my most recent submission, I believe.

11          In 2004, the testimony of Mazza was that -- and he

12  had previously testified he had observed Scarpa on occasions

13  make telephone calls, and he may very well have observed calls

14  on that morning.  But, quote, "Mazza's words under oath in

15  front of Judge Weinstein from the moment he first saw Grancio

16  to the moment he was killed, there was no time to make any

17  phone calls."  Now, this alleged declaration is dated

18  January 11, 2007.  To put it in context --

19          MR. SCHOEN:  It was dated January 10th.

20          MR. GROVER:  I thought you said the 7th.

21          MR. SCHOEN:  Faxed.  The date he signed was the

22  10th.

23          MR. GROVER:  I'm sorry, dated the 10th.  The

24  criminal case was indicted in March of '06.  This case that

25  we're here before Your Honor was originally filed in January

1   of '06.  So, we're in the middle of the proceedings.  Mazza

2   has testified to this effect, that there were no phone calls.

3   That's why the D.A. hasn't indicted on it.  We now get to

4   trial and in 2007 Mazza specifically is confronted with

5   precisely the same issue, repeats the same testimony and, I'll

6   go one even better, he testified that he didn't sign any

7   declarations or affidavits or anything.

8            So, you now have the sworn testimony of Mazza in

9   2004.  You have the sworn testimony of Mazza in 2007.  I don't

10  know where this is going or what a deposition of Mazza today

11  would bring.  But he came into the court.  He didn't have an

12  agreement with the D.A., at least as he testified.  He didn't

13  get subpoenaed.  He did so voluntarily.  He was in open court.

14  He traveled back to Florida.  Everybody knew where he was.  He

15  gave press conferences on his door step.  So, this is a guy

16  that's been out there, has testified twice under oath, and I

17  suspect if he comes back in again, he's not going to lie

18  inconsistently with what he said to Judge Weinstein or what he

19  said to Judge Reichbach only five months ago.

20           THE COURT:  What are you going to do, make him

21  perjure himself?

22           MR. SCHOEN:  Judge, it's just not a fair

23  representation of his testimony before Judge Weinstein in

24  arraignment to say he said he made no phone calls.  That's not

25  what he said then and I've said that in my papers.  It's a

1   continuing misrepresentation of that.

2          As for the D.A. saying they have no evidence of the

3   Grancio homicide, let me say this.  If we depose Noel Downey,

4   I would hope he would tell the truth and tell me that he

5   called me up to say he fully believes that DeVecchio wasn't

6   responsible for the Grancio homicide, but he didn't feel he

7   could prove it to the grand jury.  That was his problem,

8   because Larry Mazza was wavering.

9          THE COURT:  And I need affidavits.  I need, you

10  know, a showing on your part that if the affidavits are not

11  forthcoming, that you should have the opportunity to question

12  these people under oath, and you have some burden here.

13         MR. SCHOEN:  Judge, but my burden isn't to prove

14  that there was that phone call that day, because it may be

15  impossible to prove that that phone call happened that day.

16  But that's not the entire basis for the complaint, as the

17  Court pointed out far better than I could earlier on here.

18         THE COURT:  I'm looking through your papers to see

19  whether there was anything that you have that really rise to

20  the level of being significantly in opposition to the

21  affidavits that we have from Favo and DeVecchio.  And you are

22  stretching and reaching and there is a lot of smoke out there

23  arguably, but I'm not so sure you ring the bell.  And to give

24  you the opportunity to go through the files now, when the D.A.

25  has already done that, and to question these people, when they

Oral Argument                    46

1    have submitted an affidavit already, I don't know what you're

2    going to accomplish.

3         MR. SCHOEN:  Well, Judge, what we would accomplish

4    is, looking at this case wholistically, this case is an

5    absolutely -- not just this case, the scheme that was going on

6    there was a horrible scheme that still hasn't been uncovered.

