# REPORT OF THE SPECIAL DISTRICT ATTORNEY IN THE MATTER OF THE INVESTIGATION OF LINDA SCHIRO

*Submitted by*:

Judge (ret.) Leslie Crocker Snyder
Special District Attorney

## **TABLE OF CONTENTS**

I.      Introduction ...................................................................................................1

II.     Summary........................................................................................................1

III.    The Law of Perjury........................................................................................2

IV.     Linda Schiro's Grand Jury and Trial Testimony ...........................................3

        A.      Grand Jury Testimony ........................................................................3

        B.      Trial Testimony ..................................................................................5

V.      Prior Accounts ...............................................................................................8

        A.      FBI Investigation ...............................................................................8

        B.      Book Proposals...................................................................................9

                (i)             Disclosure of Capeci/Robbins Tape...................................10

                (ii)            Book Proposal by Sandra Harmon....................................15

                (iii)           Book Proposal by John Connelly.......................................16

VI.     Further Investigation....................................................................................17

VII.    Discussion and Analysis..............................................................................18

        A.      Diverging Grand Jury and Trial Testimony .....................................18

        B.      Prior Inconsistent Statements .........................................................19

                (1)             Direct Evidence of False Testimony..................................20

                (2)             Circumstantial Evidence of False Testimony ....................21

        C.      Evidence Consistent with Schiro's Testimony ...............................22

        D.      Other Reasons to Decline Prosecution ...........................................24

VIII.   Conclusion...................................................................................................28

Addendum ..............................................................................................................29

EXHIBITS:

Exhibit A.................................................... Appointment Order and Affirmation

Exhibit B.......................................................…….. Excerpts of Trial Testimony

Exhibit C.....................................…….Capeci/Robbins Notes of 1997 Schiro Interviews

Exhibit D .....................................…."Transcript from Linda Schiro's conversations with reporters," DAILY NEWS (Nov. 21, 2007)

Exhibit E ...............................Comparison Chart of Schiro Statements/Testimony

Exhibit F .............................................................. Capeci Motion to Quash (dated, July 18, 2007)

Exhibit G ...................................…..... Decision and Order, dated November 1, 2007 (Reichbach, J.)

Exhibit H ....................................................Letter, AUSA Ellen M. Corcella United States Attorney's Office Eastern District of New York (dated May 8, 1995)

Exhibit I ..............................................FD-302, FBI Agent Christopher Favo (Feb. 6, 1994); Affidavit of Christopher Favo, sworn to April 4, 1994, Wash. D.C.

Exhibit J ......................................…..Letter, dated April 23, 2007, from U.S. Rep. Dana Rohrabacher; and Mark Sherman, "FBI Waited to Check Out Tip on Nichols," ASSOCIATED PRESS (April 14, 2005)

# REPORT OF THE SPECIAL DISTRICT ATTORNEY IN THE MATTER OF THE INVESTIGATION OF LINDA SCHIRO

*Submitted by*:

Judge (ret.) Leslie Crocker Snyder
Special District Attorney
Kasowitz, Benson, Torres & Friedman LLP[*]

## I. Introduction

On November 1, 2007, the Honorable Neil Jon Firetog, Administrative Judge, Supreme Court of the State of New York, County of Kings, appointed me, pursuant to County Law § 701.1(a), to act as a special District Attorney in the Matter of the Investigation of Linda Schiro. The order so appointing me and accompanying affirmation from Charles J. Hynes, District Attorney of Kings County, are attached to this report as Exhibit A.

## II. Summary

Defendant Roy Lindley DeVecchio ("DeVecchio") was charged in March 2006 in Indictment No. 6825/05 with four counts of Murder in the Second Degree: the murders of Mari Bari, Joseph (Brewster) DeDomenico, Patrick Porco, and Lorenzo (Larry) Lampasi. Linda Schiro ("Schiro") testified as a prosecution witness against DeVecchio before a Kings County Grand Jury on February 9 and March 7, 2006 and at the ensuing trial in Kings County on October 29 and 30, 2007. The prosecution presented evidence that DeVecchio assisted Gregory Scarpa, Sr. ("Scarpa"), a notorious member of the Colombo crime family, who died in June 1994, in locating the victims and/or conspiring in the murders. At the time, Scarpa was a registered "top echelon" FBI informant, and DeVecchio was his FBI handler. Schiro testified that she was privy to DeVecchio's role in the murders because she lived with Scarpa, with whom she had a son and daughter. In the afternoon of October 30, 2007, the Assistant District Attorneys prosecuting the case became aware of a media report that, in interviews in 1997, Ms. Schiro had made statements materially inconsistent with her testimony at the grand jury and at trial in this case. Upon reviewing an audiotape recording of the interviews referenced in the news stories, the Kings County District Attorney's office moved to dismiss the indictment against DeVecchio. This report assesses whether there is a prosecutable case against Schiro for perjury.

The audiotape, standing alone, is not sufficient proof of perjury. While Schiro undeniably made prior statements inconsistent with her testimony, a full review of the record and available evidence does not yield sufficient proof of the falsity of her trial and grand jury testimony. For the reasons set forth below, Schiro cannot be prosecuted for perjury.

---

[*]   *Of Counsel:*   Michael Paul Bowen, member of Kasowitz, Benson, Torres & Friedman LLP.

### III.  The Law of Perjury

The law of perjury is codified in Article 210 of the New York Penal Law.  Oral, rather than written, statements can constitute perjury under sections 210.05, perjury in the third degree, and 210.15, perjury in the first degree.

A person commits the class A misdemeanor of third-degree perjury by "swear[ing] falsely," Penal L. § 210.05, defined in relevant part as "intentionally mak[ing] a false statement which [the speaker] does not believe to be true … while giving testimony," *Id.* § 210.00.  "Testimony" is "an oral statement made under oath in a proceeding before any court, body, agency, public servant or other person authorized by law to conduct such proceeding and to administer the oath or cause it to be administered."  *Id.*  Grand jury testimony meets this definition if "the foreperson or another member of the grand jury did in fact administer the oath, and … a quorum was present when the oath was administered and the false testimony given."  Greenberg, Marcus, *et al.,* WEST'S NEW YORK PRACTICE SERIES: NEW YORK CRIMINAL LAW § 24:6 (3d ed., 2007).

Perjury in the first degree, a class D felony, requires that the false statement "consist[] of testimony" and be "material to the action, proceeding or matter in which it is made."  Penal L. § 210.15.  The Court of Appeals has noted that "[t]o be material, the statement need not prove directly the fact in issue; it is sufficient if it is 'circumstantially material or tends to support and give credit to the witness in respect to the main fact'….  Thus a statement that '[reflects] on the matter under consideration'…, even if only as to the witness' credibility…, is material for purposes of supporting a perjury charge."[1]

There are two methods of proving the falsity of a sworn statement.  First, proof can come from a second, inconsistent statement also made while giving testimony.  Penal L. § 210.20.[2]  In such a case, "[t]he falsity of one or the other of the two statements may be established by proof or a showing of their irreconcilable inconsistency" without demonstrating which of the two is false.  *Id.*  Second, proof may come from other evidence, but it "may not be established by the uncorroborated testimony of a single witness."  Penal L. § 210.50.  The testimony of two witnesses is sufficient to prove falsity, as is circumstantial evidence that corroborates a single witness's statement.[3]  It is also possible to prove perjury "entirely on circumstantial evidence."[4]

As to Linda Schiro, this case does not involve two inconsistent statements made during testimony.  While Schiro's trial testimony differs in some respects from her grand jury testimony (described below), the overall thrust of the testimony is the same: that DeVecchio was involved

---

[1]   *People v. Davis,* 53 N.Y.2d 164, 170-71 (1981) (citations omitted).

[2]   *See People v. Uhrey,* 169 Misc. 2d 1015, 1017-19 (Sup. Ct., Kings Co., 1996) (dismissing perjury charge where the defendant made one of two inconsistent statements during an interview with a district attorney because, regardless of whether it was under oath, it was not made at a proceeding and so failed to meet the statutory definition of testimony); *see also People v. Cohen,* 187 Misc. 2d 117, 124-25 (Sup. Ct. NY Co., 2000).

[3]   *People v. Stanard,* 42 N.Y.2d 74, 79 (1977) (citing *People v. Sabella,* 35 N.Y.2d 158, 168 (1974)).

[4]   *People v. Rosner,* 67 N.Y.2d 290 (1986); *People v. Doody,* 172 N.Y. 165 (1902).

in the murders identified in the indictment.  The differences do not render the two so diametrically opposed that they cannot both be true.

This is a case where, if perjury is to be proven, it must be done through evidence other than Schiro's own statements.  That means, in the absence of a confession or direct admission, the charge cannot be sustained unless it is established beyond a reasonable doubt based wholly on circumstantial evidence: (a) that Schiro made provably false statements during her sworn testimony; (b) that the false statements were material; and (c) that she did not believe the statements to be true at the time of her testimony.[5]

## IV.  Linda Schiro's Grand Jury and Trial Testimony

### A. Grand Jury Testimony

Linda Schiro testified before a Kings County Grand Jury in the Matter of R05-155, which resulted in Indictment Number 6825/05, charging Roy Lindley DeVecchio with four counts of Murder in the Second Degree.  Hynes Aff. ¶ 3.  She did not execute a waiver of statutory immunity.  Hynes Aff. ¶ 3.

By way of introduction, Schiro spoke to the Grand Jury about meeting Greg Scarpa, Sr., with whom she would remain in a romantic relationship for 30 years, at a bar in New York in 1962, when she was 17 and he was in his mid-thirties.  Grand Jury Tr. 19:21-20:25.  She soon learned that Scarpa was "in the mafia." G.J. Tr. 21:3-8.  Among the criminal activities in which she knew he was engaged was murder.  G.J. Tr. 23:4-19.  Schiro also described Scarpa's connection to the FBI, testifying that Scarpa assisted the FBI in investigating the disappearance of civil rights workers in Mississippi in 1964, the murder of a black man by the KKK in Mississippi in 1966, and retrieval of a mob figure from Costa Rica.  G.J. Tr. 23:23-24:3, 24:13-29:18.  In that capacity and because he acted as an informant for the FBI after the 1960s, Scarpa had an FBI "handler," agent "Tony Volano" [sic].  G.J. Tr. 24:6-12, 29:20-30:18.  In 1978, FBI Agent R. Lindley Devecchio (known as Lin) became Scarpa's handler.  G.J. Tr. 30:21-32:10.  Schiro told the Grand Jury that DeVecchio came to her shared home with Scarpa approximately twice a week from 1978 to 1986, G.J. Tr. 36:13-20, and that Scarpa gave DeVecchio money—a stack of bills in a rubber band—once a week  from 1978 to 1992, G.J. Tr. 40:19-42:9.  She then described a series of events she observed or learned from Scarpa implicating DeVecchio in four counts of murder.