7         THE COURT:  You're going to do a better job than the

8    D.A., right?

9         MR. SCHOEN:  I would hope so, Your Honor.  Your

10   Honor, I was in touch with the D.A.'s office virtually every

11   day.  They would call me for information.  They had absolutely

12   no idea in most circumstances what they were doing.  They had

13   witnesses lined up and prepared to testify who they never

14   called to testify.  I have had this conversation with the DA's

15   office and others many times, Your Honor.  They dropped the

16   ball in the case and the guy has gotten away with it so far,

17   those murders criminally.

18        THE COURT:  I understand the broad strokes that you

19   paint, but I'm looking for the specifics that will allow me as

20   judge to make a reasonable determination.

21        MR. SCHOEN:  Judge, thinking about it and knowing

22   that we're dealing with the FBI here, how is it that a private

23   citizen without discovery could possibly have -- I have what I

24   have willy-nilly because I've been searching for it all for

25   five or six years.

 1          THE COURT:  You have enough out there that seems to

 2    suggest that you should have access to the FBI files and be

 3    able to do that and maybe discovery will be warranted.  We'll

 4    take a look at that.

 5          Let me ask the Government.  If I were to grant

 6    qualified immunity to DeVecchio and Favo -- I don't know

 7    whether I will at this point in the litigation or not -- where

 8    does that leave the Government?  You've only moved to dismiss

 9    for failure to exhaust and on statute of limitations, and if

10    you lose that and then there is qualified immunity, where are

11    you now?  Are you still in the case?

12          MS. MATTHEWS:  Yes, Your Honor.  But what we would

13    do is we would basically reassert all of that same information

14    and move for summary judgment on the tort case.

15          THE COURT:  You can move for summary judgment at

16    this time, too, right?

17          MS. MATTHEWS:  We could, Your Honor, but as set

18    forth in point one, it clearly states that plaintiff failed to

19    exhaust.  And just one more --

20          THE COURT:  You're not going to win on that.  You

21    could move for summary judgment in the alternative.  You could

22    have done that.

23          MS. MATTHEWS:  I did.  I joined the papers.  The

24    Government joined the papers.

25          THE COURT:  Basically, I can view your papers as

1    also summary judgment on the merits of the case?

2              MS. MATTHEWS:  Absolutely, Your Honor.  My Notice of

3    Motion was to dismiss the --

4              THE COURT:  I got procedural context.  Anyone else

5    want to say anything before we adjourn?

6              MR. CONSIDINE:  Yes.  Qualified immunity, Judge,

7    also applies to going through the process of discovery.  Agent

8    Favo is an agent that is well regarded for 25 years of

9    service.  Judge Reichbach complimented him during the course

10   of their criminal case.  And this is very important doctrine,

11   and if there's any case for which this should apply, it's this

12   one.

13             THE COURT:  We should be very cautious not to open

14   the floodgates in allowing discovery.

15             MR. CONSIDINE:  Absolutely.

16             THE COURT:  There is a whole history here that goes

17   back over a decade.  I mean, it's just such a mishmash and I

18   have to decide that what is the fair thing to do under all the

19   circumstances.

20             MR. SCHOEN:  Judge, I'm not insensitive to the last

21   point that Mr. Considine made.  That is what qualified

22   immunity provides, but we're not looking at this case in a

23   speculative sense or a fishing expedition's been alleged.  We

24   know certain things now about Agent Favo.  It's a completely

25   unacceptable behavior.  I'm sensitive to it, Your Honor,

1   because my father was an FBI agent, so I don't take lightly

2   the idea of just suing --

3             THE COURT:  The fact that he was responsible for

4   calling off surveillances is enough to make this suspect and

5   to allow you to go forward with depositions.