### Count 1: Murder of Mary Bari

Schiro first described a conversation between Scarpa and DeVecchio in which DeVecchio "sa[id] to Greg we have a problem, Mary Bari," because "she was telling the feds about where Ali Persico, who was on the lam, at the time was." G.J. Tr. 43:25; 44:3-5.  Mary Bari was the girlfriend of Alphonse Persico, brother of the boss of the Colombo crime family.  G.J. Tr. 42:16-

---

[5]   *See generally,* Criminal Jury Instructions (CJI) 2d, Penal Law Article 210, New York State Unified Court System, www.nycourts.gov/cji; Greenberg, Marcus, *supra,* §§ 24:3 – 24:5. *See, e.g., Rosner,* 67 N.Y.2d at 294-95.

24. According to Schiro, DeVecchio told Scarpa "you have to take care of this," G.J. Tr. 44:21-22, and Scarpa replied that "[h]e will get the guys who he had to get and he will take care of it," G.J. Tr. 45:1-3. Several days later, on September 25, 1984, Bari was murdered. G.J. Tr. 45:22-46:3. Schiro testified to hearing Scarpa describe the murder to DeVecchio: Scarpa stated that he ordered someone to bring Bari to a bar owned by Carmine Sessa on the pretense of helping her get a job, and upon her arrival "they shot her" and "threw her body on McDonald Avenue." G.J. Tr. 46:4-47:18. That location was two or three blocks from Schiro and Scarpa's home on Avenue J, and Mr. DeVecchio noted "Greg that's really close but [was] laughing about it." G.J. Tr. 47: 19-48:2. Schiro also stated that Scarpa recounted to DeVecchio a phone call Schiro received from Annie Sessa, the wife of Carmine Sessa, in which Sessa said her dog had "found an earring with a piece of ear on it" at the bar where Bari was murdered, and both men were laughing. G.J. Tr. 48:3-49:10.

### Count 2: Murder of Joseph DeDomenico

Schiro next told the Grand Jury about a conversation she heard between DeVecchio and Scarpa in her kitchen in 1986, this one regarding Joseph DeDomenico, known as Joe Brewster. G.J. Tr. 49:11-50:6. DeDomenico was in Scarpa's "crew" for "years," but in 1985 and 1986 his "very close" relationship with Scarpa began to deteriorate, and DeVecchio told Scarpa in this conversation that he was "getting worried" about DeDomenico, who, according to Mr. DeVecchio, had "left his wife and … is with this girl who was a Born Again Christian," had been committing burglaries with "the alarm guy" with whom Scarpa had previously worked without notifying Scarpa, and "seem[ed] like he was going to do a lot of talking." G.J. Tr. 50:7-53:19. DeVecchio therefore told Scarpa, according to Schiro's testimony, that "we can't keep a guy like this around" and "[y]ou are going to have to take care of it." G.J. Tr. 54:1-2, 7-8. DeDomenico was murdered on September 17, 1987. G.J. Tr. 54:13-21. After that date, Schiro told the Grand Jury, DeVecchio returned to Schiro's home and Scarpa told him about DeDomenico's murder: Scarpa told DeDomenico "there was a wedding or a meeting" so he would meet Scarpa, and then "[t]hey murdered him." G.J. Tr. 60:2-61:2.

### Count 3: Murder of Patrick Porco

Schiro also testified about the death of Patrick Porco. Patrick Porco was the best friend of her son, Joey Scarpa. G.J. Tr. 61:16-23. At Scarpa's instruction, the two boys stayed in New Jersey for "a week or two" after the murder of Dominic Masseria on October 31, 1989. G.J. Tr. 61:25-62:17. In late May 1990, Schiro answered a phone call from DeVecchio, and at his request Scarpa got on the phone for a "[c]ouple of seconds." G.J. Tr. 62:22-63:25. Then Scarpa hung up the phone and told Schiro he wanted to go to a pay phone, so she drove him to one he customarily used to call DeVecchio and waited while he had a five or ten minute conversation. G.J. Tr. 64:1-65:8. Upon returning to the car, Scarpa told Schiro "I can't believe this fucking kid. Patrick is going to rat on Joey. We got to do something about this." G.J. Tr. 65:11-18. The couple returned to their house and Scarpa spoke to Joey about his belief, despite Joey's vehement disagreement, that Patrick "is a rat." G.J. Tr. 65:19-66:20. Schiro then explained that Scarpa decided that Joseph Marra, known as Joe Fish, and Larry Sessa, known as Fat Larry, would kill Patrick, but on the appointed evening of May 26, the car Marra and Sessa were driving broke down. G.J. Tr. 67:2-22. Instead, John Sinagra, the husband of Schiro's niece Charlotte, came to

Schiro and Scarpa's house and departed with Joey. G.J. Tr. 67:23-68:23. Joey returned home in the late morning on May 27 and was "[v]ery shaky, crying"; "[h]e went upstairs lying in a fetal position" and remained upset for days. G.J. Tr. 69:12-70:6. John Sinagra returned that evening as well and told Schiro's daughter, Linda Schiro, that "Joey just couldn't do it" so he had been the one to kill Patrick. G.J. Tr. 70:7-25. When DeVecchio visited Scarpa at home not long after that day, Scarpa told DeVecchio that Patrick had been killed because of DeVecchio's warning, and Joey was "a mess." G.J. Tr. 71:1-72:8. Schiro said DeVecchio responded by saying "[Joey] will get over it when he realizes he does not have to go to jail because that's what Patrick was going to do. Joey would have been in jail." G.J. Tr. 72:13-17. Scarpa also told DeVecchio that Linda Schiro, but not Joey, attended Patrick's wake. G.J. Tr. 72:18-24.

### Count 4:  Murder of Larry Lampasi[6]

Finally, Schiro testified about the death of Larry Lampasi, who, according to Grand Jury testimony other than from Schiro, was a member of the Orena faction of the Colombo crime family (whereas Scarpa was on the Persico side). G.J. Tr. 81:23-82:10. Schiro said that in late May 1992, Scarpa asked DeVecchio to come to his home; he then asked DeVecchio to find out "information" about Lorenzo Lampasi (known as Larry), such as "[t]he exact times he left his house, [and] where he worked." G.J. Tr. 75:16-76:21. Two or three days before May 22, DeVecchio returned to Schiro and Scarpa's home with the address of Lampasi's place of work and told Scarpa that Lampasi left work through a gate at 4:00 in the morning. G.J. Tr. 77:1-78:20. Scarpa killed Lampasi on May 22, 1992, and told DeVecchio he had done so about a week later. G.J. Tr. 78:21-80:3. Schiro told the Grand Jury that DeVecchio "did this smirk" and nodded his head upon receiving that information, as he had when discussing other murders with Scarpa. G.J. Tr. 80:3-8.

### B.  Trial Testimony

DeVecchio waived his right to trial by jury, and the matter went to trial before Judge Gustin L. Reichbach, with opening statements on October 15, 2007. Two weeks later, Schiro testified for the prosecution, on October 29, 2007 and October 30, 2007. (Excerpts of the trial transcript are attached as Exhibit B.)[7]

After preliminary questioning about her family and home life, Schiro stated that she had been cooperating with the District Attorney's office in the case and had received assistance from that office in moving as well as paying for rent and food. Trial Tr. 1525:19-1533:12. She then answered questions about meeting Scarpa in August 1962, beginning a relationship with him, and learning he was a "gangster." Tr. 1535:18-1543:2. Schiro next testified about Scarpa's connection to the FBI, naming Tony Villano as his handler in the 1960s, as well as describing Scarpa's assistance to the FBI in finding the bodies of murdered civil rights workers in Mississippi, solving another case in Mississippi involving the Ku Klux Klan, and retrieving a mafia member from Costa Rica. Tr. 1543:3-1554:6. Schiro then explained more personal

---

[6]   The Indictment and trial transcript use this spelling ("Lampasi"); his name is commonly spelled "Lampęsi."

[7]   Some of the exhibits bear markings and underscoring that were not on the original documents, and such markings should be disregarded.

history: she married Charlie Schiro in order not to be unmarried when she and Scarpa, who was already married to another woman when the two met, had children; she and Schiro later divorced, after which she and Scarpa moved in together; while in her mid-thirties, Schiro had an intimate relationship with Larry Mazza, with the knowledge and approval of Scarpa. Mazza eventually worked for Scarpa and was part of the Colombo family war; Scarpa spent some nights with his legal wife and children in New Jersey. Tr. 1555:14-1564:8. Schiro went on to testify about Scarpa's relationship with Villano, his FBI handler, which eventually ended. Tr. 1565:12-1571:1.

According to Schiro, Scarpa stopped working for the FBI but "a few years after that" resumed doing so; she met his new handler, "Lin" DeVecchio, in or just before 1978. Tr. 1571:5-1572:12. Schiro described her husband initially meeting with DeVecchio in DeVecchio's car and then coming to Scarpa and Schiro's home once a week to sit and talk in the kitchen. Tr. 1572:13-1579:18. Scarpa had a phone number to reach DeVecchio and the men used a code name for DeVecchio, "Mr. Dello." Tr. 1580:6-1581:20. Schiro described Scarpa giving DeVecchio money each week, or more frequently after he had completed a burglary, in neat piles secured by rubber bands; she also spoke about DeVecchio receiving jewelry, a Cabbage Patch doll, eggplant parmagiana, and wine from Scarpa. Tr. 1582:21-1591:3. Schiro explained that she was present for many conversations between Scarpa and DeVecchio regarding criminal activity. Tr. 1591:8-1595:5. She said she closed the blinds and locked the doors when DeVecchio came to her home. Tr. 1595:6-1596:18. After this introduction, Schiro went on to testify about the murders in which DeVecchio was accused of being involved.

### Count 1: Murder of Mary Bari

The first particular conversation between Scarpa and DeVecchio, Schiro recounted at trial, took place in late September 1984 and was about Mary Bari, the girlfriend of Allie Persico, a captain in the Colombo crime family who was "on the lam." Tr. 1599:8-1601:24. According to Schiro, DeVecchio told Scarpa that "[w]e have a problem with this Mary Bari" because "[s]he was looking to rat out Allie," and thus Scarpa "ha[d] to take care of this." Tr. 1601:22-23, 1602:2. Scarpa replied "that he would take care of it," and he did so by killing Mary Bari; she was told she could have a job interview at a club called Occasions, owned by Carmine Sessa, but Scarpa killed her after she arrived and then "they dumped the body right on McDonald Avenue." Tr. 1602:4-1605:8. Schiro next described the conversation Scarpa had with DeVecchio after this murder took place: the two men laughed about how close the dumped body was to Scarpa's home as well as about a phone call Schiro received from Carmine Sessa's wife telling her—according to the trial testimony, in jest—that her dog had found an ear with an earring in it while Sessa was cleaning up after the killing. Tr. 1607:24-1609:8.