6             MR. SCHOEN:  And knowing what he knew about the

7   Colombos, about the hit teams.

8             THE COURT:  Called off the surveillance; right?

9             MR. CONSIDINE:  He called off the surveillance, Your

10  Honor.  But, Mr. Grancio was being surveilled because he was

11  engaged in criminal activity, as reflected in Exhibit 25,

12  which Mr. Schoen submits.  That's the affidavit --

13            THE COURT:  He still called off surveillance.

14            MR. SCHOEN:  He called off surveillance.  He called

15  a meeting.  It was prearranged.  He called it off and brought

16  everybody back.  There's no allegation by --

17            THE COURT:  It had to be that -- how much time

18  elapsed from the time he called off surveillance until Grancio

19  was murdered?

20            MR. GROVER:  It was almost two hours.  It was from

21  12:30 -- excuse me, 1:30 in Simone's report, and his testimony

22  is he was en route to New York.  The murder doesn't occur

23  until either 3:15 or 3:20, depending upon which document.

24            THE COURT:  There is nexus here.  He called off

25  surveillance and two hours later the person --

1          MR. GROVER:  Not under the complaint.  If you look

2     at the complaint, the surveillance is removed.

3          THE COURT:  I'm not limiting it to the complaint.

4          MR. CONSIDINE:  Your Honor, Christopher Favo is not

5     alleged to know that Scarpa is at the scene.  The only

6     allegation is he called off the surveillance.

7          THE COURT:  Maybe that should be the subject of some

8     discovery.

9          MR. GROVER:  Well, Judge, I think the timing is

10    critical and I've emphasized that in my papers.  If Simone

11    leaves the scene at 1:30 -- and Mazza has testified repeatedly

12    that from the moment they saw Grancio, they only had a few

13    moments, they didn't have time to make phone calls and they

14    killed him.  Even if you say for a moment that maybe it took

15    them five minutes and then they killed him, we're still

16    talking about after 3 o'clock in the afternoon, a full hour

17    and a half plus.

18         THE COURT:  Well, that's --

19         MR. GROVER:  But they couldn't make the phone call

20    to ask him to leave the scene.  That's the point.  He says, we

21    had -- the complaint says, "We made a call, they removed the

22    surveillance, we killed him."  Okay.  That's his story.  The

23    problem is the surveillance had been gone for almost an hour

24    and a half to two hours.

25         THE COURT:  This gets involved with factual matters.

1          MR. SCHOEN:  Judge, Mazza testified --

2          MR. GROVER:  But there's no dispute.  Because

3    Simone, who was a hostile witness to both the Government and

4    Mr. DeVecchio, having been prosecuted and acquitted in this

5    courthouse, he is not a happy camper and Mr. Simone would not

6    give testimony favorable to DeVecchio if he thought that he

7    could give something else.  The testimony he gave, he walked

8    in by --

9          THE COURT:  You got this declaration, you read it in

10   court.  That will be part of your opposition papers, and I'm

11   going to give you an opportunity to specify what it is

12   specifically you want in discovery or why -- I don't want to

13   have a broad -- if I do consider discovery here, I don't want

14   to have a broad fishing inquiry here that will open the FBI

15   files -- not to say you haven't made a sufficient showing, by

16   the way, but you can't just say I want discovery for the

17   asking.  You have to be specific in what you want to do.

18         MR. SCHOEN:  I followed the four prongs.

19         THE COURT:  You need to tell me what -- you want to

20   question Favo, you want to question DeVecchio.  What else do

21   you want to do?

22         MR. SCHOEN:  Did you say submit something on this,

23   Your Honor?

24         THE COURT:  Tell me what else you want to do.

25         MR. SCHOEN:  Oh, I lay it out in my Rule 56(f)

1   motion.  I followed the four prongs that the law requires.

2              THE COURT:  You say you've already laid it out?

3              MR. SCHOEN:  Yes, Your Honor, and why -- and I say

4   why.  By the way, Your Honor, I have to touch on one point.