### Count 2: Murder of Joseph DeDomenico

Schiro's testimony continued with a description of a conversation between DeVecchio and Scarpa in March 1986 about a close friend and crew-member of Scarpa, Joe DeDomenico, known as Joe Brewster. Tr. 1612:24-1613:24, 1614:8-1615:6. Scarpa told DeVecchio that DeDomenico "doesn't come around anymore," was committing burglaries "with an alarm guy

that Greg [Scarpa] did work with," and "was becoming this born-again Christian" who was using "[d]rugs, drinking." Tr. 1615:10-14. Scarpa asked that DeVecchio "see what you can find out about him" and DeVecchio said "he would take care of it." Tr. 1615:15-20. Later that week, DeVecchio, in a more nervous demeanor than he usually had around Scarpa, returned to report that Scarpa "was right about [DeDomenico] drinking, doing drugs, and the burglaries" so "we got to take care of this guy before he starts talking." Tr. 1616:13-1618:22. Subsequently—or at some point before Schiro moved in March 1986—DeDomenico came, at Scarpa's request, to Schiro and Scarpa's home; he arrived "high, very high, and foaming at the mouth" and, after Scarpa confronted DeDomenico about the burglaries, Scarpa "got aggravated ... because he was foaming" and "hit him." Tr. 1621:10-1622:20. Although at first Scarpa did not want to kill DeDomenico, Tr. 1622:21-1623:6, on September 17, 1987, DeDomenico was killed, on Scarpa's orders, by Scarpa's son and two other men, Tr. 1618:23-1621:9. Schiro testified that Scarpa later told DeVecchio he had asked DeDomenico to commit a murder and DeDomenico refused; Scarpa also said he felt terrible about having DeDomenico killed. Tr. 1627:4-1630:4. Scarpa described the murder to DeVecchio, telling him that three men picked up DeDomenico—who was "dressed" on instructions that he was to attend "a meeting, or a wedding, something like that"—and killed him; DeVecchio was quiet "with a smirk on his face." Tr. 1630:5-1631:16.

## Count 3: Murder of Patrick Porco

Schiro also testified at DeVecchio's trial about the death of Patrick Porco. She stated that Patrick and her son, Joey, were good friends and that the two boys "went away" to Scarpa's farm in New Jersey for two and a half weeks after the murder of Dominick Masseria on October 31, 1989. Tr. 1646:1-1647:11. In late May 1990, Schiro said, DeVecchio called her home and asked, in a tone more "[s]erious" than he usually used, to speak to Scarpa. Tr. 1647:12-25. Scarpa was on the phone only briefly; he then asked Schiro to drive him to a pay phone. Tr. 1648:6-1649:5. After speaking on the phone, Scarpa returned to the car "[r]eally upset" and explained that DeVecchio had told him that Patrick was going to "rat on Joey" regarding the murder of Dominick Masseria. Tr. 1649:9-1650:15, 1651:22-24. The couple went back home, where Scarpa told Joey what he had learned; Joey insisted Patrick "would never do that to me" but Scarpa replied that "[w]here this came from, Joey, it is a high up." Tr. 1650:14-1651:21. Scarpa decided "Fat Larry Sessa, and Joe Fish" would kill Patrick, but those men had "some kind of car trouble" on the day on which the murder was to take place, so Scarpa called John Sinagra, Linda Schiro's nephew, and sent him and Joey to kill Patrick. Tr. 1652:4-1654:11. Joey came home the next morning upset, a condition that "lasted weeks." Tr. 1654:12-1655:13. DeVecchio came to the house not long afterwards, and Scarpa told him how distraught Joey was; DeVecchio responded "[b]etter he cries now than he goes to jail" and expressed approval that Linda Schiro had attended Patrick's wake. Tr. 1657:5-1658:24.

## Count 4: Murder of Larry Lampasi

Finally, Schiro's testimony turned to the subject of Larry Lampasi's death. She described a conversation at her home between Scarpa and DeVecchio during which Scarpa exclaimed "Fucking Larry Lampasi starting rumors that I'm an informant, I'm ratting, I'm a rat" and asked DeVecchio to "find out exactly where he lives and his, you know, what time he leaves in the morning," information Scarpa wanted because "he wanted to kill" Lampasi. Tr. 1674:1-1675:4.

DeVecchio said he would "take care of" getting the information, and he returned to the house with an address, reporting that Lampasi "leaves the house like around four in the morning, and there's some kind of a gate that he's got to open and close before he leaves." Tr. 1675:5-1676:24. Schiro testified that Scarpa told her later that week that he and two other men murdered Lampasi. 1676:25-1677:14. Scarpa told DeVecchio "that was good information." Tr. 1678:14-1679:6.

On cross examination, Schiro said if she referred to Lampasi's work address, rather than that of his home, before the Grand Jury, she must have misspoken. Tr. 1880:8-1883:3.

## V. Prior Accounts

### A. FBI Investigation

In 1994, after the death of Scarpa, the FBI's Office of Professional Responsibility (OPR) conducted an investigation of DeVecchio's relationship with Scarpa.[8] Investigators interviewed Schiro as part of this effort. FBI records of these meetings indicate that Schiro admitted knowing DeVecchio and witnessing many conversations between DeVecchio and Scarpa, but she did not mention the murders of Bari, DeDomenico, Porco, or Lampasi. Rather, she claimed not to have heard the content of the conversations between DeVecchio and Scarpa. FBI Investigation Report, File # 263-HQ-1064117, at 2 (Aug. 17, 1994).

In her testimony before the Grand Jury, Schiro discussed her prior FBI interviews. She explained to the Grand Jury that before the interview, DeVecchio had told her "don't worry about it, tell them to go F themselves," and that at the interview she did not "tell everything" to the investigators because she was nervous around FBI agents. G.J. Tr. 80:19-81:14. She "could not understand why are they asking me questions about Lin DeVecchio," so she "lied to them" and said only that she had gotten her daughter a Cabbage Patch doll and made eggplant parmigiana for him. G.J. Tr. 87:20-25.

During her trial testimony, Schiro explained that she first learned that she would be interviewed when George Gabriel ("Gabriel"), an FBI agent and the handler of her second husband, John Baron, told her to expect agents to come to her home. Tr. 1688:11-1691:16. Before her interview, Schiro spoke to DeVecchio, who told her "[y]ou don't have to talk to them, you can tell them to go fuck themselves." Tr. 1691:22-1693:17. When the investigators questioned her, Schiro testified, she did not reveal the same information about Scarpa and DeVecchio's relationship she was describing in court; she "couldn't understand why FBI agents are investigating another FBI agent," and she was "kind of nervous" about the well being of her son, Joey, and did not want to jeopardize DeVecchio's ability to protect him. Tr. 1693:21-1696:25. Schiro testified that she told the investigators only that DeVecchio received a Cabbage Patch doll, a tray of eggplant parmagiana, and a bottle of Rothschild wine from herself and Scarpa. Tr. 1697:1-6. Gabriel later called Schiro to say he knew she was not divulging everything; the investigators returned and she told them about a big-screen television given to DeVecchio as well as DeVecchio's showing Scarpa a list of members of Scarpa's crew who were to be

---

[8]   Ultimately, no finding was made against DeVecchio.

arrested. Tr. 1697:7-1698:9. During neither conversation did she discuss the murders in which DeVecchio was allegedly involved. Tr. 1694:24-25; 1698:11-12. She stated in court to explain her omission that "Lin was still my friend." Tr. 1698:22-23.

### B. Book Proposals[9]

In the late 1990s and early 2000, Schiro gave interviews to several authors who were interested in writing books about her life with the now-deceased Scarpa. She presented her story to these writers with the intent of offering them an exciting story likely to generate significant interest and sales. She hoped to generate income for herself from any resulting book or movie deal. Tr. 1717-1718 ("If the book, if we get a book or whatever, book deal or movie, you know, then you get money.")

Schiro testified at trial about her interviews with three writers, who were working on three different projects: (i) Jerry Capeci (who at the time was working on a joint project with Tom Robbins); (ii) Sandra Harmon; and (iii) John Connelly. She testified that, in separate conversations, she told these writers about DeVecchio's involvement with, and assistance to, Scarpa's criminal enterprise. Schiro also testified that she expected that the writers would sensationalize her story and add fictional embellishment: "It was supposed to be a fiction. A lot of fiction and fact. . . . I was telling them fact, what they wrote, I never read." Tr. 1717. Nevertheless, she repeatedly stated that, while omitting some events and details, she told these writers only the "truth." Tr. 1717-18.

She was asked specifically at trial whether she told any of the writers about DeVecchio's involvement in the four homicides. She testified that she had not, with the sole exception of the murder of Patrick Porco. Tr. 1717-18. She testified at trial that she described DeVecchio's role in the Porco murder to the writers because she "was just so upset that what happened to Patrick because Lin had said he [had] ratted ... I loved Patrick like a son." Tr. 1709:2-1718:21.

> Q:   Did you talk to Capisi [sic] about murders?
> A:   No.
> Q:   Did you talk to him [Capeci] about any of the murders?
> A:   Oh, Patrick [Porco].
> Q:   And the reason?
> A:   Same reason. Because I loved Patrick.
> Q:   Did you talk about DeVecchio's role in that?
> A:   Yes.
>        . . .
> Q:   . . . The Judge asked you this question. I'm going to ask it one more time.
>        What you told these three writers, was it fact or fiction?

---

[9]   The book proposals are not appended to this Report. Each proposal belongs to its respective author (or authors) and it is left to them whether to disclose their own work to the public.

A:      I told the truth, what I knew, you know, about what went on.
        What they wrote, I don't know what they wrote.  I never read it.

Tr. 1717-18.

Based on the authors' records or summaries of the interviews and other available evidence, described below, Schiro did in fact tell them that DeVecchio was involved in Scarpa's decision to murder Patrick Porco.

With respect to the other murders, however, Schiro's trial testimony was directly contradicted by an audiotape recording made by Jerry Capeci ("Capeci"), at the time a reporter for the New York Daily News and an expert on the mafia, and Tom Robbins ("Robbins"), a reporter for the Village Voice.  They had interviewed Schiro together and were working jointly on a proposal for a book to be called "Scarpa: The Grim Reaper."  That audiotape recording demonstrates that Schiro did in fact discuss two of the other homicides (DeDomenico and Lampasi) with Capeci and Robbins.  In that taped discussion, she expressly exculpated DeVecchio with regard to those two homicides – in direct contradiction of her trial and Grand Jury testimony.  The written book proposal prepared by Capeci and Robbins, however, makes no mention of Schiro's statements about any of the murders, with the exception of the Porco homicide, and thus omits her exculpation of DeVecchio.  Based on the book proposals of the other writers and other evidence, it appears that she did not make any exculpatory comments to any of the other writers and that she consistently implicated DeVecchio in the Porco murder.

*(i)*

### *Disclosure of the Capeci/Robbins Tape*

On June 21, 2007, as preparations for DeVecchio's trial were ongoing, the defense subpoenaed Jerry Capeci to produce any notes, and specifically, any audiotape recordings of his interviews of Linda Schiro.  Although, as noted, Capeci had interviewed Schiro with Tom Robbins, only Capeci was subpoenaed and no subpoena was ever served on Robbins.  On July 18, Capeci moved to quash the subpoena.  In the motion papers, Capeci explained that he had interviewed Schiro in 1996-1997 to collect information for a book about Scarpa.  He also asserted that the interviews were conducted under an explicit understanding of "confidentiality" such that Schiro would not be revealed as Capeci's source of information.  The legal memorandum submitted with the motion to quash claimed the material sought in the subpoena was therefore "strictly protected" by the New York Reporter's Shield Law, Civil Rights Law § 79-h.  (*See* Exhibit F, Memorandum of Law in Support of Motion to Quash at 1).  This legal assertion, however, is weakened (if not eliminated) by the Capeci/Robbins book proposal itself, which says nothing at all about a promise to conceal her identity, and to the contrary, expressly touts Schiro as the source:  "Linda will tell that story for the first time."[10]

---

[10]    The legal memorandum also states that the materials subpoenaed are "not exculpatory."  (Exhibit F, at 4.)  That statement is incorrect.  (See, *infra*, Section VII.B and VII.D, pp. 19, 24-25.)