5   The idea that the agents were pulled from surveillance in

6   order to further this doesn't come out of thin air.  Mazza

7   testified he was questioned by agents who visited him

8   afterwards saying, Mazza, didn't you think it was suspicious

9   that the surveillance was called off just before you moved in

10  and killed him?  So it's not something someone created out of

11  thin air here.

12             THE COURT:  Before we leave, we'll take a look at

13  this.  It's an interesting argument.  How do you deal with

14  DeShaney and Rakes, by the way?  This is a situation about

15  calling off surveillance that created a danger.  That decision

16  came down a year after the murder.

17             MR. SCHOEN:  Again, Judge, it goes back to what the

18  wrong is.  It's absolutely preposterous to suggest -- as the

19  court wrote in this McIntyre decision that I quote at length

20  in the memorandum, it's absolutely preposterous to suggest

21  that at this time there wasn't a clearly established right to

22  be free from having an FBI agent actively, not just passively,

23  but actively give license to a known killer to stay on the

24  street with his known targets on the street to remove

25  surveillance from that known target, et cetera.  This goes

Oral Argument                        53

1   well beyond --

2              THE COURT:   Do you agree with that?

3              MR. CONSIDINE:   Absolutely not.   Your Honor, as you

4   point out in your Rosenbloom decision, I mean, the existence

5   of that doctrine -- Dwares was in 1993; this murder occurred

6   in 1992.

7              THE COURT:   No, No.   Certainly, you know, nobody has

8   a constitutional right to aid and abet a killer.

9              MR. CONSIDINE:   Right.   And there's no allegation

10  here that Mr. Favo was ever informed by Agent DeVecchio that

11  Scarpa was at the scene or that there was a request made to

12  have the surveillance removed.

13             THE COURT:   That is a fact to explore from a

14  constitutional context.

15             MR. CONSIDINE:   There's no indication that Agent

16  Favo in any way facilitated or endorsed the murder of Nicholas

17  Grancio.

18             THE COURT:   Let's assume that's factual.   Let's

19  assume there were.   Then you would certainly not say that

20  Dwares or DeShaney applies in that situation, would you?

21             MR. CONSIDINE:   Doesn't apply to what situation,

22  Your Honor?

23             THE COURT:   If, in fact, there were facts that he

24  did aid and abet in the murder.

25             MR. CONSIDINE:   If he deliberately aided and abetted

1   in the murder?  Of course, yes, I would concede that.  That's

2   not this case, though, Judge.  Mr. Favo --

3          THE COURT:  Separate the law from the facts.  You

4   say that, you know, Dwares should not apply or DeShaney

5   because of what happened in rendering those decisions

6   subsequent to this murder.  That's what you're saying.  I'm

7   telling you that this is up to you to read DeShaney and Dwares

8   and see if the facts brought out what claims; you agree with

9   that?

10          MR. CONSIDINE:  Yes.

11          THE COURT:  Okay.  Mr. Grover, you agree with that,

12   also?

13          MR. GROVER:  Yes, I do.

14          THE COURT:  That's all I'm trying to talk about.

15   DeShaney and Dwares deals with that whole state-created

16   danger.  It doesn't say that you have a constitutional right

17   to murder somebody.

18          MR. CONSIDINE:  Right.  And I don't think --

19          THE COURT:  If in the scope of employment, the think

20   I'm curious about is whether there is a Bivens situation to

21   draw a nexus to a federal official acting in the course of his

22   employment, okay.  Otherwise, there's no Bivens claim, all

23   right, so that could be a factual issue as to whether he was

24   working during the course of his employment; the answer to

25   that is yes, but that's a different type of issue than the

1    issue of whether or not a criminal case should have been in

2    the federal court or the state court under the protocol that

3    we had to flush out in the prior decision.   These are just

4    nuances I'm just talking about.