In the face of the motion to quash, and after a hearing before the Court on the issue, the defense withdrew the subpoena. *See* "Noted Mob Chronicler Becomes Part of Story," NEW YORK TIMES (8/2/2007); "Gangland Reporter Won't Take Stand," BROOKLYN DAILY EAGLE (8/6/2007).

The prosecution, which was in possession of the Capeci/Robbins book proposal, did not join in the request for this material or otherwise seek such discovery. Nor did it bring the Capeci/Robbins book proposal to the attention of the Court.[11]

After the commencement of the trial, Robbins wrote on October 16, 2007, that Linda Schiro was going to "swear an oath to tell the truth and, according to the prosecution's opening statement, explain how the agent sat in the couple's Bensonhurst home and told Scarpa Sr. about those who were talking to law enforcement, and where they could be found." Tom Robbins, "The Judge and the G-Man," VILLAGE VOICE (Oct. 16, 2007), http://www.villagevoice.com/news/0743,robbins,78151,2.html. He specifically noted the use of the People's opening statement that Schiro would testify that DeVecchio had told Scarpa when and where to find one of the shooting victims, Larry Lampasi. Robbins, "Tale of the Tape," VILLAGE VOICE (Oct. 30, 2007). But it was only during Schiro's cross examination, two-weeks after the opening statement, that Robbins revealed in a published article the existence of the audiotape of Schiro making exculpatory statements. Robbins, "Tall Tales of a Mafia Mistress," VILLAGE VOICE (Oct. "23," 2007),[12] http://www1.villagevoice.com/news/0744,robbins,78219,2.html/full; *see also* Michael Wilson, "Why Writers Emerged from Behind Shield," NEW YORK TIMES (Nov. 2, 2007). Robbins wrote that, now that the prosecution of DeVecchio "appears to rest on her," he felt compelled, "regardless of how distasteful it may be," to violate his promise of confidentiality. Robbins, "Tall Tales of a Mafia Mistress," VILLAGE VOICE, *supra*. The article then described the differences between the decade-old interviews of Schiro and her trial testimony, explaining that, on the audiotape, Schiro had not said DeVecchio was responsible for the murders of Bari, DeDomenico, or Lampasi, and in fact had specifically exculpated DeVecchio with regard to the DeDomenico and Lampasi murders. *Id.*

On October 31, 2007, the morning after Robbins's first article revealing the contents of his interviews with Schiro, Judge Reichbach was informed that the District Attorney, as well as DeVecchio's attorneys, had served subpoenas *duces tecum* on Robbins. Tr. 2000:13-25. Robbins's attorney appeared in court and stated that, by publishing the article, Robbins had waived his Shield Law privilege only with respect to those portions of the interviews related to the four murders and he was therefore willing to turn over the relevant excerpts. Tr. 2001:11-2003:10. The court then informed Schiro of the development and announced that the trial would not continue until the attorneys reviewed the tapes of the interviews and she obtained a lawyer. Tr. 2011:5-2017:17. Robbins published yet another story about finding the tapes and listening while tape excerpts were played to the prosecution and defense attorneys. Robbins, "Tale of the

---

[11]   Assistant District Attorney Monique Ferrell confirmed that "we [the prosecution] were only observers at the proceedings" and, as such, the prosecution team did not order the minutes of that court appearance.

[12]   The dates indicated on the online versions of the Robbins Village Voice articles do not comport with the timeline of the trial: the article dated "Oct. 23" about Ms. Schiro's cross-examination, for example, could not have been written on that day since the cross-examination occurred seven-days later, on Oct. 30.

Tape," VILLAGE VOICE (Oct. 30, 2007), http://www.villagevoice.com/news/0745,robbins, 78288,2.html.[13]

To play the recordings for the prosecution and defense attorneys, Robbins brought magnetic cassette audiotapes to the court house and, operating the tape-player, he played only select portions of the tapes: those portions that he identified as relating to any of the four murders as to which Schiro had testified.  He later re-played these same excerpts for an employee of the District Attorney's office, who digitally recorded them, and later produced copies as four separate audio files on a single compact disc.[14]

Along with the audio-recordings, Robbins voluntarily disclosed to the prosecution a set of redacted typewritten notes, consisting of twelve pages with blacked out text scattered throughout the pages. (Attached hereto as Exhibit C.)  These notes were made by Capeci and/or Robbins in the late 1990s as part of their book project and are based on the audio-recordings of their interviews of Schiro.  Robbins later made the redactions to block out text that relates to statements she made to them that, in Robbins' view, have no bearing on her trial testimony. Only some of the notes correspond to the audio files:  Some of the notes are a rough transcript of portions of the audio files (*i.e.,* not exactly verbatim but close to the actual words spoken); some are simply summaries or condensed paraphrasing of other portions of the located audiotapes that Robbins played for the prosecution and defense.  The remaining pages of notes relate to other statements that cannot be found on the four audio files, and, according to Robbins, these notes relate to statements Schiro had made to Capeci and Robbins, for which the corresponding audiotapes could not be found.

Based on the audio files (and the "transcript" notes, where indicated), Schiro made the following statements relevant to this case:

### Count 1: Murder of Mari Bari

The statements Schiro made to Capeci and Robbins about the murder of Mari Bari do not appear on any of the four audio files.  But the Capeci/Robbins notes (Ex. C) reflect the following about Schiro's statements regarding Mari Bari's death:  Schiro told them, "[All] I know is they had word she was turning. she was gonna let information out." Ex. C, at pp. 8-9.  Schiro explained that Mari Bari was directed to meet Carmine Sessa at his bar: "she goes down there. it was greg, carmine and gregory [Jr.]. and they shot her in the head." *Id.* at p. 9. The body, she told

---

[13]   Robbins and Capeci have stated that the decision to divulge the tapes was a joint decision they made together, and that they also decided that only Robbins would make the disclosure as he had "less to lose." Wilson, NY TIMES, *supra.* According to Robbins, he had, at one time, numerous other possibly relevant audiotapes, all of which are now lost. (Robbins, "Tall Tales of a Mafia Mistress," VILLAGE VOICE, *supra*).  Capeci, too, has stated that he also had other audio recordings of their interviews with Schiro, which have since been lost. Wilson, NY TIMES, *supra.*

[14]   Assistant District Attorney Ferrell confirmed that the prosecution never had "control" over Robbins' audio tapes and heard (and subsequently made digital audio-file copies of) only those portions of the tapes that Robbins allowed them to hear and copy.  As used in this Report, the term "audio files" refers to the digital copies of the audio recordings made by the District Attorney, and the term "audio tape" refers to the original magnetic cassette tapes in Robbins' possession.

Robbins, was left at McDonald Avenue, at a cemetery "down the block" from her home. *Id.* She also mentioned that Bari's ear was shot off and Sessa's dog found it, a story she reported hearing from Sessa who "came up to the house and [] was telling us what happened." *Id.* There is no mention, in this excerpted and redacted section of notes, of DeVecchio having any involvement in this killing.

### Count 2: Murder of Joseph DeDomenico

Schiro's statements to Capeci and Robbins about DeDomenico, whom she called Joe Brewster, do appear on the audio files (and a loose transcription also appears in the Capeci/Robbins notes, Ex. C at pp. 2-3, 11-12). On the audiotape, with considerable background noise of clinking glasses or china, Schiro apparently was showing Robbins and Capeci personal photographs, and came upon one of "Greg and Joe Brewster," prompting one of the interviewers to ask specifically about what Schiro knew about DeDomenico's murder. She replied, "Yeah, Greg had him killed. Greg didn't kill him, it was Billy and Mario." She is heard on the tape explaining that "Greg was saying I don't like the way he is acting, he is using coke and this Born Again Christian thing." One of the interlocutors asked a leading question, "Lin had nothing to do with Joe Brewster?" and —inconsistently with her trial testimony— she agreed, saying, "No. He never met him." (*See* Ex. C, at p. 12: "LIN had nothing to do with Joe Brewster. He never met him.") Elsewhere in the Capeci/Robbins notes (but *not* on the disclosed audio recordings), Schiro stated: "Joe Brewster was shot because Greg had asked him to do a few things and all of a sudden he started getting nervous and didn't want to do anything and Greg wanted him dead. Gregory did it. Mario and [B]illy [M]eli are going to testify about it." Ex C, at pp. 2-3.

On the audio files, Schiro can be heard saying:

> He [Scarpa] had asked Joe Brewster to do something and then, he didn't want to, and Joe Brewster started getting really stupid cause he came over one day on Avenue J, and he was kinda drooling, he was starting to use coke because he was going out with this girl from Manhattan now. And he had refused Greg something and Greg told Gregory, Billy, Mario. In fact they told him there were, had to go someplace they got all dressed up, Joe Brewster, and they killed him.

(These statements also appear, in rough transcription, in the notes; see Ex. C. at p. 11.)

### Count 3: Murder of Patrick Porco

Only a brief fragment of the audio files relates to the killing of Patrick Porco. But the Capeci/Robbins' notes purport to record extensive statements by Schiro on this topic. On the audio files, the interlocutors prompt Schiro to talk about "Patrick" and they ask, again in leading fashion, "And that's the case where the kid, where Greg gets information, I think we're talking about the case where Greg [over-talking by Schiro/unintelligible]." Schiro can be heard on this portion of the audio recording stating in response as follows:

In the car, they are driving by 15th Avenue, Ray Aviles was the driver, this other kid Chris, Joey and Patrick in the back.  Shots are fired from Ray or Chris, I don't remember which one did it, they killed this kid on 15th Avenue who everybody hated they thought he was a piece of shit kid [unintelligible].  So, now anyway, Greg sends Patrick . . . [unintelligible] . . . I think somebody Patrick knew on First, then someone to Buddy's house.  Anyway, Greg finds out after he gets a call from LIN . . . [unintelligible] . . . LIN comes . . . [unintelligible]. . . and is telling him that he got word that Patrick will talk . . . [unintelligible] . . . Now Greg brought it up to Joey.  Joey says, "come on Dad, what are you crazy, Patrick would never do that" . . . [unintelligible].

(This fragment is also reflected in the notes/transcript, dated March 8, 1997.  Ex. C, at p. 4.)

The Capeci/Robbins notes also reflect further statements by Schiro on this topic, although none of the following appears on any of the disclosed audio files:  according to their notes, Schiro also mentioned the Porco murder during an interview on February 22, 1997.  As in her Grand Jury and trial testimony, she said in that February 1997 interview that DeVecchio "called the house, and [G]reg and [I] went outside to make a call.  [I] drove him to the pay phone. ... [A]nd [G]reg got back in the car and told me that this kid [P]atrick was going to rat on [J]oey."  Ex. C, at p. 6.  She noted repeatedly that Joe Fish was supposed to be the one to kill Patrick, but "his car had broken down," so her son Joey and her nephew John instead "whack[ed] him."  Id.  At one point, she stated that Scarpa intended Joey and John to accompany Joe Fish while Joe Fish committed the murder.  Id.  Schiro told Capeci and Robbins that Joey denied that Patrick Porco would act as an informant:  "[J]oey was saying, "dad, you don't know what you're talking about, [P]atrick wouldn't do that."  Scarpa insisted, however, that the source of the information was reliable:  "[J]oe, you listen to me.  [W]here it came from [J]oey, it's..."  Id.  Schiro claimed not to know whether Joey or John actually committed the murder, admitting that "[I] just don't want to believe [J]oey did it but."  Id. at p. 7.