5              MR. CONSIDINE:   Judge, in all those other cases,

6    though, with regard to the state-created danger, I think it's

7    important to point out it's completely distinguishable from

8    the situation here.   We have Grancio, who's himself involved

9    in wrongdoing and misconduct, participating in a fratricidal

10   war, as Judge Weinstein pointed out, and the surveillance in

11   the first instance occurring to protect illegal conduct.   Your

12   Honor, we're talking about the Government goes out and

13   specifically encourages and incites the violence at issue, the

14   "Skinhead" case, for example.

15             THE COURT:   Well, we all agreed that we're not

16   talking about DeShaney and Dwares, and you agree with me.   If

17   the facts are such that your client and DeVecchio were

18   involved in aiding and abetting the murder, you don't need a

19   police officer, you know, to know that that's not a reasonable

20   thing to do.

21             MR. CONSIDINE:   Fair point.

22             THE COURT:   That's all I'm trying to say.

23             MR. CONSIDINE:   Absolutely.   My concern is, Judge, I

24   want to make sure that the factual record is carefully

25   considered.   Because there's no suggestion at all that

Oral Argument                          56

1    Christopher Favo knew that Scarpa was on the scene, there's no

2    suggestion that Christopher Favo was aware of this alleged

3    call that occurred between Greg Scarpa and Lindley DeVecchio.

4              THE COURT:  I understand.

5              MR. CONSIDINE:  And, in fact, there's no call

6    between Lindley DeVecchio and Agent Favo, that they both swore

7    that it didn't happen, so this case is over.

8              THE COURT:  I'm not so sure.  What it comes down to

9    is we have a lot of smoke here on whether there is sufficient

10   fire that possibly that could evolve if you allow the

11   plaintiff to go forward with some type of discovery.  That's

12   it really, I think, basically in a nutshell.  We can argue the

13   facts or -- as you've done very eloquently today, but I have

14   to sort out whether there's enough basis here to allow this

15   case to go forward.  We have your declaration now.  If you

16   want to submit anything else for Mazza, you can do so.

17             MR. GROVER:  Are we going to get copies of the

18   declaration?

19             THE COURT:  You should have it, yes.  So make sure,

20   though --

21             MR. SCHOEN:  Judge, if I may, may I redact --

22             THE COURT:  One second -- redact what?

23             MR. SCHOEN:  Mazza's fax number, his home fax

24   number.

25             THE COURT:  Do that.  So redact that, submit it to

Oral Argument                                    57

1    me as part of your opposition papers, and make sure your

2    colleagues have copies of that.  And on the redactions,

3    personal knowledge certainly is appropriate.

4            MR. SCHOEN:  And on the e-mail I would just redact

5    his e-mail address, if that's all right.

6            MR. GROVER:  We have no objection to e-mail or fax

7    or anything like that.

8            THE COURT:  The e-mail says what?

9            MR. SCHOEN:  That they should be looking at --

10           THE COURT:  Do I have that now?

11           MR. SCHOEN:  I just referred to it when I was

12   reading.  I didn't read it verbatim.  But, yeah, I'll give it

13   to the Court.

14           THE COURT:  Just give me everything, put it

15   together, this is what you want me to consider in opposition

16   to the qualified immunity motion.

17           MR. SCHOEN:  Judge, I'm thinking that maybe the best

18   course is to give the Court an unredacted version under seal

19   and then give the parties the redacted -- the only redaction,

20   again, is the identifying information.

21           THE COURT:  You're representing the only redaction

22   is the identification.  You don't have to follow the protocol

23   of giving me the entire thing.  I think we're all satisfied

24   that if I need it, you can get it.  But there is no reason for

25   it now in the context of this motion.

 1          MR. GROVER:  No.  But the one thing I would make a

 2    request is if either the Court or the Government could get a

 3    copy of the original document with the original signature.

 4          THE COURT:  You are going to send to me the

 5    original?

 6          MR. SCHOEN:  I don't have the original.  It was

 7    e-mailed to me.

 8          THE COURT:  This is in the world of electronics.

 9          MR. SCHOEN:  But if I can get the original, I'll

10    certainly provide it.