Robbins wrote an article describing some inconsistencies in her recounting of the story of Patrick Porco's murder.  But he noted that Schiro consistently said DeVecchio was involved.  See Tom Robbins, "Blood Brothers," VILLAGE VOICE (Nov. 6, 2007), http://www1.villagevoice.com/news/0746,robbins,78359,2.html.

### Count 4: Murder of Larry Lampasi

Schiro's statements to Capeci and Robbins about the Lampasi murder also appear on the disclosed portions of the audio tape.  On this part of the recording, there is considerable background noise, including the sound of music playing over a radio.  Over this din, Schiro can be heard stating:

And there's another thing, too, like, LIN, Larry Lampasi . . . wait let me just [unintelligible] [bang noise]. . . [sneeze]  See, when Lin is right, I give him right, he didn't tell Greg about Larry Lampasi [audio file recording goes dead immediately after this statement.]

(*See also* Capeci/Robbins notes, Ex. C, at p. 10 ("LIN didn't tell Greg about Larry Lampesi."))

On the audio file (and as is reflected in the Capeci/Robbins notes), Schiro also can be heard stating that, "what happened was," Scarpa's niece Rosemarie worked for Lampasi at the "bus company" and "she was crying to Greg" during a Thanksgiving (or other holiday) dinner that Lampasi was assigning her "crazy routes in bad neighborhoods" as a school bus driver and not allowing her to drive the bus home." *Id.* Schiro said Rosemarie told Scarpa "the times he gets in, the times he leaves. And Greg said, 'Well, I'll take care of it for you.'" *Id.* Schiro went on to say that Scarpa "did what he did and this other guy took care of [Rosemarie] she has her own bus that she drives back and forth, she does the best neighborhood in Staten Island." *Id.* She states on the tape recording, "So that, LIN didn't tell on Larry Lampasi, that I know for a fact." (See also Ex. C, at p. 10 ("So that LIN didn't do, fair is fair.") She repeated this and clearly emphasized it (as heard on the tape):

> In other words, he was there, so Greg, Greg's attitude was, you know at this time, was, you know he was going to fuck everybody, that's it. He don't give a fuck who he kills. And that, she got a job. Because now, the new owner, I don't know who the new owner was, but we were sitting there when she told Greg all about Larry Lampasi. So, that LIN did *not* tell.

(*See also* Ex. C, at p. 10 ("We were sitting there when she told everybody.").[15]

In a separate excerpt (audio file), the interlocutors asked Schiro whether she had ever heard anything about a letter that Larry Lampasi had written to Scarpa accusing him of being a "rat." Schiro can be heard on the tape responding, "No, but LIN, that, I told you about his niece." (Ex. C, at p. 5.) The questioner asked, "his niece?" and she said "Greg's." (The reference to "Lin" in her first answer, seems a *non sequitur* and, in this short segment, is not referred to again.)

Robbins, in one of his articles, wrote that, at the time of this second reference to Lampasi by Schiro, he and Capeci were aware that Lampasi's name had "come up" in a "court hearing"; he explained that was why they specifically went back and asked Schiro for her understanding about that murder a second time. On both occasions, she not only denied DeVecchio's involvement but offered the explanation that it was Scarpa's niece – and not DeVecchio – who provided Scarpa with the information he needed to hunt down Lampasi. Robbins, "Tall Tales of a Mafia Mistress," VILLAGE VOICE, *supra.*

*(ii)*

**Book Proposal by Sandra Harmon**

Sandra Harmon, ("Harmon") is an author and "relationship coach". *See* http://www.sandra harmon.com. In November 2000, she and Schiro signed an agreement giving Harmon a one-year option to pay Schiro for the rights to create a television show or movie based on Schiro's life;

---

[15]   The New York Daily News also published what it claimed were verbatim transcripts of the excerpts of the Capeci/Robbins' audiotapes that had been disclosed to the District Attorney. "Transcript from Linda Schiro's conversations with reporters," DAILY NEWS (Nov. 21, 2007) (Attached as Exhibit D).

among the details of the agreement was a provision allowing Harmon to "alter, amend, change, dramatize, fictionalize and/or omit any and all incidents and characters at her sole discretion." No such movie was made, but Harmon remained interested in writing a book about Schiro's experiences. Harmon wrote a book proposal, with the title "Scarpa's Mistress," detailing the account of Schiro's life she would present were she to publish the story. She also communicated with Assistant D.A. Michael Vecchione and Assistant D.A. Noel Downey of the Brooklyn District Attorney's office regarding the murder charges against DeVecchio.

### Count 2: Murder of Joseph DeDomenico

Harmon's book proposal includes a description of the murder of "Joe Brewster." Harmon reported that Scarpa, who was angry at DeDomenico for his use of cocaine, asked DeDomenico to murder someone, and DeDomenico refused because he "had fallen in love with a girl who was a born-again Christian, and he'd become one, as well." Sandra Harmon, PROPOSAL FOR "SCARPA'S MISTRESS," at 46. "From that day on, Joe was doomed," and Scarpa eventually arranged DeDomenico's murder: he told DeDomenico to meet him at a club to go to a wedding, but then killed DeDomenico in a car and left his body in it. *Id.* at 47. There is no mention of DeVecchio in connection with this killing.

### Count 3: Murder of Patrick Porco

Harmon recorded in an affidavit her recollection of Schiro's description of the facts surrounding the death of Patrick Porco. Harmon wrote that Schiro said Joey Schiro and his good friend Patrick Porco, among others, were involved in the murder of Dominick Masseria. Harmon Aff. ¶¶ 8, 12. She further cited Schiro as saying that DeVecchio called Scarpa, asked that Scarpa call him from a pay phone, and told Scarpa that Patrick "was going to 'rat' on Joey." *Id.* ¶¶ 16-17. On the ride home, "Greg was very quiet … telling me only that he was figuring out how to kill Patrick." *Id.* ¶ 17. Joe Fish was to shoot Patrick after Joey "lure[d] Patrick to the fatal meeting," but Joe Fish "had car trouble" and did not arrive, so Joey and his cousin John murdered Patrick. *Id.* ¶¶ 18-20. Joey was distraught, "crying through the night," and Linda Schiro went to Patrick's wake without her son. *Id.* ¶¶ 20-21.

The same story appears in slightly more detail in Harmon's proposal for *Scarpa's Mistress*. *See* Proposal, at 59-60.

#### (iii)

#### *Book Proposal by John Connelly*

John Connelly wrote a book proposal based on information from Schiro, but written without reference to her.

### Count 3: Murder of Patrick Porco

John Connelly's book proposal begins at the scene of Patrick Porco's murder, describing Scarpa in the car with Joey Schiro and Porco, forcing Joey to shoot Porco and then "consol[ing] his son,

who by now was sobbing and in shock," telling Joey "my police friend warned me Patrick was going to rat on you," and going on to explain that the friend was DeVecchio.  The book describes how Porco's body "was dumped alongside a stolen car" and set on fire.

## VI.  Further Investigation

Linda Schiro, on advice of counsel, refused to be interviewed and made no statements in this investigation, as is her right.

Interviews were sought with all the Assistant District Attorneys with any role in the DeVecchio prosecution.  The first and primary Assistant District Attorney was Noel Downey who was instrumental in the investigation and in obtaining the indictment against DeVecchio.  He refused to be interviewed on advice of counsel.

Assistant District Attorneys Monique Ferrell, Kevin Richardson, Joel Alexis, Laura Neubauer, Jackie Linares and Michael Veccione were interviewed.  Because of their involvement with immunized *Kastigar*[16] materials, Assistant District Attorney Ferrell and Assistant District Attorney Richardson could not participate in the trial.  The statements of all these prosecutors, who were each interviewed separately, can be summarized as follows:

Each of the assistants interviewed who had direct contact with Schiro either in interviewing or debriefing her and in preparing her testimony stated that she had been consistent in her recollection of the details of her allegations against DeVecchio.  They questioned her about her prior statements to the FBI in the OPR investigation, in which she specifically and expressly disavowed any knowledge of wrongdoing by DeVecchio (other than acceptance of gratuities).  Her explanation was consistent: she was concerned that DeVecchio was, at that time, instrumental in continuing to protect her interests and those of her son, Joey Schiro/Scarpa who was still alive.

They also questioned her about any interviews she gave to reporters and other writers.  Again, she told the prosecutors that, while she did not tell these writers the whole truth, she never said anything that was untrue.  Schiro told the Assistant District Attorneys that she had never spoken to any reporters about DeVecchio's role in any of the murders, except the Porco murder, which was consistent with the book proposals in the District Attorney's possession.  Also, Schiro made clear that the book treatments were never supposed to be the whole truth as the only goal was to sell the book.

Each member of the prosecution team believed that Schiro had, in the past, told various inconsistent versions of her story, often with omissions that, in her mind, were justified by her

---

[16]  *Kastigar v. United States,* 406 U.S. 441 (1972) (compelled testimony under a grant of immunity confers "use" immunity and such immunized testimony cannot be used in any fashion in any subsequent investigation or prosecution).  In order to protect a defendant's Fifth Amendment rights, a *Kastigar* hearing is held to ensure that statements by government agents that are compelled under penalty of dismissal are not used in a criminal investigation or proceeding.  *People v. Feerick,* 93 N.Y.2d 433, 441 n. 1 (1999).

desire to protect her son Joey Scarpa and, early on, DeVecchio, while she was under the impression that he was still protecting her. The prosecutors were prepared to counter any issues at trial about these inconsistencies. Each member of the team, also, expressed disbelief and distress about the unexpected discovery of the Capeci/Robbins tapes.

Some of the authors of the various book proposals and treatments were also interviewed, as well as others who had direct contact with Schiro. These interviews lead to the conclusion that – aside from Capeci and Robbins – none of the writers was aware of any exculpatory statements by Schiro about DeVecchio. With respect to Capeci and Robbins, brief contact was had with each. The conclusions here are largely based on their public statements and other available information.

Many other witnesses were interviewed for this report, including some who had testified at trial, some former members of law enforcement, some "mob" figures and hit men. Forensic analyst, Angela Clemente, who has been investigating the DeVecchio story and the Colombo family for many years, offered invaluable assistance.[17]

## VII. Discussion and Analysis

A.    Diverging Grand Jury and Trial Testimony.

There are discrepancies between Schiro's testimony before the Grand Jury and her testimony at trial. Such discrepancies are potentially perjurious because both statements were made under oath while giving testimony in court proceedings (and both were made within the five-year statute of limitations), and thus any irreconcilable difference between the two is, under Section 210.20 of the Penal Law, sufficient proof of the falsity element of perjury. (See Section III, above.) The differences in this case, however, are on the whole inconsequential and are not sufficient to bring a successful perjury prosecution.