11          THE COURT:  Try to tell me where the original is.

12    And if it's been destroyed, you can get a copy e-mail, but try

13    to get the original.

14          MR. SCHOEN:  All right.  And if at the end of the

15    day, by the way, the identification becomes an issue, then I

16    suppose I would have to unredact the fax number since it

17    comes --

18          THE COURT:  Let's not get crazy here.  You know the

19    substance of what we want of the original here.  Redact it --

20    or you can send me the original unredacted and just redact the

21    copy you give to counsel.

22          MR. GROVER:  Judge, I have a question.  If it was

23    sent to Mr. Schoen e-mail, was it sent, if I can use the term,

24    "by PDF" and includes the signature, or is there no signature?

25          MR. SCHOEN:  There's a signature on there.

1          THE COURT:  Okay.  And send it off to me and give it

2    to your adversaries so I have a complete file because I have a

3    decision I want to make.

4          MR. SCHOEN:  Sure.

5          MR. CONSIDINE:  Your Honor, can I just ask one

6    closing thing?  If when you review this matter again, if you

7    look at the allegations in the complaint in particular,

8    because there's no allegations that Christopher Favo

9    deliberately got involved in a murder.  The claim is that the

10   surveillance was removed.

11         THE COURT:  He's only involved with the surveillance

12   scenario.

13         MR. CONSIDINE:  Right.  And the factual record, Your

14   Honor -- and I don't want to repeat it -- clearly establishes

15   that there was no knowledge that he had about --

16         THE COURT:  Favo was in the soup, according to you,

17   because of the surveillance situation solely, correct?

18         MR. SCHOEN:  You say the surveillance situation

19   solely.  I don't know the whole package involving Favo.

20   That's what I've made in my point in my §Rule 56(f) motion.

21   The trial testimony in the criminal trial -- Judge, if I could

22   just say -- revealed certain things about Favo I had no idea

23   about earlier, about his knowledge and involvement with

24   Scarpa, that he was the alternate case agent.

25         MR. CONSIDINE:  And by the way, 99 percent of this

Oral Argument                    60

1   reference occurs after Mr. Grancio died.  It's not relevant to

2   the constitutional violation of Mr. Grancio.  That's --

3             THE COURT:  That's not true.

4             MR. CONSIDINE:  -- I think the case.

5             MS. MATTHEWS:  Your Honor, one last point on behalf

6   of the Government, the Government's reply memorandum dated

7   July 30, 2007 is almost completely devoted to the exhaustion

8   issue.

9             THE COURT:  All right.

10             MS. MATTHEWS:  It's blackletter, Your Honor.

11             THE COURT:  I'm not going to say anything.

12             MS. MATTHEWS:  Thank you.

13             MR. GROVER:  Judge, I got a little confused in the

14   last moment when you talk about the surveillance issue.  It is

15   clear from the complaint and what we're talking about in this

16   whole case is about what happened in that brief -- those brief

17   moments on that afternoon of January 7th of '92.  That is the

18   only thing that's in question, whether a surveillance team was

19   pulled intentionally and as a result --

20             THE COURT:  Is what happened on the day in question;

21   you agree with that, Mr. Schoen?

22             MR. SCHOEN:  I agree that the allegations in this

23   case are about what happened -- with respect to Grancio, what

24   happened on the day that Grancio was killed.

25             THE COURT:  That's what we're talking about.

Oral Argument                          61

1          MR. SCHOEN:  And need background also.  That's all.

2          THE COURT:  We understand the case.  Thank you very

3    much for your cooperation.

4          (WHEREUPON, the proceedings were adjourned.)

5

6                              *   *   *

7

8                    CERTIFICATE OF REPORTER

9       I certify that the foregoing is a correct transcript of
     the record of proceedings in the above-entitled matter.

10

11

12

13

     _____
14   Anthony D. Frisolone, CSR, RDR, FCRR, CRI
     Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25