The only discrepancy in Schiro's own testimony of any significance relates to the Lampasi homicide. On cross examination at trial, defense counsel demonstrated that Schiro could not explain why, before the Grand Jury, she had testified that DeVecchio provided information about the victim's opening and closing his place of *work*, whereas at trial, she testified that the defendant supplied Scarpa with the location of the victim's *home*, the time the victim left his home in the morning, and the fact that the victim had to exit his car to open and close a gate at his house. (Lampasi was gunned down at the gate to his home driveway on his way to work.) Her explanation -- "I was probably confused with the work and the house. That is probably

---

[17]    Ms. Clemente had lobbied U.S. Representative William Delahunt (D-Mass.), a member of the House Judiciary Committee, for hearings into allegations against FBI agents involved in organized crime investigations. During pre-hearing investigations, Rep. Delahunt uncovered discrepancies in the FBI records regarding DeVecchio and Scarpa and referred the matter to the Brooklyn District Attorney. Ms. Clemente knew many people involved in all aspects of this and numerous other mob cases, based on her work. She volunteered her materials and information and, importantly, she assisted in convincing witnesses to cooperate in this investigation. The author, Peter Lance, also volunteered relevant information he had gathered during the course of his research for his many books relating to organized crime, *inter alia*.

what it was. I meant the house" (Tr. 1880-81) -- is hardly satisfactory. From the context of her answers she clearly meant to refer to "work" as distinguished from home, and she referred to the victim's work more than once. GJ Tr. 76-77. The prosecutor in the Grand Jury proceeding prompted the witness to correct the point and to acknowledge before the Grand Jury that DeVecchio also supplied the victim's home address and the time he left. (Q:  You told us that Lin DeVecchio gave Greg Scarpa the time that he leaves; is that right?  A:  He gave him a time, I guess." GJ Tr. 78.)

This discrepancy, while not insubstantial, does not rise to an irreconcilable discrepancy within the meaning of the Penal Law.  Both the Grand Jury version and the trial version have the same general thrust:  that DeVecchio was involved in the Lampasi murder.  The difference in detail between the two versions does not make them so directly contradictory and irreconcilable that only one of the two versions could logically be correct so that the other necessarily must be intentionally false.[18]

The other relatively minor discrepancies that emerged between Schiro's trial testimony and Grand Jury testimony are apparent from the summaries above.  These distinctions for the most part amount to additional detail in the trial testimony, or omissions of detail in her Grand Jury testimony.  As such, they also do not rise to the level of irreconcilable inconsistencies.

Thus, none of Schiro's trial or Grand Jury statements are necessarily false simply by virtue of the differences between them and no perjury charge could be predicated on such differences.

      B.      Prior Inconsistent Statements.

The critical discrepancy in this case is obviously the irreconcilable difference between Linda Schiro's sworn testimony and her audiotaped interview with Capeci and Robbins.  Suspicion of perjury is justified by the undeniable fact that, on the tape, Schiro specifically exculpates DeVecchio on two of the homicide counts, and, at trial, she falsely denied making any prior statements to Capeci about those very same homicides.  Moreover, at trial she insisted that she had told Capeci (and the other writers) only the truth about DeVecchio, suggesting, falsely as it turns out, that her prior statements were consistent with her trial testimony.  In that way, a demonstrably false statement was used to bolster her credibility, raising the question of whether she was intentionally lying.

No challenge has been made to the authenticity of the tape recording.  There is no apparent reason to believe the tape is not a fair and accurate (albeit incomplete) recording of Schiro's

---

[18]   *See People v. Dunleavy*, 41 A.D.2d 717, 719 (1st Dept.) (Nunez, J., dissenting), *aff'd,* 33 N.Y.2d 573 (1973) ("for perjury by inconsistent statements, the alleged inconsistencies must be at such a variance" as to exclude the possibility that the differences were "due to mistake, fallibility of memory, lack of consciousness of the nature of the statement made or correction of prior testimony") (citations omitted).

actual statements to Capeci.[19]  Nor does there appear to be any reason to believe it has been in any way materially altered, corrupted or manipulated.[20]

The tape itself raises two potential grounds for a perjury charge.  First, the tape is direct evidence that proves the falsity of Ms. Schiro's sworn testimony that she had not made any statements to Capeci about the DeDomenico and Lampasi murders.  Second, the stark exculpatory statements on the audiotape are irreconcilable with her grand jury and trial testimony, which raises the possibility that she intentionally fabricated her testimony.  Nevertheless, upon a full review of the available evidence, including evidence corroborating central elements of Schiro's testimony against DeVecchio, no perjury charge is sustainable on either ground.

(1)     Direct Evidence of False Testimony

The tape is direct proof that Schiro actually did tell Capeci about the DeDomenico and Lampasi murders.  That is sufficient evidence to prove that her trial testimony to the contrary is false.  It may very well be that this falsehood is material; her claim not to have discussed these murders in the Capeci interview falsely bolstered her credibility in a case where her credibility is a key issue.[21]  The examination at trial on this point, however, is not sufficiently clear:  while she was asked whether she told Capeci about any of the murders and her response suggested that she spoke only about the Porco murder, she was never pinned down and asked directly whether she had discussed the DeDomenico and Lampasi murders:  "Did you talk to him [Capeci] about any of the murders?  A:  Oh, Patrick [Porco]."  Tr. 1717-18.  The prosecution did not follow up with respect to the other murders specifically, and the defense asked no questions about the Capeci/Robbins interviews.  Because her answer is literally true, although misleading, and because the questioner did not meet the burden "to pin the witness down to the specific object of the questioner's inquiry," this portion of her testimony will not support a charge of perjury.[22]

---

[19]   As noted above, only portions of this tape were disclosed and those excerpts were selected by Robbins.  Also, numerous other tapes were allegedly "lost," according to both Robbins and Capeci.  *See* n.13, *supra*.

[20]   Robbins noted in a published article that he inadvertently damaged the recording on one of the audio tapes.  He explained that he mistakenly pushed the "off" button on his cassette player while listening to the tape after locating it in his archives during the trial.  This affected the portion of the tape that was playing at the moment it was switched off.  *See* Robbins, "Tale of the Tape," VILLAGE VOICE (Oct. 30, 2007).  The prosecution, apparently, did not subject the original recording to technical, forensic analysis.  Schiro, however, never denied the authenticity of the tape.  Although she declined through her legal counsel to be interviewed in this investigation, she did give interviews to the media following the dismissal of the charges against DeVecchio; in none of those interviews did she deny making the statements attributed to her on the audiotape or otherwise raise a question as to the tape's authenticity.  *See* Sarah Wallace, "Eyewitness News Exclusive," (Nov. 19 – WABC, Nov. 9, 2007); "Mob moll Linda Schiro: 'I'm petrified of going to jail,'" DAILY NEWS (Nov. 21, 2007).

[21]   *See People v. Davis* 53 N.Y.2d 164, 170-71 (1981); *People v. Stanard,* 42 N.Y.2d 74, 80 (1977).  *See generally* Greenberg, Marcus, *supra*, § 24:8 (noting that the Court of Appeals' formulation of materiality in *Davis* is "expansive[].")  "Impeachment evidence is material where the witness whose credibility is at issue supplied the primary evidence linking the defendant to the crime."  *Orena v. United States,* 956 F. Supp. 1071, 1106 (E.D.N.Y. 1997) (Weinstein, J.).

[22]   *Bronston v. United States,* 409 U.S. 352, 360-62 (1973) ("precise questioning is imperative as predicate for the offense of perjury").  *See People v. Siggia,* 163 A.D.2d 113, 115-16 (1st Dept. 1990); *People v. Cohen,* 2001 N.Y. Misc. LEXIS 593, 2001 NY Slip Op 40322U, at *14-15 (N.Y. Sup. Ct. Nov. 1, 2001), *aff'd,* 9 A.D.3d 71 (1st Dept. 2004), *app. denied,* 2 N.Y.3d 797 (2004), *cert. denied,* 543 U.S. 927 (2004).

Another obstacle to a perjury charge related to this falsehood is the length of time that had elapsed between her 2007 testimony and the 1997 Capeci/Robbins interview. In answering questions about what she told Capeci, Schiro was recalling events from ten years ago. The prosecution did not possess the Capeci/Robbins notes or audio recording, and Capeci had refused to produce them to the defense. Without proof bearing on Schiro's own recollection or even proof that she had the ability to refresh her recollection, there is insufficient evidence to disprove that, at the time of her testimony, she had mis-remembered and believed, albeit mistakenly, that she had not discussed these two murders with Capeci and Robbins. A perjury prosecution cannot be based on evidence that is as "consonant with fallibility of memory" as with willful falsification.[23]

Taking these deficiencies of proof into account, it is highly unlikely that a perjury charge relating to this falsehood could be sustained.

> (2)    Circumstantial Evidence of False Testimony

The audiotape of Schiro's own inconsistent statements to Capeci is evidence that tends to show that Schiro's statements made under oath before the Grand Jury and at trial were materially false. Because those taped statements were neither under oath nor part of any proceeding before any legal body (and because they occurred outside of the statute of limitations period), they are not, however, sufficient to prove perjury without other proof of the falsity of her sworn testimony. In fact, although the taped statements may be admissible hearsay against Schiro as admissions, they are not dispositive proof of the truth of the matters asserted; just because she said it in 1997 does not necessarily make it so.[24] Schiro, therefore, cannot be legally culpable of perjury without additional evidence corroborating her earlier statements and thus demonstrating the falsity of her sworn assertions. While the statements exculpating DeVecchio on the audiotape obviously cast doubt directly on her contrary trial testimony, there is no direct evidence that she fabricated her testimony against DeVecchio. Any perjury charge based on that theory could be proven only by circumstantial evidence.

A review of the circumstances of this case show that there are a number of reasons to be concerned about Schiro's truthfulness and intent:

- History of Lying:  Schiro admitted under oath that she had routinely lied to government officials. For example, she admitted she lied to federal investigators conducting the OPR

---

[23]   *People v. Samuels,* 284 N.Y. 410, 417 (1940); *see People v. Lombardozzi,* 30 N.Y.2d 677, 678-679 (1972).

[24]   *People v. Chico,* 90 N.Y.2d 585, 587-591 (1997) (prior statements inculpating third party, although insufficient without corroboration, were admissible hearsay against defendant as "admissions" for hindering prosecution charge); *see generally Reed v. McCord,* 160 N.Y. 330, 341 (1899) (such admissions are "competent, although not conclusive evidence of the facts admitted"); Prince, RICHARDSON ON EVIDENCE §§ 8-201, 8-212 (2005) (weight and probative value of admission is for jury). In addition, the accused may not be convicted "solely upon evidence of a confession or admission made by him without additional proof that the offense charged has been committed." CPL § 60.50; *see Chico,* 90 N.Y.2d at 589-91.

review out of fear, and concern for her son, Joey Schiro, and because DeVecchio told her to lie. (Tr. 1692, 1694-1700).

- Impugned Motivation. The cross examination at trial suggested that Schiro's accusations against DeVecchio were motivated by a *quid pro quo* deal she made with Carmine (Alley Boy) Persico (another major organized crime figure). Under questioning, Schiro never admitted she had such an understanding with Persico, nor is there any direct evidence to support that claim. But she did admit that she had asked Persico for his help in collecting Scarpa's loan shark money and that her appeal to Persico occurred around the time that she began making the allegations against DeVecchio. Tr. 1812-22 *et seq.* In addition, Schiro admitted that her initial motivation in implicating DeVecchio was *not* to assist law enforcement, but rather was to sell a sensational book or movie deal in the late 1990s. It was almost a decade later – after no book or movie deal ever materialized – that she agreed to cooperate with law enforcement.

- Other Prior Inconsistent Statements. Schiro admitted at trial that she told FBI Agent George Gabriel that the press reports about DeVecchio tipping Scarpa about the whereabouts of Colombo soldiers during the 1992 war were "lies" (Tr. 1844): "You told him [Agent Gabriel] that DeVecchio *never provided* Scarpa with any information about where Colombo family members were hiding during the war? A: Yes. Q: Was that the truth. A: That I told that to George Gabriel? Yes." Tr. 1847-48 (emphasis added). Although she evades the second question, the first answer (as well as the evasion) undercuts Schiro's Lampasi testimony: Lampasi was a Colombo soldier killed during this time period.

- Other Prior Statements to the Writers. To the extent she talked about some of the murders in other interviews, she omitted any mention of DeVecchio with respect to the Bari and DeDomenico killings. So, for example, in recounting the DeDomenico murder to Harmon, Schiro did not accuse DeVecchio of being involved; and in the Capeci interview, she described Scarpa plotting the murder of Mary Bari but omitted any statement inculpating DeVecchio in that killing. At trial, she explained that, at the time she made these omissions, she still viewed DeVecchio as a "friend." But the credibility of that explanation is severely undermined by her willingness nevertheless to implicate DeVecchio – despite her desire to protect a friend – in the Porco murder. In fact, the one point on which she was unfailingly consistent was her assertion that DeVecchio was involved in the Porco murder – an assertion that she made to each of the three writers. (*See* the attached comparison chart, Exhibit E.)

C.    Evidence Consistent with Schiro's Testimony

Counterbalancing these factors, however, are other factors that support Schiro's testimony in critical respects and corroborate her accusations about DeVecchio's improper assistance to Scarpa's criminal enterprise. Evidence that suggests that her testimony against DeVecchio was not intentionally fabricated includes:

- Porco Murder.  In her interviews with the writers, Schiro consistently implicated DeVecchio in the murder of Patrick Porco, as she did at the Grand Jury and at trial.  And the details she gave to each writer about that murder are also consistent.  (See attached comparison chart, Exhibit E.)

- DeVecchio's Assistance to Scarpa.  Schiro's testimony about the close – and improper – relationship between DeVecchio and Scarpa was also corroborated through other witnesses at trial.  The testimony of FBI Special Agent Christopher Favo ("Favo"), for example, described an incident where DeVecchio tracked down information to assist Scarpa in his loan-shark operations. Tr. 463-466.  In other testimony, this same agent described how he overheard DeVecchio informing Scarpa on the "hello phone" (an untraceable government phone used with informants) that the New York City Police Department had someone in custody who had just been arrested (an obvious reference to Carmine Imbriale, another member of the Colombo crime "family"); Favo also testified that he heard DeVecchio say in that phone call that he (DeVecchio) did not know yet what Imbriale was saying about "him" (meaning Scarpa). Tr. 472-473.  This incident so unnerved Favo that he took drastic steps to ensure the safety of Imbriale, including telling DeVecchio to warn Scarpa not to try to harm him. Tr. 479-481.  Eventually, Favo even began withholding information about mob informants from DeVecchio, who at the time was Favo's direct supervisor. Tr. 508, 511-12.  In addition, Favo testified about yet another episode where he overheard the defendant disclose highly sensitive and confidential information to Scarpa. Tr. 637-38 (portion under seal).  When the decision was made months later to arrest Scarpa, Favo intentionally kept the information from DeVecchio until Scarpa was arrested. Tr. 520.

- DeVecchio's Reaction to the Lampasi Murder.  Favo also testified at trial about informing DeVecchio of the Lampasi murder and a shooting of another of Scarpa's rivals that happened around the same time. Favo testified that, in response, DeVecchio made his now infamous excited utterance: "we are going to win this thing." Tr. 505.  That comment was so out of place that Favo was compelled to state, "we are the FBI.  We are not on either side." Id.  And, of course, DeVecchio's bizarre remark lends some credence – however faint and far removed – to Schiro's testimony that DeVecchio himself had some interest and involvement in the killing of Lampasi; it is more consistent than inconsistent with Schiro's testimony.

- FBI Complicity of Tolerance and Silence in Scarpa's Murders.  Among the most alarming evidence reviewed here is that which strongly suggests that the FBI continued to work with Scarpa as a registered top echelon FBI informant even though at least some FBI agents, including DeVecchio, were fully aware that Scarpa had been directly responsible for multiple murders and continued to use criminal violence, including murder. Favo testified that, during the Colombo "war," Scarpa had been stripped of his status as an informant, but that DeVecchio orchestrated re-instating him as a top echelon informant, and that, in doing so, DeVecchio made knowingly false representations to the

main office of the Department of Justice about Scarpa's involvement in a murder plot.[25] Tr. 482-88, 500-502. Although at the trial of DeVecchio, Favo denied having any concrete evidence of Scarpa committing murders in this time period, witnesses (insisting on anonymity) have come forward who have credible evidence to the contrary. *See also* Tr. 355-56, 360-77 (Special Agent Jeffrey Tomlinson testimony regarding evidence of Scarpa's attempted murder of Joe Cacace); Tr. 507-08 (Favo also learned from Joseph Ambrosino, another Colombo conspirator, that Scarpa and his "hit squad" had gunned down Cacace). These witnesses corroborate a central allegation of Schiro's testimony and the District Attorney's theory of the case against DeVecchio: that DeVecchio was aware of and furthered Scarpa's murderous criminal enterprise.[26]

- <u>Other Corroborating Evidence</u>. The anticipated testimony of critical witnesses, like Gregory Scarpa, Jr., would also have bolstered key parts of Schiro's trial testimony (as discussed in the next section of this Report). The dismissal of the charges, however, truncated the trial record, and some of the corroborating witnesses were not called as a result.

In light of these circumstances and other evidence presented by the District Attorney which generally corroborate Schiro's testimony, the circumstantial evidence, on balance, is insufficient proof of the falsity of her statements at trial. Accordingly, the inconsistencies between Schiro's description of facts to Capeci and Robbins and during the proceedings against DeVecchio are not actionable under the law of perjury.[27]

### D.     Other Reasons to Decline Prosecution

In addition to the circumstantial evidence bearing on the question of falsity, there are a number of open issues that would, in the final analysis, undermine the integrity of any prosecution for perjury. The most salient of these are unanswered questions about the timing of the release of the Capeci/Robbins audiotapes.

---

[25]  *See* Justice Gustin Reichbach's decision, which includes a dramatic discussion of the corrupt relationship between the FBI and Scarpa, *People v. Roy Lindley DeVecchio*, 2007 NY Misc. Lexis 7827 (November 1, 2007) (attached as Exhibit G).

[26]  I outline in an Addendum other unanswered questions about the FBI's tolerance of Scarpa's criminal conduct. My investigation into the circumstances of Schiro's testimony raised many troubling questions about the DeVecchio-Scarpa relationship and about whether the federal government conducted an unbiased and honest assessment of these issues. I am compelled to identify them as open issues beyond my purview.

[27]  In addition, Schiro's personal medical history presents another obstacle. The period in which she was interviewed by Capeci/Robbins in 1997 was not long after she had suffered the loss of her common law husband, Gregory Scarpa, Sr. (who died in 1994) and her son, Joey Schiro/Scarpa (who was murdered in 1995). Her medical records show that she was, for years afterward, clinically depressed, that she was as a consequence heavily medicated, and that she had suffered some psychiatric problems, including reduced ability to concentrate. While clearly not dispositive, this documented medical condition during the same time period of the Capeci/Robbins interviews would offer another potential avenue of defense against any perjury charge. *See* Tr. 1704-08.

The press has been an invaluable force in ensuring transparency with respect to the workings of government and in uncovering information otherwise hidden from public view. That happened here, to the credit of Jerry Capeci and Tom Robbins. However, the question that is relevant to this perjury investigation is why Schiro's statements were not revealed until the eleventh hour, as a "surprise" to both parties after two-weeks of trial. First, it is difficult to understand why the defense withdrew its pre-trial subpoena for the Capeci materials, as well as why the prosecution did not join in the application for this discovery. Given that Schiro had already been publicly revealed as the "source" against DeVecchio, there is a compelling argument that the Shield Law did not apply. The case law supports the conclusion that the source in this case, Linda Schiro, waived any confidential status herself by virtue of identifying herself to law enforcement and cooperating with the District Attorney; once that occurred, the absolute confidentiality provisions of the Shield Law, logically and legally, no longer applied.[28] Certainly, by virtue of her Grand Jury testimony and impending trial testimony, Schiro's interview statements about the four murders had lost any "confidential" status.[29]

Nor would Capeci have prevailed under the Shield Law provisions that protect non-confidential information. Where, as in this case, the non-confidential information is highly material and relevant, necessary to the proceeding, and not obtainable from any alternative source, it is discoverable.[30] This standard would have been satisfied here, given the nature of Schiro's testimony and its centrality to the government's case.

In light of this legal authority, moreover, one must ask why Capeci claimed privilege in the first place when faced with the trial subpoena. The Shield Law, of course, does not *prohibit* reporters from coming forward with critical evidence: it only prevents the government from *compelling* such disclosure under certain circumstances. Here, Schiro had already elected to come forward, had testified before the Grand Jury and had been publicly identified as the primary testifying witness against DeVecchio. It was public knowledge that she would be testifying at trial. Consequently, it is difficult to understand Capeci's and Robbins's reason for remaining silent when they knew they had critical evidence. These reporters knew and wrote about the fact that Schiro was the State's star witness, one on whom the whole case turned – indeed the only

---

[28]   *See Andrews v. Andreoli*, 92 Misc. 2d 410, 420 (Sup. Ct. Onondaga Co., 1977) (reporter's source later identified himself to law enforcement, "waiving the confidentiality which undergirds the journalist's statutory privilege"); *People v. Craver*, 150 Misc. 2d 631, 632-33 (Sup. Ct. Albany Co., 1990) (once the "source has been identified, confidentiality is not at issue"). "[I]t was not the intent of the Legislature in enacting the shield law to protect that which has already been exposed to view." *People v. Zagarino*, 97 Misc. 2d 181, 192 (Sup. Ct., Kings Co., 1978) (undercover officer's statements to reporter that contradicted grand jury testimony were not "confidential" for purposes of shield law because, while identity of the source was not revealed in the published articles, the officer's identity was known to law enforcement and would be revealed at the upcoming trial).

[29]   *See People v. LeGrand*, 67 A.D.2d 446 (2d Dept. 1979) (information was non-confidential where intention was to publish the information in a book eventually and where the source had already testified to the material in the Grand Jury and at trial); *see also In re Air Crash at Belle Harbor*, 241 F.R.D. 202, 204 (S.D.N.Y.), *app. dism.*, 490. F3d 99 (2d Cir. 2007) (disclosure of the "confidential" material to attorney abrogated the Shield Law privilege).

[30]   Civil Rights Law § 79-h(c); *Sullivan v. Hurley*, 167 Misc.2d 534 (Sup. Ct. Queens Co. 1995). *E.g., People v. Nasser*, 15 Misc.3d 499, 503 (Sup. Ct., Westchester Co., 2007) (witness' statements to reporter that contradicted subsequent trial testimony were not protected under three-part standard).

witness still alive, aside from the defendant, who could talk about the secret meetings between Scarpa and his alleged FBI source.  One must ask why Capeci and Robbins did not, at least, inform the District Attorney that they had tapes relating to Schiro that were material to the District Attorney's prosecution and might well exonerate DeVecchio.  Later, by their own account, they were compelled to disclose the audiotape out of a sense of civic duty to basic justice – to not stand by and see the criminal justice system perverted in a way that had dire consequences for a man facing life in prison.  If that noble sentiment applied at the end of the case, it so applied, *a fortiori,* from the outset.

Capeci and Robbins might have prevented the entire trial by early, pre-trial disclosure of the audiotapes – or, at the very least, disclosure after having heard the District Attorney's opening statement.  Instead, their timing maximized the burden on all the parties (especially the accused); led to a regrettable waste of judicial and law enforcement resources; disrupted the trial in a manner that was most likely to bring disrepute on the entire criminal justice system; and, instead of protecting their source, disgraced her and exposed her to criminal investigation for perjury.[31]

One must also ask why the District Attorney's Office did not pursue discovery of the Capeci/Robbins audiotapes, either with them privately or through the Court.  The District Attorney's office in press reports stated that no effort had been made to obtain the Capeci material because "the expectation was they wouldn't share the information."  Matt Nestel, Alex Ginsberg, "D.A. Played Dumb," NEW YORK POST (11/3/2007).  Nevertheless, the prosecution certainly could have asked Linda Schiro to release these authors from any vestige of the confidentiality requirement (if one even existed).  And they certainly had a good faith basis on which to challenge, before the Court, any legal claim of privilege.

Whatever the answers to questions about the delay in discovery of the Capeci/Robbins audiotapes, any prosecution of Linda Schiro on charges of perjury would likely be clouded by these and similar issues.

Finally, it bears noting that, ironically, the dismissal of this case, after the implosion of Linda Schiro, also creates some difficulties as to any perjury prosecution of her.  Because the trial was terminated, certain witnesses' testimony was lost, likely permanently.  As discussed above, a number of other witnesses, some accomplices, who were interviewed here, corroborate many details of Schiro's testimony, certainly as to Porco's murder.  They also support Schiro's credibility as to her intimate relationship with Scarpa and access to his greatest secrets, although most could be impeached by their own backgrounds and involvement in many serious crimes, some at issue here.  Gregory Scarpa Jr., for example, had been brought east from a maximum security federal penitentiary in Florence, Colorado and kept for months in New York City to be called as a witness at trial.  Despite severe credibility problems, his testimony potentially would have corroborated Schiro in some critical ways.  He was directly involved in much of his father's criminal activity and he kept the financial books for his father's criminal enterprise.  In that way, like Linda Schiro, he too had access to the innermost workings of Scarpa's criminal enterprise.  He also admitted to having participated in Mari Bari's murder and would reportedly have

---

[31]   The purpose of the "confidentiality" requirement was to protect Schiro – and indeed, Mr. Capeci espoused that very purpose in his motion to quash the subpoena.

corroborated Schiro's testimony specifically as to that murder. He was never called as a witness.[32]

In his ultimate written decision granting the prosecutor's motion to dismiss, Judge Reichbach, the trier of the fact, stated: "It was *only* the discredited testimony of Linda Schiro that tied the defendant to any of the crimes charged in the indictment." *People v. DeVecchio,* 2007 NY Misc. LEXIS 7827, at *3 (NY Sup. Ct. Nov. 1, 2007) (emphasis added) (Exhibit G). The interesting question, that will now most likely never be answered, is whether that assessment (at least, perhaps, as to the Bari murder) would have changed had Scarpa, Jr. had the opportunity to testify.

In addition, the case was dismissed before the cross-examination of Linda Schiro was concluded. We do not know whether DeVecchio's defense counsel had intended to question her about her interview with Capeci and Robbins. We will never know what her response would have been had they confronted her (with or without the tapes) with questions designed to imply that she had in fact exonerated DeVecchio as to the Lampasi and DeDomenico murders. Perhaps she had some explanation that the limited tape excerpts do not, on their own, reveal.

Finally, one cannot presume to second guess the decision by Brooklyn District Attorney Charles Hynes to move for dismissal of all charges against DeVecchio. Faced with the unique complexity of this situation, and weighing the large societal issues of corruption and organized crime as well as fairness to the accused, the District Attorney made the decision that was his responsibility alone to make. Whether or not other possibilities existed, the decision to end the case was certainly one that comports with, and honors, the highest ideals of the Office of District Attorney.

---

[32] Scarpa, Jr., received a "cooperation" letter, post-trial, addressed to federal authorities from the Kings County District Attorney. That letter, the contents of which were disclosed to me on condition that the letter itself not be published, praised Scarpa, Jr.'s cooperation with the District Attorney's Office and suggested that he would have significantly corroborated Schiro had he testified. (*See also* Exhibit J, Letter, dated April 23, 2007, from U.S. Rep. Dana Rohrabacher, commenting favorably on Gregory Scarpa Jr.'s "credibility as a witness"; and, Mark Sherman, "FBI Waited to Check Out Tip on Nichols," ASSOCIATED PRESS (April 14, 2005).

## VIII. Conclusion

Accordingly, for the reasons set forth above, I conclude that Linda Schiro's testimony before the Grand Jury and at trial did not violate the perjury laws of the State of New York, and no charge of perjury is sustainable on the available evidence.

Dated: New York, New York
       October 22, 2008

                              SPECIAL DISTRICT ATTORNEY OF THE STATE OF
                              NEW YORK, COUNTY OF KINGS

                              Leslie Crocker Snyder

## Addendum

I was given a specific mandate as Special District Attorney: to determine whether Linda Schiro could be prosecuted for perjury. Early on I attempted to interview numerous witnesses in addition to interviewing the Assistant District Attorneys involved in the prosecution; few of the witnesses agreed to cooperate. Nevertheless, I felt that I could proceed without them and without empanelling a Grand Jury and still reach a conclusion based upon the law. When I had almost concluded my report, months ago, I suddenly was contacted by a number of people claiming to have pertinent information who were now willing to talk to me[*] as long as their identity was not revealed publicly. Each was interviewed separately.

Most of what they related went well beyond the mandate in the appointment order but also went well beyond mere background. They corroborated each other in large measure in describing the murders involved in the DeVecchio indictment, information which gave general support to Linda Schiro's grand jury and trial testimony.

They also each painted a portrait of the on-going "Mafia Wars" between the two factions of the Columbo crime family, the Persico faction and the Orena faction. (The federal authorities prosecuted well over 60 of these mob cases, with mixed results, and were determined to eradicate as much of the mafia as possible. *See* Exhibit G, Judge Reichbach's decision in *People v. DeVecchio*.)

In summary form, after hours and hours of conversations with these witnesses and reading materials (trial transcripts, appellate records, FBI and New York City police forms and other documents), I feel compelled to raise some of the many issues which warrant further investigation by an appropriate agency or some other investigative body:

---

[*]   Largely thanks to Angela Clemente, as noted.

1)      Did DeVecchio pass information to Scarpa Sr. regularly, setting aside the four

murders charged in the indictment?  Witnesses, and possibly records, appear to exist which

would be probative of this issue.  (*See, e.g.,* Exhibit H, May 8, 1995 Letter from U.S. Attorney's

Office, Eastern District of New York ).

2)      Is there probative evidence that the FBI – or at least DeVecchio – knew that

Scarpa Sr. was ordering, and committing, numerous murders and, nevertheless, allowed him to

continue his status as a top echelon FBI informant?  (Sealed evidence and interviews with

witnesses known to the government support this conclusion.)  (*See* Exhibit G, Justice

Reichbach's decision in *People v. DeVecchio,* 2007 NY Misc. Lexis 7827 (NY Sup. Ct. Nov. 1,

2007); Exhibit I, FD-302 (Feb. 6, 1994), FBI Agent Christopher Favo; Affidavit of Christopher

Favo, sworn to April 4, 1994, Wash. D.C.)

3)      Was there an effort by the FBI to protect Scarpa and DeVecchio in order to

protect/insulate/preserve numerous mob prosecutions and some convictions relating to the

Columbo crime family?  (*See United States v. Persico,* 1997 U.S. Dist. LEXIS 23290, at * 33-35

(E.D.N.Y. Mar. 13, 1997)'(Sifton, J.) (ordering new trials as to some mob defendants and

observing that the government improperly delayed disclosure of the fact that DeVecchio "had

become involved with Scarpa to a wholly unacceptable degree" and that "disclosures relating to

possible improprieties by law enforcement were produced [even] more slowly"), *rev'd sub nom.,*

*United States v. Orena,* 145 F.3d 551 (2d Cir. 1998) (reversing on grounds that the evidence of

DeVecchio's duplicity as catalogued by the trial court was not "material" for purposes of the

*Brady* doctrine in the face of overwhelming evidence of the mob defendants' guilt).

4)      Was Detective Joseph Simone, of the New York Police Department, a scapegoat

for the misconduct of others, as a number of people who came forward have suggested?

5)      Were the FBI agents who reported their suspicions regarding DeVecchio shunned and ostracized?  And did they later modify their positions regarding DeVecchio?

6)      Why was DeVecchio allowed to retire with a full pension, despite the Government's acknowledgment that he leaked information to a murderous informant, and why was he granted immunity after he invoked his Fifth Amendment privilege in post-conviction proceedings related to convictions in the Colombo War?  *See Orena v. United States,* 956 F. Supp. 1071, 1090 (E.D.N.Y. 1997) (Weinstein, J.) (in a hearing challenging convictions related to the Colombo "War," DeVecchio, having invoked his Fifth Amendment privilege, was granted immunity and testified about the allegations regarding his improper relationship with Scarpa; the trier of fact expressly found that, as compared to FBI Agent Favo, DeVecchio "proved a far less credible witness whose memory lapses were not believable"). *See also* Exhibit H, May 8, 1995 Letter from U.S. Attorney's Office, Eastern District of New York.

7)      Have any of the witnesses, potential witnesses, or people who cooperated in the DeVecchio investigation and/or prosecution been harassed by various agencies because of their cooperation, as many of these individuals now claim?


Others have previously raised many of these issues, especially in the context of the difficulties and dangers involving the use of informants by law enforcement.  And some of the sources supplying information with respect to the DeVecchio/Scarpa matter are criminals.  My mandate does not allow me to reach any conclusions as to these issues – and far more investigation would be required before any reliable conclusions could be reached.  Nevertheless, a dramatic picture of corruption with numerous unanswered questions exists.